**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ROBERT MARTINO, *et al*.,

              Plaintiffs,

    v.

ISLAMIC REPUBLIC OF IRAN,

              Defendant.

---

Case No. 1:21-cv-01808-RDM

**<u>PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT
ON BEHALF OF BELLWETHER PLAINTIFFS
AND MEMORANDUM IN SUPPORT THEREOF</u>**

## **<u>TABLE OF CONTENTS</u>**

I.  INTRODUCTION ................................................................................................. 1

    A.  The Bellwether Attacks and Plaintiffs .................................................... 7

    B.  Framework of the Bellwether Motion...................................................... 8

II.  PROCEDURAL HISTORY.................................................................................. 8

III.  THE 25 BELLWETHER ATTACKS ................................................................ 11

    A.  Improvised Explosive Device ("IED") Attacks .................................... 15

        Attack #1.  July 21, 2004 IED Attack in Ad Duluiyah, Saladin
Province that Killed U.S. Army Private First Class Nicholas H.
Blodgett  ...................................................................................... 17

        Attack #2.  April 28, 2005 IED Attack in Tal Afar, Nineveh Province
that Killed U.S. Army First Lieutenant William Anthony Edens
and U.S. Army Specialist Ricky William Rockholt, Jr............................ 18

        Attack #3.  August 21, 2005 IED Attack in Al-Karmah, Al Anbar
Province that Wounded U.S. Marine Corps Sergeant Adam C.
Kisielewski.................................................................................... 19

        Attack #4.  June 9, 2006 IED Attack in Al Qaim, Al Anbar Province
that Killed U.S. Marine Corps Lance Corporal Brent Basil Zoucha ........ 20

        Attack #5.  February 8, 2007 IED Attack in Al-Karmah, Al Anbar
Province that Killed U.S. Army Sergeant Ross Aaron Clevenger........... 21

        Attack #6.  February 11, 2007 Shaped-Charge IED Attack in Al-
Karmah, Al Anbar Province that Killed U.S. Army Sergeant
Russell A. Kurtz............................................................................ 22

        Attack #7.  March 5, 2007 IED Attack in Samarra, Saladin Province
that Killed U.S. Army Staff Sergeant Justin Michael Estes .................... 23

        Attack #8.  April 7, 2007 IED Attack in Zaganiyah, Diyala Province
that Killed U.S. Army Captain Jonathan Grassbaugh, U.S. Army
Private First Class Rodney Lynn McCandless, and U.S. Army
Specialist Levi Kenneth Hoover ...................................................... 25

        Attack #9.  May 28, 2007 IED Attack in Abu Sayda, Diyala Province
that Killed U.S. Army Specialist James E. "Jimmy" Summers, U.S.
Army Specialist Zachary David "Bubba" Baker, and U.S. Army
First Lieutenant Kile G. West ......................................................... 26

        Attack #10.  October 14, 2007 IED Attack in Arab Jabour
Neighborhood of Baghdad that Killed U.S. Army Sergeant First
Class Justin S. Monschke.............................................................. 27

        Attack #11.  October 24, 2007 IED Attack in Baiji, Saladin Province
that Killed District of Columbia U.S. Army National Guard
Sergeant First Class Robin L. Towns, Sr........................................... 28

Attack #12.     January 9, 2008 House-Borne IED Attack in Sinsil, Diyala Province that Killed U.S. Army Staff Sergeant Jonathan Killian Dozier, U.S. Army Sergeant Zachary Wade McBride, and U.S. Army Sergeant First Class Matthew Ignatius Pionk ................................. 29

B.     Complex Attacks ................................................................................. 30

Attack #13.     April 9, 2004, Complex Ambush Attack in Abu Ghraib, Baghdad Province that Killed U.S. Army Reserve Sergeant Elmer C. Krause and Kellogg, Brown & Root ("KBR") Civilian Contractors Stephen F. Hulett, Timothy E. Bell, Tony Duane Johnson, and Jack A. Montague ................................................ 31

Attack #14.     April 11, 2004 Complex Attack Near Mahmudiyah, Babil Province that Killed U.S. Army Sergeant Major Michael B. Stack ......... 33

Attack #15.     June 12, 2007 Complex Attack in Baqubah, Diyala Province that Killed U.S. Army Corporal Damon LeGrand .................... 34

Attack #16.     January 28, 2008 Complex Attack in Mosul, Nineveh Province that Killed U.S. Army Sergeant James Edward Craig, U.S. Army Corporal Evan Andrew Marshall, and U.S. Army Private Second Class Joshua Young ........................................................ 35

C.     Suicide Bombings ................................................................. 36

Attack #17.     May 14, 2004 Suicide Vehicle-Borne IED Attack in Balad, Saladin Province that Killed U.S. Army Sergeant James W. Harlan ....... 38

Attack #18.     October 14, 2004 Suicide Attack in Baghdad, Baghdad Province that Killed John Albert Pinsonneault ......................................... 39

Attack #19.     December 21, 2004 Suicide Attack on Forward Operating Base Marez, Mosul, Nineveh Province that Killed Maine U.S. Army National Guard Staff Sergeant Lynn Robert Poulin, U.S. Army Staff Sergeant Julian Melo, and U.S. Army Private Lionel Ayro   40

Attack #20.     December 9, 2005 Suicide Vehicle-Borne IED Attack in Abu Ghraib, Baghdad Province that killed U.S. Army Specialist Adrian N. Orosco ...................................................................... 41

Attack #21.     April 10, 2009 Suicide Vehicle-Borne IED Attack in Mosul, Nineveh Province that Killed U.S. Army Corporal Jason G. Pautsch, U.S. Army Staff Sergeant Bryan E. Hall, U.S. Army Sergeant Edward W. Forrest, and U.S. Army Staff Sergeant Gary L. Woods ................................................................................ 42

D.     Small Arms, Rocket-Propelled Grenade, and Anti-Aircraft Attacks ................... 43

Attack #22.     January 20, 2007 Anti-Aircraft Attack in Bahrez, Diyala Province that Killed Iowa U.S. Army National Guard Command Sergeant Major Marilyn L. Gabbard ........................................ 43

|  | Attack #23. | February 18, 2007 Small Arms Fire Attack in Ramadi City, Al Anbar Province that Killed Private First Class Kelly David Youngblood | 45 |

| E. | Indirect Fire | 46 |

|  | Attack #24. | April 24, 2004 Artillery Attack in Taji, Baghdad Province that Killed Arkansas U.S. Army National Guard Captain Arthur L. Felder and U.S. Army Staff Sergeant Billy J. Orton | 47 |

|  | Attack #25. | May 25, 2004 Artillery Attack in Iskandariya, Babil Province that Killed Vermont U.S. Army National Guard Sergeant Alan N. Bean | 48 |

IV.     LEGAL STANDARD ............................................................................ 49

V.      THE COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS ........................................................................... 55

A.      Plaintiffs Seek Money Damages for Personal Injury or Death ............................ 56

B.      The Bellwether Plaintiffs were Injured or Killed During Terrorist Attacks that Constituted Extrajudicial Killings .................................................. 57

C.      Iran Provided Material Support for the Extrajudicial Killings that Proximately Caused Plaintiffs' Damages .......................................... 65

1.      Iran Provided Material Support for the Sunni Terrorist Groups Who Carried Out the Bellwether Attacks ................................... 67

2.      Iran's Material Support to the Sunni Terrorist Groups Was a Proximate Cause of the Bellwether Attacks .............................. 91

D.      Iran Was a Designated State Sponsor of Terrorism at the Time of the Attacks and at the Time This Action Was Filed .............................. 119

E.      Every Plaintiff Was a U.S. National and, in Some Instances, Also a U.S. Armed Forces' Member .................................................. 120

F.      Iran Is Not Entitled to Arbitration Because Each Bellwether Attack Occurred Outside of Iran ................................................... 120

VI.     THE COURT HAS PERSONAL JURISDICTION OVER IRAN ................................ 121

VII.    IRAN IS LIABLE FOR PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 1605A ........... 122

VIII.   THE BELLWETHER PLAINTIFFS SUFFERED SUBSTANTIAL PHYSICAL AND PSYCHOLOGICAL INJURIES ENTITLING THEM TO DAMAGES AGAINST IRAN ..................................................................... 123

A.      Damages Awarded Under 28 U.S.C. § 1605A .................................. 123

1.      Pain and Suffering Damages.................................................. 126

2.      Solatium Damages ............................................................... 130

3.      Economic Damages ............................................................. 176

**4.**     Prejudgment Interest ........................................................................ 177

**5.**     Punitive Damages ............................................................................. 178

**6.**     Post-Judgment Interest ..................................................................... 180

B.     Additional Requests for Specific Relief in Judgment Submission .................... 186

**1.**     Plaintiffs' Request That a Final Judgment Be Issued Prior to July
1, 2024 ............................................................................................... 186

**2.**     Judgment Language Sufficient to Satisfy Service Pre-requisites
Under 28 U.S.C. § 1608(e) ............................................................... 188

**3.**     Judgment Language Specifying Service Should Proceed Under 28
U.S.C. § 1608(a)(4) ........................................................................... 189

IX.     CONCLUSION ............................................................................................... 190

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                       **Page(s)**

*Akins v. Islamic Republic of Iran*,
    332 F. Supp. 3d 1 (D.D.C. 2018) ...............................................................................54, 55, 68

*Anderson v. Islamic Republic of Iran*,
    753 F. Supp. 2d 68 (D.D.C. 2010) .........................................................................................55

*Anderson v. Islamic Republic of Iran*,
    839 F. Supp. 2d 263 (D.D.C. 2012) ....................................................................................131

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ...............................................................................................................50

*Asemani v. Syrian Arab Republic*,
    CA 09-1158, 2009 WL 4456323 (D.D.C. Nov. 30, 2009) .....................................................65

*Azadeh v. Gov't of Islamic Republic of Iran*,
    No. 1:16-CV-1467 (KBJ), 2018 WL 4232913 (D.D.C. Sept. 5, 2018) ..................................50

*Baker v. Socialist People's Libyan Arab Jamahirya*,
    775 F. Supp. 2d 48 (D.D.C. 2011) .........................................................................157, 158, 160

*Barot v. Embassy of the Republic of Zambia*,
    785 F.3d 26 (D.C. Cir. 2015) ...............................................................................................121

*Barry v. Islamic Republic of Iran*,
    410 F. Supp. 3d 161 (D.D.C. 2019) ....................................................................................127

*Barry v. Islamic Republic of Iran*,
    437 F. Supp. 3d 15 (D.D.C. 2020) ...........................................................................52, 56, 57

*Battles v. Islamic Republic of Iran*,
    No. 1:21-CV-179, 2022 WL 3443922 (S.D. Tex. Aug. 17, 2022) .............................81, 87, 93

*Belkin v. Islamic Republic of Iran*,
    667 F. Supp. 2d 8 (D.D.C. 2009) .......................................................................................124

*Ben-Rafael v. Islamic Republic of Iran*,
    540 F. Supp. 2d 39 (D.D.C. 2008) .......................................................................................52

*Ben-Yishai v. Syrian Arab Republic*,
    642 F. Supp. 3d 110 (D.D.C. 2022) ....................................................................................169

*\*Bernhardt v. Islamic Republic of Iran*,
    No. CV 18-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) ............................ *passim*

*Bettis v. Islamic Republic of Iran*,
315 F.3d 325 (D.C. Cir. 2003) ............................................................................. 173

*Blank v. Islamic Republic of Iran*,
No. 19-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) ................................. 53, 124

*Braun v. Islamic Republic of Iran*,
228 F. Supp. 3d 64 (D.D.C. 2017) ....................................................................... 178

*Brewer v. Islamic Republic of Iran*,
664 F. Supp. 2d 43 (D.D.C. 2009) ......................................................................... 62

*Brown v. Islamic Republic of Iran*,
No. 1:21-CV-1308 (TNM), 2023 WL 4824740 (D.D.C. July 27, 2023) ....................... *passim*

*Cabrera v. Islamic Republic of Iran*,
No. 19-cv-3835-JDB, 2023 WL 3496303 (D.D.C. May 16, 2023) .............................. *passim*

*Cabrera v. Islamic Republic of Iran*,
No. 19-cv-3835-JDB (D.D.C. Aug. 11, 2023) .................................................... 188, 189

*Cabrera v. Islamic Republic of Iran*,
No. CV 18-2065 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022), *adhered
to*, 2023 WL 1975091 (D.D.C. Jan. 27, 2023) ...................................................... *passim*

*Christie v. Islamic Republic of Iran*,
No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) ............................... 173

*Cohen v. Islamic Republic of Iran*,
238 F. Supp. 3d 71 (D.D.C. 2017) ....................................................................... 131

*Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*,
850 F. Supp. 2d 277 (D.D.C. 2012) .............................................................. 126, 181

*Coombs v. Islamic Republic of Iran*,
No. CV 19-3363 (RDM), 2022 WL 715189 (D.D.C. Mar. 10, 2022) ........................... 122

*Doe A-1 v. Democratic People's Republic of Korea*,
No. 18-CV-0252 (DLF), 2021 WL 723257 (D.D.C. Feb. 24, 2021) ............................. 181

*Doe v. Syrian Arab Republic*,
No. 18-cv-0066, 2020 WL 5422844 (D.D.C. Sept. 10, 2020) ............................ 9, 178, 179

*Driscoll v. Islamic Republic of Iran*,
No. 20-CV-622-EGS-ZMF, 2023 WL 4892710 (D.D.C. June 27, 2023),
*report and recommendation adopted sub nom. All Plaintiffs Represented by
Driscoll v. Islamic Republic of Iran*, No. CV 20-622, 2023 WL 5932974
(D.D.C. July 13, 2023) ....................................................................... 80, 83, 94, 96

*Espitia v. Islamic Republic of Iran*,
No. 1:21-cv-123, 2022 WL 2168355 (S.D. Tex. June 16, 2022)...........................68, 80, 100

*Est. of Brown v. Islamic Republic of Iran*,
872 F. Supp. 2d 37 (D.D.C. 2012) ...............................................143, 157, 160, 165

*Est. of Fishbeck v. Islamic Republic of Iran*,
No. 18-CV-2248 (CRC), 2023 WL 5333209 (D.D.C. Aug. 18, 2023)...................................65

*Est. of Fishbeck v. Islamic Republic of Iran*,
No. 18-CV-2248 (CRC), 2023 WL 7443394 (D.D.C. Mar. 27, 2023)............................67, 92

*Est. of Fishbeck v. Islamic Republic of Iran*,
No. 18-CV-2248 (CRC), 2023 WL 7448770 (D.D.C. Aug. 18, 2023)........................... *passim*

*Est. of Heiser v. Islamic Republic of Iran*,
466 F. Supp. 2d 229 (D.D.C. 2006) ................................................................... *passim*

*Est. of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) ...............................................123, 124, 131, 178

*Est. of Hirschfeld v. Islamic Republic of Iran*,
330 F. Supp. 3d 107 (D.D.C. 2018) ...................................................................177

*Est. of Parhamovich v. Syrian Arab Republic*,
No. 17-cv-61 (GMH), 2022 WL 18071921 (D.D.C. Dec. 28, 2022) .................79, 88, 99, 118

*Est. of Steinberg v. Islamic Republic of Iran*,
No. 17-CV-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019)..................................177

*Ewan v. Islamic Republic of Iran*,
466 F. Supp. 3d 236 (D.D.C. 2020) ................................................................... *passim*

*Fissler v. Islamic Republic of Iran*,
No. 18-cv-3122 (CKK), 2022 WL 4464873 (D.D.C. Sept. 26, 2022)......................94, 99, 103

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015) ................................................................... *passim*

*Foley v. Syrian Arab Republic*,
249 F. Supp. 3d 186 (D.D.C. 2017).......................................................................9, 54, 122

*Foley v. Syrian Arab Republic*,
281 F. Supp. 3d 153 (D.D.C. 2017).......................................................169, 170, 171, 172

*Force v. Islamic Republic of Iran*,
464 F. Supp. 3d 323 (D.D.C. 2020) ................................................................... *passim*

\*_Force v. Islamic Republic of Iran_,
  617 F. Supp. 3d 20 (D.D.C. 2022) ................................................................. _passim_

_Forman v. Korean Air Lines Co., Ltd._,
  84 F.3d 446 (D.C. Cir. 1996) .................................................................................177

_Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs._,
  892 F.3d 348 (D.C. Cir. 2018) ...............................................................51, 124, 131

\*_Fritz v. Islamic Republic of Iran_,
  320 F. Supp. 3d 48 (D.D.C. 2018) ................................................................. _passim_

_Fritz v. Islamic Republic of Iran_,
  324 F. Supp. 3d 54 (D.D.C. 2018) .................................................................173, 177

_Fritz v. Islamic Republic of Iran_,
  466 F. Supp. 3d 13 (D.D.C. 2020) .............................................................................2

\*_Gration v. Islamic Republic of Iran_,
  No. 21-CV-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) ......................... _passim_

_Haim v. Islamic Republic of Iran_,
  784 F. Supp. 2d 1 (D.D.C. 2011) ..........................................................................179

_Hamen v. Islamic Republic of Iran_,
  401 F. Supp. 3d 85 (D.D.C. 2019) .............................................................50, 56, 119

_Hamen v. Islamic Republic of Iran_,
  407 F. Supp. 3d 1 (D.D.C. 2019) .....................................................................179, 180

\*_Hammons v. Islamic Republic of Iran_,
  No. CV 19-2518, 2023 WL 5933340 (D.D.C. July 24, 2023), _report and_
  _recommendation adopted_, 2023 WL 6211248 (D.D.C. Sept. 25, 2023) ....................... _passim_

_Han Kim v. Democratic People's Republic of Korea_,
  774 F.3d 1044 (D.C. Cir. 2014) ...........................................................................51, 55

_Harrison v. Republic of Sudan_,
  882 F. Supp. 2d 23 (D.D.C. 2012) .........................................................................128

_Herrick v. Islamic Republic of Iran_,
  1:21-CV-168, 2022 WL 3443816 (S.D. Tex. Aug. 17, 2022) ....................................83, 87, 89

\*_Higgins v. Islamic Republic of Iran_,
  No. 1:99CV00377, 2000 WL 33674311 (D.D.C. Sept. 21, 2000) ................................. _passim_

_Jackson v. Beech_,
  636 F.2d 831 (D.C. Cir. 1980) .................................................................................50

*Jakubowicz v. Islamic Republic of Iran*,
  No. CV 18-1450 (RDM), 2022 WL 3354719 (D.D.C. Aug. 9, 2022) ........................... *passim*

*Jakubowicz v. Islamic Republic of Iran*,
  No. CV 18-1450 (RDM), 2023 WL 6907852 (D.D.C. Sept. 1, 2023) ........... 130, 132, 167, 173

*Karcher v. Islamic Republic of Iran*,
  396 F. Supp. 3d 12 (D.D.C. 2019) ................................................................. *passim*

*Karcher v. Islamic Republic of Iran*,
  No. CV 16-232 (CKK), 2021 WL 133507 (D.D.C. Jan. 14, 2021) ............................... *passim*

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) .................................................................. 53, 65

*Lee v. Islamic Republic of Iran*,
  518 F. Supp. 3d 475 (D.D.C. 2021) ......................................................... 10, 51, 58

*Lee v. Islamic Republic of Iran*,
  No. 19-CV-00830 (APM), 2023 WL 1100711 (D.D.C. Jan. 30, 2023) ............................. 116

*Lelchook v. Syrian Arab Republic*,
  No. 16-CV-1550 (RC), 2019 WL 4673849 (D.D.C. Sept. 25, 2019) ........................... *passim*

*Maalouf v. Islamic Republic of Iran*,
  514 F. Supp. 3d 280 (D.D.C. 2021) .................................................................. 51

*Maalouf v. Islamic Republic of Iran*,
  923 F.3d 1095 (D.C. Cir. 2019) ...................................................................... 123

*Mark v. Islamic Republic of Iran*,
  626 F. Supp. 3d 16 (D.D.C. 2022) .................................................................... 127

*Mohammadi v. Islamic Republic of Iran*,
  782 F.3d 9 (D.C. Cir. 2015) ........................................................................... 120

*Moradi v. Islamic Republic of Iran*,
  77 F. Supp. 3d 57 (D.D.C. 2015) ................................................................ 131, 176

*Mwila v. Islamic Republic of Iran*,
  33 F. Supp. 3d 36 (D.D.C. 2014) ..................................................................... 163

*Neiberger v. Islamic Republic of Iran*,
  No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239 (D.D.C. Sept. 8, 2022),
  *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30,
  2022) ........................................................................................... *passim*

*Opati v. Republic of Sudan,*
140 S. Ct. 1601 (2020) ................................................................................51, 125

*\*Oveissi v. Islamic Republic of Iran,*
768 F. Supp. 2d 16 (D.D.C. 2011) .................................................. *passim*

*Oveissi v. Islamic Republic of Iran,*
879 F. Supp. 2d 44 (D.D.C. 2012) ....................................................123, 125, 178

*Owens v. Republic of Sudan,*
71 F. Supp. 3d 252 (D.D.C. 2014) ...............................................................131

*Owens v. Republic of Sudan,*
826 F. Supp. 2d 128 (D.D.C. 2011) .........................................................70, 82

*\*Owens v. Republic of Sudan,*
864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded sub nom. on other*
*grounds Opati v. Republic of Sudan,* 140 S. Ct. 1601 (2020) ...........................*passim*

*Pennington v. Islamic Republic of Iran,*
No. 19-cv-796 (JEB), 2021 WL 2592910 (D.D.C. June 24, 2021) .................10, 120

*Peterson v. Islamic Republic of Iran,*
515 F. Supp. 2d 25 (D.D.C. 2007) .............................................................126

*Reed v. Islamic Republic of Iran,*
845 F. Supp. 2d 204 (D.D.C. 2012) .........................................................125, 177

*Rimkus v. Islamic Republic of Iran,*
750 F. Supp. 2d 163 (D.D.C. 2010) .............................................................55

*\*Roth v. Islamic Republic of Iran,*
651 F. Supp. 3d 65 (D.D.C. 2023) .................................................. *passim*

*Roth v. Islamic Republic of Iran,*
78 F. Supp. 3d 379 (D.D.C. 2015) ................................................62, 86, 123, 177

*Saberi v. Gov't of Islamic Republic of Iran,*
541 F. Supp. 3d 67 (D.D.C. 2021) .............................................................121

*Salzman v. Islamic Republic of Iran,*
No. CV 17-2475 (RDM), 2019 WL 4673761 (D.D.C. Sept. 25, 2019) ...................57, 65, 122

*Schwartz v. Islamic Republic of Iran,*
No. CV 18-1349 (RDM), 2020 WL 7042842 (D.D.C. Nov. 30, 2020) ................................58

*Schwartz v. Islamic Republic of Iran,*
No. CV 18-1349 (RDM), 2022 WL 1567358 (D.D.C. May 18, 2022) ................127, 178, 179

*Sheikh v. Republic of Sudan*,
    485 F. Supp. 3d 255 (D.D.C. 2020) ................................................................... 177

*Sotloff v. Syrian Arab Republic*,
    CA 16-725 (D.D.C. Mar. 15, 2021) ........................................................................ 9

*Stearns v. Islamic Republic of Iran*,
    633 F. Supp. 3d 284 (D.D.C. 2022) ........................................................... *passim*

*Stethem v. Islamic Republic of Iran*,
    201 F. Supp. 2d 78 (D.D.C. 2002) ..................................................................... 169

*Taitt v. Islamic Republic of Iran*,
    No. CV 20-1557 (RC), 2023 WL 2536518 (D.D.C. Mar. 16, 2023) ............................. *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-MDL-1570 (GBD)(SN), 2016 WL 8711419 (S.D.N.Y. Oct. 14, 2016),
    *report and recommendation adopted*, 2016 WL 6465922 (S.D.N.Y. Oct. 31,
    2016) ................................................................................................................. 176

*Thuneibat v. Syrian Arab Republic*,
    167 F. Supp. 3d 22 (D.D.C. 2016) ............................................. 141, 143, 145

*United States v. Changpeng Zhao*,
    No. 2:23-cr-00179-RAJ (W.D. Wash. Nov 14, 2023) ........................................ 187

*United States v. Young*,
    916 F.3d 368 (4th Cir. 2019) ................................................................................. 9

*United States v. Binance Holdings Ltd.*,
    No. 2:23-cr-00178-RAJ (W.D. Wash. Nov 14, 2023) ........................................ 187

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) .......................................................... *passim*

*W.A. v. Islamic Republic of Iran*,
    No. 18-CV-1883 (CKK/GMH), 2020 WL 7869218 (D.D.C. Mar. 23, 2020) ............... *passim*

*W.A. v. Islamic Republic of Iran*,
    427 F. Supp. 3d 117 (D.D.C. 2019) ............................................... *50, 120*

*Wultz v. Islamic Republic of Iran*,
    864 F. Supp. 2d 24 (D.D.C. 2012) .......................................................... *passim*

**Statutes**

5 U.S.C. § 552 ............................................................................................................ 11

8 U.S.C. § 1101(a)(22) ............................................................................................. 119

18 U.S.C. § 2339A(b)(1) ................................................................................................64

28 U.S.C. § 1330(a) ........................................................................................................55

28 U.S.C. § 1330(b) ..............................................................................................121, 122

*28 U.S.C. § 1605A ................................................................................................. *passim*

*28 U.S.C. § 1605A(a) ............................................................................................. *passim*

28 U.S.C. § 1605A(b) ...................................................................................................123

28 U.S.C. § 1605A(c) ..................................................................................8, 122, 124

28 U.S.C. § 1605A(h) ...........................................................................................57, 120

28 U.S.C. § 1608 ............................................................................................................50

*28 U.S.C. § 1608(a) ............................................................................................... *passim*

28 U.S.C. § 1608(d) .........................................................................................................9

28 U.S.C. § 1608(e) ...................................................................................51, 186, 188

28 U.S.C. § 1961(a) .....................................................................................................181

34 U.S.C. § 20144(d)(4) ...............................................................................................187

**Other Authorities**

49 Fed. Reg. 2836-02 (Jan. 23, 1984) .........................................................................119

Fed. R. Civ. P. 55 ..............................................................................................................9

Fed. R. Civ. P. 55(b)(2) ..................................................................................................50

S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003) .....................................12

United States District Court for the District of Columbia,
     Attorney Manual For Service of Process on a Foreign Defendant § VII(B)(1) ....................189

Plaintiffs respectfully submit this Memorandum in support of their Motion for Default Judgment as to Liability and Damages and entry of Final Judgment (the "Bellwether Motion for Default") against Defendant Islamic Republic of Iran ("Iran") with respect to a group of bellwether Plaintiffs: Rita Blodgett, Christina Linden, Jason Rockholt, Adam Kisielewski, Rita Zoucha, Brandon Clevenger, Roger Kurtz, Stephanie Kurtz, Norma Estes, Patricia Grassbaugh, Michael Summers, Nanette West, Clark West, Patty Jett, Shelia Towns, Martha Cabe, Sarah Lambert, Duane Pionk, Jonathan Krause, Gerald Krause, Lisa Kaufman, Alexandria Parks, Felicia Carter Bell, Michael Bell, Milissa Wojtowicz, Virginia Maitland, Ashley Rawlings, K.L., by and through her next friend Ashley Rawlings, Kelly Inman, Natalie Jackson, Andrew Marshall, Sheila Marshall, Brandi Yanez, Tara Roberts, Jacob Kosky, Nancy Poulin, Noe Orosco Sr., Josef Pautsch, Becky Johnson, Marla Van Cannon, Michael Van Cannon, Richard Gervasi II, Cheryl Felder Stuart, Manaser Orton, and Alan Bean Sr.

Following this Court's Case Management Order, Plaintiffs respectfully move the Court for judgment on liability and damages for claims brought by 45 Plaintiffs (the "Bellwether Plaintiffs") injured in 25 bellwether attacks (the "Bellwether Attacks"). *See* Dkt. 35 at 5-9.[1]

## I.    INTRODUCTION

This is a civil action against the Islamic Republic of Iran ("Iran") under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"). This case arises

---

[1] There are an additional 52 Plaintiffs whose claims arise from the same Bellwether Attacks and for whom Plaintiffs *do not* seek relief today. Per the Case Management Order, upon motion from the Plaintiffs, special masters appointed by this Court will aid in adjudicating damages for these claims at a later date. Dkt. 35 at 9.

from approximately 236 terrorist attacks on U.S. military service members[2] and civilians supporting U.S. Government missions in Iraq (the "Attack Victims") between 2003 and 2010, and one attack from 2017.[3]   Plaintiffs are 623 American service members and civilians, and their families, who were killed or wounded in the above-referenced attacks.

All of the Plaintiffs were injured and/or killed by a Sunni terrorist coalition led by al-Qaeda and its two lead affiliates in Iraq, the Zarqawi organization—which went by many names, before ultimately adopting the name al-Qaeda in Iraq ("AQI")—and Ansar al-Islam ("AAI" and collectively with the Zarqawi organization/AQI, the "Sunni Terrorist Groups").[4]   The Zarqawi

---

[2] Courts in this jurisdiction use "service members" or "servicemembers" when referring to U.S. military personnel.  Unless directly quoting another source, this Motion will use "service member," consistently with this Court's prior use.  *E.g.*, *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13, 16 (D.D.C. 2020) ("*Fritz I*") ("Plaintiff Bashar Al-Taie is the brother of Staff Sergeant Ahmed Al-Taie, a U.S. Service member who was abducted while deployed to Baghdad, held hostage, tortured, and ultimately murdered.").

[3] This attack from 2017 is not included for the Court's consideration here and will be submitted as part of subsequent proceedings.

[4] Ex. 2, Expert Report and Declaration of Dr. Daveed Gartenstein-Ross on Sunni Militant Organizations ("Sunni Militant Groups Report") at 13-14, 69; *see* discussion *infra* § V(C).  As discussed extensively by Dr. Gartenstein-Ross in his Sunni Militant Groups Report, members of the Sunni Terrorist Groups assumed a variety of names over the course of the relevant time period. AQI also identified itself as Jamaat al-Tawhid wal-Jihad ("JTJ"), Tawhid wal Jihad ("TWJ"), the Mujahedin Shura Council ("MSC"), the Islamic State of Iraq ("ISI"), and the Islamic State of Iraq and al-Sham ("ISIS"), before finally settling on its current name, the Islamic State.  Sunni Militant Groups Report at 13-14.  Throughout all of its various identities, AQI itself was, in turn, another alias for the same key entity, the highly militant, major terrorist organization referred to herein as the Zarqawi organization.  For ease of reference, Plaintiffs refer to each of these entities as the Zarqawi organization throughout this Motion except in the descriptions of the Bellwether Attacks, where Plaintiffs adopt the practice of Plaintiffs' expert Dr. Gartenstein-Ross of providing the more specific name of the Zarqawi organization aegis (AQI, JTJ, ISI, etc.) under which the attack was perpetrated. (Footnote continues on next page.)

organization operated in Iraq from 2002 through the present.  It was founded by the notorious terrorist Abu Musab al-Zarqawi, who prior to leading the group in Iraq had trained with al-Qaeda and run an al-Qaeda-funded terrorist training camp in Afghanistan.  Once in Iraq, the Zarqawi organization established itself as a ruthlessly effective militant group, publicly aligning itself with al-Qaeda in 2004, and was seen at times as the "primary terrorist threat to the Coalition."  Sunni Militant Groups Report at 14.  AAI was formed in 2001 in Iraq and initially headed by Mullah Fatih Krekar, who had studied under Osama bin Laden's mentor.  As the U.S. Treasury Department has revealed, Ansar al-Islam "came into being with the blessing of bin Laden after its leaders visited al-Qa'ida in Afghanistan in 2000 and 2001" and "Bin Laden provided AAI with an estimated $300,000 to $600,000 in seed money."[5]  By 2002, AAI was harboring numerous foreign jihadists, including Zarqawi, who had come into Iraq from Iran.  Thereafter, AAI and the Zarqawi organization coordinated in setting up bases in northern Iraq, including a poison and explosives training camp.  After being nearly decimated by coalition forces during Operation Viking Hammer in March 2003, AAI was able to regroup and resume attacks on U.S.-led forces, largely due to the support it received from the Iranian Islamic Revolutionary Guard Corps (the "IRGC").  AAI thereafter restyled itself as Ansar al-Sunna ("AAS") and closely aligned with al-Qaeda, and at

---

Similarly, AAI (sometimes styled "AI") restyled itself as Ansar Al-Sunna ("AAS") following a leadership change in late 2003.  *Id.* at 69.  Post-leadership change, AAI militants working abroad, particularly in Kurdish immigrant communities in Europe, retained their affiliation as AAI members while continuing to work on behalf of AAS.  *Id.*  Thus, while some militants continued to identify as part of AAI despite AAI's self-restyling as AAS, they are substantively the same organization.  For ease of reference, Plaintiffs will refer to AAI/AAS as AAI throughout this Bellwether Motion for Default, except in the descriptions of the Bellwether Attacks, where Plaintiffs adopt the practice of Plaintiffs' expert Dr. Gartenstein-Ross of providing the more specific name of the AAI aegis (usually AAS) under which the attack was perpetrated.

[5] Sunni Militant Groups Report at 64 (citing U.S. Department of the Treasury, "Treasury Department Statement Regarding the Designation of Ansar al-Islam," February 20, 2003).

times AQI, after which its attacks became more sophisticated and deadly.

Both groups—AQI and AAI—were designated as Foreign Terrorist Organizations ("FTOs") by the United States prior to committing the Bellwether Attacks attributable to them.[6] And both groups aligned with, and received support from, al-Qaeda in realizing the groups' collective goal of killing as many Americans as possible, in part to drive them from participating in peace-keeping missions in the Middle East.  And over the course of the ensuing two decades, al-Qaeda, the Zarqawi organization/AQI, and AAI carried out hundreds of terrorist attacks on American troops and civilian personnel in Iraq, as well as Iraqi citizens, local government officials, and Shia religious leaders.  The Sunni Terrorist Groups selected their targets and means of attack with an aim towards killing as many Americans and Iraqi civilians as possible, often using the most brutal and grotesque means.  They frequently sent suicide attackers into heavily populated areas laden with high-powered explosives that would indiscriminately rip through U.S. personnel and nearby Iraqi civilians.  They carried out beheadings of captured Americans that they filmed and broadcasted to the broadest possible audience.  The Zarqawi organization carried out 20 of the 25 Bellwether Attacks, AAI carried out four, and the Zarqawi organization and AAI operating jointly carried out one.

One of the Bellwether Attacks occurred on December 21, 2004, when an AAI militant wearing a vest lined with plastic explosives and 243 metal ball bearings entered the dining facility at Forward Operating Base ("FOB") Marez, an American outpost near Mosul, Iraq, during one of the busiest times of the day.  Ex. 3, Expert Witness Report of Dr. Daveed Gartenstein-Ross on

---

[6] AAI was designated as an FTO on March 22, 2004, approximately one month before the first Bellwether Attack.  AQI was designated on December 17, 2004, approximately four and half months before the first Bellwether Attack they committed.

Attack Attributions ("Attribution Report") at 173.  The AAI militant sat down at one of the tables facing the cafeteria line and detonated the explosives strapped to his chest, killing himself, 14 American service members—including three of the Attack Victims, *see infra* § III(C) – Attack #19—four Haliburton employees, and four Iraqi soldiers, and wounding 71 other people.  *Id.*  In a video released after the attack, AAI claimed responsibility, and showed how they had reconnoitered FOB Marez, congratulated the suicide bomber before he left on his mission, and filmed the smoke rising from what remained of FOB Marez's dining facility.  The attackers claimed they chose December 21 as the date of the attack due to the symbolic significance of attacking "Crusaders" close to a Christian holiday.  Attribution Report at 173.

Iran provided essential support that enabled al-Qaeda, the Zarqawi organization, and AAI to carry out these attacks.  As has been extensively documented and recognized by numerous courts in this and other jurisdictions, Iran provided decades of material support to the Sunni Terrorist Groups, beginning long before the first attack at issue in this case and continuing through the present.  That support enabled these groups to carry out gruesome and deadly attacks against American service members and civilian contractors in Iraq.  This support advanced Iran's goal of killing American service members and civilian contractors and undermining American foreign policy interests in the region, while retaining some ability to maintain plausible deniability.  Iran's support came in the form of weapons, funding, training, sanctuary and refuge, safe passage through Iranian territory, travel assistance throughout the greater world, military intelligence, and financial infrastructure and assistance, which the Sunni Terrorist Groups used to attack and/or injure the Plaintiffs, among others.

Plaintiffs in this case are victims of the attacks carried out by the Sunni Terrorist Groups with Iran's support—their lives cut short, or forever altered, by the acts of terrorism that Iran

purposefully supported and facilitated.  For example, ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  ██████████████████████████

██████████████████████████  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████



Under the FSIA, Plaintiffs bring claims for compensatory and punitive damages for the immeasurable pain and loss suffered as a result of Iran's material support for the terrorists that carried out the attacks against them.

### A.    The Bellwether Attacks and Plaintiffs

The 25 Bellwether Attacks and 45 Bellwether Plaintiffs represent a cross-section of the attack geographies, attack types, and victim categories spanning all of the attacks and Plaintiffs in this case.  The Bellwether Attacks include at least two attacks from each relevant geographic region where the Iran-backed Sunni Terrorist Groups were active in Iraq between 2003 and 2010: Al Anbar, Baghdad, Babil, Diyala, Nineveh, and Saladin Provinces.[7]  The Bellwether Attacks include at least one attack perpetrated using each of the five commonly occurring terrorist tactics, techniques, and procedures ("TTPs") representative of the attacks at issue in this case:  Improvised

---

[7] One attack victim was killed in Najaf Province, which borders Al Anbar Province to the southeast.  This attack is not included for the Court's consideration here and will be submitted as part of subsequent proceedings.  Given its proximity to Al Anbar Province and the relevant Iranian agent, the Najaf Province attack is still properly represented by the Bellwether Attacks.

Explosive Device ("IED") attacks; complex attacks; suicide bombings; small arms, rocket-propelled grenade ("RPG"), and anti-aircraft attacks; and indirect fire attacks.  The Bellwether Plaintiffs were selected to produce a representative group of plaintiffs whose relationships to the Attack Victims permit recovery under the FSIA.  Accordingly, the Bellwether Plaintiffs include spouses, parents, children, stepchildren and adopted children, siblings, and half-siblings of those killed in action, as well as one service member who was wounded in action.

## B.       Framework of the Bellwether Motion

This Motion first describes the procedural history of this case (*infra* § II); then provides a factual description of the 25 Bellwether Attacks at issue here (*infra* § III); next, it sets out the legal standard and burden of proof for default motions in the FSIA context (*infra* § IV), and establishes both the Court's subject-matter jurisdiction (*infra* § V) and personal jurisdiction over Iran (*infra* § VI) for Plaintiffs' claims.  The Motion then demonstrates Iran's liability under § 1605A(c) (*infra* § VII), and finally the type and amount of damages warranted in this case (*infra* § VIII).

## II.      PROCEDURAL HISTORY

This Action was initiated on July 7, 2021, by a portion of the Plaintiffs who filed the original complaint against Iran, seeking damages for wrongful death, personal injury, and related torts pursuant to the FSIA, 28 U.S.C. § 1605A.  Dkt. 1.  On November 5, 2021, Plaintiffs filed their First Amended Complaint (the "Complaint"), which is the operative complaint for the purposes of this Motion.  Dkt. 15.  The Complaint added several hundred Plaintiffs, including summaries of their respective claims.  *Id.*

Following the filing of the Amended Complaint, Plaintiffs went through the necessary steps to effectuate service, as set out in detail *infra* at § VI.  Service was effected on Iran on July 11, 2022.  Dkt. 26.  After Iran failed to answer or otherwise respond to Plaintiffs' claims within 60 days, on September 12, 2022, Plaintiffs sought an entry of default judgment against Iran pursuant

to 28 U.S.C. § 1608(d) and Federal Rule of Civil Procedure 55.  Dkt. 27.  On September 15, 2022, the Clerk for the Court provided an entry of default as to Iran.  Dkt. 29.

During this period, and in the preceding months, counsel for Plaintiffs have worked diligently to gather the necessary evidence to establish liability and damages against Iran, including from Plaintiffs, as well as through the submission of and litigation concerning Freedom of Information Act requests to eight different federal agencies, and limited third-party subpoenas to U.S. Central Command ("CENTCOM") and the U.S. Naval Surface Warfare Center.  Dkt. 31. Plaintiffs have also worked with several experts, including Dr. Daveed Gartenstein-Ross[8] and

---

[8] Dr. Gartenstein-Ross's expertise in these matters has been recognized by numerous courts in this District, where he has been admitted as an expert witness regarding Iranian support of terrorists in Iraq, as well as terrorist groups generally.  *See* Memorandum Opinion at 11-12, *Sotloff v. Syrian Arab Republic*, CA 16-725 (D.D.C. Mar. 15, 2021), ECF No. 45 ("Dr. Daveed Gartenstein-Ross[] is an anti-terrorism scholar and author who has worked, in various capacities, on issues related to violent non-state actors for over a decade.  He has testified as an expert on terrorism and jihadist groups in many courts, including in this District. . . . The Court qualified him as an expert on violent non-state actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supports.") (citations omitted); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 58 n.2 (D.D.C. 2018) ("*Fritz I*") ("Many of the Court's findings in this section are derived from the testimony and expert report[] of . . . Dr. Gartenstein-Ross as an expert on (1) violent non-state actors; (2) Iran's use of proxy organizations in Iraq from the 1990s to 2012; and (3) Iraqi Shia militias in particular"); *United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019) (prevailing when qualifications were challenged upon appeal); *Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *9 n.7 (D.D.C. Sept. 10, 2020) ("The undersigned finds that Dr. Gartenstein-Ross is qualified as an expert in the areas of terrorism and jihadist groups."); *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 n.4 (D.D.C. 2017) ("*Foley I*") ("Having considered the requirements set forth in Federal Rule of Evidence 702 . . ., the Court qualified Daveed Gartenstein-Ross as an expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism.").  More information on Dr. Gartenstein-Ross's qualifications may be found in his expert report.  Attribution Report at 6-14.

Michael Pregent,[9] to provide evidence of Iran's support for the Sunni terrorists who carried out the attacks at issue in this case, as well as to establish economic damages for certain of the Bellwether Plaintiffs.

On August 14, 2023, Plaintiffs filed their Motion for Entry of a Case Management Order (the "CMO"), which the Court granted in its Minute Order on August 16, 2023.  Dkt. 35.  The Court adopted Plaintiffs' proposed timing for this Bellwether Motion for Default, and additionally established the timing for subsequent motions regarding appointment of Special Masters, as well as the division of labor between Plaintiffs, the Court, and the Courts' Special Masters regarding the adjudication of the remaining Plaintiffs' claims in subsequent stages.  *See* Minute Order, Aug. 16, 2023.

---

[9] Mr. Michael Pregent's expertise in these matters has similarly been recognized by courts in this District, where he has been admitted as an expert witness regarding Iranian support of terrorists in Iraq, military intelligence, counterterrorism, and terrorist groups generally.  *See Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 72-73 (D.D.C. 2023) ("*Roth II*") ("[T]he Court recognized Pregent as an expert within the field of military intelligence, terrorism, and counterterrorism under Federal Rule of Evidence 702."); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2021 WL 2592910, at *2 (D.D.C. June 24, 2021) ("Plaintiffs' . . . expert[] – . . . Michael Pregent (former intelligence officer for the U.S. Army) — explained in detail Iran's history of interference in Iraq, including the support of militant Shia proxy groups, and both experts evinced confidence that Iran played a substantial role in these attacks"); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 18-19 (D.D.C. 2019) ("*Karcher I*"); *Karcher v. Islamic Republic of Iran*, No. CV 16-232 (CKK), 2021 WL 133507, at *4 (D.D.C. Jan. 14, 2021) ("*Karcher II*") ("The Court found that Mr. Pregent was qualified to testify regarding 'intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field'") (citations omitted); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021) ("*Lee I*") ("The court qualifies Pregent as an expert in 'intelligence matters, including attribution of terror attacks and . . . evidence collection and analysis in the intelligence field'"); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 291 (D.D.C. 2022) ("The court qualifies Mr. Pregent as an expert in 'intelligence matters, including attribution of terror attacks and . . . evidence collection and analysis in the intelligence field.'") (citations omitted); *see also* Ex. 4, Expert Report of Michael Pregent ("Pregent Expert Report") ¶ 18 (listing Mr. Pregent's prior expert testimony about Iran's material support of terrorist activities).  More information on Mr. Pregent's qualifications may be found in his expert report.  Pregent Expert Report ¶¶ 4-16.

Plaintiffs now bring this Bellwether Motion for Default seeking a final judgment finding Iran liable for the Bellwether Plaintiffs' claims and awarding appropriate damages and, pursuant to the CMO, laying the framework for the adjudication of the remainder of Plaintiffs' claims. In support of their claims and as described in Exhibit 1, Plaintiffs respectfully submit the following expert reports and categories of evidence: (1) Expert Report & Declaration of Dr. Daveed Gartenstein-Ross on Sunni Militant Organizations, providing background on the Sunni Terrorist Groups' activities in Iraq and Iran's provision of material support thereof (Exhibit 2) ("Sunni Militant Groups Report"); (2) Expert Witness Report of Dr. Gartenstein-Ross on Attack Attributions, attributing responsibility to the Sunni Terrorist Groups for the Bellwether Attacks (Exhibit 3) ("Attribution Report"); (3) Expert Report of Michael Pregent, providing further background on the Sunni Terrorist Groups' activities in Iraq and Iran's provision of material support thereof (Exhibit 4) ("Pregent Expert Report"); (4) Expert Damages Report of Chad Staller and Stephen M. Dripps for Sgt. Adam Kisielewski (ret.) detailing Sgt. Kisielewski's economic damages incurred as a result of his injuries (Exhibit 5) ("Staller Damages Report"); (5) Demonstratives summarizing the Bellwether Attacks, Plaintiffs, and resulting damages (Exhibits 6-8); (6) Bellwether Plaintiffs' declarations and identity documents necessary to establish their ability to recover damages under the FSIA (Exhibits 9-98); and (7) Records related to the Bellwether Attacks, many of which Plaintiffs obtained from U.S. Government agencies in response to requests and litigations under the Freedom of Information Act, 5 U.S.C. § 552, which bear upon Iran's liability for the Bellwether Attacks (Exhibits 99-221).

## III.   THE 25 BELLWETHER ATTACKS

The 25 Bellwether Attacks occurred while the United States, along with a coalition of allies (together, the "coalition forces" or "coalition"), were engaged in a peacekeeping effort in Iraq to maintain "security and stability" following the toppling of Saddam Hussein's regime in 2003. *See*

S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).   As set out in detail in Dr. Gartenstein-Ross's report, Iran saw these peacekeeping efforts as a threat and thus engaged in a proxy war in Iraq whereby it provided hundreds of millions of dollars in material support "in the form of training, financial support, weapons, safe haven, lodging, travel and transportation, and expert knowledge and assistance in tactics, techniques, procedures and attack planning" to both Shia and Sunni terrorists who were intent on killing American service members and civilians serving in Iraq.   Attribution Report at 4.   Mr. Pregent's report arrives at similar conclusions— namely, that Iran materially supported the Sunni Terrorist Groups, most often in the form of "munitions and manpower," and facilitated the movement of foreign fighters "into Iraq from Iran and Syria," thereby enabling Iran and its proxies to better achieve their "mutual" goals of killing "Americans in both Afghanistan and Iraq."  Pregent Expert Report ¶¶ 33, 35.

The effects of this support were manifest.  Iran's provision of material support to the Sunni Terrorist Groups enabled them to organize themselves and their attacks at a greater scale.   It enabled them to, *inter alia*, ambush and pin down entire American convoys and exchange gunfire for hours, *see infra* § III(B) – Attack #16, shoot down helicopters fully loaded with American troops, *see infra* § III(D) – Attack #22, and gather enough explosives to turn entire houses into explosive booby traps intended for American military or civilian personnel.  *See infra* § III(A) – Attack #12.

Each of the Attack Victims in this case (along with each of their family members) was a tragic victim of Iran's efforts to bolster terrorist groups in Iraq so as to achieve its foreign policy ends.  A detailed description of each of these attacks, with cites to the supporting evidence, is set out in Dr. Gartenstein-Ross's Attribution Report, followed by Dr. Gartenstein-Ross's findings that each of the Bellwether Attacks were carried out by the Sunni Terrorist Groups and were caused by

Iran's material support.  The Bellwether Attacks can be grouped into five (5) categories based on the TTPs employed by the Sunni Terrorist Groups.  The Attack Table below, Exhibit 6, lays out the 25 Bellwether Attacks with their respective dates, locations, responsible Iranian agents, Attack Victims, and related Bellwether Plaintiffs.

## Exhibit 6 - Bellwether Attack Table

| Attack No. | Date | Province | Iranian Agent(s) | Attack Victim(s) | Bellwether Plaintiffs |
|---|---|---|---|---|---|
| IED Attacks | | | | | |
| 1 | July 7, 2004 | Saladin | AAI | PFC Nicholas Blodgett (KIA) | Rita Blodgett (Mother) |
| 2 | April 28, 2005 | Nineveh | Zarqawi org. | 1LT William Edens (KIA) SPC Ricky Rockholt (KIA) | Christina Linden (Widow) Jason Rockholt (Brother) |
| 3 | August 21, 2005 | Al Anbar | Zarqawi org. | Sgt. Adam Kisielewski (ret.) (WIA) | Sgt. Adam Kisielewski (ret.) (Self) |
| 4 | June 9, 2006 | Al Anbar | Zarqawi org. | LCpl. Brent Zoucha (KIA) | Rita Zoucha (Mother) |
| 5 | February 8, 2007 | Al Anbar | Zarqawi org. | SGT Ross Clevenger (KIA) | Brandon Clevenger (Brother) |
| 6 | February 11, 2007 | Al Anbar | Zarqawi org. | SGT Russell Kurtz (KIA) | Roger Kurtz (Father) Stephanie Kurtz (Sister) |
| 7 | March 5, 2007 | Saladin | Zarqawi org. | SSG Justin Estes (KIA) | Norma Estes (Half-Sister) |
| 8 | April 7, 2007 | Diyala | Zarqawi org. | CPT Jonathan Grassbaugh (KIA) PFC Rodney McCandless (KIA) SPC Levi Hoover (KIA) | Patricia Grassbaugh (Mother) |
| 9 | May 28, 2007 | Diyala | Zarqawi org. | SPC James Summers (KIA) SPC Zachary Baker (KIA) 1LT Kile West (KIA) | Michael Summers (Brother) Nanette West (Mother) Clark West (Father) |
| 10 | October 14, 2007 | Baghdad | Zarqawi org. | SFC Justin Monschke (KIA) | Patty Jett (Mother) |
| 11 | October 24, 2007 | Saladin | Zarqawi org. | SFC Robin Towns, Sr. | Shelia Towns (Widow) |
| 12 | January 9, 2008 | Diyala | Zarqawi org. | SSG Jonathan Dozier (KIA) SGT Zachary McBride (KIA) SFC Matthew Pionk (KIA) | Martha Cabe (Mother) Sarah Lambert (Sister) Duane Pionk (Father) |

| Attack No. | Date | Province | Iranian Agent(s) | Attack Victim(s) | Bellwether Plaintiffs |
|---|---|---|---|---|---|
| **Complex Attacks** | | | | | |
| 13 | April 9, 2004 | Baghdad | Zarqawi org. | SGT Elmer Krause (KIA)<br>Mr. Stephen Hulett (KIA)<br>Mr. Timothy Bell (KIA)<br>Mr. Tony Johnson (KIA)<br>Mr. Jack Montague (KIA) | Jonathan Krause (Son)<br>Gerald Krause (Brother)<br>Lisa Kaufman (Daughter)<br>Alexandria Parks (Stepdaughter)<br>Felicia Bell Carter (Sister)<br>Michael Bell (Brother) |
| 14 | April 11, 2004 | Babil | Zarqawi org. | SGM Michael Stack (KIA) | Milissa Wojtowicz (Daughter)<br>Virginia Maitland (Daughter) |
| 15 | June 12, 2007 | Diyala | Zarqawi org. | CPL Damon LeGrand (KIA) | Ashley LeGrand Rawlings (Widow)<br>K.L., a minor (Daughter) |
| 16 | January 28, 2008 | Nineveh | Zarqawi org. & AAI | SGT James Craig (KIA)<br>CPL Evan Marshall (KIA)<br>PV2 Joshua Young (KIA) | Kelly Inman (Sister)<br>Natalie Jackson (Widow)<br>Andrew Marshall (Father)<br>Sheila Marshall (Mother)<br>Brandi Yanez (Sister) |
| **Suicide Attacks** | | | | | |
| 17 | May 14, 2004 | Saladin | AAI | SGT James Harlan (KIA) | Tara Roberts (Daughter) |
| 18 | October 14, 2004 | Baghdad | Zarqawi org. | Mr. John Pinsonneault (KIA) | Jacob Kosky (Stepson) |
| 19 | December 21, 2004 | Nineveh | AAI | SSG Lynn Poulin (KIA)<br>SSG Julian Melo (KIA)<br>PVT Lionel Ayro (KIA) | Nancy Poulin (Sister) |
| 20 | December 9, 2005 | Baghdad | Zarqawi org. | SGT Adrian Orosco (KIA) | Noe Orosco, Sr. (Father) |
| 21 | April 10, 2009 | Nineveh | Zarqawi org. | CPL Jason Pautsch (KIA)<br>SSG Bryan Hall (KIA)<br>SGT Edward Forrest (KIA)<br>SSG Gary Woods (KIA) | Josef Pautsch (Brother)<br>Becky Johnson (Mother) |
| **Small Arms, Rocket-Propelled Grenade, and Anti-Aircraft Attacks** | | | | | |
| 22 | January 20, 2007 | Diyala | Zarqawi org. | CSM Marilyn Gabbard (KIA) | Marla Van Cannon (Sister)<br>Michael Van Cannon (Brother) |
| 23 | February 18, 2007 | Al Anbar | Zarqawi org. | PFC Kelly Youngblood (KIA) | Richard Gervasi II (Half-Brother) |

| **Attack No.** | **Date** | **Province** | **Iranian Agent(s)** | **Attack Victim(s)** | **Bellwether Plaintiffs** |
|---|---|---|---|---|---|
| **Indirect Fire Attacks** | | | | | |
| 24 | April 24, 2004 | Baghdad | AAI | CPT Arthur Felder (KIA)<br>SSG Billy Orton (KIA) | Cheryl Felder Stuart (Mother)<br>Manaser Orton (Adopted Son) |
| 25 | May 25, 2004 | Babil | Zarqawi org. | SGT Alan Bean (KIA) | Alan Bean, Sr. (Father) |

## A.    Improvised Explosive Device ("IED") Attacks

Twelve of the 25 Bellwether Attacks involved the use of one or multiple IEDs by Iran-backed AAI or the Zarqawi organization.  The attacks took the lives of 34 service members and civilian contractors, and severely wounded many more.

IED is a catch-all term encompassing a wide variety of bombs and other explosive devices used to destroy, incapacitate, harass, or distract targets.  *See Brown v. Islamic Republic of Iran*, No. 1:21-CV-1308 (TNM), 2023 WL 4824740, at *5 (D.D.C. July 27, 2023) ("*Brown II*") (describing IEDs as "sophisticated weapons systems" that terrorist groups are trained to "emplace and trigger" on command by flipping a switch at the right time or through passive detonation, such as when a vehicle drives over one) (citations omitted); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2022 WL 2817730, at *16 (D.D.C. July 19, 2022) ("*Cabrera I*") (categorizing and defining IEDs), *adhered to*, 2023 WL 1975091 (D.D.C. Jan. 27, 2023).  IEDs are typically composed of home-made explosives or repurposed military grade explosives (such as mortar shells), contained within a purpose-built or repurposed container (such as oxygen tanks).[10]  These devices range in scale from a handheld pipe-bomb to explosives planted throughout an entire

---

[10]  United Nations Office on Drugs and Crime, Conventional Terrorist Weapons, n.d., https://www.unodc.org/images/odccp/terrorism_weapons_conventional.html.

building.  *See*, *e.g., infra* § III(A) – Attack #12.  Successful emplacement and detonation of IEDs require a certain degree of sophistication and professionalism, as the attacker must surveil and gather intelligence on U.S. operations to determine target location, manufacture the device, provide security around the site during emplacement, and in the case of non-victim operated IEDs, execute the attack at the correct moment.  Pregent Expert Report ¶¶ 147-55.  The subtypes of IEDs employed in the attacks below include vehicle-borne IEDs ("VBIEDs"), house-borne IEDs ("HBIEDs"), victim-operated IEDs ("VOIEDs"), suicide vehicle-borne IEDs ("SVBIEDs"), and suicide vest IEDs ("SVIEDs").[11]  Shaped-charge IEDs and explosively formed penetrators ("EFPs") can be placed in a variety of locations, and are differentiated from other IEDs by specially shaped container components that direct or amplify the explosion.  Several inherent properties of IEDs make them particularly attractive weapons to insurgent forces waging war against an overwhelming foe: (1) they can be set up in advance—sometimes months in advance—obviating the need for an insurgent to be present and in harm's way at the time of the attack; (2) they can be concealed effectively, rendering them difficult to detect and increasing the difficulty of employing effective countermeasures; and (3) they can be fabricated from a wide variety of available materials and components, ranging from conventional weapons, such as grenades and artillery shells, to common household items, such as fertilizer.  *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 294 (D.D.C. 2022) (noting the expert witness's explanation that insurgents attacked coalition forces with IEDs); *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-CV-2248 (CRC), 2023 WL 7448770, at *8 (D.D.C. Aug. 18, 2023) ("*Fishbeck II*") (describing an attack with two pressure-plate IEDs detonated by convoying vehicles); *see also* Pregent Expert Report ¶¶ 147-55

---

[11] The latter two subtypes of IEDs described, SVBIEDs and SVIEDs, are considered suicide bombs instead.  *See* discussion *infra* § III(C).

(discussing sophisticated IED capabilities employed by AQI and AAI, including remote or radio detonation, conditional detonation, booby trapped detonation mechanisms, and camouflaged IEDs—all of which "were IRGC-QF- and Lebanese Hezbollah-taught tactics that were particularly lethal to coalition forces").

As set out in detail *infra* at § V(C), Iran was a frequent supplier of IEDs to terrorists in Iraq, including to the Zarqawi organization and AAI, and provided these terrorists with extensive training on how to make, camouflage, deploy, and successfully detonate these highly complex and effective weapons against oftentimes heavily armored American military vehicles. *See Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 88 (D.D.C. 2023) ("*Roth II*") (finding that "Iran taught [al-Zarqawi and other terrorists] particular tactics designed to cause great harm, such as . . . IED emplacement" and provided its proxies, including Sunni militant groups, with IEDs, among other weapons); *Fishbeck II*, 2023 WL 7448770, at * 6 (attributing an IED attack to AAI, which received material support from Iran and deployed a "very sophisticated" IED that "included anti-tampering components"); *Brown II*, 2023 WL 4824740, at *2 (IEDs are "[c]ommon weapons terrorists learned to build and deploy [at Iran-funded training camps]").

Dr. Gartenstein-Ross also concludes that Iran materially supported each of these attacks, which Plaintiffs discuss *infra* in § V(C)(2)(a).

### Attack #1.    July 21, 2004 IED Attack in Ad Duluiyah, Saladin Province that Killed U.S. Army Private First Class Nicholas H. Blodgett

On July 21, 2004, Private First Class ("PFC") Nicholas Blodgett was on patrol in the Ad Duluiyah area of the Saladin Region when an IED detonated.  Attribution Report at 226.  The IED caused PFC Blodgett's vehicle, a M3A3 Cavalry Fighting Vehicle, to catch fire, ███████████
████████████████████████████████████████████████████ Six other service members were wounded in the attack.  *Id.*

Dr. Gartenstein-Ross concluded that AAI, operating as AAS, likely[12] carried out this attack, based on (1) AAS's dominance in the Ad Duluiyah region, known as the "Sunni Triangle," in 2003 and 2004, where it "credibly claimed responsibility for numerous attacks in the vicinity," *see* Attribution Report at 227-28 (listing six AAS attacks in 2004 in the region); and (2) the TTPs employed, including the use of IEDs, which were one of AAS's most commonly employed munitions at the time (which AAS frequently touted in publicly released videos, some of which showed IED explosions in the Ad Duluiyah region). *See id.* at 228.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 210 and 211. Bellwether Plaintiff Rita Blodgett was injured as a result of this attack.

> **Attack #2.** **April 28, 2005 IED Attack in Tal Afar, Nineveh Province that Killed U.S. Army First Lieutenant William Anthony Edens and U.S. Army Specialist Ricky William Rockholt, Jr.**

On April 28, 2005, U.S. Army First Lieutenant ("1LT") William Anthony Edens and U.S.

---

[12] For all Bellwether Attacks, Dr. Gartenstein-Ross has concluded that a given Iranian Agent either "likely" or "very likely" carried out the attack. *See Stearns*, 633 F. Supp. 3d at 299 (finding "satisfactory evidence in the record to demonstrate that the explosive responsible for the [ ] attack in Baghdad was an EFP traceable to Iran and its proxies" based on expert testimony that the EFP "was likely" supplied by the IRGC); *Est. of Fishbeck v. Islamic Republic of Iran,* No. 18-CV-2248 (CRC), 2023 WL 7448770, at *7 (D.D.C. Aug. 18, 2023) ("*Fishbeck II*") (stating that "the Court is satisfied that there is sufficient evidence to attribute the . . . bellwether attack to AQI, which received material support from [Iran]," based on expert testimony and a sworn declaration of a battalion commander that AQI "was likely responsible for the attack"). A determination of "likely" is based on the presence of significant but inferential evidence (e.g., the given attack occurred within a geographic area where the perpetrator had operational dominance, was executed with TTPs that are generally identified with the perpetrator, and the attack aligns with the perpetrator's motivations). Attribution Report at 17. A determination of "very likely" is made when the aforementioned indicators exist alongside explicit indicators of responsibility, such as a credible and verified claim of responsibility or government reporting attributing responsibility to the perpetrator. *Id.* "Very likely" determinations may also be based on the profuse presence of inferential evidence, such as the attack's alignment with an Iranian Agent's TTPs and area of operations dominance *and* with the Iranian Agent's announcement of a campaign targeting coalition forces in the same time frame and region as the attack. *Id.*

Army Specialist ("SPC") Ricky William Rockholt Jr. were on patrol in a Stryker armored vehicle as part of a convoy in southeast Tal Afar, Nineveh Province. Attribution Report at 184. Their armored vehicle either struck and detonated an IED or was struck by a VBIED. *Id.* at 184-85. 1LT Edens and SPC Rockholt were killed by the explosive device's blast. *Id.* at 184. The blast also killed one other service member. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, very likely carried out this attack, based on: (1) AQI's dominance of the eastern half of Tal Afar, where the attack occurred in 2005, evidenced by their operation in the area of large training facilities, storage of significant amount of equipment, and usage of satellite uplinks; (2) the TTPs employed, including the use of IEDs and VBIEDs, both of which AQI regularly made use of in the area and continued to utilize after the date of this attack; and (3) the Zarqawi organization's direct claim of responsibility for this attack. *Id.* at 185.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 182 through 187. Bellwether Plaintiffs Christina Linden and Jason Rockholt were injured as a result of this attack.

**Attack #3.** **August 21, 2005 IED Attack in Al-Karmah, Al Anbar Province that Wounded U.S. Marine Corps Sergeant Adam C. Kisielewski**

On August 21, 2005, U.S. Marine Corps Sergeant ("Sgt.") Adam C. Kisielewski and other service members were clearing a school in Al-Karmah, Al Anbar Province. When they breached the rooftop door, a 97-pound artillery shell that was rigged to the door exploded. Attribution Report at 33. ██████████████████████████████████████████

██████████████ One other service member was killed as a result of this attack. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, likely carried out this attack, based on: (1) AQI's maintenance of "a strong and persistent presence in Al

Karmah" during this time period, which it used "as a center from which to attack Fallujah;"[13] and (2) the TTPs employed, including the use of IEDs, which AQI made prolific use of throughout Fallujah and the surrounding area, which includes Al Karmah, in 2005.[14]  *Id.* at 34.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 44 and 102 through 104.  Bellwether Plaintiff Adam Kisielewski was injured as a result of this attack.

**Attack #4.**     **June 9, 2006 IED Attack in Al Qaim, Al Anbar Province that Killed U.S. Marine Corps Lance Corporal Brent Basil Zoucha**

On June 9, 2006, U.S. Marine Corps Lance Corporal ("LCpl.") Brent Basil Zoucha was on patrol in an up-armored High Mobility Multipurpose Wheeled Vehicle ("HMMWV") called an M1114 in Al Qaim, Al Anbar Province when his vehicle was struck by a remotely detonated IED. Attribution Report at 40.  LCpl. Zoucha died in the explosion, which left a blast site approximately 12 feet wide, 11 feet long, and three feet deep.  *Id.* at 40, 43.  The blast also killed three other service members.  *Id.* at 40.

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as the Mujahedin Shura Council ("MSC"), very likely carried out this attack, based on: (1) MSC's dominance in the Al Anbar Province generally, and their significant operational presence in Al Qaim, at the time of

---

[13] According to the Institute for Defense Analysis, on which Dr. Gartenstein-Ross relies, "AQI . . . maintained a strong and persistent presence in Al Karmah, using it as a center from which to attack Fallujah.  One difficulty with securing the Karmah area was its proximity to where three Coalition operating areas connected: Multi-National Division–North, Multi-National Division–Baghdad, and MNF-W. Cognizant of the 'seam,' insurgents used the boundaries to facilitate their attack. The area north of Al Karmah had also been a harbor for AQI since 2004, given its remoteness and location along a major route connecting the Samarra area to the Fallujah area." Attribution Report at 35.

[14] For example, "a threat assessment declassified by CENTCOM and dated July 2, 2005," just weeks after the attack, "depicts AQI associate groups, VBIEDs, SVBIEDs, and weapons caches in and around Fallujah," and notes that AQI insurgents were attempting to establish themselves in the area "in the same manner employed in late 2003 and early 2004."  Attribution Report at 36.

the attack;[15] and (2) the TTPs employed, including the use of a powerful and remotely detonated IED, which MSC built in IED factories located throughout Al Anbar province[16] and utilized frequently in attacks against the coalition forces.[17] *Id.* at 40.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 105 through 110. Bellwether Plaintiff Rita Zoucha was injured as a result of this attack.

**Attack #5.** **February 8, 2007 IED Attack in Al-Karmah, Al Anbar Province that Killed U.S. Army Sergeant Ross Aaron Clevenger**

On February 8, 2007, U.S. Army Sergeant ("SGT") Ross Aaron Clevenger was in a RG-31 Mine-Protected Armored Personnel Carrier at the head of a convoy operating near Al-Karmah, Al Anbar Province. Attribution Report at 46. The convoy was on a route clearance mission "in support of recovery operations for a downed U.S. helicopter." *Id.* While en route to the helicopter's crash site, SGT Clevenger's vehicle hit a deeply planted IED, which exploded, severely injuring SGT Clevenger and sundering his armored vehicle into four pieces. *Id.* ███

████████████████████████████████████████████████████████████████████

---

[15] As Dr. Gartenstein-Ross concludes, "MSC used Al Qaim"—where this attack occurred—"and its surrounding towns as a point of entry for fighters and supplies entering Iraq from neighboring Syria, seizing existing smuggling routes from local tribes. By 2005, MSC's presence in Al Qaim was extensive[.]" Attribution Report at 42. And though its dominance in the area waned in late 2005, "MSC continued fighting the Albu Mahal throughout 2006, and the city's importance as a transit point from Syria meant MSC continued attacks on Coalition and local tribes in that area. For example, three months after the IED attack that killed LCpl. Zoucha, MSC kidnapped a local high-profile sheik who had objected to the group's presence in Al Qaim." Attribution Report at 43.

[16] According to Dr. Gartenstein-Ross, "[c]oalition special forces operations targeted these facilities extensively, often finding senior MSC leaders on site." Attribution Report at 44.

[17] As the Institute for Defense Analysis reported, "this was a sophisticated enemy . . . . All main roads and avenues of approach were laced with IEDs. Residential buildings were mined in order to target Coalition forces as they breached and cleared rooms." *See id.* at 42.

███████████████████

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's dominance of the Al Anbar Province generally during the time of the attack, including Al Karmah, evidenced by their frequent IED attacks in the area and infiltration of the local government;[18] (2) the TTPs employed, including the use of IEDs, which the Zarqawi organization built in IED factories located throughout Al Anbar province and utilized frequently in attacks against the coalition forces, and especially the use of a deeply planted IED that was a known Zarqawi tactic at this time because deeply buried IEDs were capable of destroying heavily armored vehicles typically used for route clearance missions, such as the one SGT Clevenger was on; and (3) ISI's claim of responsibility for the downing of the U.S. helicopter, which occurred the day before and to which SGT Clevenger's route clearance mission was a response. *Id.* at 47, 49.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 111 through 115. Bellwether Plaintiff Brandon Clevenger was injured as a result of this attack.

**Attack #6.**  **February 11, 2007 Shaped-Charge IED Attack in Al-Karmah, Al Anbar Province that Killed U.S. Army Sergeant Russell A. Kurtz**

On February 11, 2007, SGT Russell A. Kurtz was traveling as part of an armored vehicle convoy in Al-Karmah, Al Anbar Province, when the passenger-side of his vehicle, an up-armored

---

[18] According to Dr. Gartenstein-Ross, Al-Karmah, a nearby town located approximately six kilometers from Fallujah, "was central to the group's operations in the Fallujah area" because the town was strategically located along a weapons and foreign-fighter smuggling route.  Attribution Report at 48.  ISI exerted substantial control over Al Karmah, infiltrating the town's government structure.  *Id.* at 49.  That dominance continued until well after this attack.  For example, "[i]n June 2007, Coalition forces launched Operation Black Diamond in Al-Karmah to 'clear remaining AQI elements.'"  *Id.*

M1114 HMMWV, was struck by a shaped-charged IED.  Attribution Report at 54.  SGT Kurtz was seated in the passenger seat at the time of the attack, and was struck on the right side of his head by both the IED's shock wave and loose glass from the passenger-door window, which was hurled into the vehicle's cabin as a result of the IED's blast.  *Id.*  The IED "was most likely a command wire detonated device and was placed at a 45 degree angle in a pot hole . . . to aim at the passenger [] side of the vehicle."  *Id.* at 55.  The Explosives Ordinance Disposal ("EOD") unit concluded that "any triggerman employing this type of IED would have been either very skilled or very lucky, based on the timing required to properly employ this type of IED."[19] *Id.* at 55.

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's dominance of the Al Anbar Province generally during the time of the attack, including Al Karmah where Attack #5 also took place, evinced by ISI's frequent IED attacks and infiltration of the local government during this time period; and (2) the TTPs employed, including the use of shaped-charge IEDs, which ISI built in IED factories located throughout Al Anbar province, in addition to a shaped-charge IED factory in neighboring Samara Province, which were utilized frequently in attacks against the coalition forces.  *See id.* at 55, 58.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 116 through 119. Bellwether Plaintiffs Roger Kurtz and Stephanie Kurtz were injured as a result of this attack.

**Attack #7.**　　**March 5, 2007 IED Attack in Samarra, Saladin Province that Killed U.S. Army Staff Sergeant Justin Michael Estes**

On March 5, 2007, U.S. Army Staff Sergeant ("SSG") Justin Michael Estes was on patrol

---

[19] The EOD report "goes on to state that the operative who detonated the shaped charge IED 'was most likely located within a few hundred meters north of ASR Michigan and had his escape covered by a second Insurgent who fired at the platoon (1 B3-509) from a berm 300-400 meters north of the IED site.'" Attribution Report at 55.

in the third of four armored vehicles in the southeast portion of Samarra, Saladin Province. Attribution Report at 231. The first vehicle struck a victim-operated IED, which was comprised of a pressure plate linked to multiple 155mm artillery shells. *Id.* at 232. The explosion completely destroyed the vehicle, "effectively cutting it in half." *Id.* at 231. SSG Estes exited his vehicle and ran towards the wounded to provide medical aid, but another pressure-switch IED exploded, ███ ████████████████████ *Id.* at 232. Five other service members died in the attack that killed SSG Estes. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, likely carried out this attack, based on: (1) ISI's extensive presence in Samarra during the time of the attack, evidenced by the organization's claimed attacks on police stations which marshalled some 300 insurgent fighters, roadside bombings, attacks on two minarets, and brazen threats of attacks on Iraqi police forces located within Samara;[20] and (2) the TTPs employed, including the use of IEDs that contained unique components similar to the device used to kill SSG Estes,[21] for which the Zarqawi organization ran specialized IED training camps where insurgents received instruction on IED construction and use. *Id.* at 232, 234.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 212 through 214. Bellwether Plaintiff Norma Estes was injured as a result of this attack.

---

[20] Just two months after this attack, ISI carried out another roadside bomb attack in this same area against an Iraqi army vehicle. Attribution Report at 233.

[21] Four months after the attack that killed SGT Estes, coalition forces seized a Zarqawi organization weapons cache south of Baghdad, which contained materials to construct IEDs similar to the device that killed SSG Estes. *Id.* at 234.

**Attack #8.**   **April 7, 2007 IED Attack in Zaganiyah, Diyala Province that Killed U.S. Army Captain Jonathan Grassbaugh, U.S. Army Private First Class Rodney Lynn McCandless, and U.S. Army Specialist Levi Kenneth Hoover**

On April 7, 2007, U.S. Army Captain ("CPT") Jonathan D. Grassbaugh, U.S. Army PFC Rodney Lynn McCandless, and SPC Levi Kenneth Hoover were inside an armored vehicle operating as part of a resupply convoy in Zaganiyah, Diyala Province.  Attribution Report at 141. Their convoy was returning to base when an IED detonated beneath their vehicle, exploding with such violence that the vehicle's turret and four of the five applicants were sent skyward.  *Id.*  PFC McCandless remained trapped inside the vehicle and died as the vehicle was "engulfed in fire." *Id.*  SPC Hoover was found dead "15-20 meters away from the blast site."  *Id.*  CPT Grassbaugh was found burning approximately 10 to 15 meters from the blast site and was pronounced dead on arrival at a medical center in nearby Balad.  *Id.* at 142.  The blast also killed one other service member.  *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's "effective[] occup[ation]" of the broader Diyala River Valley region, including Zaganiyah, where ISI militants killed or displaced approximately 5,000 Shia residents by March, 2007;[22] and (2) the TTPs employed, including the use of IEDs, which ISI utilized along the main roads surrounding Zaganiyah to such a degree that, at the time of the attack, certain coalition forces elements were reporting coming under "two to three daily IED attacks." *Id.* at 142, 144.

---

[22] By March, 2007, ISI had installed a new Islamic government in the region which implemented Sharia law.  *See* Attribution Report at 143.  ISI also established its military headquarters in a Zaganiyah elementary school and trained its fighters on a pre-setting tactic for IEDs, where IEDs were "buried under streets in Diyala Province" sometimes months before detonation in order to avoid detection by road surface alterations.  *Id.*

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 153 through 158. Bellwether Plaintiff Patricia Grassbaugh was injured as a result of this attack.

> **Attack #9.**   **May 28, 2007 IED Attack in Abu Sayda, Diyala Province that Killed U.S. Army Specialist James E. "Jimmy" Summers, U.S. Army Specialist Zachary David "Bubba" Baker, and U.S. Army First Lieutenant Kile G. West**

On May 28, 2007, SPC James E. "Jimmy" Summers, SPC Zachary David "Bubba" Baker, and 1LT Kile G. West were traveling as part of a convoy tasked with retrieving a downed helicopter near Abu Sayda, Diyala Province. Attribution Report at 146. Their Bradley fighting vehicle drove over a pressure plate, which in turn detonated an IED buried underneath the road. *Id.* The explosion killed SPC Summers and 1LT West immediately, while SPC Baker sustained injuries from the blast and died while being evacuated to a medical facility located in Balad. *Id.* at 146-47. One other service member was killed as a result of this attack. *Id.* at 147. Shortly after the initial explosion, a second IED containing approximately 100 pounds of explosives detonated on the recovery team, resulting in the death of another service member. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack based on: (1) ISI's dominance of the broader Diyala River Valley region during the time of the attack, including towns near Abu Sayda, which it used as a "safe haven" town from which ISI militants organized attacks on neighboring towns; (2) the TTPs employed, including the use of IEDs, which ISI utilized along the main roads surrounding the nearby towns of Baqubah and Zaganiyah to such a degree that, at the time of the attack, certain coalition forces elements were reporting coming under "two to three daily IED attacks;" and (3) the Zarqawi organization's claim of responsibility for shooting down the helicopter which was the impetus for the mission on which SPC Summers, SPC Baker, and 1LT West were killed. *Id.*

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 159 through 165.

Bellwether Plaintiffs Michael Summers, Clark West, and Nanette West were injured as a result of this attack.

**Attack #10.**    **October 14, 2007 IED Attack in Arab Jabour Neighborhood of Baghdad that Killed U.S. Army Sergeant First Class Justin S. Monschke**

On October 14th, 2007, U.S. Army Sergeant First Class ("SFC") Justin S. Monschke pursued insurgents on foot in Arab Jabour, a southern neighborhood of Baghdad.   Attribution Report at 122.  An improvised IED placed in a footpath detonated, resulting in SFC Monschke being thrown 15 meters into a 15-foot deep ditch ███████████████████████████ ████████████████████████████████████ *Id.* at 123.  SFC Monschke died from his injuries.  *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's "virtually uncontested" influence over the southeast of Baghdad at the time of the attack, fostered by the aggrieved local Sunni population, Iraqi Government absenteeism, and favorable terrain, and evinced by ISI's frequent IED attacks on main roadways, use of the area to prepare fighters for operations in Baghdad, and maintenance of a "detention house" used to torture captured combatants; and (2) the TTPs employed, including the use of IEDs, which ISI utilized in at least one other October, 2007 attack for which it claimed responsibility, and which were constructed with similar materials to those discovered in an ISI weapons cache seized by the coalition forces the following month in neighboring Babil Province. *See id.* at 123, 125.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 147 through 149. Bellwether Plaintiff Patty Jett was injured as a result of this attack.

**Attack #11.** **October 24, 2007 IED Attack in Baiji, Saladin Province that Killed District of Columbia U.S. Army National Guard Sergeant First Class Robin L. Towns, Sr.**

On October 24, 2007, District of Columbia U.S. Army National Guard SFC Robin L. Towns, Sr. was part of a four-car convoy operating in Baiji, Saladin Province.  Attribution Report at 237.  The convoy noticed a vehicle tire lying in the road and stopped to scan the tire for signs of an IED.  *Id.*  After determining there was no threat, the vehicles drove past the tire one by one. *Id.*  When SFC Towns's vehicle, an HMMWV, drove by, a buried command-wire IED detonated flipping SFC Towns's vehicle ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 237-38.

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, likely carried out this attack, based on: (1) ISI's use of Baiji before, during, and after the attack as an instrumental midpoint in a key transportation route between Mosul and Baghdad;[23] and (2) the TTPs employed, including the use of a buried command-wired IED, which ISI regularly used to target coalition forces in Iraq's northern provinces, and which were constructed with similar materials to those discovered in ISI weapons caches captured by coalition forces in neighboring Nineveh Province during this time period.[24]  *Id.* at 238, 240.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 215 through 217. Bellwether Plaintiff Shelia Towns was injured as a result of this attack.

---

[23] As Dr. Gartenstein-Ross explains, ISI's dominance in the area is further demonstrated by: the capture by coalition forces of senior ISI leaders in the Baiji network in the months leading up to the attack; and ISI's deploying of several car bombs in Baiji just before and several months after the attack.  Attribution Report at 239.

[24] The Zarqawi organization used command-wired IEDs similar to the one that killed SFC Towns in several other attacks in the neighboring province.  *Id.* at 240.

**Attack #12.** **January 9, 2008 House-Borne IED Attack in Sinsil, Diyala Province that Killed U.S. Army Staff Sergeant Jonathan Killian Dozier, U.S. Army Sergeant Zachary Wade McBride, and U.S. Army Sergeant First Class Matthew Ignatius Pionk**

On January 9, 2008, SSG Jonathan Killian Dozier, SGT Zachary Wade McBride, and SFC Matthew Ignatius Pionk entered a suspected ISI safe house in Sinsil, Diyala Province. Attribution Report at 158. Their entry triggered the explosion of a HBIED, causing the building to collapse and killing all three service members. *Id.* Three additional service members and one civilian contractor were also killed as a result of the HBIED. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi Organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's dominance of the broader Diyala River Valley region, including the town of Sinsil, where ISI militants established a nearby sanctuary, which they used to "terroriz[e] and intimidate[e] the local population;"[25] (2) the TTPs employed, including the use of HBIEDs, which were a common ISI tactic at this time, with coalition forces encountering 42 HBIEDs belonging to ISI in the Diyala River Valley between December 24, 2007 and February 18, 2008; and (3) U.S. Government reporting that indicates ISI perpetrated the attack, based in part on intelligence that just days before the attack "[ISI] started hanging out at this house. Local citizens were warned by [ISI] not to look at the activity taking place at the residence. Children who normally play in abandoned houses were told not to go in this one."[26] *Id.* at 158, 161.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 172 through 176. Bellwether Plaintiffs Martha Cabe, Sarah Lambert, and Duane Pionk were injured as a result of

---

[25] ISI used the area as a command and control site "to funnel fighters, weapons, and money." Attribution Report at 159. ISI also operated detention, torture, and execution facilities near Sinsil. *Id.*

[26] Additionally, according to the after action report, a local political leader pointed to the house where the bomb was planted, as "the location of a suspected Al Qaeda safehouse." *Id.* at 158.

this attack.

### B.    Complex Attacks

Four of the 25 Bellwether Attacks were complex attacks carried out by the Iran-backed

Zarqawi organization and/or AAI.  The attacks claimed the lives of 18 service members and

civilian contractors, and severely wounded many more.

Complex attacks involve the use of multiple types of weapons in the same attack, and are

either previously coordinated engagements by multiple attacks or opportunistic employment of

multiple available weapon types.  *See Roth II*, 651 F. Supp. 3d at 80 (deeming attacks "complex"

because one roadside bombing attack contained a mortar "indirect fire component" and another

attack involved "sustained fighting with multiple weapons systems"); *Brown II*, 2023 WL

4824740, at *4 (noting that complex attacks "involve multiple weapons systems (such as an IED

and an RPG)[,] are sustained over time[, and] show evidence of advanced planning to inflict

maximum casualties"); *Cabrera I*, 2022 WL 2817730, at *15 (categorizing and defining complex

attacks).  Complex attacks may take the form of an ambush, which generally requires the

perpetrators to have conducted reconnaissance and selected the attack site ahead of time, gathered

men and materiel, and laid in wait.  *See Roth II*, 651 F. Supp. 3d at 90 (noting the expert's testimony

that the complex attack was an "'ambush' because terrorists would have developed intelligence

about U.S. troop movement to carry it out successfully"); *Fishbeck II*, 2023 WL 7448770, at *4

(describing a complex attack "perpetrated by a large number of combatants embedded within the

city who used small arms, rocket propelled grenades ('RPGs'), and improvised explosive devices

('IEDs')" and also "used sophisticated ambush tactics, including blocking routes to funnel the

soldiers into 'a kill zone'").

Complex attacks can also begin with an event-based trigger (e.g., the detonation of an IED,

followed by small arms fire) or can involve multiple weapon systems from the outset (e.g.,

coincident engagement with small arms and RPGs, followed by remote detonation of nearby IEDs), and may involve multiple waves of attacks. *See Roth II*, 651 F. Supp. 3d at 79-80 (agreeing with an expert's conclusion that the attack was pre-planned because it involved the explosion of a building door when servicemen attempted to breach the building and subsequent fire attack from RPGs and small arms). As such, complex attacks are generally carried out by more sophisticated terrorist groups, often with substantial training and other support from Iran. *See Roth II*, 651 F. Supp. 3d at 76 (noting that Iran taught terrorists "how to commit 'complex attacks,' which involve multiple weapons such as IEDs combined with RPGs, small arms fire, and more"); *Fishbeck II*, 2023 WL 7448770, at *5 (stating that "the coordinated nature of the largescale attack," "the insurgents' sophisticated ability to lure the convoy with false intelligence, track the fast-moving convoy through the region, and immobilize the convoy in a kill zone" was "consistent with the capabilities of AQI," which received material support from Iran); Pregent Expert Report ¶¶ 157-58 (stating that as AAI/AAS, AQI, and their respective affiliates' capabilities for complex attacks increased, "U.S. forces concluded the attacks were planned out, rehearsed, and sourced, and benefitted from pattern analysis and intelligence—a trained tactic of the IRGC-QF and Hezbollah").

Dr. Gartenstein-Ross concludes that Iran materially supported each of these attacks, which Plaintiffs discuss *infra* in § V(C)(2)(b).

         **Attack #13.**    **April 9, 2004, Complex Ambush Attack in Abu Ghraib, Baghdad Province that Killed U.S. Army Reserve Sergeant Elmer C. Krause and Kellogg, Brown & Root ("KBR") Civilian Contractors Stephen F. Hulett, Timothy E. Bell, Tony Duane Johnson, and Jack A. Montague**

On April 9, 2004, SGT Elmer C. Krause and KBR civilian contractors Stephen F. Hulett, Timothy E. Bell, Tony Duane Johnson, and Jack A. Montague were serving at Logistics Support Area Anaconda, in Balad, Saladin Province when their convoy was ambushed. Attribution Report

at 99.  The day before the attack, the U.S. Army requested that KBR send an emergency convoy to the north gate of Baghdad International Airport ("BIAP") to supply fuel for U.S. forces.  *Id.*  SGT Krause's unit was tasked with protecting the unarmed KBR drivers.  *Id.*  The convoy, consisting of 26 vehicles, hit a roadblock en route to BIAP.  *Id.* at 100.  As the convoy pushed through the roadblock, it was ambushed by approximately 15 RPGs and additional rifle fire.  *Id.*  The attackers detonated IEDs during their assault.  *Id.*  Survivors report there may have been machine guns and mortars used as well.  *Id.*

SGT Krause was shot while attempting to help survivors in another vehicle evacuate into his tanker, Tanker 12.  *Id.*  After SGT Krause was shot, Tanker 12 caught fire, and SGT Krause was not seen evacuating the vehicle with the other members of the convoy.  *Id.*  SGT Krause was listed as "whereabouts unknown" until his remains were identified on April 23, 2004.  *Id.*

Mr. Hulett's tanker fishtailed and crashed.  *Id.*  He escaped his vehicle, but was killed by gunfire during the ambush.  *Id.*  ████████████████████████████████████ ████████████████  *Id.*  Mr. Johnson's tanker, Tanker 8, sustained significant damage as a result of insurgent fire, causing the tanker to crash.  *Id.*  Mr. Johnson was killed in the crash.  *Id.*  Mr. Montague's tanker, Tanker 10, was destroyed by enemy fire, resulting in his death.  *Id.*  Mr. Bell's tanker, Tanker 15, was rendered inoperable by enemy fire during the ambush.  *Id.*  After the operable vehicles arrived at BIAP, they returned to the ambush site to retrieve the wounded and stranded members of the convoy.  *Id.*  By the time they returned, Mr. Bell, along with two other convoy members, were missing.  Mr. Bell was never found and was declared dead six years later, on April 26, 2010.  *Id.* at 101.

This attack has come to be known as the "Good Friday Ambush."  *Id.*  Dr. Gartenstein-Ross concludes that the Zarqawi organization very likely carried out this attack, based on: (1) the

Zarqawi organization's maintenance of a significant presence near BIAP, and west of Baghdad generally, in the period leading up to, during, and after the attack, including carrying out multiple attacks in the area shortly before and after this ambush; (2) the TTPs employed, and especially the use of a complex ambush attack featuring RPGs, IEDs, and various small arms, all of which the Zarqawi organization had training on and access to at the time of the attack and had used in carrying out similar ambushes elsewhere in Iraq; and (3) the U.S. Government's assignment of responsibility for the attack to the Zarqawi organization, and in particular Zarqawi organization leader Hammada Awdah Abd Farhan, who was responsible for coordinating and carrying out other ambushes and assassinations in the Baghdad area during this period.  *Id.* at 101, 103.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 128 through 132. Bellwether Plaintiffs Jonathan Krause, Gerald Krause, Lisa Kaufman, Alexandria Parks, Felicia Bell Carter, and Michael Bell were injured as a result of this attack.

### Attack #14.   April 11, 2004 Complex Attack Near Mahmudiyah, Babil Province that Killed U.S. Army Sergeant Major Michael B. Stack

On April 11, 2004, U.S. Army Sergeant Major ("SGM") Michael B. Stack and his unit were returning to their primary base of operations after an earlier ambush involving the use of an IED that misfired and the attempted firing of an RPG.  Attribution Report at 73.  As SGM Stack's unit traveled near Mahmudiyah, Babil Province, they were ambushed again by a heavy volume of machine gun and small arms fire.  *Id.* at 73-74.  Securing the convoy's rear, SGM Stack directed fire against the enemy.  *Id.* at 73.  As the convoy moved through the area, "a [sic] IED/RPG was detonated on the southern side of the last vehicle."  *Id.* SGM Stack was killed in action. ████████  ████████████████████████████████████  *Id.* at 74.  Shortly after this attack, the unit was ambushed again with small arms fire.  *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization likely carried out this attack,

based on: (1) the Zarqawi organization's dominance of the city of Mahmudiyah at the time of the attack, evinced by the Zarqawi organization's terrorizing of Shia residents and frequent ambushing of coalition forces during this time period in what was known as the "Triangle of Death";[27] and (2) the TTPs employed, including the use of a complex ambush[28] attack at night involving a large quantity of machine guns and RPGs and/or IEDs, which the Zarqawi organization had employed in similar ambushes elsewhere in Iraq.[29]  *See id.* at 74, 76-77.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 123 through 125. Bellwether Plaintiffs Milissa Wojtowicz and Virginia Maitland were injured as a result of this attack.

### Attack #15.   June 12, 2007 Complex Attack in Baqubah, Diyala Province that Killed U.S. Army Corporal Damon LeGrand

On June 12, 2007, U.S. Army Corporal ("CPL") Damon LeGrand was on patrol as part of a convoy near Baqubah, Diyala Province, when his armored vehicle "ran over" an IED "comprised of 'two anti-tank mines' buried in the ground."  Attribution Report at 152.  The blast was so powerful that there was nothing left of the armored vehicle except for the "doghouse" (main

---

[27] According to the Institute for the Study of War, on which Dr. Gartenstein-Ross relies, "Al Qaeda dominated the city of Mahmudiyah from 2004 through 2006."  Attribution Report at 75.  The Zarqawi organization carried out suicide bomb attacks against police and mosques in the area in 2004.  *Id.* at 76.  The organization also moved fighters, supplies, and weapons through the region west and north of Mahmudiyah.  *Id.*

[28] As explained in the after action report for this attack, "The ambush was well directed and planned, the enemy had isolated the kill zone and there was no other CF seen on the entire MSR. The enemy placed a heavy volume of fire that was controlled and not just the usual spray of bullets. . . . The enemy followed similar TTPs for each ambush by isolating the trail vehicle directing the majority of their firepower in an attempt to possibly cause a break in contact."  *Id.*

[29] At least four other attacks on coalition forces in 2004 demonstrate the Zarqawi organization's "ability to direct and plan complex ambushes" like the attack that killed SGM Stack.  *Id.* at 76-77.

carriage). *Id.* Simultaneously, the vehicle was attacked with an RPG. *Id.* Following the IED and RPG blasts, the remainder of CPL LeGrand's unit engaged with a high volume of small arms fire. *Id.* By the time the attackers had engaged his comrades, ████████████████████████████ ████████████████████ *Id.* One other service member was killed as a result of the attack. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, likely carried out this attack, based on: (1) ISI's position as the "dominant force" during this period in Diyala Province, which includes Baqubah, where the attack took place; and (2) the TTPs employed, including the use of complex ambush attacks involving small arms, IEDs, and RPGs, all of which ISI possessed at the time of the attack.[30]  *Id.* at 152, 154-55.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 166 through 171. Bellwether Plaintiffs Ashley LeGrand Rawlings and K.L. were injured as a result of this attack.

**Attack #16.**  **January 28, 2008 Complex Attack in Mosul, Nineveh Province that Killed U.S. Army Sergeant James Edward Craig, U.S. Army Corporal Evan Andrew Marshall, and U.S. Army Private Second Class Joshua Young**

On January 28, 2008, SGT James Edward Craig, CPL Evan Andrew Marshall, and U.S. Army Private Second Class ("PV2") Joshua Young patrolled in a five-vehicle convoy in the Yarimjah neighborhood of Mosul, Nineveh Province. Attribution Report at 191. While on patrol, a powerful IED detonated directly under their up-armored vehicle, a M1114 HMMWV, splitting the vehicle in two pieces. *Id.* SGT Craig, CPL Marshall, and PV2 Young were killed immediately, and the remaining patrol vehicles came under attack from small arms fire, RPGs, and four mortar

---

[30] In the months before the attack that killed CPL LeGrand, Coalition forces uncovered several weapons caches containing machine guns, RPGs, and explosives used for the construction of IEDs. Attribution Report at 154.  ISI also conducted numerous complex attacks utilizing such weaponry in the months leading up to the attack that killed CPL LeGrand.  *Id.* at 154-55.

rounds coming from surrounding buildings. *Id.* Helicopter-borne air support and other ground troops moved to assist the embattled convoy. *Id.* at 193. The fighting lasted for nearly four and a half hours after the initial IED explosion that killed SGT Craig, CPL Marshall, and PV2 Young. *See id.* Two other service members were killed in the attack. *Id.* at 191.

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, and AAI, operating as AAS, very likely jointly carried out this attack, based on: (1) ISI's dominance of Mosul at the time of the attack, which was deemed as the organization's "last major urban stronghold," while AAS, which maintained a "working relationship" with ISI during this time, concentrated fighters in Mosul thanks in part to Mosul's large population and narrow alleyways that afforded AAS insurgents a defensible environment; (2) the TTPs employed, including the use of complex ambush attacks involving small arms, IEDs, mortars, and RPGs, all of which ISI and AAS had access to at the time; (3) declassified U.S. Government reporting, which characterized ISI as the dominant insurgent group in Mosul at the time and the likely perpetrator of the attack; and (4) AAS's claim of responsibility for the attack, which details when the insurgents planted the IED that initiated the attack, as well as the progression of the battle. *Id.* at 193.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 188 through 199. Bellwether Plaintiffs Joel Sexton-Craig, Natalie Jackson, Andrew Marshall, Sheila Marshall, and Brandi Yanez were injured as a result of this attack.

### C.    Suicide Bombings

Five of the 25 Bellwether Attacks involved the use of suicide attacks carried out by Iran-backed AAI or the Zarqawi organization. The attacks claimed the lives of 27 service members and civilian contractors, and seven Iraqi service members; they also severely wounded many more.

Suicide bombings involve an individual's purposeful commitment of suicide by command-detonating explosives while they are near their target, generally while on foot or in a vehicle.

*Cabrera I*, 2022 WL 2817730, at *17 (categorizing and defining suicide attacks); *see Taitt v. Islamic Republic of Iran*, No. CV 20-1557 (RC), 2023 WL 2536518, at *2 (D.D.C. Mar. 16, 2023) (describing a suicide bombing of the U.S.S. Cole).  On foot, suicide bombings typically involve the attacker wearing a garment—described as an SVIED—with explosives sewn into the fabric, which may be further augmented with nails, ball bearings, and other fragments which function as shrapnel when the explosives detonate, inflicting additional deaths and injuries.  *Cabrera I*, 2022 WL 2817730, at *17; *see Fishbeck II*, 2023 WL 7448770, at *7 (describing an AQI-perpetrated personnel-borne IED attack near a mosque on a major religious holiday).  Suicide bombings perpetrated from vehicles, also described as SVBIEDs, are cars, vans, or trucks loaded with explosives driven near or into their target.  *Cabrera I*, 2022 WL 2817730, at *17; *see Brown II*, 2023 WL 4824740, at *4 (noting that VBIEDs—explosive devices carried by vehicles—are one of AQI's signature attack methods); *Fishbeck II*, 2023 WL 7448770, at *10 (describing a vehicle-borne IED attack when the detonation of a parked car resulted in killing and injuring servicemen who approached the car on patrol).

As courts have previously recognized, suicide attacks are a signature TTP of the Zarqawi organization, and are often supported by Iran through the provision of weapons, training, and funding.  *See Brown II*, 2023 WL 4824740, at *10 (finding a SVBIED attack—a "signature" AQI TTP—perpetrated by AQI to have been caused by Iran's material support); *Cabrera I*, 2022 WL 2817730, at *22 (finding Iranian supply of "finances, training, and weapons" to have "substantially contributed" to a proxy's ability to conduct person-borne and SVBIED attacks); *see also* Sunni Militant Groups Report at 46, 72 (stating the Zarqawi organization "sent three kinds of people into Iraq: suicide bombers, anti-coalition fighters, and couriers" and that AAI signaled its commitment to "continu[e] the insurgency" by committing a suicide bombing in Mosul); Attribution Report at

91, 96 (describing the Zarqawi organization's practice of perpetrating suicide bombings, as well as AAI's "frequent[]" use of suicide bombers and car bombs); Pregent Expert Report ¶ 146 (stating that suicide bomb makers "would routinely enter Iraq via the IRGC-QF and the Syrian-intelligence Foreign Fighter Facilitation network, in full knowledge of both Iran and Syria").  AQI, for instance, "claimed responsibility for countless suicide bombings, an integral tactic in its war against the coalition, which reflected the group's obsession with martyrdom."  *See* Attribution Report at 120. Suiciding bombing was also a preferred method of AAI attack.  *Id.* at 96 (citing a Stanford University Center for International Security and Cooperation study finding that AAI "frequently used suicide bombers and car bombs"); *id.* at 132 (explaining that "both the Zarqawi organization and AAS/AAI remained active in the city of Baqubah, routinely conducting IED attacks on coalition and Iraqi forces, as well as suicide bombings and VBIED attacks, throughout 2007 and 2008"); *see also id.* at 172-84, 221-25 (detailing Attacks #19 and #17, respectively, both of which were suicide Bellwether Attacks committed by AAI, and also describing that suicide bombings were TTPs commonly associated with AAI).  The Sunni Terrorist Groups preferred these attacks for the same reason—they produced "'spectacular attacks,' gaining media attention and notoriety, and supporting their goal of inciting sectarian conflict."  *Id.* at 120.

Dr. Gartenstein-Ross concludes that Iran materially supported each of these attacks, which Plaintiffs discuss *infra* in § V(C)(2)(c).

### Attack #17.   May 14, 2004 Suicide Vehicle-Borne IED Attack in Balad, Saladin Province that Killed U.S. Army Sergeant James W. Harlan

On May 14, 2004, SGT James W. Harlan traveled as a passenger in a vehicle in Balad, Saladin Province.  Attribution Report at 221.  A passing vehicle carrying explosives was detonated by the driver.  *Id.* ████████████████████████████████████

████ *Id.*

Dr. Gartenstein-Ross concludes that AAI, operating as AAS, likely carried out this attack, based on: (1) AAS's maintenance of operational dominance in the Saladin Province at the time of the attack, evinced by AAS's "credibl[e] [claims of] responsibility for numerous attacks in the vicinity of Balad;"[31] and (2) the TTPs employed, including the use of an SVBIED, which AAS had utilized in several other recent attacks for which it claimed responsibility.[32]  *Id.* at 221.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 207 through 209. Bellwether Plaintiff Tara Roberts was injured as a result of this attack.

### Attack #18.   October 14, 2004 Suicide Attack in Baghdad, Baghdad Province that Killed John Albert Pinsonneault

On October 14, 2004, John Albert Pinsonneault was employed as a civilian government contractor with DynCorp, and was spending time at a bazaar in the International Zone of Baghdad. Attribution Report at 113.  While Mr. Pinsonneault and two of his colleagues were walking through the market, a suicide bomber and IED simultaneously detonated in the market and the International Zone café, respectively.  *Id.*  Mr. Pinsonneault was killed in the attack. █████████████

███████████████████████████████████████████████████████████████

████████████████   *Id.*  Two of Mr. Pinsonneault's DynCorp colleagues, one other American civilian, and six Iraqi civilians were also killed in the attack.  *Id.*

---

[31] AAS credibly claimed responsibility for attacks in the vicinity of Balad, including on April 8, 2004; April 9, 2004; April 12, 2004; April 13, 2004; and July 28, 2004.  Attribution Report at 222-23.  These attacks indicate that AAS maintained uninterrupted area of operations dominance in the area between these cities, including in and around Balad, at the time of the attack that killed SGT Harlan.  *Id.* at 223.

[32] In the months preceding this attack, AAS orchestrated several SVBIED attacks targeting coalition forces for which it claimed responsibility, including on December 12, 2003; January 31, 2004; and February 23, 2004.  *Id.* at 223.  AAS's use of SVBIEDs also continued past May 2004. *Id.*  For example, AAS was responsible for a SVBIED bombing on July 6, 2004 in Khalis, a town in Diyala Province, according to the Office of the Director of National Intelligence.  *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely carried out this attack, based on: (1) JTJ's high level of activity in Baghdad, including high-profile bombings, at the time of the attack, having perpetrated a suicide truck bombing against the U.N. Headquarters in Baghdad less than a year prior; (2) the TTPs employed, including the use of a SVIED, which was a common TTP used by the Zarqawi organization throughout its existence, including during the period it was known as JTJ; and (3) JTJ's issuance of a claim of responsibility for the attack, which was subsequently published by The New York Times. *Id.* at 113-14.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 138 through 143. Bellwether Plaintiff Jacob Kosky was injured as a result of this attack.

> **Attack #19.** **December 21, 2004 Suicide Attack on Forward Operating Base Marez, Mosul, Nineveh Province that Killed Maine U.S. Army National Guard Staff Sergeant Lynn Robert Poulin, U.S. Army Staff Sergeant Julian Melo, and U.S. Army Private Lionel Ayro**

On December 21, 2004, Maine U.S. Army National Guard SSG Lynn Robert Poulin, U.S. Army Staff Sergeant Julian Melo, and U.S. Army Private ("PVT") Lionel Ayro were in the Dining Facility ("DFAC") on FOB Marez in Mosul, Nineveh Province. Attribution Report at 172-73. A suicide bomber in an Iraqi Army uniform gained access to FOB Marez, entered the DFAC, sat at a table facing the busy cafeteria line, and detonated the explosives on his person. *Id.* at 173. The blast killed 14 U.S. military personnel, including SSG Poulin, SSG Melo, and PVT Ayro; four Haliburton employees and four Iraqi soldiers were killed as well, and 71 other people were injured by the blast. *Id.*

Dr. Gartenstein-Ross concludes that AAI, operating as AAS, very likely carried out this attack, based on: (1) AAS's maintenance of an operational presence in Mosul at the time of the attack, having engaged in fierce fighting with coalition forces in Mosul; (2) the TTPs employed, including the use of a suicide attack, of which AAS had a "documented history;" (3) AAS's

issuance of a written claim of responsibility for the attack, which included a video of the events leading up and subsequent to the attack; and (4) U.S. Government reporting, which assigned AAS responsibility for having perpetrated the attack. *Id.* at 174.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 177-81. Bellwether Plaintiff Nancy Poulin was injured as a result of this attack.

> **Attack #20.** **December 9, 2005 Suicide Vehicle-Borne IED Attack in Abu Ghraib, Baghdad Province that killed U.S. Army Specialist Adrian N. Orosco**

On December 9, 2005, SPC Adrian Noe Orosco was patrolling on foot in Abu Ghraib, a western neighborhood of Baghdad. Attribution Report at 117-18. SPC Orosco was killed at the "intersections of Route Sword and Route Michigan" by the detonation of an SVBIED. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, very likely carried out this attack, based on: (1) AQI's high level of activity in Baghdad before, during, and after the time of the attack, where only three months prior AQI militants had orchestrated 12 coordinated explosions across Baghdad that killed 167 people and wounded approximately 600 more;[33] and (2) the TTPs employed, which include the use of SVBIEDs, which were a "signature attack method[]" of AQI at the time of the attack.[34] *Id.* at 118.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 144 through 146.

_____

[33] At the time of the attack, AQI had consolidated control in the western neighborhoods of Baghdad. Attribution Report at 119. Specifically, AQI "used Route Sword and Route Michigan as primary routes for transporting weapons and supplies into Baghdad," and SPC Orosco was killed by an SVBIED explosion at the intersection of these routes. *Id.*

[34] For example, "AQI was responsible for the SVBIED attack on the U.N. Baghdad Headquarters in 2003, killing the United Nations' representative to Iraq, Sergio Vieira de Mello. In 2004, AQI carried out a SVBIED attack that killed Iraqi Governing Council head Ezzedine Salim near the Coalition headquarters compound in Baghdad. In September 2005, when AQI had strongholds in west Baghdad, AQI launched a triple suicide car bomb attack in Balad, Saladin Province, killing over 200 people." *Id.* at 119.

Bellwether Plaintiff Noe Orosco Sr. was injured as a result of this attack.

> **Attack #21.**    **April 10, 2009 Suicide Vehicle-Borne IED Attack in Mosul, Nineveh Province that Killed U.S. Army Corporal Jason G. Pautsch, U.S. Army Staff Sergeant Bryan E. Hall, U.S. Army Sergeant Edward W. Forrest, and U.S. Army Staff Sergeant Gary L. Woods**

On April 10, 2009, CPL Jason G. Pautsch, SSG Bryan E. Hall, SGT Edward W. Forrest, and SSG Gary L. Woods were on patrol as part of a convoy in western Mosul, Nineveh Province. Attribution Report at 207.  A red dump truck approached their position at FOB Marez at a high rate of speed.  *Id*.  CPL Pautsch, SGT Forrest, and SSGs Hall and Woods attempted to stop the truck with machine gun fire from their armored vehicle, but the truck continued to rapidly advance towards their position.  *Id*.  When the truck was approximately 10 meters from the service members' armored vehicle, a SVBIED contained within the truck detonated, "tearing 'the roof from the [service members'] vehicle hull,' tipping it over, and ejecting" the service members.  *Id*. CPL Pautsch, SGT Forrest, and SSGs Hall and Woods died instantaneously from injuries sustained in the blast.  *Id*. at 208.

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's continued operational presence in Mosul, which reached a cadence "35 attacks per week" in the month of and after the attack; (2) the TTPs employed, including the use of SVBIEDs, which ISI was known to use to target coalition forces compounds at the time of the attack; (3) the U.S. Government's unsealing of an indictment prosecuting a Canadian-Iraqi citizen and member of ISI, Sayfildin Tahir Sharif, for orchestrating the attack, where Sharif eventually pled guilty and was sentenced to 26 years in federal prison; and (4) ISI's issuance of a claim of responsibility, which described the attack.  *Id.* at 208, 210-13.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 200 through 206. Bellwether Plaintiffs Josef Pautsch and Becky Johnson were injured as a result of this attack.

### D.      Small Arms, Rocket-Propelled Grenade, and Anti-Aircraft Attacks

Two of the 25 Bellwether Attacks were small arms, RPG, and anti-aircraft attacks carried out by the Iran-backed Zarqawi organization.   These attacks claimed the lives of 13 service members.

Small arms (including handguns, sniper rifles, and machine guns), RPG, and anti-aircraft attacks involve the attacker firing at their target with line-of-sight visibility.  *Cabrera I*, 2022 WL 2817730, at *16 (describing the above as "[i]nfantry-style tactics" which involve "individuals pulling triggers").  As numerous courts have concluded, Iran has provided terrorist groups in Iraq with these types of weapons and trained these militants on how to use them effectively to kill American troops.  *See Roth II*, 651 F. Supp. 3d, at *92 (finding possession of RPGs by proxy forces, and in particular their successful use, to indicate "substantial" Iranian support); *Brown II*, 2023 WL 4824740, at *6 (finding RPGs require training to use accurately, indicating substantial Iranian support); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239, at *4-5, 10 (D.D.C. Sept. 8, 2022) (concluding that Iran's provision of material support proximately caused the rocket fire attack that resulted in a service member's injuries), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); *see also Cabrera I*, 2022 WL 2817730, at *11 (finding that Iran provided training to Taliban members in Afghanistan on the use of small arms and infantry tactics); Sunni Militant Groups Report at 51-52 (detailing Iranian provision of weapons to the Zarqawi organization of the kind used in Attacks 22 and 23).

Dr. Gartenstein-Ross concludes that Iran materially supported each of these attacks, which Plaintiffs discuss *infra* in § V(C)(2)(d).

### Attack #22.      January 20, 2007 Anti-Aircraft Attack in Bahrez, Diyala Province that Killed Iowa U.S. Army National Guard Command Sergeant Major Marilyn L. Gabbard

On January 20, 2007, Iowa U.S. Army National Guard CSM Marilyn Gabbard flew as a

passenger in a UH-60 Blackhawk helicopter (call sign EZ 40) as part of a two-helicopter formation over Bahrez, Diyala Province.  Attribution Report at 134.  CSM Gabbard's helicopter was struck by enemy fire and subsequently crashed, killing all 12 people onboard, including CSM Gabbard. *Id.* at 134-35.  The surviving helicopter and newly arrived aircraft engaged with and destroyed the enemy positions.  *Id.* at 135.  While the precise munition used to shoot down EZ 40 is unknown, surface-to-air missiles ("SA-7s" and retrofitted air-to-air R5 missiles), RPGs, a 50-caliber machine gun, and an anti-aircraft gun were discovered at the enemy ground site.  *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely carried out this attack, based on: (1) ISI's position as the "dominant force" at the time in the Diyala Province, which includes Bahrez, where the attack took place, as well as Bahrez's neighboring city of Baqubah;[35] (2) the TTPs employed, including the use of RPGs, SA-7s, 50-caliber machine guns, and an anti-aircraft gun, all sophisticated weapons that were found in a building near CSM Gabbard's crash site that was destroyed in the crash, and which ISI had trained its fighters to use at various locations throughout Iraq; and (3) ISI's issuance of a claim of responsibility for shooting down the helicopter, which accurately described the location and timing of the crash.  *Id.*

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 150 through 152. Bellwether Plaintiffs Marla Van Cannon and Michael Van Cannon were injured as a result of this

---

[35] As Dr. Gartenstein-Ross explains, "[d]uring the first three years of the Iraq War, the town was a frequent battleground between U.S. and Iraqi forces, on the one hand, and Sunni insurgents.  U.S. forces and their Iraqi partners would take control of the town, only to have Sunni insurgents retake it once they left.  One of these struggles for control of Bahrez occurred in mid-February 2007 – soon after the attack that killed CSM Gabbard – that ensued because ISI had once again claimed control of the town in December 2006.  According to credible news reports, the progress of Coalition forces was stymied by a combination of real and fake roadside bombs, IEDs, snipers posted "throughout the city," and rocket-propelled grenade ("RPG"), mortar, and small arms fire – demonstrating the entrenchment of ISI in Bahrez around the time of this attack."  Attribution Report at 136.

attack.

**Attack #23.    February 18, 2007 Small Arms Fire Attack in Ramadi City, Al Anbar Province that Killed Private First Class Kelly David Youngblood**

On February 18, 2008, PFC Kelly David Youngblood was serving on a three-person team manning a tank outside of Ramadi, Al Anbar Province.  Attribution Report at 61.  As PFC Youngblood exited the tank, he was the target of three synchronized gunshots fired by snipers lying in wait in three different buildings, all of which had PFC Youngblood's tank in line-of-sight. *Id.*  PFC Youngblood was found by his crewmates lying motionless on the front slope of the tank near the driver's hatch.  *Id.*  It was soon determined that PFC Youngblood had been shot once in the head.  *Id.*  He was evacuated to a medical checkpoint where he was subsequently pronounced dead. *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi Organization, operating as ISI, likely carried out this attack, based on: (1) ISI's position as the dominant insurgent force in Ramadi at the time of the attack, evinced by its longstanding presence in Ramadi and continued campaign of murder and intimidation across the city, which it sustained over the course of the year;[36] and (2) the TTPs employed, including the coordinated use of multiple small arms, which ISI was known for through several other attacks it had carried out throughout 2007 and for which ISI had the

---

[36] Just three months before this attack, Iraq's Commanding General George Casey authored a briefing, noting that 75 percent of CENTCOM's fights in Ramadi were against ISI militants. Attribution Report at 62-63.  Further, an authoritative CENTCOM report on the insurgency in Al Anbar Province published in 2007 noted that "[ISI] retained a complex and coordinated command and control infrastructure in the city despite the efforts of the Anbar Revolutionaries to assassinate the group's leadership." *Id.* at 63.  ISI "remained the most powerful insurgent group in Ramadi when this attack occurred." *Id.*

training, weapons, and familiarity with local terrain and coalition troop movements.[37]  *Id.*

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 120 through 122. Bellwether Plaintiff Richard Gervasi II was injured as a result of this attack.

### E.    Indirect Fire

Two of the 25 Bellwether Attacks were indirect fire attacks carried out by the Iran-backed AAI or Zarqawi organization.  These attacks claimed the lives of four service members, and severely wounded many more.

Indirect fire attacks involve the use of rockets, artillery, or mortars against an objective. *See Fishbeck II*, 2023 WL 7448770, at *6 (describing an attack "by artillery fire from two 120-mm mortars and two 107-mm rockets" on a base); *Brown II*, 2023 WL 4824740, at *11 (noting that rockets and mortars differ from RPGs because they involve a stabilizing base, which is used to launch them from the ground); *Stearns*, 633 F. Supp. 3d at 341-42 (describing indirect fire attacks that involved rockets and mortar rounds dropped on the Green Zone in Baghdad).  These weapons are particularly valuable because they do not require a direct line of sight to their intended target, allowing their operators to remain in cover while attacking, although they do require a known target location to be accurate.  *See Fishbeck II*, 2023 WL 7448770, at *8-9 (describing an attack that "involved several 107-mm rockets landing in Camp Travis" launched from Sadr City).  With proper training, these types of attacks can be highly effective.  *See Brown II*, 2023 WL 4824740,

---

[37] The Zarqawi organization also carried out multiple small arms attacks on coalition personnel stationed in and around Ramadi in the months leading up to and after the attack that killed PFC Youngblood.  *See id.* at 63.  Additionally, the fact that PFC Youngblood and his crewmates were shot at from multiple buildings simultaneously suggests that the perpetrators would need to be familiar with the terrain, not only to coordinate the attack itself, but to select the site as an ideal ambush location.  *Id.* at 64.  It is well documented that Iranian weapons were funneled to Zarqawi's ISI terrorists in Al Anbar Province.  *Id.*

at *6 n.6 (finding that indirect fire weapons systems used by AQI terrorists required "training and sophistication," indicating substantial Iranian support); *Stearns*, 633 F. Supp. 3d at 295 (acknowledging that "Iran's connection to mortar rounds and smaller caliber rockets spans more than fifty years"); Pregent Expert Report ¶¶ 138-43 (noting that a successful indirect fire attack "requires expertise that only comes from advanced training," and that Iran's Arabic-speaking proxy, Hezbollah, trained Sunni terrorist groups on these techniques in Iran and Lebanon).

Dr. Gartenstein-Ross concludes that Iran materially supported each of these attacks, which Plaintiffs discuss *infra* in § V(C)(2)(e).

**Attack #24.**   **April 24, 2004 Artillery Attack in Taji, Baghdad Province that Killed Arkansas U.S. Army National Guard Captain Arthur L. Felder and U.S. Army Staff Sergeant Billy J. Orton**

On April 24, 2004, Arkansas U.S. Army National Guard CPT Arthur L. Felder and SSG Billy J. Orton were in an accommodation trailer at Camp Cooke in Taji, Baghdad Province when Camp Cooke was attacked by enemy artillery, either mortars or 107mm rockets, launched from a truck. Attribution Report at 107. ██████████████████████████████████████

████████████████████████ *Id.* Helicopters subsequently engaged and destroyed the enemy launch vehicle. *Id.* The attack killed two other coalition members. *Id.*

Dr. Gartenstein-Ross concludes that AAI, operating as AAS, likely carried out this attack, based on: (1) AAS's maintenance of an operational presence in Baghdad Province and the area proximate to Baghdad City around the time of the attack, including the region north of Baghdad City and the town of Taji itself, and evinced by AAS's claims of responsibility for two other attacks

in Baghdad province in the same month;[38] and (2) the TTPs employed, specifically the use of mortars or 107mm rockets in attacks against coalition forces, which were the weapons used in eight other AAS attacks which occurred in the same month, and which AAS frequently touted in videos of rocket attacks it used as part of its recruiting and training campaign.[39]  *Id.* at 108.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 133 through 137. Bellwether Plaintiffs Cheryl Felder Stuart and Manaser Orton were injured as a result of this attack.

### Attack #25.   May 25, 2004 Artillery Attack in Iskandariya, Babil Province that Killed Vermont U.S. Army National Guard Sergeant Alan N. Bean

On May 25, 2004, U.S. Army National Guard SGT Alan N. Bean was conducting routine operations at FOB Kalsu in Iskandariya, Babil Province, approximately 20 miles south of Baghdad.  Attribution Report at 79.  At approximately 14:20, 15 simultaneously fired 107mm rockets hit the base.  *Id.* at 80.  The attack killed three service members including SGT Bean, and wounded twelve others.  *Id.* ███████████████████████████████

---

[38] "An expert report published in May 2004 states that 'AAS's area of operations included Baghdad, the Sunni triangle, and northern Iraq.'"  Attribution Report at 109 (quoting Michael Rubin, *Ansar al-Sunna: Iraq's New Terrorist Threat*, MIDDLE EAST INTEL. BULL., 6:5 (May 2004), https://www.meforum.org/meib/articles/0405_iraq1.htm).    Further, AAS "maintained an operational presence in Taji itself, even after this attack, as demonstrated by an AAS claim of responsibility for executing an Iraqi contractor in Taji in October 2004."  *Id.*  AAS also claimed responsibility for two attacks near the area carried out during the same month as the Bellwether Attack.  *Id.*  Dr. Gartenstein-Ross noted that other terrorist groups, including the Zarqawi organization, did not have an operational focus in the region of the attack that killed SGT Orton in early 2004, bolstering his conclusion that AAI was likely responsible.  *Id.* at 110-11.

[39] Profiles of AAS demonstrate that both rockets and mortars were used by AAS at the time of the attack.  For example, in the same month of the attack, AAS claimed responsibility for at least eight attacks using similar weapons.  *Id.* at 110.  By December 2004, AAS had become known to "'use videos of rocket attacks and roadside bombings as part of its recruiting and training campaign.'"  *Id.* (quoting ABC NEWS, *Profile of Terror Group Ansar al-Sunna* (Dec. 21, 2004), https://abcnews.go.com/WNT/story?id=350505).

███████████    *Id.*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, likely carried out this attack, based on: (1) JTJ's maintenance of an operational presence in Iskandariya and the surrounding area, evinced by two suicide bombing attacks carried out in the area in the months preceding the attack;[40] and (2) the TTPs employed, including the use of indirect fire weapons to target other coalition forces bases in the area, which JTJ used on a subsequent October 2004 attack on an Iraqi National Guard compound in the greater Baghdad area, and especially the use of 107mm rockets, which were known to be provided by Iran to proxy forces operating in Iraq which aligned with Iran's anti-American interests, such as JTJ, evidenced by the seizure of Iranian-made 107mm rockets from a JTJ weapons cache in Fallujah later that year.[41]  *Id.* at 80.

Dr. Gartenstein-Ross's conclusions as to this attack relied on Exhibits 126 and 127. Bellwether Plaintiff Alan Bean Sr. was injured as a result of this attack.

## IV.   LEGAL STANDARD

The Federal Rules of Civil Procedure grant district courts discretion to enter a default

---

[40] At the time of the attack, the Zarqawi organization operated heavily out of the region containing Iskandariya, known colloquially as the "Southwest Belt," or the "Baghdad Belt." Attribution Report at 81.  This area was of such strategic importance that the Zarqawi leader, Abu Musab al-Zarqawi, hand-drew a map of the area demonstrating his plan to control the region's terrain.  *Id.* at 81-82.  In the months leading up to the May 25 attack, JTJ committed two separate attacks on the same region.  *Id.* at 82.  JTJ held a stronghold in the north of Babil province—where this attack occurred—whereas other militias were most present in the south of the Babil province.  *Id.* at 83-84.

[41] JTJ regularly used rockets at this time, as demonstrated by the November 2004 seizure of a JTJ weapon cache in Fallujah, which Iran is known to have provided the militant groups it supported. *Id.* at 83; Pregent Expert Report ¶ 137 (citing Agence France-Presse, *US Shows Evidence in Iraq Rocket Attacks It Says Leads to Iran*, NAT'L, July 14, 2011, http://www.thenational.ae/news/world/middle-east/us-shows-evidence-in-iraq-rocket-attacks-it-says-leads-to-iran) (detailing Iran's pattern of providing the militant groups it supported with 107mm rockets—the same caliber as the munitions used in Attack 25).  Moreover, The Zarqawi organization also had a history of targeting coalition military bases.  *Id.*

judgment upon a party's motion when an opposing party fails to appear.  Fed. R. Civ. P. 55(b)(2); *see W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 124 (D.D.C. 2019) ("*W.A. I*").  "A default judgment is normally available, as here, when 'the adversary process has been halted because of an essentially unresponsive party.'"  *Azadeh v. Gov't of Islamic Republic of Iran*, No. 1:16-CV-1467 (KBJ), 2018 WL 4232913, at *2 (D.D.C. Sept. 5, 2018) (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  To enter a default judgment, "the Court must—at a minimum—satisfy itself that it has subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 56 (D.D.C. 2018) ("*Fritz I*").

The Foreign Sovereign Immunity Act ("FSIA") "provides the 'sole basis for obtaining jurisdiction over a foreign state in our courts.'"  *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)).  Under the FSIA, a foreign state is not entitled to immunity from suit in U.S. courts when claims against the state fall within a statutory exception, such as the "state-sponsored terrorism exception." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 356 (D.D.C. 2020) ("*Force I*") (citing 28 U.S.C. § 1605A).  The "state-sponsored terrorism exception" confers subject-matter jurisdiction to hear certain terrorism-related claims under state or federal law and recognizes a federal cause of action against those foreign states subject to the exception.  *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 98-99 (D.D.C. 2019) ("*Hamen I*").  "The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow . . . to effect service on a foreign state." *Force I*, 464 F. Supp. 3d at 356 (citing 28 U.S.C. § 1608).

To obtain a default judgment against Iran, following service, Plaintiffs must (1) produce

evidence sufficient to show that their claims fall within the state-sponsored terrorism exception, (2) establish that Iran was served in accordance with the FSIA, and (3) establish their right to relief under federal or state law by offering evidence "satisfactory to the court." *Force I*, 464 F. Supp. 3d at 336 (quoting 28 U.S.C. § 1608(e)) (citations omitted). Thus, "the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)). Even "the Supreme Court has recognized very realistically that [district] courts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to differing situations." *Id*. at 1048 (citations and quotation marks omitted).

In weighing the evidence in a "state-sponsored terrorism" case, "the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to 'compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future,'" *Force I*, 464 F. Supp. 3d at 336 (quoting *Han Kim*, 774 F.3d at 1048). Additionally, courts must consider "the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign.'" *Id*. (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens III*"), *vacated and remanded sub nom. on other grounds Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 480 (D.D.C. 2021) ("*Lee I*") (quoting *Owens III*, 864 F.3d at 785). The D.C. Circuit reviews findings underlying a default judgment in an FSIA case for abuse-of-discretion, in a "lenient" manner. *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 356 (D.C. Cir. 2018); *Maalouf v. Islamic Republic of Iran*, 514 F.

Supp. 3d 280, 285 (D.D.C. 2021) (*"Maalouf II"*) ("The district court . . . has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and "only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion.") (quoting *Owens III*, 864 F.3d at 785-86).

Uncontroverted factual allegations that are supported by admissible evidence, such as documentary and affidavit evidence, are taken as true. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 28-29 (D.D.C. 2020) ("*Barry II*") (collecting cases). The court also "need not 'step into the shoes of the defaulting party and pursue every possible evidentiary challenge.'" *Force I*, 464 F. Supp. 3d at 336 (quoting *Owens III*, 864 F.3d at 785). Furthermore, an evidentiary hearing is not required. *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008) (noting that courts reviewing FSIA claims may rely on affidavits and are not required to hold evidentiary hearings); *Hammons v. Islamic Republic of Iran*, No. CV 19-2518 (ACR/RMM), 2023 WL 5933340, at *7 (D.D.C. July 24, 2023) (noting that "expert testimony may be presented solely through written testimony including sworn affidavits, because the FSIA does not actually demand a hearing or live testimony; it demands [only] evidence.") (internal quotations omitted), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023); *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2023 WL 2598677, at *5 (D.D.C. Mar. 22, 2023) (noting that plaintiffs may meet their evidentiary burden with a prima facie showing in the absence of an evidentiary hearing); *Taitt*, 2023 WL 2536518, at *4 (stating that plaintiffs may rely on "their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain"). "As long as the evidence itself is admissible . . . and the court finds it satisfactory, its form or type is irrelevant." *Owens III*, 864 F.3d at 788. Thus, plaintiffs "may establish proof by affidavit, . . .

declarations, . . . or other written materials as [plaintiffs] can otherwise obtain," without the need

for an evidentiary hearing. *Neiberger*, 2022 WL 17370239, at *1 (quotations omitted).

Expert reports are not only entirely proper, but often sufficient and even indispensable in

terrorism cases because firsthand evidence of terrorist activities is difficult, if not impossible to

obtain. *Force I*, 464 F. Supp. 3d at 336-37 (citations and quotation marks omitted); *Fritz I*, 320 F.

Supp. 3d at 57. The D.C. Circuit has "repeatedly sustained jurisdiction or liability or both under

the terrorism exception to the FSIA . . . based *solely* upon expert testimony." *Owens III*, 864 F.3d

at 788 (emphasis added); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123,

1132-33 (D.C. Cir. 2004) (finding that defendants "have failed to satisfy their 'burden of proving

that the plaintiff's allegations do not bring its case within a statutory exception to immunity'" by

offering no evidence contradicting plaintiff's expert declaration); *Neiberger*, 2022 WL 17370239,

at *1 (quoting *Owens III*, 864 F.3d at 788).

The court may also take judicial notice of related proceedings and records in cases before

the same court. *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006)

("*Heiser I*"). A court in this jurisdiction recently explained:

> [Federal Rule of Civil Procedure] 201 is used frequently to judicially notice factual
> evidence developed in other FSIA proceedings "involving the same conduct by the
> same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have
> taken place in front of a different judge." *Foley v. Syrian Arab Republic*, 249 F.
> Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664
> F. Supp. 2d 43, 54 (D.D.C. 2009)). This avoids "the formality of having that
> evidence reproduced." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31
> (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7
> (D.D.C. 2011)); *see also Oveissi v. Islamic Republic of Iran* . . . , 879 F. Supp. 2d
> 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely
> upon the evidence presented in earlier litigation") (quoting *Rimkus*, 750 F. Supp.
> 2d at 172); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237
> (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier
> cases").

*Blank v. Islamic Republic of Iran*, No. 19-3645 (BAH), 2021 WL 3021450, at *2 (D.D.C. July 17,

2021).  "In this way, rather than require litigants to present such evidence anew in each lawsuit stemming from the same terrorist attack, courts have determined that the proper approach is one that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced, so that courts may reach their own independent findings of fact predicated on judicial notice of the evidence presented in the earlier cases." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10-11 (D.D.C. 2018) (quotations omitted); *see Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (finding same "approach appropriate" and "tak[ing] judicial notice of the requested findings") ("*Foley I*").  Thus, courts in this jurisdiction regularly take judicial notice of findings

from earlier, related proceedings.[42]

## V.   THE COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS

Pursuant to the FSIA, "the Court has 'original jurisdiction' over 'nonjury civil action[s]' against foreign states 'without regard to amount in controversy' if the claims seek 'relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.'" *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 12, 53-54 (D.D.C. 2019) ("*Karcher I*") (quoting 28 U.S.C. § 1330(a)). Thus, "[t]he pertinent jurisdictional question is whether the FSIA's 'terrorism exception,' 28 U.S.C. 1605A, applies such that Defendant Iran—a foreign state—is 'not entitled

---

[42] *See Karcher v. Islamic Republic of Iran,* 396 F. Supp. 3d 12, 16 (D.D.C. 2019) ("*Karcher I*") (taking judicial notice of certain findings by the district court in *Fritz* regarding Iran's support for terrorist attacks in Iraq) (citing *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018) ("*Fritz I*")); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (taking judicial notice of prior findings of fact regarding an Iranian-supported attack in Saudi Arabia); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (taking judicial notice of evidence concerning the attack on Khobar Towers and Iran's involvement in the attack); *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (taking judicial notice of evidence demonstrating Iranian support to Hezbollah and attacks on the Marine Barracks in Lebanon); *Taitt v. Islamic Republic of Iran*, No. CV 20-1557 (RC), 2023 WL 2536518, at *8 (D.D.C. Mar. 16, 2023) (taking judicial notice of the findings in *Flanagan* that "Iran's provision of financial, training, and travel support to Bin Laden and Al-Qaeda 'facilitated the planning and execution of the attack on the Cole.'") (quoting *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239, at *4 (D.D.C. Sept. 8, 2022) (taking notice of previous findings that deploying an explosive device was a deliberate attempt to kill someone, even when no fatalities resulted), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); *Jakubowicz v. Islamic Republic of Iran*, No. CV 18-1450 (RDM), 2022 WL 3354719, at *6-7 (D.D.C. Aug. 9, 2022) ("*Jakubowicz I*") (stating that the court may review evidence considered in a prior proceeding "without necessitating the re-presentment of such evidence" and considering the evidence submitted by the plaintiffs in *Force I*); *see generally Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) (holding that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice).

to immunity,' 28 U.S.C. 1330(a), and the [Plaintiffs] may pursue their claims before this Court."

*Barry II*, 437 F. Supp. 3d at 30 (citations omitted).  Under the state-sponsored terrorism exception

in section 1605A, a foreign state is not immune from the federal courts' subject-matter jurisdiction

when:

> [1] money damages are sought against a foreign state [2] for personal injury or
> death [3] that was caused by [4] an act of torture, extrajudicial killing,
> aircraft sabotage, hostage taking, or the provision of material support or resources
> for such an act if such act or provision of material support or resources is [5]
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency.

*Hamen I*, 401 F. Supp. 3d at 99-100 (citing 28 U.S.C. § 1605A(a)(1)).  Additionally, the exception

applies only when the following requirements are met:

> (1) the defendant was a designated state sponsor of terrorism when the attack
> happened *and* at the time the claim was filed; (2) the claimant or victim was a U.S.
> national, a member of the U.S. armed forces, or a U.S. government employee or
> contractor at the time of the attack; and (3) "in a case in which the act occurred in
> the foreign state against which the claim has been brought, the claimant has
> afforded the foreign state a reasonable opportunity to arbitrate the claim in
> accordance with the accepted international rules of arbitration."

*Karcher I*, 396 F. Supp. 3d at 53-54 (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii)); *Jakubowicz*

*v. Islamic Republic of Iran*, No. CV 18-1450 (RDM), 2022 WL 3354719, at *2 (D.D.C.

Aug. 9, 2022) ("*Jakubowicz I*") (same).

Plaintiffs "'bear[] [the] initial burden of production to show an exception to immunity, such

as § 1605A, applies,' whereupon, if the defendant fails to appear, 'jurisdiction attaches.'"  *Barry*

*II*, 437 F. Supp. 3d at 30 (quoting *Owens III*, 864 F.3d at 784); *Hamen I*, 401 F. Supp. 3d at 98-99.

The Bellwether Plaintiffs meet their burden of proof on each of the elements.  Defendant

Iran failed to appear.  Thus, this Court may exercise subject-matter jurisdiction over Iran.

### A.    Plaintiffs Seek Money Damages for Personal Injury or Death

Each of the 45 Bellwether Plaintiffs seeks money damages for personal injury and/or death

caused by Iran's support of terrorists in Iraq who perpetrated attacks against Plaintiffs or their family members.  *See* Complaint (at § IV); *infra* § VIII(A).  The Bellwether Plaintiffs thus satisfy the "money damages" requirement.  *See Jakubowicz I*, 2022 WL 3354719, at *7.

### B.      The Bellwether Plaintiffs were Injured or Killed During Terrorist Attacks that Constituted Extrajudicial Killings

Each of the 25 Bellwether Attacks constituted an "extrajudicial killing."  Section 1605A(a)(1) "strips immunity" for "personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act."  *Force I*, 464 F. Supp. 3d at 360 (citing *Karcher I*, 396 F. Supp. 3d at 57-58).

As defined in section 3 of the Torture Victim Protection Act of 1991:

> [T]he term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1605A(h)(7); *Barry II*, 437 F. Supp. 3d at 33.

The Bellwether Plaintiffs demonstrate that each attack constituted an extrajudicial killing by proving that: (1) the attack involved a killing; (2) the killing was deliberated; and (3) the killing was not authorized by a previous judgment pronounced by a regularly constituted court.  *Karcher I*, 396 F. Supp. 3d at 55-56.

As to the first element, a claimant may recover for an attack that resulted in a killing of any person.  *Force I*, 464 F. Supp. 3d at 360 (noting that "individuals who are injured but not killed in an attack that results in the death of others may recover for their injuries under § 1605A"); *Salzman v. Islamic Republic of Iran*, No. CV 17-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019) (deeming an attack on the street an extrajudicial killing—even though the plaintiffs' family members were injured not killed—because the attack killed five other people).

57

As to the second element, a deliberated killing is "simply one undertaken with careful consideration, not on a sudden impulse." *Force I*, 464 F. Supp. 3d at 363.  Evidence of the attack's sophistication and planning—such as intelligence gathering, selecting the attack site in advance, purchasing weapons, and/or operationally training to commit the attack—demonstrate deliberation.  *See id.* at 364 (finding an attack was sufficiently deliberated given it was "meticulously planned," "demonstrate[d] characteristics of organized [terrorist] attacks," and showed signs of "careful intelligence and logistic preparations . . . made prior to the attack"); *Neiberger*, 2022 WL 17370239, at *3-4 (explaining that an IED attack carried out by an Iranian-backed terror organization was a "prototypical deliberated, extrajudicial killing"); *Cabrera I*, 2022 WL 2817730, at *38 (explaining that even if Iranian-backed terrorists "may not have known in advance that [they] would have the opportunity to conduct a particular attack," these attacks were nevertheless "deliberated" because the terrorists "planned [their] tactics in advance should the opportunity to kill Americans arise"); *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349 (RDM), 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020) ("*Schwartz I*") (finding "ample evidence that the attacks in question were planned" from an expert declaration).

As to the third element, evidence that a terrorist organization carried out the attack suffices to show that the attack was unauthorized by a previous judgment from a regularly constituted court. *See Neiberger*, 2022 WL 17370160, at *3 ("As detailed below, Dr. Gartenstein-Ross offers evidence that each attack was carried out by a violent non-state actor, such as a terrorist organization.  Thus, none of these attacks were authorized by a previous judgment from a regularly constituted court.").  Moreover, as here, when no evidence is presented to show that a killing was authorized by a judgment of a regularly constituted court or lawfully carried out under the authority of a foreign nation, the presumption of the killing's extrajudicial nature stands.  *See Lee I*, 518 F.

Supp. 3d at 492.

Here, Plaintiffs were injured as a result of 25 extrajudicial killings in which at least one individual was killed.[43]  All of the 25 Bellwether Attacks were quintessential extrajudicial killings, in that they were carried out by nongovernmental terrorist organizations (with Iran's backing) outside of Iran's territory, involved deadly weaponry, required detailed preparation and planning, and were part of the Sunni Terrorist Groups' tactical approach of inflicting mass American casualties.

**IED Attacks.**  Bellwether Attacks 1-12 involved the use of IEDs, which by their nature required the terrorist responsible for the attack to deliberately make, place, arm, camouflage, and in some instances remotely detonate the IED prior to it being used to kill or injure their intended victims—American service members and/or civilian contractors.  Attribution Report at 17-18; *Roth II*, 651 F. Supp. 3d at 91 (finding that IED attacks were deliberated, extrajudicial killings because terrorists "needed to amass intelligence about U.S. routes to place IEDs where they were likely to inflict casualties on American troops, rather than on the terrorists or their sympathizers"); *Brown II*, 2023 WL 4824740, at *10 (finding that successful IED attacks were deliberated, extrajudicial killings because such attacks "require training on strategic placement" of the IED and "necess[itate] [] intelligence-gathering about routes American troops are likely to use"); *Neiberger*, 2022 WL 17370239, at *3 (explaining that "prior planning required to carry [the attack] out," including "by selecting the site" is "indicative of deliberation"); *Cabrera I*, 2022 WL 2817730, at *37-38 (buried IED attack found to be a deliberated, extrajudicial killing because the

---

[43] *Supra* § III(A) – Attack #3, involves an attack where the Attack Victim represented in this case, Bellwether Plaintiff Sgt. Kisielewski, was severely injured, but not killed.  However, Attack #3 resulted in the death of a U.S. Marine, and thus still constitutes an extrajudicial killing.

IED was placed "on a path where American forces would likely trigger it," despite the insurgents not knowing whether they would have had an opportunity to kill Americans, because the insurgents "planned [their] tactics in advance should the opportunity to kill Americans arise").  For example, in Attack #12 that killed SGT McBride, SSG Dozier, and SFC Pionk, the terrorists began rigging the house with the IED up to eight days before the assault, clearly evincing an attack "undertaken with careful consideration, not on a sudden impulse."  *Force I*, 464 F. Supp. 3d at 363; Attribution Report at 161; *see also supra* § III(A) – Attack #1 (IED placed along military supply route); Attack #2 (IED buried under road to avoid detection); Attack #3 (IED rigged as a booby trap to explode when door opened); Attack #4 (buried IED deliberately detonated by a long-range cordless telephone detonator system); Attack #5 (IED buried deeply along route between American military base and downed helicopter); Attack #6 (IED deliberately placed in a pothole alongside road at a 45-degree angle so as to pierce up-armored vehicle); Attack #7 (IED activated by pressure plate calibrated to explode under a pre-determined weight); Attack #8 (IED buried underneath road); Attack #9 (IED buried and activated by pressure plate calibrated to explode under a predetermined weight); Attack #10 (IED placed along footpath on which service member was pursuing a fleeing insurgent); Attack #11 (IED detonated by insurgent via command wire).

*Complex Attacks.*  These attacks, by their nature, required terrorists to engage in especially extensive planning and/or execution tactics and entailed the use of particularly advanced or lethal weaponry to target American troops and personnel.  Attribution Report at 18-19; *Roth II*, 651 F. Supp. 3d at 76 (finding that "Iran taught [terrorists] how to commit 'complex attacks,'" which involve multiple weapons such as IEDs combined with RPGs, small arms fire, and more); *Brown II*, 2023 WL 4824740, at *4, 9 (noting that complex attacks combined multiple weapons system and involved advanced planning to strike along routes heavily trafficked by Americans to inflict

maximum casualties, ensuring attacks were "more deadly to Americans").

The four complex Bellwether Attacks each involved a highly coordinated ambush attack on a convoy of American troops and/or civilian personnel, involving high-powered weaponry, including in IEDs and RPGs.  For example, in Attack #13 that killed SGT Krause and KBR contractors Stephen Hulett, Tony Duane Johnson, Jack Montague, and Timothy Bell, the Zarqawi terrorists had set up a roadblock to spark the attack and deployed hundreds of fighters wielding RPGs, IEDs, small arms, mortars, and machine guns.  Attribution Report at 100-101; *supra* § III(B) – Attack #13.  Moreover, members of the convoy were kidnapped and/or executed by the Zarqawi organization following the ambush.  Attribution Report at 101.  Attack #14 that killed SGM Stack likewise involved a coordinated ambush by the Zarqawi organization from multiple angles during a complex nighttime assault.  Attribution Report at 73-74; *supra* § III(B) – Attack #14.  The terrorists used IEDs, small arms, machine guns, and RPGs set up across multiple ambush points along the convoy's route to attack it.  *Id.*  In Attack #15 that killed Corporal LeGrand, Zarqawi organization terrorists initiated the ambush by deploying an IED consisting of two anti-tank mines that exploded as vehicles in the convoy approached.  *See supra* § III(B) – Attack #15.  Following the explosion, the terrorists launched a coordinated assault on the convoy, consisting of RPG and small arms fire.  Attribution Report at 152.  In Attack #16 that killed SGT Craig, CPL Marshall, and PV2 Young, Zarqawi organization and AAS terrorists teamed up to carry out a carefully coordinated and high-powered ambush of the American convoy, involving the detonation of multiple IEDs underneath the convoy's vehicles followed by a coordinated attack of the remaining vehicles from nearby buildings, using small arms fire, RPGs, and mortar rounds.  *See supra* § III(B) – Attack #16; Attribution Report at 191.

***Suicide Bombings***.  Similar to IED attacks, suicide bombings carry all of the hallmarks of

a deliberated attack—they involve preparing explosives, finding a terrorist assailant willing and capable of purposefully detonating the explosives while wearing them or having them in their vehicle, selecting a target, and planning the logistics of ensuring access to the target at the specified time and place. Such bombings also often involve filming martyr videos before the attack, and compensating the terrorist's family following the attack. *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 52-53 (D.D.C. 2009) (finding that a suicide bombing of a United States Embassy constituted an extrajudicial killing); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 395 (D.D.C. 2015) ("*Roth I*") (finding that a suicide bombing at a restaurant constituted an extrajudicial killing); *see* Attribution Report at 177-83, (describing the martyr video filmed and released by AAS claiming responsibility for Attack #19).

The five suicide bombing Bellwether Attacks involved careful and premeditated planning. In Attack #19 that killed SSG Poulin, SSG Melo, and PVT Ayro, the AAS terrorist wearing the bomb wore an Iraqi army uniform to deceive security and entered the FOB Marez mess hall at one of the busiest times of the day, as to maximize casualties. *See supra* § III(C) – Attack #19; Attribution Report at 173. The design of the suicide vest further indicates that the attacker sought to inflict maximum damage—the bomb specifically included 243 metal-coated ball bearings. Attribution Report at 173. AAS claimed responsibility for the attack afterwards, boasting about its killing of American troops. *Id.* at 173-74. In Attack #18 that killed John Albert Pinsonneault, the Zarqawi organization sent the suicide bomber into Baghdad's green zone, which was known to house many Americans and high-ranking Iraqi officials. The attacker then went to the bazaar, a bustling area with American troops present, and simultaneously detonated his suicide vest along with another IED located inside the nearby Green Zone Cafe. *See supra* § III(C) – Attack #18; Attribution Report at 113. In Attacks #17 and #20 that killed SGT Harlan and SPC Orosco,

respectively, the terrorist groups filled vehicles with powerful explosives and sent the suicide attackers to areas with U.S. military presence. Attribution Report at 222, 118. The attackers then detonated the bombs as they drove alongside clearly marked U.S. military vehicles and personnel. *Id.* In Attack #21 that killed CPL Pautsch, SSG Hall, SGT Forrest, and SSG Woods, the Zarqawi organization targeted U.S. Army FOB Marez with a vehicle-borne suicide bomber during Operation New Hope, the coalition force's operation against the Zarqawi organization in Mosul during the spring of 2009. *See supra* § III(C) – Attack #21; Attribution Report at 207, 210-211. The terrorists drove a cement truck full of explosives through the initial checkpoint, with the goal of detonating and killing as many American troops as possible. Attribution Report at 212.

**Small Arms, Rocket-Propelled Grenade, and Anti-Aircraft Attacks.** The two Bellwether Attacks involving small-arms fire, the use of RPGs, or the use of anti-aircraft munitions were deliberated attacks carried out by terrorist groups on American troops that resulted in the death of at least one American troop or civilian personnel. In Attack #22 that killed CSM Gabbard, the Zarqawi organization assailant used a weapon powerful enough to take down a UH-60 Blackhawk helicopter.[44] *See supra* § III(D) – Attack #22; Attribution Report at 134-135. The assailant had to aim the weapon at the fast-moving target, a feat evincing advanced training and preparation. That the Zarqawi organization funded bonuses for militants who were able to successfully shoot down American helicopters, paying up to $7,000 for such a feat, further evinces that this act was deliberate and intentional. *Id.* at 44. In Attack #23 that killed PFC Youngblood, several Zarqawi organization terrorists hid within an unknown building, waiting for a target, and then fired upon

---

[44] U.S. military reports did not conclusively identify the weapon used to down CSM Gabbard's helicopter, though the range of possibilities identified included surface-to-air missiles, anti-aircraft gunfire, and RPG fire.

PFC Youngblood from afar just as PFC Youngblood exited his parked tank.  *See supra* § III(D) –

Attack #22; Attribution Report at 61.  The shots were fired simultaneously from multiple buildings

which all had a line of sight to PFC Youngblood's tank, evincing deliberation, preparation,

coordination, and knowledge of the local terrain.  *Id*.

   ***Indirect fire*.**   Two of the Bellwether Attacks involved the directing of high-powered

weapons, such as rockets or mortars, at American bases with the deliberate aim of killing American

troops.  The aiming and firing of high-powered weaponry at American installations evinces the

terrorists' intent to kill as many Americans as possible.  *See Force I*, 464 F. Supp. 3d at 361 (finding

a rocket attack "evidenced an intent to kill"); *Brown II*, 2023 WL 4824740, at *11 (finding that

indirect fire weapons systems require "preparation" and "perimeter security," which are indicia of

deliberation); *Stearns*, 633 F. Supp. 3d at 342-43 (attack on the U.S. Phoenix Base in Baghdad

when 107mm rockets crashed into the roof on a gym, killing and injuring service members, found

to be deliberated); *Cabrera I*, 2022 WL 2817730, at *38 (finding an indirect fire attack on an

American airfield to be a deliberated, extrajudicial killing).  In Attack #24 that killed CPT Felder

and SSG Orton, Zarqawi organization terrorists fired rockets at Camp Taji, where American troops

were stationed.  *See supra* § III(E) – Attack #24; Attribution Report at 107.  The rockets used were

not only deliberately aimed at an American target, but also required advanced training for the

terrorists to be able to employ effectively.  *Cabrera I*, 2022 WL 2817730, at *16 (finding that

accurate indirect fire indicates receipt of training).  In Attack #25 that killed SGT Bean, Zarqawi

organization terrorists this time targeted FOB Kalsu with rockets, one of which struck and killed

SGT Bean and two other service members, and wounded twelve others.  *See supra* § III(E) –

Attack #25; Attribution Report at 80.

## C.     Iran Provided Material Support for the Extrajudicial Killings that Proximately Caused Plaintiffs' Damages

"The FSIA's terrorism exception abrogates sovereign immunity for foreign states that . . . provide 'material support or resources' for extrajudicial killings." *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-CV-2248 (CRC), 2023 WL 5333209, at *1 (D.D.C. Aug. 18, 2023) ("*Fishbeck III*") (citing 28 U.S.C. § 1605A(a)(1)). "Material support or resources" consist of:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

*Karcher I*, 396 F. Supp. 3d at 54 (quoting 18 U.S.C. § 2339A(b)(1)); *see Asemani v. Syrian Arab Republic*, CA 09-1158 (EGS), 2009 WL 4456323, at *1-2 (D.D.C. Nov. 30, 2009) (same).

Plaintiffs must show that Iran provided material support or resources through its officials acting within the scope of their official duties. *Karcher I*, 396 F. Supp. 3d at 55 (citing 28 U.S.C. § 1605A(a)(1)). Plaintiffs may rely on an expert testimony to prove this requirement. *See Hammons*, 2023 WL 5933340, at *12-14 (concluding that the expert testimony provided satisfactory evidence that Iranian officials acting within the scope of their official duties gave a terrorist organization material support and resources); *Neiberger*, 2022 WL 17370239, at *8 ("The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran. Those findings are sufficient to satisfy the scope of office requirement.").

The deaths and injuries from the attacks must have been "caused by" Iran's provision of material support to terrorist organizations. *Salzman*, 2019 WL 4673761, at *14 (quoting 28 U.S.C. § 1605A(a)(1)). "Plaintiffs need not show that Iran . . . specifically knew of or intended its support to cause the particular attacks in question, . . . or even that Iran['s] . . . material support was a 'but for' cause of their injures." *Force I*, 464 F. Supp. 3d at 368 (first citing *Owens III*, 864 F.3d at

789, then citing *Kilburn*, 376 F.3d at 1128) (quotation marks omitted).  Plaintiffs must merely show proximate causation, which is "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.*

The "two similar but distinct elements" to establish proximate cause are: (1) "the defendant's actions [were] a 'substantial factor' in the sequence of events that led to the plaintiff's injury," and (2) "the plaintiff's injury [was] 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens III*, 864 F.3d at 794 (citations omitted).  "In assessing reasonable foreseeability, moreover, the Court must consider 'the broader context' of Iran's conduct" and need not find that Iran "intend[ed] that the victims sustain the specific injuries at issue." *Fritz I*, 320 F. Supp. 3d at 86 (quoting *Owens III*, 864 F.3d at 797).  Plaintiffs also need not show "nexus" between Iran's support and each attack that caused their injuries "because funds—and, in certain instances, arms and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [terrorists groups'] 'careful bookkeeping.'" *Force I*, 464 F. Supp. 3d at 368 (quoting *Kilburn*, 376 F.3d at 1130).  Finally, a state sponsor of terrorism "may not avoid liability [under FSIA] for supporting known terrorist groups by professing ignorance of their specific plans for attacks." *Owens III*, 864 F.3d at 799.

As Dr. Gartenstein-Ross concludes, in line with previous decisions from courts in this and other jurisdictions, Iran for decades has materially supported the terrorists groups who killed or injured the Bellwether Plaintiffs, and such support was reasonably connected to the Bellwether Attacks.  *See* Attribution Report at 20-242 (attack attributions).  That support has come from the highest levels of the Iranian government, and is given with the primary aim of killing Americans so as to deter the United States' involvement in conflicts in the region near or bordering Iran.  *See Hammons*, 2023 WL 5933340, at *3 ("To promote its goal to attack the United States and other

'regional foes,' Iran supplies the Taliban with military support and resources, including a steady transfer of arms."); *Neiberger*, 2022 WL 17370239, at *18 (noting Iran's "'longstanding pattern and policy' supporting terrorist organizations that aim to harm Americans"); *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-CV-2248 (CRC), 2023 WL 7443394, at *1 (D.D.C. Mar. 27, 2023) ("*Fishbeck I*") ("The Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security provided material support, as that term is used in 28 U.S.C. § 1605A(a)(1), to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam during the relevant time period of 2003-2011.").

### 1.   Iran Provided Material Support for the Sunni Terrorist Groups Who Carried Out the Bellwether Attacks

Two Sunni terrorists groups in Iraq carried out all 25 Bellwether Attacks—the Zarqawi organization and AAI.  Multiple courts in this jurisdiction have already found Iran to be a long-standing and ardent supporter of these Sunni terrorist groups, including through the provision of material support and resources in the form of training, financial support, weapons, safe haven, lodging, travel and transportation, and expert knowledge and assistance in forming tactics, techniques, and procedures for attacks.  *See Roth II*, 651 F. Supp. 3d at 87 (stating that Iran provided the Taliban and al-Qaeda "with training, weapons, soldiers, safe haven and smooth passage, and more"); *Hammons*, 2023 WL 5933340, at *3 (noting that Iran supplied the Taliban, a Sunni terrorist organization, with military support and resources, including a steady transfer of arms "to promote its goal to attack the United States"); *Neiberger*, 2022 WL 17370239, at *7 ("Though a predominately Shi'a country, Iran also provided material support and resources to Sunni militant groups, including the Zarqawi organization, or AQI."); *Cabrera I*, 2022 WL 2817730, at *10 (noting that although Iran is a Shia regime, Iran is affiliated with "certain Sunni terrorist groups, including Hamas").

Plaintiffs' two experts, Dr. Gartenstein-Ross and Michael Pregent, have rendered the same conclusion, not just in this case, but in numerous other cases, and the courts have adopted their conclusions about Iran's provision of material support to empower its terroristic violence.  *See Roth II*, 651 F. Supp. 3d at 87 (noting that the plaintiffs provided ample evidence satisfactory to the court, including from expert Pregent, that Iran provided material support to the Taliban and al-Qaeda); *Brown II*, 2023 WL 4824740, at *11 (stating that "based on Pregent's report and testimony at the hearing, the Court is satisfied that Iran's support was a 'substantial factor' in the IED, landmine, RPG, rocket, and mortar attacks and that the consequences of its support were 'reasonably foreseeable'"); *Neiberger*, 2022 WL 17370239, at *6 ("In consideration of these past findings in *Karcher* and *Fritz* and the exhaustive report by Dr. Gartenstein-Ross, this Court too finds that Iran was providing material support and resources to terrorist groups . . . at the time of the attacks at issue."); *see also Espitia v. Islamic Republic of Iran*, No. 1:21-cv-123, 2022 WL 2168355, at *5 (S.D. Tex. June 16, 2022) ("The evidence also demonstrates that Iran provided material support specifically to AQI.").[45]

As prior courts have recognized, Iran, the world's leading state sponsor of terrorism, has relied for decades on violent non-state actors ("VNSAs") as proxies for achieving its foreign policy goals.[46]  Sunni Militant Groups Report at 3, 57 n. 290.  As a predominantly Shia state, Iran has principally employed VNSAs affiliated with Shia Islam, except where alliances of convenience with Sunni Islam VNSAs have proven useful to Iran's larger ambitions, including its ambitions to

---

[45] This Court can and should take judicial notice of these findings, and need not "require [Plaintiffs] to present such evidence anew."  *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018).

[46] A more detailed history of these groups can be found in Plaintiffs' Sunni Militant Groups Report at 13-76.

expel the coalition forces from the region or drawing them away from regions of strategic Iranian interest. *Id.* at 28-29. As Dr. Gartenstein-Ross explains in his Sunni Militant Groups Report, Iran's support for Sunni organizations is "based on 'enemy of my enemy' logic"—Iran regards Sunni militants with suspicion, but utilizes them to achieve its goals, so long as the threat to its Shia groups and "creed" is limited. *Id.* at 67. Using this logic, Iran provided significant material support to three Sunni Groups that bear upon the claims at issue here: al-Qaeda, the Zarqawi organization (which operated at times in Iraq as an al-Qaeda affiliate known as AQI), and AAI.

Iranian support of VNSAs has most frequently been provided through two of its major political arms: the Ministry of Intelligence and Security ("MOIS") and the IRGC. *Id.* at 31. Funneling support through VNSA proxies has allowed Iran and its affiliated entities to maintain a relative distance from terrorist attacks and operations abroad—thereby preserving its ability to deny involvement where convenient, politically or otherwise—despite playing a central role in their orchestration. *Id.* at 29.

Plaintiffs first address Iran's support for AQ, which in turn used that support to finance, train, arm, recruit for, and coordinate with the Zarqawi organization/AQI and AAI. Plaintiffs next address Iran's direct material support to the Zarqawi organization/AQI and AAI. Finally, Plaintiffs demonstrate the "reasonable connection" between Iran's material support for these groups and the 25 Bellwether Attacks, such that the support can readily be seen as a proximate cause of Plaintiffs' injuries.

### a.     *Iranian Material Support for al-Qaeda*

Iran has provided material support to its proxy al-Qaeda in a variety of ways over the course of its relationship with the group. *See*, *e.g.*, *Bernhardt*, 2023 WL 2598677, at *9-10 (concluding that plaintiffs produced sufficient evidence through expert Gartenstein-Ross's report that "Iran materially supported al-Qaeda in its efforts to plan and execute the Camp Chapman attack"). As

described in detail, *infra* § V(C)(1)(d), Iran has provided material support to al-Qaeda by way of: funding; weapons; training on how to conduct mass casualty operations and collect and conduct intelligence operations; sanctuary for key leaders and militants; travel facilitation for the transit of personnel, money, and other resources across borders; and infrastructure, by assisting in the establishment of new bases in the region. *See* Sunni Militant Groups Report at 43-44; *Cabrera I*, 2022 WL 2817730, at *35 (noting that Iran provided al-Qaeda with a range of "weapons, lethal substances, [and] explosives, . . . including AK-47s, 107mm rockets, mortars, RPGs, recoilless rifles, PKM machine guns, light machine guns, antitank missiles, ammunition, IEDs, EFPs, and materials, including explosives needed to make suicide vests and VBIEDs"). While finding Iran liable for attacks made possible by the provision of the aforementioned resources, courts in this jurisdiction have repeatedly recognized Iran's material support to al-Qaeda. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) ("*Owens I*") (finding that Iran, "through Hezbollah, provided explosives training to Bin Laden and al-Qaeda and rendered direct assistance to al Qaeda operatives."); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (finding that Iran provided material support and resources to Osama bin Laden and al-Qaeda through "financial support, support for training, and facilitation of travel.").

Iran's relationship with al-Qaeda started in the 1990s. Sunni Militant Groups Report at 28. As explained by Dr. Gartenstein-Ross, the nexus between Iran and al-Qaeda was first created when the leader of Egyptian Islamic Jihad ("EIJ"), a militant group, visited Iran in the early 1990s, seeking training support and assistance in its fight against Egypt's then government regime. *Id.* at 28. EIJ's leader was already associated with al-Qaeda, in large part due to a common connection to Osama bin Laden, founder and leader of al-Qaeda. *Id.* at 15, 29. Iran engaged in discussions with EIJ and al-Qaeda, and the three entities ultimately formed an alliance with the common

political and military goal of "confront[ing] the United States and Israel, and undermin[ing] Arab regimes that they viewed as supporting these two states." *Id*. at 29 (citations omitted).

Once this relationship was established, Iran began to use other VNSAs, such as Hezbollah, as conduits through which it could surreptitiously channel further support to al-Qaeda. *Id.* at 29. Since that time, the relationship between Iran and al-Qaeda has only grown stronger—bolstered by major, devastating events that "deepened" ties between Iran and al-Qaeda, such as embassy bombings and the 9/11 terrorist attacks on the United States. *See generally id.* at 28-34.  In particular, one provision of support from Iran to al-Qaeda—years of safe-housing jihadist and senior al-Qaeda leader Saif al-Adl—ultimately led to the integration of supporters of Abu Musab al-Zarqawi (founder of AQI) into al-Qaeda. *Id*. at 14, 16, 34.

### b.    *Al-Qaeda Use of Iranian Support to Bolster the Zarqawi organization/AQI and AAI*

The Zarqawi organization, founded by Abu Musab al-Zarqawi, established itself in Iraq in 2002 just before the U.S. invasion, and thereafter came to be known as the U.S.-led coalition's "primary terrorist threat" in Iraq.  *Id*. at 14.  The group is known to have been responsible for "some of the worst atrocities committed in Iraq," and for having "executed deadly attacks, established campaigns of violence, and held area of operations dominance in critical locations throughout the Iraq war."  Sunni Militant Groups Report at 14.

The Zarqawi organization was closely allied with, and received substantial and long-standing support from, al-Qaeda—and Iran directly and knowingly assisted al-Qaeda in ways that, in turn, indirectly yet "heavily" supported the Zarqawi organization. *See id.* at 45. Zarqawi himself was trained in al-Qaeda camps, and prior to entering Iraq, had run a terrorist training camp near Herat, Afghanistan—near the border with Iran—that was funded by al-Qaeda.  *Id.*  Shortly after establishing itself in Iraq, the organization publicly declared its allegiance to al-Qaeda and its

71

leader, Osama bin Laden.  *Id.*  Thereafter, al-Qaeda treated the group as its franchise in Iraq, and the group for a period of years referred to itself as al-Qaeda in Iraq ("AQI").  *Id.*

The alliance between al-Qaeda and the Zarqawi organization/AQI proved to be highly consequential, as Iran first began supporting the Zarqawi organization by using Iran's support for al-Qaeda as a pass-through intermediary to indirectly fund Zarqawi operations.  This support came in many forms.  For example, even prior to Zarqawi's move to Iraq and the establishment of AQI, al-Qaeda provided Zarqawi and his allies with specialized training, and provided financing, training, and support for Zarqawi's training camp near Herat.  *Id.* at 45-46.  As Dr. Gartenstein-Ross explains, "Al-Qaeda supported the Zarqawi organization in the early years of the Iraq war; bin Laden included the Zarqawi organization as a recipient of some of the $1.5 million in monthly funding he sent to Iraq to support the insurgency."  *Id.* at 46.  After Zarqawi declared his organization's formal affiliation with al-Qaeda, al-Qaeda provided the group with additional "considerable external financial support," and support with recruiting additional jihadists, including suicide bombers, anti-coalition fighters, and couriers, many of whom carried thousands of dollars to transport to Iraq.  *Id.* at 46-47.  This support allowed AQI to "hire[] additional fighters, pa[y] civilians to act as spies, and commission[] attacks on coalition forces."  *Id.* at 47.  As a result of the financial support from al-Qaeda, "the Zarqawi organization was able to pay its recruits a higher salary than they would receive from Iraqi security forces: While a low-ranking member of the Iraqi Army or police was paid roughly $150 per month, Zarqawi could pay $100 to $200 for a single small arms, mortar, or IED attack, and even paid civilians $10 a day to spy on coalition forces."  *Id.* at 47 (citations and quotation marks omitted).  AQI also used these funds to reward successful attackers to swell its fighter ranks: "AQI also funded bonuses: $200 for a successful improvised explosive device (IED) attack, $500 to $700 for destroying a High Mobility Multi-

Purpose Wheeled Vehicle (HMMWV), and $7,000 for shooting down a helicopter." Attribution Report at 44.

In addition to the substantial funding Iran provided al-Qaeda, Iran proactively adopted a "permissive facilitation environment" that allowed al-Qaeda and Zarqawi organization operatives to live in Iran and orchestrate their plans in relative safety, away from coalition forces. For example, during Zarqawi's time running the training camp near Herat, al-Qaeda was able to "provide logistical support through a network of safe houses in the Iranian cities of Tehran and Mashaad." Sunni Militant Groups Report at 47 (citations and quotation marks omitted). Iran also allowed al-Qaeda's primary go-between with AQI, Saif al-Adl, to coordinate al-Qaeda's support of AQI from Iran, including coordinating Zarqawi's flight from Afghanistan into Iraq to establish AQI. *Id.* at 48.

Iran further permitted another al-Qaeda operative, Yasin al-Suri, to support AQI's efforts from Iran, including by "moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq." *Id.* at 49 (citations and quotation marks omitted). According to the U.S. Treasury Department, this support was actually memorialized in a formal agreement between the Iranian government and al-Qaeda. *Id.* at 50. According to the agreement, "al-Qa'ida must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families." *Id.*

        **c.**     ***Iranian Direct Material Support of AQI and AAI***

        **i.**    <u>Iran's Direct Material Support of AQI</u>

As Dr. Gartenstein-Ross explains, "[i]n addition to Iran's role in allowing al-Qaeda to bolster the Zarqawi organization, direct Iranian material support also proved critical to the Zarqawi

organization." *Id.* at 51.  In fact, Iran's direct support to the Zarqawi organization made its formation possible in the first place.

> Gen. David Petraeus, the former commander of Multi-National Force – Iraq, highlighted what the Zarqawi organization required to establish itself.  According to General Petraeus's briefing, the Zarqawi organization required weapons, money, command and control facilitation, safe havens, and senior leader guidance . . . Tehran ultimately either provided or otherwise empowered the Zarqawi organization to obtain all of these various requirements through the Islamic Republic's provision of weapons, funding, training, logistics and organizational facilitation, as well as sanctuary for senior Zarqawi organization leaders.

*Id.* at 51.

In 2006, evidence was obtained from the IRGC-QF via operatives in Iraq, which "detailed 'how the Quds Force was working with individuals affiliated with Al Qaeda in Iraq and Ansar al Sunnah [AAS/AAI],' including by 'importing modern, specially shaped explosive charges,' among other weapons and organizational support." *Id.* at 53.  And at several times in 2007, coalition forces discovered weapons caches belonging to AQI that contained "weapons of Iranian origin." *Id.* at 54.  Among the caches were descriptions of the assistance that the Iranians provided Sunni militants (AQI being the predominant Sunni group in Iraq at the time):

> Arms that American military officials say appear to have been manufactured in Iran as recently as last year have turned up in the past week in a Sunni-majority area, the chief spokesman for the American military command in Iraq said Wednesday in a news conference.  The spokesman, Maj. Gen. William B. Caldwell IV, said that detainees in American custody had indicated that Iranian intelligence operatives had given support to Sunni insurgents.

*Id.* at 53 (citations omitted).

Iran's support to the Zarqawi organization/AQI continued for years and has earned Iran and its government organs/officials sanctions designations from the United States, in both 2008 (IRGC-QF brigadier general) and 2012 (Iran's MOIS). *Id.* at 53.  According to the U.S. Treasury Department, the IRGC-QF brigadier general, Ahmed Foruzandeh, "committed, directed, or

supported acts of violence against Coalition forces via his financial and material support," to insurgent groups; directing subordinates to "further sectarian violence within Iraq," which Dr. Gartenstein-Ross described as aligned with AQI's goal of "igniting sectarian violence that would force the Coalition out of Iraq." *Id.* at 54 (citations and quotation marks omitted). In his position as brigadier general, Foruzandeh also instructed other Iranian intelligence officers in the IRGC to "direct funding of Sunni militant operations" against coalition forces. *Id.* at 54. Dr. Gartenstein-Ross concludes that "[t]he fact that Foruzandeh directed this support to Sunni groups in Saladin Province means that his efforts very likely financed the Zarqawi organization specifically." *Id.* at 55.

In 2011, the U.S. Department of State identified that Muhammad Hisham Muhammad Isma'il Abu Ghazala, a specialist in IEDs and an Iranian affiliate, was connected to "multiple IED networks across northern Iraq, where the Zarqawi organization primarily operated." *Id.* at 57. Dr. Gartenstein-Ross concludes that "it is very likely that Ghazala played a role in facilitating IED attacks for the Zarqawi organization." *Id.*

Dr. Gartenstein-Ross highlights the straightforward rationale underlying Iran's support to al-Qaeda and AQI:

> Adopting such a stance is in line with Tehran's general approach to foreign relations and is one that has borne dividends. Iran's provision of logistical and operational support buttressed the ability of al-Qaeda and the Zarqawi organization to target a common enemy, the United States. At the same time, allowing the groups' cadres to shelter on its soil afforded Iran with leverage in its dealings with Washington: restrictions on al-Qaeda's activities can be loosened to deter or retaliate against American actions, while tighter control can be exercised in exchange for concessions, or to improve bilateral relations. Finally, working with al-Qaeda provided Iran with an insurance policy that often helped to shield it from the group's attacks.

*Id.* at 58.

Just as Iran's self-interest has been served by supporting al-Qaeda, it has been served by

supporting AQI: "[f]or the most part, Tehran's backing for Zarqawi's group was part of a wider strategy aimed at accelerating the eviction of U.S. troops from Iraq, while simultaneously providing some insurance against the emergence of a strong Shia state that could threaten the legitimacy—and predominance—of Iran's clerical regime." *Id.* at 59.   Dr. Gartenstein-Ross concludes that Iran's support to AQI has been "essential in fulfilling the Zarqawi organization's material needs . . . Iran's support enabled the Zarqawi organization to become a lethal and formidable militant force." *Id.* at 59.

ii.  <u>Iran's Direct Material Support of AAI</u>

Iran's support for Sunni groups was not limited to al-Qaeda, AQI, and their affiliates; Iran has also provided significant support to AAI, an Islamic Sunni terrorist group that emerged from Iraq's Kurdistan region. *Id.* at 66.   Dr. Gartenstein-Ross recounts the history of the predominately Kurdish Islamist group AAI, which operated mainly in Northern Iraq, and how its leader, Mullah Fatih Krekar, studied Islamic jurisprudence under Osama bin Laden's mentor and effectively idolized al-Qaeda. *Id.* at 63-65.   Though it is unclear how strong AAI's relationship with al-Qaeda was prior to the official formation of the AAI organization, Kurdish Islamist groups have been sending fighters to train with al-Qaeda since at least 2000, with general encouragement from Osama bin Laden. *Id.* at 63-64.   In the wake of the 9/11 terrorist attacks, AAI established its first territory, and eventually formed an official organization with financial support from, and the blessing of, Osama bin Laden. *Id.* at 64.

Over time, and as described in detail in Dr. Gartenstein-Ross's Sunni Groups Report, AAI became progressively sectarian and increasingly instigated attacks against other Kurdish groups such as the Patriotic Union of Kurdistan ("PUK") and the Kurdish Communist Party. *Id.* at 64-65. The campaign against the PUK was "significant because it reflects the degree to which Ansar al-Islam had begun to adhere to the sectarian values that would later be associated with Zarqawi."

*Id.* at 65.  Dr. Gartenstein-Ross further suggests that this early fighting was meaningfully supported

by an external source—Iran:

> A significant degree of Iranian support was necessary for Ansar al-Islam to function, given that the group's military supplies came in from Iran (the mountainous region they controlled touches the Iranian border), veterans from Afghanistan joined them via Iran, and their cadres (including Mullah Krekar himself) entered and left the area via Iran. The Shiite regime in Iran likely provided support to this radical Sunni group as a means of exercising leverage on the Kurdish secular parties ruling the KRG.  Support for Ansar al-Islam could provide Iran with a particularly effective means of warning Iraqi Kurds not to allow Iranian Kurdish dissidents based in the KRG (the Kurdistan Democratic Party of Iran and Komala) to make too much trouble for Iran.

*Id.* at 66 (citing David Romano, *An Outline of Kurdish Islamist Groups in Iraq*, p. 12).

In 2003, U.S.-led coalition forces mounted an attack against AAI, referred to as "Operation

Viking Hammer."  *Id.* at 67-69.  As a result of Operation Viking Hammer, AAI lost a substantial

number of militants, but many managed to flee to Iran.  *Id.* at 67.  Though Iranian authorities did

hand over some number of these fighters to the PUK, it is estimated that as many as 700 AAI

fighters may have successfully escaped to Iran.  *Id.*  Indeed, Dr. Gartenstein-Ross concludes that

"[t]he survival of Ansar al-Islam as a coherent organization is largely a function of the support it

received from the IRGC," which included "medical treatment to injured members" and "fake

identification cards."  *Id.* at 68.

Iran, al-Qaeda, and AQI supported AAI to varying degrees from roughly 2004

through2006, and AAI's size and presence in Iraq likewise fluctuated.  *Id.* at 72, 75-76.  But when

AAI's cooperative relationship with AQI deepened in certain critical periods, AAI attack TTPs

started looking increasingly similar to TTPs routinely employed by al-Qaeda.  *Id.* at 70 (regarding

AAI, "[t]he group's attacks also regularly employed disguises, and it developed sophisticated

ambush techniques that used improvised explosive devices and RPGs.") (citations omitted).

In 2006, when AAI was relatively weak as an organization, Iran renewed its support for

the terrorist group in Kurdistan.  *Id.* at 73.  This remained true despite the fact that, "under Iraqi Kurdish pressure,"  Iran purportedly ended its *public* support for AAI in 2007, as—contrary to this posturing—Iran chose not to suppress AAI's activities, which instead continued unimpeded in Iranian Kurdistan.  *Id.* at 73-74.  Though AAI experienced a period of "near inactivity" in 2010 and a gradual declination in organizational strength, it still remained "a significant terrorist threat—particularly in the Nineveh and Diyala provinces."  *Id.* at 75.

**d.**    ***The Extent and Means of Iran's Material Support to the Zarqawi Organization and AAI in Iraq***

As noted above, Iran has provided extensive direct material support to AQI and AAI operating in Iraq, including but not limited to weapons; expert training, including knowledge and assistance in tactics, techniques, procedures, and attack planning; safe haven and lodging in, and passage through, Iran; financial support; and intelligence information and methodologies.  *See supra* §§ V(C)(1)(a)-(c); *see generally* Attribution Report at 243; Sunni Militant Group Report at 51-88 (detailing Iran's direct material support of the Zarqawi Organization); *id.* at 75-76 (discussing Iran's direct material support of AAI and AAS); Pregent Expert Report ¶¶ 37, 84-85, 107-30, 141-42, 151-52, 157-58.

i.    <u>Weapons</u>

Iran provided weapons to AQI and AAI, which have been used to carry out vicious attacks against coalition forces, including the Bellwether Attacks.  For example, "in December 2006, evidence found on captured IRGC-QF operatives detained in Baghdad described how the Quds Force was working with individuals affiliated with Al Qaeda in Iraq and Ansar al Sunnah [AAS/AAI], including by importing modern, specially shaped explosive charges, among other weapons and organizational support."  Sunni Militant Groups Report at 74 (quotation marks omitted).  Additional weapons provided to AQI include "small arms, RPGs, IEDs, IEDs with

mortar components, specially shaped explosive charges, and grenades" in addition to "automatic weapons, uniforms, and military equipment." *Id.* at 52-53.

Coalition forces at various points discovered weapons caches uncovered in areas held by AQI that included weapons of Iranian origin, including mortars and IEDs.  For example, "[o]n February 3, 2007, Coalition forces discovered an AQI weapons cache in Abu Ghraib (Baghdad Province) containing Iranian-manufactured mortars." *Id.* at 53.  And "[i]n April 2007, the chief American military spokesman in Iraq, Gen. William B. Caldwell IV, disclosed that U.S. forces had again discovered Iranian-manufactured arms and that Sunni detainees had described assistance that Iranian intelligence provided to them." *Id.*  Dr. Gartenstein-Ross concludes that "Iran's provision of weapons to AQI was one of the most substantial types of support that Iran provided— significant enough to be a causal factor in the U.S. Department of the Treasury's designation of Iran's Ministry of Intelligence and Security (MOIS)." *Id.* at 51 (quotation marks omitted).

Moreover, as Dr. Gartenstein-Ross highlights, an American military spokesman in Iraq observed that Sunni extremists were using explosively formed penetrators ("EFPs"), and "specially shaped explosives . . . among the weapons that the IRGC-QF provided" which "require[d] some degree of training" to use—indicating not only that Sunni extremists received specific weapons from Iran, but also potentially received instructions on how to use the weapons from a source familiar with them. *Id.* at 56.  *See Roth II*, 651 F. Supp. 3d at 76 (finding that Iran provided small arms, ammunition, EFPs, IEDs, mortars, and RPGs to proxies, and specifically "introduced [] 'uniquely lethal' weapons because they could penetrate [American] armored vehicles"); *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 WL 18071921, at *8 (D.D.C. Dec. 28, 2022) (recognizing that Iran sent "modern, specially shaped

explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles").

Iran's provision of weapons to Sunni groups has been significant enough for courts in this and other jurisdictions to hold Iran liable for attacks caused by terrorist organizations, where these violent non-state actors employed Iranian weapons in the attacks.  *See Roth II*, 651 F. Supp. 3d at 87 (stating that the plaintiffs "have sufficiently alleged that senior officials in Iran and its Quds Force supported . . . the Taliban [ ] and al-Qaeda" by providing the terrorist groups with weapons, *inter alia*); *Fishbeck II*, 2023 WL 7448770, at *6-7 (concluding that Iran was liable for materially supporting an IED attack carried out by AAI, notwithstanding the lingering possibility that AQI may instead have been responsible for the attack, because ultimately Iran "provided material support to both groups."); *Neiberger*, 2022 WL 17370239, at *7 (concluding that Iran provided material support to AQI in the form of weapons, among other things); *Espitia*, 2022 WL 2168355, at *5 ("The evidence also demonstrates that Iran provided material support specifically to AQI . . . intelligence experts determined that Iran was responsible for a significant portion of AQI's weapons arsenal, and would have been AQI's principal supplier of EFPs."); *see also Brown II*, 2023 WL 4824740, at *2 ("the Quds Force provided a new leader—Abu Musab al-Zarqawi—with funds, weapons, and safe passage into Iraq to target Americans."); *Driscoll v. Islamic Republic of Iran*, No. 20-CV-622-EGS-ZMF, 2023 WL 4892710, at *11 (D.D.C. June 27, 2023) ("Iran used the IRGC-QF to provide funding, training, *weapons*, equipment, and direction to various Shia militia groups *and Sunni groups* to target Americans in post-Saddam Hussein Iraq," including "provid[ing] Abu Musab al-Zarqawi, founding member of al-Qaeda in Iraq ('AQI'), funding, weapons, and transportation into Iraq to target U.S. troops."), *report and recommendation adopted sub nom. All Plaintiffs Represented by Driscoll v. Islamic Republic of Iran*, No. CV 20-622

(EGS/ZMF), 2023 WL 5932974 (D.D.C. July 13, 2023) (emphasis added); *Battles v. Islamic Republic of Iran*, No. 1:21-CV-179, 2022 WL 3443922, at *3 (S.D. Tex. Aug. 17, 2022) ("By no later than early February 2004, a supply of arms flowed from Iran into al Qaeda strongholds in Iraq, and Iranian arms became an important part of al Qaeda's arsenal.") (quotation marks omitted).

ii.   Training

Iran provided training to AQI and AAI, which has facilitated the strength and expansion of those groups in Iraq.  Dr. Gartenstein-Ross's Sunni Groups Report demonstrates the extent to which Iran imparted its sophisticated training and knowledge on both AQI and AAI, which made possible countless deadly attacks perpetrated by those groups.  Training that Iran has provided includes, but is not limited to, knowledge and assistance on tactics, techniques, procedures, and planning for attacks.  This involves training in explosives, intelligence, and security.  Sunni Militant Groups Report at 76-77.

Starting around 1991, al-Qaeda and Iran established "an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States."  *Id.* at 30 (citations and quotation marks omitted).  The training was put into practice in connection with several subsequent, identifiable attacks.  For instance, in the 1998 East African U.S. Embassy bombings, "trainees who received instruction from Iran and Hizballah included al-Qaeda's 'top military committee members,' as well as al-Qaeda terrorists."  Sunni Militant Groups Report at 30.  "Indeed, the 9/11 Commission found that the training provided by Iran and Hizballah gave al-Qaeda the 'tactical expertise' it required for the 1998 U.S. Embassy bombings."  *Id.*  Another instance is in the bombing of the USS Cole, during the years leading up to which "Iran was directly involved in . . . training and logistics for al-Qaeda in the Gulf region."  *Id.* at 32.  Without Iran's coaching, it is unlikely that al-Qaeda could have successfully executed

these mass casualty attacks. *See Owens I*, 826 F. Supp. 2d at 138 (highlighting instances where Iran trained al-Qaeda operatives, and noting that prior to Iran's training contributions, "al-Qaeda had not carried out any successful large scale bombings" and that "it would not have been possible . . . without this type of training it received from Iran and Hezbollah").

Al-Qaeda—armed with newfound knowledge on the best practices for succeeding in terrorism—began to share its Iranian-learned techniques and procedures with AQI and AAI. Zarqawi, the founder of AQI, "arranged training for terrorists at al-Qaida camps" and made contact with al-Qaida to train Jordanians. Sunni Militant Groups Report at 17. Zarqawi's operatives "trained at al-Qaida's al-Faruq Camp, where they received full support from al-Qaida." *Id.* (citations omitted). Even Zarqawi himself received training in al-Qaeda training camps, and prior to entering Iraq, ran a terrorist training camp near Herat, Afghanistan—in close proximity to the border with Iran—that was funded by al-Qaeda. *Id.* at 15, 45-46. *See Roth II*, 651 F. Supp. 3d at 88 (noting that Iran had "trained al-Zarqawi, who eventually founded AQI with the mission of killing Americans in Iraq," teaching al-Zarqawi "particular tactics designed to cause great harm, such as ambushes, mortars, rockets, and IED emplacement"). Courts have recognized Iran's role in training AQI as instrumental to AQI's ability to accomplish significant attacks that would not have been possible without extensive training from Iranian figures. *See Roth II*, 651 F. Supp. 3d at 87 (stating that the plaintiffs "have sufficiently alleged that senior officials in Iran and its Quds Force supported . . . the Taliban [ ] and al-Qaeda" by providing the terrorist groups with training, *inter alia*); *Brown II*, 2023 WL 4824740, at *9 ("Iran trained . . . JTJ [and] AQI . . . to use various weapons—including IEDs, RPGs, VBIEDs, and more. These are all lethal explosives engineered to kill targets. And Iran provided instruction on military tactics to help proxy groups deploy these weapons more effectively. This support strengthened these groups and made them more deadly to

Americans.") (citations omitted); *Driscoll*, 2023 WL 4892710, at *13 ("Iran provided training to proxy groups on particular tactics designed to cause great harm, such as ambushes, mortars, rockets, and IED emplacement.") (quotation marks omitted); *Herrick v. Islamic Republic of Iran*, 1:21-CV-168, 2022 WL 3443816, at *5 (S.D. Tex. Aug. 17, 2022) ("[T]he Court concludes that the evidence is satisfactory to demonstrate that Iran, through various state officials and agents, contributed significantly to AQI's ability to orchestrate an attack with a weapon that was powerful enough to penetrate an armored combat vehicle.").

As far as AAI, Iranian entities were actively teaching AAI how to improve their skills as to the use of explosive devices:

> Intelligence indicates that elements of Iran's Islamic Revolutionary Guard Corps 'are providing safe haven and basic training to Iran-based AI [Ansar al-Islam] cadres.' A report by the Iraq Survey Group noted that a source had reported "approximately 320 Ansar al-Islam terrorists being trained in Iran . . . for various attack scenarios including suicide bombings, assassinations, and general subversion against U.S. forces in Iraq." Another British intelligence source "said that Iranian government agencies were also secretly helping Ansar al-Islam members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces." American sources confirmed this information, adding that "an Iranian was aiding Ansar al-Islam 'on how to build and set up' improvised explosive devices, known as IEDs." An analyst for the U.S. Central Command offered this assessment: 'AI [Ansar al-Islam] is actively attempting to improve IED effectiveness and sophistication.'

Sunni Militant Groups Report at 72 (citations omitted). The U.S. Treasury made similar findings when designating AAI as a terrorist organization:

> Ansar al-Islam has received training and logistical assistance from al-Qa'ida. Groups of AI's Kurdish members have traveled to Afghanistan to train with al-Qa'ida, while AI's foreign members are believed to be al-Qaida-trained veterans of conflicts in Afghanistan and Chechnya.

> Ansar al-Islam has a close association with senior al-Qa'ida operative Abu Musab al-Zarqawi, . . . whose network has established a poison and explosives training camp in the area of northeastern Iraq that is controlled by Ansar al-Islam.

*Id.* at 66.

iii.     Safe Haven and Safe Passage through Iran

Iran provided AQI and AAI with sanctuary within and passage through its borders.  Iran—
through a "secret" relationship with Osama bin Laden—served as a common transit route and
sanctuary for the al-Qaeda members (and their money) that moved throughout the region.  Sunni
Militant Groups Report at 31.  Saif al-Adl and Abu Musab al-Zarqawi in particular were two major
beneficiaries of Iranian sanctuary, as were militants fleeing responsibility for the 9/11 attacks and
subsequent invasions by coalition forces.  *Id.* 31, 33.[47]  In addition to simply allowing the fleeing
terrorists to pass through its borders, Iran affirmatively provided them with "special traveling
papers" and "instructed its border guards not to stamp the passports of these operatives, effectively
cloaking their movements."  *Id.* at 32-33.  Iran was especially supportive of al-Zarqawi; giving
him safe passage, an Iranian passport, a satellite phone, and two additional cell phones to remain
under the radar while recruiting and coordinating organizational activities and attacks from within
Iran's borders.  *Id.* at 57.  As Dr. Gartenstein-Ross explains:

> In addition to the passage Iran granted to Zarqawi and his organization for network-
> building and operational activities, Iran provided sanctuary to Zarqawi himself, as
> well as other Zarqawi organization operatives.  Zarqawi and other operatives from
> his group used this sanctuary to plan and execute attacks in Iraq. . . . Indeed, in the
> latter part of 2003, European intelligence assessed that Zarqawi was located in Iran,
> using it as a base from which to coordinate his group's operations in Iraq, including
> attacks.

*Id.* at 57-58.

This, and the impact of the Iranian safe haven provided to prominent al-Qaeda leaders,
such as al-Adl, cannot be understated.  While on "house arrest" in Iran, al-Adl was essentially

---

[47] Dr. Gartenstein-Ross demonstrates how far this sanctuary went, with "General Qassem
Suleimani, the head of the Quds Force, reportedly t[aking] 'personal responsibility' for tending to
Osama bin Laden's fleeing family, as well as senior al-Qaeda members, when they 'sought
sanctuary in Iran in 2002.'"  Sunni Militant Groups Report at 33.

living freely and comfortably, maintaining a connection to his terrorist network, and contributing substantially to al-Qaeda's operations. *Id.* at 34. Most notably, Iran's sanctuary to al-Adl gave him the time needed to facilitate the design and dissemination of master strategies for achieving the goals of both Al-Qaeda, and also the Zarqawi organization by extension. Al-Adl's resulting "master plan" is described by Dr. Gartenstein-Ross as the "most consequential jihadist strategic documents ever produced." *Id.* at 36. And this was nowhere near the end—Jordanian journalist Fouad Hussein (recipient and publisher of al-Adl's plan) incorporated and relied on al-Adl's work in his own strategic publication, building upon al-Adl's vision to fuse the Zarqawi organization and al-Qaeda into one synthesized movement. *Id.* Iran's ongoing support for al-Qaeda in this way is no secret—the U.S. Department of State has identified it as a "serious issue," given that Iran has been facilitating and enabling al-Qaeda since 2009. *Id.* at 42.

In 2003, U.S.-led coalition forces mounted an attack against AAI, referred to as "Operation Viking Hammer," in which U.S.-led forces wiped out approximately 50 percent of the group's fighters. *Id.* at 67-69. As a result of Operation Viking Hammer, AAI lost a substantial number of militants, but many managed to flee to Iran. *Id.* at 67. Though Iranian authorities did hand over some number of these fighters to the PUK, it is estimated that as many as 700 AAI fighters may have successfully escaped to Iran. *Id.* Iran also provided AAI with "medical treatment to injured members" and "fake identification cards." *Id.* at 68. Dr. Gartenstein-Ross explains that, "[g]iven the intensity of the Operation Viking Hammer military operation, it is reasonable to conclude, as I do, that the survival of Ansar al-Islam as a coherent organization is largely a function of the support it received from the IRGC." *Id.* at 76.

Iran's provision of safe haven to AAI continued for years thereafter. For example, intelligence reporting from 2004 "indicates that elements of Iran's Islamic Revolutionary Guard

Corps 'are providing safe haven and basic training to Iran-based AI [Ansar al-Islam] cadres.'" *Id.* at 72 (citations and quotation marks omitted). In 2008, AAI/AAS fought alongside members of the IRGC against a Kurdish contingent "in return for a continued Iran-based safe haven." *Id.* at 75. Dr. Gartenstein-Ross further concludes:

> Safe haven is a significant boon for any militant organization, bolstering the full range of its capabilities, and it is evident that AAI/AAS highly valued its safe haven in Iran—enough that it could be persuaded to fight Iran's enemies to maintain this territorial access. This safe haven in Iran significantly enhanced AAI/AAS's ability to conduct operations in Iraq, which was the major focus of the group's militant activities.

*Id.* at 76.

Likewise, Iran has provided a safe haven to members and leaders of AAI/AAS (including by declining to suppress AAI/AAS's activities within its borders), and has facilitated their escape amid conflict. *Id.* Dr. Gartenstein-Ross concludes that the territorial access to Iran "significantly enhanced AAI's ability to conduct operations in Iraq, which was the major focus of the group's militant activities." *Id.*

As with AQI, because Iranian safe havens facilitated AAI's ability to escape capture or defeat, such provision ultimately supported all subsequent attacks perpetrated by the terrorists who benefitted from the safe haven environment and used it to escape capture or defeat at the hands of Coalition Forces. Iran's provision of safe haven and safe passage has indeed been recognized by courts as a form of material support. *See Roth II*, 651 F. Supp. 3d at 87 (stating that the plaintiffs "have sufficiently alleged that senior officials in Iran and its Quds Force supported . . . the Taliban . . . and al-Qaeda" by providing the terrorist groups with "safe haven and smooth passage," *inter alia*); *Force I*, 464 F. Supp. 3d at 365 (noting that courts have held that safe havens to terrorist organizations can constitute material support); *Roth I*, 78 F. Supp. 3d at 388 (finding that Iran provided material support—including "safehaven"—for a bombing); *Neiberger*, 2022 WL

17370239, at *7 (referring to the expert's report as satisfactory proof that "Iran provided safe haven to Zarqawi and its leaders by 'permit[ting] Zarqawi recruits to transit Iranian territory and make use of safe houses in different parts of the country'"); *Cabrera I*, 2022 WL 2817730, at *12 (concluding that the safe havens Iran provided were "critical to the Taliban's insurgency"); *Herrick*, 2022 WL 3443816, at *2 ("After the United States invaded Afghanistan in 2001, Iran provided safe haven to several al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist who initially operated under the protection of the IRGC and its elite Quds Brigade.  According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq.") (citations and quotation marks omitted); *Battles*, 2022 WL 3443922, at *2 ("Iran provided 'safe haven' to several al Qaeda leaders and prominent extremists[,]" including to AQI, an organization that presented "a very serious threat to the post-2003 stability of Iraq").

iv.    <u>Financial Support</u>

Iran's financial contributions to AQI and AAI have occurred over a great length of time, and have been crucial to the existence and operational success of both organizations.  As Dr. Gartenstein-Ross explains, with respect to AQI, "Al-Qaeda supported the Zarqawi organization in the early years of the Iraq war; bin Laden included the Zarqawi organization as a recipient of some of the $1.5 million in monthly funding he sent to Iraq to support the insurgency."  Sunni Militant Groups Report at 46.

In 2006, the U.S. Treasury designated a handful of individuals for, in part, giving money to al-Qaeda and other terrorist organizations—money that al-Qaeda used to recruit jihadists and pay expenses for AQI, effectively ensuring support for the Zarqawi organization at "every stage of the terrorist life-cycle."  *Id.*  The U.S. Treasury Department revealed that Iran's MOIS was providing money and weapons directly to the Zarqawi organization.  *See id.* at 51, 54, 57.  Ahmed

87

Foruzandeh, IRGC brigadier general, is among those identified as having provided "financial and material support" to insurgent Sunni groups in Iraq. *Id.* at 54. Osama bin Laden himself has praised Iran as al-Qaeda's "main artery for funds, personnel, and communication." *Id.* at 40. Dr. Gartenstein-Ross concludes in his report that the funding Iran provided to AQI had a "significant impact on the organization's ability to execute a high volume of attacks against Coalition forces." *Id.* at 53.

Regarding AAI, at its inception, Osama bin Laden provided AAI with "seed money," in the amount of roughly $300,000 to $600,000. *Id.* at 64. In addition to the massive starter donation, bin Laden "regularly provided the group with installments of $10,000 from 2001 to 2003 through couriers." *Id.* And even more than this, Iran offered "salaries of $1,500" to Iranian Kurds for their participation in its training exercises—directly contributing to the skill, financial stability, and overall advancement of the group and individual insurgents. *Id.* at 73. As evidenced by the significant sums of money transferred from al-Qaeda to AAI, and as concluded by Dr. Gartenstein-Ross, the relationship between al-Qaeda and AAI ultimately "manifested [] through funding." *Id.* at 63; *see Hammons*, 2023 WL 5933340, at *13 (summarizing an expert's testimony that "[i]n addition to direct funding, Iran provides substantial financial support to the Taliban[, a Sunni organization,] by enabling its international narcotics trade[.]"); *Cabrera I*, 2022 WL 2817730, at *12 ("Iran provided cash to key Taliban leaders so they could buy weapons and other materials to disseminate throughout the regions where they operated."); *Parhamovich*, 2022 WL 18071921, at *8 (noting the evidence that "[i]n 2008, a leading Sunni militant and principal al Qaeda fundraiser who had sent money to the Zarqawi organization, reported in an interview that 'Iran was both providing [AQI] with money and weapons and facilitating the movement of its fighters'" to deter the United States "in order for [the U.S.] not to give its entire attention to Iran"); *Neiberger*, 2022

WL 17370239, at *7 (noting that Iran provided "funding and weapons to Zarqawi/AQI" based on the evidence from the expert Gartenstein-Ross's report); *Cabrera I*, 2022 WL 2817730, at *40 (finding that Iran's provision of financial and military aid was essential to the terrorists' operating capacity, and such material support was a substantial factor in the attacks that caused the injuries); *Herrick*, 2022 WL 3443816, at *5 ("The United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included . . . providing funds . . . to al Qaeda operatives in various middle eastern countries, including Iraq.").

v. <u>Intelligence Information and Methodologies</u>

Iran also materially supported Sunni terrorist groups (including AQ, the Zarqawi organization, and AAI) by providing them with important intelligence information and intelligence collection and use methodologies (i.e., intelligence techniques Iran's terrorist allies could use to acquire and process attack intelligence on their own).

First, Iran's intelligence apparatus was directly involved in Iran's provisioning of the previous four categories of material support to its terrorist allies, and Iran often used its official state intelligence service, MOIS, as a conduit to provide this support.  Indeed, logistical guidance and "[m]uch of Iran's support for al-Qaeda was rendered through its Ministry of Intelligence and Security (MOIS) and the IRGC."  Sunni Militant Groups Report at 31, 53 (Sunni detainees confirmed that Iranian intelligence operatives supported them); *see also* Sunni Militant Groups Report at 31, 36 (recognizing Iran's MOIS, and the IRGC, as "deeply involved in supporting terrorists, including al Qaeda.") (citations omitted).  And as noted above, Iran's MOIS received a U.S. Treasury designation for supporting terrorist organizations, as did Ahmed Foruzandeh, IRGC-QF brigadier general, who specifically directed Iranian intelligence officers to provide support to Sunni militants.  *See* Sunni Militant Groups Report at 51, 54; *supra* § V(C)(1)(c)(i).

Dr. Gartenstein-Ross highlights how al-Qaeda members and top officials were trained in

explosives and intelligence by Iranian intelligence agents and Hezbollah. *See* Sunni Militant Groups Report at 30, 55 (citations omitted). Al-Qaeda military officials, based in Iran, also independently worked to gather intelligence for al-Qaeda's benefit and did so while benefitting from the inaction of Iranian intelligence officials who allowed such intelligence gathering on Iranian soil. *See* Sunni Militant Groups Report at 41-42. Having information of this caliber made it possible for operatives to, among other things, seamlessly and secretly move in and out of Iran's borders. *See* Sunni Militant Groups Report at 44. In fact, it was Iranian policy to facilitate this type of movement, even where it benefitted the Zarqawi organization: "Iran's intelligence service no doubt understood Zarqawi's sectarian disposition, but they also had a policy of tolerating jihadis transiting their territory, especially if those fighters were hostile to the Taliban." Sunni Militant Groups Report at 18 (citations omitted). Likewise, the MOIS has extended support to AAI during offensives. Sunni Militant Groups Report at 61. It is likely that the continuous collaboration between Iran's MOIS and the Sunni insurgents contributed to AQI and AAI becoming "the most powerful actors in the Iraqi insurgency," as described by U.S. military intelligence officials. *See* Sunni Militant Groups report at 73; *see also* Pregent Expert Report ¶ 44 ("The IRGC, Lebanese Hezbollah, and the MOIS made possible the ability of AQI and AAI/AAS to conduct resupply operations, maintain freedom of movement, and shift forces from one geographic area to another to attack U.S. forces.").

Beyond specific examples of intelligence support, Iran—through the IRGC-QF—also provided intelligence training to Iranian proxy Lebanese Hezbollah on what types of intelligence information is needed to execute a successful and highly lethal attack. Pregent Expert Report ¶¶ 141-42, 151-52, 157-58 ("[T]errorists, including AQI and AAI/AAS, learned from Hezbollah how to apply reconnaissance and surveillance practices to scope out an area for attack, prepare

exfiltration routes, monitor timing of shift changes and patterns of patrols, and learn the response times of U.S. Quick Reaction Forces (QRF). The trainings sensitized AAI/AAS, AQI, and their respective affiliates to the types of information that they would need to collect in order to make any attack successful."). This training on intelligence gathering was ultimately disseminated by the Hezbollah to al-Qaeda, the Zarqawi organization, and AAI, and this Iranian-provided intelligence methodology has served as a framework for each of the militant organizations when planning future attacks. Pregent Expert Report ¶¶ 37, 84-85, 141-42, 151-52, 157-58. Specifically, knowing *how* to collect the requisite intelligence information has given each group insight into the best practices for picking targets; timing attacks; identifying vulnerabilities; planning escape routes; and anticipating counterattacks—ultimately elevating their capabilities exponentially, and indefinitely. *See* Pregent Expert Report ¶¶ 141-42, 151-52, 157 ("[Trainings] empowered AQI, AAI/AAS, and their respective affiliates to prepare for attacks without further input from Iran or Hezbollah as to the details of any specific attack—having learned the Iran-Hezbollah intelligence methodology, AQI, AAI/AAS, and their respective affiliates could prepare such intelligence on their own.").

In this way, Iran provided valuable material support—through its IRGC-QF and MOIS, and through its proxy Lebanese Hezbollah—to the Sunni Terrorist Groups in the form of both specific intelligence information, and in the form of intelligence methodologies that were brought to bear to increase the effectiveness and lethality of the Sunni Terrorist Groups' attacks against Americans.

**2.   Iran's Material Support to the Sunni Terrorist Groups Was a Proximate Cause of the Bellwether Attacks**

Plaintiffs' expert Dr. Gartenstein-Ross concludes that all 25 Bellwether Attacks were perpetrated by the Sunni Terrorist Groups having received Iranian material support, that such

Iranian material support substantially contributed to each attack that killed or injured Plaintiffs, and that Iran's material support was provided to the Sunni Terrorist Groups with the express and intended purpose of causing injuries and deaths exactly like those inflicted on Plaintiffs and their loved ones.  *See* Attribution Report at 241-42 ("Given the nature and extent of Iranian material support to al-Qaeda, the Zarqawi organization, and Ansar al-Islam/Ansar al-Sunnah, Iran's assistance was critical to the survival of these militant organizations, significantly increased their capabilities, and is reasonably connected to each of the attacks listed above."); *id.* at 20-240 (attributing each individual attack).  The material support that Iran provided to the Sunni Terrorist Groups is thus a proximate cause of the Bellwether Attacks.  *See Force I*, 464 F. Supp. 3d at 368-69 (concluding that Iran's financial and military aid to terrorist groups coupled with active encouragement to carry out terrorist attacks was a substantial factor in the attacks that caused foreseeable plaintiffs' injuries); *Fishbeck I*, 2023 WL 7443394, at *1 (finding plaintiffs' evidence satisfactory that Iran "provided material support, as that term is used in 28 U.S.C. § 1605A(a)(1), to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam during the relevant time period of 2003-2011" and also finding that the provision of material support by Iran "to the above-mentioned Sunni terrorist groups was essential to the groups' operating capacity, and terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support").

### a.    *IED Attacks*

Each of the twelve IED attacks at issue in this case was proximately caused by Iran's material support of the Zarqawi organization or AAI terrorists that perpetrated them.  As both Dr. Gartenstein-Ross and Mr. Pregent conclude, Iran provided IEDs to AQI and AAI during the relevant time period, trained AQI and AAI terrorists on how to manufacture, design, and effectively deploy this type of weapon, and provided these groups (as well as al-Qaeda) with

substantial funding in which to carry out these types of attacks.  Attribution Report at 230 (U.S. intelligence reporting that an Iranian was training AAI militants "on how to build and set up" IEDs) (citing Kimberly Kagan, *Iran's Proxy War against the United States and the Iraqi Government, Iraq Report May 2006—August 20, 2007*, Institute for the Study of War, at 7, https://www.understandingwar.org/sites/default/files/reports/IraqReport06.pdf);  Sunni  Militant Groups Report at 51-53, 75-76 (describing Iranian provision of weapons—including IEDs—and other material support to enable Zarqawi organization- and AAI-perpetrated attacks, respectively); Pregent Expert Report ¶ 155 ("I have personal knowledge that AQI and AAI/AAS specialized in these tactics and deployed such IEDs to great effect using the aforementioned training and material support they had received from the IRGC-QF"); s*ee Battles*, 2022 WL 3443922, at *3 ("Iran was providing terror cells in Iraq with the capacity to build IEDs, both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the express intended purpose of attacking United States servicemembers and further destabilizing the Iraqi region.") (quotation marks omitted).  These Iranian IEDs came from IED factories located within Iraq which were staffed by Iranian-trained bomb-makers, as well as factories located within Iran itself.  Sunni Militant Groups Report at 51-53; *see*, *e.g.*, Attribution Report at 59-60 (finding Iran provided material support to the Zarqawi organization in the form of training to use IEDs and provision of IED components).

IEDs were one of AAI's and the Zarqawi organization's most commonly employed munitions at the time.  *See* Sunni Militant Groups Report at 59-60 ("[T]he Islamic Republic's provision of IEDs and IED components was especially critical in supporting a hallmark of Zarqawi's operations: spectacular attacks that were often achieved via bombings[.]"); *see also id.* at 55-56 (describing Iranian provision of training in explosives attack planning); Attribution

Report at 96 (IEDs were among AAI's "most commonly employed munitions, although [AAI] also frequently used suicide bombers and car bombs"). The use of IEDs was further supported by Iranian-provided financial support to the Zarqawi organization, which allowed the organization to pay its recruits higher salaries than they would have received from Iraqi Security Forces, and allowed Zarqawi to offer, *inter alia*, "$100 to $200 for a single small arms, mortar, or IED attack." Sunni Militant Groups Report at 47. AAI made itself known for its use of IEDs, and by late December 2007, AAI was known for using videos of prior IED attacks as part of its recruitment and training tactics. Attribution Report at 228. In 2007, AAI released a seven-minute video of their "Top 20 IED Attacks," which ranked attacks based on criteria including precision, impact, and video quality. *Id.* Similarly, the Zarqawi organization became known for using IEDs, as they produced "spectacular attacks." *Id.* at 89. As to VBIEDs, a court in this jurisdiction has already characterized this TTP as "a signature AQI attack method." *Brown II*, 2023 WL 4824740, at *4.

Courts have consistently found that IED attacks carried out by AQI and AAI in Iraq were proximately caused by Iran. *See Fishbeck II*, 2023 WL 7448770, at *6-7 (finding evidence satisfactory to attribute an IED attack to AAI, with material support from Iran); *Brown II*, 2023 WL 4824740, at *10 (finding that Iran's material support caused IED attacks perpetrated by terrorist organizations in Iraq, including AQI, because IEDs were sophisticated weapons that required training to make them and place them strategically to inflict casualties); *Fissler v. Islamic Republic of Iran*, No. 18-cv-3122 (CKK), 2022 WL 4464873, at *1, 3 (D.D.C. Sept. 26, 2022) (finding Iran liable for IED attacks in light of Iran's arms transfers, training programs, and signature tactic of burying IEDs in the ground); *Neiberger*, 2022 WL 17370239, at *4 (finding Iran liable for an IED attack carried out by AQI in Sadr City); *Driscoll*, 2023 WL 4892710, at *13 (finding Iran's material support to Sunni militant groups, including through provision of training

on particular attacks designed to cause great harm, "was a substantial factor in the sequence of events that resulted in the deaths of eleven servicemembers and injuries to one servicemember from IED and rocket fire attacks").

Details about the IEDs used in Attacks #1 through #12 further bolster the finding that Iran materially supported these attacks. All 12 IED attacks occurred in regions and at specific times where Iran was known to have provided specific support to the terrorist groups who carried out the attacks. Attribution Report at 38-39, 44-45, 52-53, 59-60 (detailing Iranian support for IED attacks which occurred in Al Anbar Province), 125-26 (same in Baghdad Province), 144-45, 149-50, 161-62 (same in Diyala Province), 189-90 (same in Nineveh Province), 229-30, 235-36, and 241-42 (same in Saladin Province); *see Fishbeck II*, 2023 WL 7448770, at *6-7 (attributing an IED attack to AAI, which received material support from Iran, because the terrorist group "enjoyed a 'safe heaven'" in the area at the time of the attack, "had claimed responsibility for other IED attacks in the surrounding area," and deployed a "very sophisticated" IED that "included anti-tampering components"). As detailed below, many of the IEDs were powerful enough to penetrate armored military vehicles and left large blast sites, which reflects the sophistication and power of the weapon indicating Iranian origin and/or training. *See supra* § III(A) – Attacks 1-2, 4-9 (attacks involving destruction of armored vehicles); *Fishbeck II*, 2023 WL 7448770, at *8-10 (attributing the pressure-plate IED attack to AQI, which received material support from Iran, because of "the size and sophistication of the blast" sufficient to flip over the 14-ton mine-resistant, ambush-protected vehicle, the "sophistication of the design, and ability to plant the IEDs without targeting civilians"); *Hammons*, 2023 WL 5933340, at *3, 11 (stating that the size of the blast in Camp Sullivan residential complex, from a truck containing more than three thousand pounds of explosive material, supports the Taliban's claim of responsibility for the attack and Iran's

involvement by providing material support to its proxy to "to attack U.S. forces and its allies in the region with acts of terrorism"); *Driscoll*, 2023 WL 4892710, at *7 (finding AQI-detonated IED traceable to Iran in part because the weapon penetrated an M1114, noting that the court in *Karcher II* "was persuaded by the 'clear photographic evidence of the catastrophic damage to and the incineration of [the] up-armored vehicle'") (quoting *Karcher v. Islamic Republic of Iran*, No. CV 16-232 (CKK), 2021 WL 133507 (D.D.C. Jan. 14, 2021) ("*Karcher II*")).  Further, many of the IEDs used in the Bellwether Attacks were camouflaged, deeply buried, booby-trapped, and/or remotely detonated, demonstrating a level of sophistication and training indicating Iranian support. *See infra* § III(A) – Attack #3 (booby-trapped door); Attack #4 (remotely detonated IED); Attack #8 (command wire used, indicating familiarity and training with IED weapons system); Attack #11 (same); *Roth II*, 651 F. Supp. 3d at 86 (noting that the IED deployed in an attack "was a sophisticated weapons system that required training to use"); *Fishbeck II*, 2023 WL 7448770, at *8 (finding that AQI, with material support from Iran, carried out an attack with two camouflaged pressure-plate IEDs detonating convoying vehicles); *Cabrera I*, 2022 WL 2817730, at *23 (finding "Iran's material support for the Taliban . . . substantially contributed to the Taliban's ability to conduct [an IED] attack" because the trigger device on the IED "was significantly more sophisticated than the devices typically found in the area [and] it was designed to compress only under the weight of a fully armed soldier, allowing the Taliban to place it under a commonly used path without injuring local civilians"); *Karcher II*, 2021 WL 133507, at *10 (concluding that "precisely the right directional focus, distance from the target, [the] timing of the [passive infra-red device]-enabled" explosive device as well as "camouflaging the weapon to avoid tipping off U.S. forces" required extensive training).

Attack #1 involved an IED that penetrated and destroyed an M3A3 Cavalry Fighting

Vehicle.  The attack was carried out by AAI, operating as AAS, and occurred shortly after the group had retreated to Iran, where it received safe haven, training, funding, and weapons, including IEDs.  *See Fishbeck II*, 2023 WL 7448770, at *7 ("Given the sophistication of the [IED] attack, the location of the attack in an AAI safe haven, and a credible attribution by both plaintiffs' expert and a military report, the Court is satisfied that there is sufficient evidence to attribute the [ ] attack to AAI, which received material support from [Iran], and holds [Iran] liable for the attack.").

Attack #2 involved an IED that was able to penetrate a Stryker armored vehicle.  The attack was carried out by the Zarqawi organization during a period where they were receiving substantial material support from Iran in the form of weapons, including IEDs, and training, including with regards to carrying out IED attacks.

Attack #3 featured a highly powerful explosive that was booby-trapped to a door within an Iraqi school that was wired to explode upon opening, a TTP that required a level of sophistication indicative of advanced training of the kind provided by Iran.  The attack was carried out by the Zarqawi organization in Al-Karmah, very close to Fallujah, during a period in which the group was receiving extensive support from Iran and al-Qaeda, "including funneling weapons to AQI strongholds in Fallujah and Al Anbar Province."  Attribution Report at 38.

Attack #4 involved an IED sufficiently large to destroy an M1114 up-armored HMMWV, a vehicle highly resistant to all but the strongest IEDs, and left a blast site measuring 12 feet wide, 11 feet long, and 3 feet deep, indicating it was provided by Iran and/or the terrorists received advanced training from Iran and/or al-Qaeda.  Moreover the Explosive Ordnance Disposal team investigating the explosion discovered a base station for a long range cordless telephone—a type of remote detonation system—on the "southern edge of the road" with a 12-volt car battery, indicating that the IED was remotely detonated.  Attribution Report at 43; *see Karcher II*, 2021

WL 133507, at *20 (finding that "Iran and its proxies [bore] responsibility" for an attack that involved a long-range cordless telephone armed IED with a passive infrared device trigger). The attack was carried out by the Zarqawi organization, operating as MSC, during a period in which the group was highly dependent on Iranian support. MSC frequently used IEDs to attack coalition forces, controlled several IED factories, and had received munitions from Iran, including IEDs, all in Al Anbar Province. Attribution Report at 43-45. During the time of this attack, Iran supported MSC militants in Al Anbar Province with the provision of arms, including IEDs, and military intelligence. In December 2004, Iranian support for MSC was discovered when two Quds Force operatives were arrested in Baghdad. *Id.* at 44. Per U.S. defense officials, the documents possessed by the operatives definitively demonstrated the Quds Force's cooperation with Sunni militias, including MSC. *Id.* Further, the use of a remotely detonated IED indicates Iranian material support. In 2011, the U.S. Department of State identified Muhammad Hisham Muhammad Isma'il Abu Ghazala, a Hamas operative, as a facilitator in the construction and deployment of IEDs. *Id.* at 45. The State Department noted Ghazala's affiliations with Iran and al-Qaeda, his work in distributing designs for remote detonation IEDs used by terrorist groups in Iraq, and his connections to multiple IED networks across northern Iraq, which is where MSC primarily operated. *Id.* Dr. Gartenstein-Ross concludes that given Ghazala's affiliations with Iran and al-Qaeda and the nature of Ghazala's activities in Iraq, it is "very likely" that Ghazala played a role in facilitating IED attacks for MSC, such as the attack described above. *Id.*

With respect to Attacks #5 and #6, Iran provided the Zarqawi organization militants in Al Anbar Province that carried out the attacks with arms, IEDs, financing, and military intelligence, each of which was brought to bear in their execution of the attacks. *See supra* § III(A) – Attacks 5 and 6; Attribution Report at 46-60. Attack #5, in particular, featured a deeply buried IED that

"was not detected the previous night due to its depth beneath the road," and fully destroyed an RG-31 Mine-Protected Armored Personnel Carrier, lifting it into the air and breaking it into four pieces. Attribution Report at 46.  Dr. Gartenstein-Ross lays out the significance of deep-buried IEDs in his attribution report, and particularly describes both how "[t]he use of deep-buried IEDs was a known ISI TTP during this time period," and also how ISI IED attacks accounted for 64 percent of IED attacks in Al-Karmah, according to contemporaneous reporting by CENTCOM. Attribution Report at 51.  Attack #6 featured a highly sophisticated shaped charge IED most likely detonated by a command wire and placed at a 45-degree angle to aim at the passenger side of the vehicle.  *Id.* at 55 (citing contemporaneous AR 15-6 Investigation Report).  After observing these features, the EOD team "indicated that any triggerman employing this type of IED would have been either very skilled or very lucky, based on the timing required to properly employ this type of IED."  *Id.*  Each of these features—a shaped charge, command wire, and the specific angle of placement to target the vehicle's occupant—all evince that the perpetrator had received and deliberately deployed advanced IED training likely acquired from Iran or supported by Iranian material support.  *See Fissler*, 2022 WL 4464873, at *2 (incorporating *Karcher*'s findings that an operator's use of a "command wire" or "remote frequency" to arm an explosive device "requires substantial technical expertise" and "all but necessitates the inference that Iran was responsible" for the attacks); *Parhamovich*, 2022 WL 18071921, at *8 (summarizing expert testimony that AQI relied on logistics networks in Iran to procure sophisticated weapons, such as "specially shaped explosive charges," and training on such weapons that AQI then used in roadside bombs to target U.S. military armored vehicles).  ISI's EFP factory in the adjacent Saladin Province also demonstrates the groups' ability to conduct precisely such attacks, which in turn were facilitated by Iran's extensive support to ISI in the Al Anbar province.  Attribution Report at 58-60.

For Attack #7, Iran provided Zarqawi organization militants in Saladin Province—where this attack occurred—with arms and military intelligence, both of which were used by the Zarqawi organization in this attack. *See supra* § III(A) – Attack 7; Attribution Report at 235-36. The attack featured two independent IEDs of similar construction, featuring 155mm projectiles detonated by a pressure switch. *Id.* at 231-32; *see Espitia*, 2022 WL 2168355, at *5 (finding Iran caused an AQI attack, explaining that "the use of multiple IEDs and EFPs in a series of attacks . . . renders almost a certainty that Iran supplied at least some of these weapons."). ISI was well known at the time for utilizing such IED attacks in Saladin Province, and had established a campaign in the province for each cell to conduct three IED attacks. Attribution Report at 234. Coalition forces additionally seized an ISI weapons cache south of Baghdad that included materials to construct IEDs similar to the devices used in Attack #7. *Id.*

Attacks #8 and #9 were supported by Iran's supplying of weapons, logistics, and military intelligence to Zarqawi organization militants in the Diyala River Valley where these attacks took place. *See supra* § III(A) – Attacks #8 and #9; Attribution Report at 140-50. Attack #8 featured a blast so powerful that it completely destroyed an up-armored Humvee, left it "immediately engulfed in fire," and threw its occupants—including SPC Hoover and CPT Grassbaugh—10-20 meters from the blast site. *Id.* at 141. This kind of powerful munition is evidence of Iranian material support. *Fishbeck II*, 2023 WL 7448770, at *9-10 (attributing the pressure-plate IED attack to AQI, which received material support from Iran, because of "the size and sophistication of the blast" sufficient to flip over the 14-ton, mine-resistant, ambush-protected vehicle). Other evidence collected by the explosive ordinance disposal team also suggests Iranian-supported ISI carried out the attack: the IED had been preset and buried "several months" prior to the attack, a tactic the team described as allowing IED emplacers to avoid detection, and the IED was detonated

by a command wire, likely leading to a nearby house to give a direct vantage point.  Attribution Report at 143.  Dr. Gartenstein-Ross explains, "The timelines required to pre-set an IED and knock a hole in the wall of a house suggest that those who executed the attack were active in the area for some months prior to the attack, which aligns with ISI's March 2007 area of operations dominance in the region."  *Id.*  ISI had used IEDs to regularly target coalition forces in the Diyala River valley at the time of the attack, and had extensively "mined the main roads" the month before Attack #8, "resulting in two to three daily IED attacks" on just one squadron alone.  *Id.*  A subsequent raid in Diyala Province—Operation Arrowhead Ripper—seized approximately 250 IEDs from ISI weapons caches in the region.  *Id.*

Attack #9 featured two successive IED blasts that killed SPC Summers, SPC Baker, and 1LT West while they were on a mission to retrieve a downed Kiowa helicopter outside of Abu Sayda, Diyala Province.  Attribution Report at 146-47.  The first was the result of a large IED detonation that destroyed a Bradley Fighting Vehicle when it struck the IED's pressure switch.  *Id.* at 146.  The second blast was the result of an IED detonation that "used approximately 100 pounds of explosives."  *Id.*  These large buried IEDs went undetected, despite the fact that "the mission was very deliberate in the route clearance by leading with Heavy tracked Vehicles for protection and dismounting Troopers to look for IED pressure switches or command detonating wire."  *Id.* This speaks to the sophistication of the attack, and it suggests that the perpetrators had received advanced IED training that Iran was providing to ISI at the time.  *See Roth II*, 651 F. Supp. 3d 65, 89-90 (stating that Iran proximately caused an attack with "a daisy chain of IEDs . . . spread out so they hit at different points of the convoy" because Iran "provided the training and weaponry to its proxies necessary to carry out" the attack); *Fishbeck II*, 2023 WL 7448770, at *8 (finding that AQI, with material support from Iran, carried out an attack with two camouflaged pressure-plate

IEDs detonating convoying vehicles); *Brown II*, 2023 WL 4824740, at *4, 9-10 (concluding that Iran caused the attack that involved "daisy chained IEDs" placed "along routes heavily trafficked by Americans").

Attack #10 was supported by Iran's provision of the same categories of material support to Zarqawi organization forces in Baghdad, *see supra* § III(A) – Attack #10; Attribution Report at 125-26. Attack #10 featured an IED that "was constructed of gray metal and unknown bulk explosives, was approximately 155 millimeters in size, and was triggered by a pressure wire." *Id.* at 124. The IED was placed in a footpath and the explosion threw SFC Monschke "approximately 15 meters into a 15-foot deep ditch," killing him instantly. *Id.* at 122-23. The large, pressure-wire triggered IED indicates Iranian support.

Attack #11 was substantially supported by Iran's providing of weapons and military intelligence to Zarqawi organization operatives in Saladin province, and additionally by Iranian agents, who before, during, and after the attack smuggled weapons and ammunition across the border into Iraq, before then distributing them to individuals who wanted to attack coalition forces. *See supra* § III(A) – Attack #11; Attribution Report at 241-42. Attack #11 featured an IED that had "a white command wire running from the blast seat to a telephone pole, and along a wall." *Id.* at 238. The command wire went undetected by the convoy who stopped to investigate before the explosion. *Id.* at 237. The blast from the IED in Attack #11 was powerful enough to flip a HMMWV, killing SFC Towns who was riding inside. *Id.* at 238. The command-wired IED was similar to several ISI command-wired IEDs that Iraqi security forces and coalition forces captured in neighboring Nineveh Province. *Id.* at 240. "These caches indicate that ISI had both the materials and knowledge required to construct and deploy command wire IEDs at the time of this attack." *Id.* The command wire used in this attack, along with the fact that it was buried deep

enough to go undetected, further indicates that the perpetrator received advanced IED training likely acquired from or supported by Iranian material support. *See Fishbeck II*, 2023 WL 7448770, at *9 (relying on expert testimony and intelligence reports to attribute the attack to AQI because the IED was "ideally located and buried to create the most maximum effect," which "demonstrate[d] training" and "demonstrate[d] understanding of tactics and understanding of U.S. operations"); *Fissler*, 2022 WL 4464873, at *2 (incorporating *Karcher*'s findings that an operator's use of a "command wire" or "remote frequency" to arm an explosive device "requires substantial technical expertise" and "all but necessitates the inference that Iran was responsible" for the attacks).

Attack #12 was supported by the aforementioned support Iran provided the Zarqawi organization in the Diyala River Valley, and featured a powerful, booby-trapped HBIED that killed SGT McBride, SFC Pionk, and SGT Dozier. Attribution Report at 158. According to Dr. Gartenstein-Ross's report, "HBIED's were a common ISI TTP during the period in which this attack occurred." *Id.* at 161. Before and after Attack #12, coalition forces conducted 74 different operations that discovered and cleared "'42 HBIED's' belonging to ISI." *Id.* at 160. Other evidence collected by the EOD team also indicates Iran supported ISI in carrying out the attack: the EOD team had previously "cleared a building and dismantled an HBIED in Diyala Province with the same crush-wire trigger mechanism as the HBIED used in this attack." *Id.* The sheer number of HBIEDs belonging to ISI which were discovered by coalition forces, which are comparable to the HBIED that killed SGT McBride, SFC Pionk, and SGT Dozier, indicates Iranian support. In 2011, the U.S. Department of State identified Muhammad Hisham Muhammad Isma'il Abu Ghazala, a Hamas operative, as a facilitator in the construction and deployment of IEDs. *Id.* at 161. The State Department noted Ghazala's affiliations with Iran and al-Qaeda, his work in

distributing designs for remote detonation IEDs used by terrorist groups in Iraq, and his connections to multiple IED networks across northern Iraq, which is where ISI primarily operated. *Id.* Dr. Gartenstein-Ross concludes that given Ghazala's affiliations with Iran and al-Qaeda and the nature of Ghazala's activities in Iraq, it is "very likely" that Ghazala played a role in facilitating IED attacks for ISI, such as the attack described above. *Id.*

> **b.**  ***Complex Attacks***

Each of the four complex attacks at issue in this case were proximately caused by Iran's material support of the Zarqawi organization or joint Zarqawi/AAI terrorists that perpetrated them. Such attacks have routinely been found to have been supported by Iranian material support, including its provisioning of the training, munitions, and financing necessary to perpetrate them. *See Roth II*, 651 F. Supp. 3d at 78 (relying on expert Pregent's testimony that the indicia of a complex attack—an ambush with machine gun rounds, RPGs, and a daisy chain of IEDs—demonstrated a level of sophistication and showed how prominent and how dangerous AQI was at the time). The nature of these attacks evince Iranian support, including the provision of the advanced weaponry used to the groups carrying out the attacks, as well as the advanced training the perpetrators received from Iran. *See Roth II*, 651 F. Supp. 3d at 90 ("The Court is persuaded [by expert Pregent's testimony] that Iran's support of AQI and AAH was a 'substantial factor' in [complex attacks] and that the consequences of its support were 'reasonably foreseeable.'"); *Brown II*, 2023 WL 4824740, at *9-10 (concluding that Iran's provision of material support—weapons and training—caused complex attacks because these attacks involved the combining of multiple weapons systems to inflict casualties and striking along routes heavily trafficked by Americans); *Fishbeck II*, 2023 WL 7448770, at *4-5 (finding the evidence sufficient to attribute the complex "attack to AQI, which received material support from" Iran, based on "(1) the sophistication of the coordinated attacks, (2) the use of weapons commonly used by AQI, such as

grenades, PKM machine guns, and explosives, and (3) the specific tactic of using wounded U.S. service members as 'bait' for ambushes were consistent with AQI being responsible for the attack").

Attack #13, the so-called "Good Friday Ambush," illustrates all of the hallmarks of a highly coordinated attack that could only have been undertaken with the material support—munitions, training, financing—that Iran had provided to the Zarqawi organization. An ambush on a 26-vehicle convoy, Attack #13 began with the simultaneous firing of 15 RPGs and additional rifle fire when the convoy hit a roadblock designed to halt their progress. Attribution Report at 100. Survivors also reported machine gun and mortars may have been fired, as well, which Iran provided to the Zarqawi organization prior to and during this time period. Shortly after Attacks #13 and #14 (discussed *infra*), coalition forces subsequently captured weapons caches containing Iranian-made mortars, RPGs, explosives, and ammunition in the area where the Zarqawi organization had operated, including the area of west of Baghdad where Attack #13 occurred. *See supra* § III(B) – Attacks #13 and #14.

Attack #14 was another ambush—this time, at night, and the second ambush the victims had encountered that same day—and featured two separate "kill zones," one featuring a heavy volume of machine gun and small arms fire, and the other featuring an IED/RPG detonation in addition to small arms fire. Attribution Report at 73-74. Shortly after the initial attack, the unit was ambushed again with additional small arms fire. *Id.* This synchronized, multi-kill-zone attack under cover of darkness, followed by a subsequent ambush of the same unit, is emblematic of the kind of training, coordination, and munitions that Iran had provided the Zarqawi organization for expressly such purpose.

Attack #15 featured tactics and procedures that could only have been conducted with the

support that Iran provided the Zarqawi organization, including IEDs, RPGs, and small arms fire. Attribution Report at 151-52.  CPL LeGrand, driving an HMMWV, simultaneously hit an IED comprised of two anti-tank mines with accelerant buried in the ground and was struck by an RPG, which penetrated the vehicle.  *Id.* at 152.  Immediately after, the convoy was ambushed by firearms.  *Id.*  The explosion from the IED "was so powerful there was nothing left of the vehicle except for the 'doghouse' (main carriage)."  *Id.*  According to Dr. Gartenstein-Ross's report, "The composition of the complex attack reflects a trend in attacks carried out by ISI," which received substantial support from Iran used to carry out this attack, including weapons, training, military intelligence, and funding.  *Id.* at 154.

Attack #16—which was jointly perpetrated by the Zarqawi organization and AAI—was another ambush that involved weapons typical of Zarqawi organization and AAI attacks provided to them by Iran.  An HMMWV carrying SGT Craig, CPL Marshall, and PV2 Young drove over an IED, blasting the vehicle into two pieces and killing its occupants.  Attribution Report 191. Following the explosion, "Enemy forces attacked the patrol from surrounding buildings, which included homes and a mosque, employing small arms fire, RPGs, and around four mortar rounds." *Id.*  The level of sophistication required in Attack #16 is also indicative of the kind of training, coordination, and munitions that Iran had provided ISI and AAS for the purpose of executing such attacks.

### c.    *Suicide Bombings*

Each of the five suicide bombing attacks at issue in this case was proximately caused by Iran's material support of the Zarqawi organization or AAI terrorists that perpetrated them. Iran and al-Qaeda (which was in turn supported by Iran) provided the explosive materials, training, and even the suicide bombers themselves that the Zarqawi organization and AAI required to successfully carry out suicide bombings, which became a signature TTP of each group.  *See* Sunni

Militant Groups Report at 46, 72 (stating the Zarqawi organization "sent three kinds of people into Iraq: suicide bombers, anti-coalition fighters, and couriers" and AAI signaled its commitment to "continu[e] the insurgency" by committing a suicide bombing in Mosul); Attribution Report at 90-91, 96 (describing the Zarqawi organization's practice of perpetrating suicide bombings, as well as AAI's "frequent" use of suicide bombers and car bombs); Pregent Expert Report ¶ 146 ("[S]uicide bomb-makers . . . would routinely enter Iraq via the IRGC-QF and the Syrian-intelligence Foreign Fighter Facilitation network, in full knowledge of both Iran and Syria."); *see also supra* § III(C); *Brown II*, 2023 WL 4824740, at *10 (finding that Iran proximately caused the VBIED attacks by providing material support to AQI because (1) the use of VBIED is a signature AQI attack method, (2) these "sophisticated attacks" required "expertise that only comes from advanced training," and (3) the attacks "took place in AQI strongholds"); *Fishbeck II*, 2023 WL 7448770, at *7 (finding the evidence sufficient to attribute a personnel-borne IED attack near a mosque to AQI, which received material support from Iran); *Bernhardt*, 2023 WL 2598677, at *8 (concluding that Iran provided training to a Sunni terrorist evidenced by a carefully planned suicide bombing of a covert American military installation, statements issued by al-Qaeda after the attack, and videos about "the anticipated attack designed for distribution on several jihadist media networks"); *Cabrera I*, 2022 WL 2817730, at *11 (noting that Iran provided a range of weapons to Sunni terrorist groups, including "components for suicide attacks (e.g., triggers and detonators)").

Attack #17, a SVBIED attack, was likely perpetrated by AAI, operating as AAS, which had received extensive Iranian training in the perpetration of this precise kind of suicide bombing. *See* Attribution Report at 224-25. As Iraq expert Kimberly Kagan of the Institute for the Study of War details in her description of Iranian support for AAI/AAS:

U.S. and British intelligence reports in 2004 "concluded that Ansar al-Islam was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces . . . . [O]ne British defense report noted pointedly: 'Some elements of [Ansar al-Islam] remain in Iran. **Intelligence indicates that elements' of Iran's Islamic Revolutionary Guard Corps 'are providing safe haven and basic training to Iran-based AI [Ansar al-Islam] cadres.'**" A report by the Iraq Survey Group noted that a source had reported "**approximately 320 Ansar al-Islam terrorists being trained in Iran . . . for various attack scenarios including suicide bombings**, assassinations, and general subversion against U.S. forces in Iraq." Another British intelligence source "said that Iranian government agencies were also secretly helping Ansar al-Islam members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces." American sources confirmed this information, adding that "an Iranian was aiding Ansar al-Islam 'on how to build and set up' improvised explosive devices, known as IEDs. An analyst for the U.S. Central Command offered this assessment: '**AI [Ansar al-Islam] is actively attempting to improve IED effectiveness and sophistication**.'"

Expert Sunni Militant Groups Report at 72 (citing Kimberly Kagan, *Iran's Proxy War against the United States and the Iraqi Government, Iraq Report May 2006-August 20, 2007*, Institute for the Study of War, https://www.understandingwar.org/sites/default/files/reports/IraqReport06.pdf) (emphasis added).

The same is true for Attack #19, which featured a suicide AAI/AAS bomber disguised in an Iraqi Republican Army uniform, giving the bomber access to the Dining Facility of FOB Marez on a specific date—in close proximity to the Christmas holiday—and at a time specifically selected as one of the busiest times of day. Attribution Report at 173-74. The bomb consisted of C4 explosives and 243 metal-coated ball bearings designed to maximize the damage inflicted on its victims. *Id.* at 173. The sophistication and planning of this attack, along with the highly powerful explosives used, demonstrate Iranian support. *See Cabrera I*, 2022 WL 2817730, at *17-18 (finding that Iran's material support substantially contributed to the Taliban's ability to conduct an attack on a U.S. Army vehicle patrol base because such attack required sophistication and training to surveil the area in the preceding days, divert water into a nearby irrigation canal to disguise sounds, and ensure that no civilians were present near the base on the day of the attack).

Attacks #18, #20, and #21 were each suicide attacks perpetrated by the Zarqawi organization, which had received extensive training and support for suicide bombings from al-Qaeda (which in turn had received them from Iran, knowing this would be passed on to further insurgents) and from Iran directly.  Attack #18 was a dual IED and SVIED attack at a public bazaar in the International Zone of Baghdad (known as the "Green Zone") that killed six people and wounded 10 others and was perpetrated by the Zarqawi organization, operating as JTJ.  This specific attack TTP was both a common JTJ/Zarqawi organization tactic and, as described above, a tactic with respect to which it had received specific training, munitions, and logistical support from Iran and al-Qaeda.  Attribution Report at 114, 116.  Courts have previously recognized Iranian provision of material support to the Zarqawi organization, including, *inter alia*, trainings, IEDs, IEDs made with mortar components, specially shaped explosive charges, and grenades, which are all weapons comparable, if not identical, to the weapons used in this attack, as sufficient to hold Iran liable for attacks the Zarqawi organization committed throughout Iraq from June 2004 through May 2007.  *Id.* at 116; *Roth II*, 651 F. Supp. 3d 65, 89 (attributing AQI attacks to Iran and noting that "[o]n top of training and troops, Iran provided weapons to its proxies," including extremely lethal IEDs to "ensure maximum U.S. casualties" and supplied these weapons via "specific smuggling routes").  Finally, Iranian provision of weapons and money to JTJ and other Zarqawi affiliates was a "causal factor" in the U.S. Department of Treasury's designation of Iran's Ministry of Intelligence and Security for human rights abuses and support for terrorism.  Attribution Report at 116.

Attack #20 was a SVBIED attack conducted by the Zarqawi organization, operating as AQI, in the Baghdad suburb of Abu Ghraib in Iraq's Baghdad governorate.  Attribution Report at 117-18.  Iran's connection to Attack #20 is clear from its support of AQI militants in the Baghdad

region, where the attack occurred, through the provision of both arms and intelligence, Attribution

Report at 121, and the fact that Iran had provided the Zarqawi organization with weapons,

including explosive materials, from the very beginning of its support for the group.  *Id.*  As Dr.

Gartenstein-Ross explains, "By 2007, Coalition forces captured a number of weapons caches

containing Iranian mortars, explosive material, RPGs, and ammunition in areas where the Zarqawi

organization maintained strong areas of operations - including Abu Ghraib, where [Attack #20]

occurred."  *Id.*

Finally, Attack #21, an SVBIED attack perpetrated by the Zarqawi organization, operating

as ISI, featured a high-speed dump truck lined with explosives that sped toward a convoy near

FOB Marez's gate before exploding violently; even though the SVBIED exploded when still 10

meters away from the Max Pro Mine Resistant Ambush Protected vehicle carrying CPL Jason

Pautsch, SSG Bryan Hall, SGT Edward Forrest, and SSG Gary Woods, the explosion was so large

that it tore the roof from the vehicle, and ejected all four passengers, all of whom died instantly,

along with three other individuals (over two dozen other coalition forces were also injured).

Attribution Report at 207-08.  In this way, Attack #21 underscores why ISI's "preferred methods

were suicide attacks with either Person or Vehicle Borne Improvised Explosive Devices

(PBIED/VBIED),"[48] which yielded horrifying results "aimed to gain media attention by killing a

large number of people or striking symbolic individuals or targets in important cities."[49]  In 2008,

---

[48] Attribution Report at 212 (citing "2008 Report on Terrorism," National Counterterrorism Center, April 30, 2009, pp. 16, 38, 39, 42, 46, https://www.fbi.gov/stats-services/publications/terror_08.pdf).

[49] Eric Hamilton, *Targeting the Diyala Suicide Bombing Network,* (Institute for the Study of War, n.d.),                                     p.                                     1, https://www.understandingwar.org/sites/default/files/reports/Targeting%20the%20Diyala%20Suicide%20Bombing%20Network.pdf (describing such attacks as a hallmark of AQI, ISI's predecessor).

the year before the attack, ISI maintained SVBIED factories and claimed responsibility for a number of SVBIED and VBIED attacks throughout Iraq—including Mosul, where Attack #21 took place.  *See* Attribution Report at 211.  Iran's material support to ISI is well documented, as are the ways this material support was brought to bear on ISI attacks exactly like this one, including through the provision of explosives, training, and military intelligence.  *See id.* at 243-44; Sunni Militant Groups Report at 76-77.

### d.       *Small Arms, RPG, and Anti-Aircraft Attacks*

Small arms (including handguns, sniper rifles, and machine guns), RPG, and anti-aircraft attacks generally involve an attacker firing at its target with line-of-sight visibility.  The intent of such fire is generally to wound or kill, but it also has been used to deter movement of targets or evacuation forces.  Anti-aircraft attacks involve engagement of aircraft with small arms, RPGs, anti-aircraft guns/artillery, and surface-to-air missiles.

Attacks #22 and #23 involved a combination of small arms, RPGs, and anti-aircraft weaponry; both were proximately caused by Iran's material support of the Zarqawi organization terrorists that perpetrated them.

Both attacks involved the types of weapons provided to the Zarqawi organization by Iran. Attack #22 (surface-to-air missiles, RPGs, 50 caliber machine guns, anti-aircraft guns, other machine guns); Attack #23 (small arms, rifles).  Moreover, the successful use of these weapons reflects the training Iran provided to these groups.  *See Stearns*, 633 F. Supp. 3d at 296 (finding satisfactory evidence to trace Iran's material support to an attack on a Joint Coordination Center when terrorists entered the building under the disguise of friendly forces and proceeded to shoot, beat, and execute U.S. service members); *Brown II*, 2023 WL 4824740, at *6 (noting that RPGs require training to be used accurately).  Finally, Iran-provided financial support to the Zarqawi organization allowed the organization to pay its recruits higher salaries than they would have

received from Iraqi Security Forces, and allowed Zarqawi to offer, *inter alia*, "$100 to $200 for a single small arms, mortar, or IED attack," or $7,000 to individual militants who were able to shoot down an American helicopter.  Attribution Report at 44; Sunni Militant Groups Report at 47.

In Attack #22, the Zarqawi organization, operating as ISI, successfully shot down a moving UH-60 Blackhawk helicopter flying over Bahrez, Iraq in Diyala Province, killing all 12 passengers and crew onboard.  Although the precise munitions used in the attack have never been confirmed, in part due to the insurgent attack site being destroyed by the helicopter's crash and the ensuing counterattack, weapons recovered from the wreckage included surface-to-air missiles (SA-7 and retrofitted air-to-air R5 missiles), RPGs, and machine gun fire.  Attribution Report at 135 (citing Ex. 152, Department of the Army, USARCENT FOIA FA-22-0067, AR 15-6 Collateral Investigation of UH-60 incident on 20JAN07 (February 3, 2007)).  Such munitions were known to have been directly provided to ISI/the Zarqawi organization by the Iran and its IRGC-QF.  Attribution Report at 139 ("By 2007, Coalition forces captured a number of weapons caches containing Iranian mortars, explosive material, RPGs, and ammunition in areas where ISI maintained strong areas of operations."); Pregent Expert Report ¶ 122 (detailing the IRGC-QF's provisioning of mortars, rockets, man-portable air-defense systems (MANPADS) and anti-aircraft missiles (including SA-7 Strela and Misagh 1 & 2 systems), as well as anti-tank mines, small arms, and critical bomb components (including Iranian electronics) to the Zarqawi organization/AQI).  Courts in this jurisdiction have also found that the successful use of RPGs indicates training, which likely would have come from Iran, and that Iran provided RPGs to ISI.  *See Roth II*, 651 F. Supp. 3d at 83, 90 (noting an expert's conclusion that accurate RPG attacks denote proficiency and indicate that AQI terrorists were trained on the use of RPGs and finding that Iran's support was a "substantial factor" in these RPG attacks).

Attack #23 was also carried out by the Zarqawi organization, operating as ISI, with Iran's material support.  This time, however, ISI's attack methodology manifested as a methodically deployed and synchronized rifle strike where the perpetrators (operating in three different buildings in tight coordination) patiently waited for the victim (PFC Youngblood) to leave the protection of his tank before simultaneously firing upon him and shooting him in the head, killing him.  Attribution Report at 61-62, 64.  While rifle strikes were not uncommon in Iraq during hostilities, ISI was the dominant insurgent group in Ramadi when the attack occurred, and a declassified note by Central Command (CENTCOM) describing the circumstances on the ground in Ramadi three months before the attack indicates that "75 percent of their fight is against [ISI]." *Id.* at 62-63.  ISI sustained this dominance in Ramadi over the next year, as illustrated by an authoritative CENTCOM report on the insurgency published in 2007, which stated that a series of ISI attacks in late 2006 "illustrated that AQI retained a complex and coordinated command and control infrastructure in the city." *Id.* at 63.  Furthermore, Dr. Gartenstein-Ross concludes that ISI "remained the most powerful insurgent group in Ramadi when [Attack #23] occurred." *Id.* at 64. ISI was also known for carrying out small arms fire attacks throughout 2007 like the attack featured in Attack #23, revealing that ISI had both the weapons and the training to carry out the attack. *Id.* at 63 (cataloging examples of such ISI small arms attacks).  Furthermore, the synchronized actions of three riflemen, operating in three different buildings all with eyes on the same target suggests that "[t]he perpetrators of such an attack would likely need to be familiar with the terrain in order to coordinate three different locations from which to attack . . ., and to know that these locations would be an ideal place to carry out such an attack based on Coalition movements." *Id.* at 64.

In addition to the broad support Iran provided to ISI before, during, and after this attack,

evidence demonstrates that Iran supported Zarqawi organization elements in Al-Anbar Province at the time the attack occurred with weapons and financial assistance.  Dr. Gartenstein-Ross explains, "It is well documented that 'Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Al-Anbar province.'"  Attribution Report at 65 (citing Bill Roggio, "Iran and al Qaeda in Iraq," *Long War Journal*, January 6, 2007, https://www.longwarjournal.org/archives/2007/01/iran_and_alqaeda_in.php).  The attack took place at a time when the Zarqawi organization was dependent on Iranian support (especially to access weaponry, including small arms).  *See* Attribution Report at 64-65.  Writing in July 2007, MG Rick Lynch discussed an Iranian weapons cache, saying:

> Over the last three months, we've found . . . four specific weapons caches, where as we worked our way through those caches, we found Iranian munitions.  We found Iranian rockets, we found Iranian mortars clearly marked with Iranian markings, and that is just unacceptable.  So what's happening is these bad things are coming from Iran into Iraq, they're finding themselves in the hands of the extremists in our battlespace, and they're being used against coalition forces, against Iraqi security forces and against innocent Iraqis, and that just has to stop.

*Id.*  Dr. Gartenstein-Ross thus concludes that "[t]he discovery of Iranian weapons caches and the knowledge that it was the opinion of Al Qaeda and AQI [ISI] leadership around the time of this attack that they were dependent on Iranian support strongly supports the conclusion that Iranian aid had a reasonable connection to this attack."  *Id.*

### e.  *Indirect Fire Attacks*

Indirect fire attacks involve weapons that do not require line-of-sight to targets (rockets and artillery or mortar fire), but do require a known target location to be accurate.  Such attacks require advanced training.  Pregent Expert Report ¶¶ 138-43 (detailing that successful use of mortars and rockets requires selection of a launch site, appropriate reconnaissance, and well-rehearsed exfiltration routes to allow the firing of as many rounds as possible before the arrival of counter-strikes, and further explaining how Iran used Hezbollah to train AAI in these TTPs in Iran

itself, and to train al-Qaeda on the same TTPs in Lebanon).  Such training also required time, space, and munitions with which to practice, each of which Iran provided to AAI and the Zarqawi organization.  *Id.* ¶¶ 122, 136-37 (detailing the IRGC-QF's provisioning of mortars, rockets, man-portable air-defense systems (MANPADS) and anti-aircraft missiles (including SA-7 Strela and Misagh 1 & 2 systems), as well as anti-tank mines, small arms, and critical bomb components (including Iranian electronics) to the Zarqawi organization/AQI); *see Fishbeck II*, 2023 WL 7448770, at *11 (finding "sufficient evidence to hold AQI responsible" for the mortar fire attack directed at a U.S. Army base because "the perpetrators were sophisticated, highly trained, and capable of successfully attacking and evading counter-attack"); *Brown II*, 2023 WL 4824740, at *6 (noting that rockets and mortars, which involve stabilizing plates placed on the ground into which fired explosives are loaded, require training to be used accurately); *Cabrera I*, 2022 WL 2817730, at *16 (noting that without "outside advice" and training from Iran, "mortar attacks were ineffective," but effective use of mortars by insurgents evidenced such training on the mechanics and tactics of a mortar attack).

Attacks #24 and #25 were indirect fire attacks, one committed by AAI, operating as AAS, and another committed by the Zarqawi organization.  Both were proximately caused by Iran's material support of the Zarqawi organization or AAI terrorists that perpetrated them.  Both were carried out using mortars or rockets, which Iran provided to both groups during the relevant time period.  *See Fishbeck II*, 2023 WL 7448770, at *6 (finding sufficient evidence to attribute an indirect fire attack to AQI, which received material support from Iran, because AQI had conducted other rocket and mortar attacks in the area and had claimed responsibility for such indirect fire attacks); Sunni Militant Groups Report at 53 (describing coalition forces' discovery of a Zarqawi organization weapons cache in Baghdad Province containing Iranian-manufactured mortars);

Attribution Report at 111-12 (describing Iranian material support for an artillery attack perpetrated by AAI, operating as AAS); Pregent Report ¶¶ 45-46, 103, 121-22 (coalition forces reporting indicating Iranian munitions were used by AAI and AQI against U.S. forces, and Iranian munitions, including artillery, were seized from caches within the immediate vicinity of AQI and AAI positions).

Attack #24 was likely executed by AAI, operating as AAS, on April 24, 2004, when terrorists fired either two mortar rounds or 57mm rockets on Camp Cooke in Taji, Baghdad Province, the second of which struck and killed four coalition members, and wounded seven more. Attribution Report at 107. The successful carrying out of such indirect fire attacks have been found to be evidence of Iranian material support. *See Stearns*, 633 F. Supp. 3d at 343-44 (finding Iran responsible for the attack on a U.S. base carried out by Iran's "proxies" with four Improvised Rocket Assisted Munition-propelled 240mm rockets launched from a dump truck); *Lee v. Islamic Republic of Iran*, No. 19-CV-00830 (APM), 2023 WL 1100711, at *23-24 (D.D.C. Jan. 30, 2023) ("*Lee II*") (finding satisfactory evidence that Iranian-backed forces were responsible for the attack that involved eight explosives remotely fired using a cell phone from a cargo truck to hit a perimeter wall of a Joint Security Station). Mr. Pregent details how "[a]mong the most visible symbols of Iran's support to Shia and Sunni Proxy Groups are the mortar and rocket attacks launched against U.S. bases in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists." Pregent Expert Report ¶ 136. Pregent explains further that U.S. bases have been fired upon by Iranian supported militant groups using Iran-provided 60mm and 81mm mortars quite similar to the munitions potentially used in Attack #24 on Camp Cooke. *Id.* ¶ 137. AAS, the likely perpetrator of Attack 24, also carried out several other attacks in the same month and in the same

region north of Baghdad City—near Taji, where Attack #24 took place—and maintained an operational presence in Taji itself.  Attribution Report at 109-10.  AAI also commonly used both rockets and mortars against coalition forces like the kind used in Attack #24, and in the same month as Attack #24, AAS claimed responsibility for at least eight attacks using similar types of mortar and rocket weapons.  *Id.* at 110.

Iran's material support to AAI is extensively documented in Dr. Gartenstein-Ross's Sunni Militant Groups Report, but additional, specific Iranian support was brought to bear on Attack #24 in the form of the safe haven Iran provided to AAI leaders during Operation Viking Hammer in 2003, which allowed AAI to persist as an organization into 2004, when Attack #24 took place.  *Id.* at 111.  Additionally, information gleaned from two Quds Force operatives arrested in Baghdad in December 2006—including "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information"—reveals "how the Quds Force [was] working with individuals affiliated with Al Qaeda in Iraq and Ansar al-Sunna [AAS/AAI]."  *Id.* at 112 (citing Eli Lake, "Iran's Secret Plan for Mayhem," *The New York Sun*, January 3, 2007).  Attack #24 was thus materially supported by Iran.

Attack #25 was a rocket strike carried out by the Zarqawi organization that featured no fewer than 15 simultaneously fired 107mm rockets directed at FOB Kalsu, all of which hit the base, killing three and wounding twelve others.  Attribution Report at 79-80.  As Plaintiff's expert Michael Pregent explains, the munitions used in this attack—107mm Chinese rockets—were precisely the same caliber as munitions known to have been made in Iran and provided by Iran to the militant groups it materially supported.  Pregent Expert Report ¶ 137 (citing Agence France-Presse, *US Shows Evidence in Iraq Rocket Attacks It Says Leads to Iran*, Nat'l, July 14, 2011,

http://www.thenational.ae/news/world/middle-east/us-shows-evidence-in-iraq-rocket-attacks-it-says-leads-to-iran).  Additionally, the sheer number of munitions used, and the synchronicity with which they were fired, speaks to advanced coordination and training of the kind that Iran was known to have provided the Zarqawi organization.  Indeed, courts in this jurisdiction have held that Iran's provision of material support and resources to the Zarqawi organization (including training, funding, small arms, RPGs, IEDs, IEDs with mortar components, specially shaped explosive charges, and grenades) was sufficient to hold Iran liable for attacks carried out by the Zarqawi organization.  *See Parhamovich*, 2022 WL 18071921, at *8 (finding that Iran provided material support to the Zarqawi organization—including funding, weaponry, smooth passage, and safe houses—and finding that Iran's provision of material support was a legally sufficient cause of the Zarqawi organization's small arms fire attack); *Neiberger*, 2022 WL 17370239, at *7-8 (concluding that Iran provided material support and resources to AQI based on reports that in 2006 the "IRGC-QF leaders were found with 'weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information,'" and in "2008, a Sunni terrorist reported in an interview that Iran was providing AQI with money and weapons, and facilitating the movement of its fighters," *inter alia*).

Furthermore, in November 2004, coalition forces seized a Zarqawi organization/JTJ weapons cache in Fallujah—which is located approximately 54 miles north of Iskandariya, where Attack #25 took place—containing various indirect fire systems and munitions, including mortar systems and artillery shells.  Attribution Report at 83; *see also* Sunni Militant Groups Report at 53 (coalition forces discovered weapons caches containing Iranian-made mortars in areas previously held by the Zarqawi organization).  Finally, it was the financial support that Iran provided to the Zarqawi organization that funded higher salaries for Zarqawi's recruits than they would have

received from Iraqi Security Forces, and allowed Zarqawi to offer, *inter alia*, "$100 to $200 for a single small arms, mortar, or IED attack." Attribution Report at 47. In sum, Iran's material support to the Zarqawi organization undoubtedly was brought to bear on its rocket strikes. *See Fishbeck II*, 2023 WL 7448770, at *11 (attributing a mortar fire attack directed at a base to AQI, which received material support from Iran, because "the attack required 'specialized training and a high degree of sophistication distinctly associated with the well-supported AQI cells in Al Anbar [Province]'" in order to target the base "with accurate fire and then evade the return fire from Coalition Forces"); *Brown II*, 2023 WL 4824740, at *11 (finding that Iran caused indirect fire attacks through provision of material support because placing rockets and mortars to deliver accurate hits required sophistication and training in preparation and perimeter security).

### D.     Iran Was a Designated State Sponsor of Terrorism at the Time of the Attacks and at the Time This Action Was Filed

Iran was a designated state sponsor of terrorism at the time of the relevant acts as well as when these claims were filed, in satisfaction of these two elements of the terrorism exception to sovereign immunity. *Force I*, 464 F. Supp. 3d at 358 (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)). Each of the 25 Bellwether Attacks at issue here occurred between April, 2004 and April, 2009. *See supra* § III. "Iran was designated as a state sponsor of terrorism in 1984, and has remained designated as a state sponsor of terrorism to this day." *Hamen I*, 401 F. Supp. 3d at 100 (citing 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz)); Ex. 99, State Sponsors of Terrorism, U.S. Dep't of State, available at https://www.state.gov/state-sponsors-of-terrorism/ (last visited November 18, 2023) (currently designating Iran as a state sponsor of terrorism); *Karcher II*, 2021 WL 133507, at *64 (noting that "Iran has been a designated state sponsor of terrorism since 1984 and presently retains that designation").

**E.      Every Plaintiff Was a U.S. National and, in Some Instances, Also a U.S. Armed Forces' Member**

Under the FSIA's terrorism exception to sovereign immunity, "the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred." *Jakubowicz I*, 2022 WL 3354719, at *2 (citing § 1605A(a)(2)(A)(ii)).  "The terrorism exception assigns the term 'national of the United States' the 'meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (INA).'" *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 8 U.S.C. § 1101(a)(22); 28 U.S.C. § 1605A(h)(5)).  "The referenced provision of the INA, in turn, generally describes 'national of the United States' to mean either a 'citizen of the United States' or a 'person who, though not a citizen of the United States, owes permanent allegiance to the United States.'" *Id.* (quoting 8 U.S.C. § 1101(a)(22)).

Each Bellwether Plaintiff was a national of the United States and in some instances also a member of the U.S. armed forces at the time of the attacks.  *See* Ex. 7, Bellwether Plaintiffs Table (citing to exhibits containing each Plaintiff's birth certificate and/or U.S. passport).

**F.      Iran Is Not Entitled to Arbitration Because Each Bellwether Attack Occurred Outside of Iran**

Only when a terrorist act "occurred in the foreign state against which the claim has been brought," the foreign state must have "a reasonable opportunity to arbitrate the claim." *Jakubowicz I*, 2022 WL 3354719, at *2 n.2 (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii)).  The Bellwether Attacks took place in Iraq, not Iran.  *See supra* § III.  Thus, Plaintiffs were not required to afford Iran a reasonable opportunity to arbitrate.  *See Karcher I*, 396 F. Supp. 3d at 54 (stating that "the killings at issue did not take place in Iran and accordingly Plaintiffs had no obligation to afford Iran an opportunity to arbitrate[.]"); *W.A. I*, 427 F. Supp. 3d at 133 (same); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2021 WL 2592910, at *3 (D.D.C. June 24, 2021) (noting that

because "[t]he attack occurred in Iraq, not Iran, the third condition [requiring reasonable opportunity to arbitrate] does not come into play").

## VI.   THE COURT HAS PERSONAL JURISDICTION OVER IRAN

Under the FSIA, the court has personal jurisdiction over a foreign state "as to every claim for relief over which the [court] ha[s] jurisdiction . . . where service has been made under section 1608." *Force I*, 464 F. Supp. 3d at 370 (quoting 28 U.S.C. § 1330(b)).  To sue a foreign state, plaintiffs must effect service in compliance with section 1608(a).  *Id.* (citing *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015)).

The court in *Saberi* summarized the application of section 1608(a) requirements in the context of serving Iran:

> The FSIA enumerates four methods for serving foreign states "in descending order of preference."  *Valore*, 700 F. Supp. 2d at 69; *see* 28 U.S.C. § 1608(a).  The first two methods are unavailable here because there is no "special arrangement for service" between the United States and Iran, 28 U.S.C. § 1608(a)(1), and Iran is not party to an "applicable international convention on service," *id.* § 1608(a)(2).  The third method requires "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  *Id.* § 1608(a)(3).  And the fourth method, effected here, requires "sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the" State Department so service can be effected through diplomatic channels.  *Id.* § 1608(a)(4).  This Circuit has held that "foreign states are not persons protected by the Fifth Amendment," leaving no need to conduct a minimum contacts analysis.  *Price*, 294 F.3d at 95 (internal quotation marks omitted).

*Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 80-81 (D.D.C. 2021).

Here, Plaintiffs first attempted to effect service of the Second Amended Complaint (and the accompanying service documents) on Iran, in accord with § 1608(a)(3), on December 7, 2021. *See* Dkt. 18.  The Clerk of Court then filed a notice on the docket informing Plaintiffs that it attempted to effect service under § 1608(a)(3) on December 21, 2021.  *See* Dkt. 22.  Iran did not

respond.  Thirty days thereafter, on January 21, 2022, following § 1608(a)(4), Plaintiffs began service through diplomatic channels.  *See* Dkt. 23-25.  Service was effected under § 1608(a)(4) on July 11, 2022.  *See* Dkt. 26.  This Court therefore has jurisdiction over Iran for Plaintiffs' claims. *See*, *e.g.*, *Force I*, 464 F. Supp. 3d at 369-70 ("Under the FSIA, the Court has personal jurisdiction over a foreign state 'as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608.'" (quoting 28 U.S.C. § 1330(b))).

## VII.    IRAN IS LIABLE FOR PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 1605A

Plaintiffs who offer proof sufficient to establish a waiver of foreign sovereign immunity also establish their entitlement to relief as a matter of federal law because of the factual and legal overlap between the elements of section 1605A(c) causes of action and the state-sponsored terrorism exception.  *See Force I*, 464 F. Supp. 3d at 369 ("Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that those Plaintiffs who are U.S. nationals are entitled to relief under [28 U.S.C. § 1605A(c)]."); *Coombs v. Islamic Republic of Iran*, No. CV 19-3363 (RDM), 2022 WL 715189, at *21 (D.D.C. Mar. 10, 2022); *Salzman*, 2019 WL 4673761, at *15 ("There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law.") (quoting *Foley I*, 249 F. Supp. 3d at 205) (cleaned up). Every Bellwether Plaintiff has also demonstrated his or her status as a U.S. national at the time this suit was filed, entitling each to relief under section 1605A(c).  *See* Ex. 7, Bellwether Plaintiffs Table; *Jakubowicz I*, 2022 WL 3354719, at *2 (citing § 1605A(a)(2)(A)(ii)); *Coombs*, 2022 WL 715189 at *21 (noting that a foreign state designated as a sponsor of terrorism is liable to "a national of the United States").

Finally, Iran has forfeited any potential statute of limitations defense under 28 U.S.C.

section 1605A(b) because Iran failed to appear or submit any filing in this action.[50]  *See Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("*Maalouf I*") ("We conclude that no such authority exists for a federal court to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant.").

## VIII.   THE BELLWETHER PLAINTIFFS SUFFERED SUBSTANTIAL PHYSICAL AND PSYCHOLOGICAL INJURIES ENTITLING THEM TO DAMAGES AGAINST IRAN

Each of the Bellwether Plaintiffs suffered severe physical, economic, and/or psychological damages as a result of Iran's material support of attacks on Plaintiffs or their loved ones.

### A.   Damages Awarded Under 28 U.S.C. § 1605A

To recover damages against Iran, Plaintiffs "must prove that the consequences of the [defendant's] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate."  *Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth I*, 78 F. Supp. 3d at 402).  Courts in this jurisdiction consistently apply the general principles of tort law to FSIA actions.  *See Roth I*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran,* 879 F. Supp. 2d 44, 54 (D.D.C. 2012) ("*Oveissi II*")) (stating that courts "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (acknowledging that the court must proceed in the same manner as prior courts and look "to sources such as state decisional law, legal treatises, or the Restatements"); *Neiberger*,

---

[50] Under the FSIA statute of limitations, "[a]n action may be brought or maintained . . . if the action is commenced . . . not later than the latter of—(1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose."  28 U.S.C. § 1605A(b).

2022 WL 17370239, at *11 (quoting *Fraenkel*, 892 F.3d at 353) (noting that courts "rely on well-established statements of common law[ ] found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)").

Under these general principles, a state sponsor of terrorism that provided material resources and support to a terrorist organization for an attack that caused an extrajudicial killing is responsible for intentional infliction of emotional distress ("IIED"), the resulting pain and suffering, and solatium of immediate family.  *See Ewan*, 466 F. Supp. 3d at 245 (finding that survivors of terrorism were entitled to damages for IIED "[b]ecause acts of terrorism [were] 'by their definition' extreme and outrageous conduct"); *Valore*, 700 F. Supp. 2d at 80 (stating that a person "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Heiser II*, 659 F. Supp. 2d at 27 ("Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes [the IIED] test easily."); *Gration*, 2023 WL 5221955, at *26 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."); *Blank*, 2021 WL 3021450, at *9 (quoting *Heiser II*, 659 F. Supp. 2d at 27) (finding that because the defendant supported a terrorist organization, the defendant's "conduct was 'sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present,' such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress").  Furthermore, courts in this jurisdiction regularly hold that family members need not be present at the terrorist attack to recover under the theory of IIED.  *See Valore*, 700 F. Supp. 2d at 80 (stating that a person "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Heiser II*, 659 F. Supp. 2d at 27-28

(explaining "that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families" who need not meet the presence requirement to recover for IIED); *Taitt*, 2023 WL 2536518, at *8 (citing *Flanagan*, 87 F. Supp. 3d at 115) ("In terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived.").

After finding that Plaintiffs' "injuries were reasonably certain and were the intended consequences of [Iran's] material support of" terrorist organizations, the court must determine the amount of Plaintiffs' damages by a reasonable estimate. *Gration*, 2023 WL 5221955, at *29. Courts generally look to prior awards for comparable injury. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (noting that courts "take pains to ensure that individuals with similar injuries receive similar awards") (quotation marks omitted). Courts may also adjust damages upward or downward based on factors such as severity of pain and suffering, *inter alia*. *See Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 33 (D.D.C. 2022) ("*Force II*")).

The types of available damages largely depend on the eligible claimant's categorization as either direct or indirect attack victim. *Neiberger*, 2022 WL 17370239, at *12. Surviving U.S. soldiers and civilians who were directly injured by attacks supported by Iran may recover economic losses caused by their injuries as well as damages for their pain and suffering. *Valore*, 700 F. Supp. 2d at 83. Family members of deceased or injured U.S. soldiers and civilians may recover solatium damages. *Id.* In addition, these eligible claimants may recover punitive damages as well as prejudgment and post-judgment interest. *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1608 (2020) (confirming availability of punitive damages for attacks that preceded the 2008 FSIA amendment); *Force II*, 617 F. Supp. 3d at 41 (citing *Oveissi II*, 879 F. Supp. 2d at 59) ("[P]rejudgment interest is an element of complete compensation."); *Valore*, 700 F. Supp. 2d at 83

(acknowledging availability of punitive damages generally); *Gration*, 2023 WL 5221955, at *37 (citing *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012)) (awarding post-judgment interest at the statutory rate because "[a]pplication of section 1961(a) is mandatory, not discretionary").

Each Bellwether Plaintiff belongs to a claimant category discussed above: (1) U.S. soldiers and civilians who suffered physical and psychological injuries from attacks that Iran materially supported, *see infra* § VIII(A)(1)(a); or (2) immediate family members of the deceased or injured U.S. soldiers and civilians, having suffered severe emotional distress and loss of solatium as a result of the attacks on their loved ones. *See infra* §§ VIII(A)(2)(a)-(b). The types of standard damages available to such claimants follow.

### 1.      Pain and Suffering Damages

For directly injured claimants, such as Bellwether Plaintiff Adam Kisielewski, courts in this jurisdiction apply the nonbinding *Heiser* framework to calculate compensatory damages for their pain and suffering.[51] *Force II*, 617 F. Supp. 3d at 33 ("In the interest of uniformity, judges in this district have developed a general framework for assessing pain and suffering damages for victims of terror attacks."); *Taitt*, 2023 WL 2536518, at *9 (citing *Heiser I*, 466 F. Supp. 2d 229). The framework establishes a baseline amount of $5 million as an appropriate measure of damages for directly injured claimants and gives courts discretion to adjust the award upward or downward to compensate claimants equitably. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) ("*Oveissi I*") ("Decisions to deviate from the starting points provided by the *Heiser*

---

[51] Some courts utilize the *Peterson II* framework for baseline awards but grant upward and downward variances based on individual circumstances. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB, 2023 WL 3496303, at *2 (D.D.C. May 16, 2023) ("*Cabrera II*") (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)).

framework are committed to the discretion of the particular court in each case [.]"); *Valore*, 700 F. Supp. 2d at 84 (acknowledging the baseline award of $5 million to surviving victims of attacks).

Thus, courts determine pain and suffering awards "based on factors including the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Force II*, 617 F. Supp. 3d at 33. Courts make an upward departure from the baseline in severe instances of physical and psychological pain. *See Force II*, 617 F. Supp. 3d at 33-34 (finding an upward departure warranted for the claimant who survived six gunshot wounds "that lacerated his liver, colon, left ureter, and femoral artery" and required numerous surgeries, resulting in severe psychological effects and permanent physical problems); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 36 (D.D.C. 2022) (deeming the surviving victim's injuries—brain contusion with an open wound, a penetrating injury to an eye, and massive injuries to her orbital bones—"grievous and severe, warranting an upward adjustment from the standard $5 million under *Heiser*"); *Taitt*, 2023 WL 2536518, at *10 (making an upward adjustment for pain and suffering damage awards to the directly injured plaintiffs "based on the number and severity of the physical and emotional injuries suffered"); *Cabrera I*, 2022 WL 2817730, at *30, 45 (making an upward departure for service member who lost a "big chunk of [hi]s skull" after shrapnel from IED sliced through his head and optic nerve). A downward departure may be appropriate where victims suffered relatively more minor injuries, such as minor shrapnel injuries or emotional injuries accompanied by relatively minor physical injuries. *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 180 (D.D.C. 2019) ("*Barry I*"). Courts remain guided by the principle that "individuals with similar injuries receive similar awards" when determining upward or downward adjustments from the baseline. *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349 (RDM), 2022 WL 1567358, at *3 (D.D.C. May 18,

2022) ("*Schwartz II*") (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012)).

a.   ***Bellwether Plaintiffs: Surviving Attack Victim Who Was Wounded in Action***

On August 21, 2005, U.S. Marine Corps Sergeant Adam C. Kisielewski and other service members were clearing a school in Al-Karmah, Al Anbar Province.  *See supra* § III(A) – Attack #3.  When they breached the rooftop door, a 97-pound artillery shell that was rigged to the door exploded.  *Id.*



Ex. 44, Declaration of Adam C. Kisielewski ¶ 12 [hereinafter Kisielewski Decl.].



███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████

█ ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████

Adam Kisielewski is entitled to a baseline amount of $5 million, and this Court should grant an

upward departure of $4 million, for a total of $9 million for pain and suffering.  *Cabrera v. Islamic*

*Republic of Iran*, No. 19-cv-3835-JDB, 2023 WL 3496303, at *8 (D.D.C. May 16, 2023)

("*Cabrera II*") (awarding $9 million to a surviving victim of an IED attack who lost his right foot

and suffered significant additional permanent physical and emotional harm).

For example, in *Cabrera II*, Plaintiff Eric Hunter suffered severe injuries as a victim of an

IED, resulting in the amputation of his right foot among a litany of other injuries.  *Cabrera II*,

2023 WL 3496303, at *8. ████████████████████████████████████

████████████████████████████████████████████████ Because Adam

Kisielewski's injuries are comparable to, and arguably more severe than, Eric Hunter's injuries,

he should be awarded at least $9 million in damages for pain and suffering.  *See Cabrera II*, 2023

WL 3496303, at *8.

2.   **Solatium Damages**

a.   ***Immediate Family Members***

Solatium damages provide compensation to immediate family members of the victims for

mental anguish, grief, and loss of society and comfort.  *See Force II*, 617 F. Supp. 3d at 36;

*Jakubowicz v. Islamic Republic of Iran*, No. CV 18-1450 (RDM), 2023 WL 6907852, at *4

(D.D.C. Sept. 1, 2023) ("*Jakubowicz II*") (applying *Force II* and *Jakubowicz I* by Special Master

and reaching congruent conclusions).  The victim need not be killed; an injury in a terrorist attack

suffices. *Oveissi I*, 768 F. Supp. 2d at 2. The immediate family includes the victim's spouse, children, parents, and siblings. *Heiser II*, 659 F. Supp. 2d at 28. An immediate family claimant must provide credible testimony about the attack's effect on him or her. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (relying on the wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband). But the family member need not have been present at the attack or directly injured by it to recover solatium damages. *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("Solatium claims are typically brought by family members who were not present or injured themselves").

Courts follow the *Heiser* framework for solatium damages, which establishes baselines to "help ensure that similarly situated victims receive comparable awards." *Force II*, 617 F. Supp. 3d at 36. The baseline awards are between $8 million and $12 million for pain and suffering to a spouse of a deceased victim, approximately $5 million to a child or parent, and approximately $2.5 million to a sibling. *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) ("*Owens II*") (noting that the customary baseline award to a child of a deceased victim is akin to the award of a deceased victim's parent, i.e., $5 million); *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values). Solatium damages to family members of an injured but not killed victim typically range from $4 million for a spouse, $2.5 million for a child or parent, and $1.25 million for a sibling. *Force II*, 617 F. Supp. 3d at 36 (first citing *Owens II*, 71 F. Supp. 3d at 260, then citing *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012)).

Courts have discretion to depart upward from the baseline based upon the circumstances of each claimant. *Force II*, 617 F. Supp. 3d at 36 (citing *Fraenkel*, 892 F.3d at 361-62). "A court may consider 'evidence establishing an especially close relationship between the [claimant] and

decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing.'" *Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up); *Neiberger*, 2022 WL 17370239, at *15 (quoting *Oveissi I*, 768 F. Supp. 2d at 26-27).  An upward enhancement typically ranges from approximately 20 to 50 percent of the baseline award. *See Jakubowicz II*, 2023 WL 6907852, at *7 (recommending a 25 percent enhancement over the baseline to the claimant who watched the victim undergo multiple surgeries and "deteriorate into death," and suffered ongoing grief and pain from the victim's death and the circumstances of the death); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent enhancement to baseline solatium damages to family members for their severe mental distress from the victim's sudden death); *Neiberger*, 2022 WL 17370239, at *13 (awarding a 50 percent upward departure to the service member who suffered brain injuries, an arm amputation, and vision impairment from a terrorist attack); *Cabrera II*, 2023 WL 3496303, at *9-10 (awarding an upward variance of 25 percent to the victim's spouse for the "particularly brutal suffering" and upward variance of 20 percent to children for the time without a parent during their "formative years" and the depression they suffered); *Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family

members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up).  The solatium baselines are also subject to downward variances, as warranted by individual circumstances.  *Cabrera II*, 2023 WL 3496303, at *9.

i.   Bellwether Plaintiffs: Plaintiff Parents of Attack Victims

Fifteen of the 45 Bellwether Plaintiffs were parents of Attack Victims killed in the Bellwether Attacks.  Each of these parents tragically lost a child early, knowing that they suffered a violent death at the hands of terrorists.

As a direct result of the Bellwether Attacks, each parent Plaintiff experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their child's society, companionship, comfort, advice, and counsel.  Given the loss of their child, each parent Plaintiff is entitled to a minimum baseline amount of $5 million.  *See infra* § VIII(A)(2)(a)(i)(1).  Six of these parents are entitled to an additional upward adjustment.  *See infra* § VIII(A)(2)(a)(i)(2).

**(1)   Plaintiff Parents of Attack Victims Seeking a Baseline Award of $5 Million in Damages**

There is perhaps no greater trauma than that suffered by a parent who loses a child to violence.  Parents who survive a child's death often cannot communicate the extent of their grief. *See*, *e.g.*, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40 (D.D.C. 2012) ("I honestly can say I was very ashamed to be around.  It is not normal . . . that the father will bury his son, and the only reason I'm here is because Daniel saved my life with his own beautiful body . . . I should have been dead.").  "It is natural that a parent is likely to have a stronger bond and closer day-to-day relationship [with their child] than, for example, a sibling of a victim.  Indeed, this is precisely the reason why the starting point for parents of victims is higher than that of siblings on the *Heiser* scale—to account for the natural differences between the two relationships."  *Oveissi I*, 768 F.

133

Supp. 2d at 28.

As the surviving parents of Attack Victims, nine of the fifteen parent Plaintiffs seek the baseline amount of $5 million.  *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values).  Each of these surviving parents suffered immeasurable pain, yet have attempted to describe for the Court the extent of their losses.  This grief is expressed below and demonstrates their entitlement to judgments equal to that amount.  These Plaintiffs are:

- **Roger Kurtz** – Father of KIA Attack Victim SGT Russell A. Kurtz.  *See* Ex. 56, Declaration of Roger Michael Kurtz ("R. Kurtz Decl.").

- **Patricia Grassbaugh** – Mother of KIA Attack Victim CPT Jonathan D. Grassbaugh.  *See* Ex. 64, Declaration of Patricia Marie Grassbaugh ("P. Grassbaugh Decl.").

- **Clark West** – Father of KIA Attack Victim 1LT Kile West.  *See* Ex. 70, Declaration of Clark Grady West ("C. West Decl.").

- **Duane Pionk** – Father of KIA Attack Victim SFC Matthew Ignatius Pionk.  *See* Ex. 84, Declaration of Duane Gregory Pionk ("D. Pionk Decl.").

- **Andrew Marshall** – Father of KIA Attack Victim Cpl. Evan Andrew Marshall.  *See* Ex. 90, Declaration of Andrew Marshall ("A. Marshall Decl.").

- **Sheila Marshall** – Mother of KIA Attack Victim Cpl. Evan Andrew Marshall.  *See* Ex. 92, Declaration of Sheila Marshall ("S. Marshall Decl.").

- **Noe Orosco, Sr.** – Father of KIA Attack Victim SPC Adrian Noe Orosco.  *See* Ex. 46, Declaration of Noe Orosco, Sr. ("N. Orosco Decl.").

- **Cheryl Felder Stuart** – Mother of KIA Attack Victim CPT Arthur L. Felder.  *See* Ex. 26, Declaration of Cheryl Felder Stuart ("C. Stuart Decl.").

- **Alan Bean, Sr.** – Father of KIA Attack Victim SGT Alan Norman Bean Jr.  *See* Ex. 32, Declaration of Alan Norman Bean, Sr. ("A. Bean Decl.").

*Roger Kurtz* – *Father of KIA Attack Victim SGT Russell A. Kurtz.* ███████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

*Patricia Grassbaugh* – *Mother of KIA Attack Victim CPT Jonathan D. Grassbaugh.* ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████

*Clark West* – *Father of KIA Attack Victim 1LT Kile West.* ███████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████   ██████   █████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████

*Duane Pionk* – *Father of KIA Attack Victim SFC Matthew Ignatius Pionk.* ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███

*Andrew Marshall* – *Father of KIA Attack Victim Cpl. Evan Andrew Marshall.* ███████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

***Sheila Marshall*** – *Mother of KIA Attack Victim Cpl. Evan Andrew Marshall.* ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

***Noe Orosco, Sr.*** – *Father of KIA Attack Victim SPC Adrian Noe Orosco.* ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

*Cheryl Felder Stuart* – *Mother of KIA Attack Victim CPT Arthur L. Felder.* ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

*Alan Bean, Sr.* – *Father of KIA Attack Victim SGT Alan Norman Bean, Jr.* ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

(2)   **Plaintiff Parents of Attack Victims Seeking an Upward Adjustment in Damages**

As the surviving parents of Attack Victims, six of fifteen parent Plaintiffs seek an upward

adjustment to the baseline amount due to their specific circumstances.  These Plaintiffs are:

- **Rita Blodgett** – Mother of KIA Attack Victim PFC Nicholas H. Blodgett.  *See* Ex. 34, Declaration of Rita Ann Blodgett ("R. Blodgett Decl.").

- **Rita Zoucha** – Mother of KIA Attack Victim LCpl Brent Basil Zoucha.  *See* Ex. 48, Declaration of Rita Ann Zoucha ("R. Zoucha Decl.").

- **Nanette West** – Mother of KIA Attack Victim 1LT Kile G. West.  *See* Ex. 68, Declaration of Nanette Gae West ("N. West Decl.").

- **Martha Cabe** – Mother of KIA Attack Victim SSG Jonathan Killian Dozier.  *See* Ex. 80, Declaration of Martha Cabe ("M. Cabe Decl.").

- **Patty Jett** – Mother of KIA Attack Victim SFC Justin S. Monschke.  *See* Ex. 76, Declaration of Patty Jett ("P. Jett Decl.").

- **Becky Johnson** – Mother of KIA Attack Victim SSG Gary Lee Woods.  *See* Ex. 98, Declaration of Becky Johnson ("B. Johnson Decl.").

***Rita Blodgett*** *– Mother of KIA Attack Victim PFC Nicholas H. Blodgett*.



Rita Blodgett has been victimized twice as a direct result of Iran's actions. As a pure function of the anguish caused by the loss her son, Plaintiffs would seek an additional $2.5 million in compensatory damages for Rita Blodgett, which represents an upward departure of 50 percent from the baseline. *See Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. v. Islamic Republic of Iran*, No. 18-CV-1883 (CKK/GMH), 2020 WL 7869218, at *17-18 (D.D.C. Mar. 23, 2020) ("*W.A. II*") (awarding 50 percent upward departures due to son's "profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27); *see also Wultz*, 864 F. Supp. 2d at 40 (departing upward from $5 million to $7 million due to parent's PTSD, persistent grief, and depression).

However, recognizing that Iran's actions directly caused Rita's dual victimization—███ ████████████████████████████████████████████████████████████ ████████████████████████—Plaintiffs seek an upwards departure of 100 percent for Rita Blodgett to $10 million. *See Higgins v. Islamic Republic of Iran*, No. 1:99CV00377, 2000 WL 33674311, at *4 (D.D.C. Sept. 21, 2000) (awarding daughter $12 million who changed her college plans after her father's kidnapping, subsequently performed poorly in her academics, and eventually withdrew from school altogether); *id.* (awarding wife $12 million who suffered "great agony" and "periods of deep depression and despair as she coped with the needs of her stepdaughter"). ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

***Rita Zoucha*** – *Mother of KIA Attack Victim LCpl Brent Basil Zoucha.* ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

████████████████████████ Plaintiffs seek an upward departure of at least 25 percent for

Rita Zoucha to $6.25 million in solatium damages.  *See Thuneibat v. Syrian Arab Republic*, 167

F. Supp. 3d 22, 52 (D.D.C. 2016) (departing upward from $5 million to $6.25 million for a victim's

father who "became depressed to the point of requiring medication"); *Flanagan*, 87 F. Supp. 3d at

118 (awarding 25 percent upward departures for the severe and persistent pain experienced by

family members of a deceased victim who was "the center of his family"); *Wultz*, 864 F. Supp. 2d

at 40 (departing upward from $5 million to $7 million due to parent's PTSD, persistent grief, and

depression); *Bernhardt*, 2023 WL 2598677, at *16 (granting an upward departure of 25 percent

for family member who "suffered from adrenal exhaustion and now suffers from PTSD").

    ***Nanette West** – Mother of KIA Attack Victim 1LT Kile G. West.* ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ Plaintiffs seek an upward departure of 50

percent for Nanette West to $7.5 million in solatium damages. *Oveissi I*, 768 F. Supp. 2d at 29-

30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from

"the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that

warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp.

2d at 86); *W.A. II*, 2020 WL 7869218, at *17-18 (awarding 50 percent upward departures due to

son's "profound permanent change to his life" and because they "suffered in a way that is

'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27).

**Martha Cabe** *– Mother of KIA Attack Victim SSG Jonathan Killian Dozier.* ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



Plaintiffs seek an upward departure of at least 25 percent in solatium damages for Martha Cabe to $6.25 million. *See Thuneibat*, 167 F. Supp. 3d at 52 (departing upward from $5 million to $6.25 million for a victim's father who "became depressed to the point of requiring medication"); *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43-44 (D.D.C. 2012) ("*Brown I*") (awarding a 20 percent upward departure to sister of deceased victim because "she suffered a nervous breakdown" for which "she sought medical treatment and was prescribed medication for approximately one year"); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to a plaintiff who suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered); *Neiberger*, 2022 WL 17370239, at *16 (awarding an upward departure of 25 percent to a plaintiff that attempted suicide in the aftermath of her son's killing, which led to a 10-day hospitalization and PTSD and severe depression diagnoses).

**Patty Jett** – *Mother of KIA Attack Victim SFC Justin S. Monschke.*



Plaintiffs seek an upward departure of 50 percent, totaling $7.5 million in solatium damages for Patty Jett. *See Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. II*, 2020 WL 7869218, at *17-18 (awarding 50 percent upward departures due to son's

"profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27); *see also Wultz*, 864 F. Supp. 2d at 40 (departing upward from $5 million to $7 million due to parent's PTSD, persistent grief, and depression).

   ***Becky Johnson*** – *Mother of KIA Attack Victim SSG Gary Lee Woods.*



Plaintiffs seek an upward departure of 25 percent for Becky Johnson, totaling $6.25 million in solatium damages. *See Thuneibat*, 167 F. Supp. 3d at 52 (departing upward from $5 million to $6.25 million for a victim's father who "became depressed to the point of requiring medication"); *Lelchook v. Syrian Arab Republic*, No. 16-CV-1550 (RC), 2019 WL 4673849, at *6 (D.D.C. Sept. 25, 2019) (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world" and whose trajectory and outlook in life

changed due to the death of her loved one).

ii.    <u>Bellwether Plaintiffs: Plaintiff Children of Attack Victims</u>

Seven of the 45 Bellwether Plaintiffs were children of Attack Victims killed in the Bellwether Attacks.  Each of these children tragically lost a parent, knowing that their mother or father suffered a violent death at the hands of terrorists.  Some of these children were old enough to understand their respective parent's decision to serve overseas, and they lost someone with whom they had an extremely close relationship.  Others were young and have only limited memories of their parent, losing the opportunity to develop those relationships and rely on the support and guidance a parent can provide.  These children's families were irreparably broken by Iran-backed terrorists.

As a direct result of the Bellwether Attacks, each Plaintiff child of an Attack Victim experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their parent's society, companionship, comfort, advice, and counsel.  Given the loss of their parent, each surviving child Plaintiff is entitled to a minimum baseline amount of $5 million.  *See infra* § VIII(A)(2)(a)(ii)(1).  Further, two of these surviving child Plaintiffs are entitled to an additional upward adjustment.  *See infra* § VIII(A)(2)(a)(ii)(2).

**(1)    Plaintiff Children of Attack Victims Seeking a Baseline Award of $5 Million in Damages**

As the surviving children of Attack Victims, four of seven Plaintiffs in this category seek the baseline amount of $5 million.  *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values).  Each of these surviving children lost a parent (and often experienced secondhand the suffering felt by their surviving parent), which permanently altered their life trajectories and opportunities.  These Plaintiffs are:

- **Jonathan Krause** – Son of KIA Attack Victim SGT Elmer C. Krause.  *See* Ex. 18, Declaration of Jonathan Krause ("J. Krause Decl.").

146

- **Virginia Maitland** – Daughter of KIA Attack Victim SGM Michael B. Stack. *See* Ex. 24, Declaration of Virginia Maitland ("V. Maitland Decl.").

- **K.L., a minor (Daughter)** – Daughter of KIA Attack Victim Cpl. Damon G. LeGrand. *See* Ex. 74, Declaration of K.L. ("K.L. Decl.").

- **Tara Roberts** – Daughter of KIA Attack Victim SGT James William Harlan. *See* Ex. 30, Declaration of Tara Nicole Roberts ("T. Roberts Decl.").

***Jonathan Krause*** *– Son of KIA Attack Victim SGT Elmer C. Krause.* ███████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████

***Virginia Maitland*** *– Daughter of KIA Attack Victim SGM Michael B. Stack.* ██████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

***K.L., a minor*** *– Daughter of KIA Attack Victim Cpl. Damon G. LeGrand.* ████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

***Tara Roberts*** *– Daughter of KIA Attack Victim SGT James William Harlan.* ████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████  ██  ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

> **(2)**   **Plaintiff Children of Attack Victims Seeking an Upward Adjustment in Damages**

Three of the seven children of Attack Victims seek an upward adjustment to their baseline solatium damages due to their specific circumstances.  These Plaintiffs are:

- **Lisa Kaufman** – Daughter of KIA Attack Victim Mr. Stephen F. Hulett.  *See* Ex. 14, Declaration of Lisa Kaufman ("L. Kaufman Decl.").

- **Milissa Wojtowicz** – Daughter of KIA Attack Victim SGM Michael B. Stack.  *See* Ex. 22, Declaration of Milissa Wojtowicz ("M. Wojtowicz Decl.").

- **Manaser Orton** – Adopted Son of KIA Attack Victim SSG Billy J. Orton.  *See* Ex. 28, Declaration of Manaser Simbad Orton ("M. Orton Decl.").

***Lisa Kaufman*** *– Daughter of KIA Attack Victim Mr. Stephen F. Hulett.* ████████

███████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Plaintiffs seek an upward variance of $5 million for Lisa Kaufman, representing a 100 percent departure from the baseline. *See Higgins v. Islamic Republic of Iran*, No. 1:99CV00377, 2000 WL 33674311, at *4 (D.D.C. Sept. 21, 2000) (awarding daughter $12 million who changed her college plans after her father's kidnapping, subsequently performed poorly in her academics, and eventually withdrew from school altogether); *Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due

to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. II*, 2020 WL 7869218, at *17 (awarding 50 percent upward departures due to son's "profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27).

   ***Milissa Wojtowicz*** *– Daughter of KIA Attack Victim SGM Michael B. Stack.* ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

        ██████████████████████████████████████████████   ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████

        ████████████████████████████████████████████████████

██████████████████████████████████████████████████ Plaintiffs seek an

upward departure of at least 50 percent to $7.5 million for Milissa Wojtowicz. *See Oveissi I*, 768

F. Supp. 2d at 29-30 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *W.A. II*, 2020 WL 7869218, at *17 (awarding a 50 percent departure upward due to son's "profound permanent change to his life"); *Higgins*, 2000 WL 33674311, at *4 (awarding daughter $12 million who changed her college plans after her father's kidnapping, subsequently performed poorly in her academics, and eventually withdrew from school altogether).

   ***Manaser Orton*** – *Adopted Son of KIA Attack Victim SSG Billy J. Orton.* ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

   As the child of SSG Billy J. Orton, Manaser Orton is entitled to the baseline amount of $5 million in solatium damages.  *See Heiser I*, 466 F. Supp. 2d at 269; *see also Valore*, 700 F. Supp.

2d at 79-80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him as the natural father, and the half-brother or step-brother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling). ████████████████████

████████████████████████████████████

Plaintiffs seek an upward departure of at least 25 percent to $6.25 million for Manaser Orton. *See Cabrera II*, 2023 WL 3496303, at *9-10 (awarding an upward variance of 20 percent to children for the time without a parent during their "formative years" and the depression they suffered); *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world" and whose trajectory and outlook in life changed due to the death of her loved one); *Higgins*, 2000 WL 33674311, at *4 (awarding daughter $12 million who changed her college plans after her father's kidnapping, subsequently performed poorly in her academics, and eventually withdrew from school altogether).

### iii.   Bellwether Plaintiffs: Plaintiff Siblings of Attack Victims

Sixteen of the 45 Bellwether Plaintiffs were siblings of Attack Victims killed in the Bellwether Attacks. Each of these Plaintiffs tragically lost a brother or sister, knowing that they suffered a violent death at the hands of terrorists.

As a direct result of the Bellwether Attacks, each Plaintiff sibling of an Attack Victim experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their sibling's society, companionship, comfort, advice, and counsel. Given the loss of their brother or sister, each Plaintiff sibling of an Attack Victim is entitled to a minimum baseline amount of $2.5 million. *See infra* § VIII)(A)(2)(a)(iii)(1). Seven of these Plaintiff siblings are entitled to an additional upward adjustment. *See infra* § VIII(A)(2)(a)(iii)(2).

### (1) Plaintiff Siblings of Attack Victims Seeking a Baseline Award of $5 Million in Damages

As the surviving siblings of Attack Victims, seven of sixteen sibling Plaintiffs seek the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values). Each of these sibling Plaintiffs of Attack Victims were deprived of a meaningful relationship with their brother or sister, and they have experienced grief in their own way, with harsh impacts on their personal lives. These Plaintiffs are:

- **Brandon Clevenger** – Brother of KIA Attack Victim SGT Ross Aaron Clevenger. *See* Ex. 54, Declaration of Brandon Clevenger ("B. Clevenger Decl.").

- **Sarah Lambert** – Sister of KIA Attack Victim SGT Zachary Wade McBride. *See* Ex. 82, Declaration of Sarah Jean Lambert ("S. Lambert Decl.").

- **Felicia Bell Carter** – Sister of KIA Attack Victim Mr. Timothy E. Bell. *See* Ex. 10, Declaration of Felicia Bell Carter ("Bell Carter Decl.").

- **Michael Bell** – Brother of KIA Attack Victim Mr. Timothy E. Bell. *See* Ex. 12, Declaration of Michael Bell ("M. Bell Decl.").

- **Nancy Poulin** – Sister of KIA Attack Victim SSG Lynn Robert Poulin. *See* Ex. 38, Declaration of Nancy Poulin ("N. Poulin Decl.").

- **Josef Pautsch** – Brother of KIA Attack Victim CPL Jason Graham Pautsch. *See* Ex. 96, Declaration of Josef Alec Pautsch ("J. Pautsch Decl.").

- **Richard Gervasi II** – Half-Brother of KIA Attack Victim PFC Kelly David Youngblood. *See* Ex. 60, Declaration of Richard Donald Gervasi III ("R. Gervasi Decl.").

*Brandon Clevenger* – *Brother of KIA Attack Victim SGT Ross Aaron Clevenger.* ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

*Sarah Lambert* – *Sister of KIA Attack Victim SGT Zachary Wade McBride.* ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

**_Felicia Bell Carter_** _– Sister of KIA Attack Victim Mr. Timothy E. Bell._ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

**_Michael Bell_** _– Brother of KIA Attack Victim Mr. Timothy E. Bell._ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

**_Nancy Poulin_** _– Sister of KIA Attack Victim SSG Lynn Robert Poulin._ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

***Josef Pautsch*** *– Brother of KIA Attack Victim CPL Jason Graham Pautsch.*   ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████   ████████   ██████████████

███████████████████████████████████████████

███████████████████████████████████████

██████

***Richard Gervasi II*** *– Half-Brother of KIA Attack Victim PFC Kelly David Youngblood.*

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

**(2)     Plaintiff Siblings of Attack Victims Seeking an
Upward Adjustment in Damages**

As the surviving siblings of Attack Victims, nine of 16 Plaintiffs in this group seek an

upward adjustment to the baseline amount due to their specific circumstances.  The Plaintiffs are:

- **Jason Rockholt** – Brother of KIA Attack Victim SPC Ricky William Rockholt Jr. *See* Ex. 42, *Declaration of Jason Rockholt* ("J. Rockholt Decl.").

- **Stephanie Kurtz** – Sister of KIA Attack Victim SGT Russell A. Kurtz.  *See* Ex. 58, Declaration of Stephanie Joy Kurtz ("S. Kurtz Decl.").

- **Norma Estes** – Half-Sister of KIA Attack Victim SSG Justin Michael Estes**.**  *See* Ex. 62, Declaration of Norma Estes ("N. Estes Decl.").

- **Michael Summers** – Half-Brother of KIA Attack Victim SPC James Eugene "Jimmy" Summers.  *See* Ex. 66, Declaration of Michael Shane Summers ("M. Summers Decl.").

- **Brandi Yanez** – Sister of KIA Attack Victim PFC Joshua Young.  *See* Ex. 94, Declaration of Brandi Yanez ("B. Yanez Decl.").

- **Marla Van Cannon** – Twin Sister of KIA Attack Victim CSM Marilyn Lea Gabbard.  *See* Ex. 50, Declaration of Marla Marie Van Cannon ("Marla Van Cannon Decl.").

- **Michael Van Cannon** – Brother of KIA Attack Victim CSM Marilyn Lea Gabbard. *See* Ex. 52, Declaration of Michael Lee Van Cannon ("Michael Van Cannon Decl.").

- **Kelly Inman** – Sister of KIA Attack Victim SGT James ("Jim") Edward Craig. *See* Ex. 86, Declaration of Kelly Inman ("K. Inman Decl.").

- **Gerald Krause** – Older Brother and "Functional Equivalent" of Father of KIA Attack Victim SGT Elmer C. Krause.  *See* Ex. 20, Declaration of Gerald Krause ("G. Krause Decl.").

*Jason Rockholt* – *Brother of KIA Attack Victim SPC Ricky William Rockholt Jr.* ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

████████████████████████████    Plaintiffs seek an upward departure of at least 25 percent in solatium damages to \$3.125 million for Jason Rockholt.  *See Flanagan*, 87 F. Supp. 3d at 118 (awarding mother and siblings an upward departure of 25 percent due to their "traumatic grief," "persistent complex bereavement-related disorder," and "PTSD" as a result of victim's death, and where the "violent nature in which he died further exacerbated their grief and mental suffering"); *Brown I*, 872 F. Supp. 2d 37, 43-44 (awarding a 20 percent upward departure to sister of deceased victim because "she suffered a nervous breakdown" for which "she sought medical treatment and was prescribed medication for approximately one year"); *Bernhardt*, 2023 WL 2598677, at *16 (granting an upward departure of 25 percent for sister of victim who "suffered from adrenal exhaustion and now suffers from PTSD"); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (awarding 25 percent upward departure for siblings who "turned to self-destructive behavior" and "battled depression" after the loss of their sister).

**Stephanie Kurtz** – *Sister of KIA Attack Victim SGT Russell A. Kurtz*. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Plaintiffs seek an upward

departure of at least 25 percent for Stephanie Joy Kurtz to $3.125 million in solatium damages.

*See Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent upward departure to a plaintiff that

continues to suffer sadness and anger, and whose grief over their relative's death steered them to

"pursue particular studies and fields of practice linked to" their relative's death, compelling the

plaintiff to constantly remember their relative's death and defining who the plaintiff is today);

*Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member

who "lost her sense of place in the world" and whose trajectory and outlook in life changed due to

the death of her loved one); *Baker*, 775 F. Supp. 2d at 83 (awarding 25 percent upward departure

for siblings who "turned to self-destructive behavior" and "battled depression" after losing sister).

**Norma Estes** – *Half-Sister of KIA Attack Victim SSG Justin Michael Estes.* ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████



Plaintiffs seek an upward departure of 50 percent for Norma Estes to $3.75 million.  *See Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. II*, 2020 WL 7869218, at *17 (awarding 50 percent upward departures due to son's "profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27); *see also Wultz*, 864 F. Supp. 2d at 40 (departing upward from $5 million to $7 million due to parent's PTSD, persistent grief, and depression).

**Michael Summers** – *Half-Brother of KIA Attack Victim SPC James Eugene "Jimmy" Summers.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

    ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

    ██████████████████████████████████████████████

████████████████████████████████████████████ Plaintiffs seek an upward

departure of 25 percent, for a total of $3.125 million dollars in solatium damages for Michael

Summers. *See Flanagan*, 87 F. Supp. 3d at 118 (awarding mother and siblings an upward

departure of 25 percent due to their "traumatic grief," "persistent complex bereavement-related

disorder" and "PTSD" as a result of victim's death and where the "violent nature in which he died

further exacerbated their grief and mental suffering"); *Brown I*, 872 F. Supp. 2d at 43-44 (awarding

a 20 percent upward departure to sister of deceased victim because "she suffered a nervous

breakdown" for which "she sought medical treatment and was prescribed medication for

approximately one year"); *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward

departure to a family member who "lost her sense of place in the world" and whose trajectory and

outlook in life changed due to the death of her loved one); *Baker*, 775 F. Supp. 2d at 83 (awarding

25 percent upward departure for siblings who "turned to self-destructive behavior" and "battled depression" after the loss of their sister).

**Brandi Yanez** – *Sister of KIA Attack Victim PFC Joshua Young.* ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ Plaintiffs seek an upward departure of at least 50 percent for Brandi Yanez to $3.75 million.  *See Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. II*, 2020 WL 7869218, at *17 (awarding 50 percent upward departures due to son's "profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27); *see also Wultz*, 864 F. Supp. 2d at 40 (departing upward from $5 million to $7 million due to parent's PTSD, persistent grief, and depression).

   ***Marla Van Cannon*** *– Twin Sister of KIA Attack Victim CSM Marilyn Lea Gabbard.* ▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Plaintiffs seek an upward departure of at least 50 percent for Marla Van Cannon to $3.75 million in solatium damages. *See Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 45 (D.D.C. 2014) (awarding $4 million to the twin brother of an attack victim, rather than the $2.5 million typically awarded to siblings of deceased victims, because of the closer-than-normal sibling relationship the plaintiff shared with his twin brother); *see also Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent departure to a plaintiff due to his "lifetime of suffering" resulting from "the exact sort of acute feeling of 'permanent loss or change caused by decedent's absence' that warrants an upward departure from the standard *Heiser* valuation") (quoting *Valore*, 700 F. Supp. 2d at 86); *W.A. II*, 2020 WL 7869218, at *17 (awarding 50 percent upward departures due to son's "profound permanent change to his life" and because they "suffered in a way that is 'particularly more acute or agonizing'") (citing *Oveissi I*, 768 F. Supp. 2d at 27).

**Michael Van Cannon** – *Brother of KIA Attack Victim CSM Marilyn Lea Gabbard.*

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] Plaintiffs seek an upward departure of at least 25 percent for Michael Lee Van Cannon to $3.125 million in solatium damages.  *See Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures for the severe and persistent pain experienced by family members of a deceased victim who was "the center of his family"); *Bernhardt*, 2023 WL 2598677, at *16 (granting an upward departure of 25 percent for sister of victim who "suffered from adrenal exhaustion and now suffers from PTSD"); *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world" and whose trajectory and outlook in life changed due to the death of her loved one).

***Kelly Inman*** – *Sister of KIA Attack Victim SGT James ("Jim") Edward Craig.* [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Plaintiffs seek an upward departure of at least 25 percent for Kelly Inman to $3.125 million in solatium damages. *See Flanagan*, 87 F. Supp. 3d at 118 (awarding mother and siblings an upward departure of 25 percent due to their "traumatic grief," "persistent complex bereavement disorder" and "PTSD" as a result of victim's death and where the "violent nature in which he died further exacerbated their grief and mental suffering"); *Brown I*, 872 F. Supp. 2d at 43-44 (awarding a 20 percent upward departure to sister of deceased victim because "she suffered a nervous breakdown" for which "she sought medical treatment and was prescribed medication for approximately one year"); *Bernhardt*, 2023 WL 2598677, at *16 (granting an upward departure of 25 percent for sister of victim who "suffered from adrenal exhaustion and now suffers from PTSD"); *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world" and whose trajectory and outlook in life changed due to the death of her loved one).

**Gerald Krause** – *Older Brother and "Functional Equivalent" of Father of KIA Attack Victim SGT Elmer C. Krause.* ████████████████████████████████

████████████████████████████████████████████████████

███████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████  *Heiser I*, 466 F. Supp. 2d, at 269.  ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████  *Higgins*, 2000 WL 33674311,

at *4 (awarding $12 million to the daughter of a victim who faced a "tumultuous time" and

uncertainty regarding her father's welfare during his time in captivity).

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  *See Jakubowicz II*, 2023 WL 6907852, at *7 (finding a

grandfather as a functional equivalent of a parent because he "served as a father figure").  Because

Gerald would be entitled to either $3.75 million as a sibling of a decedent with an upward departure

or a $5 million baseline as the functional equivalent of a father of a decedent, the Court should use

the higher $5 million figure as his baseline.  *See generally Wultz*, 864 F. Supp. 2d at 40 (awarding

the higher of two baseline awards to a plaintiff that could be awarded damages as both the spouse

of a survivor and the mother of a decedent).

              iv.    <u>Bellwether Plaintiffs: Plaintiff Spouses of Attack Victims</u>

Four of the 45 Bellwether Plaintiffs are surviving spouses of Attack Victims killed in the

Bellwether Attacks.  Each of these Plaintiffs lost their chosen life partner to a violent death at the

hands of terrorists.

As a direct result of the Bellwether Attacks, each surviving spouse Plaintiff of an Attack Victim experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband's society, companionship, comfort, advice, and counsel.  Given the loss of their husband, each surviving spouse Plaintiff is entitled to a minimum baseline range between $8 million and $12 million.  *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values).  These Plaintiffs are:

- **Ashley LeGrand Rawlings** – Wife of KIA Attack Victim Cpl. Damon G. LeGrand. *See* Ex. 72, Declaration of Ashley LeGrand Rawlings ("A. LeGrand Rawlings Decl.").

- **Natalie Jackson** – Wife of KIA Attack Victim SGT James Edward Craig.  *See* Ex. 88, Declaration of Natalie Jackson ("N. Jackson Decl.").

- **Christina Linden** – Spouse of KIA Attack Victim 1LT William ("Wil") Anthony Edens.  *See* Ex. 40, Declaration of Christina Marie Linden ("C. Linden Decl.").

- **Shelia Towns** – Spouse of KIA Attack Victim SGT Robin Leslie Towns, Sr.  *See* Ex. 78, Declaration of Shelia Towns ("S. Towns Decl.").

*Ashley LeGrand Rawlings* – *Wife of KIA Attack Victim Cpl. Damon G. LeGrand.*





Plaintiffs seek $12 million in solatium damages for Ashley LeGrand Rawlings. *See Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 155-57 (D.D.C. 2017) ("*Foley II*") (awarding $12.5 million and $17 million to the widows of two victims); *W.A. II*, 2020 WL 7869218, at *16 (awarding $12 million in solatium damages to spouse experiencing *inter alia* "acute feelings of permanent loss") (cleaned up); *Higgins*, 2000 WL 33674311, at *9 (awarding $12 million to widow of victim); *see also Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 132 (D.D.C. 2022) (awarding a 25 percent enhancement to parents that were not present at the scene of the attack but had first-hand observations and vivid memories of their daughter's lifeless body shortly afterward); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90-91 (D.D.C. 2002) (noting

that courts have acknowledged that anguish is exacerbated when family members live with the knowledge of the suffering of their loved ones).

*Natalie Jackson* – *Wife of KIA Attack Victim SGT James Edward Craig.* ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

████████████████████████████████████████

████████████████████████████████████ Plaintiffs

seek $11 million in solatium damages for Natalie Jackson.  *See Bernhardt*, 2023 WL 2598677, at *15 (noting that courts have awarded higher amounts of solatium damages "when evidence establishes an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant is presented; and circumstances surrounding the terrorist attack rendered the suffering particularly more acute or agonizing."); *see also Foley II*, 281 F. Supp. 3d at 155-57 (awarding $12.5 million and $17 million to the widows

of two victims); *W.A. II*, 2020 WL 7869218, at *16 (awarding $12 million in solatium damages to spouse experiencing *inter alia* "acute feelings of permanent loss"); *Higgins*, 2000 WL 33674311, at *9 (awarding $12 million to widow of victim); *but cf. Valore*, 700 F. Supp. 2d at 86 (declining an upward departure to the wife because her husband was killed after only six months of their marriage).

**Christina Linden** – *Spouse of KIA Attack Victim 1LT William ("Wil") Anthony Edens*.



Plaintiffs seek $10 million in solatium damages for Christina Linden.  *See Foley II*, 281 F. Supp. 3d at 155-57 (awarding $12.5 million and $17 million to the widows of two victims); *W.A. II*, 2020 WL 7869218, at *16 (awarding $12 million in solatium damages to spouse experiencing *inter alia* "acute feelings of permanent loss"); *Heiser*

*I*, 466 F. Supp. 2d at 269 (describing the baseline award values); *Higgins*, 2000 WL 33674311, at *9 (awarding $12 million to widow of victim).

**Shelia Towns** *– Spouse of KIA Attack Victim SGT Robin Leslie Towns, Sr.* 

Plaintiffs seek $9 million in solatium damages for Shelia Towns. *See Foley II*, 281 F. Supp. 3d at 155-57 (awarding $12.5 million and $17 million to the widows of two victims); *Valore*, 700 F. Supp. 2d at 86 (noting that aggravated circumstances warranting an upward departure include a family member's general feeling of permanent loss and medical treatment for depression or related disorders); *W.A. II*, 2020 WL 7869218, at *16 (awarding $12 million in solatium damages to spouse experiencing "acute feeling[s] of 'permanent loss,'" *inter alia*); *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values); *Higgins*, 2000 WL 33674311, at *9 (awarding $12 million to widow of victim).

**b.**   ***Functional Equivalent of Immediate Family Members***

Courts in this jurisdiction also have discretion to award solatium damages to claimants who are "viewed as the functional equivalents of immediate family members" of terrorist attacks'

victims. *Force II*, 617 F. Supp. 3d at 38 (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003)); *Cabrera II*, 2023 WL 3496303, at *5 (stating that a claimant may recover on a solatium claim if he or she is the "functional equivalent" of an immediate family member, even if not legally or biologically related to the victim). Under the functional equivalency test, the claimant must show that he or she was "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("*Fritz II*") (noting that step-siblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Valore*, 700 F. Supp. 2d at 79-80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him as the natural father, and the half-brother or step-brother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling); *Jakubowicz II*, 2023 WL 6907852, at *7 (finding a grandfather as a functional equivalent of a parent because he "served as a father figure"); *Hammons*, 2023 WL 5933340, at *26 (deeming a long-term domestic partner as functionally equivalent to a spouse when the partner resided with the victim and had a marriage-like bond); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273, at *19 (D.D.C. July 2, 2020) (finding that a victim's fiancée who had been living with him for approximately six months before his deployment "was the functional equivalent of a spouse"). The same solatium damages baseline and adjustments framework apply to the functionally equivalent claimants as to immediate family claimants. *See generally Jakubowicz II*, 2023 WL 6907852, at *6-7.

i.   <u>Bellwether Plaintiffs: Functional Equivalent of Immediate Family Members</u>

Two of the 45 Bellwether Plaintiffs were the "functional equivalent of family" to Attack

Victims killed in the Bellwether Attacks.  Each of these Plaintiffs had an intensely close relationship with an Attack Victim, and suffered in the aftermath in their death in a manner identical to how someone with a blood relationship would grieve.

As a direct result of the Bellwether Attacks, each of these Plaintiffs experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their family member equivalent's society, companionship, comfort, advice, and counsel.  These Plaintiffs are:

- **Alexandria Parks** – Stepdaughter of KIA Attack Victim Mr. Stephen F. Hulett. *See* Ex. 16, Declaration of Alexandria Parks ("A. Parks Decl.").
- **Jacob Kosky** – Stepson of KIA Attack Victim John Albert Pinsonneault.  *See* Ex. 36, Declaration of Jacob Kosky ("J. Kosky Decl.").

*Alexandria Parks* – *Stepdaughter of KIA Attack Victim Mr. Stephen F. Hulett.*



*Valore*, 700 F. Supp. 2d at 79-80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him

174

as the natural father, and the half-brother or step-brother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").  Given the loss of her stepfather ███

████████████████████████████████████████████████████████████████████████████████

Alexandria is entitled to a minimum baseline amount of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

   ***Jacob Kosky*** – *Stepson of KIA Attack Victim John Albert Pinsonneault.*   ████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

         ██████████████████████████████████████████████████████

████████████████████████████████████████████████████      Therefore, Jacob Kosky is entitled to a baseline of $5 million for children of victims killed in a terrorist attack. *See Valore*, 700 F. Supp. 2d at 79-80 (holding that a stepfather and stepbrother of victim were functionally the equivalent of immediate family to the victim because the stepfather "treated [the

decedent] as his own son"); *Heiser I*, 466 F. Supp. 2d at 269 (describing the baseline award values); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD)(SN), 2016 WL 8711419, at *3 (S.D.N.Y. Oct. 14, 2016) (departing upward to award solatium damages in amount of $8,500,000 to stepdaughter where father-daughter relationship "was virtually indistinguishable from that of a biological father and daughter" and deceased "clearly served a father role" and thus plaintiffs were "the functional equivalent[s] of" a daughter or son to deceased), *report and recommendation adopted*, 2016 WL 6465922, at *8-10 (S.D.N.Y. Oct. 31, 2016).

### 3.   Economic Damages

Surviving direct victims of terrorist attacks, such as Sgt. Adam Kisielewski (ret.), may recover for economic losses stemming from their injuries. *Force II*, 617 F. Supp. 3d at 30. "As a general rule, lost earnings—past and future—are compensable economic damages." *Moradi*, 77 F. Supp. 3d at 71. Economic damages are typically "not hard to quantify," but must be proven with "competent evidence." *Force II*, 617 F. Supp. 3d at 30 (quoting *Moradi*, 77 F. Supp. 3d at 71).

Sgt. Adam Kisielewski (ret.) seeks economic damages of $1,906,778 in lost earnings and benefits. Using reasonable assumptions and reliable calculations—based on economic models and government data—experts at the Center for Forensic Economic Studies estimate Adam's lost military and civil pay and benefits, subtracting out taxes and personal maintenances, ranges from $1,796,269 to $1,906,778, differing based on the expected work-life. Ex. 5, Expert Damages Report of Chad Staller and Stephen M. Dripps for Sgt. Adam Kisielewski (ret.) ("Staller Damages Report") at 7. Courts have routinely concluded that the estimates used by the Center for Forensic Economic Studies, including an expected work-life out to the Social Security retirement age, are reasonable, and as a result, Plaintiffs seek the higher end of the range. *See Neiberger*, 2022 WL 17370239, at *14 (accepting the economic damages model proposed by Mr. Staller at the Center

for Forensic Economic Studies based on similar estimates and data and a work-life up to the social security retirement age, deeming such conclusions "reasonable, consistent with generally accepted practices, and calculated using appropriate assumptions based on reasonable and well-documented sources") (quotation marks omitted); *Roth I*, 78 F. Supp. 3d at 405 (same); *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 268 (D.D.C. 2020) (same); *Fritz II*, 324 F. Supp. 3d at 59-60 (same); *Lelchook*, 2019 WL 4673849, at *3 (same); *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *8 (D.D.C. Nov. 18, 2019) (same).  Plaintiffs, however, do not seek to apply prejudgment interest to these economic damages because the Center for Forensic Economic Studies report already includes estimates on present value.  Staller Damages Report at 6.

### 4.  Prejudgment Interest

Plaintiffs who were "delayed in recovering compensation for their injuries" may seek prejudgment interest on their compensatory damages.  *Reed*, 845 F. Supp. 2d at 214.  Courts in this jurisdiction award prejudgment interest on the plaintiffs' "past economic loss and their non-economic pain and suffering and solatium damages."  *Force II*, 617 F. Supp. 3d at 42 (quotation marks and citation omitted).

The most appropriate measure of prejudgment interest is the average annual prime rate from the date of the attack to the judgment's date.  *Force II*, 617 F. Supp. 3d at 42 (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450-51 (D.C. Cir. 1996)).  The court in *Ewan* provided an example:

> To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1983 (10.79%); discounted that interest by the percentage of the year left from April 18, 1983, to December 31, 1983 (70.4%); and then added that amount to $1.00—yielding $1.07596. Then, the Court took that amount and multiplied it by the prime rate in 1984 (12.04%) and added that amount to $1.07596, yielding $1.205506. The Court continued this iterative process through June 10, 2020, resulting in a total multiplier of 10.62015. *See* Opati, 60 F. Supp. 3d at 83 n.10. For 2020, the Court

estimated the rate to be 4.05167%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (44.2623%).

*Ewan*, 466 F. Supp. 3d at 250 n.3.

Plaintiffs respectfully seek an award of prejudgment interest.  Applying the methodology detailed in *Ewan*, Exhibit 8 details the resulting prejudgment interest figures to account for the time that passed since the attacks until the estimated judgment date of July 1, 2024.

### 5.   Punitive Damages

Punitive damages "serve to punish and deter the actions for which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87.  "Punitive damages are warranted where defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (quotation marks and citations omitted).

Courts in this jurisdiction consider four factors in granting punitive damages: "(1) the character of the defendants' act, (2), the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Valore*, 700 F. Supp. 2d at 87.  Iran's provision of material support to terrorists for the purpose of harming Americans "militate in favor of a sizable award."  *Schwartz II*, 2022 WL 1567358, at *4.  Courts have taken varied approaches when calculating punitive damage awards.

One approach to calculating punitive damages is to multiply Iran's average annual support for terrorism during the relevant period by a factor between three to five and distributing that amount proportionally based on each Plaintiff's compensatory awards.  *Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *17 (D.D.C. Sept. 10, 2020) (citing *Heiser II*, 659 F. Supp. 2d at 30); *see also Oveissi II*, 879 F. Supp. 2d at 57 (awarding $300M in punitive

damages to a single plaintiff for a single attack); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 14 (D.D.C. 2011) (awarding $300M in punitive damages to the family of a single attack victim); *Valore*, 700 F. Supp. 2d at 90 (awarding $1 billion in punitive damages against Iran for a single attack resulting in 241 deaths).  Another approach to punitive damages calculation involves awarding a lump sum of $150 million per victim.  *Doe v. Syrian Arab Republic*, 2020 WL 5422844, at *17; *see Est. of Hirschfield v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 150 (D.D.C. 2018) (awarding $150 million in punitive damages to family of student killed in terrorist attack).  However, other courts have opposed punitive damage awards based on these approaches because the amounts are difficult to calculate, and the calculations require sufficient evidence of the defendant's expenditure on terrorism and rely on a potential deterrence effect of a large multiplier.  *See Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 10-11 (D.D.C. 2019) *("Hamen II")*.

Thus, courts have increasingly adopted a third approach to punitive damages: to multiply the total compensatory damages by a fixed multiplier value.  *See Force II*, 617 F. Supp. 3d at 40; *Doe v. Syrian Arab Republic*, 2020 WL 5422844, at *18; *Schwartz II*, 2022 WL 1567358, at *4 (citing *Hamen II*, 407 F. Supp. 3d at 10).  The multiplier—between one and five—depends on "whether the case involved exceptional circumstances, the perceived deterrence effect, and the nexus between the defendant and the injurious acts."  *Force II*, 617 F. Supp. 3d at 40.  Courts have used higher multipliers in exceptional circumstances and also to send a strong message that support of terrorism against the U.S. nationals will not be tolerated.  *See Haim*, 784 F. Supp. 2d at 3 (using the multiplier of three to calculate punitive damages for a suicide bombing attack that killed eight people); *Valore*, 700 F. Supp. 2d at 88 (applying the multiplier of five for a bombing attack that killed 241 service members, finding satisfactory an expert's testimony on the punitive damages' deterrence effect).  But absent exceptional circumstances or evidence of deterrence effect, courts

have applied a multiplier of two when a foreign nation provided material support to a terrorist organization that carried out attacks on Americans. *See Force II*, 617 F. Supp. 3d at 41 (concluding that the multiplier of two was appropriate for an Iran-sponsored Hamas shooting attack based on awards in prior cases and with only "little evidence regarding the potential deterrence effect of a larger multiplier"); *Hamen II*, 407 F. Supp. 3d at 11 (applying a multiplier of two in action against Iran for the abduction and murder of two private U.S. contractors).

Finally, courts apply the punitive damages multiplier to the compensatory damages inclusive of prejudgment interest, i.e., "*after* completing the prejudgment interest calculation." *Force II*, 617 F. Supp. 3d at 42 (stating that "prejudgment interest is necessary to provide complete recompense for Plaintiffs' compensatory damages"); *Ewan*, 466 F. Supp. 3d at 252 n.4 (noting that "the sum of each plaintiff's compensatory damages" is "adjusted to reflect present value," for the purposes of calculating punitive damages).

In light of Iran's highly culpable conduct, Plaintiffs request the Court to apply a multiplier of two and award $1,104,594,438 in punitive damages. The attacks were designed to produce mass casualties and resulted in the deaths of at least 44 service members, U.S. government employees or contractors, and potentially hundreds more military and civilian deaths. *See supra* § III. The attacks also severely wounded many people, including Plaintiff Adam Kisielewski. *Id*. A multiplier of two will fairly compensate Plaintiffs and keep the amount of punitive damages narrowly tailored to the compensatory damages award. Plaintiffs also seek to apply the multiplier approach to streamline and remove the need of presenting and evaluating the evidence of Iran's expenditures on terrorism.

### 6.    Post-Judgment Interest

Post-judgment interest is interest on any money judgment in a civil case by a district court, including against a foreign sovereign over whom the court has jurisdiction. *Gration*, 2023 WL

5221955, at *37 (citing 28 U.S.C. § 1961(a)).  Courts in this jurisdiction award post-judgment interest at the statutory rate because the application of section 1961(a) is mandatory, not discretionary.  *See Cont'l Transfert Technique Ltd.*, 850 F. Supp. 2d at 287; *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-CV-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021).  The statute provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).

The Bellwether Plaintiffs seek post-judgment interest from the date of the favorable judgment to the date of the judgment's payment.

## Exhibit 8 – Bellwether Damages Table

| Plaintiff (Relation to Victim) | Date of Attack | Pain and Suffering and/or Solatium Damages | Economic Damages | Prejudgment Interest Multiplier[52] | Total Compensatory Damages Including Prejudgment Interest | Punitive Damages (distributed proportionally based on compensatory damages award) | Post-Judgment Interest |
|---|---|---|---|---|---|---|---|
| **Rita Blodgett (Mother)***[53] | 07/21/2004 | $10M | | 2.542489 | $25,424,890 | **$1,104,594,438** (2x Total Compensatory Damages) | Yes |
| **Christina Linden (Spouse)** | 04/28/2005 | $10M | | 2.427981 | $24,279,810 | | |
| **Jason Rockholt (Brother)*** | 04/28/2005 | $3.125M | | 2.427981 | $7,587,441 | | |
| **Sgt. Adam Kisielewski (ret.) (Victim)*** | 08/21/2005 | $9M | $1,906,778 | 2.375123 (not applied to economic damages) | $23,282,885 | | |
| **Rita Zoucha (Mother)*** | 06/09/2006 | $6.25M | | 2.233076 | $13,956,725 | | |
| **Brandon Clevenger (Brother)** | 02/08/2007 | $2.5M | | 2.134175 | $5,335,438 | | |
| **Roger Kurtz (Father)** | 02/11/2007 | $5M | | 2.132959 | $10,664,795 | | |
| **Stephanie Kurtz (Sister)*** | 02/11/2007 | $3.125M | | 2.132959 | $6,665,497 | | |
| **Norma Estes (Half-Sister)*** | 03/05/2007 | $3.75M | | 2.123237 | $7,962,139 | | |
| **Patricia Grassbaugh (Mother)** | 04/07/2007 | $5M | | 2.110275 | $10,551,375 | | |

[52] The prejudgment interest multiplier was calculated using the method outlined in *Ewan v. Islamic Republic of Iran,* 466 F. Supp. 3d 236, 251 (D.D.C. 2020), as well as an estimated judgment date of July 1, 2024.  Ex. 101, Monthly interest rates dating back to 2004, were found online, through the Federal Reserve at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last visited October 18, 2023).

[53] Plaintiffs identified with an asterisk seek upward departures in their damages awards.

### Exhibit 8 – Bellwether Damages Table

| Plaintiff (Relation to Victim) | Date of Attack | Pain and Suffering and/or Solatium Damages | Economic Damages | Prejudgment Interest Multiplier[52] | Total Compensatory Damages Including Prejudgment Interest | Punitive Damages (distributed proportionally based on compensatory damages award) | Post-Judgment Interest |
|---|---|---|---|---|---|---|---|
| Michael Summers (Half-Brother)* | 05/28/2007 | $3.125M | | 2.089616 | $6,530,050 | | |
| Nanette West (Mother)* | 05/28/2007 | $7.5M | | 2.089616 | $15,672,120 | | |
| Clark West (Father) | 05/28/2007 | $5M | | 2.089616 | $10,448,080 | | |
| Patty Jett (Mother)* | 10/14/2007 | $7.5M | | 2.034525 | $15,258,938 | | |
| Shelia Towns (Spouse) | 10/24/2007 | $9M | | 2.030474 | $18,274,266 | | |
| Martha Cabe (Mother)* | 01/09/2008 | $6.25M | | 2.006513 | $12,540,706 | | |
| Sarah Lambert (Sister) | 01/09/2008 | $2.5M | | 2.006513 | $5,016,283 | | |
| Duane Pionk (Father) | 01/09/2008 | $5M | | 2.006513 | $10,032,565 | | |
| Jonathan Krause (Son) | 04/09/2004 | $5M | | 2.57953 | $12,897,650 | | |
| Gerald Krause (Brother/Functional Equivalent of Father)* | 04/09/2004 | $5M | | 2.57953 | $12,897,650 | | |
| Lisa Kaufman (Daughter)* | 04/09/2004 | $10M | | 2.57953 | $25,795,300 | | |
| Alexandria Parks (Stepdaughter) | 04/09/2004 | $5M | | 2.57953 | $12,897,650 | | |
| Felicia Bell Carter (Sister) | 04/09/2004 | $2.5M | | 2.57953 | $6,448,825 | | |

## Exhibit 8 – Bellwether Damages Table

| Plaintiff (Relation to Victim) | Date of Attack | Pain and Suffering and/or Solatium Damages | Economic Damages | Prejudgment Interest Multiplier[52] | Total Compensatory Damages Including Prejudgment Interest | Punitive Damages (distributed proportionally based on compensatory damages award) | Post-Judgment Interest |
|---|---|---|---|---|---|---|---|
| Michael Bell (Brother) | 04/09/2004 | $2.5M | | 2.57953 | $6,448,825 | | |
| Milissa Wojtowicz (Daughter)* | 04/11/2004 | $7.5M | | 2.578804 | $19,341,030 | | |
| Virginia Maitland (Daughter) | 04/11/2004 | $5M | | 2.578804 | $12,894,020 | | |
| Ashley LeGrand Rawlings (Spouse) | 06/12/2007 | $12M | | 2.083945 | $25,007,340 | | |
| K.L., a minor (Daughter) | 06/12/2007 | $5M | | 2.083945 | $10,419,725 | | |
| Kelly Inman (Sister)* | 01/28/2008 | $3.125M | | 2.003173 | $6,259,916 | | |
| Natalie Jackson (Spouse) | 01/28/2008 | $11M | | 2.003173 | $22,034,903 | | |
| Andrew Marshall (Father) | 01/28/2008 | $5M | | 2.003173 | $10,015,865 | | |
| Sheila Marshall (Mother) | 01/28/2008 | $5M | | 2.003173 | $10,015,865 | | |
| Brandi Yanez (Sister)* | 01/28/2008 | $3.75M | | 2.003173 | $7,511,899 | | |
| Tara Roberts (Daughter) | 05/14/2004 | $5M | | 2.56682 | $12,834,100 | | |
| Jacob Kosky (Stepson) | 10/14/2004 | $5M | | 2.512347 | $12,561,735 | | |
| Nancy Poulin (Sister) | 12/21/2004 | $2.5M | | 2.487388 | $6,218,470 | | |
| Noe Orosco, Sr. (Father) | 12/09/2005 | $5M | | 2.324603 | $11,623,015 | | |

### Exhibit 8 – Bellwether Damages Table

| Plaintiff (Relation to Victim) | Date of Attack | Pain and Suffering and/or Solatium Damages | Economic Damages | Prejudgment Interest Multiplier[52] | Total Compensatory Damages Including Prejudgment Interest | Punitive Damages (distributed proportionally based on compensatory damages award) | Post-Judgment Interest |
|---|---|---|---|---|---|---|---|
| Josef Pautsch (Brother) | 04/10/2009 | $2.5M | | 1.927884 | $4,819,710 | | |
| Becky Johnson (Mother)* | 04/10/2009 | $6.25M | | 1.927884 | $12,049,275 | | |
| Marla Van Cannon (Sister)* | 01/20/2007 | $3.75M | | 2.141466 | $8,030,498 | | |
| Michael Van Cannon (Brother)* | 01/20/2007 | $3.125M | | 2.141466 | $6,692,081 | | |
| Richard Gervasi II (Half-Brother) | 02/18/2007 | $2.5M | | 2.130124 | $5,325,310 | | |
| Cheryl Felder Stuart (Mother) | 04/24/2004 | $5M | | 2.574083 | $12,870,415 | | |
| Manaser Orton (Adopted Son)* | 04/24/2004 | $6.25M | | 2.574083 | $16,088,019 | | |
| Alan Bean, Sr. (Father) | 05/25/2004 | $5M | | 2.562825 | $12,814,125 | | |
| **Total Compensatory Damages Awards:** | | **$242,875,000** | **$1,906,778** | | **$552,297,219** | | |

**B.      Additional Requests for Specific Relief in Judgment Submission**

In addition to the foregoing relief, Plaintiffs respectfully request that—to the extent this Court issues a final judgment finding that the Defendant Iran is liable for damages to the Bellwether Plaintiffs—the Court: (1) issue the final judgment prior to July 1, 2024 so that Plaintiffs may submit their judgments to the United States Victims of State Sponsored Terrorism fund (the "Fund") by August 1, 2024, which is Plaintiffs' best estimated deadline for submissions of judgments for the next anticipated funding cycle of the Fund;[54] (2) include language in the final judgment sufficient to satisfy service of process pre-requisites under 28 U.S.C. § 1608(e); and (3) include language in the final judgment specifying that service of process should proceed under 28 U.S.C. § 1608(a)(4).

**1.      Plaintiffs' Request That a Final Judgment Be Issued Prior to July 1, 2024**

A final judgment as to Bellwether Plaintiffs' claims prior to July 1, 2024 would maximize their chances of timely submitting applications to the Fund in advance of its next distribution of awards.  Given the difficulty of collecting a judgment issued against a hostile foreign sovereign, the Fund represents the Bellwether Plaintiffs' most meaningful avenue of recovering any amount of damages owed for their injuries.  Plaintiffs' sense of urgency to be accepted into the Fund prior to the 2025 distribution derives from the fact that the Fund does not make distributions on a predictable annual cycle due to the Fund's lack of consistent appropriations or other means of accruing assets.  The Fund, which accrues funding from specific and limited Congressional appropriations and a trickle of qualifying case deposits, only makes a distribution when sufficient

---

[54] While the Fund has not established the 2025 application deadline for any upcoming distribution, it has set a deadline of August 1 in prior years.

funds are available—which is never guaranteed.  *See* 34 U.S.C. § 20144(d)(4) (requiring the Special Master of the Fund to authorize a distribution within one year of the Fund reaching $100 million in assets).  In recent years, two to three years have passed between distributions rounds, with the most recent distribution having been authorized on December 30, 2022.  The Fund is not making a distribution in 2024 due to having fewer than $100 million in assets.  However, there is a real possibility of a substantial payment being made to victims accepted into the fund prior to the 2025 distribution cut-off.  In addition to several recent cases involving substantial settlements that may be directed into the Fund,[55] Congress recently allocated $3 billion to a reserve fund for lump sum catch-up payments to victims of certain terrorist attacks not at issue in this matter, and the remaining funds after these payments will be deposited into the general Fund and potentially available to be paid out to victims accepted into the Fund prior to 2025.[56]  If Bellwether Plaintiffs miss the cutoff, they may miss out on this potentially substantial distribution and have to wait several more years in order to recover any portion of their judgments.  Plaintiffs stand ready to provide the Court with any additional information that would help to facilitate a resolution of the Bellwether Motion by July 1, 2024.

---

[55] The Fund is currently tracking two ongoing federal criminal matters, *United States v. Binance Holdings Ltd.,* No. 2:23-cr-000178-RAJ (W.D. Wash. Nov 14, 2023) and *United States v. Changpeng Zhao*, No. 2:23-cr-000179-RAJ (W.D. Wash. Nov 14, 2023) along with enforcement actions brought by the Department of Treasury and the U.S. Commodity Futures Trading Commission, which appear likely to result in criminal penalties totaling approximately $4.3 billion.  Due to the nature of the charges brought, some portion of this settlement is likely to qualify for deposit into the Fund and for eventual distribution to Fund claimants.  Plaintiffs believe it likely that any portion of the settlement which will be earmarked for the Fund would be authorized for distribution by January 1, 2025.

[56] *See, e.g.*, USVSST FAQ 7.4, available at http://www.usvsst.com/faq.php.

**2.      Judgment Language Sufficient to Satisfy Service Pre-requisites Under 28 U.S.C. § 1608(e)**

Plaintiffs also respectfully request the Court include language that its ruling on the Bellwether Motion is the final default judgment for purposes of 28 U.S.C. § 1608(e).  The inclusion of such language will alleviate the need for Plaintiffs to wait until the Clerk of Court's entry of each Plaintiff's individual judgment before Plaintiffs can commence service upon Iran, which, in turn, will reduce the amount of lag time between when the Court issues its ruling and when the Bellwether Plaintiffs can submit any damages awards to the Fund.

Without a court judgment specifically including this requested language, the finality of the judgment will remain ambiguous for Fund submission purposes, a circumstance which has led plaintiffs in prior cases to wait for both the court's judgment that listed all plaintiffs' awards and also the individual "judgment in a civil action" forms issues by the Clerk of Court.  *See*, *e.g.*, Affidavit Requesting Foreign Mailing, *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB (D.D.C. Aug. 11, 2023), ECF No. 233.  This process has resulted in the delayed submission of these plaintiffs' claims because the issuance of such individual judgments can take several months from the issuance of the court's omnibus Bellwether Opinion.  *See id.*, Memorandum Opinion, ECF No. 137 (awarding damages to 89 plaintiffs on May 16, 2023); *id.*, Clerk's Judgment in favor of Plaintiff Estate of Kurt E. Zwilling, ECF No. 229 (despite being backdated to June 6, 2023, the final individual judgment was not entered until July 12, 2023, nearly two months after the court's omnibus judgment was issued).  Should this be required, Plaintiffs would then have to have a ruling well before July 1, 2024 in order to make the August 1, 2024 cutoff.

Plaintiffs have included requisite language in the Proposed Order submitted alongside this Memorandum, which would enable Plaintiffs to begin service of Iran immediately upon entry of judgment as opposed to only after the individual "judgment in civil action" forms issue with

respect to each Plaintiff.

### 3.   Judgment Language Specifying Service Should Proceed Under 28 U.S.C. § 1608(a)(4)

Finally, Plaintiffs request that the Court include language in its Bellwether judgment ordering that service on Iran may be effectuated directly under 28 U.S.C. § 1608(a)(4) rather than under the utterly futile process described in 28 U.S.C. § 1608(a)(3), which consistently delays Fund submission by an additional 30 days.

In prior cases, plaintiffs have mailed default judgments to Iran, per 28 U.S.C. § 1608(a)(3), and waited 30 days before initiating State Department service, per 28 U.S.C. § 1608(a)(4). Affidavit Requesting Foreign Mailing, *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB (D.D.C. Aug. 11, 2023), ECF No. 233; *id.*, Affidavit Requesting Foreign Mailing, ECF No. 241 (exemplifying plaintiffs' affidavits requesting foreign mailing via 28 U.S.C. §§ 1068(a)(3) and (4), respectively).   The U.S. District Court for the District of Columbia Attorney Manual for Service of Process on a Foreign Defendant, however, states that the judge "should state specifically which rule to follow" in serving final judgments.   *See* United States District Court for the District of Columbia, Attorney Manual For Service of Process on a Foreign Defendant § VII(B)(1). Moreover, the State Department has stated that proceeding directly to § 1608(a)(4) is appropriate in circumstances such as those Plaintiffs face here:

> As a practical matter, if service has been attempted in accordance with the hierarchical methods set forth in Section 1608(a) in the initial phase of the action (service of the summons, complaint, and notice of suit) without success, necessitating service under Section 1608(a)(4) through the diplomatic channel, when service of a default judgment on the Foreign State becomes necessary, plaintiffs may transmit the request for service through the diplomatic channel to the Department of State, without repeating efforts at service under Section 1608(a)(1)-1608(a)(3).

Ex. 100, U.S. Department of State, Foreign Sovereign Immunities Act – *How do I effect service of a default judgment or other documents?*, https://travel.state.gov/content/travel/en/legal/travel-

189

legal-considerations/internl-judicial-asst/Service-of-Process/Foreign-Sovereign-Immunities-Act.html.  To avoid unnecessary delay and to effectuate an efficient service on Iran, Plaintiffs thus request that the Court orders service under § 1608(a)(4) when entering a final default judgment on behalf of any plaintiff, allowing Plaintiffs' submission of applications to the Fund to begin 30 days sooner, without any prejudice to the Defendant, which would be unsuccessfully served under 28 U.S.C. § 1608(a)(3) in any event.

**IX.    CONCLUSION**

For the foregoing reasons, the Court should issue a final judgment finding that the Defendant Iran is liable for damages to Plaintiffs in the amount specified herein.

Dated:  November 30, 2023          Respectfully submitted,

*/s/ Michael J. Gottlieb*
Michael J. Gottlieb (D.C. Bar No. 974960)
Devin Charles Ringger (D.C. Bar No. 1044160)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1000
Fax: (202) 303-2000
MGottlieb@willkie.com
DRingger@willkie.com

Nicholas Reddick (D.C. Bar No. 1670683)
Willkie Farr & Gallagher LLP
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7400
Fax: (415) 858-7599
NReddick@willkie.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*

191

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of November, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Michael J. Gottlieb*_____
Michael J. Gottlieb