# **Exhibit 177**

UNCLASSIFIED



SSG Melo, Julian
SSG Lynn Poulin

UNCLASSIFIED
~~SECRET//NOFORN~~

# AR 15-6 INVESTIGATION OF FOB MAREZ DFAC BOMBING MOSUL, IRAQ

BG Richard P. Formica
Investigating Officer

Approved for Release

~~SECRET//NOFORN~~

UNCLASSIFIED

UNCLASSIFIED

I.    (U) Background.....................................................................................1

II.   (U) Facts............................................................................................2

III.  (U) Comment on Operational Context..................................................5

IV.   (U) Major Findings and Recommendations...........................................6

V.    (U) FOB Marez Geographic and Demographic Status...........................13

VI.   (U) 248th RAOC Headquarters...........................................................15

VII.  (U) Intelligence..................................................................................20

VIII. (U) Physical Security.........................................................................21

      A. (U) Perimeter Security.................................................................22
      B. (U) Guard Towers.......................................................................24
      C. (U) Entry Control Points (ECP).....................................................25
      D. (U) Quick Reaction Force/Roving Guards......................................29
      E. (U) Access to High Density Areas.................................................30
      F. (U) Force Protection Program.......................................................32
      G. (U) July 2004 Joint Staff Integrated Vulnerability
         Assessment (JSIVA)...................................................................33
      H. (U) Explosives...........................................................................35

IX.   (U) Badges........................................................................................35

      A. (U) Screening Process.................................................................37
      B. (U) Badging...............................................................................41

X.    (U) Accountability and Access of ISF Personnel.................................45

      A. (U) Iraqi Regular Army (IRA)........................................................45
      B. (U) Iraqi National Guard (ING).....................................................47
      C. (U) Facilities Protection Service (FPS)...........................................48

UNCLASSIFIED

UNCLASSIFIED

~~SECRET//NOFORN~~

# I. (U) <u>Background</u>

(S) I was appointed by LTG Thomas F. Metz, Commander, Multi-National Corps-Iraq (MNC-I) on 23 December 2004 to investigate the facts and circumstances surrounding the 21 December attack on the dining facility (DFAC) at forward operating base (FOB) Marez, located in Mosul, Iraq.[1] (Annex A) I was directed to identify the limitations of any force protection measures, policies, or procedures at FOB Marez, to include: 1) the adequacy of force protection measures at high density facilities; 2) entry control point screening and searching; and 3) hiring procedures, background checks, and badging policies and procedures for third country nationals (TCN) and contractors.  I was also directed to make recommendations regarding my findings.

(S) I began the investigation from the premise that this was a suicide bombing from within the DFAC – not an indirect fire attack.  This belief was validated by the preliminary site assessment investigated by the Army's Criminal Investigation Division (CID) and Combined Explosives Exploitation Cell (CEXC). In conducting our investigation I considered three broad possibilities:

- The bomber was not authorized access to the base.  He gained access by violating the perimeter or an entry control point.

- The bomber was authorized access to the base as a local nation (LN) or TCN employee or a vendor/contractor.

- The bomber was authorized access to the base by virtue of his position in one of the Iraqi Security Forces (ISF) operating on the base:  Iraqi Regular Army (IRA), Iraqi National Guard (ING), Facilities Protective Service (FPS).

However he gained access to the base, it appears likely that he accessed the DFAC by wearing an Iraqi Security Force uniform. (Annex D-3)

(S) We therefore, reviewed base physical security, access and badging procedures, and Iraqi Security Force control to identify potential problems that the bomber might have exploited to gain access.  As a starting point, we looked at the base command and control structure and its organization to manage and implement force protection measures.

(S) This investigation focuses on several force protection areas that may or may not have been the proximate cause of the attack on the Marez DFAC.  While I cannot say with certainty how the perpetrator gained access to FOB Marez, the

---

[1] I assembled a team to assist in the investigation including ████(b)(3), (b)(6)████, MNC-I, Effects, Coordination Cell ████(b)(3), (b)(6)████ MNC-I ████(b)(3), (b)(6)████, MNC-I, Security Effects Cell, and ████(b)(3), (b)(6)████ ████(b)(3), (b)(6)████.

1

~~SECRET//NOFORN~~

UNCLASSIFIED
SECRET//NOFORN

areas covered in this report were contributing factors, either separately or in combination, which set the conditions that allowed the perpetrator both access to FOB Marez and DFAC.

(C) There are ongoing investigations by CID and continuing operations by MNC-I units to determine the identity of the bomber. These may provide some insight into how he specifically gained access to the base.   The results of their preliminary reports are considered in this report. (Annex D-4)

## II. (U) Facts

(U) On Tuesday, 21 December 2004, at approximately 1204, an explosion occurred at the dining facility (DFAC) at FOB Marez, in Mosul, Iraq.  At the time of the explosion, the dining facility was serving the lunchtime meal to a crowded facility.  The explosion killed 22 people and injured approximately sixty-nine others.  Those killed by the explosion included 13 US Soldiers, one US Sailor, four US civilians, three Iraqi Regular Army soldiers, and one Iraqi National Guard soldier. (Annexes D-3, D-4)

(S) Initially, the suspected cause of the explosion was an indirect fire attack, possibly by one or more 122mm rockets.  (Annexes D-3, D-4) The Marez DFAC had previously been the target of numerous indirect fire attacks. (Annexes C-83, G-4, G-5)  The suspected cause of the explosion quickly changed, however, upon close inspection of the scene, of the physical factors present, and of the testimony of numerous witnesses.  Several who were there knew immediately that it was not a rocket or mortar attack.  (Annexes C-103, D-4)

(S) Soldiers from the 705th Explosive Ordnance Disposal (EOD) detachment arrived shortly after the explosion, examined the site, and advised that the explosion was not the result of an indirect fire attack. (Annexes D-4, D-5) Numerous ball bearings found at the scene were inconsistent with a rocket or mortar explosion.  (Annex D-3) The effect of the blast at the "seat of the explosion" was very shallow, and inconsistent with a rocket or mortar.  The blast effect, however, was consistent with an improvised explosive device (IED). (Annex D-3) 705th EOD further opined that the hole in the dining facility ceiling was consistent with an internal blast rather than a high explosive projectile. (Annex D-4) Medical personnel also indicated that the nature of the injuries of those killed or wounded was not indicative of injuries normally seen as a result of indirect fire.  (Annex C-103)

(S) On 22 December 2004, the Combined Explosives Exploitation Cell (CEXC) arrived on the scene.  CEXC conducted a forensic sweep.  (Annex D-3)

(S) CEXC confirmed that the bombing was not caused by indirect fire.  No ordnance components were recovered from the scene such as stabilizing fins, the rocket motor, or the fusing system.  The seat of the explosion, the blast, and

2

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

the fragmentation pattern were not consistent with an event involving a rocket or mortar. Specific analysis of the seat of the explosion and the fragmentation pattern indicated that the explosion did not take place directly on the ground. The majority of the fragmentation was directed towards the cafeteria serving line area. (Annex D-3)

(S) CEXC found numerous items at the scene consistent with an IED device. They found components of a 9V DC battery that appeared to have been in contact with detonated high explosive material. This battery type is commonly used to power IEDs. (Annex D-3) They found a small piece of copper resembling a blasting cap section, 243 metal-coated ball bearings, a small spring, and an LED consistent those recovered by CEXC in other IED circuits. (Annexes D-3, N-1, N-2)

(S) In addition to the bodies, numerous body parts were collected.  (b)(6)
(b)(6)
(b)(6)
(b)(6)
(b)(6)
(b)(6)
(b)(6)  the scene have been forwarded to Armed Forces Institute of Pathology (AFIP) for analysis. It is anticipated that a DNA match of the (b)(6)  (b)(6)
(b)(6)  (Annexes D-1, D-2, D-3, D-4)

(S) There were many uniform fragments found in the DFAC. (Annex N-2) The fragments were from the chocolate-chip uniform normally worn by ING and IRA. They were small and burned on the inside indicating that they were part of the uniform worn by the suicide bomber. It is anticipated that DNA extracted from the uniform samples will validate that belief. No blood was found on the uniform's charred sections of material. This indicates that the material was in close proximity to a high explosive event. (Annexes C-34, C-57, D-3, N-3, N-1)

(S) One section of the chocolate chip uniform was recovered with the label still attached. The label contained English text. The recovered label matches labels found on uniforms issued and worn by the 11th IRA Battalion (BN) soldiers. (Annex N-3)

(S) Sections of reinforced canvas material were found in key areas of the DFAC co-located with the blast pattern. CEXC noted that the stitching on the canvas was made by a machine, but appeared to be erratic. The material was consistent with material they have seen in suicide vests. (Annex D-3)

(U) Five days after the explosion, on Sunday, 26 December 2004, the terrorist group, Ansar Al-Sunnah, released a video purportedly showing the attack on the Marez DFAC from outside the facility. The video showed a fireball

3

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

rising from a white tent and subsequently the accompanying sound of the explosion. The final image is apparently shot from a video camera while driving past the base showing the dining facility with a hole in the ceiling. In a separate terrorist video clip released with the dining facility attack video, a black-garbed gunman identifying himself as "Abu Omar al-Mosuli", wearing an explosive device around his body, was shown saying good-bye to his comrades. The video has a time signature of 20 December 2004, the day before the attack. Three gunmen are shown sitting in front of a banner displaying the name of the group, wearing black masks and holding rifles. One of them is wearing what appears to be a suicide belt. The gunman in the center reads a statement describing how the attack will be carried out. He says, "one of the lions from our martyrdom-seeking brothers will infiltrate the defenses of the enemy at Marez base in Mosul. He will slip through a hole in the camp's wire, exploiting the changing of the guard. We have been observing their schedule for a long time. The lion will proceed to his target, and he will take advantage of lunchtime when the dining hall is crowded with crusaders and their Iraqi allies. The operation will then be carried out." (Annex O-1)

(S) 1-24 Infantry Battalion (Stryker) conducted an intelligence assessment of the video. Based on the terrain in the video and time delay in the sound of the explosion on the video, analysts determined the buildings in Mosul from which the Ansar Al-Sunnah video was likely made. On 27 December, they conducted a raid of the location and detained sixteen individuals and located a camera. As of the date of this report, they continue to exploit the detainees and evidence seized in the raid. (Annex G-6)

(S) Given what I found during my investigation, the terrorist group's declaration of responsibility and method of access was plausible.

(S) On 4 January 2005, [ (b)(3), (b)(6) ] [(b)(3), (b)(6)] examined the bodies of the three IRA soldiers killed in the blast. He determined that the nature of their wounds eliminated the possibility that any of them was the bomber. Their bodies were submitted by CID request to AFIP for an autopsy. The results are pending. (Annex D-1)

(S) The ING soldier that was killed was not in a position to have been the suicide bomber. The nature of his wounds was inconsistent with being the bomber. CID released his body to his family. (Annex D-2)

(S) On 7 January 2005, [ (b)(3), (b)(6) ] 133rd EN BN, conducted an analysis and provided an opinion on the body parts found at the scene of the bombing. Two legs were found at the scene that appeared to match and possibly belong to the same person. The legs and feet did not appear to come from any of the bodies of the identified deceased or injured at the scene. He, therefore, surmised that they most likely belonged to the suicide bomber. [(b)(3), (b)(6)] hypothesized that the legs belonged to a person between 160-170



4

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

pounds, between 5'6" and 5'7" in height, and between the ages of 23 and 27. (Annex D-2)

(S) Also found at the scene were two large sections of scalp with singed long black hair, the scalp of which would account for approximately half a cranium. He found that none of the bodies at the scene had hair that length or enough scalp missing to account for this scalp. [(b)(3), (b)(6)] surmised the scalp sections belonged to the bomber. The complete forensic analyses are not included in this report. They will be incorporated into the CID investigative report. Preliminary DNA Results provided by AFIP to [(b)(3), (b)(6)] do corroborate his assessment. (Annex D-2)

(S) He indicated that he believed the bomber was sitting at the time of the blast with his feet tucked up under the chair with heels upward and that his head was slightly bent in a praying position at the time of the blast. He determined that the bomber's head was completely detached and blown into multiple pieces as a result of the blast. The scalp portions with singed hair place him within the fireball area. (Annex D-2)

(S) Two anecdotal reports from soldiers from the 11th IRA battalion indicate that they saw what they described as an Iraqi in IRA uniform, without helmet and body armor, entering the DFAC with three ING soldiers. (Annex D-4) They noticed him because the absence of the helmet and body armor made him stand out from the other IRA soldiers. A Kellogg, Brown and Root (KBR) service worker said that she saw three ING soldiers in the line just before the blast. (Annex C-53) A US soldier who survived the attack reported to me that his buddy who was killed by the blast, noticed an Iraqi in uniform. He commented that there must be a new Iraqi uniform SOP, indicating that he saw something different. Unfortunately, as the surviving soldier looked up to see, the blast occurred. (Annexes C-97, C-100)

(S) I find it more likely than not that the bomber entered the DFAC by wearing an IRA uniform. It is possible that he entered the DFAC just after 1200, perhaps in the midst of the three unidentified ING soldiers.

## III. (U) Comment on Operational Context

(U) Mosul is Iraq's second largest city. It's predominantly Sunni, but is a key economic component of the Kurdish dominated region. Governance, economy, and social conditions were progressing ahead of much of the country.

- (S) Conditions in the northern region had progressed to the point that it was determined by the Commander, CJTF-7, to be an acceptable risk to reduce the size of the Coalition presence from a US Division to a smaller Task Force built around a Stryker Brigade Combat Team (SBCT).

5

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

○ (U) Task Force Olympia (TFO), commanded by BG Carter Ham, assumed responsibility for MNB-NW upon Transfer of Authority (TOA) with the 101st Airborne Division (Air Assault) in February 2004. The SBCT provided TFO its principal combat capability.

