# **Exhibit 195**

UNCLASSIFIED

CPL Marshall, Evan

Approved for Release

UNCLASSIFIED

# Findings and Recommendations

Approved for Release

UNCLASSIFIED



# DEPARTMENT OF THE ARMY
B COMPANY, 63D EXPEDITIONARY SIGNAL BATTALION
FORWARD OPERATING BASE MAREZ
MOSUL, IRAQ APO AE 09334



REPLY TO THE
ATTENTION OF

NETC-SAG-B                                                                 14 February 2008

MEMORANDUM FOR [(b)(6), (b)(3)] Commander, 3d Armored Cavalry Regiment

SUBJECT: AR 15-6 Findings and Recommendations Concerning the Hostile Fire Deaths on 28 January 2008; B Company, 1-8 Infantry

1. The purpose of this investigation is to determine the pertinent facts and circumstances surrounding the hostile fire deaths of Staff Sergeant Gary Jeffries, Sergeant James Craig, Corporal Evan Marshall, Specialist Brandon Meyer and Private First Class Joshua Young on 28 January 2008. In particular, this investigation will address:
   a. The cause of death.
   b. An explanation of the unit's mission, highlighting the contributions of the above-named Soldiers to the mission.
   c. What factor or series of factors contributed to the incident.
   d. Any safety precautions not taken or that would have impacted on the incident.
   e. An explanation of potential corrective action which could preclude similar incidents.
   f. Any other issues relating to this incident which would provide insight into the deaths or future operations.

2. The cause of death. Staff Sergeant Gary Jeffries, Sergeant James Craig, Corporal Evan Marshall, Specialist Brandon Meyer and Private First Class Joshua Young's deaths were instantaneous; the Soldiers did not suffer. The Soldiers were transported to FOB Diamondback where [(b)(6), (b)(3)] of the 86th Combat Support Hospital determined that the official cause of death for Staff Sergeant Gary Jeffries, Sergeant James Craig, Corporal Evan Marshall and Specialist Brandon Meyer was attributed to massive exangunation (Exhibit M, N, O & Q, page 2) and Private First Class Joshua Young's official cause of death was [(b)(6)] (Exhibit P, page 2).

3. The unit's mission, highlighting the contributions of the above-named Soldiers to the mission. 2/B/1-8 IN BN was conducting a Time Sensitive Targeting (TST) mission on Insurgents within Mosul supporting Operation Rifles Harvest II; to help provide a safe environment for the local population and to eliminate the resistance in Mosul. Staff Sergeant Gary Jeffries, Sergeant James Craig, Corporal Evan Marshall, Specialist Brandon Meyer and Private First Class Joshua Young were in the first vehicle in the convoy during this and many missions because of their professionalism and experience. They were trusted in their ability to lead the Platoon through any

NETC-SAG-B
SUBJECT: AR 15-6 Findings and Recommendations Concerning the Hostile Fire Deaths on 28 January 2008; B Company, 1-8 Infantry

situation. The following were the vehicle commanders for each vehicle in the patrol: [(b)(6), (b)(3)]. See Exhibit G for the by name and position list of each Soldier in the Patrol.

4. Events taking place after the initial IED detonation. At approximately 1232 hours the search for an Insurgent ended and the [(b)(6), (b)(3)] conducted a map reconnaissance to determine a route out of the neighborhood. All of the Soldiers in the Patrol were able to confirm the time because the Call to Prayer was playing. Once the map reconnaissance was completed the patrol began its movement out of the area (between Canal and Liberty Express).

   a. The following route was chosen: North on Liberty Express, left on Broadway and right on 42d Street. The first vehicle in the order of march (Staff Sergeant Gary Jeffries, Sergeant James Craig, Corporal Evan Marshall, Specialist Brandon Meyer and Private First Class Joshua Young) had traveled approximately 40 meters from the intersection when a command wired IED was detonated [(b)(1)1.4a] [(b)(1)1.4a] at 1239 hours. The patrol came under immediate contact by small arms fire (SAF) and rocket propelled grenades (RPGs). [(b)(6), (b)(3)] immediately radioed to his Platoon to "Stop, Stop, Stop," stay on the street and to backup. [(b)(3), (b)(6)] [(b)(6), (b)(3)] assessed the IED as a catastrophic kill and began to report the Battle Roster numbers. During this time the Gunners were engaging multiple targets from all directions. While the Gunners were engaging their targets, they guided their vehicles back into a 360 degree security position in the intersection. The Soldiers in the vehicles called out distance and directions of positively identified targets to the Gunners while also firing from their windows. During the movement to and while in their security position the Patrol was receiving a barrage of SAF, RPGs and approximately four mortar rounds.

