# EXHIBIT B

licenses); and, if there are multiple terrestrial licensees, a further description of the leasing arrangement and explanation of how those licensees together hold all of the relevant licenses in a particular geographically dependent area (GIA). Entities completing FCC Form 608 for the purposes of providing SCS must also indicate that the application is for SCS by checking a box on Form 608.

This information collection is designed to allow Commission staff to carry out its statutory duties to regulate satellite communications in the public interest; namely, to ensure that prospective providers of SCS will operate in compliance with the applicable regulatory framework. This process utilizes an existing Commission form, which will remove confusion by employing the procedures that are already in place. The modifications for Form 608 covered herein will enable the Commission to more accurately track filings related to the provision of SCS, a critical component of application review given the interplay between part 1 lease filings and part 25 license applications inherent in the SCS framework. This is especially crucial where multiple entities together hold all co-channel licenses in a particular band throughout a geographically independent area (GIA) and wish to deploy a leasing agreement with a satellite operator to provide SCS. Such arrangements are only permitted in the circumstances described in section 1.9047(d)(1)(ii)(A)–(B); specifically, the Commission must be able to confirm that the multiple licensees in fact cover the entirety of the GIA in question and that, when reviewing related part 25 license applications, the entire area of the proposed service is covered by the associated leases. This collection will thereby enable the Commission to monitor and enforce the entry criteria that SCS providers must satisfy, and which are designed to minimize the possibility of harmful interference. Finally, the collection will play a critical role in the Commission's effort to review and track leasing arrangements that will result in entities providing SCS.

Federal Communications Commission.

**Aleta Bowers,**
*Information Management Specialist, Office of the Secretary.*

[FR Doc. 2024–15060 Filed 7–8–24; 8:45 am]

**BILLING CODE 6712–01–P**

# GOVERNMENT ACCOUNTABILITY OFFICE

## Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology; Request for Comment

**AGENCY:** U.S. Government Accountability Office (GAO).

**ACTION:** Notice of estimated lump sum catch-up payments and planned methodology; request for comment.

**SUMMARY:** GAO is now accepting comments on proposed lump sum catch-up payments to certain 1983 Beirut barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible applications for payment to the United States Victims of State Sponsored Terrorism Fund. GAO is publishing this notice pursuant to the requirements of the Fairness for 9/11 Families Act. Comments should be sent to the email address below.

**DATES:** Interested persons are invited to submit comments on or before August 8, 2024.

**ADDRESSES:** Submit comments to *FundPaymentComments@gao.gov* or by U.S. mail to Ms. Triana McNeil at 441 G Street NW, Washington, DC 20548.

**FOR FURTHER INFORMATION CONTACT:** David Lutter, at 202–512–7500 or *LutterD@gao.gov*, if you need additional information. For general information, contact GAO's Office of Public Affairs, 202–512–4800.

**SUPPLEMENTARY INFORMATION:**

### Background

Pursuant to section 101 of the Fairness for 9/11 Families Act (Fairness Act), GAO is conducting a review and publishing a notice of proposed lump sum catch-up payments to certain 1983 Beirut barracks bombing victims[1] and certain 1996 Khobar Towers bombing victims[2] who have submitted eligible applications to the United States Victims of State Sponsored Terrorism Fund (Fund), on or after December 29, 2022, and by June 27, 2023.[3] On December 28, 2023, GAO published a notice (88 FR 89693) of our methodology for estimating certain lump sum catch-up payments. In this notice, we are providing a summary of comments and our responses to comments on the December notice, our revised proposed methodology, and the estimated amount needed to provide lump sum catch-up payments to certain 1983 Beirut barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible applications for payment to the Fund, and we are accepting comments on updates to our planned methodology.

The Fund, which is administered by a Special Master and supported by Department of Justice (DOJ) personnel,[4] was established in 2015 by the Justice for United States Victims of State Sponsored Terrorism Act (Victims Act).[5] For purposes of the Fund, the term "claim" generally refers to a claim based on compensatory damages awarded to a United States person in a qualifying final judgment.[6] These judgments are issued by a United States district court under state or federal law against a foreign state that was designated as a state sponsor of terrorism at the time certain acts of international terrorism occurred or was so designated as a result of such acts,

---

[1] For the purposes of this analysis and consistent with the Fairness Act, "1983 Beirut barracks bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim [to the Fund] that arises out of the October 23, 1983, bombing of the United States Marine Corps barracks in Beirut, Lebanon; and includes a plaintiff, estate, or successor in interest [ ] who is a judgment creditor [in] *Peterson* v. *Islamic Republic of Iran* [ ] or a Settling Judgment Creditor as identified in the order dated May 27, 2014, [in] *In Re 650 Fifth Avenue & Related Properties*." 34 U.S.C. 20144(j)(15).

[2] The term "1996 Khobar Towers bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim [to the Fund] that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia; and includes a plaintiff, estate, or successor in interest [ ] who is a judgment creditor [in] *Peterson* v. *Islamic Republic of Iran* [ ] or a Settling Judgment Creditor as identified in the order dated May 27, 2014, [in] *In Re 650 Fifth Avenue & Related Properties*." 34 U.S.C. 20144(j)(16).

