**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROBERT MARTINO, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>    *Defendant.* | Civil Action No. 21-1808 (RDM)<br><br>**UNDER SEAL** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

   This case arises from over 200 terrorist attacks perpetrated against United States servicemembers and civilians serving in Iraq between 2003 and 2010. The 623 Plaintiffs are the victims of the attacks and their family members. Defendant is the Islamic Republic of Iran ("Iran"). Plaintiffs allege that Iran caused their injuries by providing material support to a Sunni terrorist coalition led by al-Qaeda and its two main affiliates in Iraq, the Zarqawi organization, also known as al-Qaeda in Iraq ("AQI"), and Ansar al-Islam ("AAI"). Plaintiffs seek compensatory and punitive damages under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Iran has not answered or otherwise appeared in this action. Consequently, at Plaintiffs' request, the Clerk of the Court entered default against Iran. Dkt. 29.

   To facilitate the efficient resolution of their claims, Plaintiffs sought, and this Court approved, a case management order. *See* Min. Order (Aug. 16, 2023); Dkt. 35. The order provides for "three phases" following the entry of default judgment. Dkt. 35 at 3. The first phase requires determining liability and damages for 45 bellwether Plaintiffs ("Bellwether Plaintiffs") associated with 25 bellwether attacks ("Bellwether Attacks"). *Id.* These Bellwether

Plaintiffs and Attacks "represent a cross-section of the attack geographies, attack types, and victim categories spanning all of the attacks and Plaintiffs in this case."  Dkt. 38-2 at 21.  The second phase will be a "a damages phase for additional[, non-bellwether] plaintiffs harmed by the bellwether attacks," and the third phase will be "a liability and damages phase for two additional tranches of non-bellwether attacks and plaintiffs that will be able to rely on the Court's bellwether ruling."  Dkt. 35 at 3.

The pending motion concerns the first and second phases.  Before the Court is the Bellwether Plaintiffs' motion for default judgment, Dkt. 38-2, as well as Plaintiffs' motion to appoint a special master to adjudicate damages for the 52 additional, non-bellwether Plaintiffs whose claims arise from the same Bellwether Attacks, Dkt. 44.

This opinion will proceed in three parts.  First, it will present the Court's findings of fact regarding the connection between Iran and the two terrorist groups:  the Zarqawi organization and Ansar al-Islam.  Next, the Court will review each of the 25 Bellwether Attacks and will set forth its conclusions regarding the likely perpetrator of each attack.  Finally, the Court will set forth its legal conclusions regarding Iran's liability for the Bellwether Plaintiffs' injuries.

For the reasons explained below, the Court will grant the Bellwether Plaintiffs' motion for default judgment as to liability, Dkt. 38-2; *see* 28 U.S.C. § 1608(e), and will appoint a special master to hear their damages claims and to prepare a report for the Court recommending the awards of compensatory damages for each of the 45 Bellwether Plaintiffs.  The Court will further grant Plaintiffs' motion, Dkt. 44, to appoint a special master to evaluate the claims for damages asserted by the additional 52 Plaintiffs whose claims arise from the same Bellwether Attacks.

# I. INTRODUCTION

Bellwether Plaintiffs, 45 U.S. nationals, bring this action for damages against the Islamic Republic of Iran.  One of these Bellwether Plaintiffs, U.S. Marine Corps Sergeant Adam Kisielewski, seeks to recover for the devastating injuries that he sustained, and the remaining Bellwether Plaintiffs seek to recover for the solatium damages resulting from the extrajudicial killing of their family members while serving in Iraq.  Dkt. 15 at 10 (Am. Compl. ¶¶ 1–2); Dkt. 38-2 at 123-180.  Plaintiffs claim that Iran, in effect, "orchestrated" and supported this terrorist coalition "by, among other things, helping establish the groups in the first instance, providing critical safehouses and travel assistance, training terrorists how to attack Americans effectively, providing sophisticated weapons and facilitating the smuggling thereof, and providing substantial funding to groups targeting Americans, including by paying terrorists who killed U.S. forces."  Dkt. 15 at 10 (Am. Compl. ¶ 3).  Moreover, they detail an array of direct and indirect support that Iran provided to the Zarqawi organization and AAI, including the provision of weapons, training, safe haven and safe passage through Iran, financial support, and intelligence.  Dkt. 38-2 at 81–133.  To establish subject matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a), as well as the federal cause of action against state sponsors of terrorism under § 1605A(c), Dkt. 15 at 12 (Am. Compl. ¶¶ 9–11).

Plaintiffs effected service on Iran on July 11, 2022.  Dkt. 26.  Iran has not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.  *See* Dkt. 27. Accordingly, at Plaintiffs' request, the Clerk of the Court declared Iran in default on September 15, 2022.  Dkt. 29.

Plaintiffs now seek entry of a default judgment with respect to liability against Iran pursuant to Federal Rule of Civil Procedure 55. Dkt. 38-2. Even in a garden variety case, the entry of a default judgment "is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, moreover, the Court's discretion to enter a default judgment is more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d)). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens II*"), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). In a case like this one, which alleges that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or

4

sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens II*, 864 F.3d at 785.

This means that, to obtain a default judgment against Iran, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens II*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal law by offering evidence "satisfactory to the court," *id.* §§ 1605A(c), 1608(e).

Plaintiffs endeavor to meet this burden using three types of evidence:  First, each of the Bellwether Plaintiffs has submitted identity documents establishing that they are U.S. nationals and declarations in which they recount their injuries, including Sergeant Kisielewski's pain and suffering and lost income and the other Bellwether Plaintiffs' suffering due to the deaths of their close family members in the Bellwether Attacks.  *See generally* Dkt. 38.  Second, Plaintiffs have proffered supporting documentary evidence, including government reports.  *Id.*  Finally, Plaintiffs have submitted detailed expert reports and declarations from two experts.[1]

Plaintiffs' first expert is Dr. Daveed Gartenstein-Ross, Dkt. 38-4 (Gartenstein-Ross Report); Dkt. 38-5 (Gartenstein-Ross Attribution Report),[2] the Chief Executive Officer of Valens

---

[1] The Court will defer consideration of Plaintiffs' damages experts following the Special Master's report.  *See* Dkt. 38-7 (Expert Damages Report of Chad Staller and Stephen M. Dripps).

[2] Dr. Gartenstein-Ross prepared two expert reports, one on Sunni militant organizations, Dkt. 38-4 (Gartenstein-Ross Report), and the other attributing the 25 attacks in question, Dkt. 38-5 (Gartenstein-Ross Attribution Report).

Global, Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies, and former Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships, whom this Court has previously qualified as "an expert on (1) violent non-state actors . . . ; (2) Iran's use of proxy organizations in Iraq from the 1990s to 2012," and related subject matters. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 n.2 (D.D.C. 2018). Here, Plaintiffs offer Dr. Gartenstein-Ross as an expert on "Iran's historical use of violent non-state actors (VNSAs) as proxy forces . . . and Iran's material support to Sunni VNSAs in Iraq, including the Zarqawi organization and Ansar al-Islam/Ansar al-Sunna," among other issues. Dkt. 38-4 at 4 (Gartenstein-Ross Report). The Court is, once again, persuaded that he is highly qualified to testify as an expert.

Plaintiffs' second expert is Michael Pregent, Dkt. 38-6 (Pregent Decl.), a former intelligence officer, Senior Fellow at the Hudson Institute, and Visiting Fellow at the Institute for National Strategic Studies at the National Defense University, whom this Court has also previously qualified as an expert on related subject matters. *See Hamen v. Islamic Republic of Iran*, 401 F. Sup. 3d 85, 91 n.1 (D.D.C. 2019); *Coombs v. Islamic Republic of Iran*, 2022 WL 715189, at *2 (D.D.C. Mar. 10, 2022). As several judges on this Court have recognized, Mr. Pregent has extensive relevant experience and expertise. *See* Dkt. 38-2 at 24 n.9 (collecting cases); Dkt. 38-6 at 3–7 (Pregent Decl. ¶¶ 4–16). Here, Plaintiffs offer Mr. Pregent as an expert on "Iranian influence in Iraq and . . . Islamist terrorist special groups operating in Iraq." Dkt. 38-2 at 2 (Pregent Decl. ¶ 2). As with Dr. Gartenstein-Ross, the Court is—once again—persuaded that Mr. Pregent is eminently qualified to testify as an expert.

In the course of reviewing the evidence, the Court has applied the Federal Rules of Evidence, but has done so on the understanding, first, that it has "the authority—indeed, . . . the

obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (alterations in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens II*, 864 F.3d at 785.  Expert testimony, moreover, is not only entirely proper, but often sufficient, *id.* at 788, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain," *id.* at 787.

In lieu of holding an evidentiary hearing, the Court relies on Plaintiffs' declarations, exhibits, and the expert reports and declarations submitted in this case.  *See Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e)); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment); *accord Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *5 (D.D.C. Sept. 25, 2019) (relying on family members' declarations "detailing their mental anguish and emotional suffering"); *Hake v. Bank Markazi Jomhouri Islami Iran*, 2022 WL 4130837, at *13 (D.D.C. Sept. 12, 2022) (relying on exhibits of plaintiffs' birth certificates to demonstrate U.S. citizenship).

Moreover, although the expert reports and declarations "recount potentially inadmissible facts," these facts are necessary "to establish the basis for their admissible opinions" and, thus, are properly before the Court.  *Owens II*, 864 F.3d at 790; *see Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 93 n.3 (D.D.C. 2019).  The Court has an obligation "to engage with the

underlying facts in order to explain why" it finds the experts' opinions credible. *Owens II*, 864 F.3d at 790. And to the extent the Court relies on sources cited in the reports, the Court notes that the government reports that they cite fall within the public records exception to the hearsay rule, which provides that "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

Based on this record, the Court makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

As noted above, Plaintiffs have provided the Court with reports from two experts, declarations from the 45 Bellwether Plaintiffs, and dozens of exhibits. *See* Dkt. 38. Based on that evidence, and as explained in the sections of this opinion that follow, the Court finds as follows:

*First*, Iran provided the Zarqawi organization and AAI with significant support in the form of arms, funding, training, technical expertise, and safe haven.

*Second*, it is more likely than not that the Zarqawi organization carried out 20 of the 25 terror attacks at issue: (1) the April 28, 2005 improvised explosive device ("IED") attack, which resulted in the deaths of U.S. Army First Lieutenant William Anthony Edens and U.S. Army Specialist Ricky William Rockholt, Jr.; (2) the August 21, 2005 IED attack, which led to the injury of U.S. Marine Corps Sergeant Adam C. Kisielewski, one of the named Bellwether Plaintiffs in this case; (3) the June 9, 2006 IED attack, which resulted in the death of U.S. Marine Corps Lance Corporal Brent Basil Zoucha; (4) the February 8, 2007 IED attack, which resulted in the death of U.S. Army Sergeant Ross Aaron Clevenger; (5) the February 11, 2007 IED attack,

which resulted in the death of U.S. Army Sergeant Russell A. Kurtz; (6) the March 5, 2007 IED

attack, which resulted in the death of U.S. Army Staff Sergeant Justin Michael Estes; (7) the

April 7, 2007 IED attack, which resulted in the deaths of U.S. Army Captain Jonathan

Grassbaugh, U.S. Army Private First Class Rodney Lynn McCandless, and U.S. Army Specialist

Levi Kenneth Hoover; (8) the May 28, 2007 IED attack, which resulted in the deaths of U.S.

Army Specialist James E. Summers, U.S. Army Specialist Zachary David Baker, and U.S. Army

First Lieutenant Kile G. West; (9) the October 14, 2007 IED attack, which resulted in the death

of U.S. Army Sergeant First Class Justin S. Monschke; (10) the October 24, 2007 IED attack,

which resulted in the death of U.S. Army National Guard Sergeant First Class Robin L. Towns,

Sr.; (11) the January 9, 2008 IED attack, which resulted in the deaths of U.S. Army Staff

Sergeant Jonathan Killian Dozier, U.S. Army Sergeant Zachary Wade McBride, and U.S. Army

Sergeant First Class Matthew Ignatius Pionk; (12) the April 9, 2004 complex ambush attack,

which resulted in the deaths of U.S. Army Reserve Sergeant Elmer C. Krause and civilian

contractors Stephen F. Hulett, Timothy E. Bell, Tony Duane Johnson, and Jack A. Montague;

(13) the April 11, 2004 complex attack, which resulted in the death of U.S. Army Sergeant Major

Michael B. Stack; (14) the June 12, 2007 complex attack, which resulted in the death of U.S.

Army Corporal Damon LeGrand; (15) the October 14, 2004 suicide attack, which resulted in the

death of civilian contractor John Albert Pinsonneault; (16) the December 9, 2005 suicide attack,

which resulted in the death of U.S. Army Specialist Adrian N. Orosco; (17) the April 10, 2009

suicide attack, which resulted in the deaths of U.S. Army Corporal Jason G. Pautsch, U.S. Army

Staff Sergeant Bryan E. Hall, U.S. Army Sergeant Edward W. Forrest, and U.S. Army Staff

Sergeant Gary L. Woods; (18) the January 20, 2007 anti-aircraft attack, which resulted in the

death of U.S. Army National Guard Command Sergeant Major Marilyn L. Gabbard; (19) the

February 18, 2007 small arms fire attack, which resulted in the death of Private First Class Kelly David Youngblood; and (20) the May 25, 2004 artillery attack, which resulted in the death of U.S. Army National Guard Sergeant Alan N. Bean.

*Third*, it is more likely than not that AAI carried out four of the 25 terror attacks at issue: (1) the July 21, 2004 IED attack, which resulted in the death of U.S. Army Private First Class Nicholas H. Blodgett; (2) the May 14, 2004 suicide attack, which resulted in the death of U.S. Army Sergeant James W. Harlan; (3) the December 21, 2004 suicide attack, which resulted in the deaths of U.S. Army National Guard Staff Sergeant Lynn Robert Poulin, U.S. Army Staff Sergeant Julian Melo, and U.S. Army Private Lionel Ayro; (4) the April 24, 2004 artillery attack, which resulted in the deaths of U.S. Army National Guard Captain Arthur L. Felder and U.S. Army Staff Sergeant Billy J. Orton.  And the Court finds that it is more likely than not that the Zarqawi organization and AAI jointly carried out a complex attack on January 28, 2008, which resulted in the deaths of U.S. Army Sergeant James Edward Craig, U.S. Army Corporal Evan Andrew Marshall, and U.S. Army Private Second Class Joshua Young.

*Fourth*, it is more likely than not that neither the Zarqawi organization nor AAI would have been able to effectuate the attacks described above without the assistance of Iran and that the attacks were a foreseeable result of Iran's material support.

The Court ultimately concludes that Iran supported the Bellwether Attacks and thereby caused each of the injuries for which the Bellwether Plaintiffs now seek to recover.

**A.      Iran's Material Support to Sunni Terrorist Groups**

1.      *Overview of Iran's Proxy Strategy*

For decades, Iran has relied on violent non-state actors ("VNSAs") as proxies to advance its policy goals.  Dkt. 38-4 at 4, 58 n.290 (Gartenstein-Ross Report).  Following the U.S.

invasion of Iraq in 2003, Iran's "goal" was to "provide lethal aid to all groups fighting the United States." Dkt. 38-6 at 16 (Pregent Decl. ¶ 36). In particular, Iran used its "[Islamic Revolutionary Guard Corps Qods Force ('IRGC-QF'), the military body responsible for identifying and training proxy organizations], its premier proxy Lebanese Hezbollah, and its additional proxy Syria to provide funding, training, weapons, and equipment to Sunni terrorist groups to target Americans and [to] destabilize Iraq." *Id*. at 13–15, 16 (Pregent Decl. ¶¶ 29–30, 36). The Sunni terrorist groups in question included al-Qaeda, the Zarqawi organization, and AAI. "Plaintiffs refer to [Islamic State of Iraq] ('ISI'), [al-Qaeda in Iraq] ('AQI'), Tawhid wal Jihad ('TWJ'), and a number of other organizations collectively as the 'Zarqawi organization' in an effort to explain their consistent leadership by Abu Musab al-Zarqawi and his followers," *id*. at 5, n.3 (Pregent Decl. ¶ 9), and "Plaintiffs use the overall title 'AAI' to describe both Ansar al-Islam and Ansar al-Sunna ['AAS'] because AAS ultimately grew out of AAI," *id*. at 4, n.2 (Pregent Decl. ¶ 6). Pregent explains that "the Zarqawi organization, as described by Plaintiffs, describes a consistent organization—despite its use of various monikers over time," and that this "do[es] not change [his] conclusion that Iran materially supported AQ, the Zarqawi organization as defined by Plaintiffs, and AAI." *Id.* at 5, n.3 (Pregent Decl. ¶ 9). The Court is persuaded that a sufficient continuity and overlap exists between these separately-named entities to adopt this nomenclature as well.[3]

---

[3] The Zarqawi organization has undergone several name changes since its emergence in the early 1990s. It has been known by the following names: Bayat al-Imam (c. 1993–1999), Jund al-Sham (c. 1999–2004), Jamaat al-Tawhid wa-l-Jihad ("JTJ") (2004), Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or "AQI") (2004–2006), Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura Council or "MSC") (2006), Islamic State of Iraq ("ISI") (2006–April 2013), Islamic State of Iraq and al-Sham ("ISIS") (April 2013–June 2014), and Islamic State (June 2014–present). Dkt. 38-4 at 14–15 (Gartenstein-Ross Report). The Court agrees with Plaintiffs that these name changes do not undermine the existence of a single, continuously operating organization.

Iran's backing of these Sunni militant groups was part of "a wider strategy aimed at accelerating the eviction of U.S. troops from Iraq" and "creating instability in Iraq that would both impose political, economic, and human costs on the United States."  Dkt. 38-4 at 60 (Gartenstein-Ross Report).  As a result, the United States has, since 1984, continuously designated Iran as a state sponsor of terrorism. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://perma.cc/5S2L-2M9K.

    2.    *Iran's Material Support to Sunni Terrorist Groups*

        a.    <u>Al-Qaeda as a Proxy</u>

The Court first finds that Iran used Al-Qaeda as a proxy and liaison between Iran and other Sunni militant groups, including the Zarqawi organization and AAI, to provide those groups with funding, training, weaponry, and operational and logistical support.  The relationship between Iran and al-Qaeda started in the early 1990s.  Ayman al-Zawahiri, the emir of Egyptian Islamic Jihad ("EIJ"), brokered a deal with Iran in which Iran provided $2 million in funding and training to EIJ to support its fight against Egypt's Hosni Mubarak regime.  Dkt. 38-4 at 29 (Gartenstein-Ross Report); Dkt. 38-6 at 38 (Pregent Decl. ¶ 87).  EIJ and al-Qaeda were "closely linked" by virtue of Zawahiri's connections to al-Qaeda's leader, Osama bin Laden, and in 2001, EIJ and al-Qaeda merged.  Dkt. 38-4 at 30 (Gartenstein-Ross Report).  Zawahiri subsequently rose "through the ranks" of al-Qaeda, eventually "becoming its emir after bin Laden's 2011 death."  *Id.*

Iran provided material support to its proxy al-Qaeda in the form of funding, weapons, "training of its operatives," "sanctuary and refuge," "travel facilitation," and "financial and infrastructure assistance."  Dkt. 38-4 at 44–45 (Gartenstein-Ross Report).  Senior al-Qaeda operatives and trainers "traveled to Iran to receive training in explosives," while others received

"advice and training from [Iran's proxy] Hezbollah in Lebanon." Dkt. 38-6 at 40 (Pregent Decl. ¶ 93). Iran also facilitated the movement of al-Qaeda operatives "into Iraq, Afghanistan, and Pakistan." *Id.* (Pregent Decl. ¶ 94).

Iranian-backed militants provided the technical expertise and explosives training for al-Qaeda to carry out terror attacks, including the 1998 U.S. East African Embassy attacks. Dkt. 38-4 at 31–33 (Gartenstein-Ross Report). Iran also provided safe passage through its territory for al-Qaeda members transiting between Afghanistan and Yemen, which "helped the terrorist group to execute the 9/11 attacks." *Id.* at 32–33 (Gartenstein-Ross Report); *accord Havlish v. Bin Laden*, 2011 WL 13244047, at *16 (S.D.N.Y Dec. 22, 2011). The 9/11 Commission Report describes the relationship between al-Qaeda and Iran as "an informal agreement to cooperate in providing support . . . for actions carried out primarily against Israel and the United States." *Id.* at 31 (Gartenstein-Ross Report) (quoting Nat'l Comm'n on Terrorist Attacks upon the United States, *The 9/11 Commission Report* 61 (2004)).

On July 28, 2011, a U.S. Treasury Department designation "revealed the extensive relationship between al-Qaeda and Iran, citing the importance of Iranian finance and recruitment facilitation," as well as providing a transit point for al-Qaeda to "mov[e] money, arms, and fighters." Dkt. 38-6 at 41 (Pregent Decl. ¶ 98). According to the Treasury Department, this support was memorialized in an agreement between al-Qaeda and the Iranian government, under which Iran promised to provide al-Qaeda with "freedom of operation and uninhibited ability to travel for extremists and their families." Dkt. 38-4 at 51 (Gartenstein-Ross Report) (quoting U.S. Dep't of Treasury, *Treasury Further Exposes Iran-Based Al-Qa'ida Network* (Oct. 18, 2012), https://perma.cc/KN4J-QVUU).