○ (C) It was anticipated that conditions would continue to improve in the Mosul area and that ISF would assume a greater role in security of the area.

○ (S) As conditions warranted, the SBCT provided combat capability for the Corps Operational Reserve for short-term requirements in other areas of Iraq. On short notice in August, a battalion from the SBCT was deployed out of sector. It conducted combat operations in Al Kut. They were relocated to Baghdad as the Operational Reserve.

○ (S) The threat situation in Mosul had worsened. It became necessary to return the Corps Reserve Stryker battalion from Baghdad to Mosul in November 2004.[2]

○ (S) In the fall of 2004, coincident with Corps operations in Fallujah, the AIF in Mosul posed an increased threat. Zarqawi operatives and former regime elements operated out of Mosul. Attacks against Iraqi civilians, government officials, and ISF rose dramatically, as did attacks against coalition forces. The AIF launched a substantive intimidation campaign.

○ (S) During Ramadan in October and November of 2004, the AIF threat and intimidation campaign caused many local workers to discontinue their employment on Coalition FOBs. ISF and FPS experienced rising AWOL rates; much of the contract work on FOBs was disrupted.

○ (S) Over a period of two months, beginning in November and as of 21 December, there were 242 dead bodies found in Mosul: 165 unidentified, 36 ISF, 5 Kurds, and 6 TCNs. They were the victims of execution-style murders that were part of the AIF intimidation campaign. (Annex G-9)

○ (S) By December, the Corps sent reinforcement Coalition forces and ISF to bolster Mosul security, regain the initiative, and reduce force protection risks.

## IV. (U) Major Findings

1. (S) A suicide bomber carried out the 21 December 2004 bombing of the Marez DFAC. The bomber's identity and how he obtained access to the base is not yet determined; he entered the DFAC wearing an IRA uniform. (Annexes D-3, N-1)

---

[2] On 18 October 2004, 1-23 IN was relieved in place by 1-5 IN.

6

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

2. (S) There are three broad possibilities of how he obtained access to the base:

- Not authorized access (violated the perimeter)
- Authorized access (badged civilian employee/vendor)
- Authorized access (member of an Iraqi Security Force)

3. (S) FOB Marez is a large base and difficult to secure. It had essential force protection systems in place, however, there were seams in execution that could be exploited.

**4. (U) Base Command and Control**

- (S) The 248th RAOC (WAARNG) was assigned as the command and control element for FOB Marez. They assumed their duties in late September 2004. In late November, their duties expanded to include LSA Diamondback. (Annexes C-46, F-2)

- (S) This was an appropriate mission for a RAOC, but its 18 person staff was not sufficient to meet the numerous mission requirements. (Annex C-46)

- (C) The disciplined execution of basic FP tasks requires emphasis by all of the tenant units on FOB Marez.

- (S) The command and control relationship of the RAOC with the tenant units wasn't clearly defined. The HQ had no tasking authority and acted primarily as a coordinating HQ. The RAOC depended on units to assume ownership of assigned areas of responsibility for the force protection (FP) status of base common areas. It relied on TFO for tasking authority, even for routine requirements. (Annexes C-9, C-13, C-31, C-43, C-44, C-45, C-47, C-46, C-48, C-56, C-89, C-90)

- (S) Tenant units were fully engaged conducting combat operations in Mosul and executing mission essential tasks on FOB Marez. Vigorous prosecution of offensive operations was the single most important contribution the units made to provide base force protection. (Annexes C-13, C-47, C-48, C-56)

- (S) The tenant units focused their attention outside the wire on combat operations. It was on these operations that they concentrated their troop to task requirements. But they invested approximately 369 soldiers a day for force protection at FOB Marez. (Annexes C-13, C-48, C-56, M-7)

- (C) Most units built battalion FOBs within FOB Marez to ensure battalion force protection. They also tended to defer responsibility for FOB Marez force protection tasks to the RAOC. (Annexes C-9, C-13, C-48, C-62, C-89)

7

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

○ (S) Intelligence available to MNB-NW, 1st SBCT, 25th ID, the RAOC, and the tenant units did not warn of a suicide bomber threat to FOB Marez or the DFAC. The threat focus for that area prior to the bombing was on suicide VBIEDs and indirect fire. (Annexes C-15, C-83, G1-G5, G-7)

**5. (U) Physical Security**

○ (S) The base is secured by a chain link fence. That fence is reinforced by berms and/or concertina wire around 60% of the perimeter. The fence line was not augmented with passive measures. (Annexes C-98, C-99, D-7)

● (S) The command had identified areas that required improvement; three MILCON force protection related projects had been submitted and approved for FY05. (Annexes M-5, M-6)

● (S) There were five breaches in the fence line of the Ammunition Supply Point (ASP) in the southern part of FOB Marez on 28 December. (Annex N-4)

● (S) Guard towers overlooking the perimeter were manned by US Soldiers and FPS. Disciplined execution of tower guard duty needs to be emphasized. (Annexes C-89, C-9)

● (S) The method used to bring in explosives onto FOB Marez is not known. It is possible that it could have been carried in a gate undetected, tossed over the perimeter fencing, or walked through in breaches in the fencing in the ASP area.

● (S) The internal Quick Reaction Force (QRF) conducted occasional roving patrols. (Annexes C-13, C-20)

● (S) Access to the Marez DFAC was not strictly controlled. <u>Military headcounts were not always present</u>. Based on a given threat assessment, added force protection measures were implemented. This was most recently done in October and November 2004, during Ramadan. There were no additional force protection measures in place on 21 December 04. (Annexes L-2, C-2, C-26, C-43, C-45, C-96)

● (S) A Joint Staff Integrated Vulnerability Assessment (JSIVA) of FOB Marez was conducted in July 2004. The previous base command headquarters developed a corrective action plan and initiated corrective actions for several areas. Some of the corrective actions had not been fully implemented by December. (Annexes M-5, D-6)

● 248th RAOC staff did not have Level Two AT training. (Annex C-98)

● **(S) The suicide bomber could have obtained access to the base through the perimeter.**

8

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

**6. (U) Security Screening and Badging**

- (S) FOB Marez requires badges to obtain access.  There was a system in place to issue and control badges.  The FOB Marez SOP dated 26 August 2004 was thorough.  Execution of duties associated with the badge processes and procedures was not always adequate.  (Annexes E-2, E-8, C-69, C-70)

- (S) TFO Badge and Access SOP dated October 2004, was not yet implemented at the time of the bombing.  (Annexes C-69, C-70, C-86, E-8)

- (S) There was a disproportionate share of green (no escort) badges issued. Enforcement of the badging SOP was inconsistently applied.  (Annexes C-16, C-31, C-69, C-70, H-7)

- (S) Some units did not positively hand off responsibility for badged employees during RIP/TOA. (Annexes C-48, C-69, C-70)

- (S) The security screening process for locally employed personnel (LEPs) was immature.  Screeners on the base had limited access to a common database. (Annexes C-1, C-6, C-19, C-32, C71, C-92, C96)

  - Not all employees with badges were screened.
  - ING/IRA records indicate they were not screened.
  - Most FPS were screened.

- (S) Biometric Automated Tool Set (BATS) was available to screeners but was only local in nature and was not connected to the central BATS system. (Annexes C-1, C-6, C-19, C-32, C71, C-92, C96, M-4)

- **(S) The bomber could have obtained access to the base by having an issued access badge.**

**7. (U) Iraqi Security Forces**

- (S) ISF are integrated forces at FOB Marez as a Coalition base.

  - (S) There is an ING compound adjacent to the base that afforded access to LSA Diamondback, adjacent to FOB Marez.  A company of ING occupied a second compound in the ASP in the southern of part of FOB Marez. (Annex M-1)

  - (S) 11th IRA Battalion (BN) occupied a compound within FOB Marez (across from the DFAC) separated by a gate controlled by an IRA soldier. (Annex M-1)

9

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- (S) FPS occupy a compound on LSA Diamondback. They were integrated into the security force at FOB Marez and LSA Diamondback and they had access to the base with an FPS ID Card. (Annex M-1)

- (S) Coalition unit liaison teams and Advisor Support Teams (AST) executed physical control of ING/IRA personnel through their presence. Controls of ING and IRA appeared adequate. Accountability and physical control of FPS was attempted by one senior NCO from the RAOC. This was inadequate. (Annexes C-9, C-10, C-11, C-18, C-21, C33, C-34, C-48, C-57, C-61, C-60, C-72, C-80, K-1, K-2)

- (S) ISF were afforded access to the DFAC alongside Coalition forces as a part of their integration. (Annexes C-48, C-80)

- (S) Large numbers of AWOL soldiers and turbulent leave practices make true accountability of the ISF difficult to achieve. At best, accountability is day to day It is primarily the responsibility of the ISF chain of command to achieve accountability; ISF are supervised by the ASTs and liaison teams. (Annexes C-9, C-10, C-11, C-18, C-21, C33, C-34, C-48, C-57, C-61, C-60, C-72, C-80, K-1, K-2, K-2, K-1)

- **(S) The bomber could have obtained access to FOB Marez as a member of ISF, but this possibility is least likely of the three. Based on the evidence, he obtained access to the DFAC by wearing an IRA uniform.**

## (U) Recommendations

### (U) Base Command and Control

- (S) Continue to assign a dedicated headquarters to command and control FOB Marez/LSA Diamondback.

- (S) Ensure staff meets troop to task requirements for integrated force protection and mayoral duties.

- (S) Establish a clear relationship between the RAOC and its tenant units.

  - Empower the RAOC to task within an established threshold
  - Empower the RAOC to set and enforce FP measures

### (U) Physical Security

- (U) Validate and balance standing FP manning requirements with the SBCT troops to tasks requirements for combat operations.

10

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

- (S) Sustain ownership and continuity of ECPs.

- (S) Develop ownership and continuity of guard towers.

  - (S) Affix responsibility for assigned sectors to maintain fence line and towers
  - (S) Establish long term, battalion level ownership
  - (S) Assign soldiers to specific towers for 60-90 days at a time for continuity
  - (S) Ensure disciplined execution of guard/ECP/search duties
  - (S) Increase senior leader supervision

- (S) Fund approved construction projects for FY05 in order to improve the fence line, establish passive measures, and improve ECPs.

- (S) Review entry control points and closely relook the integration of LSA Diamondback's West gate and FOB Marez's C Gate.

- (S) Allow DFAC access only to authorized individuals. Enforce with military headcount all the time and with guards as force protection posture dictates.

- (S) Base commander should create a formal Mission Essential Vulnerable Assessment (MEVA) list and determine appropriate FP measures. Assign long term FP responsibilities to a designated unit for ownership and continuity for high-density areas to include the DFAC, fitness facility, MWF facility, and the post-exchange.

- (S) Mobile training teams should provide Level Two AT training to those units already in theater. Units designated to deploy to Iraq that will have base protection responsibilities should deploy with Level two AT trained staff.

### (U) Security Screening and Badges

- (S) Assign sufficient HSTs for workload at FOB Marez/LSA Diamondback to conduct both LEP security screening and an active Counter-Intelligence program.

- (S) Field BATs to THTs/HSTs and ensure SIPR connectivity.

- (S) Tighten control of all badges at the base level.

  - (S) Conduct PAI of badged employees monthly per FOB Marez SOP.
  - (C) Ensure positive handoff of badged employees between units during RIP/TOA.

11

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- ○ (C) Continue physical controls of active badged employees by unit representatives.
- ○ (S) Re-issue new TFO badges to security screened employees.

### (C) Iraqi Security Forces

- (S) Establish an MNF-I/MNCI policy governing ISF access to Coalition bases and facilities.

- (S) Retain emphasis on building credible ISF. Strengthen US / ISF trust and do not step back from integration efforts, but maintain accountability and physical controls.

  - (S) Sustain 1-5 IN relationship w/11th IRA Battalion
  - (S) Sustain 1-24 IN relationship with 106th ING Battalion
  - (S) Establish similar unit partnerships with FPS at FOB Marez and LSA Diamondback
  - (S) Security screen all ISF (IRA/ING/FPS) that will reside on US/Coalition FOBs

### (S) Accountability

(S) Because we cannot determine how the bomber accessed the base, the evidence did not establish proximate cause for this incident. Rather, the evidence establishes a series of problems that were contributing factors, separately or in combination, leading to the circumstances that enabled an unauthorized access to occur.

- TFO made a positive step by assigning the 248th RAOC to command and control FOB Marez and LSA Diamondback. TFO was, however, ultimately responsible for the RAOC's command relationship with tenant units and for assigning it duties it was not resourced to perform.

- The 296th BSB (3rd SBCT, 2ID), the 248th RAOC and the tenant units share responsibility for the lapse in controls of the badging process; the failure to properly account for badges during RIP/TOA; and the lack of monthly reconciliation of badged employees.

- The two SBCTs share command responsibility for the failure to account for badges during RIP/TOA.

- The 248th RAOC and the tenant units share responsibility for not consistently executing tower guard and ECP duties to standard, and for allowing five undetected breaches of the perimeter.

12

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

- The 248th RAOC commander and the commander of 1-24 IN share responsibility for not ensuring <u>a military headcount</u> was on duty at the DFAC the week of 19 December 2004.

- The TFO DCO supervised the 248th RAOC in the execution of its duties and was responsible for ensuring AT/FP issues were addressed.

(S) There were mitigating factors that come into play:

- The OPTEMPO and troop to task requirements of combat operations
- The availability of FPS
- The October relief in place of 3rd SBCT, 2ID with 1st SBCT, 25th ID.
- Like all units in theater, the 248th RAOC was inexperienced in commanding and controlling a FOB of this nature, and the unique challenges associated with employing local national workers. In two months, the unit had made positive improvements in several areas.