   b. At 1300 hours, Thug (Scout weapon system, OH-58 Kiowa helicopters) arrived on site and provided suppressive fire into the East field vicinity Mosque 2. At 1305 hours, 1/A/1-8 Infantry Battalion were the first ground troops to arrive. 1st Platoon (Red Platoon) consisted of three Bradley Fighting Vehicles and one M1114. Red Platoon split into two sections. The first section, comprised of two Bradley's (Red 4 and 2) arrived from the North along 42d Street and the second section, comprised of one Bradley and one M1114 (Red 1 and Red 3) moved down Canal Street. [(b)(3), (b)(6)] [(b)(6), (b)(3)] Rock 6, arrived with the Second Section (Exhibit V, page 1). [(b)(6), (b)(3)] was in control of Red Platoon and Thug during the engagement providing the locations of the Insurgents to be engaged, with the assistance of his Squad Leaders and Platoon Sergeant. There were approximately 3-5 firing positions with approximately 2-5 Insurgents being utilized at each building depicted in Exhibit S. While the First Section of Red Platoon was clearing building 2 and the building to the North, all elements were still receiving SAF. The two Bradley's reached their positions and provided suppressive fire.

NETC-SAG-B
SUBJECT: AR 15-6 Findings and Recommendations Concerning the Hostile Fire Deaths on 28 January 2008; B Company, 1-8 Infantry

Section Two also received SAF enroute to their location and at their final position. The Insurgent SAF and RPGs did not slow down until 1/A/1-8 Infantry Battalion arrived on site. Thug's arrival only slightly reduced the Insurgent SAF.

   c. At 1315 hours additional Machine elements arrived including Machine 6 (b)(3), (b)(6) (b)(6), (b)(3). This element conducted a Screen to the Northeast (Exhibit S). Approximately 1400 hours, (b)(6), (b)(3) broke from screening to escort 2/A/1-8 Infantry Battalion (White Platoon) that brought the Recovery Assets and 3/A/1-8 Infantry Battalion (Green Platoon) into location from the North along 42d Street. Green Platoon was the Quick Reaction Force (QRF) that arrived second in the order of march coming from COP Fortitude. Green Platoon took the Southern security down 42d Street. Between 1600-1700 hours (b)(6), (b)(3) took control of the Recovery, and (b)(3), (b)(6) along with elements of the Iraqi Army, took control of the dismounted fight. The remaining Insurgent SAF came from Mosque 1 and the surrounding buildings in the West, resulting in a tank firing two main gun rounds into Mosque 1 stopping the SAF. While the tank was moving into position (b)(6), (b)(3) (b)(6), (b)(3) dismounted their vehicle to provide suppressive fire at Mosque 2 and (b)(6), (b)(3) fired his M203 at an Insurgent firing position within Mosque 2's courtyard. (b)(6), (b)(3) and (b)(3), (b)(6) (b)(6), (b)(3) returned to their vehicles when SAF increased.

   d. (b)(6), (b)(3) and a portion of his Platoon moved north to help provide security for the Recovery Assets; however, their (b)(6), (b)(3) told them to return to their vehicles and provide security. The only Soldier to remain and assist with the recovery from 2d Platoon was (b)(6), (b)(3), the (b)(3). During the Platoon's departure with the Recovery Assets, (b)(6), (b)(3) crew exhausted the last of their M240 rounds at 1630 hours. Once they returned to Forward Operating Base (FOB) Marez the entire platoon entered the Company Command Post (CP). There they spoke with their (b)(6), (b)(3) and the Chaplain. That night the Soldiers gathered around a fire pit and told stories; remembering the Heroes that gave their lives. (b)(6), (b)(3) said the Soldiers were angry that they had to sit through the Stress De-brief; however, afterwards the majority recognized the importance and believed the class was very helpful (Exhibit B, page 4).