[3] Public Law 117–328, div. MM, sec. 101(b)(3)(B)(iii), 136 Stat. 4459, 6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)). Section 101 directs us to estimate catch-up payments for those who submitted eligible applications to the Fund between the date of enactment (Dec. 29, 2022), and June 27, 2023, which is the date by which claimants must have applied to the Fund to be considered for catch-up payments. We refer to this time frame, Dec. 29, 2022 through June 27, 2023, as the "statutory application time frame" throughout the remainder of this notice. In general, the deadline for submitting a claim to the Fund is not later than 90 days after obtaining a final judgment. However, the Fairness Act established a new application period for all 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims awarded final judgments before Dec. 29, 2022, providing that these victims had 180 days from the date of enactment of the Fairness Act (June 27, 2023) to submit an application for payment to the Fund. Public Law 117–328, 136 Stat. at 6106–6107 (pertinent portion codified at 34 U.S.C. 20144(c)(3)(A)(ii)).

[4] See 34 U.S.C. 20144(b)(1).

[5] Public Law 114–113, div. O, tit. IV, sec. 404, 129 Stat. 2242, 3007–3017 (codified as amended at 34 U.S.C. 20144).

[6] 34 U.S.C. 20144(c)(2).

and arising from acts of international terrorism.[7] In general, a claim is determined eligible for payment from the Fund if the Special Master determines that the judgment holder (referred to as a ''claimant'') is a United States person, that the claim at issue meets the definition of claim above, and that the application for payment was submitted timely.[8] As of January 2023, the Fund has allocated to eligible claimants approximately $3.4 billion in four payment rounds, which were distributed in 2017, 2019, 2020, and 2023. Claimants in these four payment rounds included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[9]

Additionally, at the time the Fund was established, the law allowed plaintiffs in two identified lawsuits, *Peterson* v. *Islamic Republic of Iran* (*Peterson*) and *In Re 650 Fifth Avenue and Related Properties*[10] to elect to participate in the Fund and irrevocably assign all rights, title, and interest in the actions for the purposes of participating in the Fund.[11] Plaintiffs in these actions who did not elect to participate in the Fund were also permitted to submit an application for conditional payment from the Fund in which payment amounts would be determined and set aside, pending a final determination in these actions.[12] In the event that a final judgment was entered in favor of the plaintiffs in the *Peterson* action and funds were distributed, the payments allocated to claimants who applied for a conditional payment were to be considered void, and any funds previously allocated to such conditional payments be made available and distributed to all other eligible claimants.[13] A final judgment in favor of plaintiffs in *Peterson* was entered, appealed to the United States Court of Appeals for the Second Circuit, and ultimately affirmed by the United States Supreme Court on April 20, 2016.[14] Distributions to the judgment creditor plaintiffs in *Peterson* commenced on October 19, 2016.[15] Accordingly, conditional claimants who were judgment creditors in *Peterson* did not receive award payments from the Fund, and the Fund did not include them in award calculations in 2017 for the first round of payments or subsequent payment rounds.[16]

The Victims Act outlines minimum payments requirements in which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed on the applicant's claim from any source other than the Fund[17] shall not receive any payment from the Fund until all other eligible applicants generally have received from the Fund an amount equal to 30 percent of the compensatory damages awarded to those applicants pursuant to their final judgments (referred to as the ''30 percent rule'').[18] The Fairness Act amended the Victims Act to provide that the minimum payments requirements include the total amount received by applicants who are 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims as a result of or in connection with *Peterson* or *In Re 650 Fifth Avenue and Related Properties.* It further provides that any such applicant who has received or is entitled or scheduled to receive 30 percent or more of such applicant's compensatory damages judgment as a result of or in connection with such proceedings shall not receive any payment from the Fund, except as consistent with minimum payments requirements or as part of a lump sum catch-up payment under section 101 of the Fairness Act.[19]

Section 101 of the Fairness Act contains a provision for GAO to conduct an audit and publish a notice of proposed lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund during the statutory application time frame (December 29, 2022, and by June 27, 2023).[20] This section also established a lump sum catch-up payment reserve fund within the Fund and appropriated $3 billion to this reserve fund.[21]

We published our initial planned methodology for comment on December 28, 2023 (88 FR 89693). We are now publishing for comment our updated planned methodology for estimating lump sum catch-up payments pursuant to section 101 of the Fairness Act for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers

---

[7] 34 U.S.C. 20144(c)(2).

[8] 34 U.S.C. 20144(c)(1). All decisions made by the Special Master with regard to compensation from the Fund are final and generally not subject to administrative or judicial review. *See* 34 U.S.C. 20144(b)(3). A claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master not later than 30 days after receipt of a written decision. Id. 20144(b)(4)(A). Not later than 90 days after any such hearing, the Special Master must issue a final written decision affirming or amending the original decision, and that written decision is final and nonreviewable. Id. 20144(b)(4)(B).

[9] According to Fund data, 12 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims were eligible for Fund payment for the first time in round 1, 141 in round 2, 423 in round 3, and 708 in round 4. Claimants continue to receive payment in future rounds, so the numbers of claimants receiving payment in rounds two, three, and four are cumulative.

[10] *Peterson* v. *Islamic Republic of Iran,* No. 10 Civ. 4518 (S.D.N.Y.) and *In Re 650 Fifth Avenue and Related Properties,* No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008).

[11] Public Law 114–113, 129 Stat. at 3013 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iii)).

[12] Public Law 114–113, 129 Stat. at 3013–3014 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iv)).

[13] Public Law 114–113, 129 Stat. at 3014 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iv)(II)(bb)).

[14] *See Bank Markazi aka Central Bank of Iran* v. *Peterson,* 578 U.S. 212 (2016); U.S. Victims of State Sponsored Terrorism Fund, ''Supplemental Report from the Special Master,'' at 6 (August 2017).

[15] U.S. Victims of State Sponsored Terrorism Fund, ''Supplemental Report from the Special Master,'' at 6 (August 2017).

[16] Id. There were 78 conditional claimants who were *Peterson* judgment creditors. Id.