Based on the unrebutted testimony offered by Plaintiffs' experts, the Court finds that al-Qaeda operated at the relevant times as an Iranian proxy.

      b.    <u>The Zarqawi Organization</u>

      i.    *Background*

The Zarqawi organization, "a highly significant militant group," established itself in Iraq in 2002.  Dkt. 38-4 at 15, 20 (Gartenstein-Ross Report).  In 2004, the U.S.-led coalition forces (the "Coalition") deemed the Zarqawi organization the "primary terrorist threat to the Coalition." *Id*. at 15 (Gartenstein-Ross Report).  "Bolstered by support from Iran and al-Qaeda, the Zarqawi organization executed deadly attacks, established campaigns of violence, and held area of operations dominance in critical locations throughout the Iraq war." *Id*. (Gartenstein-Ross Report).  From its establishment, the Zarqawi organization was closely allied with al-Qaeda, receiving substantial and long-standing support from the latter.  *Id*. at 46 (Gartenstein-Ross Report).  Abu Musab al-Zarqawi, the founder and leader of the Zarqawi organization, was trained in al-Qaeda camps and "served as an al-Qaeda operative in Afghanistan."  Dkt. 38-6 at 29 (Pregent Decl. ¶ 68).  Zarqawi received "funding, training, weapons, and transportation into Iraq" from Iran to "target U.S. troops," before moving into Afghanistan and heading a terrorist training camp funded by al-Qaeda near Herat.  *Id*. at 29–30 (Pregent Decl. ¶ 68); Dkt. 38-4 at 48 (Gartenstein-Ross Report).  Zarqawi "formally pledged allegiance to al-Qaeda in October 2004." Dkt. 38-4 at 47 (Gartenstein-Ross Report).

      ii.    *Iran's Provision of Funding, Weapons, and Training*

      A.    Direct

Iran provided direct material support to the Zarqawi organization in the forms of weapons, funding, logistical support, and operational facilitation.  Throughout 2007, weapons

caches were uncovered in territory occupied by the Zarqawi organization that revealed "weapons of Iranian origin." *Id*. at 54 (Gartenstein-Ross Report).  For example, "Coalition forces discovered a Zarqawi organization weapons cache in Abu Ghraib (Baghdad Province) containing Iranian-manufactured mortars." *Id*.  Iran's "provision of IEDs and IED components was especially critical in supporting a hallmark of Zarqawi's operations:  spectacular attacks that were often achieved via bombings." *Id*. at 60–61 (Gartenstein-Ross Report).

There is also evidence of Iranian financial support.  According to the U.S. Treasury Department, a brigadier general in the Iranian Revolutionary Guard Corps – Quds Force directed officers to "disburse" funds to "Sunni militant operations against Coalition forces," and Dr. Gartenstein-Ross concludes that these disbursements "very likely financed the Zarqawi organization specifically." *Id*. at 55–56 (Gartenstein-Ross Report) (citing U.S. Dep't of Treasury, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (Jan. 9, 2008), https://perma.cc/9436-EVUG).  The Zarqawi organization also likely obtained training in explosives and attack planning directly from Iran and from al-Qaeda.  IRGC-QF provided Iranian EFPs (explosively formed penetrators) to the Zarqawi organization, which require "training" to operate. *Id*. at 57 (Gartenstein-Ross Report); *see Fishbeck v. Islamic Republic of Iran*, 2023 WL 7448770, at *8 (D.D.C., Aug. 18, 2023) ("The connection between EFP attacks and Iranian support has been well documented.").

Aside from weapons, funding and training, Iran also provided "substantial logistical support and operational facilitation" to the Zarqawi organization, such as allowing Zarqawi organization operatives to use safe houses throughout Iran or securing prisoner releases of Zarqawi organization operatives "who had been captured by Iraqi security forces and their allies."  38-4 at 57 (Gartenstein-Ross Report) (citing *Parhamovich*, 2022 WL 18071921, at *8).

15

Iranian agencies "intentionally created a permissive environment in which AQI [i.e., the Zarqawi organization] and AAI/AAS could freely operate." Dkt. 38-6 at 18 (Pregent Decl. ¶ 44). This "support zone" made "[a]ttacks attributed to both AQI and AAI/AAS against U.S. forces . . . more successful." *Id*. at 19 (Pregent Decl. ¶¶ 45, 47); *see also id*. (Pregent Decl. ¶ 47) (Iran's "permissive environment provided a relative safe haven for all manner of supportive conduct, including weapons acquisition, exfiltration, training, and recruitment"). This arrangement greatly benefited Iran, as it "provided Iran with a great deal of insulation" from terror attacks carried out by these Sunni militant groups, Dkt. 38-4 at 59–61, 76–77 (Gartenstein-Ross Report), and it allowed Iran to keep its "larger goals outside of the conflict's limelight," Dkt. 38-6 at 18 (Pregent Decl. ¶ 44).

## B.    Through al-Qaeda

Through the early years of the Iraq War, and especially after its formal pledge of allegiance to al-Qaeda in 2004, the Zarqawi organization received "considerable external financial support" from the group. Dkt. 38-4 at 47 (Gartenstein-Ross Report) (internal quotation marks and citation omitted). Indeed, al-Qaeda leader bin Laden "included the Zarqawi organization as a recipient of some of the $1.5 million in monthly funding he sent to Iraq to support the insurgency." *Id*. (Gartenstein-Ross Report). This funding improved all aspects of the Zarqawi organization's operations, such as supporting its intelligence collection efforts by providing money to pay civilians to spy on Coalition forces. *Id*. at 51 (Gartenstein-Ross Report). Receiving financial support also enhanced the Zarqawi organization's recruiting programs and expanded the organization in size and membership, which in turn allowed it to carry out more complex operations, absorb other Sunni militant factions, and increase in prominence in the Iraqi militant scene. *Id*. (Gartenstein-Ross Report). Aside from funding, al-Qaeda also provided the

Zarqawi organization with the specialized training necessary to carry out their terror attacks, and "provided financing, training, and support for Zarqawi's training camp near Herat." *Id.* at 46–47 (Gartenstein-Ross Report).  "[E]xpert trainers from al-Qaeda" also provided the Zaraqawi organization with training to "conduct complex attacks using advanced weapons and weapons systems."  Dkt. 38-6 at 48 (Pregent Decl. ¶ 123)

The Court, accordingly, finds that Iran provided material support in the form of weapons, training, funds, logistical support and operational assistance to the Zarqawi organization, both directly and indirectly through al-Qaeda, during the time period relevant to the Bellwether Attacks.

      c.     <u>Ansar Al-Islam</u>

      i.    *Background*

Ansar al-Islam ("AAI" or "AAS") is a Kurdish Salafist militant group that was formed in 2001.  Dkt. 38-6 at 31 (Pregent Decl. ¶ 74).  AAI's formation was a "direct effect" of encouragement from al-Qaeda leaders.  *Id.* at 44 (Pregent Decl. ¶ 108).  AAI's leader, Mullah Fatih Krekar, "had studied Islamic jurisprudence" under al-Qaeda leader Osama bin Laden's mentor, and he described bin Laden as "a jewel in the crown of Islam."  Dkt. 38-4 at 64 (Gartenstein-Ross Report).  According to the Treasury Department, AAI "came into being with the blessing of bin Laden after [AAI's] leaders visited al-Qaeda in Afghanistan in 2000 and 2001."  Dkt. 38-6 at 33 (Pregent Decl. ¶ 77) (quoting U.S. Dep't of Treasury, *Treasury Department Statement Regarding the Designation of Ansar al-Islam* (Feb. 20, 2003), https://perma.cc/PV6L-SPSN).

ii.    *Iran's Provision of Funding, Weapons, and Training*

A.    Direct

Iran provided direct material support and resources to AAI in the forms of training and operational assistance.  Iran's permissive environment for Sunni militant groups was essential for AAI to function, "given that the group's military supplies came in from Iran (the mountainous region they controlled touches the Iranian border), veterans from Afghanistan joined them via Iran, and their cadres (including [their leader] Mullah Krekar himself) entered and left the area via Iran."  *Id*. at 67 (Gartenstein-Ross Report) (internal quotations and citation omitted).  After Coalition forces launched "Operation Viking Hammer" against AAI in March 2003, Iran facilitated the escape of surviving AAI members, "provided medical treatment," "offered haven to regroup," and offered safe passage for AAI members to return to Iraq.  Dkt. 38-6 at 34–35 (Pregent Decl. ¶ 79).  This Iranian safe-haven allowed AAI to "survive near total destruction" and continue their operations in carrying out terror attacks.  *Id*. at 49 (Pregent Decl. ¶ 126).

Beginning in early 2004, Iran provided training to AAI members "in training camps along the Iranian border in the Hamrin mountain region and near the city of Mariwan in Iran."  *Id*. at 51 (Pregent Decl. ¶ 128).  Various intelligence sources indicated that AAI terrorists were being trained in Iran and that Iranian specialists were teaching these AAI operatives how to "build and set up" IEDs as part of AAI's attempt to "improve IED effectiveness and sophistication."  Dkt. 38-4 at 73 (Gartenstein-Ross Report) (internal quotations and citation omitted).  There was also a "Kurdish Facilitation Network" involving AAI leaders that "moved cash from Iran to Iraq to support their fighters there."  Dkt. 38-6 at 51 (Pregent Decl. ¶ 129) (internal quotation marks and citation omitted).

B.    Through al-Qaeda

As a result of its deep connection with al-Qaeda, bin Laden provided AAI with "an estimated $300,000 to $600,000 in seed money," along with "installments of $10,000 from 2001 to 2003." *Id*. (Pregent Decl. ¶ 77). Support from al-Qaeda allowed AAI to develop "sophisticated ambush techniques that used improvised explosive devices" (IEDs) and carry out increasingly "well-timed, planned, and precise attacks." *Id*. at 35 (Pregent Decl. ¶ 81). AAI also imitated the cell-based organizational structure employed by al-Qaeda, with each cell "organized into small units of ten to fifteen members led by an emir or commander," which made "the organization more difficult to destroy." *Id*. at 50 (Pregent Decl. ¶ 127). Pregent explains that "AAI/AAS remained a consistent terrorist threat," though "their stature diminished after the group splintered into rival factions in 2007." *Id*. at 36 (Pregent Decl. ¶ 82).

The Court, accordingly, finds that Iran provided material support in the form of training, funds, and operational assistance to AAI, both directly and indirectly through al-Qaeda, at least during the time period in which the Bellwether Attacks occurred.

## B.    Improvised Explosive Device ("IED") Attacks

### 1.    *July 21, 2004 IED Attack*

#### a.    Killing of U.S. Army Private First Class Nicholas H. Blodgett

On July 21, 2004, Private First Class ("PFC") Nicholas Blodgett was driving a M3A3 Cavalry Fighting vehicle while on patrol in Ad Duluiyah, a town northeast of the city of Balad in Saladin Province. Dkt. 38-5 at 228 (Gartenstein-Ross Attribution Report). At 00:23, PFC Blodgett was moving west on an alternative supply route when an improvised explosive device (IED) detonated, causing his vehicle to catch fire, trapping him inside. *Id*. (Gartenstein-Ross Attribution Report). PFC Blodgett died from "the blast and shrapnel injuries he sustained from

the IED blast." *Id.* (Gartenstein-Ross Attribution Report) (citing PFC Blodgett's autopsy report, Dkt. 38-213).  Six other servicemembers were also wounded in the attack.  *Id.* (Gartenstein-Ross Attribution Report).

PFC Blodgett's mother, Rita Blodgett (a U.S. citizen) is a Bellwether Plaintiff in this case.  She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her son's death, as well as the "loss of PFC Blodgett's society, companionship, and counsel." Dkt. 15 at 99 (Am. Compl. ¶¶ 382–83); *see also* Dkt. 38-2 at 152–54; Dkt. 38-36 (Blodgett Decl.).

   b. <u>Attribution to AAI</u>

Before addressing the proper attribution of this specific attack, the Court pauses to offer a few general observations about attribution.  In conducting his analysis, Dr. Gartenstein-Ross concludes at times that the attribution that he proposes is "likely" and, at other times, he concludes that it is "very likely."  That distinction makes sense, because terrorist organizations sometimes claim responsibility for their attacks, and sometimes they do not, because at times a single terrorist organization is the predominant group operating in a particular area, and at other times, multiple groups operate in the same area, and because these groups, at times, employ unique or specialized tactics, and at other times, they do not.  The Court has reviewed the evidence and agrees that, in some cases, there is overwhelming evidence that a particular group was responsible for a particular attack, while in other cases, the facts are murkier.  Ultimately, however, the Court must simply decide whether Plaintiffs have proffered sufficient evidence to permit the Court to find by a preponderance of the evidence that the attack can be attributed either to the Zarqawi organization or AAI.  In making that assessment, moreover, the Court must be mindful of the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from

an absent and likely hostile sovereign, *Owens v. Rep. of Sudan*, 864 F.3d 751, 785 (D.C. Cir.

2017), *rev'd on other grounds*, 590 U.S. 418 (2020), and from dangerous terrorist organizations,

which often operate in secrecy and in hostile regions.

Turning, then, to the killing of PFC Blodgett, the Court is persuaded by Dr. Gartenstein-

Ross's conclusion that AAI "likely" committed this attack.  Dkt. 38-5 at 228 (Gartenstein-Ross

Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of this

conclusion.

*First*, Dr. Gartenstein-Ross explains that AAI was the "dominant militant group" in the

region where the attack took place (known as the "Sunni Triangle") in 2003 and 2004.  *Id*. at 229

(Gartenstein-Ross Attribution Report).  Moreover, AAI "credibly claimed responsibility for

numerous attacks in the vicinity of Balad, where the attack that killed PFC Blodgett occurred,"

including five other attacks in 2004.  *Id*. at 229–30 (Gartenstein-Ross Attribution Report).

*Second*, the Tactics, Techniques, and Procedures ("TTPs") used in carrying out this

attack—an IED explosion—is another indication that AAI was responsible.  *Id*. at 230

(Gartenstein-Ross Attribution Report).  According to a group profile of AAI by the Center for

International Security and Cooperation at Stanford University, "'small arms and IED attacks

were [AAI's] most commonly employed munitions' from its inception in 2001 to 2014."  *Id*.

(Gartenstein-Ross Attribution Report) (citing Stanford University, *Mapping Militants Project,*

*"Ansar al-Islam,"* https://perma.cc/8PV5-YCRE).  Moreover, AAI actively circulated videos of

the group carrying out IED attacks "as part of its recruiting and training campaign," which

showed footage of IED attacks in a number of cities in the Sunni Triangle, including Balad.  *Id*.

(Gartenstein-Ross Attribution Report).

*Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in the Ad Duluiyah region at the time. *Id*. at 231 (Gartenstein-Ross Attribution Report). JTJ (another name for the Zarqawi organization) was also "active in Saladin Province during this time, and often used the area as a refuge from the pressure of Coalition forces in its other areas of influence." *Id*. (Gartenstein-Ross Attribution Report). However, in the months leading up to the attack, "JTJ was concentrating on fighting Coalition forces in the First Battle of Fallujah, which occurred from April 4 to May 1, 2004." *Id*. (Gartenstein-Ross Attribution Report). Therefore, Dr. Gartenstein-Ross concludes that while JTJ was active in the area at the time of the attack, its attention was occupied elsewhere and "the area was not then a priority for the organization's attack networks."[4] *Id*. (Gartenstein-Ross Attribution Report). In addition, even though the Saladin province was home to "a small Shia population, that Shia population was not large enough to sustain a consistent presence of Shia militias," and given AAI's dominance in the area, "it is unlikely that other insurgent groups, especially Shia militants, conducted this attack." *Id*. (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that AAI was responsible for the July 21, 2004 IED attack.

     2.    *April 28, 2005 IED Attack*

          a.    <u>Killings of U.S. Army First Lieutenant William Anthony Edens and U.S.</u>
              <u>Army Specialist Ricky William Rockholt, Jr.</u>

On April 28, 2005, U.S. Army First Lieutenant ("1LT") William Edens and Specialist ("SPC") Ricky Rockholt were participating in a joint operation in southeast Tal Afar, Nineveh

---

[4] Dr. Gartenstein-Ross also points out that even if JTJ was the group responsible for this attack, it (the Zarqawi organization) is also an Iranian-backed Sunni militant group at issue in this case, so the conclusion that Iran provided material support which allowed a militant group to effectuate this attack would remain the same. *Id*. (Gartenstein-Ross Attribution Report).

Province. Dkt. 38-5 at 186 (Gartenstein-Ross Attribution Report). At 16:34, they were patrolling "as part of a convoy near the outskirts of Tal Afar" when 1LT Edens's vehicle struck an improvised explosive device (IED) that had been placed in the road, causing the IED to detonate. *Id.* (Gartenstein-Ross Attribution Report). 1LT Edens and SPC Rockholt were both killed as a direct result of the blast, which also killed one other service member and wounded three others. *Id.* (Gartenstein-Ross Attribution Report).

1LT Edens' widow, Christina Linden (a U.S. citizen), and SPC Rockholt's brother, Jason Rockholt (a U.S. citizen), are Bellwether Plaintiffs in this case. They seek damages for the "severe mental anguish, emotional pain and suffering" caused by 1LT Edens and SPC Rockholt's deaths, as well as the loss of their "society, companionship, and counsel." Dkt. 15 at 132, 247 (Am. Compl. ¶¶ 661–62, 1603–04); *see also* Dkt. 38-2 at 170–71, 185; Dkt. 38-42 (Linden Decl.); Dkt. 38-44 (Rockholt Decl.).

> b.    Attribution to the Zarqawi organization operating as "AQI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as al-Qaeda in Iraq) very likely committed this IED attack."[5] Dkt. 38-5 at 187 (Gartenstein-Ross Attribution Report). He offers three considerations in support of his conclusion.

*First*, he explains that in 2005, AQI was the dominant militant group in the eastern half of Tal Afar, where the attack occurred. *Id.* at 188 (Gartenstein-Ross Attribution Report). AQI's control over this region was "so extensive that it possessed large training facilities, significant amounts of equipment, and good satellite uplinks." *Id.* (Gartenstein-Ross Attribution Report) (internal quotations and citation omitted). Moreover, other militant groups active in this region,

---

[5] Dr. Gartenstein-Ross refers to the Zarqawi organization by the name it was known for at the time of this attack, which was al-Qaeda in Iraq ("AQI").

such as AAI, were "primarily located in the western half of Tal Afar, away from where this attack took place." *Id*. at 188–89 (Gartenstein-Ross Attribution Report).

*Second*, AQI routinely used IEDs to carry out their attacks. Throughout 2005, Coalition forces "discovered several AQI IED factories" in Al Anbar, Nineveh's neighboring province. *Id*. at 189 (Gartenstein-Ross Attribution Report). In November 2005, "Coalition forces seized large AQI caches of IEDs and IED materials [], demonstrating AQI's continued reliance on IEDs after the date of this attack." *Id*. at 190 (Gartenstein-Ross Attribution Report). In June 2005, "AQI also claimed responsibility for two IED attacks in Nineveh's provincial capital, Mosul," which demonstrates AQI's use of IED attacks in this region. *Id*. (Gartenstein-Ross Attribution Report).

*Finally*, and most significantly, AQI claimed responsibility for the attack. On April 28, 2005 (the day of the attack), AQI claimed responsibility for an attack in which "an armored car was destroyed with an explosive device." *Id*. (Gartenstein-Ross Attribution Report). The date, location, and the description of the attack in AQI's claim all aligned with information in U.S. Government materials about the attack that killed 1LT Edens and SPC Rockholt. *Id*. (Gartenstein-Ross Attribution Report). In addition, a voice recording released the following day in which AQI claimed responsibility for attacks on April 28, 2005, "specifically encourages attacks on convoys, like the one 1LT Edens and SPC Rockholt were traveling in." *Id*. (Gartenstein-Ross Attribution Report).

The Court, accordingly, finds that it is more likely than not that the Zarqawi organization was responsible for the April 28, 2005 IED attack.

3.      *August 21, 2005 IED Attack*

      a.      <u>Injury to U.S. Marine Corps Sergeant Adam C. Kisielewski</u>

On August 21, 2005, U.S. Marine Corps Sergeant ("SGT") Adam Kisielewski and other servicemembers on his patrol team were clearing a school reported to be occupied by insurgents near Al-Karmah, a city close to Fallujah in Al Anbar Province.  Dkt. 38-5 at 35 (Gartenstein-Ross Attribution Report); Dkt. 38-46 at 5 (Kisielewski Decl. ¶ 9).  When they reached the rooftop, "[SGT] Kisielewski stood to the right of the door that led to the rooftop . . . while another servicemember stood in front of the door."  Dkt. 38-5 at 35 (Gartenstein-Ross Attribution Report).  When they breached the door, the IED rigged to the door exploded, instantly killing the servicemember standing in front of the door and seriously injuring SGT Kisielewski.  *Id.* (Gartenstein-Ross Attribution Report); Dkt. Dkt. 38-46 at 5 (Kisielewski Decl. ¶¶ 10–11).  SGT Kisielewski sustained "shrapnel wounds to the lower right leg, upper left arm, and left leg," which resulted in the loss of his right leg and left arm.  Dkt. 38-104 at 2; *see* Dkt. 38-46 at 6–7 (Kisielewski Decl. ¶¶ 12–16).