(S) Since proximate cause could not be established, and given these mitigating factors individual culpability cannot be determined. Nonetheless, commanders at all levels are ultimately responsible for ensuring execution to standard.

## V. (U) <u>FOB Marez Geographic and Demographic Status</u>

(U) FOB Marez is located at the southern edge of Mosul, Iraq. It originally served as the Iraqi Republican Guard Fifth Corps Headquarters and the structures were built in the mid 1980s. TFO now uses the facility. (Annexes M-1, M-2)

(S) FOB Marez consists of two areas: the cantonment area and the Ammunition Supply Point (ASP). <u>The cantonment area encompasses 3.4 kilometers and has a perimeter of 8.6 kilometers and consists of over 300 buildings, such as barracks, administrative buildings, dining facilities,</u> theatre, etc. <u>The ASP has an external perimeter of 14.1 kilometers (not including the boundary with the cantonment area), and the Ammunition Holding Area (AHA) encompasses 9.8 square kilometers within the ASP.</u> (Annex M-1)

(S) The ASP lies immediately to the south of the cantonment area and is bordered by open land on all sides. The ASP area contains 65 ammunition bunkers, warehouses, bunkers and earthen revetments throughout the ASP, most of which have been cleared and sealed by EOD. Tenant units currently use an area just west of the ASP as a firing range. The ING also has a compound adjacent to the ASP. FPS and US Forces guard the ASP. (Annex M-1)

13

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

(S) LSA Diamondback lies adjacent to the eastern border of the Marez cantonment area. The area immediately north of the FOB Marez was once part of the former Iraqi base but now lies in ruins and is occupied by Iraqi locals. Highway 1 (Main Supply Route (MSR) Tampa) runs the western border of the facility. The land west of MSR Tampa is open. (Annex M-1)

(S) The total population of FOB Marez is 4,214 personnel, comprised of approximately 3,108 US military, civilians, and Coalition partners, 205 ISF, and 901 Contractors. (Annex M-2) The major tenant units include:

- 1-5 Infantry Battalion, 1-25 SBCT, TFO
- 1-24 Infantry Battalion, 1-25 SBCT, TFO
- Elements of HHC, 3-21 Infantry Battalion, 1-25 SBCT, TFO
- 25th Brigade Support Battalion  (BSB), 1-25 SBCT, TFO
- 276th Engineer Battalion, 1-25 SBCT, TFO
- 133rd Engineer Battalion (-), TFO
- 73rd Engineer Battalion, 1-25 SBCT, TFO
- B Company, 115th Signal Company, 1-25 SBCT, TFO
- 744th EOD Company
- 194th Long Range Surveillance Detachment
- Radar Section from A/2/131st FA Battalion (-), TFO
- ODA 052, CJSOTF-AP
- A Co., 106th ING Battalion
- 11th IRA Battalion

(S) LSA Diamondback (also known as Mosul Airfield) is located immediately south of the city of Mosul and one kilometer west of the Tigris River. The facility serves as a major logistical center and APOD for MNC-I. It has a total population of approximately 4,609 personnel comprised of 2,808 US military, civilians, and Coalition partners, 173 ISF, and 1,628 contractors. The major units currently on LSA Diamondback include (Annex M-2):

- 17th Corps Support Battalion
- 67th Combat Support Hospital   (TOA with 228th CSH on 2 Jan 05)
- Elements of the 293rd MP Battalion
- Elements of the 107th FA Battalion, (retrained as MPs)
- 401st Transportation Company
- 367th Transportation Company
- Elements of the 160th Special Operations Aviation Regiment
- 194th Long Range Surveillance Company
- THT, 310th MI Company,
- 330th Military Police Detachment, TFO
- 426th Civil Affairs Battalion, TFO

14

SECRET//NOFORN

Approved for Release

UNCLASSIFIED

~~SECRET//NOFORN~~

# VI. (U) 248th RAOC Headquarters

(S) I addressed three areas concerning the command and control structure that existed on 21 December 2004. First, the 248th RAOC lacked the command authority to effectively influence tenant units to support force protection requests. Second, 248th RAOC was not staffed to effectively handle all the missions it was assigned. Third, there were policies and procedures that were not consistently applied by units on the FOB. I address each of these areas and make specific recommendations for each.

## A. (U) Headquarters Command and Control Structure

(S) On 21 December 2004, FOB Marez installation command was exercised by the 248th RAOC (WAARNG); the ⬚⬚⬚ (b)(3), (b)(6) ⬚⬚⬚ and the Operations ⬚⬚⬚ (b)(3), (b)(6) ⬚⬚⬚ Annexes C-10, C-46)

(S) The 248th RAOC was mobilized on 5 December 2003 and deployed to theater on 20 February 2004. They arrived in Iraq on 23 March 2004. The RAOC deployed at 100% of authorized strength with 27 soldiers. It was assigned to TFO to provide command and control at Habur Gate at the Iraqi and Turkey border. That mission required the ⬚⬚⬚ (b)(3), (b)(6) ⬚⬚⬚ and eight of their soldiers. The remaining members of the unit were dispersed among the TFO staff or were used as Liaison Officers (LNO). (Annexes C-69, C-89)

(S) During the 3d Stryker Brigade Combat Team (SBCT), 2d Infantry Division (ID) deployment with MNB-NW, the 296th Brigade Support Battalion (BSB) exercised command and control of FOB Marez while concurrently performing its primary mission of sustainment support to the SBCT. When 3/2 SBCT conducted its relief in place/transfer of authority (RIP/TOA) with 1st SBCT, 25th IN, Brigadier General (BG) Carter Ham, Commanding General (CG), TFO and MNB-NW, opted to consolidate the 248th RAOC and assigned it garrison command duties at FOB Marez. At that time, 248th RAOC was able to consolidate 18 of its 27 deployed soldiers at FOB Marez for this new mission.[3] (Annexes C-31, C-46, C-47)

(S) In November 2004, the 116th RAOC, which had been performing the garrison function at LSA Diamondback, was reassigned to perform garrison command duties at FOB Endurance. The 248th RAOC expanded its mission to include LSA Diamondback. (Annexes C-46, C-47)

(S) The 248th RAOC's mission was to provide command and control to FOBs Marez and Diamondback in order to provide integrated force protection and execute mayoral duties. (Annexes C-31, C-46, C-47)

---

[3] Two soldiers had been ⬚ (b)(6) ⬚ redeployed; three soldiers met their two year mobilization limit; and four remained tasked to TFO for duties within MNB-NW.

15

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

(S) The 248th RAOC's duties included:

Force Protection (Annexes C-43, C-44, C-45, C-46, F-2):

- o   Managing Force Protection Operations Center (FPOC)
- o   Providing base Sergeant of the Guard (SOG)
- o   Supervising unit SOGs
- o   Integrating towers/Entry Control Points (ECPs)
- o   Establishing standardized base procedures
- o   Directing and implementing Base FP policies and posture

Mayoral duties (Annexes C-43, C-44, C-45, C-46):

- o   Internal base administration
- o   Contracting and construction
- o   Managing the Base master plan
- o   Managing department of public works
- o   Real estate management
- o   Badging/access
- o   Protocol

(S) To execute these duties the RAOC was organized as follows (Annexes C-46, F-2):

Command section (1)
Force protection Ops center (11)
Mayor – Marez (5 + 3(+/-) augmentees)
Mayor – Diamondback (4 augmentees)

(S) The RAOC supervises force protection on FOB Marez directly through the FPOC.  At LSA Diamondback it does so through the 17th CSB that directly supervises FP activities there.  (Annexes C-46, C-47, C-54, E-14) Specifics regarding the execution of force protection tasks are discussed further in Section VIII.

(S) The RAOC's doctrinal mission is to coordinate defense for a base cluster of units positioned in a Corps rear area.  The 248th RAOC has no CSM or SGM. It must coordinate with brigade and battalion command sergeants major with a 1SG.  When he was committed to other tasks, a SFC, Sergeant of the Guard assumed that role.  The RAOC has no plans officer.  One major was diverted to augment the austere TFO staff.  With no CSM/SGM, no plans officer and 18 soldiers, the RAOC was challenged to accomplish its assigned tasks. (Annexes C-9, C-20, C-31, C-46, C-66, C-89, C-90)

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

(S) Command and control relationships were not clearly established. MNB-NW FRAGO 069 assigned the RAOC as the installation command element, but its authorities and relationship with tenant units on the base were not clearly defined. Most tenant units belong 1st SBCT, 25th Infantry Division. Their assigned tactical mission was to conduct combat operations in Mosul. (Annexes C-13, C-56, C-46, C-47, C-48, F-2)

(S) In order to conduct force protection at FOB Marez, the RAOC provided the HQ; the tenant units had to provide the manpower. To accomplish this, responsibility for the towers and entry control points (ECPs) was assigned to the tenant units. The RAOC was responsible to integrate the FP plan among these units. (Annexes C-28, C-31, C-46, C-47, C-89, C-90)

(S) In order for this arrangement to work effectively, the RAOC HQ had to be robust enough to accomplish its assigned and implied tasks; it had to have adequate resources to execute the FP tasks or authority to task tenant units for resources (within established parameters); and, it had to have clearly defined policies and procedures that could be applied consistently by tenant units. Based on my assessment, I find that it was lacking to one degree or another in each of these areas for several reasons. (Annexes C-13, C-31, C-46, C-47, C-89, C-90)

(S) In the three the months that it had the mission, the RAOC had instituted systems to improve force protection in several areas. Those systems were neither mature nor fully implemented on 21 December 2004. (Annexes C-46, C-89)

### B. (U) 248th RAOC Headquarters and Tenant Units

(S) The RAOC was a command and control headquarters element. (Annex F-2) It relied on tenant units for the vast majority of its manpower to execute FP tasks. (Annexes C-46, C-47, C-89, C-90)

(S) Responsibility for the four common ECPs was assigned to the following units:

- A Gate:  133rd EN  (Annexes C-24, C-46, C-62, N-4)
- B Gate:  276th EN  (Annexes C-46, C-62, C-95, N-4)
- C Gate:  25th BSB (Annexes C-4, C-14, C-46, N-4)
- Stryker Gate: 1-24th IN (Annexes C-9, C-27, N-4)

(S) Guard tower assignments were also established, but they changed frequently as units adjusted their troop to tasks requirements coincident to combat operations in Mosul. (Annex C-4, C-9, C-90) This was, in part, the result of 1-23 IN departure from FOB Marez as the Corps Reserve and was also impacted by FPS reliability and availability. These reassignments of tower

17

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

responsibilities were managed through the twice-weekly FP meetings held by the RAOC. (Annexes C-9, C-27, C-28, C-48, C-59)

(S) To manage the myriad of FP tasks and to coordinate efforts among the tenant units, the FP cell hosted force protection meetings twice weekly. (b)(3), (b)(6) (b)(3), (b)(6) the RAOC's (b)(3), (b)(6) ran the meetings. Attendance was consistent, however, the unit representatives were usually company grade officers or senior NCOs. In discussions about force protection, units consistently referred to these bi-weekly FP meetings, but these meetings appear to have been effective only for coordinating routine activities. (Annexes C-9, C-12, C-46, C-59, C-72, C-89, C-90)



(S) The RAOC staff relied on tenant units to cover identified requirements, or to accept short-term FP tasks. While all units had to balance their operational mission tasks with FP tasks, the maneuver units were conducting combat operations in their battlespace and were providing force protection for combat outposts in the city. In this regard, robust combat operations in Mosul were maneuver unit's most meaningful contribution to FOB force protection. As a result of combat missions, maneuver units would frequently be unwilling and unable to accept FP or mayoral taskings from the RAOC and would voice this at the FP meetings. (Annexes C-9, C-12, C-13, C-27, C-46, C-47, C-48, C-56, C-67, C-68, C-95)

(S) The troop-to-task ratio for FOB Marez FP was approximately 369 soldiers for a 24-hour period in December 2004. The FPOC broke them down into three, eight-hour shifts of 123 soldiers. Tenant units on Marez were tasked by the RAOC based on their total number of personnel and mission. The units would find the existing operational tempo difficult to maintain at times while still providing necessary personnel to the RAOC.[4] (Annexes C-27, C-46, C-47, M-7)

(S) Units would often tell the RAOC that in order to balance their mission requirements, FOB force protection and mayoral taskings would have to come from their parent brigade headquarters rather than from the RAOC. In principle, this is understandable, but in practice, this created an environment in which the RAOC had no leverage with the tenant units. The RAOC would have to request that TFO task the brigade, in order to task the unit. While this may be acceptable for major requirements, this was not effective for routine taskings. (Annexes C-9, C-46, C-47, C-66, C-67)

(S) As a result, the RAOC would often either have to find another unit to accept the tasking, accept a lesser solution, or allow the tasking to go unfilled. It

---

[4] Most tenant units developed their own perimeters within the existing compound (FOB within a FOB). This is a sound practice as it creates secondary echelons of protection. The units, however, should not allow internal perimeter manning to degrade support to the RAOC for base defense.

18

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

does not appear that an effective forum existed to address these kinds of issues at another level above the FP meeting, short of going to TFO. This should not have been necessary to resolve daily issues that should be resolved among FOB Marez units. While it was not the proximate cause of the bombing, it is notable that due to this, there was no military headcount on duty at the DFAC the week of 19 December 2004. (Annexes C-13, C-46, C-66, C-47)

(S) Given the balance between force protection tasks and the requirements to conduct combat operations in Mosul, TFO needs to establish a viable mechanism to enable the 248th RAOC to resolve routine issues on the FOB. (Annexes C-46, C-47)

## C. (U) Policies and Procedures

(C) To successfully integrate the activities of the tenant units, clearly defined and easily understood policies and procedures must be in place. The FOB Marez had an effective FP SOP. The TFO badge and access SOP was issued in October to standardize procedures throughout MNB-NW and to implement MNC-I policies. TFO badge SOP had not been fully implemented at FOB Marez and LSA Diamondback by December 2004. (Annexes E-1, E-2, E-8)

Recommendations:

- o (C) Continue to resource FOB Marez/Diamondback with a dedicated installation HQ whose duties are principally force protection and mayoral.