   e. (b)(6), (b)(3) commended the Gunners for staying composed to cover 360 degree security and to continue to engage the enemy, the Squad Leaders for directing their Soldiers and keeping their composure and the Passengers for providing the critical distance and direction to the enemy. An example of the professionalism and courage of the Soldiers of 2/B/1-8IN BN can be seen through the actions of (b)(3), (b)(6) (b)(6), (b)(3). During the engagement (b)(6), (b)(3) Gunner for (b)(6), (b)(3)'s vehicle, field stripped his M240, while continuing to engage the Insurgents with his M4 and M203, firing 14 magazines and six 40mm grenade rounds. (b)(6), (b)(3) assessment of the situation was the enemy planned a deliberate and complex attack that someone was going to get hit by (Exhibit A, pages 1 & 3).

Approved for Release

UNCLASSIFIED

NETC-SAG-B
SUBJECT: AR 15-6 Findings and Recommendations Concerning the Hostile Fire Deaths on 28 January 2008; B Company, 1-8 Infantry

5. Factor or series of factors contributing to the incident. There was a pattern of IED contact in this area. On 26 January 2008, the Route Clearance Team, 1/E/1-8 IN BN, conducted route clearance along RTE Lexus, turning South on 42d Street and left on RTE Broadway. A command wired IED was detonated [(b)(1)1.4a] [(b)(1)1.4a] of a Joint Explosive Ordnance Disposal Rapid Response Vehicle (JERRV) at the exact location as the IED on 28 January. There was minor damage to the JERRV and the passenger was unharmed.

   a. On 28 January 2008, the same Route Clearance Team cleared the route along 42d Street and RTE Broadway. While conducting the clearance along 42d Street the Clearance Team approached a berm that was built across the road exactly where the command wired IED detonated on 26 January. Due to the drastic change in the roadway to include debris around the road the Clearance Team lead by [(b)(3), (b)(6)] [(b)(6), (b)(3)] and [(b)(6), (b)(3)] cleared the area for approximately one hour, 0650 to 0740hrs, utilizing the Buffalo Armored Vehicle (Exhibit J, page 5). [(b)(6), (b)(3)] was very confident that the route was cleared and continued clearing the assigned route (Exhibit J, page 6).

   b. Between 0740 and 1230 hours the Insurgents had the opportunity to bury an IED. After the incident, Intelligence confirmed the IED was a propane cylinder emplaced on 27 January (Exhibit T, page 2). The 184th Explosive Ordnance Disposal Battalion/Team 2-3's determination was a command wired IED estimated to have been 120 pounds of Home Made Explosives detonated [(b)(1)1.4a] the M1114. The Insurgents most likely utilized the electricity pole as an Aiming Point to detonate the IED while remaining hidden from view (Exhibit L, page 10). Based on Intelligence, IED indicators and frequency of IED's placed at this location I believe the IED was emplaced by the Insurgents on 27 January. However, I find the Route Clearance Team completed the interrogation of the area fully and are not responsible for the deaths. All steps had been taken to protect the lives of the Soldiers and equipment.

6. Any safety precautions not taken or that would have impacted on the incident. The Soldiers of 2/B/1-8 IN BN took all precautions to prevent this incident. The Platoon was utilizing a route that was cleared earlier in the day and varied its exit route. The Platoon followed all Tactics Techniques and Procedures, this was an unavoidable incident conducted by a dedicated enemy. 184th Explosive Ordnance Disposal Battalion/Team 2-3 stated in their Storyboard on 26 January 2008 that the entire length of ASR 42nd St is susceptible to IED's being buried in the road to result in catastrophic underbelly strikes. And the Team Leader determined that repair and protective works need to be implemented to reduce the threat of buried IEDs being used against Coalition Forces (Exhibit L, page 3).