[17] The statute requires that as part of the procedures to apply and establish eligibility for payment, the Special Master must require applicants to provide the Special Master with information regarding compensation from any source other than this Fund that the claimant (or, in the case of a personal representative, the victim's beneficiaries) has received or is entitled or scheduled to receive as a result of the act of international terrorism that gave rise to a claimant's final judgment, including information identifying the amount, nature, and source of such compensation. Public Law 114–113, 129 Stat. at 3008 (pertinent portion codified at 34 U.S.C. 20144(b)(2)(B)). Those procedures require applicants to provide information and documentation regarding the amount, nature, and source of any payment they received or are entitled or scheduled to receive, and state that applicants must update that information throughout the period of the Fund. ''Justice for United States Victims of State Sponsored Terrorism Act,'' 81 FR 45535, 45538 (July 14, 2016).

[18] Public Law 114–113, 129 Stat. at 3011 (pertinent portion codified at 34 U.S.C. 20144(d)(3)(B)(i)).

[19] Public Law 117–328, 136 Stat. at 6107 (pertinent portion codified at 34 U.S.C. 20144(d)(3)(B)(iii)).

[20] Public Law 117–328, 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)(i)). As discussed in footnote 3, section 101 directs us to estimate lump sum catch-up payments for those who submitted eligible applications to the Fund between the date of enactment (Dec. 29, 2022) and June 27, 2023, which is the date the application period closed for catch-up payments. See Public Law 117–328, 136 Stat. at 6106–6107 (pertinent portion codified at 34 U.S.C. 20144(c)(3)(A)(ii)). GAO's methodology for the estimation of lump sum catch-up payments is only for the purposes of carrying out the provisions directed to the Comptroller General under the Fairness Act.

[21] Public Law 117–328, 136 Stat. at 6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)(iv)). Additionally, not earlier than 90 days and not later than 1 year after submission of the report that is to follow this notice, the Special Master is to authorize lump sum catch-up payments from the reserve fund in amounts equal to those estimated by GAO. 34 U.S.C. 20144(d)(4)(D)(iv)(II). Not later than 1 year after the Special Master disburses all lump sum catch-up payments from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. 34 U.S.C. 20144(d)(4)(D)(iv)(IV).

bombing victims in ''amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022.''[22] The language used in section 101 to describe the percentage resulting from the receipt of lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims is equivalent to the language in the Sudan Claims Resolution Act, which directed us to estimate lump sum catch-up payments to 9/11 victims, spouses, and dependents.[23] Section 101 further provides for GAO to conduct this audit in accordance with 34 U.S.C. 20144(d)(3)(A), which requires that distributions be made ''on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims, until such amounts have been paid in full or the Fund is closed.''[24] Additionally, 34 U.S.C. 20144(d)(3)(A) places limits on the amount of eligible claims (referred to as ''individual and family statutory caps'').[25]

**Summary of Comments**

GAO received a total of 319 comments by the closing date of January 29, 2024. GAO received 310 comments from individuals and 9 comments from law firms representing victims of state-sponsored terrorism.[26] GAO received 316 comments by email; the remaining 3 comments were received in voicemails or letters. In general, comments from individuals were from 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims, 9/11 victims and their family members, and Members of Congress;[27] and comments from law firms were from attorneys representing 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.

GAO has carefully considered all comments received. Below is a summary of the types of comments GAO received and GAO's responses.[28]

*Equity Issues Related to U.S. Victims of State Sponsored Terrorism Fund and Lump Sum Catch-Up Payments*

Some comments expressed concern with certain groups of victims within the Fund being prioritized and stated that all victims should be treated equally and fairly. Some commenters also stated that since 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims were never excluded from the Fund, they should not receive catch-up payments.

*GAO Response:* Section 101 of the Fairness Act includes a provision for GAO to conduct an audit and publish a notice of proposed lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund during the statutory application time frame. As such, GAO is carrying out the processes directed by that provision and is not otherwise taking a position with respect to who should receive lump sum catch-up payments.

*Eligibility Criteria for a Lump Sum Catch-Up Payment*

GAO received comments regarding the eligibility criteria for a lump sum catch-up payment. Many of the comments on this topic related to the timing of applications to the Fund by 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. Specifically, commenters raised issues related to prior applicants to the Fund who either withdrew their prior applications or were already deemed eligible claimants by the Fund, and reapplied within the statutory application time frame. One group of commenters stated that applicants who withdrew prior applications and subsequently reapplied to the Fund within the statutory application time frame should be considered ineligible for a lump sum catch-up payment, describing them as ''late filers.'' A second group of commenters who submitted a comment letter stated that claimants who applied to the Fund previously, as conditional claimants or otherwise, and then subsequently applied to the Fund within the statutory application time frame should be eligible for a lump sum catch-up payment. These commenters stated that section 101 of the Fairness Act does not prohibit successive applications or further define the term ''application'' in a way that would disqualify claimants who previously applied to the Fund and then applied subsequently within the statutory application time frame. Some commenters also raised concerns that the Fund had administratively closed claimants' applications, or did not permit claimants to apply under the Fund's procedures.[29]

---

[22] 34 U.S.C. 20144(d)(4)(D)(i). The Fairness Act required GAO, by Dec. 28, 2023, to conduct an audit and publish a notice in the **Federal Register**. The act further required GAO to provide a 30-day period for public comment and to submit a report to congressional committees and the Special Master not later than 30 days after the expiration of the comment period. Id. 20144(d)(4)(D)(ii)–(iii). We acknowledge that we did not meet the date identified in the statute for submitting a report to congressional committees and the Special Master. We also acknowledge that the Fairness Act does not contain a provision for GAO to publish a second **Federal Register** notice on this topic. We believe that we need to issue this notice to ensure an accurate and transparent methodology for claimants to receive the correct amounts of lump sum catch-up payments. In response to the first **Federal Register** notice, we received numerous comments that raised disparate and considered views, and it is critical that we fully consider and address them. In addition, this second notice considers certain claimant data that were not available in December 2023 when we issued the first notice to meet the date required by the Fairness Act.