SGT Kisielewski (a U.S. citizen) is a Bellwether Plaintiff in this case.  He seeks damages for the "severe physical and emotional pain and suffering" he endured as the result of this attack.  Dkt. 15 at 182 (Am. Compl. ¶¶ 1068–69); *see* Dkt. 38-2 at 141–43; Dkt. 38-46 (Kisielewski Decl.).

b.   Attribution to the Zarqawi organization operating as "AQI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as al-Qaeda in Iraq) likely committed this IED attack."[6]  Dkt. 38-5 at 36 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explains that AQI was the dominant militant group in the Fallujah region in Al Anbar Province from 2004 to 2007.  *Id*. at 36–37 (Gartenstein-Ross Attribution Report).  Fallujah was a recognized "AQI stronghold" in 2004.  *Id*. at 36 (Gartenstein-Ross Attribution Report).  In November of 2004, the Coalition carried out "Operation Al Fajr," which "succeeded in pushing AQI fighters out of Fallujah."  *Id*. at 37 (Gartenstein-Ross Attribution Report).  Some of these fighters fled to Al-Karmah (near the location of the attack), where they "maintained a strong and persistent presence [], using it as a center from which to attack Fallujah."  *Id*. (Gartenstein-Ross Attribution Report).  In addition to the presence of AQI's own fighters in the area, the organization was also affiliated with local insurgent leaders around Fallujah, who swore allegiance to AQI.  *Id*. (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross therefore concludes that "AQI's strong influence in both cities around the time of the attack and in Al-Karmah itself are indicative of AQI's likely responsibility."  *Id*. (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another indication that AQI is responsible.  *Id*. at 38 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross points out that "IED attacks were a known AQI tactic in Fallujah in 2005," citing to statements by local residents and press releases which associated AQI with IED attacks.

---

[6] Dr. Gartenstein-Ross refers to the Zarqawi organization by the name it was known for at the time of this attack, which was al-Qaeda in Iraq ("AQI").

*Id*. (Gartenstein-Ross Attribution Report).  Moreover, a threat assessment issued in July 2005 speaks of "insurgents [] attempting to reestablish themselves in Fallujah" and associated weapons caches.  *Id*. at 38–39 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross concludes that this threat assessment was likely referring to AQI, given that "insurgency in Fallujah had largely consolidated around AQI" during this time period.  *Id*.

*Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in the Al Anbar Province at the time.  *Id*. at 39 (Gartenstein-Ross Attribution Report).  He explains that "although Jaysh Mohammed and the Green Battalion were present around Fallujah, these groups were primarily involved in other activities at the time, including criminal activity and political endeavors."  *Id*. (Gartenstein-Ross Attribution Report).  In addition, Jaysh Mohammed had objectives conflicting with those of AQI, so it is unlikely that the two groups would cooperate. *Id*. (Gartenstein-Ross Attribution Report).  Only two groups, AAI and AQI, were the dominant insurgent groups in this area around the time of the attack.  *Id*. (Gartenstein-Ross Attribution Report).  Although Dr. Gartenstein-Ross concedes that "it is possible that AAS [also known as AAI] carried out this attack," he nevertheless concludes that "this attack was most likely carried out by AQI."  *Id*. (Gartenstein-Ross Attribution Report).  Even if AAI was the group responsible for this attack, however, AAI is also an Iranian-backed Sunni militant group at issue in this case, so the conclusion that Iran's material support to a militant group allowed it to effectuate this attack would remain the same.  *Id*. (Gartenstein-Ross Attribution Report).

The Court, accordingly, finds that it is more likely than not that the Zarqawi organization (or possibly by AAI) was responsible for the August 21, 2005 IED attack.

4.    *June 9, 2006 IED Attack*

      a.    <u>Killing of U.S. Marine Corps Lance Corporal Brent Basil Zoucha</u>

On June 9, 2006, Marine Corps Lance Corporal ("LCpl.") Brent Zoucha was serving as the gunner of an armored vehicle while on patrol in Al Qaim, Al Anbar Province.  Dkt. 38-5 at 42 (Gartenstein-Ross Attribution Report).  His vehicle was struck by an IED, which left a blast site approximately 12 feet wide, 11 feet long, and three feet deep.  *Id.* at 42, 45 (Gartenstein-Ross Attribution Report).  The blast killed LCpl. Zoucha and three other servicemembers, and wounded another servicemember.  *Id.* at 42 (Gartenstein-Ross Attribution Report).

LCpl. Zoucha's mother, Rita Zoucha (a U.S. citizen) is a Bellwether Plaintiff in this case. She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her son's death, as well as the "loss of LCpl. Zoucha's society, companionship, and counsel."  Dkt. 15 at 304 (Am. Compl. ¶¶ 2066, 2068); *see also* Dkt. 38-2 at 153–54; Dkt. 38-50 (Zoucha Decl.).

      b.    <u>Attribution to the Zarqawi organization operating as "MSC"</u>

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as Mujahedin Shura Council ["MSC"]) very likely committed this IED attack."[7]  Dkt. 38-5 at 42 (Gartenstein-Ross Attribution Report).  He offers two considerations in support of his conclusion.

*First*, he explains that in 2006, MSC was the major armed force in Al Qaim, where the attack occurred.  MSC's presence in the region "began in 2004 and reached a peak in 2005."  *Id.* at 43 (Gartenstein-Ross Attribution Report).  Taking advantage of the region's strategic location, MSC "used Al Qaim and its surrounding towns as a point of entry for fighters and supplies

---

[7] On January 15, 2006, "AQI deputy emir Abu Maysarah al-Iraqi announced the establishment of the Majlis Shura al-Mujahidin fi-l-Iraq (better known as the Mujahedin Shura Council, or MSC), an umbrella group composed of six Iraqi Sunni militant factions.  *Id.* (Gartenstein-Ross Attribution Report).  As this attack occurred after this change, Dr. Gartenstein-Ross refers to the Zarqawi organization by the name MSC in attributing this attack.

entering Iraq from neighboring Syria, seizing existing smuggling routes from local tribes" and "imposed brutal conditions on local Iraqis." *Id*. at 44 (Gartenstein-Ross Attribution Report). To counter MSC's brutality, the local tribe Albu Mahal worked in cooperation with Coalition and Iraqi Government forces against MSC, carrying out "Operation Steel Curtain" in November 2005, which succeeded in weakening MSC's influence in Al Qaim. *Id*. at 44–45 (Gartenstein-Ross Attribution Report). However, even though its influence waned, MSC "continued fighting the Albu Mahal throughout 2006, and [Al Qaim's] importance as a transit point from Syria meant MSC continued attacks on Coalition and local tribes in that area." *Id*. at 45 (Gartenstein-Ross Attribution Report). Moreover, the "only other significant armed force in Al Qaim" was the local tribes, which "had aligned themselves with Coalition forces," leading Dr. Gartenstein-Ross to conclude that "it is very unlikely that the local tribes would have attacked a U.S. Marine patrol, especially using an IED." *Id*. (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another indication that AQI is responsible. *Id*. at 45 (Gartenstein-Ross Attribution Report). Investigation of the blast site revealed that the IED used to carry out this attack was "composed of powerful explosives and remotely detonated." *Id*. During this time period, MSC "frequently used IEDs to attack Coalition forces throughout Al Anbar Province, particularly in areas under MSC control." *Id*. For example, during Operation Steel Curtain, U.S. Marines "encountered numerous IEDs as they cleared the city." *Id*. Al Anbar Province also "housed numerous MSC IED factories," often with "senior MSC leaders on site." *Id*. at 46 (Gartenstein-Ross Attribution Report). Moreover, MSC "frequently paid local fighters to conduct IED attacks in their areas of operation," offering "$500 to $700 for destroying a High Mobility Multi-Purpose Wheeled Vehicle"—the type of

vehicle LCpl. Zoucha was occupying at the time of his death—in IED attacks.  *Id*. (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the June 9, 2006 IED attack.

5.    *February 8, 2007 IED Attack*

a.    Killing of U.S. Army Sergeant Ross Aaron Clevenger

On February 8, 2007, U.S. Army Sergeant ("SGT") Ross Aaron Clevenger was driving an RG-31 Mine-Protected Armored Personnel Carrier, the lead vehicle in a convoy on a route clearance mission in Al-Karmah, Al Anbar Province, "in support of recovery operations for a downed U.S. helicopter."  Dkt. 38-5 at 48 (Gartenstein-Ross Attribution Report) (internal quotation omitted).  While turning a curve en route to the helicopter's crash site, SGT Clevenger's vehicle hit an IED that "was not detected the previous night due to its depth beneath the road."  *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-116 at 7).  The explosion "lifted the vehicle into the air and broke it into four pieces."  *Id.* (Gartenstein-Ross Attribution Report).  While SGT Clevenger survived the initial blast, he died due to the severity of his injuries before he could reach a medical facility in Fallujah.  *Id.* at 48–49 (Gartenstein-Ross Attribution Report).

SGT Clevenger's brother, Brandon Clevenger (a U.S. citizen), is a Bellwether Plaintiff in this case.  He seeks damages for the "severe mental anguish, emotional pain and suffering" caused by his brother's death, as well as the "loss of SGT Clevenger's society, companionship, and counsel."  Dkt. 15 at 113 (Am. Compl. ¶¶ 499, 501); *see also* Dkt. 38-2 at 167–68; Dkt. 38-56 (Clevenger Decl.).

b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "it is very likely that the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) committed this IED attack."[8]  Dkt. 38-5 at 49 (Gartenstein-Ross Attribution Report).  He offers two considerations in support of his conclusion.

*First*, Dr. Gartenstein-Ross explains that in 2007, Al-Karmah, the neighboring city of Fallujah, and the Al Anbar Province generally were "key ISI areas of operation."  *Id*. (Gartenstein-Ross Attribution Report).  He cites multiple sources indicating that "ISI's presence in Al-Karmah was central to the group's operations in the Fallujah area," and its regional operations centers "supplied ISI with insurgents and weapons to conduct attacks in Fallujah and Baghdad."  *Id*. at 50 (Gartenstein-Ross Attribution Report).  By early 2007, Al-Karmah was a well-known ISI sanctuary, and the group's presence had become "so pervasive that [they] had infiltrated the government structure in Al-Karmah."  *Id*. at 51 (Gartenstein-Ross Attribution Report).  At this time, "ISI attacks (particularly IED attacks) had risen 'dramatically' in Al-Karmah, accounting for 64 percent of attacks in the area."  *Id*. (Gartenstein-Ross Attribution Report) (citation omitted).  This influence continued well after the attack at issue occurred in February 2007.  *Id*. (Gartenstein-Ross Attribution Report).

Moreover, although ISI did not issue a claim of responsibility for the IED attack that killed SGT Clevenger, the group claimed responsibility for "the downing of a Marine Corps CH-46 Sea Knight helicopter on February 7, the day before the attack."  *Id*. at 52 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross concludes that SGT Clevenger was likely on his way to complete recovery operations for this helicopter that ISI shot down.  *Id*. at 51–52 (Gartenstein-

---

[8] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id*. (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

Ross Attribution Report). ISI's claim of responsibility for downing the helicopter "confirms their presence in the area at the time of this attack." *Id*. at 52 (Gartenstein-Ross Attribution Report).

*Second*, the employment of a deeply buried IED "demonstrates a TTP consistent with ISI." *Id*. (Gartenstein-Ross Attribution Report). Burying IEDs deep underground was a tactic frequently used by militant groups to counter the "metal detectors and ground-penetrating radars" used by the Coalition to detect IEDs. *Id*. (Gartenstein-Ross Attribution Report). "ISI tended to favor the use of deep-buried IEDs made with [home-made explosives] to attack MRAP vehicles"—the type of vehicle SGT Clevenger was driving at the time of the attack. *Id*. at 52 (Gartenstein-Ross Attribution Report). This was "a known ISI TTP during this time period," as demonstrated by ISI attacks utilizing deep-buried IEDs in multiple locations where the group asserted dominance. *Id*. at 52–53 (Gartenstein-Ross Attribution Report). By 2006, "ISI was regularly using IEDs in Al Anbar Province." *Id*. at 53 (Gartenstein-Ross Attribution Report). Moreover, "ISI frequently used IED attacks in conjunction with other types of attacks to conduct stand-off attacks, ambushes, and cover retreats." *Id*. at 54 (Gartenstein-Ross Attribution Report) (internal quotation marks and citation omitted). Therefore, Dr. Gartenstein-Ross concluded that "the attack that killed SGT Clevenger was likely an opportunistic attack conducted in the wake of the shootdown, utilizing an IED that had been placed prior to February 7, 2007 and capitalizing on increased Coalition movement in the wake of the CH-47 crash." *Id*. (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the February 8, 2007 IED attack.

6.      *February 11, 2007 IED Attack*

a.      <u>Killing of U.S. Army Sergeant Russell A. Kurtz</u>

On February 11, 2007, U.S. Army Sergeant ("SGT") Russell A. Kurtz was the Tactical

Commander seated in the passenger seat of an armored vehicle "travelling west on alternative

supply route [] while returning from an operation that had 'provided route security for the main

assault effort in the convoy'" in the vicinity of Al-Karmah, Al Anbar Province.   Dkt. 38-5 at 56

(Gartenstein-Ross Attribution Report) (citing Dkt. 38-119 at 10).   SGT Kurtz's vehicle was

travelling approximately 400 meters behind the main assault effort when an IED in the road

detonated.   Dkt. 38-119 at 10.   "SGT Kurtz was struck in the right side of his head, below the rim

of his advanced combat helmet," by the "explosive shock wave and the ballistic glass installed in

the . . . Armored Door" of his vehicle.   Dkt. 38-5 at 56 (Gartenstein-Ross Attribution Report)

Immediately after the attack, SGT Kurtz was administered medical assistance and medically

evacuated to Balad, but he ultimately succumbed to his wounds.   *Id.* at 56–57 (Gartenstein-Ross

Attribution Report).

SGT Kurtz's father, Roger Kurtz, and his sister, Stephanie Kurtz, are both U.S. citizens

and Bellwether Plaintiffs in this case.   They seek damages for the "severe mental anguish,

emotional pain and suffering" caused by SGT Kurtz's death, as well as the "loss of SGT Kurtz's

society, companionship, and counsel."   Dkt. 15 at 184–85 (Am. Compl. ¶¶ 1085–87); *see also*

Dkt. 38-2 at 148, 171–70; Dkt. 38-58 (Roger Kurtz Decl.); Dkt. 38-60 (Stephanie Kurtz Decl.).

b.      <u>Attribution to the Zarqawi organization operating as "ISI"</u>

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of

Iraq ["ISI"]) very likely committed this shaped charge IED attack," for many of the same reasons

noted in the attribution for the February 8, 2007 IED attack.[9]  Dkt. 38-5 at 57 (Gartenstein-Ross Attribution Report).

*First*, this attack was committed in the same territory as the February 8, 2011 IED attack. Thus, "ISI was present in Fallujah at the time this attack occurred," and "by 2007[,] ISI had taken advantage of the lack of U.S. forces there to reestablish influence in the city." *Id*. at 58 (Gartenstein-Ross Attribution Report).  Moreover, in addition to the February 8, 2007 attack, there were a multitude of recorded IED attacks conducted by the ISI in the Al-Karmah area. *See id*. at 59–60 (Gartenstein-Ross Attribution Report).

*Second*, this attack involved a "shaped charge" IED, which is "[a]nother indicator that ISI was responsible for the attack." *Id*. at 60 (Gartenstein-Ross Attribution Report).  Shaped-charge IEDs are "specially designed devices that effectively penetrate armor" and function similarly to explosively formed penetrators (EFPs). *Id.* at 60 (Gartenstein-Ross Attribution Report).  ISI operated an "EFP factory" in the neighboring province, which "indicates that ISI had the capabilities to make complex explosive devices such as the shaped-charge IED, as well as personnel with expertise to carry out a sophisticated attack." *Id.* (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the February 11, 2007 IED attack.

---

[9] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq." *Id*. (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

7.    *March 5, 2007 IED Attack*

a.    Killing of U.S. Army Staff Sergeant Justin Michael Estes

On March 5, 2007, U.S. Army Staff Sergeant ("SSG") Justin Estes was patrolling in the southeast portion of Samarra, Saladin Province. Dkt. 38-5 at 233 (Gartenstein-Ross Attribution Report). The patrol was moving north when "the first vehicle of the four vehicle patrol struck a victim-operated improvised explosive device." *Id.* (Gartenstein-Ross Attribution Report). The explosion completely destroyed the vehicle, "effectively cutting it in half." *Id.* at 233 (Gartenstein-Ross Attribution Report). SSG Estes, who was in the patrol's third vehicle, "ran towards the impacted vehicle and soldiers to provide medical aid. *Id.* at 234 (Gartenstein-Ross Attribution Report). He was caught in the second explosion set off by a well-hidden victim-operated IED shortly after the first explosion. *Id.* at 234 (Gartenstein-Ross Attribution Report). "The attack killed six servicemembers, including SSG Estes, and wounded four others." *Id.* (Gartenstein-Ross Attribution Report).

SSG Estes' half-sister, Norma Estes (a U.S. citizen), is a Bellwether Plaintiff in this case. She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her brother's death, as well as the "loss of SSG Estes' society, companionship, and counsel." Dkt. 15 at 136 (Am. Compl. ¶¶ 693–94); *see also* Dkt. 38-2 at 172–73; Dkt. 38-64 (Estes Decl.).

b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) likely committed this IED attack."[10] Dkt. 38-5 at 234 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

---

[10] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq." *Id.* (Gartenstein-Ross Attribution Report). Since this attack took place while the Zarqawi

*First*, Dr. Gartenstein-Ross explains that ISI "maintained an operational presence in Samarra in the time period leading up to and after the attack that killed SSG Estes." *Id*. at 235 (Gartenstein-Ross Attribution Report). According to a 2007 CENTCOM report, "ISI sent members from Al Anbar to Saladin, particularly the area between Samarra and Lake Thar Thar." *Id.* at 235 (Gartenstein-Ross Attribution Report). ISI committed series of attacks in the vicinity of Samarra from May to October 2007. *See id.* (Gartenstein-Ross Attribution Report). Moreover, news reports in May 2007 stated that "Samarra had been 'singled out' by ISI, with the group issuing warnings of attacks against Iraqi police forces in the city." *Id.* at 236 (Gartenstein-Ross Attribution Report) (internal citation omitted). This further indicates "the strength and prominence of the ISI organization in Samarra" around the time of the attack that killed SSG Estes. *Id.* (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another indication that ISI is responsible. *Id*. (Gartenstein-Ross Attribution Report). "ISI's use of IEDs in Saladin Province during 2007 [] is well documented." *Id.* at 236. ISI documents seized by Coalition forces in early 2007 indicated that ISI "conducted 'training camps' for members in Al Anbar Province that included instruction on IED construction and use." *Id*. (Gartenstein-Ross Attribution Report) (internal citation omitted). Beyond IED training, the capture of an ISI IED cell leader in January 2007 also demonstrated that ISI "maintained specialized IED cells at the time of the attack that killed SSG Estes." *Id*. (Gartenstein-Ross Attribution Report). Several months later, U.S. forces seized an ISI weapons cache south of Baghdad which "included materials to construct IEDs similar to the device that killed SSG Estes." *Id*. (Gartenstein-Ross

organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

Attribution Report).  As the year progressed, ISI established a "'ghazw [raid] campaign' in
Saladin Province which stated that 'the individual mission of each mujahid . . . is to conduct 3
IED attacks or 3 attacks with explosives, especially martyrdom attacks, or at least to kill 3
'apostates and traitors.'"  *Id.* at 236–37 (Gartenstein-Ross Attribution Report) (alterations in
original) (internal citation omitted).

    *Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in the Saladin
Province at the time.  *Id.* at 237 (Gartenstein-Ross Attribution Report).  He explains that "Saladin
Province is overwhelmingly Sunni Arab," and given the prominence of Sunni militant groups in
the region, it is unlikely that Shia militants conducted the attack.  *Id.* (Gartenstein-Ross
Attribution Report).  Of the two dominant Sunni militant groups, Dr. Gartenstein-Ross opines
that "ISI was the stronger and hence the likelier of the two to be responsible for this attack,"
while acknowledging that "it is possible that another Sunni militant organization, Ansar al-Islam
(AAI/AAS), was involved in this attack," given that AAI "conducted several attacks against
Coalition forces in Saladin Province between 2006 and 2008."  *Id.* (Gartenstein-Ross Attribution
Report).  This question, however, may be immaterial, given that the March 2007 attack occurred
at a time when ISI and AAI were "cooperat[ing] closely," to the extent that "it could be difficult
to distinguish between the outer organizational boundaries of ISI and AA[I], in part because
some of AA[I]'s cadres were in the process of being absorbed into ISI during this period."  *Id.*
(Gartenstein-Ross Attribution Report).  He concludes that, in any event, "while ISI is the most
likely culprit behind this attack, AA[I]'s possible involvement would not undermine a finding of
Iran's culpability, because of 1) the cooperation between AA[I] and ISI during this period, and
hence the commingling of their resources, and 2) because [Iran] also provided significant
material support to AA[I]."  *Id.* (Gartenstein-Ross Attribution Report).

The Court, accordingly, finds that it is more likely than not that the Zarqawi organization was responsible for the March 5, 2007 IED attack.