- o (C) Empower the RAOC to task tenant units for immediate, short-term requirements and to task long range, routine requirements within a defined threshold to accommodate operational requirements.

- o (C) Establish a mechanism by which the RAOC commander can interact directly with tenant XO/CSMs (if not BN commanders) to resolve issues that the FP meeting could not resolve which do not merit MNB-NW involvement.

- o (S) Review the standing FP requirements for both Marez and LSA Diamondback and validate their allocation of tenant units.

- o (S) Prioritize installation force protection requirements based on troop availability and mission criticality. Ensure the HQ has sufficient staff to meet minimum troop-to-task requirements. The 2-180th FA Battalion is replacing 248th RAOC in February 2005. It will have a HQ staff of 44.[5] This will alleviate some of the challenges experienced by the 248th RAOC.

---

[5] HQ - 4 personnel, Mayor cell - 19 personnel, Force Protection - 21

19

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- ∘ (S) Establish a forum to integrate FOB Marez and LSA Diamondback FP requirements on a regular, recurring basis.

## VII. (U) <u>Intelligence</u>

(S) I examined the intelligence available to TFO, 1 SBCT, 25th ID, the FOB Marez tenet units, and 248th RAOC to determine if there was a credible intelligence report in the days preceding the bombing of a suicide bomber was a threat to the FOB Marez DFAC. I also reviewed the intelligence gathering, analyzing and disseminating responsibilities at FOB Marez to determine if the process somehow contributed to the lack of advance warning of the bombing. I found no specific intelligence threat warning to indicate the threat of a suicide bombing to the FOB Marez DFAC on that day. That said, the process to analyze and disseminate the intelligence on FOB Marez is not well-defined. (Annexes C-12, C-30, C-38, G-4, G-5, G-7, G-8)

(S) 248th RAOC had two soldiers assigned intelligence responsibilities, a CPT and a SSG. They served as night battle captain/NCO for the FPOC. Their intelligence related duties included collection and dissemination of SIGACT information during the night shift.[6] The 248th RAOC relied on TFO to provide intelligence analysis and threat warnings. (Annexes C-12, C-30)

(S) Nightly Intelligence Working Groups were conducted by 1 SBCT, 25th ID via MIRC. The 248th RAOC did not routinely participate. The TFO G2 routinely passed intelligence about MNB-NW AOR and FOB Marez to the 248th RAOC. The 248th RAOC provided SIGACT information received from FOB Marez perimeter towers and ECPs to 1 SBCT, 25th ID and TFO. (Annexes, C-12, C-15 C-30, C-38)

(S) A review of the intelligence in November and December 2004 revealed that the overarching threat to FOB Marez during that time based on credible threat warnings was a Vehicle-Borne or Vehicle-Carried Improvised Explosive Devices (VBIED/VCIED). This threat of VBIED/VCIEDs, coupled with a marked increase in insurgent operations in Mosul required the maneuver units to focus intelligence assets outside of the FOB. (Annexes C-38, G-1, G-2, G-3, G-7)

(S) An intelligence report, dated 8 December 2004, identified a group of 15 suicide bombers, assessed to be associated with the employment of

_____

(b)(3), (b)(6) was the 248th RAOC (b)(3), (b)(6) , with his primary mission being Operations. He estimated spending 10-20% of his time focused on intelligence and the remainder involved with Operations. (b)(3), (b)(6) was the 248th RAOC (b)(3), (b)(6) He estimated that he spent 4 hours per night reviewing intelligence information from TFO and FOB Marez tenant units, however spent the majority of his time focused on Operations. Neither individual conducted Intelligence Analysis or produced Threat Analysis products for FOB Marez. Both had routine access to TFO and 1 SBCT, 25th ID Intelligence Websites via SIPRNET and did state that they visited these sites during routine performance of their duties.

20

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

VBIED/VCIEDs, operating within the Multi-National Brigade Northwest. This report was deemed unreliable due to the source. (Annexes G-3, G-11)

(S) A review of the intelligence for the 10 days prior to the bombing revealed an indirect fire threat to the FOB Marez DFAC, but not a suicide bombing. HUMINT and SIGINT confirmed the threat, noting increased operations of Anti-Iraqi mortar teams working in close proximity of the Baghdad Traffic Circle, Mosul. There were reports of personnel maintaining surveillance of FOB Marez; however, the specified target was Stryker vehicles exiting the FOB. (Annexes G-5, G-4)

(S) It is notable that the 1 SBCT, 25th ID Commander was about to increase Force Protection measures for his subordinate units in preparation for the upcoming holiday period. This was not, however, in reference to any specific intelligence threat to FOB Marez. It was to be implemented on 22 or 23 December 2004. (Annex C-13)

**(U) Findings**

- (S) No specific intelligence threat warning indicated a suicide bombing at the FOB Marez DFAC on 21 December 2004. (Annexes G-1, G-2, G-3, G-7, G-8)

- (S) The overarching threat to FOB Marez during that time was the threat of a Vehicle-Borne or Vehicle-Carried Improvised Explosive Devices. (Annexes C-38, G-1, G-2, G-3)

- (S) While not related directly to a suicide bomber attack, an increased Force Protection Posture (due to the indirect fire threat) may have mitigated the damage inflicted by the suicide bomber at the DFAC. (C-13)

**(U) Recommendations**

- (S) Properly organize intelligence personnel within the RAOC to cover both day and night shifts.

- (S) Ensure intelligence personnel and products are integrated into FP working group meetings.

- (S) Ensure intelligence personnel participate in higher headquarters intelligence forums and actively monitor adjacent commands' intelligence forums.

## VIII. (U) Physical Security

(S) FOB Marez is a difficult base to secure. In trying to determine how a suicide bomber could have gained access to FOB Marez and subsequently, the

21

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

Marez DFAC, we examined the physical security of FOB Marez and the FP procedures and processes in place on 21 December 2004 to find potential gaps. It is possible that the suicide bomber located gaps in the perimeter defenses that allowed him to breach the perimeter on the day of the bombing and gain access to the FOB. The bomber may or may not have carried the explosives onto the FOB with him the day of the bombing. I identify the potential seams observed and make specific recommendations to address each in order to minimize the possibility of exploitation of these areas in the future.

## A. (U) Perimeter Security

(U) The most basic tenet of physical security is securing the perimeter from an enemy breach. Many aspects of perimeter security, when combined effectively, provide effective security.

(S) A perimeter fence secures FOB Marez. The existing fence is old and in some areas requires repair. These areas appear to be easily breachable by personnel on foot.[7] On 28 December, we inspected the perimeter and discovered five breaches in the ASP fence line. Four of the breaches were deliberately cut and one area of fence appeared to have been damaged from a vehicle crash from the Marez side of the fence.[8] The fence line also contained several gaps large enough to allow a person to crawl under the wire.[9] Approximately 60% of the perimeter is reinforced with triple strand concertina wire on either the outside or inside of the main perimeter fence. (Annexes C-98, C-99, D-7, N-4)

(S) The 248th RAOC previously recognized that the fence was old and in need of improvement, and sought approval to upgrade it. A MILCON project for FY05 was approved to upgrade the fencing around the ASP. (Annexes M-5, M-6)

(S) FOB Marez has no Electronic Early Warning (EEWS) and no perimeter cameras. Overwatch of the FOB perimeter is left to soldiers in the guard towers. As an augmentation, a JLENS RAID system, is being installed to improve FOB overwatch. A MILCON project approved for FY05 includes emplacing high intensity lighting and, an alert and camera system. (Annexes M-5, M-6)

(S) Other pending MILCON force protection projects approved for FY05 include new guard towers, construction of an ECP identification screening building, and an inspection/turn around point on the access road at C Gate. (Annexes M-5, M-6)

---

[7] The existing fence was built in the 1980s.
[8] The breaches found by the investigating team were quickly mended by the 248th RAOC.
[9] The 248th RAOC is responsible for monitoring and repairing the perimeter fence. They often had to use the FOB's dedicated Quick Reaction Force (QRF) to perform duties to maintain the perimeter.

22

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

(S) A large portion of the compound is observable by personnel outside the FOB. Because of this, guard-mount patterns, and other base defense activities, are easily observable by AIF. A portion of the perimeter in the cantonment is augmented by a vehicle berm that degrades the direct line of sight into the FOB, but, the ASP perimeter has no similar berm. The rolling terrain allows for observation into much of the compound. Sugar Beet Road dissects FOB Marez and LSA Diamondback and allows direct visibility into both.[10] (Annexes M-1, N-4)

**(U) Standard**

(U) DoD O-2000.12-H Chapter 21 provides that a perimeter barrier must cause an intruder to make an overt action that shall demonstrate intent to penetrate the perimeter, assist in controlling and screening authorized entries into the protected area, and impede vehicle passage. (Annex E-15)

**(U) Findings:**

- (S) The existing FOB Marez perimeter fence is old and in need of repair in some areas. The perimeter had five breaches in the ASP fence line on 28 December 2004. There were also places in the fence that would allow a person to crawl under the fence. (Annexes C-98, C-99, N-4)

- (S) An FY05 MILCON project has been approved for a new fence in the cantonment area and ASP. The construction of an internal fence around the AHA has also been approved. (Annexes M-5, M-6)

- (S) A large portion of the compound is observable by personnel outside the FOB. (Annexes M-1, N-4)

- (S) FOB Marez has no electronic surveillance passive measures such as Electronic Early Warning (EEWS) or perimeter cameras. A J-LENS is being installed to augment observation. (Annexes D-6, D-7)

- (S) There are abandoned buildings directly outside the FOB that allow for enemy reconnaissance and concealment. (Annexes D-6, D-7, N-4)

- (S) It is possible that the bomber gained access to FOB Marez through a breach in the perimeter. (Annex N-4)

**(U) Recommendations:**

---

[10] Unoccupied buildings are directly outside the perimeter. The "Sugar Factory" located just north of Gate C, allows for covered observation onto both Diamond Back and Marez at both West and C gates. Plans are in effect to close Sugar Beat Road.

23

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- ○ (S) Breaches must be repaired and breachable areas should be reinforced with triple strand concertina wire.

- ○ (S) Place sniper screens along the fence line to prevent observation into the FOB. As an ancillary benefit, sniper screens make breaches in the perimeter more visible.

- ○ (S) Regularly check abandoned buildings directly outside the FOB or in the alternative destroy such buildings that allow for enemy cover or observation.

- ○ (S) Augment tower observation with EEW and/ or perimeter camera system, with the feed going directly to the FPOC. A MILCON project for motion detectors has been approved for FY05.

- ○ (S) Assign tenant units sectors of the perimeter for which they are fully responsible, including condition of the fence line, maintenance, manning and equipping, and integration with the FPOC.

### B. (U) Guard Towers

(U) Guard towers are a critical part of FOB force protection. Appropriately staffed, trained, and equipped tower guards significantly decrease the probability of perimeter breaches by the enemy. (Annex D-6)

(S) Most FOB Marez guard towers are adequate. Communication to the FPOC was adequate. In certain areas of the ASP, however, some towers do not have overlapping fields of view due to the undulant terrain. Some towers require repair and have piles of trash at their base. (Annexes C-89, C-98, C-99, N-4)

(S) In some instances, soldiers were not adequately trained or lacked equipment. Some soldiers manning guard towers were not qualified on their crew-served weapons. Some did not have range cards to provide well-defined or interlocking sectors of fire. Some lacked binoculars. The 248th RAOC guard tower SOP covers these issues, but tenant units manning the towers were not consistently enforcing the standards. Soldiers manning the towers were rotated frequently which led to a lack of continuity in procedures. (Annexes C-4, C98, C-99, D-6)

(S) A MILCON project exists to construct new guard towers at the ECPs and in the ASP for FY05. (Annexes M-5, M-6)

### (U) Standard

(U) FM 3-19.30 provides that the level of tower protection should equate to the threat level. Ideally, towers should be hardened against small-arms effects

24

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

using sandbags, salvage armor, or commercially fabricated bullet-resistant construction. Tower personnel should possess communications capabilities, as well as night observation equipment. Target-acquisition equipment is also helpful.

(U) Tower height should be appropriate for terrain observation. Towers should have overlapping, mutually supported fields of observation and fire and be provided with fortified, back-up defensive positions.

**(U) Findings:**

- (S) Most FOB Marez guard towers are adequate. Some require minor repairs. (Annexes C-89, C-98, C-99, C-4, D-6)

- (S) Certain towers in the ASP, however, do not have overlapping fields of view due to the undulant terrain. (Annexes C-98, C-99)

- (S) Most towers were hardened but did not have back-up defensive positions. (Annexes C-98, C-99)

- (S) Not all tower personnel were adequately trained or equipped. (Annexes C-4, C-98, C-99, D-6, D-7)

**(U) Recommendations**

- (S) To ensure consistent, disciplined execution of guard tower duties and improve continuity in perimeter defense, tenant units assign subordinate units and soldiers to man towers for a minimum 60-90 days increments. Tenant units increase senior leader supervision of the towers.

- (S) Enforce the RAOC guard tower SOP. Ensure that the soldiers are properly trained with their weapons, have the proper equipment including range cards with well-defined sectors of fire, and binoculars. Provide special instructions when necessary.

## C. (U) Entry Control Points (ECP)

(U) The Entry Control Points (ECP) must allow for adequate flow of friendly forces, while still maintaining the safety and security of those manning the ECPs and those inside the wire.