7. Explanation of potential corrective action which could preclude similar incidents. 1) There are limited routes in and out of this neighborhood and as a result, the Insurgents have a higher rate of success to cause US Soldiers harm by placing IEDs

4

FOR OFFICIAL USE ONLY
UNCLASSIFIED

UNCLASSIFIED

NETC-SAG-B
SUBJECT: AR 15-6 Findings and Recommendations Concerning the Hostile Fire Deaths on 28 January 2008; B Company, 1-8 Infantry

or ambushes at these critical intersections and roadways. Leadership must continue to ensure Soldiers vary their routes and at what times they begin their patrols in an attempt to catch Insurgents off guard. If routes in and out of neighborhoods are limited Soldiers must pay particular attention to any changes in the road. The addition of trash, berms, potholes, standing water on the road and aiming points must be watched as an indicator that an incident might occur. 2) Pictures of these areas would greatly help Soldiers recognize the current state of the roads in high risk areas.

3) EOD and/or the Route Clearance Teams video record routes, highlighting high risk areas, to assist the drivers, gunners and vehicle commanders identifying any major changes to the roadway. 4) Develop and implement a plan that incorporates the recommendations of the Route Clearance and EOD Teams. 5) Squadron/Battalion and Troop/Company elements send a FBCB2 message to each Patrol/Convoy leaving a FOB/COP that identifies routes that have been recently cleared by the Route Clearance Team. In addition to the Convoy Brief the FBCB2 message would ensure Patrols/Convoys that find themselves in an unknown area can refer to the FBCB2 message for the latest Route Clearance information (routes and estimated timeline). Recommend these additional steps be added into the Regiment's Standard Operating Procedure.

8. Any other issues relating to this incident which would provide insight into the deaths or future operations. I recommend the following steps be emplaced. 1) Convoys travel with at a minimum one M2. The firing of the M2 has a much greater psychological impact on the enemy than a M240. Even with the arrival of the air assets the enemy did not make a significant withdrawal until QRF arrived. 2) Emplace a FBCB2 system in the Signal Intelligence (SIGINT) Cell to allow the latest intelligence to be relayed directly to the Soldiers on ground.

9. Additional Findings. 1) I find the vehicle and associated equipment listed in Exhibit 5, pages 1 – 7 were destroyed at no fault of the Soldiers or Chain of Command. 2) Based on varying accounts of explosions during the incident I find the following High Explosives detonated, according to my discussions with each vehicle commander: six 40mm grenade rounds fired by [(b)(6), (b)(3)] one fired by [(b)(6), (b)(3)] two positively identified RPGs; one potential RPG/mortar; for a total of ten high explosives (Exhibit S).

10. Point of contact for the memorandum is the undersigned at [(b)(6), (b)(3)] or email [(b)(6), (b)(3)] @us.army.mil.

[(b)(6), (b)(3)]
Commanding

5

UNCLASSIFIED

# DA FORM 1574

Approved for Release

UNCLASSIFIED

# REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER/BOARD OF OFFICERS
For use of this form, see AR 15-6; the proponent agency is OTJAG.

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

## SECTION I - APPOINTMENT

Appointed by **(b)(6), (b)(3)** Commander, 3d Armored Cavalry Regiment
(Appointing authority)

on **30 January 2008** (Attach inclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)
(Date)

## SECTION II - SESSIONS

The (investigation) (board) commenced at **Forward Operating Base Marez** at **1200 hours**
(Place) (Time)

on **31 January 2008** (If a formal board met for more than one session, check here ☐. Indicate in an inclosure the time each session began and ended, the place, persons present and absent, and explanation of absences, if any.) The following persons (members, respondents, counsel) were present: (After each name, indicate capacity, e.g., President, Recorder, Member, Legal Advisor.)

N/A

The following persons (members, respondents, counsel) were absent: (Include brief explanation of each absence.) (See paras 5-2 and 5-8a, AR 15-6.)

N/A

The (investigating officer) (board) finished gathering/hearing evidence at **1600 hours** on **6 February 2008**
(Time) (Date)

and completed findings and recommendations at **2000 hours** on **12 February 2008**
(Time) (Date)