[23] See Public Law 116–260, div. FF, tit. XVII, sec. 1705(b)(2), 134 Stat. 1182, 3293–3294 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(C)(i) (''[T]he Comptroller General of the United States shall conduct an audit and publish in the **Federal Register** a notice of proposed lump sum catch-up payments to 9/11 victims, 9/11 spouses, and 9/11 dependents who have submitted applications in accordance with subparagraph (B) in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of December 27, 2020.'')).

[24] See 34 U.S.C. 20144(d)(3)(A)(i) (requiring the division of funds on a pro rata basis, subject to minimum payments provisions in 34 U.S.C. 20144(d)(3)(B) and limitations in 34 U.S.C. 20144(d)(3)(A)(ii)).

[25] 34 U.S.C. 20144(d)(3)(A)(ii). For example, for individuals, the cap is $20,000,000 and for claims of non-9/11 family members when aggregated, the cap is $35,000,000.

[26] GAO counted comments received multiple times with the same content and sender as one comment.

[27] We received a comment letter signed by three Members of Congress. According to the comment letter, they are members of the United States Senate who worked on the Fairness Act and on S. 5156, the Fairness for American Victims of State-Sponsored Terrorism Act (which later became the catch-up payment provision in the Fairness Act). The Members of Congress provided comments stating their views that all eligible claimants should be referred to GAO from the Special Master, GAO should use the Fund's payment percentage for purposes of lump sum catch-up payments, and GAO should exclude offsets from claimants' net eligible claims.

[28] Some comments fell into multiple categories and are included in all applicable categories.

[29] According to Fund officials, the Fund administratively closed applications submitted by claimants previously found eligible because it cannot and does not accept successive or duplicate applications. See ''Justice for United States Victims of State Sponsored Terrorism Act,'' 81 FR 45535, 45537 (July 14, 2016) (stating that ''[o]nly one application may be submitted for each claim''). On Feb. 7, 2023, during the statutory application time frame, the Fund updated the frequently asked questions section of its website, adding language that 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims ''who are not eligible for lump sum catch-up payments under the Fairness Act, such as USVSST Fund claimants previously found eligible, may still be eligible for compensation in the USVSST Fund's other statutory distributions.'' U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions,* https://www.usvsst.com/Home/Faq (last accessed June 25, 2024) (Frequently Asked Question (FAQ) 7.3 Which 1983 Beirut barracks

*GAO Response:* GAO's view is that the provision for lump sum catch-up payments in section 101 of the Fairness Act does not disqualify claimants who previously applied to the Fund and then subsequently applied within the statutory application time frame.[30] The Comptroller General's mandate to determine amounts of lump sum catch-up payments does not state that successive applications cannot be submitted for lump sum catch-up payments, and we do not read such a prohibition in the related provision regarding the deadline for application submission.[31] Accordingly, we are updating our methodology to include all eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted an application to the Fund within the statutory application time frame, including those who submitted successive applications to the Fund.[32]

In accordance with section 101 of the Fairness Act, we will not include claimants who did not have a final judgment awarded as of the date of enactment of the Fairness Act and will not include claimants who did not submit an application to the Fund within the statutory application time frame.[33]

*Support for GAO's Percentage Calculation Methodology*

Comments received expressed support for GAO's percentage calculation methodology as described in our December 28, 2023, notice (88 FR 89693). These commenters noted that the methodology we outlined was the same formula used to calculate the 9/11 lump sum catch-up payments, and also noted that since the relevant statutory language for that calculation and this calculation are identical, they find this approach appropriate. These commenters also generally stated that employing a different formula or methodology would potentially give prioritization or preferential treatment to one group of victims over another.

*GAO's Response:* We agree that the language used in section 101 of the Fairness Act to describe the percentage that we are to calculate to estimate lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims is equivalent to the language in the Sudan Claims Resolution Act, which directed us to estimate lump sum catch-up payments to 9/11 victims, spouses, and dependents.[34] Thus, we plan to use the same methodology that we used to calculate ''GAO's percentage calculation'' for the 9/11 lump sum catch-up payments for this population.

*Request To Use the Fund's Payment Percentage*

GAO received comments about the use of the Fund's payment percentage for our estimation of lump sum catch-up payments. For example, commenters suggested that GAO add the payment percentages calculated by the Fund in the first through fourth rounds to determine the percentage needed for catch-up payments.[35]

*GAO's Response:* Section 101 of the Fairness Act calls for GAO to estimate lump sum catch-up payments ''in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022.''[36] Consistent with our approach pursuant to equivalent language in the Sudan Claims Resolution Act and outlined in a prior notice (86 FR 31312, June 11, 2021) and report,[37] GAO estimated the amount needed to provide lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted

---

bombing victims and 1996 Khobar Towers bombing victims are included in the Fairness Act's lump sum catch-up payment provision and how do these victims file a claim with the USVSST Fund?). Further, on July 28, 2023, the Fund updated FAQ 7.1 What are lump sum catch-up payments? and FAQ 7.3 to add language stating that ''[e]ach claimant has one claim before the USVSST Fund for all compensation, including lump sum catch-up payments. The USVSST Fund cannot accept duplicative filings.'' According to Fund officials, claimants may have refrained from filing an application after contacting the Fund or reviewing the application procedures based on the advice received from their counsel or the Fund. For good cause shown, the Special Master may grant a claimant a reasonable extension of the section 20144(c)(3)(A)(ii)(II) deadline. 34 U.S.C. 20144(c)(3)(B) (applying to deadlines under (c)(3), as enacted by the Victims Act, Public Law 114–113, 129 Stat. at 3010).