8.    *April 7, 2007 IED Attack*

a.    <u>Killings of U.S. Army Captain Jonathan Grassbaugh, U.S. Army Private First Class Rodney Lynn McCandless, and U.S. Army Specialist Levi Kenneth Hoover</u>

On April 7, 2007, U.S. Army Captain ("CPT") Jonathan Grassbaugh, Private First Class ("PFC") Rodney McCandless, and Specialist ("SPC") Levi Hoover were traveling in the lead vehicle of a squadron combat logistical patrol consisting of nine vehicles while serving with U.S. Army 5th Squadron, 73rd Cavalry Regiment (5-73).  Dkt. 38-5 at 143 (Gartenstein-Ross Attribution Report).  The convoy was returning from a resupply mission in the south of Zaganiyah, Diyala province, when an IED detonated under their vehicle.  *Id*. (Gartenstein-Ross Attribution Report).  The IED blast "blew the vehicle into the air, ejecting the vehicle's turret along with four of the five occupants."  *Id*. (Gartenstein-Ross Attribution Report).  PFC McCandless remained trapped inside the vehicle and died when the vehicle was "immediately engulfed in fire" upon impact with the ground.  *Id*. (Gartenstein-Ross Attribution Report).  SPC Hoover was found dead 15 to 20 meters away from the blast site.  *Id*. (Gartenstein-Ross Attribution Report).  CPT Grassbaugh was found unconscious and on fire 10 to 15 meters from the blast site, and was pronounced dead upon arrival at a nearby medical center in Balad.  *Id*. (Gartenstein-Ross Attribution Report).  The blast also killed one other servicemember in addition to CPT Grassbaugh, PFC McCandless and SPC Hoover.

CPT Grassbaugh's mother, Patricia Grassbaugh (a U.S. citizen) is a Bellwether Plaintiff in this case.  She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her son's death, as well as the "loss of CPT Grassbaugh's society, companionship, and

counsel." Dkt. 15 at 150 (Am. Compl. ¶¶ 804–05); *see also* Dkt. 38-2 at 149; Dkt. 38-66 (Grassbaugh Decl.).

        b.     <u>Attribution to the Zarqawi organization operating as "ISI"</u>

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) very likely committed this IED attack."[11]  Dkt. 38-5 at 144 (Gartenstein-Ross Attribution Report).  He offers two considerations in support of his conclusion.

*First*, Dr. Gartenstein-Ross explains that by March 2007, ISI "effectively occupied" the broader Diyala River Valley region in which Zaganiyah is located, and "established area of operations dominance in Zaganiyah."  *Id.* at 144–45 (Gartenstein-Ross Attribution Report).  He cites the report of CPT James Few, comrade of CPT Grassbaugh, PFC McCandless, and SPC Hoover in 5-73, which states that ISI had "consolidated control of Zaganiyah," "effectively killing or displacing 5,000 Shia residents, dissolving the Iraqi Government presence, instituting an Islamic government, and implementing Shar'iah law."  *Id.* at 145 (Gartenstein-Ross Attribution Report).  In conducting reconnaissance of Zaganiyah in the spring of 2007, 5-73 estimated that "10% of the Zaganiyah population consisted of ISI fighters" and discovered that "ISI had established a military headquarters in a Zaganiyah elementary school."  *Id.* (Gartenstein-Ross Attribution Report).

Moreover, the timing of preparation for the attack and the attack itself supports ISI's responsibility.  The IED that killed CPT Grassbaugh, PFC McCandless, and SPC Hoover was pre-set and had been buried "several months" prior to the arrival of CPT Grassbaugh's unit.  *Id.*

---

[11] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id.* (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

(Gartenstein-Ross Attribution Report).  That IED was "detonated by a command wire, which likely led to a house with a hole 'chipped' out of a wall that gave a direct vantage point to the site of the IED attack."  *Id.* (Gartenstein-Ross Attribution Report) (internal citation omitted).  Dr. Gartenstein-Ross opines that the time required to pre-set an IED months in advance and knock a hole in the wall of a nearby house "suggest that those who executed the attack were active in the area for some months prior to the attack, which aligns with ISI's March 2007 area of operations dominance in the region."  *Id.* (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another indication that ISI is responsible.  *Id.* at 145 (Gartenstein-Ross Attribution Report).  At the time of the attack, ISI regularly used IEDs to target Coalition forces in the Diyala River Valley.  *Id.* (Gartenstein-Ross Attribution Report).  CPT Few reports that in March 2007 ISI had extensively "mined the roads" surrounding Zaganiyah, resulting in "two to three daily IED attacks" on the 5-73 squadron.  *Id.* at 146 (Gartenstein-Ross Attribution Report).  During "Operation Arrowhead Ripper," Coalition forces "captured approximately 250 IEDs when seizing ISI weapons caches" from the nearby city of Baqubah in Diyala River Valley.  *Id.* (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the April 7, 2007 IED attack.

9.    *May 28, 2007 IED Attack*

      a.    <u>Killings of U.S. Army Specialist James E. Summers, U.S. Army Specialist Zachary David Baker, and U.S. Army First Lieutenant Kile G. West</u>

On May 28, 2007, U.S. Army Specialist ("SPC") James Summers, U.S. Army Specialist Zachary Baker, and U.S. Army First Lieutenant ("1LT") Kile West were traveling as part of a

convoy on a mission to retrieve a downed helicopter outside of Abu Sayda, Diyala Province, a

town northeast of Baqubah. Dkt. 38-5 at 148 (Dr. Gartenstein-Ross Attribution Report).

According to the Investigation Report on this attack, the mission was "very deliberate in the

route clearance by leading with Heavy Tracked Vehicles for protection and dismounting

Troopers to look for IED . . . pressure switches or command detonating wire." *Id.* (Dr.

Gartenstein-Ross Attribution Report) (internal citation omitted). Along the route, the convoy

"stopped to inspect an IED blast and search for IEDs in the dirt section of the otherwise paved

road," and proceeded after completing its reconnaissance. *Id.* (Dr. Gartenstein-Ross Attribution

Report). After the first vehicle in the convoy passed the blast site, the vehicle containing SPC

Summers and 1LT West "struck a pressure switch detonating a large buried IED directly under

the crew compartment of the" vehicle. *Id.* (Dr. Gartenstein-Ross Attribution Report). SPC

Summers and 1LT West died immediately in the explosion from blast and shrapnel injuries,

while SPC Baker died while being evacuated to a medical facility in Balad. *Id.* at 148–49 (Dr.

Gartenstein-Ross Attribution Report). The blast also killed another servicemember and wounded

three others. *Id.* (Dr. Gartenstein-Ross Attribution Report).

   SPC Summers' half-brother, Michael Summers, 1LT West's mother, Nanette West, and

father, Clark West, are all U.S. citizens and Bellwether Plaintiffs in this case. They seek

damages for the "severe mental anguish, emotional pain and suffering" caused by SPC Summers

and 1LT West's deaths, as well as the "loss of [their] society, companionship, and counsel."

Dkt. 15 at 275, 295–96 (Am. Compl. ¶¶ 1826–27, 1996–97, 2001); *see also* Dkt. 38-2 at 149,

155–56, 173–74; Dkt. 38-68 (Summers Decl.); Dkt. 38-70 (Nanette West Decl.); Dkt. 38-72

(Clark West Decl.).

    b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) very likely committed this IED attack."[12]  Dkt. 38-5 at 149 (Gartenstein-Ross Attribution Report).  He offers two considerations in support of his conclusion.

*First*, as explained above, ISI "effectively occupied" the broader Diyala River Valley region (including Abu Sayda) by March 2007.  *Id*. at 150 (Gartenstein-Ross Attribution Report). CPT Few indicated that "ISI used their occupation of 'safe haven' towns in the area to conduct regular attacks on the Iraqi government in other towns, including Abu Sayda."  *Id*. (Gartenstein-Ross Attribution Report) (internal citation omitted).  Moreover, U.S. military operations undertaken in the Diyala River Valley region to target ISI also demonstrate the group's dominance in the area.  According to CPT Few, "5-73 began operations to eliminate ISI from the Diyala River Valley in February 2007."  *Id*. at 151 (Gartenstein-Ross Attribution Report). Coalition forces began Operation Arrowhead Ripper in June 2007, "with the explicit mission to eliminate ISI from Baqubah and later its northeast environs where Abu Sayda is located."  *Id*. (Gartenstein-Ross Attribution Report).  These operations demonstrate the "pervasive presence" of ISI in the region past the date of the attack that killed SPC Summers, SPC Baker, and 1LT West.  *Id*. (Gartenstein-Ross Attribution Report).

Moreover, although ISI did not issue a claim of responsibility for the IED attack that killed SPC Summers, SPC Baker and 1LT West, they claimed responsibility for a helicopter attack that Dr. Gartenstein-Ross opined "almost certainly was the one SPC Summers, SPC

---

[12] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id*. (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

Baker, and 1LT West were responding to on their [] mission, which places ISI in the immediate vicinity of this attack." *Id*. (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another indication that ISI is responsible. *Id*. (Gartenstein-Ross Attribution Report). At the time of the attack, ISI regularly used IEDs to target Coalition forces in the Diyala River Valley. *Id*. (Gartenstein-Ross Attribution Report). As noted above, CPT Few reported that in March 2007 ISI had extensively "mined the roads" surrounding Zaganiyah, resulting in "two to three daily IED attacks" on the 5-73 squadron. *Id*. (Gartenstein-Ross Attribution Report). And during Operation Arrowhead Ripper, Coalition forces "captured approximately 250 IEDs when seizing ISI weapons caches" from the nearby city of Baqubah in Diyala River Valley. *Id*. (Gartenstein-Ross Attribution Report).

In light of these considerations, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the May 28, 2007 IED attack.

      10.   *October 14, 2007 IED Attack*

          a.   <u>Killing of U.S. Army Sergeant First Class Justin S. Monschke</u>

On October 14, 2007, U.S. Army Sergeant First Class ("SFC") Justin Monschke was on a mission to detain "a known insurgent operating in the Arab Jabour region," a neighborhood in southern Baghdad. Dkt. 38-5 at 124 (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-149). While SFC Monschke and his team were pursuing insurgents on foot, an IED buried in a footpath detonated. SFC Monschke was within the blast area of the IED, was thrown "approximately 15 meters into a 15-foot deep ditch" and died from his injuries. *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-149).

SFC Monschke's mother, Patty Jett (a U.S. citizen), is a Bellwether Plaintiff in this case. She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her son's death, as well as the "loss of SFC Monschke's society, companionship, and counsel." Dkt. 15 at 219 (Am. Compl. ¶¶ 1366–67); *see also* Dkt. 38-2 at 157–58; Dkt. 38-78 (Jett Decl.).

> b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) very likely committed this IED attack."[13]  Dkt. 38-5 at 125 (Gartenstein-Ross Attribution Report).  He offers two considerations in support of his conclusion.

*First*, ISI had established a "significant presence" in Arab Jabour by May 2007, and according to a report by the U.S. Army's Center of Military History, the group's influence was "virtually uncontested." *Id.* at 126 (Gartenstein-Ross Attribution Report) (quoting Dale Andrade, Center for Military History, *Surging South of Baghdad: The 3D Infantry Division and Task Force Marne in Iraq, 2007-2008*, at 120 (2010), https://perma.cc/G5WM-RG4N).  ISI continued operations in the area until the group's neutralization there in 2009, which included "manufacturing IEDs and burying them along main roadways," "preparing fighters for operations in Baghdad," and "maintaining a 'detention house' used to torture captured combatants." *Id.* (Gartenstein-Ross Attribution Report) (internal citation omitted).  Arab Jabour remained "an ISI stronghold of over 1,500 fighters" until February 2008. *Id.* (Gartenstein-Ross Attribution Report).

---

[13] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq." *Id.* (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

*Second*, ISI had access to the type of IEDs used in the October 14, 2007 attack. *Id*. (Gartenstein-Ross Attribution Report). Remnants of the blast indicated that "the IED was constructed of gray metal and unknown bulk explosives, was approximately 155 millimeters in size and was triggered by a pressure wire." *Id*. (Gartenstein-Ross Attribution Report) (internal citation omitted). In November 2007—one month after the attack—U.S. forces captured an ISI weapons cache that included 155-millimeter IEDs in Baghdad's neighboring Babil Province, from which Dr. Gartenstein-Ross concludes that "ISI had access to this type of weapon during the time period of the attack." *Id*. (Gartenstein-Ross Attribution Report). Moreover, "ISI's claim of responsibility for a high-profile IED attack on a council leader in Saladin Province on October 4, 2007 affirms that ISI was committing IED attacks against its enemies during the timeframe of the attack that killed SFC Monschke." *Id*. (Gartenstein-Ross Attribution Report).

In light of these considerations, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the October 14, 2007 IED attack.

11. *October 24, 2007 IED Attack*

a. <u>Killing of U.S. Army National Guard Sergeant First Class Robin L. Towns, Sr.</u>

On October 24, 2007, Sergeant First Class ("SFC") Robin Towns was part of a four-car convoy on patrol in Baiji, approximately 112 miles north of Baghdad in Saladin Province. Dkt. 38-5 at 239 (Gartenstein-Ross Attribution Report). The patrol "noticed a vehicle tire laying in the middle of the road" and "stopped for approximately 45–60 seconds about 30–50 meters from the obstacle to scan the tire." *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-218). After deeming it clear, the vehicles in the convoy picked up speed one-by-one and passed the tire. *Id.* (Gartenstein-Ross Attribution Report). As the rear vehicle in which SFC Towns was seated drove past, a command-wire IED detonated, causing blast injuries to SFC Towns and

others in the vehicle.  *Id.* at 239–40 (Gartenstein-Ross Attribution Report).  SFC Towns died

from his injuries.  *Id.* at 240 (Gartenstein-Ross Attribution Report).

SFC Towns's widow, Shelia Towns (a U.S. citizen), is a Bellwether Plaintiff in this case.

She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her

husband's death, as well as the "loss of SFC Towns' society, companionship, and counsel."  Dkt.

15 at 283 (Am. Compl. ¶¶ 1889–90); *see also* Dkt. 38-2 at 186; Dkt. 38-80 (Towns Decl.).

b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes "it is likely that the Zarqawi organization (as the Islamic

State of Iraq ["ISI"]) was responsible for this IED attack."[14]  Dkt. 38-5 at 240 (Gartenstein-Ross

Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his

conclusion.

*First*, Dr. Gartenstein-Ross explains that Baiji had become a "key center" for ISI by the

end of 2006, and throughout 2007, Baiji remained "an instrumental location for ISI operations in

the region."  *Id.* at 241 (Gartenstein-Ross Attribution Report).  This is demonstrated by two

attacks ISI carried out in Baiji in October and December 2007, and by two ISI members captured

who were associated with the attacks in Baiji.  *Id.* (Gartenstein-Ross Attribution Report).

Despite opposition from Coalition forces, Baiji remained an ISI stronghold until 2008.  *Id.* at 242

(Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an IED explosion—is another

indication that ISI is responsible.  *Id*. (Gartenstein-Ross Attribution Report).  The October 24,

---

[14] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id*.
(Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi
organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in
attributing this attack.

2007 attack "was carried out with a command wire IED." *Id*. (Gartenstein-Ross Attribution Report). Between September 2007 and January 2008, Iraqi security forces and Coalition forces "captured several ISI IED caches in neighboring Nineveh Province, which included command wires similar to the one used in the attack that killed SFC Towns." *Id*. (Gartenstein-Ross Attribution Report). According to Dr. Gartenstein-Ross, "[t]hese caches indicate that ISI had both the materials and knowledge required to construct and deploy command wire IEDs at the time of this attack." *Id*. (Gartenstein-Ross Attribution Report).

*Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in Saladin Province at the time. *Id*. at 242 (Gartenstein-Ross Attribution Report). He explains that "AAS was also present in Saladin Province during this time," but since "AAS was allied with ISI at the time," AAS' involvement "would not mitigate the likelihood of ISI involvement." *Id*. (Gartenstein-Ross Attribution Report).[15] In addition, Jaysh Al-Mahdi ("JAM") also "operated in Saladin Province when this attack occurred." *Id.* (Gartenstein-Ross Attribution Report). But Dr. Gartenstein-Ross points out that "JAM's presence in the province was mostly a product of Sunni violence against the smaller Shia population" and that their activity was "largely focused on sectarian protection and reprisals, and not as heavily on counter-Coalition operations." *Id.* at 242–43 (Gartenstien-Ross Attribution Report). Given that Baiji was an ISI stronghold and that "JAM's activity in Saladin Province at the time was largely focused on sectarian protection and

---

[15] Moreover, since Iran also provided material support to AAS/AAI, AAS's possible involvement would not undermine a finding of Iran's culpability.

reprisals, and not as heavily on counter-Coalition operations," he concludes that it is unlikely that JAM was responsible for the attack.[16] *Id.* at 243 (Gartenstien-Ross Attribution Report).

In light of the above, the Court concludes that it is more likely than not that the Zarqawi organization was responsible for the October 24, 2007 IED attack.

    12.    *January 9, 2008 IED Attack*

        a.    Killings of U.S. Army Staff Sergeant Jonathan Killian Dozier, U.S. Army
              Sergeant Zachary Wade McBride, and U.S. Army Sergeant First Class
              Matthew Ignatius Pionk

On January 9, 2008, U.S. Army Sergeant ("SGT") Zachary McBride, Sergeant First Class ("SFC") Matthew Pionk, and Staff Sergeant ("SSG") Jonathan Dozier were on a mission to clear the town of Sinsil in Diyala Province of ISI militants and to locate a suspected ISI safe house. Dkt. 38-5 at 159–60 (Gartenstein-Ross Attribution Report). Their patrol learned of the location of the safe house from Sinsil's *mukhtar* (a local political and social leader), who denied the existence of explosives in the compound. *Id.* at 160 (Gartenstein-Ross Attribution Report). Shortly after they entered the suspected safe house and started investigating the building, an IED was triggered and "a massive explosion detonated across the southwestern portion of the structure, causing 'the entire entrance of the building and the roof to collapse as a result of the blast.'" *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-174 at 14). The explosion killed a civilian interpreter and six servicemembers, including SGT McBride, SFC Poink and SSG Dozier. *Id.* (Gartenstein-Ross Attribution Report).

SGT McBride's sister, Sarah Lambert, SFC Pionk's father, Duane Pionk, and SSG Dozier's mother, Martha Cabe, are all U.S. citizens and Bellwether Plaintiffs in this case. They

---

[16] Although JAM's "relationship with Iran is significantly less straightforward than that of the [Iranian-backed] Special Groups," Gartenstien-Ross explains that it also received Iranian support. Dkt. 38-5 at 72–73 & n.376.

seek damages for the "severe mental anguish, emotional pain and suffering" caused by SGT

McBride's, SFC Pionk's and SSG Dozier's deaths, as well as the "loss of [their] society,

companionship, and counsel."  Dkt. 15 at 128, 208, 236 (Am. Compl. ¶¶ 624–25, 1281–82, 1509,

1511); *see also* Dkt. 38-2 at 149, 156–57, 167–68; Dkt. 38-82 (Cabe Decl.); Dkt. 38-84 (Sarah

Lambert Decl.); Dkt. 38-86 (Pionk Decl.).

> b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization very likely committed this

[]IED attack."[17]  Dkt. 38-5 at 160 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross

offers three considerations in support of his conclusion.

*First*, he explains that ISI had exerted operational dominance over Sinsil through early

January 2008.  Until mid-2007, ISI had control over "the area northwest of Muqdadiyah—near

where Sinsil is located," which they dubbed the "Breadbasket."  *Id.* at 161 (Gartenstein-Ross

Attribution Report).  From mid-to-late 2007 until January 2008, Coalition forces conducted

operations intended to clear the area of ISI militants.  *Id.* (Gartenstein-Ross Attribution Report).

By early 2008, ISI forces were "heavily focused on defending their remaining logistics and

command and control nodes in the small rural towns north of Muqdadiyah," and attempted to

repel Coalition forces through the use of IED attacks—"forty-eight such attacks occurred in the

areas north of Muqdadiyah in January 2008."  *Id.* at 161–62 (Gartenstein-Ross Attribution

Report).  The statements of local Sinsil residents interviewed for an Institute for the Study of

---

[17] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id*.
(Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi
organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in
attributing this attack.

War report also corroborated ISI's control over the area. *Id.* at 162 (Gartenstein-Ross Attribution Report).

*Second*, the use of IEDs installed in buildings (house-borne IEDs or HBIEDs) was a common ISI TTP around the time of this attack. Between December 24, 2007, and February 18, 2008, Coalition forces discovered and cleared 42 HBIEDs belonging to ISI, four of which were in Diyala province. *Id.* (Gartenstein-Ross Attribution Report). A Weapons Intelligence Team report also detailed a prior incident in which an HBIED with "the same crush-wire trigger mechanism as the HBIED used in this attack" from a building in Diyala Province. *Id.* (Gartenstein-Ross Attribution Report). HBIEDs remained a common TTP for ISI for years after this attack. In 2010, the media reported that ISI was "renting residential buildings and shops— particularly in the Iraqi capital of Baghdad, which neighbors Diyala Province—and rigging them with explosives, killing dozens of civilians and confounding the efforts of security forces in the ensuing detonations." *Id.* at 163 (Gartenstein-Ross Attribution Report).

*Finally*, the U.S. Army's AR 15-6 Investigation Report on the explosion that killed SGT McBride, SFC Pionk and SSG Dozier indicates that ISI was responsible for this attack. *See* Dkt. 38-174. Exhibit E of the Investigation states that the house SGT McBride, SFC Pionk and SSG Dozier were investigating "was visited around ten days ago by . . . [Coalition forces]. Around two days afterwards, [ISI] started hanging out at this house. Local citizens were warned by [ISI] not to look at the activity taking place at the residence." *Id.* at 35.