(S) On and before 21 December, FOB Marez had four ECPs: A, B, C, and Stryker Gates. (Annexes C-89, C-99)

25

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

- (S) A Gate was dedicated to local national (LN), civilian traffic, and ISF individuals returning from leave; (not ISF units returning from missions). (Annexes C-16, C-98, C-99)

- (S) B Gate was dedicated to US military traffic and ISF convoys escorted by US Forces. (Annexes C-62, C-98, C-99, N-4)

- (S) C Gate was dedicated to traffic moving from the Mosul Air Field's (FOB Diamond Back) West Gate to FOB Marez. (Annexes C-14, C-98, C-99, N-4)

- (S) STRYKER gate was dedicated to US military traffic and ISF convoys escorted by US Forces. (Annexes C-98, C-99, N-4)

## (U) A GATE

(S) A Gate consisted of a pedestrian entrance and a vehicle entrance. A Gate was manned by US soldiers and supplemented by FPS personnel. Pedestrians entering at A Gate were initially searched by FPS with US Forces overwatching, and then searched again by US soldiers. Metal detecting wands and explosive detection devices were not always available. The Vapor Tracer explosive detection devices arrived in early August 04 but had been down for maintenance reasons since mid-December 04. When available, these devices would be used. (Annexes D-6, D-7, C-16, C-20, C-98, C-99, N-4)

(S) Green badged employees could enter the FOB unescorted. LNs authorized green (no escort) badges would present their Iraqi ID card, receive their badge, and be allowed unaccompanied access to FOB Marez. (Annexes C-69, E-1)

(S) Those with yellow or red badges would wait in a holding area until a unit escort came to accompany the employee onto the FOB. The A Gate SOP allowed yellow badge holders to take the KBR bus to his designated unit area, in lieu of being physically escorted by a US service member. Soldiers working at A Gate recognized the vulnerability, however, and said they did not allow LNs with yellow badges to leave the holding area, even on the bus, without US escorts. (Annexes E-1, C-14, C-16, C-69)

(S) Civilian vehicles entering through A Gate were initially searched by FPS, and then brought to a search area where both the vehicle and the driver underwent a search by KBR contracted Brigada Security. Brigada sometimes used a bomb dog to augment searches. US Forces over-watched Brigada searches. (Annexes C-14, C-16, C-20)

26

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

(S) Vehicle passengers were taken to a holding area to be searched by US forces. US soldiers then scanned the vehicle using the MVACIS, a [ (b)(7)e ] [ (b)(7)e ] (Annexes C-16, C-20)

(S) After the bombing and in response to the CENTCOM Joint security Directorate (JSD) visit, A Gate was closed to all traffic on 30 December. Pedestrian and vehicle traffic now enter through either the Diamondback Pedestrian Gate or West gate. LNs are then escorted to FOB Marez through C Gate. When A Gate was closed, the MVACIS machine was moved to LSA Diamondback's West gate. (Annexes C-4, C-98)

## (U) B GATE

(S) US military traffic uses B Gate. B Gate is manned by US personnel manning two overwatch towers and a M2 .50 Cal machine gun. ISF can use the gate when escorted by US Forces and are not searched when returning from operations with US Forces. In part, ISF are not searched to facilitate a trusting relationship with US Forces.[11] (Annexes C-62, C-98, C-99, N-4)

## (U) Stryker Gate

(S) Stryker Gate is operated by 1-24 IN and is used in the same manner as B Gate. US military traffic use this gate. ISF may also use the gate when accompanied by the US Forces.[12] (Annexes C-34, C-98, C-99, N-4)

## (U) C Gate

(S) Traffic that crosses between LSA Diamondback and FOB Marez uses this gate. 25th BSB operates C Gate 24 hours a day. The gate includes a military vehicle only (non-search) lane and a search lane for all other traffic. (Annexes C-4, C-14, C-34, C-98, C-99, N-4)

---

[11] While not related to the 21 December bombing, we found B Gate susceptible to a VBIED attack due to a poorly constructed serpentine. The serpentine should be constructed to require more aggressive vehicle maneuvering to negotiate. There are four drop-arm gates at B Gate, however none were being used during our first visit. Some of the drop-arms had been damaged due to US vehicle impacts that were not repaired. The drop arms were being repaired during the conclusion of our visit and were being used when available.
[12] On a force protection note unrelated to the 21 December bombing, we found that Stryker gate is susceptible to a VBIED attack for several reasons. One reason is that the access roads leading to the gate outside of the FOB do not have Traffic Control Points (TCP) in place to monitor incoming vehicles. The soldiers indicated that FPS had previously manned TCPs but had not returned since the Ramadan Holiday. One tower to the west of the gate was manned and had some over watch of the access roads, but no communications existed between the tower and the gate guards. The gate guards consisted of 2 soldiers and 1 NCOIC. They man the gate with one Stryker Fighting Vehicle as a heavy weapons platform and a barrier. There is an overwatch guard tower at the gate but the gate security rarely has soldiers to man it and the vehicle. The ECP's only additional barrier is a sliding metal gate that could not alone stop a large truck. A Detention Facility is located 30 meters from the gate. The close proximity of the facility to the gate could potentially be exploited by AIF.

27

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

(S) All non-military vehicles are searched when passing through this gate. Soldiers were not consistently using under-vehicle mirrors when we first arrived at FOB Marez, however, over time they began to use them. Explosive detection equipment was not being used and has been inoperable since mid-December. (Annexes C-4, C-20, C-14, C-46, C-98, C-99)

(S) US soldiers conduct searches of badged LN employees, contractors and their vehicles. Vehicle searches were conducted within clear sight of the vehicle that the occupants had just exited. This allows the passenger to observe soldier search patterns. (Annexes C-14, C-98, C-99)

(U) <u>Standards</u>

(C) To perform this mission effectively, ECP guards must be adequately trained in the following areas: badge access procedures, searching procedures, and rules of engagement.

(S) IAW FM-3-19.03 ECP gates should be able to withstand considerable vehicle weight and speed and provide a barrier that restricts entry into the installation.[13]

(S) Vehicle gates should allow for locking a vehicle in a search area, preventing escape upon detection of suspect cargo, and allowing for the over watch tower to engage with lethal force as necessary.[14]

(S) Personnel outside of the search area should not be able to observe vehicle search techniques, equipment, or procedures. This mitigates the enemy's ability to determine weaknesses in searching capabilities, techniques and procedures. It also minimizes the damage of a remotely detonated IED.[15] The vehicle search pit should be designed to give the search personnel the best access to vehicles, from top to underneath.

(U) <u>Findings</u>

• (U) The disciplined execution of assigned tasks to standard and ensuring the availability of operable equipment requires emphasis.

---

[13] Vehicle gates must be able to stop a 60,000 pound vehicle. (Mil Handbook 1013/14)
[14] The walls around the search area must also be able to withstand a 60,000 pound vehicle from passing through. The walls can be made of HESCO, concrete, dirt berms, etc. The walls have three functions: prevent a vehicle from escaping the area (same as the gates), prevent observation of the search, and to minimize high velocity fragmentation and small blast effects.
[15] This requires the walls be as tall as the highest vehicle normally entering the search area. The walls should not be so high as to limit observation to the over watch and tower. A blast created by a large IED (>500 pounds) will probably propagate over the wall. The only mitigating measures for such blast is resistant facility construction and standoff distance.

28

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

○ (S) Sugar Beet Road bypass is inherently dangerous and very difficult to secure. It creates a complex ECP complicated by local traffic transit, high risk of VBIED, indirect fire attacks, and the possibility of fratricide. (Annexes C-98, C-99)

○ (S) Some ECP guards were not trained to standard in search techniques and procedures contained within their SOPs. Not all ECP guards were using the equipment available to conduct the searches. Not all equipment was operable, nor was it being repaired. (Annexes C-98, C-99)

○ (S) Some units took ownership of their gates, improved their positions, and displayed disciplined execution of their assigned tasks. (Annexes C-98, C-99)

(U) **Recommendations**

○ (S) Conduct formalized training on searching procedures and the use of explosive detection equipment.

○ (S) Soldiers must adhere to disciplined execution of: search procedures, use of mirrors and detection wands, use of dogs from time to time.

○ (S) Consider closing Sugar Beet Road to local civilian traffic. There is an approved FY05 MILCON project that is intended to change the ECP layout and improve traffic flow.

○ (S) Tenant units increase senior leader supervision and checks of perimeter barriers, guard towers, and ECPs to ensure standards are maintained.

D. (U) **Quick Reaction Force/Roving Guards**

(S) The 248th RAOC FPOC has responsibility for maintaining an internal QRF and Roving Patrol on FOB Marez. Their QRF consisted of a 6-man, 2-vehicle force from 25th BSB. They did not have a dedicated Roving Patrol. (Annexes C-9, C-20, C-46, C-89)

(S) We found that the designated internal QRF was often required to perform other tasks such as roving patrol, logistical operations, and perimeter fence repair. These additional missions take away from the primary mission of the QRF. (Annexes C-20, C-89)

(S) The FPOC would request the Brigade external QRF to respond to incidents observed by tower or gate guards outside of the perimeter. (Annexes C-13, C-89)

29

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

**(U)** Standards

(C) The Quick Reaction Force (QRF) must be a mobile force with appropriate fire power and support to deal with threats on the FOB.  The QRF should be a dedicated force ready to deploy in moments.  The roving patrol must be able to conduct frequent, random patrols of the FOB in order to gather information and react to threats.

**(U)** Findings

- (S) The dedicated internal QRF was required to perform non-QRF missions thereby detracting from their overall force protection mission.   (Annex C-46, C-89, C-98)

- (S) The RAOC did not have a dedicated roving patrol.  (Annexes C-20, C-46)

- (S) Brigade QRF was not always available to respond to routine perimeter incidents outside the wire.  The RAOC's internal QRF did not respond outside the wire.  (Annexes C-67, E-1)

**(U)** Recommendations

- (S) The FPOC should maintain a centrally located internal QRF with a minimum of 6 soldiers and two vehicles available 24-hours.  Ideally, the QRF should have no other duties.

- (S) Establish procedures for the internal QRF to respond to perimeter incidents just outside the wire that don't warrant commitment of the brigade's external QRF.

- (S) Divide battlespace to define unit QRF responsibilities.

- (S) The FPOC should have a dedicated roving patrol to augment the towers, particularly in the ASP.

- (S) Establish clearly defined coordination procedures between the RAOC and the Brigade external QRF.

**E.(U)** Access to High Density Areas

(S) The high density facilities at FOB Marez include the DFAC, the gym, the PX, and the MWR facility.  (Annexes D-7)

(S) Entrance guards had been implemented at high density areas when TFO had increased the threat level.  At the time of the bombing, no intelligence had warranted an increase to the threat level.  (Annexes C-13, F-4, G-4, G-5)

30

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

(S) It was a practice to have a military headcount at the DFAC. One was not, however, present on the day of the bombing. By regulation, a military headcount serves two purposes: to count the number of personnel entering the DFAC for accounting purposes and to ensure that those who are dining are authorized. Providing a military headcount may have an ancillary force protection benefit that they present a deterrent to unauthorized personnel attempting to enter the facility. (Annexes C-2, C-5, C-24, C-26, C-43, C-45, C-46, L-1 through L-6)

(S) In October the Mayor's cell published a list of units responsible for providing headcount personnel. 1-24 Infantry was tasked to provide a headcount beginning the week of 19 December. They did not do so due to operational requirements and because they required a tasking from their parent brigade. (Annexes C-45, C-67, J-1, L-1)

**(U) Standards**

(U) FM 3.19.30 states that physical protective measures, procedural security measures, and terrorism counteraction measures implemented are based on the threat. Measures should include increased security at a high density areas when the threat warnings warrant such actions.

(U) AR 190-50 provides that a Mission Essential or Vulnerable Area (MEVA) list must be developed. A risk analysis must then be completed for every MEVA.

(U) AR 30-22, Chapter 3, establishes Army dining facility policy. Paragraph 3-26 provides that DFACs provide meals to personnel entitled to subsist at government expense. The headcount system is in place to ensure the authorized personnel receive meals and to receive payment from those who must be charged.

(U) The headcount is responsible for accurately accounting for each individual admitted to the dining facility for a meal. Individuals must be identified to determine their eligibility to subsist. In a combat zone, the person would be turned away if they were deemed ineligible to eat at the DFAC.

(C) DA Pam 30-22, paragraph D-5, states that the headcount will not be assigned additional duties such as checking attire, maintaining order, selling newspapers, and so forth. The headcount's full attention must be devoted to accurately accomplishing headcount duties.

**(U) Findings**

• (S) Units would typically take measures at high-density facilities to mitigate risks when the threat level warning increased. (Annexes C-43, F-4)

31

~~SECRET//NOFORN~~

UNCLASSIFIED
SECRET//NOFORN

○ (S) At the time of the bombing, there was no specific intelligence that warranted an increase to the threat level and force protection posture. (Annexes C-13, F-4, G-4, G-5)

○ (S) More often than not, there was a soldier conducting a military headcount at the Marez DFAC. There had been previous occasions when only a KBR provided civilian headcount was on duty. (Annexes C-5, C-18)

○ (S) On 21 December 2004, there was no military headcount at the Marez DFAC. There had not been one there since 17 December 2004. (Annexes C-2, C-5, C-26, C-45)

○ (S) While a headcount is not a substitute for a door guard, under normal force protection posture, a headcount provides a deterrent effect to unauthorized personnel attempting to enter the facility. (Annex C-2)

(U) Recommendations

- (S) Place guards at entry points to high occupancy areas, such as the DFAC, the gym and the MWR facility, to enforce badge access limitations on personnel attempting to enter such facilities.