## SECTION III - CHECKLIST FOR PROCEEDINGS

| A. COMPLETE IN ALL CASES | YES | NO[1] | NA[2] |
|---|---|---|---|
| 1. Inclosures (para 3-15, AR 15-6) Are the following inclosed and numbered consecutively with Roman numerals: (Attached in order listed) | | | |
| a. The letter of appointment or a summary of oral appointment data? | ☒ | ☐ | |
| b. Copy of notice to respondent, if any?(See item 9, below) | ☐ | ☐ | ☒ |
| c. Other correspondence with respondent or counsel, if any? | ☐ | ☐ | ☒ |
| d. All other written communications to or from the appointing authority? | ☐ | ☐ | ☒ |
| e. Privacy Act Statements (Certificate, if statement provided orally)? | ☒ | ☐ | ☐ |
| f. Explanation by the investigating officer or board of any unusual delays, difficulties, irregularities, or other problems encountered (e.g., absence of material witnesses)? | ☐ | ☐ | ☒ |
| g. Information as to sessions of a formal board not included on page 1 of this report? | ☐ | ☐ | ☒ |
| h. Any other significant papers (other than evidence) relating to administrative aspects of the investigation or board? | ☐ | ☐ | ☒ |

FOOTNOTES: 1/ Explain all negative answers on an attached sheet.
2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.

*Approved for Release* (watermark)

USARCENT FOIA FA-22-0067 Batch 2

UNCLASSIFIED

63

DA FORM 1574, MAR 1983          EDITION OF NOV 77 IS OBSOLETE.          Page 1 of 4 pages          APD PE v1.30

UNCLASSIFIED

| | | YES | NO[1] | NA[2] |
|---|---|---|---|---|
| 2 | Exhibits *(para 3-16, AR 15-6)* | | | |
| | a. Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | ☒ | ☐ | ☐ |
| | b. Is an index of all exhibits offered to or considered by investigating officer or board attached before the first exhibit? | ☒ | ☐ | ☐ |
| | c. Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | ☒ | ☐ | ☐ |
| | d. Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | ☐ | ☐ | ☒ |
| | e. Are descriptions or diagrams included of locations visited by the investigating officer or board *(para 3-6b, AR 15-6)*? | ☐ | ☐ | ☒ |
| | f. Is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded in a verbatim record? | ☒ | ☐ | ☐ |
| | g. If official notice of any matter was taken over the objection of a respondent or counsel, is a statement of the matter of which official notice was taken attached as an exhibit *(para 3-16d, AR 15-6)*? | ☐ | ☐ | ☒ |
| 3 | Was a quorum present when the board voted on findings and recommendations *(paras 4-1 and 5-2b, AR 15-6)*? | ☐ | ☐ | ☒ |
| **B. COMPLETE ONLY FOR FORMAL BOARD PROCEEDINGS** *(Chapter 5, AR 15-6)* | | | | |
| 4 | At the initial session, did the recorder read, or determine that all participants had read, the letter of appointment *(para 5-3b, AR 15-6)*? | ☐ | ☐ | ☐ |
| 5 | Was a quorum present at every session of the board *(para 5-2b, AR 15-6)*? | ☐ | ☐ | ☐ |
| 6 | Was each absence of any member properly excused *(para 5-2a, AR 15-6)*? | ☐ | ☐ | ☐ |
| 7 | Were members, witnesses, reporter, and interpreter sworn, if required *(para 3-1, AR 15-6)*? | ☐ | ☐ | ☐ |
| 8 | If any members who voted on findings or recommendations were not present when the board received some evidence, does the inclosure describe how they familiarized themselves with that evidence *(para 5-2d, AR 15-6)*? | ☐ | ☐ | ☐ |
| **C. COMPLETE ONLY IF RESPONDENT WAS DESIGNATED** *(Section II, Chapter 5, AR 15-6)* | | | | |
| 9 | Notice to respondents *(para 5-5, AR 15-6)*: | | | |
| | a. Is the method and date of delivery to the respondent indicated on each letter of notification? | ☐ | ☐ | |
| | b. Was the date of delivery at least five working days prior to the first session of the board? | ☐ | ☐ | |
| | c. Does each letter of notification indicate — | | | |
| | (1) the date, hour, and place of the first session of the board concerning that respondent? | ☐ | ☐ | |
| | (2) the matter to be investigated, including specific allegations against the respondent, if any? | ☐ | ☐ | |
| | (3) the respondent's rights with regard to counsel? | ☐ | ☐ | |
| | (4) the name and address of each witness expected to be called by the recorder? | ☐ | ☐ | |
| | (5) the respondent's rights to be present, present evidence, and call witnesses? | ☐ | ☐ | |
| | d. Was the respondent provided a copy of all unclassified documents in the case file? | ☐ | ☐ | |
| | e. If there were relevant classified materials, were the respondent and his counsel given access and an opportunity to examine them? | ☐ | ☐ | |
| 10 | If any respondent was designated after the proceedings began *(or otherwise was absent during part of the proceedings)*: | | | |
| | a. Was he properly notified *(para 5-5, AR 15-6)*? | ☐ | ☐ | ☐ |
| | b. Was record of proceedings and evidence received in his absence made available for examination by him and his counsel *(para 5-4c, AR 15-6)*? | ☐ | ☐ | ☐ |
| 11 | Counsel *(para 5-6, AR 15-6)*: | | | |
| | a. Was each respondent represented by counsel? | ☐ | ☐ | |
| | Name and business address of counsel: | | | |
| | | | | |
| | *(If counsel is a lawyer, check here ☐ )* | | | |
| | b. Was respondent's counsel present at all open sessions of the board relating to that respondent? | ☐ | ☐ | |
| | c. If military counsel was requested but not made available, is a copy *(or, if oral, a summary)* of the request and the action taken on it included in the report *(para 5-6b, AR 15-6)*? | ☐ | ☐ | ☐ |
| 12 | If the respondent challenged the legal advisor or any voting member for lack of impartiality *(para 5-7, AR 15-6)*: | | | |
| | a. Was the challenge properly denied and by the appropriate officer? | ☐ | ☐ | |
| | b. Did each member successfully challenged cease to participate in the proceedings? | ☐ | ☐ | |
| 13 | Was the respondent given an opportunity to *(para 5-8a, AR 15-6)*: | | | |
| | a. Be present with his counsel at all open sessions of the board which deal with any matter which concerns that respondent? | ☐ | ☐ | ☐ |
| | b. Examine and object to the introduction of real and documentary evidence, including written statements? | ☐ | ☐ | ☐ |
| | c. Object to the testimony of witnesses and cross-examine witnesses other than his own? | ☐ | ☐ | ☐ |
| | d. Call witnesses and otherwise introduce evidence? | ☐ | ☐ | |
| | e. Testify as a witness? | ☐ | ☐ | |
| | f. Make or have his counsel make a final statement or argument *(para 5-9, AR 15-6)*? | ☐ | ☐ | |
| 14 | If requested, did the recorder assist the respondent in obtaining evidence in possession of the Government and in arranging for the presence of witnesses *(para 5-8b, AR 15-6)*? | ☐ | ☐ | ☐ |
| 15 | Are all of the respondent's requests and objections which were denied indicated in the report of proceedings or in an inclosure or exhibit to it *(para 5-11, AR 15-6)*? | ☐ | ☐ | ☐ |