[30] GAO's view is for purposes of implementing the Comptroller General's responsibilities under 34 U.S.C. 20144(d)(4)(D)(i)–(iii) to conduct an audit and calculate amounts for the Special Master to allocate lump sum catch-up payments.

[31] See 34 U.S.C. 20144(c)(3)(A)(ii)(II); 34 U.S.C. 20144(d)(4)(D)(i) (conditioning eligibility for lump sum catch-up payments on those individuals filing applications for payment between Dec. 29, 2022, and June 27, 2023). Interpreting the statute in this way also aligns with another provision of the Fairness Act, related to litigation involving certain 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims. See Public Law 117–328, 136 Stat. at 6109 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(v) (providing that statutory provisions regarding elections by plaintiffs in *Peterson* v. *Islamic Republic of Iran* and *In Re 650 Fifth Avenue and Related Properties* shall not apply with respect to 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims who submit an application during the statutory application time frame)).

[32] This includes claimants who, within the statutory application time frame, submitted applications to the Fund, including those who submitted a letter to the Fund expressing the claimants' intent to apply for lump sum catch-up payments, regardless of a previous determination of eligibility by the Fund or administrative closure of their applications. As discussed in further detail below, this comprises 512 claimants (which includes 78 conditional claimants who were *Peterson* judgment creditors).

[33] Section 101 of the Fairness Act requires that applications be submitted on or after Dec. 29, 2022, and by June 27, 2023. In contrast, the Sudan Claims Resolution Act provided 9/11 victims, spouses, and dependents 90 days from the date of enactment to submit an application for a payment. Public Law 116–260, 134 Stat. at 3293–3294 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(C)(i)). Therefore, GAO could calculate lump sum catch-up payments for 9/11 victims, spouses, and dependents who submitted applications to the Fund prior to the date of enactment of the Sudan Claims Resolution Act, while GAO cannot calculate lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims unless they have submitted an application during the 180-day period from the date of enactment of the Fairness Act.

[34] Compare 34 U.S.C. 20144(d)(4)(D)(i) (''in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022''), with 34 U.S.C. 20144(d)(4)(C)(i) (''in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of December 27, 2020.''). The Fairness Act directed the Special Master to authorize lump sum catch-up payments to 9/11 victims, spouses, and dependents in amounts equal to those previously estimated by GAO and appropriated funds for that purpose. Public Law 117–328, 136 Stat. at 6107; GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments,* GAO–21–105306 (Aug. 11, 2021).

[35] The Fund's ''payment percentage'' is the amount of funds available to pay all eligible claimants in a given round divided by compensatory damages after accounting for the individual and family statutory caps, compensation from other sources, and prior payments from the Fund. The payment percentage for the initial round of payments was 13.6561 percent (generally rounded to 13.66 percent in USVSST Fund communications). The payment percentage for the second round of payments was 4.1955 percent (rounded to 4.2 percent in USVSST Fund communications). The payment percentage for non-9/11-related claimants in the third round of payments was 5.8385 percent (rounded to 5.84 percent in USVSST Fund communications). The non-9/11-related payment percentage for the fourth round was 0.4047 percent (rounded to 0.4 percent in USVSST Fund communications). The payment percentage total for all four rounds is 24.0948 percent, rounded here to 24 percent. See U.S. Victims of State Sponsored Terrorism Fund, ''Payment Calculation Explanation for Non-9/11-Related Claims,'' at 5 (December 2022).

[36] 34 U.S.C. 20144(d)(4)(D)(i).

[37] GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments,* GAO–21–105306 (Aug. 11, 2021) (see Enclosure II for further discussion of the Fund's payment percentage and GAO's percentage calculation).

potentially eligible applications within the statutory application time frame in an equal percentage to that of the payments that have been made to non-9/11 claimants in the Fund's first three payment rounds.[38]

We note that there are key differences in how the Fund calculated its payment percentage and how GAO calculated the percentage of lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. In particular, the Fund and GAO calculated percentages in different ways to fulfill distinct purposes. The Fund's mission in each payment round is to distribute the available money in the Fund—a known amount—among Fund claimants. Section 101 of the Fairness Act, however, directs GAO to estimate the amount of money that is needed to catch up eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in an equal percentage to that of the payments that have been made to non-9/11 claimants in the Fund's first three payment rounds.[39]

*Offsetting Eligible Claims With Compensation From Other Sources for Lump Sum Catch-Up Payments*

GAO received comments regarding our planned approach of estimating two amounts in this notice: (1) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims; and (2) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources. Some commenters advocated for the final lump sum catch-up payment estimates provided by GAO to be offset by compensation from other sources for this population. These commenters stated that the statute governing the Fund and section 101 of the Fairness Act support an approach that is based on an individual's unpaid compensatory damages claim, which is an applicant's claim value after moneys received from sources other than the Fund are deducted. These commenters also noted that certain 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims have received compensation from other sources that are to be offset by the Fund pursuant to the statute governing the Fund.[40]

In contrast, other commenters advocated for the final lump sum catch-up payment estimates provided by GAO to not be offset by compensation from other sources for this population. These commenters stated that section 101 of the Fairness Act's use of the phrase "received from the Fund" should be read to modify the employment of 34 U.S.C. 20144(d)(3)(A) such that claims should not be offset other than from amounts received from the Fund. These commenters acknowledged 34 U.S.C. 20144(d)(3)(A)(i) provides that payments should be "based on the amounts outstanding and unpaid on eligible claims," but stated that this language does not apply to catch-up payments because the focus of the directive to GAO is on amounts received from the Fund. They further stated that the exemption for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims from the 30 percent rule for the purposes of receiving a lump sum catch-up payment indicates congressional intent that, for the purposes of these catch-up payments, the normal Fund rules offsetting payments should not apply.