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the January 9, 2008 IED attack.

C.    **Complex Attacks**

     1.    *April 9, 2004 Complex Attack*

          a.    <u>Killings of U.S. Army Reserve Sergeant Elmer C. Krause and Civilian
Contractors Stephen F. Hulett, Timothy E. Bell, Tony Duane Johnson, and
Jack A. Montague</u>

On April 8, 2004, the U.S. Army requested for KBR, a civilian contractor, to send an
emergency convoy to the Baghdad International Airport ("Airport") to supply fuel for U.S.
forces.  Dkt. 38-5 at 101 (Gartenstein-Ross Attribution Report).  The following day, at
approximately 10:15, a convoy of KBR employees—including Stephen Hulett, Timothy Bell,
Tony Johnson, and Jack Montague—accompanied by U.S. Army Reserve Sergeant ("SGT")
Elmer Krause's unit—left their camp for the Airport.  *Id.* (Gartenstein-Ross Attribution Report).
The convoy hit a roadblock and "received small arms fire" en route.  *Id.* (Gartenstein-Ross
Attribution Report).  While pushing through, the convoy was ambushed with "approximately 15
RPGS [rocket propelled grenades] and additional small arms," and what seemed like "hundreds
of insurgents . . . firing rifles and rocket-propelled grenades (RPGs) and triggering IEDs."  *Id.* at
101–02 (Gartenstein-Ross Attribution Report) (first alternation in original) (quoting Dkt. 38-
133).

     As the ambush progressed, "the vehicles in the convoy sustained damage, forcing drivers
and passengers from their vehicles into the ambush zone."  *Id.* at 102 (Gartenstein-Ross
Attribution Report).  Mr. Johnson's vehicle sustained significant damage in the insurgent fire,
causing the vehicle to crash, killing Mr. Johnson.  *Id.* (Gartenstein-Ross Attribution Report).  Mr.
Hulett exited his vehicle after it "fishtailed and crashed," but was killed by gunfire during the
ambush.  *Id.* (Gartenstein-Ross Attribution Report).  Then, "Mr. Montague's vehicle was
destroyed by enemy fire, resulting in his death."  *Id.* (Gartenstein-Ross Attribution Report).  SGT

Krause was shot when personnel from another vehicle evacuated into his vehicle, which then caught fire, but SGT Krause was not seen exiting his vehicle with other members of the convoy. *Id.* (Gartenstein-Ross Attribution Report).  According to a Department of Defense news release, SGT Krause was listed as "whereabouts unknown" until his remains were identified on April 23, 2004.  *Id.* (Gartenstein-Ross Attribution Report) (citing Dkt. 38-134).  After the remaining vehicles arrived at the Airport, they "returned to the kill zone to retrieve other members of the convoy who had been wounded in the ambush."  *Id.* (Gartenstein-Ross Attribution Report).  Despite rescue efforts, six civilians and two servicemembers were killed in the ambush, and another three convoy members—including Mr. Bell—were deemed missing.  *Id.* (Gartenstein-Ross Attribution Report).  Mr. Bell was never found and was declared dead six years later, on April 26, 2010.  *Id.* at 103 (Gartenstein-Ross Attribution Report).  This attack came to be known as the "Good Friday Ambush."  *Id.* (Gartenstein-Ross Attribution Report).

SGT Krause's son, Johnathan Krause, and his brother, Gerald Krause; Mr. Hulett's daughter, Lisa Kaufman, and his step-daughter, Alexandria Parks; Mr. Bell's sister, Felicia Bell Carter, and his brother, Michael Bell, are all U.S. citizens and Bellwether Plaintiffs in this case. They seek damages for the "severe mental anguish, emotional pain and suffering" caused by SGT Krause's, Mr. Hulett's and Mr. Bell's deaths, as well as the "loss of [their] society, companionship, and counsel."  Dkt. 15 at 95, 168, 183 (Am. Compl. ¶¶ 349–50, 352, 949–50, 952, 1073–74, 1076); *see also* Dkt. 38-2 at 162–63, 168, 179–81, 188–89; Dkt. 38-12 (Carter Decl.); Dkt. 38-14 (Bell Decl.); Dkt. 38-16 (Kaufman Decl.); Dkt. 38-18 (Parks Decl.); Dkt. 38-20 (Johnathan Krause Decl.); Dkt. 38-22 (Gerald Krause Decl.).

52

    b. <u>Attribution to the Zarqawi organization</u>

  Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as Jamaat al-Tawhid wal-Jihad, or JTJ) very likely committed this complex ambush."[18]  Dkt. 38-5 at 103 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers four considerations in support of his conclusion.

  *First*, he explains that JTJ maintained a "strong presence" in Baghdad and actively opposed Coalition Forces, citing five attacks conducted by JTJ in various parts of Baghdad from February to May 2004.  *Id.* at 104 (Gartenstein-Ross Attribution Report).  As 2004 progressed, JTJ strengthened their presence in Baghdad, to the extent that by October 2004 the U.S. Department of State designated Baghdad as a locus of the group's activities.  *Id.* (Gartenstein-Ross Attribution Report) (citing U.S. Dep't of State, Press Release, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (October 15, 2004), https://perma.cc/RC5K-6PDW).

  *Second*, the TTPs used in carrying out this attack—a complex ambush—is another indication that JTJ is responsible.  *Id.* at 105 (Gartenstein-Ross Attribution Report).  At the time of this attack, JTJ "possessed the weapons and commonly used the tactics observed in the Good Friday Ambush."  *Id.* (Gartenstein-Ross Attribution Report) (citing reports by the U.S. Central Command and the Australian Government).  Moreover, JTJ "regularly conducted similarly

---

[18] As noted above, the Zarqawi organization underwent several name changes since its inception. In October 2004, the group underwent one such name change when they formally pledged allegiance to al-Qaeda, changing its name from Jamaat al-Tawhid wal-Jihad ("JTJ") to al-Qaeda in Iraq ("AQI").  Dkt. 38-5 at 103 (Gartenstein-Ross Attribution Report).  As this attack occurred before JTJ took on the moniker of AQI, Dr. Gartenstein-Ross refers to the group as JTJ in attributing this attack.

complex ambushes against Coalition forces." *Id.* (Gartenstein-Ross Attribution Report) (citing four complex attacks from June to October 2004 in the vicinity of Baghdad).

*Third*, U.S. government reports concluded that JTJ was responsible for the attack. U.S. military officials "have stated that a JTJ leader named Hammadi Awdah Abd Farhan . . . was responsible for the attack on the convoy carrying Mr. Johnson, Mr. Montague, Mr. Bell, Mr. Hulett, and SGT Krause." *Id.* at 106 (Gartenstein-Ross Attribution Report). According to the U.S. Department of Defense, Farhan had longstanding connections to JTJ and had an established presence in the Baghdad area in 2004. *Id.* (Gartenstein-Ross Attribution Report). U.S. officials have revealed that, "as the emir of [the Baghdad] area, Farhan was responsible for the planning and execution of several attacks on Coalition forces," and was "behind the April 9, 2004 kidnapping of Sgt. Keith Matthew Maupin, [a servicemember who went missing during the attack]." *Id.* (Gartenstein-Ross Attribution Report) (internal citation omitted).

*Finally*, Dr. Gartenstein-Ross rules out the possibility that another group was responsible. JAM, the other insurgent group with a significant presence in Abu Ghraib, was initially suspected of perpetrating the attack. *Id.* at 106–07 (Gartenstein-Ross Attribution Report). But "given JTJ's significant presence in the region, routine employment of ambushes in this timeframe, *and* the U.S. government's authoritative conclusion that JTJ conducted the attack, it is unlikely that JAM perpetrated the Good Friday Ambush." *Id.* at 107 (Gartenstein-Ross Attribution Report) (emphasis in original).

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the April 9, 2004 complex attack.

2.    *April 11, 2004 Complex Attack*

    a.    <u>Killing of U.S. Army Sergeant Major Michael B. Stack</u>

On April 11, 2004, U.S. Army Sergeant Major ("SGM") Michael B. Stack and his unit were returning to their primary base of operations after an ambush earlier in the day.  Dkt. 38-5 at 75 (Gartenstein-Ross Attribution Report).  As SGM Stack's unit traveled near Mahmudiyah, Babil Province, they were ambushed again by "a heavy volume of machinegun and small arms fire."  Dkt. 38-126 at 4.  SGM Stack's unit "immediately returned a heavy volume of fire and continued to engage until out of the kill zone," during which "SGM Stack provided rear security for the convoy and directed fire against the enemy to protect the rest of the element."  *Id.* at 4–5.  A few hundred meters past the initial kill zone, SGM's unit was again attacked "with small arms and machine fire," and an IED "was detonated on the southern side of the last vehicle" in which SGM Stack was travelling.  *Id.* at 5.  It was determined that SGM Stack was killed in action.  *Id.*

SGM Stack's daughters, Milissa Wojtowicz and Virginia Maitland, are both U.S. citizens and Bellwether Plaintiffs in this case.  They seek damages for the "severe mental anguish, emotional pain and suffering" caused by their father's death, as well as the "loss of SGM Stack's society, companionship, and counsel."  Dkt. 15 at 273 (Am. Compl. ¶¶ 1808–10); *see also* Dkt. 38-2 at 161, 164–65; Dkt. 38-24 (Wojtowicz Decl.); Dkt. 38-26 (Maitland Decl.).

    b.    <u>Attribution to the Zarqawi organization</u>

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as Jamaat al-Tawhid wal-Jihad, or JTJ) likely committed this complex ambush attack."[19]  Dkt. 38-5 at 76

---

[19] The Zarqawi organization underwent several name changes since its inception.  In October 2004, the group underwent one such name change when they formally pledged allegiance to al-Qaeda, changing its name from Jamaat al-Tawhid wal-Jihad (JTJ) to al-Qaeda in Iraq (AQI). Dkt. 38-5 at 76 (Gartenstein-Ross Attribution Report).  As this attack occurred before JTJ took on the moniker of AQI, Dr. Gartenstein-Ross refers to the group as JTJ in attributing this attack.

(Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explains that JTJ maintained "a strong operational presence" in the intersection of Highway 1 and Highway 8 (dubbed the "Triangle of Death") near Mahmudiyah in Babil Province, immediately south of Baghdad.  *Id.* at 77 (Gartenstein-Ross Attribution Report). According to a report by the Institute for the Study of War, JTJ "dominated the city of Mahmudiyah from 2004 through 2006" and "controlled the triangle of territory west and north of Mahmudiyah, between the Euphrates River and Highway 8" until January 2007.  *Id.* (Gartenstein-Ross Attribution Report).  JTJ's presence in the Triangle was also demonstrated by two attacks in the area in February and March of 2004.  *Id.* at 77–78 (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—a complex ambush—is another indication that JTJ is responsible.  *Id.* at 78 (Gartenstein-Ross Attribution Report).  The After Action Report indicated that "[t]he ambush was well directed and planned, the enemy had isolated the kill zone and . . . placed a heavy volume of fire that was controlled and not just the usual spray of bullets."  *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-126 at 7). Moreover, "[t]he enemy followed similar TTPs for each ambush by isolating the trail vehicle directing the majority of their firepower in an attempt to possibly cause a break in contact."  *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-126 at 7).  Government reports indicate that at the time of this attack, JTJ had local access to weapons used in the attack, including "small arms, RPGs, machine guns, IEDs, and mortars."  Dkt. 38-5 at 78 (Gartenstein-Ross Attribution Report) (citing reports by the U.S. Central Command (CENTCOM) and the Australian Government).  Moreover, JTJ "conducted several ambushes against Coalition forces

during the time period of this attack," which demonstrated "JTJ's ability to direct and plan complex ambushes." *Id.* (Gartenstein-Ross Attribution Report) (citing four complex attacks from June to October 2004 in the vicinity of Baghdad).

      *Finally*, Dr. Gartenstein-Ross assessed "the possibility that Jaysh Al-Mahdi ("JAM") perpetrated the attack." *Id.* at 79 (Gartenstein-Ross Attribution Report).  Because JAM's network was "predominately active in southern Iraq, particularly in Najaf, Al Diwaniyah, and Kut," he concludes that "despite JAM's presence and attacks on Coalition forces in Babil Province, JTJ's dominance in nearby Mahmudiyah and northern Babil indicates that the organization was more likely to have conducted the attack which killed SGM Stack." *Id.* (Gartenstein-Ross Attribution Report).

      In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the April 11, 2004 complex attack.

      3.    *June 12, 2007 Complex Attack*

      a.    <u>Killing of U.S. Army Corporal Damon LeGrand</u>

      On June 12, 2007, U.S. Army Corporal ("CPL") Damon LeGrand was on patrol as part of a convoy near Baqubah, Diyala Province, when his armored vehicle "ran over" an IED "comprised of 'two anti-tank mines' buried in the ground and was simultaneously attacked 'with a[n] RPG [rocket propelled grenade] which penetrated the vehicle." Dkt. 38-5 at 153–54 (Gartenstein-Ross Attribution Report) (alteration in original) (citing Dkt. 38-172).  The blast was so powerful that "there was nothing left of the armored vehicle except for the 'doghouse' (main carriage)." *Id.* at 154 (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-171).  CPL LeGrand and one other servicemember was killed in the blast. *Id.* (Gartenstein-Ross Attribution

Report).  "After the initial attack, a sustained firefight erupted between the assailants and the U.S. military survivors."  *Id.* (Gartenstein-Ross Attribution Report).

CPL LeGrand's widow, Ashley Rawlings, and his minor daughter, K.L., are both U.S. citizens and Bellwether Plaintiffs in this case.  They seek damages for the "severe mental anguish, emotional pain and suffering" caused by CPL LeGrand's death, as well as the "loss of [his] society, companionship, and counsel."  Dkt. 15 at 190–91 (Am. Compl. ¶¶ 1135–36, 1139); *see also* Dkt. 38-2 at 161–62, 182–84; Dkt. 38-74 (Rawlings Decl.); Dkt. 38-76 (K.L. Decl.).

           b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes "it is likely that the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) committed this complex attack."[20]  Dkt. 38-5 at 154 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explains that by 2006, ISI was the "dominant force" in Diyala Province, and the group's activities in the area continued into 2007.  *Id.* at 155 (Gartenstein-Ross Attribution Report).  From 2004 to 2006, "Coalition operations to secure Baghdad forced ISI fighters into surrounding territories," which resulted in "a large increase in militant group activity in Diyala Province."  *Id.* (Gartenstein-Ross Attribution Report).  Diyala Province was "a vital geographic area for ISI due to its location on the northeast Baghdad belt, which was part of ISI's network of routes used to move freely between the provinces and project force into Baghdad."  *Id.* (Gartenstein-Ross Attribution Report).  As the bulk of the Coalition Force's attention was

---

[20] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  *Id.* (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to it by the same name in attributing this attack.

centered on Baghdad, ISI's territorial presence in Diyala province remained largely uncontested until 2007. *Id.* at 156 (Gartenstein-Ross Attribution Report). U.S. military planning documents dated December 2007 also confirmed that "the Diyala River Valley was a support zone for ISI forces." *Id.* (Gartenstein-Ross Attribution Report) (citing Multi-National Corps – Iraq, *Operation Phantom Phoenix* 5 (Dec. 24, 2007), https://perma.cc/WL5J-4769).

*Second*, the TTPs used in carrying out this attack—a complex attack that combined IEDs, RPGs, and smalls arms fire—is another indication that ISI is responsible. *Id*. (Gartenstein-Ross Attribution Report). ISI conducted numerous complex attacks in Iraq from 2006 to May 2007, including in Ramadi and Mosul, some of which employed weapons "strikingly similar to the types of weapons used in the attack that killed CPL LeGrand." *Id.* at 156–57 (Gartenstein-Ross Attribution Report). In addition, a report published by the Combating Terrorism Center (CTC) at West Point in August 2008 observed that "ISI frequently used roadside IEDs in Baqubah to 'deter coalition and Iraqi patrols.'" *Id.* at 157 (Gartenstein-Ross Attribution Report) (quoting Michael Knights, *Pursuing Al-Qa`ida into Diyala Province*, 1 CTC Sentinel 9, 1 (Aug. 2008), https://perma.cc/8KTY-4DB9).

*Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in Diyala Province at the time. *Id*. at 157 (Gartenstein-Ross Attribution Report). He notes that "[t]he 1920 Revolution Brigades had a known footprint in Diyala Province during this time period," but "they were negotiating with the Coalition for an alliance against ISI in the province" and carried out more attacks against ISI than against the Coalition, so "it is highly unlikely that the 1920 Revolution Brigades carried out this attack." *Id.* (Gartenstein-Ross Attribution Report). AAI was also present in Diyala Province during this time, but in addition to being weaker than ISI, AAI was also allied with ISI at the time, so AAI's involvement "would not preclude ISI culpability." *Id.*

(Gartenstein-Ross Attribution Report).  In addition, although JAM was also present in Diyala,

Dr. Gartenstein-Ross concluded that they "likely lacked the operational control in Bahrez to

execute this attack, considering ISI's dominance in the area."  *Id.* (Gartenstein-Ross Attribution

Report).

       In light of the above, the Court finds that it is more likely than not that the Zarqawi

organization was responsible for the June 12, 2007 complex attack.

       4.    *January 28, 2008 Complex Attack*

            a.    <u>Killings of U.S. Army Sergeant James Edward Craig, U.S. Army Corporal Evan Andrew Marshall, and U.S. Army Private Second Class Joshua Young</u>

On January 28, 2008, U.S. Army Sergeant ("SGT") James Craig, Corporal ("CPL") Evan

Marshall, and Private Second Class ("PV2") Joshua Young were on patrol as part of a five-

vehicle convoy in the Yarimjah neighborhood of Mosul, Nineveh Province.  Dkt. 38-5 at 193

(Gartenstein-Ross Attribution Report).  While on patrol, an IED "detonated directly under the

vehicle's crew compartment" of the armored vehicle carrying SGT Craig, CPL Marshall, and

PV2 Young.  Dkt. 38-200 at 3.  The blast split the vehicle into two pieces and killed all five

occupants, including SGT Craig, CPL Marshall, PV2 Young and two other servicemembers.

Dkt. 38-5 at 193 (Gartenstein-Ross Attribution Report).  The remaining vehicles came under fire

immediately from small arms fire, RPGs, and four mortar rounds coming from surrounding

buildings.  The fighting lasted for nearly four-and-a-half hours.  *Id.* at 193–95 (Gartenstein-Ross

Attribution Report).

       SGT Craig's widow, Natalie Jackson, and his sister, Kelly Inman; CPL Marshall's

parents, Sheila and Andrew Marshall; and PV2 Young's sister, Brandi Yanez, are all U.S.

citizens and Bellwether Plaintiffs in this case.  They seek damages for the "severe mental

anguish, emotional pain and suffering" caused by SGT Craig's, CPL Marshall's, and PV2 Young's deaths, as well as the "loss of [their] society, companionship, and counsel." Dkt. 15 at 118, 205, 301 (Am. Compl. ¶¶ 536, 539, 542, 1256–58, 2040–41); *see also* Dkt. 38-2 at 149–50, 175–76, 178–79, 184–85; Dkt. 38-88 (Inman Decl.); Dkt. 38-90 (Jackson Decl.); Dkt. 38-92 (Andrew Marshall Decl.); Dkt. 38-94 (Sheila Marshall Decl.); Dkt. 38-96 (Yanez Decl.).

        b.      Joint attribution to the Zarqawi organization operating as "ISI" and AAI operating as "AAS"

Dr. Gartenstein-Ross concludes that "this attack was very likely carried out by the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) and Ansar al-Islam (AAI) (as Ansar al-Sunna (AAS))."[21] Dkt. 38-5 at 195 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross offers four considerations in support of his conclusion.

*First*, he explains that ISI held area of operations dominance in Mosul when this attack occurred. When the Coalition centered its attention on Baghdad and the surrounding areas in 2006, ISI militants fled the surge of Coalition forces and refocused its efforts on Mosul. *Id.* at 196 (Gartenstein-Ross Attribution Report). Moreover, Nineveh Province historically served as a stronghold for Sunni insurgents, "facilitating transfer of foreign fighters and acting as a significant funding source for the Zarqawi organization." *Id.* at 197 (Gartenstein-Ross Attribution Report). By late 2007, ISI felt so secure in its control of Nineveh that its senior leader Abu Ayyub al-Masri moved into the city, and he was joined by "most of the group's other top leaders, including Abu Qaswarah, also known as Mohamed Moumou, ISI's third in

---

[21] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq." Dkt. 38-5 at 195 (Gartenstein-Ross Attribution Report). Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to the group as ISI in attributing this attack; AAI changed its name to Ansar al-Sunna on September 20, 2003, and since this attack occurred after the name change, Dr. Gartenstein-Ross refers to AAI as AAS in this attribution. *Id.* (Gartenstein-Ross Attribution Report).

command in 2008 and the day-to-day operational leader for the entire ISI." *Id.* at 197

(Gartenstein-Ross Attribution Report) (quoting Johnston et al., RAND Corp., *Foundations of the*

*Islamic State: Management, Money, and Terror in Iraq 2005-2010*, at 54, 55 (2016),

https://perma.cc/Q4AB-WY33).  ISI was so dominant in Mosul around this time that its presence

prompted a largescale Coalition operation—Operation Phantom Phoenix—in which "Iraqi and

US forces [] captured or killed 121 al Qaeda fighters, wounded 14, and detained an additional

1023 suspects," as well as "discovered 351 weapons caches and four tunnel complexes . . . three

car bomb and [IED] factories and 410 IEDs." *Id.* at 198–99 (Gartenstein Ross Attribution

Report) (quoting Bill Roggio, *Al Qaeda in Iraq's Shrinking Area of Operations*, Long War

Journal (Jan. 17, 2008), https://perma.cc/Z5NM-JWUD).