- (C) Ensure a military headcount is present during meal times and only allow authorized personnel to eat in the DFAC.

- (C) Identify Mission Essential Vulnerable Areas and mitigate against potential attacks based on the current threat conditions. Mitigate the concentration of personnel in single location. Establish time lines for use in areas such as gyms, DFACs, or MWR facilities.

F. (U) Force Protection Program

(S) As previously noted, while 248th RAOC had FP responsibility for FOB Marez, they did not have tasking authority to efficiently execute all the FP responsibilities. They conducted biweekly Anti-terrorism/force protection (AT/FP) meetings to discuss AT/FP on FOB Marez between tenant units and the RAOC. The units consistently attended these sessions indicating the value attributed to them. But, as indicated previously, they were coordinating sessions with the RAOC unable directly task units in the forum. (Annexes C-9, C-31, C-46, C-89, C-90)

(S) The 248th RAOC FPO was not Level Two Anti-terrorism trained. This is a DoD requirement for installation FPOs and is directed by MNF-I FRAGO 517. This FRAGO was published after 248th RAOC deployed to theater. As a result, the installation FPO was not afforded the opportunity to attend the training before

32

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

being deployed. A mobile training team was not employed to provide Level Two Anti-terrorism training in theater. (Annexes C-98, E-15, F-13)

(U) **Standards**

(S) MNF-I FRAGO 517 provides that an assessment of both the threat and the vulnerabilities of an installation must be conducted and a comprehensive plan must be developed. A risk analysis must be conducted to determine the priorities for force protection assets. Proper training, education, and exercises must be implemented to ensure execution to standard and to validate the plan. Weekly Force Protection Working Group meetings must be conducted. The installation FPO must be Level II AT/FP trained. This training will give them the education to establish a comprehensive force protection program. (Annexes E-18, F-13)

(U) **Findings**

- (S) 248th RAOC staff did not have Level Two AT training. (Annex C-98)

- (S) The FOB Marez AT/FP program was immature but improvements have been and continue to be implemented. (Annex D-6)

- (S) Two external assessments (JSIVA and ISD) had been completed which met the vulnerability assessment requirement. (Annexes D-6, D-7)

(U) **Recommendations**

- (S) Mobile training teams should provide Level Two AT training to those units already in theater. Units designated to deploy to Iraq that will have base protection responsibilities should deploy with Level two AT trained staff.

- (S) Initiate a base wide vulnerability assessment followed by a detailed corrective action plan mitigate the identified threats.

G. (S//NF) **July 2004 Joint Staff Integrated Vulnerability Assessment (JSIVA)**

(S//NF) A JSIVA was conducted of FOB Marez's Anti-Terrorism posture on 15-19 July 2004. The unit in charge of force protection at the time of the assessment was the 296th BSB. The JSIVA team determined that the Marez AT/FP program was effective yet not entirely comprehensive. (Annex D-6) The JSIVA noted the following physical security vulnerabilities:

- (S//NF) Lack of SOPs regarding guard towers and ECPs
- (S//NF) Lack of range cards and clearly identified tower fields of fire.

33

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

- ◦ (S//NF) No standardized training and enforcement of proper procedures for personnel and vehicle searches.
- ◦ (S//NF) Lack of SOPs enforcement regarding access and badging.
- ◦ (S//NF) Although the Mobile Vehicle And Cargo Inspection System (MVACIS) scanned all commercial vehicles at A Gate, explosive detection equipment suitable for personnel searches (i.e. Vapor Tracers) was not used at A or C gates. The MVACIS pad also needed improvement.[16]
- ◦ (S//NF) The JSIVA also noted that the DFAC was vulnerable to a VBIED and needed additional stand off and barriers.  (Annex D-6)

(U) The 296th BSB conducted a RIP/TOA with the 248th RAOC in October 2004. (Annexes C-46, C-98, F-2)

Findings

- • (S) Guard towers and gate SOPs had been developed, however, there is still a lack of execution to standard at the guard towers.  (Annexes C-98, C-99)

- • (S) Personnel searches at C Gate improved, but with inconsistency.  (Annexes C-98, C-99, D-7)

- • (S) Inconsistent access and badging SOPs enforcement continued.  (Annexes C-98, C-99)

- • (S) The RAOC has obtained explosive detection equipment for personnel searches and had used them.  The devises were down for maintenance, however, during the time of the bombing.  The MVACIS pad had been improved. (Annexes D-6, C-98)

- • (C) FOB Marez mitigated the VBIED threat to the DFAC with concrete barriers around the entire DFAC.  (Annexes D-7)

- • (S) A detailed explanation and transfer of a corrective action plan had not been incorporated during the 296th BSB and 248th RAOC RIP. (Annex C-98)

(C) Recommendations

(C) Ensure that all AT/FP reports and plans are properly incorporated during unit relief in place (RIP).

---

[16] The Mobile Vehicle and Cargo Inspections System (MVACIS) is ⬚⬚⬚ (b)(7)e ⬚⬚⬚ (b)(7)e ⬚⬚⬚s.  There are currently 13 MVACIS systems employed in the Iraqi Theater.

34

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

- ○ (C) Create and execute a detailed corrective action plan based on the JSIVA report to mitigate vulnerabilities that still exist.

- ○ (C) Enforce execution of guard tower and gate tasks to standard.


**H. (U) Explosives**

(S) The CEXC report assessed that the type of explosive used in the 21 December DFAC bombing was a plastic explosive. A further note in the report indicated that the plastic explosive could have been either Plastic Explosive 4-A (PE4-A) or Composition 4 (C4). A footnote in the CEXC report referenced previous theft of C4 from FOB Marez. (Annex D-3)

(S) A CID report dated 16 October 2004 indicates that C4 (M183), along with various munitions, was stolen from a bunker in the ASP complex on FOB Marez on 13 October 2004. The FPS were implicated in the CID report, however, no conclusive evidence established the FPS as the perpetrators of this crime. (Annex D-5)

(S) The CID report regarding the FOB Marez DFAC bombing states that the component used was a plastic explosive, probably PE-4. (Annex D-4)

(S) The method used to introduce explosives onto FOB Marez is not known. It is possible that it could have been carried or transported in a gate undetected, tossed over the perimeter fencing, or walked in through breaches in the fencing in the ASP area. (Annex C-13)

**Findings**

- ○ (S) C4 explosive material was stolen from a bunker in the ASP complex on FOB Marez on 13 October 2004. (Annex D5)

- ○ (S) The method used to bring in explosives onto FOB Marez is not known. It is possible that it could have been carried in a gate undetected, tossed over the perimeter fencing, or walked in through breaches in the fencing in the ASP area. (Annex C-13)

## IX. Badges

(U) A critical element of force protection on any base is the implementation of a standard badge program. Ideally, the badge program should be easy for soldiers to understand and enforce and difficult for infiltrators to use to their advantage.

35

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

(S) This section of the report examines the process of obtaining access on FOBs Marez and LSA Diamondback and the areas of concern that existed prior to 21 December 2004. This will include the security screening process, the badge system and badge control, accountability, and enforcement.

(S) FOBs Marez and LSA Diamondback are unique by nature of the personnel that co-exist on these FOBs. On 21 December 2004, approximately 4600 personnel worked on FOB Marez and approximately 4200 personnel worked on LSA Diamondback. These personnel consisted of US military, DoD civilians, other US Government agencies, Coalition partners, ING, IRA, FPS personnel, TCNs, LN workers, Kellogg, Brown and Root (KBR) contractors, and KBR contracted Brigada security forces. The badge records indicate approximately 1667 local nationals received FOB badges.[17] (Annexes C-70, M-2, H-7)

(S) According to the SOP not all personnel who work on the FOBs are required to possess a FOB badge for access:

- (S) US Military, DoD civilians and contractors, other US government agencies and Coalition military carry their standard government issued identification card. (Annex E-2)

- (S) ISF badge requirements vary. IRA soldiers were not required to obtain FOB badges. Some ING cadre were issued FOB Marez no-escort green badges, but did not undergo security screening. Other than ING cadre, remaining ING do not receive FOB Marez badges. They are allowed escorted access. FPS undergo security screening and obtain a badge to access the base.[18] (Annexes E-2, C9, C11,C-32, C-46, C-69, C-70)

- (S) KBR provides TCN subcontractors with KBR badges.[19] LN KBR local hires are required to go through the security screening prior to receiving a FOB badge. (Annexes C-43, C-46, E-2)

---

[17] This number reflects the accounting given to us by the ████████ (b)(3), (b)(6) ████████ However, by his own testimony, many of these badges were no longer in use by 21 December 2004. He indicated that he has about 200 in his office under his control to be destroyed either because they reflect employees who are no longer employed on the FOB or because their badges have been replaced.
[18] A recent addition to FPS personnel are the Pesh Merga. By agreement with Barzani (PUK) and Talabani (KDP), they do not undergo security screening.
[19] As noted above, KBR provides KBR badges for their TCN subcontractor personnel; these personnel do not receive FOB Badges. KBR personnel and their subcontractors do not go through the ordinary screening process. The exception to this is locally employed personnel (LEP). This raises the question as to what level of "screening" KBR conducts with regard to third country national KBR workers and contractors. We found that most of the KBR subcontractors are third country nationals (Turkey, Phillipino, Indian, etc) and they arrived en mass as subcontractors. KBR employees are allowed unescorted access to FOBs with KBR badges.

36

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- (S) All LN employees and TCN[20] employees undergo security screening and obtain a badge to access either FOB.    (Annexes C-42, C-46, C-69, C-70, C-96, E-2)

(S) FOB Marez and LSA Diamondback obtain their LN employees through a contracted company named the New Iraq Employment Company (NIEC).[21] Applicants are initially screened by the NIEC for suitability and security risk assessment.  Subsequently, NIEC applicants undergo a security screening conducted by the US screening teams, as described herein.  If the applicant passes the security screening, the applicant's name is placed in a labor pool until a unit identifies a need for a new employee.[22]  (Annexes C-1, C-41, C-86, H-3, H-4, I-1, I-3)

(S) I found no notable security concerns with regard to the process by which the NIEC obtains or provides a worker pool to the FOBs.  If there is a security concern, I found that it exists in the security screening process and badging processes.  The NIEC merely provides the applicant work force – hiring local Iraqis carries with it inherent security risks, no matter what source the applicants are drawn from.  (Annexes C-41, C-86, C-65, I- through I 6, H-3, H-4)

**A. (U) Screening Process**

(S) The first stage in the badging process is the security screening.  Security screening in Iraq is immature.  (Annex D-6)

(S) Security screenings are conducted by either Tactical HUMINT Teams (THTs) attached to tactical units or the HUMINT Support Teams (HSTs), a CACI contracted team specifically authorized to conduct local employee personnel (LEP) security screenings.  Two THTs and one HST supported the security screening requirements at FOB Marez and LSA Diamondback.[23]  (Annexes C-1, C-19, C-32, C-42, C-7, C-96)

---

[20] Except KBR TCNs.
[21] New Iraq Employment Company and the US Army entered a contract on 28 March 2004.  NIEC was awarded a contract that covers management and payroll of local national employees at all FOBs in Northern Iraq the company is owned and run by two _____(b)(6)_____  The NIEC is responsible for advertising job positions and obtaining local nationals willing to work on the FOBs.  The workers provided varied in skill and fell into five categories: unskilled labor (janitorial, manual), skilled labor (electrician, plumber, carpenter), manager (speaks English, manages up to 50 laborers), professional (interpreter, engineer, college educated), and supervisor (fluent in English and supervises managers).
[22] Units needing workers would make a written request through the contracting office to the NIEC and outline the number of workers needed, the skills desired, the duration of tentative employment, and the military point of contact for the request.
[23] The screeners would ensure the standard local employment personnel screening sheet was filled out properly and conduct the screening.  The LEP screening entailed working through an interpreter to gather various personal data from the applicant.  The screener had to use their screening skills and intuition to evaluate the veracity and demeanor of the applicant to determine if he or she was a potential security risk or a criminal threat to Coalition forces.

37

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

(S) On FOB Marez, two tactical HUMIT teams (THT) had been conducting LEP security screenings since mid-October 2004.[24] These two THTs are assigned to the ▓▓▓▓▓▓▓▓▓▓▓▓ (b)(1)1.4a ▓▓▓▓▓▓▓▓▓▓▓▓ (b)(1)1.4a a direct support role to conduct counter-intelligence exploitation missions related to the interrogations of sources and detainees. Though it was not their primary mission, given their training in counter-intelligence and interrogation, conducting LEP security screenings was within their expertise. ▓▓▓▓▓ (b)(1)1.4a ▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓ (b)(1)1.4a ▓▓▓▓▓▓▓▓▓▓▓▓
(Annexes C-42, C-70, C-71, C-73, C92, C-96)

(S) The THTs did not have an ideal handoff with the unit who conducted security screenings for FOB Marez prior to them.[25] The THTs received paper copies of screening records and used them as a start point to re-screen everyone on the list and then to build a new LEP database. It is possible some FOB employees received badges without being previously screened. Some badge files did not contain a notation that a security screening had been completed on the badge holder. This was either because no screening was conducted or because of poor record keeping. (Annexes C-71, C-96)

(S) The THTs initially entered the information into a stand alone BATS system, using an older version of BATS. Because they were using an old software version of BATS, they were unable to check the information they entered against the national BATS database. The THTs received the new hardware, software, and SIPR access required to enter the BATS system in mid-December, but they did not have a compatible password. (Annexes C-42, C-71, C-73, C92, C-96)

(S) At the end of November 2004, 1-24 IN directed the THTs to cease security screenings as it was impacting intelligence operations. The THTs continued to conduct some LEP screenings out of necessity because they did not know who would screen on Marez if they did not. (Annexes C96, F-17)

(S) The requirement to conduct LEP screenings, however, has been greatly reduced because the pool of local Iraqi workers willing to work on the FOB dropped off drastically during and after Ramadan. The THTs have recently all but stopped LEP screenings except for an occasional screening for employees at the maneuver units they support. (Annex C-96)

(S) We found that the LEP screening responsibility on LSA Diamondback lacked continuity as well.[26] In the past, security screenings may have been

---

[24] There are four THTs located on FOB Marez. Only THT 609 and THT 611 conduct LEP screenings. THT 611 has three people on the team; only two members of 611 conducted LEP screenings. THT 609 has four people on the team; only two conducted LEP screenings.
[25] 3rd Stryker Brigade, 2nd Infantry Division appears to have been the unit who had previous screening responsibility.
[26] There was a lapse in LEP security screening during the summer of 2004 when CACI operations were suspended when CACI was named in the Abu Gharib detainee abuse investigation.