FOOTNOTES: 1/ Explain all negative answers on an attached sheet.
2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.

*Approved for Release*

UNCLASSIFIED

## SECTION IV - FINDINGS  (para 3-10, AR 15-6)

The (investigating officer) (board), having carefully considered the evidence, finds:

See attached memorandum.

## SECTION V - RECOMMENDATIONS  (para 3-11, AR 15-6)

In view of the above findings, the (investigating officer) (board) recommends:

See attached memorandum.

*Approved for Release*

UNCLASSIFIED

### SECTION VI - AUTHENTICATION  (para 3-17, AR 15-6)

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. *(If any voting member or the recorder fails to sign here or in Section VII below, indicate the reason in the space where his signature should appear.)*

_____   (b)(6), (b)(3)
(Recorder)   (b)(6), (b)(3)
   (Investigating Officer) (~~President~~)

_____   _____
(Member)   (Member)

_____   _____
(Member)   (Member)

### SECTION VII - MINORITY REPORT  (para 3-13, AR 15-6)

To the extent indicated in Inclosure _____, the undersigned do(es) not concur in the findings and recommendations of the board. *(In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)*

_____   _____
(Member)   (Member)

### SECTION VIII - ACTION BY APPOINTING AUTHORITY  (para 2-3, AR 15-6)

The findings and recommendations of the *(investigating officer)* ~~(board)~~ are (approved) ~~(disapproved)~~ ~~(approved with following exceptions/substitutions)~~. *(If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if oral) as a numbered inclosure.)*

FEB 17 2008

(b)(6), (b)(3)

(b)(6), (b)(3)

Approved for Release