Some commenters also raised concerns about GAO's planned approach of estimating two amounts and that GAO should provide only one estimated amount.

*GAO's Response:* Section 101 of the Fairness Act requires GAO to conduct this audit "in accordance with clauses (i) and (ii) of [34 U.S.C. 20144(d)(3)(A)]." Consistent with our prior lump sum catch-up payment calculation for 9/11 victims, spouses, and dependents, and in accordance with clause (ii) of 34 U.S.C. 20144(d)(3)(A), we plan to estimate lump sum catch-up payments for this population using their "net eligible claims,"[41] that is, the amount of their claims after the application of individual and family statutory caps.[42]

Section 101 also requires us to conduct our work in accordance with clause (i) of 34 U.S.C. 20144(d)(3)(A), which requires that payments be made "based on the amounts outstanding and unpaid on eligible claims." In order to give effect to this provision, compensatory damages from other sources received by the claimant under their final judgment must be subtracted to produce the amount "outstanding and unpaid" on their claims. In our prior work, we did not offset eligible 9/11 victims, spouses, and dependents' net eligible claims with compensation from other sources because that population did not have qualifying compensation from other sources.[43] Since certain 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims do have qualifying compensation from other sources, our reading of section 101's directive for us to conduct our work in accordance with clause (i) of 34 U.S.C. 20144(d)(3)(A) requires us to offset their net eligible claims by the amounts paid on eligible claims in the final lump sum catch-up payment estimates provided in our report.[44]

In light of the language of clause (i) of 34 U.S.C. 20144(d)(3)(A), the comments

---

[38] We did not include the Fund's fourth payment round because, according to the Fund, it did not begin issuing fourth-round payments until Jan. 4, 2023, after the Fairness Act was enacted.

[39] See our methodology section below for more details of the calculation of the GAO percentage.

[40] See 34 U.S.C. 20144(d)(3)(A)(i). These commenters stated that while the Fairness Act explicitly exempts 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims from the 30 percent rule for the purposes of receiving a lump sum catch-up payment, the statute governing the Fund still requires that their total compensatory damages be offset of the moneys they have already received or are scheduled to receive.

[41] For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of individual and family statutory caps. 34 U.S.C. 20144(d)(3)(A)(ii).

[42] 34 U.S.C. 20144(d)(3)(A)(ii). For example, for individuals, the cap is $20,000,000 and for claims of non-9/11 family members when aggregated, the cap is $35,000,000.

[43] *See* 34 U.S.C. 20144(d)(3)(A)(i)(III), (d)(3)(B).

[44] This provision is different than the minimum payments provisions in 34 U.S.C. 20144(d)(3)(B), under which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed to such applicant on the applicant's claim from any source other than the Fund shall not receive any payment from the Fund until such time as all other eligible applicants have received from the Fund an amount equal to 30 percent of the covered compensatory damages awarded to those applicants. *See* 34 U.S.C. 20144(d)(3)(A)(i) ("Except as provided in subparagraph (B) [minimum payments provisions] and subject to the limitations described in clause (ii) [individual and family statutory caps], the Special Master shall carry out paragraph (1), by . . . further dividing the funds allocated to non-9/11 related victims of state sponsored terrorism on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims, until such amounts have been paid in full or the Fund is closed."). The Fairness Act added a new provision, codified at 34 U.S.C. 20144(d)(3)(B)(iii), stating that compensatory damages received or entitled or scheduled to be received by an applicant who is a 1983 Beirut barracks bombing victim or a 1996 Khobar Towers bombing victim as a result of or in connection with *Peterson* or *In Re 650 Fifth Avenue and Related Properties* are excepted for purposes of lump sum catch-up payments. In using the term "offsets," we refer to compensation from sources other than the Fund for the purposes of applying clause (i) of 34 U.S.C. 20144(d)(3)(A) and the minimum payments provisions. GAO's view is for purposes of implementing the Comptroller General's responsibilities under 34 U.S.C. 20144(d)(4)(D)(i)–(iii) to conduct an audit and calculate amounts for the Special Master to allocate lump sum catch-up payments.

we received on this issue, and concerns by some commenters about our approach of providing two amounts, we will provide in this notice one estimate: the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources.

### Methodology To Produce Estimates for Lump Sum Catch-Up Payments

To estimate the amount(s) called for in section 101, GAO used the following data from the Fund: (1) payments from the Fund received by non-9/11 claimants in the first through third payment rounds;[45] (2) net eligible claims[46] of these non-9/11 claimants; (3) compensation from other sources received by these non-9/11 claimants;[47] (4) net eligible claims[48] of the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame (between December 29, 2022, and June 27, 2023);[49] and (5) compensation from other sources received by the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame.[50]

To carry out our mandate under section 101 of the Fairness Act, using data from the Fund described above, we estimated the amount of payments that non-9/11 claimants received in the first three rounds of Fund payments, as a percentage of their net eligible claims offset by compensation from other sources.[51] We first determined the payment amounts received by non-9/11 claimants from the Fund in the first through third payment rounds.[52] We then summed the payments for the three payment rounds across all non-9/11 claimants. Next, we determined the net eligible claims of the non-9/11 claimants as of the third round that they received a payment, offset by compensation from other sources, and summed across all claimants. We divided the amount of payments by the net eligible claims offset by compensation from other sources to determine the percentage called for in our mandate of 16.0353 percent (GAO's percentage calculation).[53]