Similarly, Mosul "proved attractive to AAS fighters" as early as 2003 and the group

"maintained a strong presence in the city until 2008." *Id.* at 200 (Gartenstein Ross Attribution

Report).  AAS and ISI had a history of cooperation in Mosul, in which they carried out multiple

complex attacks together.  *Id.* (Gartenstein Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—a complex attack that involved

multiple IEDs, RPGs, and small arms fire—is another indication that ISI and AAS are

responsible.  *Id.* at 201 (Gartenstein-Ross Attribution Report).  At the time of the attack, "ISI and

AAS frequently employed complex attacks against Coalition forces in Mosul." *Id.* (Gartenstein-

Ross Attribution Report) (citing multiple complex attacks attributed to both groups in May 2007

and another jointly-conducted complex attack in January 2008).  Moreover, ISI frequently

conducted IED attacks in Mosul.  In January 2008 alone, "300 IEDs were found or detonated by

the 3-3 AC [Armored Cavalry] squadron. By the middle of February, attacks averaged around 20

per day, ranging anywhere from 12 to 30. One week, attacks spiked to 180, or almost 26 attacks

a day." *Id.* (Gartenstein-Ross Attribution Report) (internal citation omitted). Dr. Gartenstein-Ross concludes that "[t]he high volume of IED attacks in a city known to be controlled by ISI leadership, as well as the presence of a reported bombmaking factory within the city, demonstrates ISI's ability to build and detonate IEDs against Coalition forces." *Id.* at 202 (Gartenstein-Ross Attribution Report).

*Third*, multiple reports and declassified U.S. military materials indicate ISI's involvement in the attack. A researcher for the Institute for the Study of War noted in January 2008 that "'there is some evidence that AQI and Ansar al Sunna have formed a working relationship in Mosul,' despite AQI clashing with other 'elements of the insurgency . . . particularly . . . the nationalist groups,'" and concluded that the attack which killed SGT Craig, CPL Marshall, and PV2 Young "was a product of the working relationship between AAS and ISI." *Id.* at 200 (Gartenstein-Ross Attribution Report) (quoting Institute for the Study of War, Eric Hamilton, *Iraq Report March 2002 – March 2008: The Fight for Mosul* 18 (2008), https://perma.cc/PQN9-JD22). U.S. military materials "not only concur with the conclusions reached by analysts operating in the public sphere in determining that ISI fighters were moving into Mosul, but also assess that ISI had an intention to 'improve planning and deliberate targeting to increase the effectiveness of [ISI] attacks.'" *Id.* at 203 (Gartenstein-Ross Attribution Report) (alternation in original) (internal citation omitted). Moreover, U.S. Government documents describing and investigating this complex attack contain multiple direct references to ISI as the perpetrator. *Id.* (Gartenstein-Ross Attribution Report) (citing Dkts. 38-200, 38-201) (the AR 15-6 and Significant Activity Reports).

*Finally,* and perhaps most importantly, AAS released a claim of responsibility for this attack on January 29, 2008. *Id.* at 204 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross explains:

> This claim, released the day following the attack, correctly identifies the location of the attack and identifies TTPs used in the attack acknowledged by witnesses to the attack, including IEDs, small arms fire, and the concentrated presence of enemy forces in the attack zone. This claim lends further evidence to the witness statements claiming detonation of several IEDs in this single attack on Coalition and Iraqi forces. The only inconsistency is the claim that one of the IEDs following the initial explosion killed "a large number of the apostate soldiers." The AR 156 Investigation Report claims only five killed in action during this attack, in the initial IED blast.

*Id.* at 205 (Gartenstein-Ross Attribution Report). Moreover, he stresses that AAS' claim of responsibility does not contradict that ISI was jointly responsible for the attack, given that the organizations "had coordinated actions for years prior to this attack, as well as at the specific time and place of the attack." *Id.* (Gartenstein-Ross Attribution Report).

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization and AAI were jointly responsible for the January 28, 2008 complex attack.

**D.    Suicide Bombings**

1.    *May 14, 2004 Suicide Attack*

a.    <u>Killing of U.S. Army Sergeant James W. Harlan</u>

On May 14, 2004, U.S. Army Sergeant ("SGT") James W. Harlan was traveling as a passenger in a vehicle in Balad, Saladin Province when a passing vehicle containing explosives blew up. Dkt. 38-5 at 223 (Gartenstein-Ross Attribution Report). SGT Harlan was caught in the explosion and declared dead upon arrival at a hospital in Baghdad. *Id.* (Gartenstein-Ross Attribution Report).

64

SGT Harlan's daughter, Tara Roberts (a U.S. citizen), is a Bellwether Plaintiff in this case. She seeks damages for the "severe mental anguish, emotional pain and suffering" caused by her father's death, as well as the "loss of SGT Harlan's society, companionship, and counsel." Dkt. 15 at 158 (Am. Compl. ¶¶ 874–75); *see also* Dkt. 38-2 at 162; Dkt. 38-32 (Roberts Decl.).

> ### b.    Attribution to AAI operating as "AAS"

Dr. Gartenstein-Ross concludes that "Ansar al-Islam (AAI) (as Ansar al-Sunna (AAS)) likely committed this suicide . . . attack."[22] Dkt. 38-5 at 223 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he cites four attacks one month before—in April of 2004—in the vicinity of Balad for which "AAS credibly claimed responsibility," indicating that "AAS maintained uninterrupted area of operations dominance in the area between [Kirkuk, Mosul, Ramadi, and Tikrit (all of which surround Balad)], including in and around Balad, at the time of the attack that killed SGT Harlan." *Id.* at 224–25 (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—a suicide vehicle-borne IED—is another indication that AAI is responsible. *Id.* at 225 (Gartenstein-Ross Attribution Report). Between December 2003 and February 2004, AAI orchestrated and claimed responsibility for three suicide vehicle-borne IED attacks targeting Coalition forces. *Id.* (Gartenstein-Ross Attribution Report). Moreover, AAI was also responsible for a suicide vehicle-borne IED bombing on July 6, 2004 in Khalis, a town in Diyala Province. *Id.* (Gartenstein-Ross Attribution Report).

---

[22] AAI changed its name to Ansar al-Sunna on September 20, 2003. Since this attack occurred after the name change, Dr. Gartenstein-Ross refers to AAI as AAS in this attribution. *Id.* (Gartenstein-Ross Attribution Report).

*Finally*, Dr. Gartenstein-Ross ruled out other militant groups active in this area in attributing this attack.  As he explained in attributing the July 21, 2004 IED attack, Balad is located in Saladin Province in the Sunni Triangle, which makes it more conducive to the activities of Sunni militant groups than those of Shia militant groups.  "Saladin Province is home to several important Shia shrines and to a small Shia population," but "that Shia population was not large enough to sustain a consistent presence of Shia militias, leading to greater overall opportunities for Sunni militant groups," the strongest of which was AAI.  *Id.* at 225–26 (Gartenstein-Ross Attribution Report).  The Zarqawi organization (as JTJ) was also active in Saladin Province during this time, but according to a U.S. CENTCOM report, "in the months before and leading up to the attack, JTJ was concentrating on fighting Coalition forces in the First Battle of Fallujah, which occurred from April 4 to May 1, 2004."  *Id.* at 226 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross concludes that "[w]hile JTJ likely had fighters in Saladin Province in mid-2004, the area was not then a priority for the organization's attack networks."  *Id.* (Gartenstein-Ross Attribution Report).  Nonetheless, since Iran also provided material support to the Zarqawi organization, the group's possible involvement in this attack would not undermine a finding of Iran's culpability.

In light of the above, the Court finds that it is more likely than not that AAI was responsible for the May 14, 2004 suicide attack.

2.    *October 14, 2004 Suicide Attack*

a.    Killing of John Albert Pinsonneault

On October 14, 2004, civilian government contractor John Albert Pinsonneault was visiting a bazaar in the International Zone of Baghdad (known as the "Green Zone"), located in central Baghdad.  Dkt. 38-5 at 115 (Gartenstein-Ross Attribution Report).  While Mr.

Pinsonneault and two of his colleagues were walking through the market, "[o]ne alleged IED and one alleged suicide bomber detonated near[ly] simultaneously" near the International Zone Cafe. *Id.* (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-140 at 2). The explosion killed six people, including Mr. Pinsonneault and his two colleagues, and wounded ten others. *Id.* (Gartenstein-Ross Attribution Report).

Mr. Pinsonneault's stepson, Jacob Kosky (a U.S. citizen), is a Bellwether Plaintiff in this case. He seeks damages for the "severe mental anguish, emotional pain and suffering" he suffered as a result of his stepfather's death, as well as the "loss of Mr. Pinsonneault's society, companionship, and counsel." Dkt. 15 at 235 (Am. Compl. ¶¶ 1499–500); *see also* Dkt. 38-2 at 189–90; Dkt. 38-38 (Kosky Decl.).

b.    Attribution to the Zarqawi organization operating as "JTJ"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as Jamaat al-Tawhid wal-Jihad, or JTJ) very likely committed this suicide bombing."[23] Dkt. 38-5 at 115 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explains that JTJ maintained a strong presence in Baghdad and actively opposed Coalition Forces. *Id.* at 116 (Gartenstein-Ross Attribution Report). "This attack occurred on October 14, 2004 in Baghdad, Baghdad Province, where JTJ at that time was regularly carrying out attacks." *Id.* (Gartenstein-Ross Attribution Report). That same month, the U.S. Department of State designated Baghdad as a locus of the group's activities, referring to the group's

---

[23] The Zarqawi organization underwent several name changes since its inception. In October 2004, the group underwent one such name change when they formally pledged allegiance to al-Qaeda, changing its name from Jamaat al-Tawhid wal-Jihad (JTJ) to al-Qaeda in Iraq (AQI). Dkt. 38-5 at 103 (Gartenstein-Ross Attribution Report). As this attack occurred before JTJ took on the moniker of AQI, Dr. Gartenstein-Ross refers to the group as JTJ in attributing this attack.

responsibility for the August 2003 suicide truck bombing of the U.N. Headquarters in Baghdad. *Id.* (Gartenstein-Ross Attribution Report).  In March 2004, JTJ claimed responsibility for several suicide bombings, including bombings in Baghdad.  *Id.* (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—a suicide vest IED—is another indication that JTJ is responsible.  *Id.* (Gartenstein-Ross Attribution Report).  As previously established, IEDs were commonly used by JTJ throughout the group's existence.  Moreover, JTJ's use of suicide bombings as a TTP is evidenced by the aforementioned August 2003 and March 2004 attacks, as well as an IED attack on May 19, 2004, (killing Iraqi Governing Council head Ezzedine Salim) and a series of suicide bombings in Baghdad in fall 2004.  *Id.* at 117 (Gartenstein-Ross Attribution Report).

*Finally*, JTJ likely issued a claim of responsibility for this attack.  The *New York Times* reported that JTJ claimed responsibility for an attack that occurred on October 14, consisted of multiple bombs, and had American victims employed by DynCorp, the company Mr. Pinsonneault and his colleagues were working for at the time.  *Id.* (Gartenstein-Ross Attribution Report).  These details led Dr. Gartenstein-Ross to conclude that the attack for which JTJ claimed responsibility was the same attack that killed Mr. Pinsonneault, and that since "the claim aligns with JTJ's area of operations, capabilities, and typical attack types at the time, [he finds that] JTJ's claim of responsibility is credible."  *Id.* (Gartenstein-Ross Attribution Report).

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the October 14, 2004 suicide attack.

3.    *December 21, 2004 Suicide Attack*

      a.    <u>Killings of U.S. Army National Guard Staff Sergeant Lynn Robert Poulin,
U.S. Army Staff Sergeant Julian Melo, and U.S. Army Private Lionel
Ayro</u>

On December 21, 2004, U.S. Army National Guard Staff Sergeant ("SSG") Lynn Robert
Poulin, SSG Julian Melo, and Private ("PVT") Lionel Ayro were in the Dining Facility
("DFAC") on Forward Operating Base Marez in Mosul, Nineveh Province.  Dkt. 38-5 at 174–75
(Gartenstein-Ross Attribution Report).  A suicide bomber in an Iraqi Army uniform gained
access to the base, entered the DFAC, sat at a table facing the busy cafeteria line, and detonated
the explosives on his person.  *Id.* (Gartenstein-Ross Attribution Report).  "Upon detonation, the
blast killed the assailant, 14 U.S. military personnel, four Haliburton employees, and four Iraqi
soldiers, as well as injuring 71 people."  *Id.* (Gartenstein-Ross Attribution Report).  SSG Poulin,
SSG Melo, and PVT Ayro were killed in the attack.  *Id.* at 175–76 (Gartenstein-Ross Attribution
Report).

SSG Poulin's sister, Nancy Poulin (a U.S. citizen), is a Bellwether Plaintiff in this case.
She seeks damages for the "severe mental anguish, emotional pain and suffering" she suffered as
a result of her brother's death, as well as the "loss of SSG Poulin's society, companionship, and
counsel."  Dkt. 15 at 240 (Am. Compl. ¶¶ 1546–47); *see also* Dkt. 38-2 at 168–69; Dkt. 38-40
(Poulin Decl.).

b.    Attribution to AAI operating as "AAS"

Dr. Gartenstein-Ross concludes that "Ansar al-Islam (AAI) (as Ansar al-Sunna (AAS))
very likely committed this suicide attack."[24]  Dkt. 38-5 at 176 (Gartenstein-Ross Attribution
Report).  Dr. Gartenstein-Ross offers four considerations in support of his conclusion.

*First*, he explains that AAI was active in Mosul at the time of the attack.  "In November
and December 2004, Mosul experienced fierce fighting between Coalition forces and several
Sunni insurgent groups, including AAS and the Zarqawi organization."  *Id.* at 177 (Gartenstein-
Ross Attribution Report).  Despite U.S. forces conducting clearing operations in Mosul, Sunni
militia groups like AAS continued to conduct attacks on U.S. forces, including a large assault on
Combat Outpost Tampa on December 29, 2004, eight days after this attack.  *Id.* (Gartenstein-
Ross Attribution Report).

*Second*, AAS has a documented history of utilizing suicide bombers to conduct attacks in
similar operating environments, which "constitute[s] a core TTP for their kinetic operations."  *Id.*
at 178 (Gartenstein-Ross Attribution Report).  From 2004 to 2007, AAS claimed responsibility
for over 1,600 attacks of all kinds, many of which utilized suicide bombings.  *Id.* (Gartenstein-
Ross Attribution Report).  In 2003 and 2004, AAS conducted other high-profile attacks,
including a suicide bombing of the Turkish Embassy in Baghdad which killed one and wounded
24 others, and simultaneous suicide attacks at the headquarters of the Kurdish Democratic Party
and the Patriotic Union of Kurdistan in Erbil which resulted in more than 100 people killed and
over 130 wounded.  *Id.* (Gartenstein-Ross Attribution Report).

---

[24] AAI changed its name to Ansar al-Sunna on September 20, 2003.  Since this attack occurred
after the name change, Dr. Gartenstein-Ross refers to AAI as AAS in this attribution.  *Id.*
(Gartenstein-Ross Attribution Report).

*Third*, AAS claimed responsibility for this attack, which Dr. Gartenstein-Ross opined to be "credible and authentic." *Id.* (Gartenstein-Ross Attribution Report). AAS released a statement on its website claiming responsibility for the attack immediately after it took place, and four days later "released a lengthier statement describing its role in the attack as well as a video that purports to show the attack's planning and execution." *Id.* at 179 (Gartenstein-Ross Attribution Report); *see id.* at 179–181 (including English translations of the statements claiming responsibility and a description of the contents of the video, complete with photos from the footage).

*Finally,* official U.S. government reports also attribute the attack to AAS. The AR 15-6 Investigation Report—conducted in the aftermath of the bombing—describes AAS's claim of responsibility [and deems] it credible." *Id.* at 183 (Gartenstein-Ross Attribution Report) (internal citation omitted). Moreover, the U.S. State Department's 2004 *Country Reports on Terrorism*— "an authoritative U.S. government document that undergoes the highest level of scrutiny in its factual claims prior to publication"—also indicates AAS's responsibility for this attack. *Id.* at 184 (Gartenstein-Ross Attribution Report) (citing U.S. Dep't of State, *Country Reports on Terrorism, 2004*, at 94–95 (2005), https://perma.cc/4NKH-BWND).

In light of the above, the Court finds that it is more likely than not that AAI was responsible for the December 21, 2004 suicide attack

4.    *December 9, 2005 Suicide Attack*

a.    Killing of U.S. Army Specialist Adrian N. Orosco

On December 9, 2005, U.S. Army Specialist ("SPC") Adrian Orosco was on dismounted patrol in Abu Ghraib, a western neighborhood of Baghdad. Dkt. 38-5 at 119 (Gartenstein-Ross Attribution Report). At the "intersections of Route Sword and Route Michigan," he was killed

by the detonation of a suicide vehicle-borne improvised explosive device ("SVBIED") "that was traveling from west to east along Route Michigan." *Id.* at 119–20 (Gartenstein-Ross Attribution Report) (quoting Dkt. 38-146 at 3).

SPC Orosco's father, Noe Orosco, Sr., (a U.S. citizen), is a Bellwether Plaintiff in this case. He seeks damages for the "severe mental anguish, emotional pain and suffering" caused by his son's death, as well as the "loss of SPC Orosco's society, companionship, and counsel." Dkt. 15 at 226 (Am. Compl. ¶¶ 1426–27); *see also* Dkt. 38-2 at 150–51; Dkt. 38-48 (Orosco Decl.).

b.   Attribution to the Zarqawi organization operating as "AQI"

Dr. Gartenstein-Ross concludes "the Zarqawi organization (as al-Qaeda in Iraq ["AQI"]) very likely committed this . . . attack."[25] Dkt. 38-5 at 120 (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross offers two considerations in support of his conclusion.

*First*, he explains "AQI was the deadliest Sunni terrorist group in the Baghdad area" from 2005 to 2006. *Id.* at 121 (Gartenstein-Ross Attribution Report). During this period, AQI consolidated its control over neighborhoods in west Baghdad. *Id.* (Gartenstein-Ross Attribution Report). This attack occurred at the intersections of Route Sword and Route Michigan, which AQI used as "primary routes for transporting weapons and supplies into Baghdad." *Id.* (Gartenstein-Ross Attribution Report). Moreover, "Abu Ghraib was a key transit point for these supplies," which demonstrated AQI's "dominance and high level of activity in this location during the time period when this attack occurred." *Id.* (Gartenstein-Ross Attribution Report) (citing Institute for the Study of War, *Baghdad City*, https://perma.cc/4XYM-7U8M).

---

[25] Dr. Gartenstein-Ross refers to the Zarqawi organization by the name it was known for at the time of this attack, which was al-Qaeda in Iraq ("AQI").

*Second*, as other decisions from this Court have observed, the use of vehicle-borne IEDs is a "signature attack method" of AQI. *Id.* (Gartenstein-Ross Attribution Report) (citing *Brown v. Islamic Republic of Iran*, 687 F.Supp.3d 21, 35, 41 (D.D.C. 2023)).  According to a U.S. Government report, "AQI claimed responsibility for countless suicide bombings, an integral tactic in its war against the coalition, which reflected the group's obsession with martyrdom." *Id.* at 122 (Gartenstein-Ross Attribution Report) (citing CENTCOM, *Insurgent Group Profile: Al Qaeda in Iraq (AQI)* 5 (May 2, 2007), https://perma.cc/D47V-UWEF).  AQI was responsible for the suicide vehicle-borne IED attack on the U.N. Baghdad Headquarters in 2003 (killing the United Nations' representative to Iraq, Sergio Vieira de Mello), the suicide vehicle-borne IED attack near the Coalition headquarters compound in Baghdad in 2004 (killing Iraqi Governing Council head Ezzedine Salim), and the triple suicide car bomb attack in Balad, Saladin Province in 2005 (killing over 200 people).  *Id.* at 121 (Gartenstein-Ross Attribution Report).  By 2006, the Institute for the Study of War observed that AQI's vehicle-borne IED network was "sophisticated."  *Id.* at 122 (Gartenstein-Ross Attribution Report) (quoting Eric Hamilton, Institute for the Study of War, *Backgrounder #24: Targeting the Diyala Suicide Bombing Network* 1–2 (Mar. 2008), https://perma.cc/6C8D-VT85).  Dr. Gartenstein-Ross concluded that "[u]sing [vehicle-borne] IEDs allowed AQI to conduct spectacular attacks, gaining media attention and notoriety, and supporting their goal of inciting sectarian conflict," all of which demonstrates that "AQI possessed the capability and willingness to carry out [the] attack which killed SPC Orosco."  *Id.* (Gartenstein-Ross Attribution Report) (internal quotation marks and citation omitted).

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the December 9, 2005 suicide attack.