38

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

conducted by untrained personnel or not conducted at all. The THT 700, 310th MI conducted screenings for a short time after the 116th RAOC left in mid-November 2004 and until CACI took over the LEP security screening mission full-time for LSA Diamondback. (Annexes C-19, C-69, C-73, C-86, C-96)

(S) The HST on LSA Diamondback had been operating without any communications equipment or computer connections, in an isolated location on LSA. The HST possessed BATS hardware and software but no SIPR connectivity to allow them the capability to connect to the national BATS system. HST personnel stated that each evening they went to the CID office where they had access to a SIPR connection that allowed them to place the LEP screening information into the BATS database. (Annex C-1)

(S) Records indicate that not all local employees were security screened. This was particularly an issue prior to September. It was an area the 248th RAOC and the THTs/HST were working hard to correct. With regards to FPS security screenings, either screenings were not universally conducted or proper records and tracking systems had not been implemented.[27] (Annexes C-9, C-11, C-32, C-69, C-86, C-96)

(S) We identified one inherent problem in the security screening process, not attributable to the screeners. Iraqi IDs are very easy to counterfeit. Most Iraqi IDs contain Arabic writing and many show baby pictures. Given the lack of infrastructure in Iraq, screeners have no effective way to determine if the person who is presenting an Iraqi ID is genuinely the person whose name appears on that ID. This problem allows an Iraqi with a counterfeit ID or possessing someone else's ID to create a new identify with relative ease.[28] (Annexes C-71, C-92, C-96)

**(U) Standards**

(S) CJTF-7 FRAGO 693, dated 27 April 2004, established a common baseline security-screening standard with regards to non-coalition personnel. It requires that individuals who are granted access to coalition bases throughout the Iraqi theater of operations must be screened in accordance with CJTF-7 Personnel Screening SOP established as of 25 April 2004. It directed that organizations performing LEP screening to collect and report the screening results to their higher commands and use the Biometrics Automated Toolset Set (BATS) to log and track entries. (Annex E-5)

---

[27] In January 2005, the HST received the current FPS roster and HST identified several FPS personnel whose records show no indication that they had been screened. In some cases, FPS personnel had not been badged.
[28] There is little that can be done about this, however, one way to mitigate this situation is to ensure the BATS system is functional and all information is systematically entered in the BATS database. This way, at a minimum, we know if the applicant has been entered in common database under another name through a fingerprint check.

39

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

(S) MNF-I/C2X published an Iraqi Theater of Operations Personnel Screening SOP, dated 9 September 2004.   This SOP reiterated the requirement to screen individuals granted access to Coalition bases and to provide a baseline screening standard for all non-coalition personnel. (Annex E-7)  In pertinent part, it provided that screeners will:

- Create a record of the screening applicant's interview
- Input that information into BATS
- Notify agencies of derogatory information
- Maintain a database of screenings
- Identify and report security shortfalls exposed during the interview to the physical security POC
- Provide perishable intelligence information to the appropriate agency.

(S) In October 2004, TFO published an implementing SOP on personnel screening, badging and counter-intelligence.  The purpose of this SOP was to detail and integrate a standard badge program with the Force Protection and Counter-intelligence Program across the MNB-NW area of occupation and to control and manage access to military installations.  (Annex E-8)

(S) FOB Marez and LSA Diamondback were operating, in part, under the old badge and access policy in December 2004 but they were moving towards implementing the new badge system when the bombing occurred.  At the time of this report, TFO badge and access policy was being implemented on both FOBs and all badges were being replaced.   (Annexes C-69, C-70, C-86)

**(U) Findings**

- (S) The security screening process for locally employed personnel (LEPs) was immature.  It was an area identified for improvement by 248th RAOC and they had taken measures to do so.  In December 2004, LEP security screenings were conducted by trained personnel at FOB Marez and LSA Diamondback. (Annexes C-1, C-69)

- (S) THTs and the HST maintained databases on their respective FOBs of LEP security screening information, however, neither team could directly access the national BATS database.   (Annexes C-1, C-19, C-42, C-71, L-7 through L-10)

- (S) Not all LN employees and not all FPS with badges were screened. (Annexes C-42, C-86, C-96)

**(U) Recommendations**

40

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

- (S) Recommend that all LNs, TCNs and FPS on both FOB Marez and LSA Diamondback be immediately re-screened to minimize existing security risk.[29]

- (S) Provide a functional BATS system to the THTs on FOB Marez to allow them to enter screening data into the BATS systems ASAP.

- (S) Provide HST with SIPR connectivity to facilitate mission accomplishment and ensure direct access to BATS. Provide a suitable location to facilitate the security screening mission.

- (S) Place a BATS system at ECPs for gate guards to use to minimize identity fraud.

**B. (U) Badging**

(S) Both FOB Marez and LSA Diamondback required badges to access the bases. Until recently, they were two independent FOBs so they had two different badging SOPs. They had not yet transitioned to the new October 2004 MND-NW SOP. (Annexes C-69, C-70, C-86, E-2, E-8, E-18)

(S) The FOB Marez badging office was run out of the Mayor's Cell, by [b)(3), (b)(6)] [(b)(3), (b)(6)] the [(b)(3), (b)(6)] since September 2004. [(b)(3), (b)(6)] was charged with maintaining a database to track badge information for both FOBs Marez and Diamondback. (Annexes C-69, C-70)

(S) The RAOC [(b)(3), (b)(6)] was the approval authority for unaccompanied access badges on FOB Marez. His determination was based on a request from a sponsoring unit commander and a satisfactory LEP security screening. I found a disproportionately high number of unaccompanied access badges issued on FOB Marez. Of the 1667 badges, 924 were green (no escort) badges, 740 were yellow badges and were red badges. It appeared that commanders might have requested unaccompanied access badges before an employee reasonably demonstrated reliability or trustworthiness. This risk is compounded by the immature security screening process. (Annexes C-46, C-69, C-70, E-2, H-7)

(S) Units appeared to have control of badged employees that they were expecting on any given day. I am not as comfortable that the Marez Mayor's cell had control.[30] There were a number of badges at A Gate left by units that had

---

[29] As of the writing of this report, this is being done.

[30] Two weeks after the bombing, FOB Marez Mayor Cell had two badged employees who signed in on 19 and 21 December (139 ands 122, respectively) and did not sign out. It took them nearly a week to account for them, although not to my satisfaction. In one case, I was assured that they knew the identify of the badge holder (#122) , however, the pay records did not corroborate the statements of the Mayor's cell. The Mayor's cell paid the employee for 23 days, however, the sign in log indicated that he only worked for the Mayor's cell for 9 days in December. LSA Diamondback had six badged employees who signed in on 7 Jan;

41

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

redeployed over three months ago. Many of those badges required no escort. These afforded the possibility that a LN could come to the gate, get his green access badge and enter the FOB when a unit is not expecting him. (Annexes C-16, C-44, C-45, C-65, C-70)

(S) The soldiers at A Gate executed a standard procedure each night by notifying the FPOC of those badges that had not been turned in, indicating that the employee was still on base. The FPOC would call the sponsoring unit for accountability. There was no follow-up by the FPOC that the badged employee eventually departed the FOB. This was a good procedure but the process fell short in that there was no closure at the FPOC. (Annexes C-16, C-45, C-69)

(S) Base SOP required a monthly PAI to reconcile badges with employees. These were not conduced and as a result, the Mayor's cell did not maintain an accurate roster of badges. (Annexes C-69, C-70, E-2)

(S) There was a lack of common understanding as to what access privileges were associated with various badges. The confusion ranged from not knowing if certain badged personnel could travel between FOBs to whether certain badges entitled the holder to enter the DFAC. (Annexes C-96, C-14, C-20, C-91)

(S) Badge enforcement on FOB Marez was inconsistent. It was not uncommon to see personnel not displaying their badges as required by SOP. Personnel possessing yellow badges were seen walking without escorts.[31] (Annexes C-2, C-14, C-16, C-45, C-91)

(U) **Standards**

(S) In October 2004, TFO published an SOP on personnel screening, badging and counter-intelligence. The purpose of this SOP was to detail and integrate a standard badge program with the Force Protection and Counter-intelligence Program across the MNB-NW area of occupation and to control and manage access to military installations. (Annex E-8)

(S) FOB Marez and LSA Diamondback were operating, in part, under the old badge and access policy in December 2004 but they were moving towards implementing the new badge system when the bombing occurred. At the time of this report, TFO badge and access policy was being implemented at both FOBs and all badges were being replaced. (Annexes C-69, C-70)

---

did not sign out that night – and the BDOC had not identified this as an issue – had not accounted for them by 0730 on 8 January. One of them accessed the gate with a 116th RAOC badge – The 116th RAOC departed LSA Diamondback in late November.
[31] In one case, a soldier told us that twice he witnessed TCN KBR personnel enter his trailer without an escort in contravention to policy guidance.

42

SECRET//NOFORN

UNCLASSIFIED

SECRET//NOFORN

(S) The badge policy being used on FOB Marez during the December 2004 time frame was the FOB Marez Access SOP policy dated 26 August 2004. This SOP was issued by the Commander, 296th BSB. (Annex E-2)

(S) Pursuant to the FOB Marez access SOP, all LNs and TCNs were to obtain an access badge to enter FOB Marez. A LN or TCN wishing to access FOB Marez needed to obtain one of three badges - a green badge, a yellow badge, or a red badge. (Annex E-2)

(S) A green badge was to be issued only by the base commander to selected local or foreign nationals who work on Marez and who's sponsoring unit requests a green badge with good reason for the person to possess a green badge. A green badge allows a LN or TCN to escort other LNs or TCNs who have red or yellow badges. The SOP states that "contractor or labor supervisors in charge of the special projects will be issued Green badges to ensure they have full access in order to complete their task." (Annex E-2)

(S) A yellow badge is issued on the approval of a company commander to LNs who work on FOB Marez upon the showing that there is good reason that they require access to certain areas unescorted. This badge allows for unescorted access around the battalion area. It does not allow unescorted access to all areas of FOB Marez. It also carries with it no escort privileges. (Annex E-2)

(S) A red badge with picture was to be issued to LN or TCN who works on FOB Marez. Holders of a red badge must be escorted at all times by a US Soldier or a green badge holder. The SOP stated no limit as to how many red-badged personnel a military person or a green badge could escort. A red badge without a picture was to be provided by request for small groups of workers (less than 10) working on short term projects that are limited to five days or less. A military escort is required at all times during the work. (Annex E-2)

(C) IAW the Marez badge policy, no badges were to leave FOB Marez for any reason. (Annex E-2)

(C) The SOP requires a monthly PAI to reconcile badges with employees. All units with local or foreign nationals working for their battalion should conduct a badging PAI within the first week of every month to ensure all badges are current. The purpose of the PAI is also designed to collect names of personnel who have been blacklisted, quit, or fired. A hard copy of all updates was to be provided each month to the badging office so that their records could be updated. (Annexes C-16, C-69, D-11, E-2 )

(S) The badge policy being used on LSA Diamondback during December was contained in the LSA Diamondback Access Standard Operating Procedure (SOP) Revision 1, dated 1 July 2004, signed by the commander, 116th RAOC.

43

SECRET//NOFORN

UNCLASSIFIED

~~SECRET//NOFORN~~

As stated previously, like FOB Marez, LSA Diamondback had not yet fully implemented the new TFO badge policy promulgated in October 2004. (Annex E-18)

(S) LSA Diamondback Access SOP provided that all local or foreign nationals, must obtain an access badge to enter the LSA Diamondback. A LN or TCN wishing to access LSA Diamondback needed to obtain one of six colored badges of varying access privileges.[32] (Annex E-18)

(U) <u>Findings</u>

- (C) FOB Marez requires badges to obtain access. There was a system in place to issue and control badges. FOB Marez SOP dated 26 August 2004 was thorough. Process and procedures were not in place to assure disciplined execution of badge accountability and verification responsibilities. (Annex E-2)

- (S) Neither FOB Marez nor LSA Diamondback had implemented the October TFO SOP as of December 2004. (Annexes C-69, C-70, C-86)

- (S) A disproportionate number of green badges were issued to LN and TCN thereby allowing them unescorted access to FOB Marez. (Annex H-7)

- (S) <u>There was a lack of rigor in transferring badged employee responsibility from one unit to the next upon unit RIP/TOA.</u> (Annexes C-69, C-70)

- (S) There was not a common understanding of the access privileges associated with badges. (Annexes C-2, C-69, C-70, C-91)

- (S) Proper display of badges was not consistently enforced, escort duty was not always performed appropriately. Access to some facilities was being granted because of a misunderstanding as to what access a badge holder was entitled. (Annexes C-2, C-16, C-91)

- (S) The Mayor's office was not conducting PAI with tenant units of badged employees monthly per FOB Marez SOP. (Annexes C-16, C-69)

---

[32] The 1 July 2004 Diamondback Access SOP had two exceptions to badge requirements. Medical emergencies which required treatment to prevent loss of life, limb or eyesight were not required to obtain an access badge, however, the medical CSH was to inform the RAOC and request a visitor badge as soon as possible. The second exception was convoy drivers who were hired by a contractor and have no security screening. They received a convoy pass at the gate, were not authorized to leave the immediate area of their vehicle, and must remain under escort at all times. As long as they were part of a convoy, under the direct supervision of a convoy escort, and have no other access to LSA Diamondback, they were not required to have badges.