### Estimates for Lump Sum Catch-Up Payments

Using GAO's percentage calculation, we estimated the total amount needed to provide lump sum catch-up payments to the 2,086 potentially eligible 1983

---

[45] As discussed in footnote 9, this includes some 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who were eligible for payment from the Fund in prior rounds. We did not include in this group 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who did not receive any payment in the first through third payment rounds. We used this information to help us identify the percentage of claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of the Fairness Act's enactment date (Dec. 29, 2022). See 34 U.S.C. 20144(d)(4)(D)(i). Given this reference to the act's enactment date, we omitted fourth-round payments from the calculation of the payment percentage because non-9/11 victims of state sponsored terrorism received them after that date. The Fund notified eligible claimants of their fourth-round payment amounts on Dec. 30, 2022, and began issuing the fourth-round payments on a rolling basis on Jan. 4, 2023, after the Fairness Act was enacted. U.S. Victims of State Sponsored Terrorism Fund, "Special Master's Report Regarding the Fourth Distribution," at 3 (January 2023).

[46] For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of individual and family statutory caps by the Fund, if applicable. 34 U.S.C. 20144(d)(3)(A)(ii).

[47] Not all compensation from other sources is necessarily offset against claimants' net eligible claims. When referring to "compensation from other sources" for purposes of our methodology and estimates, we are referring to compensation from other sources that the Fund would offset from its awards under its calculation methodology, which the Fund provided to GAO.

[48] As of March 2024, data from the Fund on the claim amounts after the application of individual and family statutory caps ("net eligible claims") for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who are potentially eligible for lump sum catch-up payments were not available for new applicants to the Fund. This is because these new claimants have not been included in a payment distribution that would require the application of individual and family statutory caps by the Fund. GAO used Fund methodology to apply the individual and family statutory caps to these claims. *See* U.S. Victims of State Sponsored Terrorism Fund, *Payment Calculation Explanation for Non-9/11-Related Claims* at 2–3 (December 2022). Before applying the $35 million family statutory cap, we first treated any individual claim that exceeded the $20 million individual statutory cap as $20 million. For purposes of the $35 million family statutory cap, GAO summed individual claims for those claims that indicated a family relationship in the data by a family identification number. Once summed, if claims within a family identification number exceeded the $35 million family statutory cap, we then allocated the $35 million family statutory cap among the family members in proportion to their individual claims. We provided our analysis to the Fund for review and they confirmed that based on their review our approach appeared consistent with their methodology. While this analysis enabled us to determine the "net eligible claims" for the purposes of estimating lump sum catch-up payments for our population, we recognize that the Fund may receive additional information or data in the future that might impact these amounts if these claimants are included in a future payment distribution.

[49] We received data from the Fund as of May 2024 for 1,778 claimants for the 1983 Beirut barracks bombing and 308 claimants for the 1996 Khobar Towers bombing who submitted eligible applications to the Fund and applied in the statutory application time frame. Of those, 512 had received a prior eligibility determination from the Fund and 1,559 were new applicants. We also received data on 14 victims of these attacks who submitted applications during the statutory application time frame whose eligibility is still being determined by the Fund as of June 2024. Because eligibility for some of these victims is still being determined, we refer to the group as a whole as "potentially eligible" for catch-up payments. These applications are pending because the Fund is awaiting additional documentation from these individuals that is needed to determine their claims' eligibility. We encourage applicants with pending applications to provide requested documentation to the Fund that is needed to determine their claims' eligibility. For purposes of estimating lump sum catch-up payments in this notice, we are including all of the potentially eligible claims. However, in our final report, to be issued no later than 30 days following the close of the comment period, we will only include the total amount needed to provide lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1986 Khobar Towers bombing victims who submitted claims that the Fund has deemed eligible.

[50] We obtained from the Fund information on compensation from other sources as of March 2024 for claimants who have eligibility for regular distributions from the Fund. Fund officials confirmed that, based on information included in these applications, all applicants who reported compensation from other sources are *Peterson* judgment creditors whose offsets are the amounts recovered in *Peterson.* After GAO informed the Fund that it would include claimants who previously had eligibility determinations made by the Fund in its estimated lump sum catch-up payment calculations, on May 31, 2024, the Fund provided the remaining offset information that the 78 conditional claimants who were *Peterson* judgment creditors included in their applications for lump sum catch-up payments, for purposes of our audit and calculations. In order to apply the minimum payments provisions in 34 U.S.C. 20144(d)(3)(B), before issuing our final report, we will need to confirm the source of the offsets for these 78 conditional claimants. The Fund does not use information contained in duplicate applications administratively closed by the Fund for Fund purposes, according to the Fund officials.

[51] In accordance with GAO standards, we will assess the reliability and completeness of the data from the Fund to ensure that it is appropriate for these purposes.

[52] The non-9/11 claimants included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who received payments from the Fund. See 34 U.S.C. 20144(j)(9). In applying this standard, we excluded three types of claims: (1) those where the victim received no payments because they were conditional claimants; (2) those where the victim never received payment in any of the first through third rounds of distribution because compensation from other sources (offsets) exceeded 30 percent of the compensatory damages (before applying the individual and family statutory caps); and (3) those where the offsets exceeded the percentage of compensatory damages awarded to other eligible applicants in each of the first through third rounds of distribution for which these claims were eligible. See id. 20144(d)(4)(D)(i).