5.      *April 10, 2009 Suicide Attack*

   a.      Killings of U.S. Army Corporal Jason G. Pautsch, U.S. Army Staff
           Sergeant Bryan E. Hall, U.S. Army Sergeant Edward W. Forrest, and U.S.
           Army Staff Sergeant Gary L. Woods

On April 10, 2009, U.S. Army Corporal ("CPL") Jason Pautsch, Staff Sergeant ("SSG")

Bryan Hall, Sergeant ("SGT") Edward Forrest, and SSG Gary Woods were on reconnaissance

patrol as part of a convoy in western Mosul, Nineveh Province.  Dkt. 38-5 at 209 (Gartenstein-

Ross Attribution Report).  Once outside the Forward Operating Base Marez gate, the unit noticed

a red dump truck approaching their position at a high rate of speed.  *Id.* (Gartenstein-Ross

Attribution Report).  CPL Pautsch, SGT Forrest, and SSGs Hall and Woods attempted to stop the

truck with machine gun fire from their armored vehicle, but the truck continued to rapidly

advance towards their position.  *Id.* (Gartenstein-Ross Attribution Report).  When the truck was

approximately 10 meters from the armored vehicle, an IED contained within the truck detonated,

"'[tearing] the roof from the vehicle hull,' tipping it over, and ejecting" the service members.  *Id.*

(Gartenstein-Ross Attribution Report) (alteration in original) (citing Dkt. 38-206).  "CPL

Pautsch, SGT Forrest, and SSGs Hall and Woods died instantaneously from injuries sustained in

the blast."  *Id.* at 210 (Gartenstein-Ross Attribution Report).

CPL Pautsch's brother, Josef Pautsch, and SSG Woods' mother, Becky Johnson, are both

U.S. citizens and Bellwether Plaintiffs in this case.  They seek damages for the "severe mental

anguish, emotional pain and suffering" caused by CPL Pautsch's and SSG Woods' deaths, as

well as the "loss of [their] society, companionship, and counsel."  Dkt. 15 at 231, 299–300 (Am.

Compl. ¶¶ 1466–67, 2029, 2031); *see also* Dkt. 38-2 at 159–60, 169; Dkt. 38-98 (Pautsch Decl.);

Dkt. 38-100 (Johnson Decl.).

b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) very likely committed this . . . attack."[26]  Dkt. 38-5 at 210 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers four considerations in support of his conclusion.

*First*, he explains that "ISI had a history of entrenchment in Mosul prior to this attack." *Id.* at 211 (Gartenstein-Ross Attribution Report).  In late 2006, ISI refocused its efforts on Mosul while fleeing the surge of Coalition forces in central Iraq and Al Anbar Province.  *Id.* at 211–12 (Gartenstein-Ross Attribution Report).  In February 2009, Coalition forces launched Operation New Hope "with the goal of forcing ISI out of Mosul."  *Id.* at 212 (Gartenstein-Ross Attribution Report).  However, despite the Coalition's efforts, "ISI launched an average of 35 attacks per week in Mosul throughout April and May 2009."  *Id.* at 213 (Gartenstein-Ross Attribution Report).  One such attack occurred on April 9—the day before this attack occurred—when ISI launched a suicide vehicle-borne IED attack in south Mosul, killing five U.S. soldiers, three Iraqis, and wounding over 60 people.  *Id.* (Gartenstein-Ross Attribution Report).

*Second*, suicide vehicle-borne IED attacks were a common ISI TTP at the time of the attack.  According to a 2009 report, "ISI's preferred methods were suicide attacks with either Person or Vehicle Borne Improvised Explosive Devices," noting that in April 2009, ISI "conducted almost a dozen near-simultaneous VBIED attacks throughout Baghdad."  *Id.* (Gartenstein-Ross Attribution Report) (quoting Bianka J. Adams, *MND-B 2009 Command*

---

[26] On October 15, 2006, AQI adopted the moniker "the Islamic State of Iraq."  Dkt. 38-5 at 195 (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to the group as ISI in attributing this attack.

*Report* 28 (2009), https://perma.cc/KP5T-K6LK).  Moreover, ISI was known to use suicide vehicle-borne IEDs to target Coalition and Iraqi compounds.  *Id.* at 214 (Gartenstein-Ross Attribution Report) (citing attacks on Iraqi government buildings and the International Zone in Baghdad).

*Third*, the U.S. Government's prosecution of an individual linked to this attack is another indicator of ISI's culpability.  On December 8, 2011, the U.S. Department of Justice unsealed an indictment that charged Sayfildin Tahir Sharif, an Iraqi Canadian dual citizen residing in Canada, with orchestrating the attack that killed CPL Pautsch, SGT Forest, SSG Hall, and SSG Woods. *Id.* (Gartenstein-Ross Attribution Report).  Multiple sources confirm that Sharif was affiliated with and acting in support of ISI at the time of this attack.  *Id.* at 214–15 (Gartenstein-Ross Attribution Report).

*Finally,* ISI claimed responsibility for the attack in a statement published by ISI's propaganda bureau.  Notwithstanding certain factual discrepancies—Dr. Gartenstein-Ross noted that "ISI's claims of responsibility routinely exaggerated casualty numbers and the level of destruction caused by their attacks"—the date, location, and TTP described in the claim of responsibility accord with the government investigation report of this attack.  *Id.* at 215 (Gartenstein-Ross Attribution Report) (citing Dkt. 38-206).

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the April 10, 2009 suicide attack.

E.    **Small Arms, Rocket-Propelled Grenade, and Anti-Aircraft Attacks**

1.    *January 20, 2007 Anti-Aircraft Attack*

a.    <u>Killing of U.S. Army National Guard Command Sergeant Major Marilyn</u>
        <u>L. Gabbard</u>

On January 20, 2007, U.S. Army National Guard Command Sergeant Major ("CSM")
Marilyn Gabbard was a passenger aboard a UH-60 Blackhawk (callsign EZ 40), which was
flying in formation behind another Blackhawk helicopter over Bahrez, a town northeast of
Baghdad in Diyala Province.  Dkt. 38-5 at 136 (Gartenstein-Ross Attribution Report).  CSM
Gabbard's helicopter was struck by enemy fire and subsequently crashed, killing all 12 people
onboard, including CSM Gabbard.  *Id.* at 137 (Gartenstein-Ross Attribution Report).  The
surviving helicopter and newly arrived aircraft engaged with and destroyed the enemy positions.
*Id.* (Gartenstein-Ross Attribution Report).  While the precise munition used to shoot down EZ 40
is unknown, surface-to-air missiles, RPGs, a 50-caliber machine gun, and an anti-aircraft gun
were discovered at the enemy ground site.  *Id.* (Gartenstein-Ross Attribution Report).

CSM Gabbard's twin sister, Marla Van Cannon, and brother, Michael Van Cannon, are
both U.S. citizens and Bellwether Plaintiffs in this case.  They seek damages for the "severe
mental anguish, emotional pain and suffering" caused by their sister's death, as well as the "loss
of CSM Gabbard's society, companionship, and counsel."  Dkt. 15 at 142 (Am. Compl. ¶¶ 740–
42); *see also* Dkt. 38-2 at 176–77; Dkt. 38-52 (Marla Van Cannon Decl.); Dkt. 38-54 (Michael
Van Cannon Decl.).

b.    Attribution to the Zarqawi organization operating as "ISI"

Dr. Gartenstein-Ross concludes that "it is very likely that the Zarqawi organization (as the Islamic State in Iraq ["ISI"]) committed this helicopter shoot-down attack."[27]  Dkt. 38-5 at 137 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, ISI had traditionally fought for control over Bahrez and its southern neighboring areas "because these towns served as facilitation nodes for the group's attacks into eastern Baghdad."  *Id.* at 138 (Gartenstein-Ross Attribution Report).  "During the first three years of the Iraq War, the town was a frequent battleground between Coalition forces and Sunni militant groups."  *Id.* (Gartenstein-Ross Attribution Report).  One of these skirmishes for control of Bahrez occurred in mid-February 2007—soon after the attack that killed CSM Gabbard—and "ensued because ISI had once again claimed control of the town in December 2006."  *Id.* (Gartenstein-Ross Attribution Report).  Moreover, ISI was also the dominant militant group in Bahrez's neighboring city of Baqubah, the capital of Diyala Province.  *Id.* (Gartenstein-Ross Attribution Report).  Control of Baqubah "enhanced ISI's ability to project power in the city's environs," and the city's location in the Sunni Triangle "made it a magnet for ISI fighters from the onset of the Sunni insurgency."  *Id.* (Gartenstein-Ross Attribution Report).  Both preceding and shortly after the attack that killed CSM Gabbard, "Coalition forces launched several major offenses to degrade ISI in Diyala Province generally, but particularly in Baqubah and its

---

[27] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  Dkt. 38-5 at 195 (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to the group as ISI in attributing this attack.

environs." *Id.* at 139 (Gartenstein-Ross Attribution Report) (citing multiple operations from November 2006 until October 2007).

*Second*, the TTP used to carry out the attack—a helicopter shoot-down attack—is another indication that ISI is responsible. *Id.* (Gartenstein-Ross Attribution Report). At the time of the attack, ISI had access to training and materials required to conduct attacks with weapons including surface-to-air missiles, RPGs, 50-caliber machine guns, and anti-aircraft guns—the types of weapons found in enemy positions near the helicopter crash site. *Id.* (Gartenstein-Ross Attribution Report). According to a U.S. government CENTCOM report, ISI-associated groups based in Diyala Province received RPG training with ISI members in Al Anbar Province in 2006, and that "by October 2006, ISI members holding rallies in Ramadi, Al Anbar Province were seen brandishing 'RPGs, IGLA [Soviet surface-to-air missile system] rockets, and Dimitrov anti-aircraft guns.'" *Id.* (Gartenstein-Ross Attribution Report) (quoting CENTCOM, *Chapter Six: AQI Dominates the Insurgency* (2006), *in* Study of the Insurgency in Anbar Province, Iraq 7 (June 13, 2007), https://perma.cc/UZ36-UXLB). Between October 2006 and November 2008, Coalition forces found at least 118 surface-to-air missiles and evidence of ISI forces' training in their use in various places throughout Iraq. *Id.* (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross concludes that "[g]iven ISI's area of operations dominance in Diyala Province, it is unlikely that other groups were present in the area with the same capabilities and access to the materials necessary to carry out this attack." *Id.* at 139–140 (Gartenstein-Ross Attribution Report).

*Finally*, ISI claimed responsibility for this attack. The ISI Ministry of Information, ISI's propaganda arm, released a statement claiming responsibility for downing a Blackhawk helicopter in the area of Bahrez, Diyala Province on January 21, 2007. *Id.* at 140 (Gartenstein-

Ross Attribution Report).  Dr. Gartenstein-Ross concludes that the claim is reliable given the accurate details provided, despite the date being one day off, which he opines "may be due to discrepancies in converting dates from the Hijri (Islamic) calendar, which ISI preferred, to the Gregorian calendar."  *Id.* at 141 (Gartenstein-Ross Attribution Report).

In light of the above, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the January 20, 2007 anti-aircraft attack.

2.    *February 18, 2007 Small Arms Fire Attack*

a.    <u>Killing of U.S. Army Private First Class Kelly David Youngblood</u>

On February 18, 2008, U.S. Army Private First Class ("PFC") Kelly David Youngblood was serving on a three-person team manning a tank outside of Ramadi, Al Anbar Province.  Dkt. 38-5 at 63 (Gartenstein-Ross Attribution Report).  As PFC Youngblood exited the tank, he was shot with three synchronized gunshots fired by snipers lying in wait in three different buildings, all of which had PFC Youngblood's tank in line-of-sight.  *Id.* (Gartenstein-Ross Attribution Report).  PFC Youngblood was found lying motionless on the front slope of the tank and determined to have been shot in the head.  *Id.* (Gartenstein-Ross Attribution Report).  He was evacuated to a medical checkpoint where he was subsequently pronounced dead.  *Id.* (Gartenstein-Ross Attribution Report).

PFC Youngblood's half-brother, Richard Gervasi II (a U.S. citizen), is a Bellwether Plaintiff in this case.  He seeks damages for the "severe mental anguish, emotional pain and suffering" caused by his half-brother's death, as well as the "loss of PFC Youngblood's society, companionship, and counsel."  Dkt. 15 at 301–02 (Am. Compl. ¶¶ 2046–47); *see also* Dkt. 38-2 at 169; Dkt. 38-62 (Gervasi Decl.).

    b. <u>Attribution to the Zarqawi organization operating as "ISI"</u>

  Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as the Islamic State of Iraq ["ISI"]) likely committed this small arms fire attack."[28]  Dkt. 38-5 at 63 (Gartenstein-Ross Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

  *First*, he explains that "ISI was the dominant insurgent group in Ramadi when this attack occurred."  *Id.* at 64 (Gartenstein-Ross Attribution Report).  A briefing by Iraq's Commanding General George Casey on Ramadi on October 25, 2006—just three months before this attack—revealed that "75 percent of [the Coalition's] fight is against [ISI]. The other 25 percent is composed of the Sunni Resistance."  *Id.* (Gartenstein-Ross Attribution Report) (second alteration in original) (quoting CENTCOM, *GEN Casey's 25 October Travel to Ramadi and Al Asad* 1, https://perma.cc/HYS8-HZGT).  ISI sustained its dominance in Ramadi through late 2006, as is illustrated by an attack it carried out during Ramadan (September to October in 2006), in which ISI was able to simultaneously attack multiple Coalition positions in Ramadi.  *Id.* at 65 (Gartenstein-Ross Attribution Report).  According to an authoritative 2007 CENTCOM report, the attacks "illustrated that AQI retained a complex and coordinated command and control infrastructure in the city despite the efforts of the Anbar Revolutionaries to assassinate the group's leadership."  *Id.* (Gartenstein-Ross Attribution Report) (internal citation omitted).  "Although ISI's hold on Ramadi had begun to slip by 2007, it remained the most powerful

---

[28] On October 15, 2006, AQI adopted the moniker of "the Islamic State of Iraq."  Dkt. 38-5 at 195 (Gartenstein-Ross Attribution Report).  Since this attack took place while the Zarqawi organization referred to itself as ISI, Dr. Gartenstein-Ross also refers to the group as ISI in attributing this attack.

insurgent group in the city when this attack occurred." *Id.* (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—a small arms fire attack—is another indication that ISI is responsible. *Id.* (Gartenstein-Ross Attribution Report). Dr. Gartenstein-Ross opines that "ISI had the weapons and training necessary to carry out this attack," as is demonstrated by four small arms fire attacks in or near Ramadi from January to June 2007. *Id.* at 65–66 (Gartenstein-Ross Attribution Report). Moreover, since PFC Youngblood's attackers fired at his unit from three different buildings simultaneously, Dr. Gartenstein-Ross noted that "[t]he perpetrators of such an attack would likely need to be familiar with the terrain" and "know that these locations would be an ideal place to carry out such an attack." *Id.* at 66 (Gartenstein-Ross Attribution Report). ISI's long presence in Ramadi, dominance in the area, and familiarity with Coalition movements "make them the best-poised group to execute such a coordinated attack." *Id.* (Gartenstein-Ross Attribution Report).

*Finally*, Dr. Gartenstein-Ross acknowledges that although AAI was also active in Ramadi around the time of the attack, "ISI was cooperating closely with AAS in Ramadi in early 2007 on leadership, finances, and operations, and so AAS involvement would not rule out ISI involvement." *Id.* (Gartenstein-Ross Attribution Report). Moreover, since ISI is the more dominant group of the two, it is more likely that ISI was responsible. *Id.* (Gartenstein-Ross Attribution Report). Lastly, since Iran also provided material support to AAI, the group's possible involvement in the attack would not undermine a finding of Iran's culpability.

Although this attack presents a close question, the Court finds that it is more likely than not that the Zarqawi organization was responsible for the February 18, 2007 small arms fire attack.

**F.**    **Indirect Fire**

1.    *April 24, 2004 Artillery Attack*

a.    <u>Killings of U.S. Army National Guard Captain Arthur L. Felder and U.S.</u>
<u>Army Staff Sergeant Billy J. Orton</u>

On April 24, 2004, U.S. Army National Guard Captain ("CPT") Arthur Felder and Staff

Sergeant ("SSG") Billy Orton were serving at Camp Cooke in Taji, Baghdad Province when

Camp Cooke was attacked by enemy artillery, either mortars or 107mm rockets, launched from a

truck.  Dkt. 38-5 at 109–10 (Gartenstein-Ross Attribution Report).  CPT Felder and SSG Orton

were killed in the attack.  *Id.* at 109 (Gartenstein-Ross Attribution Report).

CPT Felder's mother, Cheryl Felder Stuart, and SSG Orton's adopted son, Manaser

Orton, are both U.S. citizens and Bellwether Plaintiffs in this case.  They seek damages for the

"severe mental anguish, emotional pain and suffering" caused by CPT Felder's and SSG Orton's

deaths, as well as the "loss of [their] society, companionship, and counsel."  Dkt. 15 at 137, 227

(Am. Compl. ¶¶ 698, 700, 1434–35); *see also* Dkt. 38-2 at 151, 165–66; Dkt. 38-28 (Stuart

Decl.); Dkt. 38-30 (Orton Decl.).

b.    <u>Attribution to AAI operating as "AAS"</u>

Dr. Gartenstein-Ross concludes that "Ansar al-Islam (AAI) (as Ansar al-Sunna (AAS))

likely committed this artillery attack."[29]  Dkt. 38-5 at 110 (Gartenstein-Ross Attribution Report).

Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explained that "AAS maintained an operational presence in Baghdad Province

and northern Iraq more generally," which is confirmed by both AAS propaganda and expert

---

[29] AAI changed its name to Ansar al-Sunna on September 20, 2003.  Since this attack occurred
after the name change, Dr. Gartenstein-Ross refers to AAI as AAS in this attribution.  *Id.*
(Gartenstein-Ross Attribution Report).

reports.  *Id.* at 111 (Gartenstein-Ross Attribution Report).  AAS also claimed responsibility for attacks near Taji on April 11 and 12, 2004, which demonstrates that AAS was actively conducting attacks in the area during the time immediately preceding this attack.  *Id.* (Gartenstein-Ross Attribution Report).  AAS also claimed responsibility for an attack following this one, in which AAS executed an Iraqi contractor in Taji in October 2004.  *Id.* (Gartenstein-Ross Attribution Report).

*Second*, AAS commonly used both rockets and mortars in attacks against Coalition forces.  *Id.* at 112 (Gartenstein-Ross Attribution Report).  In April 2004 alone, AAS claimed responsibility for eight attacks using similar types of mortar and rocket weapons.  *Id.* (Gartenstein-Ross Attribution Report).  By December 2004, AAS had become known to "use videos of rocket attacks and roadside bombings as part of its recruiting and training campaign," which also demonstrates AAS' familiarity with the weapons.  *Id.* (Gartenstein-Ross Attribution Report).

*Finally*, Dr. Gartenstein-Ross ruled out the involvement of other insurgent groups in this attack.  He opined that "[g]iven the attack occurred in the Sunni Triangle, it is unlikely that a Shia group perpetrated this attack."  *Id.* (Gartenstein-Ross Attribution Report).  Moreover, he concluded that "JTJ, [the Zarqawi organization,] the other prominent Sunni group in the province, [was unlikely to have] conducted the attack that killed CPT Felder and SSG Orton," because "JTJ's limited operational focus on Baghdad during the first four months of 2004 was focused mostly on areas west of the city . . . and not the northern section or its environs where the attack that killed CPT Felder and SSG Orton occurred."  *Id.* at 112–13 (Gartenstein-Ross Attribution Report).  Lastly, since Iran provided material support to JTJ as well as AAS, JTJ's

possible involvement in the attack would not undermine a finding of Iran's culpability. *Id.* at 113 (Gartenstein-Ross Attribution Report).

Although this attack presents a close question, the Court finds that it is more likely than not that AAI was responsible for the April 24, 2004 artillery attack.

2.    *May 25, 2004 Artillery Attack*

a.    <u>Killing of U.S. Army U.S. Army National Guard Sergeant Alan N. Bean</u>

On May 25, 2004, U.S. Army National Guard Sergeant ("SGT") Alan Bean was conducting routine operations at Forward Operating Base Kalsu in Iskandariya, Babil Province, approximately 20 miles south of Baghdad. Dkt. 38-5 at 81–82 (Gartenstein-Ross Attribution Report). At approximately 14:20, 15 simultaneously fired 107mm rockets hit the base. *Id.* at 82 (Gartenstein-Ross Attribution Report). The attack killed three service members, including SGT Bean, and wounded 12 others. *Id.* (Gartenstein-Ross Attribution Report).

SGT Bean's father, Alan Bean, Sr. (a U.S. citizen), is a Bellwether Plaintiff in this case. He seeks damages for the "severe mental anguish, emotional pain and suffering" caused by his son's death, as well as the "loss of SGT Bean's society, companionship, and counsel." Dkt. 15 at 92 (Am. Compl. ¶¶ 324–25); *see also* Dkt. 38-2 at 151; Dkt. 38-34 (Bean Decl.).

b.    <u>Attribution to the Zarqawi organization operating as "JTJ"</u>

Dr. Gartenstein-Ross concludes that "the Zarqawi organization (as Jamaat al-Tawhid wal-Jihad, or JTJ) likely committed this artillery attack."[30] Dkt. 38-5 at 82 (Gartenstein-Ross

---

[30] The Zarqawi organization has underwent several name changes since its inception. In October 2004, the group underwent one such name change when they formally pledged allegiance to al-Qaeda, changing its name from Jamaat al-Tawhid wal-Jihad (JTJ) to al-Qaeda in Iraq (AQI). Dkt. 38-5 at 103 (Gartenstein-Ross Attribution Report). As this attack occurred before JTJ took on the moniker of AQI, Dr. Gartenstein-Ross refers to the group as JTJ in attributing this attack.