44

~~SECRET//NOFORN~~

Approved for Release

UNCLASSIFIED

~~SECRET//NOFORN~~

- ○ (S) The bomber could have obtained access to the base by having an issued access badge.

## (U) Recommendations

- • (U) Implement the October 2004 TFO badging policy and procedure to ensure strict accountability and a common standard between TFO bases.

- • (U) Conduct PAI of badged employees monthly per FOB Marez SOP. It is essential during unit transition to account for all badges issued to employees of the outgoing unit and to properly transfer responsibility for badged employees from one unit to the next. Ensure all units follow badge procedure during RIP/TOA and handover all employees to the unit replacing them.

- • (S) Badge office gain 100% badge accountability and ensure all employees are screened and evidence of screening contained in their file.

- • (C) Provide badge awareness training to ensure all personnel understand the access limits placed on various badge holders.

- • (C) Place a BATS system at pedestrian ECPs to mitigate ID fraud by verifying through fingerprint checks.

### X. (U) Accountability and Access of ISF personnel

(S) ISF accountability is difficult to achieve. Procedures were in place to reliably account for all ISF personnel on FOB Marez on 21 December 2004. It is less true for ISF on leave or AWOL. The physical evidence at the scene of the explosion indicated that the suicide bomber was probably wearing a chocolate chip IRA uniform. (Annexes D-3, N-2, N-3)

(S) There were three categories of ISF on FOB Marez on 21 December 2004: IRA, ING, and FPS. All three groups had access to the Marez DFAC and different control measures were applied to each group. (Annex C-9)

### A. (U) Iraqi Regular Army (IRA)

(S) The 11th IRA Battalion maintained control and accountability of its battalion with oversight by a US Advisor Support Team (AST) from the 98th Training Support Division. The AST physically lives and works within the IRA compound on the FOB. The IRA compound is set within the cantonment area of FOB Marez, directly across from the DFAC. It is bounded by HESCO Bastion Barriers to isolate it from the base. Access is controlled through one central gate secured by IRA soldiers. (Annexes C-5, C-21, C22, C-51, C-60, K-4, M-1, N-4)

45

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

(S) It was the responsibility of the AST to account for all of the IRA soldiers accompanying them to the DFAC. The IRA were marched to the concrete blast barriers in front of the DFAC and moved single file to the hand-washing station where they entered the DFAC. When the meal was complete and the IRA personnel were marched back to their area, the AST ensured that any IRA stragglers, (primarily IRA senior personnel), were directed back to the IRA compound.[33] (Annexes C-5, C-18, C21, C-51, C-60, C-72)

(S) The IRA were rotated on a set schedule in 20-30 minute intervals to ensure all soldiers were afforded an opportunity to eat, to ensure accountability, and to limit the number of IRA soldiers in the DFAC at any given time. That day there were only two shifts, 1100 and 1120. The second shift departed the DFAC shortly before the blast under the control of the AST. (Annexes C-5, C-18, C-21, C-22, C-51, C-60, C-61)

(S) The 11th Battalion was recently assigned TACON to 1-5 IN Battalion. The 1-5 IN Battalion has established a liaison element with the 11th Battalion and the AST. This adds another level of physical control and quality assurance of day-to-day accountability and supervision. (Annexes C-72, C-80)

(S) A complication of IRA accountability is the make-up of this battalion. It was recently assembled on short notice and consists of soldiers from the 10th, 11th and 12th IRA Battalions and from the 4th Brigade and 8th Division HQs. On 21 December, the BN had 194 AWOL soldiers, making physical accountability of all assigned members difficult to achieve. (Annex C-51)

(S) On 21 December, the AST team accounted as follows (Annexes K-1, C-51):

    Authorized Strength – 737
    Assigned Strength – 387
    Leave - 77; AWOL – 194
    Detachments/Others - 48 (10 in Al Kasik and 38 in Hammam al Alil)
    TDY - 1
    Quarters - 0
    Present for Duty - 67

(S) Upon taking IRA accountability of those present for duty following the bombing, it was determined that 4 IRA were missing from their ranks. It was later determined, however, that 3 were KIA and 1 was WIA.[34] All members of the 11th IRA Battalion who were present for duty on 21 December were accounted for on that day after the bombing. (Annexes K-1, C-51)

---

[33] IRA uniform for meals normally included IBA and helmet. Sergeants Majors and Officers had the discretion to forego wearing their IBA and helmets to the DFAC. The IRA soldiers typically removed their IBA and Helmets when sitting to dine.
[34] Accountability of IRA soldiers who had previously gone AWOL is not possible because the AWOL soldiers may or may not return. If an IRA Soldier remains AWOL for 30 days, he is dropped from the rolls (DFR).

46

~~SECRET//NOFORN~~

Approved for Release

UNCLASSIFIED

~~SECRET//NOFORN~~

**B. (U) <u>Iraqi National Guard (ING)</u>**

(S) There are two different ING compounds.

(S) 106th BN HQ: The ING BN HQ is located on the west-northwest portion of LSA Diamondback.  A pedestrian gate provided access between the 106th compound and LSA Diamondback.   Prior to 21 December that gate remained open all the time.  Someone who gained access to the ING compound could easily have proceeded through that pedestrian gate and had near complete access to LSA Diamondback.  From Diamondback, they could proceed to FOB Marez through gate C.  This would require an unaccompanied access badge or an escort.  (Annexes C-20, C-27, C-56, C-89, C-90, M-1)

(S) I do not believe that this was proximate to the Marez DFAC incident; but it represents a level of openness that may not have been necessary and provided an opportunity to be exploited.   I recommend that the gate remain secured and that it be opened only as required.  If opened, it should be guarded to facilitate controlled access by badging.

(S) A CO: A CO, 106th ING Battalion is physically located in a separate compound in the ASP south of FOB Marez.  The compound is well situated to provide separation of the ING from US Forces, yet convenient enough for interaction.  There are no physical controls that preclude unwarranted access, though its physical location makes that less likely and easily detectable. (Annexes C-5, M-1, N-4)

(S) Twenty-five US soldiers from the 1-24th INF BN, led by [ (b)(3) ] [ (b)(6) ] as the senior ING mentor / trainer, provide oversight of the A Co, 106th ING Battalion and its co-located basic training academy.  The primary trainers for the ING trainees are ING cadre members from A Company, 106th ING BN.  The basic training unit remains under physical control all of the time.  (Annexes C-33, C-34, C-57)

(S) The basic trainees eat breakfast and dinner in the DFAC, but not lunch.  They did not eat lunch there on 21 December. The A CO cadre is supposed to eat meals on their own compound but they are not physically restricted.  Given a green badge, an A CO cadre member/leader could have eaten lunch in the DFAC on 21 December.  According to the company commander and validated by [ (b)(3), (b)(6) ], they did not. (Annex C-57)

(S) Accountability for ING on FOB Marez on 21 December 2004 as follows (Annex C-33, K-2):

88 - A Co,106th ING BN

~~SECRET//NOFORN~~

UNCLASSIFIED

~~SECRET//NOFORN~~

19 - ING Scouts working directly with USSF[35]
56 - ING trainees[36]
48 - Vacation
7  - Hospitalized
14 - AWOL
2  - Sickcall

(S) [(b)(3), (b)(6)] and [(b)(3), (b)(6)] provided the <u>accountability</u> of the A Co, 106th ING members that were not on the range with [(b)(3), (b)(6)] on 21 December. They received it from [(b)(6)] the commander, A Co., 106th ING. Based on this information, it was determined that all 106th ING BN soldiers who were present for duty on 21 December 2004 were accounted for after the blast. (Annexes C-33, C-57, K-2)

(S) One member of A Co, 106th ING that was working with US Special Forces was killed in the blast. His body was released back to his family after it was determined that he was not in position to have been the bomber. (Annexes C-104, D-3).

(S) As with the other ISF, it is not possible to positively account for those ING members listed as AWOL or on leave prior to the 21st of December.  (Annex K-2)

## C. (U) <u>Facilities Protection Service (FPS)</u>

(S) FPS personnel have been working on FOB Marez for over a year providing FOB security in various capacities.  Prior to 21 December, the FPS had been working in the guard towers in the ASP.  On 21 December FPS were working on A Gate and C Gate on FOB Marez and in the pedestrian gate at LSA Diamondback.[37]  (Annexes C-9, C-10, C11, C-14, C-88)

(S) The FPS reside at a compound located on LSA Diamondback, on the south-west end of the Mosul Army Airfield. The compound is separated geographically from FOB Marez, however, there were no restrictions placed upon the areas or times the FPS were allowed to travel.  (Annexes C-14, M-1)

(S) The FPS enter FOB Marez from LSA Diamondback through C gate.  FPS were transported in pick-up trucks and typically not searched upon entering FOB Marez. Personnel manning both Charlie Gate on FOB Marez and West Gate on LSA Diamondback did not routinely require the FPS to present ID cards when

---

[35] The ING Scouts were accounted for by [(b)(6)] as well. He indicated that 19 of 19 were present on 21 December. This was independently corroborated by the USSF ODA member who works with them.
[36] Four ING cadre were with [(b)(3), (b)(6)] at the range on the 21 December.   All 56 ING trainees were accounted for by [(b)(3), (b)(6)]
[37] New personnel have been brought in to provide FOB security as of 28 December 2004.  The majority of new FPS forces are Pesh Merga. The group consists of Kurdish Democratic Party (KDP) and People's Union of Kurdistan (PUK). The remaining number of Arab FPS is very low. [(b)(3), (b)(6)] estimated the total FPS work pool is about 100 personnel, however without records written in English, it is difficult to ascertain an accurate accounting.

48

~~SECRET//NOFORN~~

Approved for Release

UNCLASSIFIED

~~SECRET//NOFORN~~

passing.  The FPS were allowed to enter the DFACs on both FOBS, unescorted. (Annexes C-9, C-11, C-14)

(S) [(b)(3), (b)(6)] 248th RAOC, was the [(b)(3), (b)(6)] responsible for daily FPS accounting.  He depended on the [(b)(3), (b)(6)] for daily FPS accountability. [(b)(3), (b)(6)] would use this information to compile the FPS pay roster for submission to TFO.  We attempted to ascertain the total number of FPS personnel on FOB Marez on 21 December. [(b)(3), (b)(6)] estimated that between 15-19 FPS personnel were present.  The documents [(b)(3), (b)(6)] provided to us during this investigation were given to him by the [(b)(3), (b)(6)] [(b)(3), (b)(6)] The documents were incomplete Arabic personnel and pay rosters, which do not afford accurate accountability of who was present and when.  (Annexes C-9, C10, C11, K-3)

(S) As with all of the ISF, accountability of FPS was a day to day occurrence. FPS experienced considerable turnover due to a high AWOL rate and by the increased threats and intimidation by the AIF (Annexes C-9, C10, C11)

(S)  It is possible that the bomber could have been an FPS member who had recently quit or gone AWOL prior to 21 December and whom the RAOC was no longer expecting for duty.

(S) Physical control of the ISF is one of the key mitigating factors to the risk associated with their presence on the FOB.  Physical control is exercised through separation into discreet compounds on the FOB and by supervision by CF. There were more reliable physical controls of the IRA and ING than of the FPS. (Annexes C-5, C-9, C10, C11, C-18, C-21, C-33, C-34, C-56, C-51, C-60)

(U) Findings

- (S) FPS were integrated into the security force at FOB Marez and LSA Diamondback and they had access to the base with an FPS ID Card. (Annexes C-9, C11)

- (S) Coalition unit liaison teams and ASTs executed physical control of ING/IRA personnel through their presence.  Accountability and physical control of FPS was attempted by one senior NCO.  This was inadequate. (Annexes C-5, C-9, C-11, C-18, C-21, C-33, C-51, C-60)

- (S) Large numbers of AWOL soldiers and turbulent leave practices make accountability of the ISF difficult to achieve.  At best, accountability is day to day. It is primarily the responsibility of the ISF chain of command to achieve accountability; ISF are supervised by ASTs and liaison teams. (Annexes C-5, C-9, C-11, C-18, C-51)

49

~~SECRET//NOFORN~~

UNCLASSIFIED

SECRET//NOFORN

- ○ (S) ISF were afforded access to the DFAC alongside Coalition forces as a part of their integration. (Annexes C-5, C-9, C-18, C-21, C-22, C-31, C-47, C-56, C-51, C-60,)

- ○ (S) The bomber could have obtained access to FOB Marez as a member of ISF. Based on the evidence, he obtained access to the DFAC by wearing an ING/IRA uniform.[38] (Annexes D-3, N-1, N-3)

## (U) Recommendations

- ○ (S) Continue to oversee ISF accountability procedures.

- ○ (C) Establish and enforce clear MNC-I and MNF-I policy that addresses ISF access to Coalition bases and facilities.

- ○ (C) Establish unit partnerships with FPS to relieve the RAOC NCOIC of that responsibility.

- ○ (S) AST teams and embedded trainers bridge the gap between the Iraqi and Coalition Forces and provide dedicated insight to the day-to day operations, accountability, and other related items. Increase the emphasis on ASTs and embedded trainer employment to further develop the ISF and provide direct Coalition Force oversight.

---

[38] IRA Uniforms are readily available on the open market for purchase.

50

SECRET//NOFORN