[53] We reported 4.6122 percent in the first notice. The percentage changed due to a data programming error that occurred in our initial estimate and has now been corrected. Specifically, the net eligible claims were inadvertently included in the initial round that the payment was received as well as in the subsequent rounds, resulting in a larger summed net eligible claims and a lower calculated percentage. Furthermore, the calculation included the fourth payment round which, as indicated in footnote 35, had a very low payment percentage among the four rounds.

Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources.[54] In the data provided, 1,495 of the potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims reported compensation from other sources of some non-zero amount, such as court-awarded compensation.[55] To identify a claimant's lump sum catch-up payment, the calculated GAO percentage will be applied to the claimant's net eligible claims offset by compensation from other sources. Then, to identify a net lump sum catch-up payment, we will subtract any amount of money a claimant had previously received from the Fund.[56] Our calculation produced $614,988,012.55, the total amount needed to provide lump sum catch-up payments for Beirut barracks and Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame.[57]

After consideration of the comments from this notice, we will issue a report using data from the Fund to report estimated lump sum catch-up payments based on this methodology with any changes we determine appropriate. We invite comments on all aspects of the planned methodology and lump sum catch-up payments proposed in this notice. Our final report will be available on *gao.gov*.

*Authority:* Pub. L. 117–328, div. MM, sec. 101(b)(3)(B)(iii), 136 Stat. 4459, 6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)).

**Triana McNeil,**
*Director, Homeland Security and Justice, U.S. Government Accountability Office.*
[FR Doc. 2024–15016 Filed 7–8–24; 8:45 am]
**BILLING CODE 1610–02–P**

---

[54] In our prior work, we did not offset eligible 9/11 victims, spouses, and dependents' net eligible claims with compensation from other sources because this population did not have qualifying compensation from other sources. Although some 9/11 claimants may have received awards from the September 11th Victim Compensation Fund (VCF), money received from the VCF is not considered an offset for the Fund's award calculations. See U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions, https://www.usvsst.com/Home/Faq* (last accessed June 18, 2024) (see 4.8 What is a source of compensation other than the USVSST Fund?).

[55] The Fund provided information about compensation from other sources for all potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. According to Fund data, the reported compensation from other sources for some of these potentially eligible claimants was $0. For potentially eligible claimants who received compensation from other sources of some non-zero amount, that compensation ranged from approximately $65,000 to approximately $5 million.

[56] The payments previously received from the Fund will include all the payment rounds—first through fourth rounds—as applicable.

[57] The net lump sum catch-up payment is the difference between the calculated lump sum catch-up and the compensation already received from the Fund (it would be zero if the compensation already received from the Fund is equal to or exceeds the calculated lump sum catch-up).

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

**[Document Identifiers: CMS–855B]**

## Agency Information Collection Activities: Proposed Collection; Comment Request

**AGENCY:** Centers for Medicare & Medicaid Services, Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Medicare & Medicaid Services (CMS) is announcing an opportunity for the public to comment on CMS' intention to collect information from the public. Under the Paperwork Reduction Act of 1995 (PRA), Federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information (including each proposed extension or reinstatement of an existing collection of information) and to allow 60 days for public comment on the proposed action. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including the necessity and utility of the proposed information collection for the proper performance of the agency's functions, the accuracy of the estimated burden, ways to enhance the quality, utility, and clarity of the information to be collected, and the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

**DATES:** Comments must be received by September 9, 2024.

**ADDRESSES:** When commenting, please reference the document identifier or OMB control number. To be assured consideration, comments and recommendations must be submitted in any one of the following ways:

1. *Electronically.* You may send your comments electronically to *http://www.regulations.gov*. Follow the instructions for "Comment or Submission" or "More Search Options" to find the information collection document(s) that are accepting comments.

2. *By regular mail.* You may mail written comments to the following address: CMS, Office of Strategic Operations and Regulatory Affairs, Division of Regulations Development, Attention: Document Identifier/OMB Control Number: ___, Room C4–26–05, 7500 Security Boulevard, Baltimore, Maryland 21244–1850.

To obtain copies of a supporting statement and any related forms for the proposed collection(s) summarized in this notice, please access the CMS PRA website by copying and pasting the following web address into your web browser: *https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.*

**FOR FURTHER INFORMATION CONTACT:**
William N. Parham at (410) 786–4669.

**SUPPLEMENTARY INFORMATION:**

### Contents

This notice sets out a summary of the use and burden associated with the following information collections. More detailed information can be found in each collection's supporting statement and associated materials (see **ADDRESSES**).

CMS–855B  Medicare Enrollment Application for Clinics/Group Practices and Other Suppliers

Under the PRA (44 U.S.C. 3501–3520), Federal agencies must obtain approval from the Office of Management and Budget (OMB) for each collection of information they conduct or sponsor. The term "collection of information" is defined in 44 U.S.C. 3502(3) and 5 CFR 1320.3(c) and includes agency requests or requirements that members of the public submit reports, keep records, or provide information to a third party. Section 3506(c)(2)(A) of the PRA requires Federal agencies to publish a 60-day notice in the **Federal Register** concerning each proposed collection of information, including each proposed extension or reinstatement of an existing collection of information, before submitting the collection to OMB for approval. To comply with this requirement, CMS is publishing this notice.

### Information Collections

1. *Type of Information Collection Request:* Reinstatement with change of a previously approved collection; *Title of Information Collection:* Medicare Enrollment Application for Clinics/Group Practices and Other Suppliers; *Use:* Various sections of the Act, the United States Code (U.S.C.), Internal Revenue Service (IRS) Code, and the CFR require providers and suppliers to