Attribution Report).  Dr. Gartenstein-Ross offers three considerations in support of his conclusion.

*First*, he explains that Iskandariya is a town in the north of Babil Province and considered a part of two regions—the Southwest Belt of Baghdad and the "Triangle of Death," which was "a well-known ambush zone directly south of Baghdad." *Id.* at 83 (Gartenstein-Ross Attribution Report).  At the time of this attack, JTJ retained an operational presence in both regions.  *Id.* (Gartenstein-Ross Attribution Report).  According to the Institute for the Study of War, prior to 2007, the Southwest Belt of Baghdad remained "a key transit and supply route for" JTJ, which was further demonstrated by a hand-drawn map of the Baghdad Belts by the group's leader, Abu Musab al-Zarqawi, which the Coalition forces obtained in 2006.  *Id.* (Gartenstein-Ross Attribution Report) (quoting Institute for the Study of War, *Southwest*, https://perma.cc/4V8C-F6SG).  Around the time of the attack, JTJ also maintained an operational presence in the Triangle of Death, as illustrated by JTJ attacks in the area in February and March of 2004.  *Id.* at 84 (Gartenstein-Ross Attribution Report).

*Second*, the TTPs used in carrying out this attack—an artillery attack—is another indication that JTJ is responsible.  *Id.* (Gartenstein-Ross Attribution Report).  Reports on attacks carried out by JTJ in 2004 and the seizure of JTJ weapons cache near Iskandariya by Coalition forces both demonstrate that JTJ had access to a range of artillery weapons including "small arms, artillery shells, heavy machine guns, and antitank mines" as well as "mortar systems, rocket-propelled grenades, launchers, recoilless rifles and parts of surface-to-air weapons systems" around the time of the attack.  *Id.* at 85 (Gartenstein-Ross Attribution Report). Moreover, JTJ has a history of targeting Coalition military bases, carrying out at least two

sophisticated attacks against U.S. military bases in December 2003 and April 2005.  *Id.*
(Gartenstein-Ross Attribution Report).

> *Finally*, Dr. Gartenstein-Ross ruled out other insurgent groups active in the area around
this time.  He explains that "Shia militant groups were active in Babil Province during this time
. . . includ[ing] the Badr Corps and Jaysh al-Mahdi (JAM)."  *Id.* (Gartenstein-Ross Attribution
Report).  But "these groups were most strongly concentrated in the south of Babil, Province,
while JTJ held strongholds in the north, such as Iskandariya," so he concludes that this attack
was most likely carried out by JTJ."

> Although this attack presents a close question, the Court finds that it is more likely than
not that the Zarqawi organization was responsible for the May 25, 2004 artillery attack.

## III.  CONCLUSIONS OF LAW

> Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including
its instrumentalities, is immune from suit in state or federal court unless the case falls within an
express statutory exception.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d
1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the
"state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject matter
jurisdiction on federal district courts to hear certain terrorism-related claims, *see* 28 U.S.C.
§ 1330(a), and recognizes a federal cause of action against those foreign states subject to the
exception, *see Owens II*, 864 F.3d at 764–65.  The FSIA also addresses personal jurisdiction and
specifies precise procedures that a plaintiff must follow—at times with the assistance of the clerk
of the court and the U.S. Department of State—to effect service on a foreign state.  *See* 28 U.S.C.
§ 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of a plaintiff's state or federal law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the plaintiff has established her "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens II*, 864 F.3d at 784–86. And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6 (footnote omitted).

Each of these inquiries, in turn, implicates a slightly different standard of proof. To establish subject-matter jurisdiction, a FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens II*, 864 F.3d at 784. "Although a court gains jurisdiction over a claim against a defaulting defendant when a plaintiff meets his burden of production, the plaintiff must still prove his case on the merits." *Id.* To do so, the plaintiff must "establish his . . . right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision's "protection against an unfounded default judgment" does not altogether "relieve[] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer "admissible evidence" sufficient to "substantiate [the] essential element[s]" of her claim. *Owens II*, 864 F.3d at 785–86 (quotations omitted). Finally, to establish personal

jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6.

As explained below, the Court finds that it has subject-matter jurisdiction over Plaintiffs' claim and personal jurisdiction over the Islamic Republic of Iran. The Court also finds that the Bellwether Plaintiffs have carried their burden of establishing a right to relief under the federal cause of action established in § 1605A. Finally, the Court will defer until the damages stage the determination whether each of the Bellwether Plaintiffs has established the necessary familial relationship to recover individual damages and, if so, the damages to which each is entitled.

## A.    Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA. 28 U.S.C. § 1330(a). The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception, moreover, applies only to suits in which two additional requirements are met. First, the claimant or victim must be a U.S. national, a member of the U.S.

armed forces, or a U.S. government employee or contractor at the time the act of terrorism

occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Second, the foreign state must be designated as a

state sponsor of terrorism both at the time the act occurred (or was so designated as a result of

the act) and at the time the lawsuit was filed (or was so designated within the six-month period

preceding the filing of the suit).[31]  *Id.* § 1605A(a)(2)(A)(i)(I); *see also Owens II*, 864 F.3d at

763–64.

Several of the conditions for subject-matter jurisdiction are easily addressed in this case.

First, Plaintiffs expressly seek only monetary relief, prejudgment interest, costs and expenses,

and attorneys' fees.  *See* Dkt. 15 at 306 (Am. Compl. Prayer).  Second, Iran was designated as a

state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2741, 2836 (Jan. 23, 1984) (statement of

Secretary of State George P. Shultz), and remain so designated to this day, *see* U.S. Dep't of

State, *State Sponsors of Terrorism*, https://perma.cc/QJ84-EX2J.  Third, at the time the relevant

acts occurred, all 44 direct victims and 45 family members were U.S. nationals.  *See supra* Part

II.B-F.

As a result, the only substantial jurisdictional question left for the Court is whether

Plaintiffs' claims are for "personal injury or death that [were] caused by . . . act[s] of torture,

extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an

"official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).  For the reasons explained

below, the Court finds as follows: (1) the Zarqawi organization and AAI committed acts of

---

[31]  Section 1605A(a)(2) also requires that the foreign state have received "a reasonable
opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state
against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement
is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in
Iran.

"extrajudicial killing" within the meaning of the International Convention Against the Taking of Hostages and the Torture Victim Protection Act; (2) Iranian officials and their agents provided "material support or resources" for the extrajudicial killings that caused Plaintiffs' injuries within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support to the Zarqawi organization and AAI caused the injuries or deaths of the 44 victims. Plaintiffs' claims against Iran, therefore, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

1.       *"Personal Injury or Death . . . Caused By" Defendant's Conduct*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts. 28 U.S.C. § 1605A(a)(1). Here, Plaintiff Adam Kisielewski is seeking to recover for personal injuries, while the other Bellwether Plaintiffs are seeking to recover injuries resulting from the extrajudicial killing of their family members.

Plaintiff Kisielewski suffered life-altering physical injuries as a result of terrorist attacks committed by the Zarqawi organization (or AAI), *see* Dkt. 38-46, and his claim to recover for those injuries easily satisfies the personal injury requirement of § 1605A(a)(1). Moreover, because the statute is understood to encompass claims by family members for the distress caused by a relative's injuries or death, also known as solatium actions, *see* 28 U.S.C. § 1605A(c); *see also Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019), the relatives of the 43 victims who died as a result of terrorist attacks committed by the Zarqawi organization and/or AAI also satisfy the personal injury requirement of § 1605A(a)(1). Family members seeking solatium damages are entitled to recover based on a theory that parallels a common law claim for intentional infliction of emotional distress, and they are therefore

considered to be bringing claims for "personal injury." *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012)

      2.    *The Zarqawi Organization and AAI's Acts of Extrajudicial Killing*

To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies] or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). The FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA") to define "extrajudicial killing." 28 U.S.C. § 1605A(h)(7). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350 note). As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens II*, 864 F.3d at 770.

      a.    <u>Killing</u>

Of the 25 Bellwether Attacks, 24 attacks (with the exception of the August 21, 2005 IED attack) indisputably constitute extrajudicial killings. In the August 21, 2005 IED attack, one servicemember was killed, and Sgt. Kisielewski was seriously injured. Dkt. 38-46 at 5 (Kisielewski Decl. ¶¶ 10–11). Several decisions from this district have held that individuals who are injured but not killed in an attack that results in the death of others may recover for their injuries under § 1605A. *See, e.g.*, *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360–61 (D.D.C. 2020); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019);

*Salzman*, 2019 WL 4673761, at *12; *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d

1, 14 (D.D.C. 2011); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017).

Those injuries were, in the ordinary sense, "caused by" the "act of . . . extrajudicial killing."

*Salzman*, 2019 WL 4673761 at *12.  A bombing, for example, might kill some of the victims and

maim others.  In that scenario, both sets of victims would suffer "personal injury or death . . .

caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1)—that is, the bombing

was, in fact, an act of extrajudicial killing, and that act caused both the deaths and the injuries.

"Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to

account for their repressive practices," *Han Kim*, 774 F.3d at 1048, and that rationale extends to

both injured and killed victims, *see Salzman*, 2019 WL 4673761, at *12.  Sgt. Kisielewski's

claim to recover for his "personal injury . . . caused by an act of . . . extrajudicial killing" satisfies

the requirement of § 1605A(a)(1).[32]

> b.   Deliberated

Plaintiffs must show that the attacks that caused each death were "deliberated" in order

for the deaths to qualify as "extrajudicial killing[s]."  A "deliberated" killing is "simply one

undertaken with careful consideration, not on a sudden impulse."  *Owens v. Republic of Sudan*,

174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens I*") (citing Webster's Third New International

Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law

---

[32] The D.C. Circuit recently held that attacks in which no one was killed do not constitute "extrajudicial killings" within the meaning of the FSIA.  *See Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024).  Nothing in that decision, however, casts doubt on the long line of authority holding that the extrajudicial killing exception to the FSIA applies to claims brought by those who suffer non-mortal injuries in attack that resulted in the death of others. The distinction between cases in which no killing occurs, and those in which someone other than the plaintiffs or a relative of the plaintiff is killed, is addressed in *Force v. Islamic Rep. of Iran*, 610 F. Supp. 3d 216 (D.D.C. 2022).

Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).  Here, there is ample evidence that the attacks in question were planned.  Some of the IED attacks involved, for example, explosives buried deep beneath the ground to avoid detection, indicating that the attacks were "deliberated" and "planned."  *See e.g.*, Dkt. 38-5 at 48 (Gartenstein-Ross Attribution Report) (February 8, 2007 attack); *id.* at 35 (Gartenstein-Ross Attribution Report) (August 21, 2005 attack).  The other types of IED attacks similarly indicate advance planning.  The U.S. Army's AR 15-6 Investigation Report regarding the January 9, 2008 house-borne IED attack, for example, suggests that the terrorists installed the IED up to eight days in advance of the attack.  Dkt. 38-5 at 163 (Gartenstein-Ross Attribution Report); *see also id.* at 56–57(Gartenstein-Ross Attribution Report) (February 11, 2007 attack) (IED was "command wire detonated" and was "placed at a 45 degree angle in a pot hole" so as to "aim at the passenger [] side of the vehicle"); *id.* at 239 (Gartenstein-Ross Attribution Report) (October 24, 2007 attack) (IED detonated by insurgent via command wire).

Complex attacks involved ambushing Coalition forces at critical points in their missions, which similarly required prior planning and knowledge of mission conducted by the Coalition forces.  Moreover, suicide bombings also involved prior planning, and in addition a preparation for "martyrdom."  *Id.* at 122 (Gartenstein-Ross Attribution Report) (citing CENTCOM report opining that suicide bombings reflected AQI's "obsession with martyrdom").  The same is true for small arms fire attacks, which not only required prior planning but also for the group "to be familiar with the terrain . . . and to know that these locations would be an ideal place to carry out such an attack."  *Id.* at 66 (Gartenstein-Ross Attribution Report).  Artillery attacks also required the Zarqawi organization and AAI to be familiar with the location and occupation of their target

U.S. military bases.  All five types of attacks, moreover, require obtaining and using specific types of weapons, such as IEDs, which often require prior training.  All this demonstrates that the attacks were planned.

Finally, there is no evidence whatsoever that any of these attacks were authorized "by a prior judgment affording judicial guarantees o[f] due process," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see also Owens II*, 864 F.3d at 770, or that it was "lawfully carried out under the authority of a foreign nation," TVPA § 3(a).  To the contrary, for several of the attacks, either the Zarqawi organization or AAI, both non-state actors, claimed credit.  *E.g.*, Dkt. 38-5 at 190 (Gartenstein-Ross Attribution Report) (April 28, 2005 IED Attack); *id.* at 178 (Gartenstein-Ross Attribution Report) (December 21, 2004 Suicide Attack); *id.* at 215 (Gartenstein-Ross Attribution Report) (April 10, 2009 Suicide Attack); *id.* at 140 (Gartenstein-Ross Attribution Report) (January 20, 2007 Anti-Aircraft Attack).  And, with respect to the remaining attacks, the Court has found that the Zarqawi organization or AAI was responsible.  *See supra* Parts II.B–F.

The Court, accordingly, finds that all of the attacks at issue qualify as "extrajudicial killing[s]" under 28 U.S.C. § 1605A(a)(1).

3.    *Iran's Provision of Material Support for the Zarqawi Organization and AAI's Acts of Extrajudicial Killing*

The FSIA's terrorism exception applies when a plaintiff seeks money damages for "personal injury or death that was caused by . . . the provision of material support or resources for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," so long as that support was provided by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).  Section 1605A(h)(3) defines "material support or resources" by reference to 18 U.S.C. § 2339A,

the criminal material support statute.  Section 2339A defines "material support or resources" to

mean

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The Court has found that, during the years leading up to and surrounding the attacks at

issue, Iran (directly and indirectly) provided substantial financial support to the Zarqawi

organization and AAI.  *See supra* Part II.A.  Iran also provided substantial operational capacity

to both groups, including IEDs and other weapons, weapons technology, safe passage, and

training of operatives.  *See id*.  As detailed in the Pregent declaration:  Iran "specifically used its

IRGC[] and MOIS to provide funding, training, weapons, equipment, and most importantly

lethal aid to its Sunni Terrorist Proxies, al-Qaeda, the Zarqawi Organization, and AAI/AAS so

that they could target Americans in Iraq."  Dkt. 38-6 at 61 (Pregent Decl. ¶ 60); *see also id*. at

42–51 (Pregent Decl. ¶¶ 101–30).  The Court therefore concludes that Iran provided both the

Zarqawi organization and AAI "material support" in the form of, "currency," "training,"

"operational assistance," and "weapons," among other things, within the meaning the FSIA.  28

U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).

4.    *Causation*

The Court must also consider whether Plaintiffs' injuries were "caused by" provision of

material support to the Zarqawi organization and AAI.  28 U.S.C. § 1605A(a)(1).  Plaintiffs need

not show that Iran "specifically knew of or intended its support to cause" the particular attacks in

question, *Owens II*, 864 F.3d at 798, or even that Iran's material support was a "but for" cause of

their injures, *Kilburn*, 376 F.3d at 1128.  Instead, the FSIA requires only a "showing of

'proximate cause,'" which is satisfied where a Plaintiff can show "some reasonable connection

between the act or omission of the defendant and the damage which the plaintiff has suffered."

*Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)).

This inquiry thus "contains two similar but distinct elements."  *Owens II*, 864 F.3d at 794.

"First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to

the plaintiff's injury."  *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).  "Second,

the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural

consequence' of the defendant's conduct."  *Id.* (quoting same).

    With respect to the first element, Plaintiffs need not prove that Iran's support was directly

tied to each of the attacks that caused their injuries.  Such a "nexus" is not necessary because

funds—and, in certain instances, arms, training, safe passage, and other support—are fungible,

and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on the Zarqawi

organization and AAI's "careful bookkeeping."  *Kilburn*, 376 F.3d at 1130.  The Court

previously concluded that Iran's financial and military aid to the two groups was essential to

each group's operating capacity and that, without Iran's backing, both groups would be

substantially weakened.  *See* Part II.A.  As Mr. Pregent explains, Iran's "material support and

lethal aid" to these groups made them "capable" of "conducting complex attacks against U.S.

forces."  Dkt. 38-6 at 6–7 (Pregent Decl. ¶ 14); *see also id*. at 21, 42-51 (Pregent Decl. ¶¶ 51,

101-130).  Thus, Iran's support to both the Zarqawi organization and AAI was a substantial

factor in the 25 Bellwether Attacks that caused Bellwether Plaintiffs' injuries.

    This, then, leaves the question whether Plaintiffs' injuries resulting from the attacks at

issue were "reasonably foreseeable" or "natural consequence[s]" of Defendants' conduct.  *Owens*

*II*, 864 F.3d at 794. On this issue, too, the record is clear. At the time of the attacks, Iran believed "that the presence of U.S. forces in Afghanistan and the invasion of Iraq in 2003 meant Iran could be next." Dkt. 38-6 at 16 (Pregent Decl. ¶ 36). Iran's "goal" was "to provide lethal aid to all groups fighting the United States." *Id.* Thus, Iran not only supported these groups, but also actively encouraged them to carry out attacks in Iraq as part of its broader geopolitical strategy and provided both groups with the funding, weapons, and know-how to do so effectively. *See supra* Part II.A. The death and injury to servicemembers and contractors, and the suffering of their families was, by any measure, foreseeable. *Owens II*, 864 F.3d at 797–98 (finding the 1998 embassy bombings by al Qaeda to be a reasonably foreseeable consequence of Sudan's offer in 1991 to shelter Osama Bin Laden); *see also Salzman,* 2019 WL 4673761, at *14.

5.    *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief under the federal cause of action Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). Although the federal cause of action was added to the FSIA in 2008, "§ 1605A(c) operates retroactively" and "plainly applies . . . to the pre-enactment conduct of a foreign sovereign." *Owens II*, 864 F.3d at 815; *see also Opati*, 590 U.S. at 425-29. There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to "a national of

the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person.  28 U.S.C. § 1605A(c).

All Bellwether Plaintiffs are U.S. nationals.  *See* Dkt. 38-9 (Bellwether Plaintiffs Table) (citing to exhibits containing each Plaintiff's birth certificate and/or U.S. passport).  Accordingly, the Court concludes that, subject to a showing that they suffer compensable losses, Plaintiffs have for the reasons described above carried their burden of demonstrating that they are entitled to relief under § 1605A(c).

**B.      Personal Jurisdiction**

The Court also concludes that it has personal jurisdiction over the Islamic Republic of Iran.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference," *id.*:

(1)      by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)      if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)      if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of

the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)     if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case.  *See* Dkt. 23 at 1.  No "special arrangement" governs service between the United States and Iran, nor is Iran party to an international convention on service of judicial documents. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 77–78 (D.D.C. 2017).  As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from "the clerk of the court to the head of the ministry of foreign affairs of the foreign state."  28 U.S.C. § 1608(a)(3).  On August 18, 2021, Plaintiffs initiated service to Iran under § 1608(a)(3), Dkt. 12, and, at Plaintiffs' request, the Clerk of Court mailed the relevant documents to Iran on September 1, 2021, Dkt. 14.  After Plaintiffs amended their complaint, Dkt. 15 (Am. Compl.), they re-served Iran under § 1608(a)(3), Dkt. 20, and, at their request, the Clerk of Court mailed the relevant documents to Iran on December 21, 2021, Dkt. 22.

100

Because this attempted service was unsuccessful, Plaintiffs then proceeded to serve Iran pursuant to § 1608(a)(4). Dkt. 23 at 1. That provision requires service by mail from the clerk of court to the Secretary of State, who must then transmit the required material "through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a)(4). The Department of State must then send "the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on January 21, 2022. Dkt. 23. The Clerk mailed these materials to the State Department on January 26, 2022. Dkt. 25. On August 29, 2022, the State Department notified the Clerk that the documents had been delivered to the Islamic Republic of Iran. Dkt. 26. As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the Government of Iran," the documents were transmitted to the Foreign Interest Section of the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on July 11, 2022. *Id.* at 1, 7. The Swiss Embassy reported that the Iranian Ministry of Foreign Affairs "refused" to accept the documents that same day. *Id.* at 10. After the Islamic Republic of Iran failed to respond to the complaint, the clerk entered a default on September 15, 2022. Dkt. 29.

Because Plaintiffs accomplished service pursuant to 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Iran. *See* 28 U.S.C. § 1330(b).

## CONCLUSION

For the foregoing reasons, the motion for default judgment, Dkt. 38-2, is hereby **GRANTED** in part.  The Court will **APPOINT** a special master to hear Bellwether Plaintiffs' damages claims and to report to the Court recommending the appropriate award.  The Court will further **GRANT** Plaintiffs' motion, Dkt. 44, to appoint a special master to adjudicate damages for the additional 52 Plaintiffs whose claims arise from the same Bellwether Attacks.  A separate order appointing a special master and setting the terms of that appointment will follow.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 30, 2024