IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT MARTINO, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Case No. 1:21-cv-01808-RDM <br><br> **UNDER SEAL** |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS CONCERNING LIABILITY AND DAMAGES FOR TRANCHE 1 FALLUJAH NON-BELLWETHER PLAINTIFFS**

## TABLE OF CONTENTS

I.    Introduction ............................................................................................................1

II.   Evidentiary Standards .............................................................................................2

III.  Legal Framework .....................................................................................................3

      A.    Personal Jurisdiction ....................................................................................4

      B.    Subject-Matter Jurisdiction .........................................................................4

            1.    Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks. ...............................................................................5

            2.    Plaintiffs Bring Claims for Personal Injury or Death. ...................6

            3.    The Attacks Constitute Acts of Extrajudicial Killing. ...................6

            4.    The Zarqawi Organization Committed Each Attack. ...................10

            5.    Iran Provided Material Support for the Zarqawi Organization's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries. ...............................................................12

      C.    Federal Cause of Action.............................................................................14

      D.    Damages......................................................................................................15

            1.    Solatium Damages ........................................................................15

            2.    Prejudgment Interest .....................................................................22

            3.    Post-Judgment Interest ..................................................................23

IV.   Analysis of Each Attack and Damages Warranted for Each Plaintiff .................23

      A.    IED Attacks................................................................................................23

            1.    May 25, 2004 IED Attack that Killed U.S. Army Private First Class James Lambert ......................................................................23

            2.    July 20, 2004 IED Attack that Killed U.S. Marine Corps Corporal Todd Godwin.........................................................................................25

            3.    August 19, 2004 IED Attack that Killed U.S. Marine Corps Reserve Corporal Brad McCormick ..............................................33

            4.    February 27, 2005 IED Attack that Killed U.S. Army Second Lieutenant Richard Brian Gienau.................................................36

            5.    August 22, 2005 IED Attack that Killed U.S. Marine Corps Private First Class Ramon Romero .............................................................41

            6.    December 1, 2005 IED Attack that Killed U.S. Marine Corps Corporal Anthony McElveen and Lance Corporal John Holmason ........................49

            7.    September 4, 2006 IED Attack that Killed U.S. Navy Reserve Petty Officer Second Class Christopher Walsh ...................................52

            8.    November 5, 2006 IED Attack that Killed U.S. Marine Corps Corporal Jose Galvan ...................................................................................59

9.      January 20, 2007 IED Attack that Killed U.S. Army Specialist Jeffrey Bisson.................................................................................................62

10.    February 19, 2007 IED Attack that Killed U.S. Marine Corps Private First Class Brett Witteveen ..............................................................68

11.    April 14, 2007 IED Attack that Killed U.S. Army Sergeant Brandon Wallace ....................................................................................73

B.      Complex Attack ....................................................................................81

12.    June 23, 2005 Complex Attack that Killed U.S. Marine Corps Corporal Ramona Valdez......................................................................81

C.      Suicide Attacks ....................................................................................84

13.    September 6, 2004 SVBIED Attack that Killed U.S. Marine Corps Corporal Mick Bekowsky, Lance Corporal Michael Allred, Lance Corporal Derek Gardner, and Lance Corporal Christopher McCarthy......84

14.    September 13, 2004 SVBIED Attack that Killed U.S. Marine Corps Corporal Adrian Soltau ..............................................................96

D.      Sniper Attacks ....................................................................................104

15.    December 16, 2006 Sniper Attack that Killed U.S. Marine Corps Lance Corporal Nicklas Palmer ....................................................104

16.    May 14, 2007 Sniper Attack that Killed U.S. Marine Corps Lance Corporal Jeffrey Walker ............................................................109

V.      Conclusion ....................................................................................117

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya,*
  775 F. Supp. 2d 48 (D.D.C. 2011) .................................................................. *passim*

*Ben-Rafael v. Islamic Republic of Iran,*
  540 F. Supp. 2d 39 (D.D.C. 2008) ........................................................................19

*Ben-Yishai v. Syrian Arab Republic,*
  642 F. Supp. 3d 110 (D.D.C. 2022) .................................................................76, 93

*Bernhardt v. Islamic Republic of Iran,*
  No. 18-CV-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) ............ *passim*

*Blank v. Islamic Republic of Iran,*
  No. 19-CV-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) ...................16

*Bova v. Islamic Republic of Iran,*
  No. 15-CV-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020) .............18, 78

*Braun v. Islamic Republic of Iran,*
  228 F. Supp. 3d 64 (D.D.C. 2017) .........................................................................3

*Brown v. Islamic Republic of Iran,*
  687 F. Supp. 3d 21 (D.D.C. 2023) ...........................................................82, 85, 97

*Brown v. Islamic Republic of Iran,*
  No. 1:21-CV-1308 (TNM), 2023 WL 4824740 (D.D.C. July 27, 2023)....................82, 85, 96

*Bundy v. Jackson,*
  641 F.2d 934 (D.C. Cir. 1981) ...............................................................................2

*Cabrera v. Islamic Republic of Iran,*
  No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022)...................8, 21, 31

*Cabrera v. Islamic Republic of Iran,*
  No. CV 18-2065 (JDB), 2023 WL 3496303 (D.D.C. May 16, 2023)
  .................................................................................................15, 20, 32, 48

*Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria,*
  850 F. Supp. 2d 277 (D.D.C. 2012) ......................................................................23

*Doe A-1 v. Democratic People's Republic of Korea,*
  No. 18-CV-252 (DLF), 2021 WL 723257 (D.D.C. Feb. 24, 2021).........................23

*Driscoll v. Islamic Republic of Iran*,
No. 20-cv-622, 2023 WL 4892710 (D.D.C. June 17, 2023), *report and recommendation adopted sub nom*. 2023 WL 5932974 (D.D.C. July 13, 2023) ...................38

*Est. of Brown v. Islamic Republic of Iran*,
872 F. Supp. 2d 37 (D.D.C. 2012) ................................................................. *passim*

*Est. of Fishbeck v. Islamic Republic of Iran*,
No. 18-CV-2248 (CRC), 2023 WL 7448770 (D.D.C. Aug. 18, 2023)...................51

*Est. of Fouty v. Syrian Arab Republic*,
No. 18-CV-385 (RBW), 2024 WL 3443591 (D.D.C. July 17, 2024)...................21

*Est. of Fouty v. Syrian Arab Republic*,
No. CV 18-385 (RBW), 2024 WL 4006166 (D.D.C. Aug. 30, 2024)...................18

*Est. of Heiser v. Islamic Republic of Iran*,
466 F. Supp. 2d 229 (D.D.C. 2006) ............................................................ *passim*

*Est. of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) ...................................................................16, 17

*Ewan v. Islamic Republic of Iran*,
466 F. Supp. 3d 236 (D.D.C. June 10, 2020)...................................................16, 22

*Fissler v. Islamic Republic of Iran*,
No. CV 18-3122 (CKK), 2022 WL 4464873 (D.D.C. Sept. 26, 2022) ...........53, 64

*Flanagan v. Islamic Republic of Iran*,
190 F. Supp. 3d 138 (D.D.C. 2016) ........................................................................3

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015) ................................................................. *passim*

*Force v. Islamic Republic of Iran*,
464 F. Supp. 3d 323 (D.D.C. 2020) ........................................................................7

*Force v. Islamic Republic of Iran*,
617 F. Supp. 3d 20 (D.D.C. 2022) ...........................................................17, 20, 22

*Forman v. Korean Air Lines Co., Ltd.*,
84 F.3d 446 (D.C. Cir. 1996) ................................................................................22

*Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*,
892 F.3d 348 (D.C. Cir. 2018) ..............................................................................17

*Fritz v. Islamic Republic of Iran*,
324 F. Supp. 3d 54 (D.D.C. 2018) ............................................................... *passim*

iv

*Fritz v. Islamic Republic of Iran*,
  No. 15-CV-456 (RDM), 2018 WL 5046229 (D.D.C. Aug. 13, 2018) ...................................21

*Gration v. Islamic Republic of Iran*,
  No. 21-CV-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) ......................15, 16, 22

*Hammons v. Islamic Republic of Iran*,
  No. 19-2518, 2023 WL 5933340 (D.D.C. 2023) ......................................................................3

*Han Kim v. Democratic People's Republic of Korea*,
  774 F.3d 1044 (D.C. Cir. 2014) ...........................................................................................2, 3

*Higgins v. Islamic Republic of Iran*,
  No. 99-CV-377, 2000 WL 33674311 (D.D.C. Sept. 21, 2000) ......................................31, 115

*Jakubowicz v. Islamic Republic of Iran*,
  No. 18-1450 (RDM), 2023 WL 6907852 (D.D.C. Sept. 1, 2023) ...................................21, 112

*Karcher v. Islamic Republic of Iran*,
  No. 16-CV-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023)......................................21

*Kilburn v. Islamic Republic of Iran*,
  699 F. Supp. 2d 136 (D.D.C. 2010) ........................................................................................15

*Lelchook v. Syrian Arab Republic*,
  No. 16-1550 (RC), 2019 WL 4673849 (D.D.C. Sept. 25, 2019) ............................................95

*Mark v. Islamic Republic of Iran*,
  626 F. Supp. 3d 16 (Sept. 8, 2022) .........................................................................................95

*Mohammadi v. Islamic Republic of Iran*,
  782 F.3d 9 (D.C. Cir. 2015) ......................................................................................................5

*Moradi v. Islamic Republic of Iran*,
  77 F. Supp. 3d 57 (D.D.C. 2015) .............................................................................................16

*Neiberger v. Islamic Republic of Iran*,
  No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239 (D.D.C. Sept. 8, 2022) ..................... *passim*

*Oveissi v. Islamic Republic of Iran*,
  768 F. Supp. 2d 16 (D.D.C. 2011) ................................................................................ *passim*

*Oveissi v. Islamic Republic of Iran*,
  879 F. Supp. 2d 44 (D.D.C. 2012) ......................................................................................6, 16

*Owens v. Republic of Sudan*,
  174 F. Supp. 3d 242 (D.D.C. 2016) ..........................................................................................7

*Owens v. Republic of Sudan*,
   71 F. Supp. 3d 252 (D.D.C. 2014) ...........................................................................17

*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017), *rev'd on other grounds*, 590 U.S. 418 (2020) .............. *passim*

*Pennington v. Islamic Republic of Iran*,
   No. 19-CV-796 (JEB), 2022 WL 168261 (D.D.C. Jan. 19, 2022) .........................................20

*Peterson v. Islamic Republic of Iran*,
   515 F. Supp. 2d 25, 52 (D.D.C. 2007) ...................................................................21

*Reed v. Islamic Republic of Iran*,
   845 F. Supp. 2d 204 (D.D.C. 2012) ..................................................................17, 22

*Roth v. Islamic Republic of Iran*,
   651 F. Supp. 3d 65 (D.D.C. 2023) .................................................................. *passim*

*Roth v. Islamic Republic of Iran*,
   78 F. Supp. 3d 349 (D.D.C. 2015) ..................................................................15, 16

*Salazar v. Islamic Republic of Iran*,
   370 F. Supp. 2d 105 (D.D.C. 2005) .....................................................................21

*Salzman v. Islamic Republic of Iran*,
   No. 17-2475 (RDM), 2019 WL 4673761 (D.D.C. Sept. 25, 2019) ...................................6, 14

*Schwartz v. Islamic Republic of Iran*,
   No. CV 18-1349 (RDM), 2020 WL 7042842 (D.D.C. Nov. 30, 2020)....................................8

*Selig v. Islamic Republic of Iran*,
   No. 1:19-cv-02889-TNM, 2021 WL 5446870 (D.D.C. Nov. 22, 2021)...............................112

*Taitt v. Islamic Republic of Iran*,
   No. 20-CV-1557 (RC), 2023 WL 2536518 (D.D.C. Mar. 16, 2024) .....................................17

*Thuneibat v. Syrian Arab Republic*,
   167 F. Supp. 3d 22 (D.D.C. 2016) .................................................................. *passim*

*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010) .................................................................. *passim*

*Wultz v. Islamic Republic of Iran*,
   864 F. Supp. 2d 24 (D.D.C. 2012) .................................................................. *passim*

**Statutes**

28 U.S.C. § 1350...............................................................................................7

vi

8 U.S.C. § 1101(a)(22)...................................................................................................5

18 U.S.C. § 2339A(b)(1)...............................................................................................13

28 U.S.C. § 1604.........................................................................................................1, 2

28 U.S.C. § 1604............................................................................................................4

28 U.S.C. § 1605A(a).....................................................................................................2

28 U.S.C. § 1605A(a)(1).......................................................................................4, 6, 13

28 U.S.C. § 1605A(a)(2)(A)(i)(I)....................................................................................4

28 U.S.C. § 1605A(a)(2)(A)(ii)..............................................................................4, 5, 15

28 U.S.C. § 1605A(a)(2)(A)(iii)......................................................................................4

28 U.S.C. § 1605A(c)...........................................................................................2, 6, 15

28 U.S.C. § 1605A(h)(3)...............................................................................................13

28 U.S.C. § 1605A(h)(5).................................................................................................5

28 U.S.C. § 1605A(h)(7).................................................................................................6

28 U.S.C. § 1608(a).........................................................................................................2

28 U.S.C. § 1608(a)(4)....................................................................................................4

28 U.S.C. § 1608(e).....................................................................................................2, 3

28 U.S.C. § 1961(a).......................................................................................................23

Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350
    note) ........................................................................................................................7

Pursuant to the Court's Order appointing me as Special Master and adopting an Administrative Plan, Dkt. [1] 64 ("Admin. Plan"), I respectfully submit this Report and Recommendations concerning Liability and Damages for the Tranche 1 Fallujah Non-Bellwether Plaintiffs Assigned to me.

## I.    INTRODUCTION

Plaintiffs are family members of American servicemembers or civilians who were killed or injured in terrorist attacks in Iraq between 2003 and 2017.  Plaintiffs brought suit against the Islamic Republic of Iran in 2021 under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

On November 30, 2023, Plaintiffs filed a motion for default judgment presenting evidence as to 25 bellwether attacks and 45 bellwether plaintiffs.  *See* Dkt. Nos. 38, 39, 40, 41.  On September 30, 2024, the Court issued a Memorandum Opinion and Order granting Plaintiffs' motion as to Iran's liability for all 25 bellwether attacks.  Dkt. 55 ("Bellwether Opinion" or "Bellwether Op.").  In the Bellwether Opinion, the Court also resolved personal jurisdiction and several requirements for subject matter jurisdiction for all plaintiffs in this case.  The Court then appointed Special Masters to consider all issues related to each of the remaining non-bellwether Plaintiffs' entitlement to relief and to make recommendations regarding the liability and damages claims of these Plaintiffs.  *See* Admin. Plan at 2-5.

Plaintiffs have submitted to me a memorandum of law and accompanying exhibits to establish liability against Iran for 16 non-bellwether attacks (the "Attacks") that occurred in or near Fallujah, Al Anbar Province, Iraq, and to establish damages for 54 Plaintiffs ("Plaintiffs")

---

[1] Unless otherwise stated, citations to "Dkt." refer to the Court's docket in *Martino, et al. v. Islamic Republic of Iran*, No. 1:21-cv-01808-RDM (D.D.C.).

associated with the Attacks.  Each Plaintiff is a family member of one of the 20 direct victims killed in the Attacks (the "Attack Victims").

## II.    EVIDENTIARY STANDARDS

Plaintiffs' claims arising from the Attacks are part of a default judgment case under the terrorism exception to the FSIA, 28 U.S.C. § 1605A.  To obtain a default judgment against Iran, Plaintiffs must "(1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens II*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal or state law by offering evidence 'satisfactory to the court,' *id*. §§ 1605A(c), 1608(e)."  Bellwether Op. at 5.  "In a case like this one, which alleges that a foreign state materially supported acts of terrorism, the district court must determine 'how much and what kinds of evidence the plaintiff must provide.'"  *Id*. at 4 (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)).  "But the Court must do so in light of Congress's purpose in enacting § 1605(A)—that is, to compensate the victims of terrorism so as to punish foreign states who have committed or sponsored such acts and to deter them from doing so in the future—and the difficulty in obtaining firsthand evidence and eyewitness testimony from an absent and likely hostile sovereign."  *Id*. at 4-5 (cleaned up).

Thus, in the Bellwether Opinion, the Court "applied the Federal Rules of Evidence, but has done so on the understanding, first that it has 'the authority—indeed . . . the obligation—to adjust evidentiary requirements to . . . differing situations,' *Kim*, 774 F.3d at 1048 (alterations accepted) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, second, that the Court need not 'step into the shoes of the defaulting party and pursue every possible evidentiary challenge,' *Owens II*, 864 F.3d at 785."  Bellwether Op. at 6-7.  "Expert testimony, moreover, is not only

entirely proper, but often sufficient, . . . and even indispensable in 'terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'"  Bellwether Op. at 7 (quoting *Owens II*, 864 F.3d at 785-788).  As a result, courts have recognized that in the FSIA context, experts may rely on hearsay evidence in formulating their admissible expert opinions.  *See Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016); *Hammons v. Islamic Republic of Iran*, No. 19-2518, 2023 WL 5933340, at *14 (D.D.C. 2023).  For these reasons, "[i]n lieu of holding an evidentiary hearing," in its Bellwether Opinion the Court relied solely on "Plaintiffs' declarations, exhibits, and the expert reports and declarations submitted," which are sufficient to support entry of a default judgment in a FSIA case.  Bellwether Op. at 7; *see also Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment).

The Court has already found that Plaintiffs' two expert witnesses, Dr. Daveed Gartenstein-Ross and Michael Pregent, are highly qualified to testify as experts on attack attribution and Iranian support for terrorists operating in Iraq, including the terrorists who committed the Attacks, during the relevant time period.  Bellwether Op. at 5-6.

## III.    LEGAL FRAMEWORK

In order to prevail on their claims, Plaintiffs must establish personal jurisdiction, subject matter jurisdiction, a federal cause of action, and damages.  In this section, I discuss the applicable legal standards governing the elements of the Plaintiffs' liability and damages claims, the relevant findings and conclusions the Court has already made in the Bellwether Opinion, and how Plaintiffs' evidence generally meets each element.  In the next Section (IV), I discuss the evidence

establishing Iran's liability for each of the 16 Attacks at issue here, as well as each corresponding

Plaintiff's entitlement to damages under the FSIA's legal framework.

### A.    <u>Personal Jurisdiction</u>

The Court has already held it has personal jurisdiction over Iran because Plaintiffs served

Iran under 28 U.S.C. § 1608(a)(4).  *See* Bellwether Op. at 101.  Thus, it is not necessary for me to

provide a recommendation as to this issue.

### B.    <u>Subject-Matter Jurisdiction</u>

Although foreign states are generally "immune from" jurisdiction, the FSIA provides for

certain exceptions in Sections 1605 to 1607.  28 U.S.C. § 1604.  The terrorism exception waives

sovereign immunity for foreign states in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for
> personal injury or death [(3)] that was caused by [(4)] an act of . . .
> extrajudicial killing . . . or the provision of material support or
> resources for such an act if such act or provision of material support
> or resources is [(5)] engaged in by an official, employee, or agent of
> such foreign state while acting within the scope of his or her office,
> employment or agency.

Bellwether Op. at 89 (quoting 28 U.S.C. § 1605A(a)(1)).  The exception, moreover, applies only

to suits in which two additional requirements are met.  "First, the claimant or victim must be a

U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at

the time the act of terrorism occurred."  *Id*. at 89-90 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)).

"Second, the foreign state must be designated as a state sponsor of terrorism both at the time the

act occurred . . . and at the time the lawsuit was filed[.]" [2]  *Id*. at 90 (citing 28 U.S.C.

§ 1605A(a)(2)(A)(i)(I)).

---

[2] "Section 1605A(a)(2) also requires that the foreign state have received 'a reasonable opportunity
to arbitrate the claim,' but only if the act of terrorism 'occurred in the foreign state against which
the claim has been brought.'" Bellwether Op. at 90 (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii)).  As

In the Bellwether Opinion, the Court resolved two of these requirements. First, it held that "Plaintiffs expressly seek only monetary relief, prejudgment interest, costs and expenses, and attorneys' fees." Bellwether Op. at 90 (citing Dkt. 15 at 306). Second, it held that "Iran was designated as a state sponsor of terrorism in 1984 . . . and remains so designated to this day." *Id*. (citations omitted).

Plaintiffs here satisfy each of the remaining elements.

### 1.    Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks.

The FSIA's terrorism exception requires that the claimant or the victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii). "The terrorism exception assigns the term 'national of the United States' the 'meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (INA).'" *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 8 U.S.C. § 1101(a)(22); 28 U.S.C. § 1605A(h)(5)). "The referenced provision of the INA, in turn, generally describes 'national of the United States' to mean either a 'citizen of the United States' or a 'person who, though not a citizen of the United States, owes permanent allegiance to the United States.'" *Id*. (quoting 8 U.S.C. § 1101(a)(22)).

Each Attack Victim was serving as a member of the U.S. armed forces or as a U.S. government contractor at the time of the Attack in which they were killed, which is sufficient to meet this element. Furthermore, the majority of Plaintiffs were U.S. citizens at the time of the Attacks in which their loved ones were killed, as evidenced by their submission of declaration testimony and birth certificates, passports, and/or certificates of naturalization. *See* Ex. 2, Tranche

---

the Court has held, "[t]hat requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran." *Id*. at 90.

1 Fallujah Plaintiffs Table (listing each Plaintiff and his or her respective exhibits containing proof of citizenship). Each Plaintiff therefore meets this requirement.

### 2. Plaintiffs Bring Claims for Personal Injury or Death.

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts. 28 U.S.C. § 1605A(a)(1). Here, Plaintiffs are seeking to recover damages resulting from the extrajudicial killing of their family members. Plaintiffs satisfy the personal injury requirement of § 1605A(a)(1) "because the statute is understood to encompass claims by family members for the distress caused by a relative's injuries or death, also known as solatium actions." Bellwether Op. at 91 (citing 28 U.S.C. § 1605A(c) and *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019)). "Family members seeking solatium damages are entitled to recover based on a theory that parallels a common law claim for intentional infliction of emotional distress, and they are therefore considered to be bringing claims for 'personal injury.'" *Id.* at 91-92 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54-55 (D.D.C. 2012)).

### 3. The Attacks Constitute Acts of Extrajudicial Killing.

The terrorism exception also requires that Plaintiffs' personal injuries or deaths must have been "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act[.]" 28 U.S.C. § 1605A(a)(1). Plaintiffs' evidence shows that each of the Attacks constituted an extrajudicial killing.

"The FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA") to define 'extrajudicial killing.'" Bellwether Op. at 92 (citing 28 U.S.C. § 1605A(h)(7)). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantee which were are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350 note).  "As the D.C. Circuit has explained, this definition 'contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.'"  Bellwether Op. at 92 (quoting *Owens II*, 864 F.3d at 770).

First, Plaintiffs' evidence, discussed in more detail infra at § IV, shows that each of the Attacks indisputably involved a "killing."  Indeed, each Plaintiff is a family member of an Attack Victim who was killed in one of the Attacks.  *See generally* Bellwether Op. at 92-93 (holding that 24 of the 25 bellwether attacks "indisputably constitute[d] extrajudicial killings," and one attack, in which a bellwether plaintiff was injured but another servicemember was killed, also constituted an extrajudicial killing).

Second, Plaintiffs' evidence shows that each of these killings was "deliberated."  *See* § IV.  "A 'deliberated' killing is 'simply one undertaken with careful consideration, not on a sudden impulse.'"  Bellwether Op. at 93 (citing *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016)).  Evidence of an attack's sophistication and planning—such as intelligence gathering, selection of the attack site in advance, the purchase or obtainment of weapons for use in the attack, and/or operational training to commit the attack—demonstrate deliberation.  *See* Bellwether Op. at 93-95; *see also Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 364 (D.D.C. 2020) ("*Force I*") (finding an attack was deliberated because it was "meticulously planned," "demonstrate[d] characteristics of organized [terrorist] attacks," and showed signs of "careful intelligence and logistic preparations . . . made prior to the attack"); *Neiberger v. Islamic*

*Republic of Iran*, No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239, at *3-4 (D.D.C. Sept. 8, 2022) (explaining that an [improvised explosive device ("IED")] attack carried out by an Iranian-backed terror organization was a "prototypical deliberated, extrajudicial killing"); *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *38 (D.D.C. July 19, 2022) (explaining that even if Iranian-backed terrorists "may not have known in advance that [they] would have the opportunity to conduct a particular attack," these attacks were nevertheless "deliberated" because the terrorists "planned [their] tactics in advance should the opportunity to kill Americans arise"); *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349 (RDM), 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020) ("*Schwartz I*") (finding "ample evidence that the attacks in question were planned" from an expert declaration).

In the Bellwether Opinion, the Court found there was "ample evidence" that the 25 bellwether attacks—including IED attacks, complex attacks, suicide bombings, small arms fire attacks, and artillery attacks—were all deliberated. Bellwether Op. at 93-95. In reaching this conclusion, the Court considered factors such as IED attacks employing explosives that were buried beneath the ground, installed in advance, or detonated via command wire; complex attacks involving ambushes of Coalition forces at critical points in their missions; suicide bombings requiring preparation for "martyrdom"; small arms fire attacks requiring planning and familiarity with the terrain; and artillery attacks requiring familiarity with the location and occupation of the target military bases. *See id.* "All five types of attacks, moreover, require obtaining and using specific types of weapons, such as IEDs, which often require prior training." *Id.* at 95.

As set forth *infra* in Section IV(A)-(D), each of the 16 Attacks was likewise deliberated. Eleven of the 16 Attacks involved the use of IEDs, which the Court, consistent with voluminous FSIA precedent, found by their nature require deliberation. Bellwether Op. at 94; *see also, e.g.,*

*infra* Attack #6 (employing an IED that was constructed of a hidden pressure plate initiation device and four artillery shells buried in two separate locations); Attack #7 (employing an IED that was command detonated via copper wire running to a residence approximately 200 meters to the West); Attack #9 (employing an IED that consisted of one 130-155 millimeter round that was detonated with a command wire running 2,500 meters from the site).  One of the Attacks was a complex attack in which terrorists ambushed Coalition forces using a suicide vehicle-borne improvised explosive device ("SVBIED") and follow-on small arms fire; the Court has likewise found that similar complex attacks "required prior planning and knowledge of [the] mission conducted by the Coalition forces" and were thus deliberated.  *Id*.  Two of the Attacks involved suicide bombings, which the Court has held require "prior planning, and in addition a preparation for 'martyrdom.'" *Id*.  Lastly, two of the Attacks were sniper attacks, which "not only require[] prior planning but also for the group to be 'familiar with the terrain . . . and to know that these locations would be an ideal location to carry out such an attack.'"  *Id*.

Plaintiffs' attack attribution expert Dr. Gartenstein-Ross also concludes that the Zarqawi organization "planned" each Attack and discusses the planning and capabilities required to carry out each specific type of attack in detail in his Expert Witness Report on Tranche 1 Fallujah Attack Attributions ("Attribution Report").  *See* Attribution Report at 3-4, 16-18.

Finally, there is no evidence that any of the Attacks were authorized by a prior judgment affording judicial guarantees of due process or that they were lawfully carried out under the authority of a foreign nation.  *See* Bellwether Op. at 95.  To the contrary, Plaintiffs demonstrate that each Attack was perpetrated by the Zarqawi organization—a foreign terrorist group—which is sufficient to show that it was not authorized by a previous judgment from a regularly constituted court.  *See Neiberger*, 2022 WL 17370239, at *3.  Thus, each of the Attacks constitutes an

"extrajudicial killing," just as the 25 bellwether attacks were "extrajudicial killings." *See* Bellwether Op. at 95.

### 4.    The Zarqawi Organization Committed Each Attack.

Plaintiffs' evidence demonstrates that the Zarqawi organization committed each of the Attacks.[3]  To assess responsibility for the Attacks, Dr. Gartenstein-Ross considered the following factors: (1) the geography and time period of the attack; (2) the tactics, techniques, and procedures ("TTPs") employed in the attack; (3) when relevant, U.S. Government reporting or analysis on the attack; and (4) when relevant, analysis of any claims of responsibility for the attack by terrorist groups.  Attribution Report at 15-16.  In addition, Dr. Gartenstein-Ross considered the likelihood that *any* terrorist group present in a given region could have been responsible for certain attacks and, where other groups were present, he rules them out and explains why, in his expert opinion, it is more likely than not that the Zarqawi organization was responsible.  *See id.* at 18-19, 46-47.

---

[3] The Zarqawi organization is a Sunni terrorist organization that has undergone several name changes since its emergence in the early 1990s and its operation in Iraq since 2002.  It has been known by the following names: Bayat al-Imam (c. 1993-1999), Jund al-Sham (c. 1999-2004), Jamaat al-Tawhid wal-Jihad ("JTJ") (2004), Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or "AQI") (2004-2006), Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura Council or "MSC") (2006), Islamic State of Iraq ("ISI") (2006-2013), Islamic State of Iraq and al-Sham ("ISIS") (2013-2014), and the Islamic State (2014-present).  *See* Bellwether Op. at 11 n.3; Attribution Report at 65; *see also generally* Dr. Daveed Gartenstein-Ross, Expert Report & Declaration on Sunni Militant Organizations (Nov. 29, 2023), Dkt. 41-2 ("Sunni Militant Groups Report"); Michael Pregent, Expert Report (Nov. 20, 2024), Dkt. 41-4.  Because of the "continuity and overlap" between these separately named entities, the Court has held that the "Zarqawi organization" is an appropriate nomenclature to define the "single, continuously operating organization" with "consistent leadership by Abu Musab al-Zarqawi and his followers." Bellwether Op. at 11; *id.* at 11 n.3.  For ease of reference, I refer to these entities as the Zarqawi organization throughout this R&R, except in their descriptions of the Attacks and attributions, where I, like the Court, adopt Dr. Gartenstein-Ross's practice of providing the more specific name of the Zarqawi organization aegis under which each Attack was perpetrated.  *See, e.g.*, Bellwether Op. at 26 n.6.

Just as with the 25 bellwether attacks, Dr. Gartenstein-Ross concludes that the terrorist group at issue, here the Zarqawi organization, either "likely" or "very likely" carried out the attack. *See id*. at 16 (explaining attribution probabilities).[4]   In assessing the 25 bellwether attacks, the Court determined that either finding was sufficient to attribute the attacks to the identified terrorist group.  Bellwether Op. at 20-21.  Upon a review of the evidence, the Court "agree[d] that, in some cases, there is overwhelming evidence that a particular group was responsible for a particular attack, while in other cases, the facts are murkier."  *Id*.  "Ultimately, however, the Court must simply decide whether Plaintiffs have proffered sufficient evidence to permit the Court to find by a preponderance of the evidence that the attack can be attributed either to the Zarqawi organization" or a different Iranian-supported terrorist organization.  *Id*.  "In making that assessment, moreover, the Court must be mindful of the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign,' *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds*, 590 U.S. 418 (2020), and from dangerous terrorist organizations, which often operate in secrecy in hostile regions."  *Id*.  at 20-21.

---

[4] "One example of the kind of evidence that would support an attribution with a confidence level of *likely* is if the attack occurred within a group's geographic area of operations dominance, was executed with TTPs generally associated with the group, and aligns with the group's motivations (e.g., the target of attack matched the kind of targets that the group typically selected)."  Attribution Report at 18.  Dr. Gartenstein-Ross may determine that a specific terrorist group is *very likely* responsible for an attack "when the aforementioned factors exist alongside indicators of responsibility that make it appear that, rather than merely meeting a *preponderance of evidence* threshold, the group's responsibility can be determined with a probability that would satisfy an evidentiary threshold like *clear and convincing*."  *Id*.  As the Court explained, "That distinction makes sense, because terrorist organizations sometimes claim responsibility for their attacks, and sometimes they do not, because at times a single terrorist organization is the predominant group operating in a particular area, and at other times, multiple groups operate in the same area, and because these groups, at times, employ unique or specialized tactics, and at other times, they do not."  Bellwether Op. at 20.

As set forth *infra* at § IV, Dr. Gartenstein-Ross—based on his expertise and assessment of supporting documentary evidence, including reports from the U.S. government and military—concludes it is more likely than not that the Zarqawi organization is responsible for all 16 of the Attacks. *See also* Attribution Report at 3-4, 25-131. This is consistent with the Court's previous findings that the Zarqawi organization committed three of the bellwether attacks that occurred in or around Fallujah, and that it was "the dominant militant group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 25-27, 30-32, 33-34.

The Zarqawi organization was founded by the notorious terrorist Abu Musab al-Zarqawi, who prior to leading the group in Iraq had trained with al-Qaeda and run an al-Qaeda-funded terrorist camp in Afghanistan. Sunni Militant Groups Report at 13-14. Once in Iraq, Zarqawi established his organization as a ruthlessly effective militant group, which he publicly aligned with al-Qaeda in 2004. *Id.* The Zarqawi organization was deemed to be the "primary terrorist threat to the Coalition" in Iraq in February 2004, and it "executed deadly attacks, established campaigns of violence, and held area of operations dominance in critical locations throughout the Iraq war, with one of its peaks occurring between 2004 and 2008." *Id.* One of those critical locations was Fallujah—a "major hub of operations for the Zarqawi organization" where it "managed to enjoy area of operations dominance" from 2004 to 2007, including as it established its dominance following the First Battle of Fallujah in early 2004, confronted Coalition forces in the Second Battle of Fallujah in late 2004, reestablished itself from 2005 to 2006, and persisted through 2008. Attribution Report at 20-25.

### 5. Iran Provided Material Support for the Zarqawi Organization's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries.

"The FSIA's terrorism exception applies when a plaintiff seeks money damages for 'personal injury or death that was caused by . . . the provision of material support or resources for'

an 'act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking,' so long as that support was provided by 'an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'"  Bellwether Op. at 95 (citing 28 U.S.C. § 1605A(a)(1)).  "Plaintiffs need not show that Iran 'specifically knew of or intended its support to cause' the particular attacks in question . . . or even that Iran's material support was a 'but for' cause of their injuries."  *Id*. at 96-97 (internal citations omitted).  Instead, the FSIA requires only a showing of proximate cause, which requires (1) that Iran's actions be a "substantial factor" in the sequence of events that led to Plaintiffs' injuries, and (2) that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's actions.  *Id*. at 97 (citing *Owens II*, 864 F.3d at 794).

The Court has already found that Iran provided substantial financial support and operational capacity to the Zarqawi organization operating within Iraq during the same general time period.  The Court concluded "that Iran provided . . . the Zarqawi organization . . . 'material support' in the form of, 'currency,' 'training,' 'operational assistance,' and 'weapons,' among other things, within the meaning of the FSIA."  *Id*. at 96 (citing 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1)).  The Court further found, consistent with Dr. Gartenstein-Ross's opinions here, that Iran materially supported attacks carried out by the Zarqawi organization in or around Fallujah during the same general time period as the Attacks.  Bellwether Op. at 97 ("Iran's financial and military aid to [the Zarqawi organization] was essential to [the] group's operating capacity and [], without Iran's backing, [the Zarqawi organization] would be substantially weakened.").

As to the foreseeability that such support would cause Plaintiffs' injuries, the Court previously found that "Iran's goal was to provide lethal aid to all groups fighting the United States," and "[t]hus, Iran not only supported these groups [including the Zarqawi organization],

13

but also actively encouraged them to carry out attacks in Iraq as part of its broader geopolitical strategy and provided [the] groups with the funding, weapons, and know-how to do so effectively." *Id*. at 97-98 (internal quotations and citations omitted). The Court therefore concluded that "[t]he death and injury to servicemembers and contractors, and the suffering of their families was, by any measure, foreseeable." *Id*. at 98 (citing *Owens II*, 864 F.3d at 797-98; *Salzman*, 2019 WL 4673761, at *14).

In addition to the Court's prior findings as to Iranian support for Zarqawi organization attacks in Fallujah and elsewhere in Iraq, the Special Master may rely on Dr. Gartenstein-Ross's determinations, consistent with the available evidence, that each of the 16 Attacks were materially supported by Iran. *See infra* § IV; *see also* Attribution Report at 4, 29-30, 35-37, 40-42, 47-49, 55-57, 62-64, 69-71, 75-77, 83-85, 88-91, 95-97, 102-04, 110-12, 116-18, 122-23, 128-30. As Dr. Gartenstein-Ross explains in his Attribution Report, as well as in his background report on Sunni Militant Groups, prior to and during the time period when the Attacks occurred, Iran and its Islamic Revolutionary Guard Corps Quds Force ("IRGC-QF") provided Zarqawi organization elements in Fallujah and throughout Al Anbar Province with weapons, including IEDs, machine guns, sniper rifles, RPGs, mortars, and explosives—the same types of weapons the Zarqawi organization used to perpetrate the Attacks at issue here—in addition to financing, safe haven, travel facilitation, and training. *See id*. Because this support was crucial to the Zarqawi organization's ability to function and carry out attacks against U.S. servicemembers, Dr. Gartenstein-Ross concludes that Iran's material support "had a reasonable connection to" and "substantially contributed to" each Attack. *See id*.

### C.     Federal Cause of Action

Plaintiffs bring claims solely under the private right of action in 28 U.S.C. § 1605A(c). The elements for establishing Iran's liability under this federal cause of action are "essentially the

same" as the elements necessary to establish the FSIA's waiver of sovereign immunity discussed above. *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment,' or 'the legal representative of' any such person." Bellwether Op. at 98-99 (quoting 28 U.S.C. § 1605A(c)). However, unlike the FSIA's requirements for subject matter jurisdiction, the private right of action does not necessitate that the claimant fall into one of the covered categories *at the time* the terrorist attack occurred. *Compare* 28 U.S.C. § 1605A(a)(2)(A)(ii) (granting jurisdiction over claims based on the status of "the claimant or the victim . . . at the time the [terrorist] act . . . occurred"), *with* § 1605A(c) (granting private right of action to "a national of the United States" or "a member of the armed forces" without temporal limits). *See also Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303, at *6 (D.D.C. May 16, 2023) ("*Cabrera II*"). Each Plaintiff is a U.S. national and thus meets this requirement. *See* Ex. 2, Tranche 1 Fallujah Plaintiffs Table (listing exhibits including each Plaintiff's declaration and identity documents).

### D.    <u>Damages</u>

#### 1.    **Solatium Damages**

To recover damages against Iran, Plaintiffs "must prove that the consequences of the [Defendant's] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 349, 402 (D.D.C. 2015) ("*Roth I*")). Courts may rely on written

declarations from family member claimants describing the attack's effect on him or her. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (relying on wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband).

Courts in this jurisdiction consistently apply the general principles of tort law to FSIA actions. *See Roth I*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) ("*Oveissi II*")) (stating that courts "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (acknowledging that the court must proceed in the same manner as prior courts and look "to sources such as state decisional law, legal treatises, or the Restatements"); *Neiberger*, 2022 WL 17370239, at *11.

Under these general principles, a state sponsor of terrorism that provided material resources and support to a terrorist organization for an attack that caused an extrajudicial killing is responsible for intentional infliction of emotion distress ("IIED"), the resulting pain and suffering, and solatium of immediate family members. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. June 10, 2020) (finding that survivors of terrorism were entitled to damages for IIED "[b]ecause acts of terrorism [were] 'by their definition' extreme and outrageous conduct"); *Heiser II*, 659 F. Supp. 2d at 27 ("Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes [the IIED] test easily."); *Gration*, 2023 WL 5221955, at *26; *Blank v. Islamic Republic of Iran*, No. 19-CV-3645 (BAH), 2021 WL 3021450, at *9 (D.D.C. July 17, 2021). Courts in this jurisdiction regularly hold that family members need not be present at the terrorist attack to recover under a theory of IIED. *See Valore v. Islamic*

*Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010) (a person "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Heiser II*, 659 F. Supp. 2d at 27 (explaining "that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families" who need not meet the presence requirement to recover for IIED); *Tautt v. Islamic Republic of Iran*, No. 20-CV-1557 (RC), 2023 WL 2536518, at *8 (D.D.C. Mar. 16, 2024) (citing *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) ("In terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived.")).

In assessing damages awards, courts generally look to prior awards for comparable injury, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (noting that courts "take pains to ensure that individuals with similar injuries receive similar awards") (quotation marks omitted), and typically follow the *Heiser* framework for solatium damages, which establishes baseline awards to "help ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022) ("*Force II*") (citing *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018)).

Under the *Heiser* framework, baseline awards are between $8 million and $12 million for a spouse of a deceased attack victim, $5 million for a child or parent, and $2.5 million for a sibling. *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*"); *see also Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) ("*Owens II*") (noting that the customary baseline award to a child of a deceased victim is akin to the award of a deceased victim's parent, i.e., $5 million).

Courts may also adjust damages upward based on factors such as severity of pain and suffering. *See id.* at 33. In particular, a court may consider "evidence establishing an especially

close relationship between the [claimant] and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-30 (D.D.C. 2011) ("*Oveissi I*") (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up). Upward enhancements can range from approximately 20 to 100 percent of the baseline award depending on the plaintiff's circumstances. *See, e.g.*, *Bova v. Islamic Republic of Iran*, No. 15-CV-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding plaintiff a 20 percent upward departure after she suffered a "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-CV-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding a 25 percent enhancement to family members for their severe mental distress from the victim's sudden death); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent enhancement due to plaintiff's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Est. of Fouty v. Syrian Arab Republic*, No. CV 18-385 (RBW), 2024 WL 4006166, at *24 (D.D.C. Aug. 30, 2024) (awarding 100 percent upward departures to two siblings because they had especially close

relationships with the victim, they were "intimately aware of the inhumane manner in which their servicemen brothers were murdered," and they were "forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member" who was taken hostage).

The solatium baselines may also be subject to downward variances, as warranted by individual circumstances. *See, e.g.*, *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact with her victim son for the 16 years preceding his death). For children who were under the age of three at the time of their parent's death, most courts in this District consider the totality of a child's circumstances when awarding solatium damages; they do not apply a categorical rule that departs downward for children who lost their parent at the age of three or younger. *See, e.g.*, *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57-58 (D.D.C. 2008) (awarding $5 million in solatium damages to each child of a slain father, who were three years old and nine months old at the time of his murder); Special Master's Report and Recommendations, *Stearns v. Islamic Republic of Iran*, No. 17-CV-131 (RCL) (D.D.C. May 01, 2024), ECF No. 114 at 24-27, *report and recommendation adopted*, Order and Judgment, *id.* at ECF 108 (D.D.C. Apr. 30, 2024) (awarding plaintiff J.H., who was five weeks old at the time of her father's death, $5 million in solatium damages); Special Master's Report and Recommendations, *Lee v. Islamic Republic of Iran*, No. 19-CV-0083 (APM), (D.D.C. Apr. 11, 2022), ECF No. 59, *report and recommendation adopted*, Order and Judgment, *id.* at ECF 84 (D.D.C. June 29, 2023) (awarding plaintiff J.T., who was five weeks old at the time of his father's death, $5 million in solatium damages). *See also* Dkt. 65 at 51 (filed under seal), Special Master Stephen A. Saltzburg's Report and Recommendations regarding Damages for 45 Bellwether Plaintiffs (recommending $5 million dollars in solatium

damages to Plaintiff K.L., who was six months old when her father was killed). However, Plaintiffs are aware of two outlier cases that depart from the majority approach, where the court applied downward departures for children under the age of three at the time their parents were killed. *See Cabrera II*, 2023 WL 3496303, at *11 (reducing the Special Master's issuance of baseline awards to L.B., S.B., C.C.V., and R.C.V., who were three years, three months, two months, and two years old, respectively, at the times of their loved one's deaths); *Pennington v. Islamic Republic of Iran*, No. 19-CV-796 (JEB), 2022 WL 168261, at *2 (D.D.C. Jan. 19, 2022) (reducing the awards of the two Egli children, who were seven months and two years old at the time their parents were attacked, half of the baseline amount, as they "had no independent recollection of the attack" and thus "cannot recover for the psychological pain they suffered from learning of the event."). I previously adopted the majority approach to solatium damages for young children with respect to the Bellwether plaintiffs, and Plaintiffs have urged that I adhere to the majority approach in reviewing the claims assigned to me. Although the judges on the Court are not uniform in their approach, there is reason to believe that a child who lost their parent at three years old or younger does not necessarily suffer less than one who lost theirs at three years and one month. To the contrary, many of the young children who are plaintiffs in this case continue to be haunted by the absence of their parent throughout their lives and, in some sense, suffer more compared to older children because they lack many of the core memories with their parent to cherish. Applying the baseline award for children of Attack Victims will "ensure that individuals with similar injuries receive similar awards," *Force II*, 617 F. Supp. 3d at 33.

Plaintiffs are all either immediate family members or functionally equivalent[5] to immediate family members of a servicemember who was killed in an Attack. They are thus entitled to recover solatium damages. *See, e.g.*, *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families," immediate family members are entitled to solatium awards); *Est. of Fouty v. Syrian Arab Republic*, No. 18-CV-385 (RBW), 2024 WL 3443591, at *25-26 (D.D.C. July 17, 2024) (citing, *inter alia*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) and *Fritz v. Islamic Republic of Iran*, No. 15-CV-456 (RDM), 2018 WL 5046229, at *20 (D.D.C. Aug. 13, 2018) (stating that the strict meaning of immediate family "include[s] . . . immediate family members of half blood")); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("*Fritz II*"). The class of plaintiffs that can recover solatium damages also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related to the victim.

---

[5] To establish that a plaintiff is the functional equivalent of an immediate family member, they must show that they were "treated like" an attack victim's spouse, child, parent, or sibling. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Valore*, 700 F. Supp. 2d at 79-80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him as the natural father, and the half-brother or step-brother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling); *Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2023 WL 6907852, at *7 (D.D.C. Sept. 1, 2023) ("*Jakubowicz II*") (finding a grandfather as a functional equivalent of a parent because he "served as a father figure"); *Karcher v. Islamic Republic of Iran*, No. 16-CV-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) ("*Karcher III*") (determining that a stepparent was a functional equivalent of a family member—even though the stepchild victim also had a relationship with his biological parent—because the stepparent "supplemented" the parental role as evidenced by "the nature of the relationship" with "many weekends, school breaks, summer vacations" spent together). The same framework of solatium damages baselines and adjustments applies to functionally equivalent claimants as to immediate family claimants. *See generally Jakubowicz II*, 2023 WL 6907852, at *6-7.

*Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022) ("*Cabrera I*") (internal quotations omitted).

## 2. Prejudgment Interest

Plaintiffs who were "delayed in recovering compensation for their injuries" may seek prejudgment interest on their compensatory damages. *Reed*, 845 F. Supp. 2d at 214. Courts in this jurisdiction award prejudgment interest on the plaintiffs' "past economic loss and their non-economic pain and suffering and solatium damages." *Force II*, 617 F. Supp. 3d at 42 (quotation marks and citation omitted).

The most appropriate measure of prejudgment interest is the average annual prime rate from the date of the attack to the judgment's date. *Force II*, 617 F. Supp. 3d at 42 (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450-51 (D.C. Cir. 1996)). The court in *Ewan* provided an example:

> To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1983 (10.79%); discounted that interest by the percentage of the year left from April 18, 1983, to December 31, 1983 (70.4%); and then added that amount to $1.00—yielding $1.07596. Then, the Court took that amount and multiplied it by the prime rate in 1984 (12.04%) and added that amount to $1.07596, yielding $1.205506. The Court continued this iterative process through June 10, 2020, resulting in a total multiplier of 10.62015. *See* Opati, 60 F. Supp. 3d at 83 n.10. For 2020, the Court estimated the rate to be 4.05167%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (44.2623%).

*Ewan*, 466 F. Supp. 3d at 250 n.3.

Plaintiffs respectfully seek an award of prejudgment interest. Applying the methodology detailed in *Ewan*, the table in the Conclusion of this Report and Recommendations details the resulting prejudgment interest figures to account for the time that passed since the Attacks until the estimated judgment date of March 31, 2025.

### 3.      Post-Judgment Interest

Post-judgment interest is interest on any money judgment in a civil case issued by a district court, including against a foreign sovereign over whom the court has jurisdiction.  *Gration*, 2023 WL 5221955, at *37 (citing 28 U.S.C. § 1961(a)).  Courts in this jurisdiction award post-judgment interest at the statutory rate because the application of section 1961(a) is mandatory, not discretionary.  *See Cont'l Transfer Tech. Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-CV-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021).  The statute provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  Thus, Plaintiffs request, and I recommend, that the Court grant post-judgment interest from the date of the favorable judgment to the date of the judgment's payment.

## IV.   ANALYSIS OF EACH ATTACK AND DAMAGES WARRANTED FOR EACH PLAINTIFF

This R & R concerns 54 plaintiffs who were injured in 16 attacks in the Fallujah region of Iraq from 2004 to 2007.  The 16 attacks fall into three categories: IED attacks, complex attacks, and suicide bombings.  Dr. Gartenstein-Ross concludes that every Attack was either likely or very likely carried out by the Zarqawi Organization.  Each attack, along with damages warranted for each plaintiff injured in the attack, are detailed below.

### A.     IED Attacks

### 1.      May 25, 2004 IED Attack that Killed U.S. Army Private First Class James Lambert

On May 25, 2004, PFC Lambert was serving with the U.S. Army 3rd Battalion, 62nd Air Defense Artillery, 10th Mountain Division (Light Infantry) in Fallujah, Al Anbar Province.

Attribution Report at 26.  PFC Lambert's unit was on patrol escorting a civil affairs group team to a meeting with a sheikh in West Fallujah when they were attacked by an IED.  *Id*.  PFC Lambert died from penetrating shrapnel injuries caused by the IED, and one other servicemember was killed and two were wounded.  *Id*.

### i. *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely carried out this attack.  *Id*.  He bases his conclusion on the geographic location and the timing of the attack and the TTPs used to carry out the attack.  *Id*. at 26-29.  *First*, he explains that the attack occurred shortly after "JTJ subsumed other groups and began to emerge as a unifying entity within the broader insurgency throughout Al Anbar Province" on May 1, 2004, when the First Battle of Fallujah came to an end.  *Id*. at 27.  In the weeks before the attack, JTJ gained dominance over the insurgency around Fallujah.  *Id*.  And shortly after the attack, Zarqawi continued to use the city as the group's "base of operations," and JTJ's leadership of the insurgency was made official by local terrorists' pledges of loyalty to Zarqawi.  *Id*. at 28.  As the Court noted in its Bellwether Opinion, the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007."  Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, the TTPs used to carry out this attack—an IED explosion—are another indicator that JTJ was responsible.  *Id*. at 28-29.  JTJ regularly used IEDs to attack U.S. forces during the First Battle of Fallujah and through the summer and fall of 2004.  *Id*.  According to a U.S. Marine Corps report, by October 2004, intelligence had identified more than 300 well-constructed defensive positions interlaced with IEDs in Fallujah, which Dr. Gartenstein-Ross concludes were likely orchestrated by JTJ.  *Id*.

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack.  *See* Attribution Report at 29-30 (citing U.S. government reporting substantiating Iran's

support for the Zarqawi organization in Iraq from 2003 to 2012).  The IRGC-QF helped Zarqawi establish his presence in Iraq and continued to support JTJ beyond 2003, including by funneling weapons to JTJ strongholds in Fallujah and throughout Al Anbar Province in 2004.  *Id*. at 29.  *See also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three in or around Fallujah from 2005 to 2007); *see also Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

<strong>ii.</strong>     <strong><em>Damages for</em> Sarah Marie Lambert</strong>[6] <em>– Sister of PFC James Lambert</em>

<strong>2.</strong>     <u><strong>July 20, 2004 IED Attack that Killed U.S. Marine Corps Corporal Todd Godwin</strong></u>

On July 20, 2004, Cpl. Godwin was serving with Headquarters and Service Company, 1st Battalion, 8th Marines, Regimental Combat Team 7, 1st Marine Division near Fallujah, Al Anbar Province.  Attribution Report at 31.  His unit's mission at the time was to search for insurgents who had been emplacing IEDs in the area.  *Id*. ██████████████████████████████

██████████████████████████████████████  *Id*. (citing Ex. 55, N. Godwin Decl. at 4).  They were riding back to base in a High Mobility Multipurpose Wheeled

---

[6] Plaintiffs' counsel has been unable to obtain Sarah's signed declaration as of the time of their submission of proposed findings of fact and conclusions of law.  Plaintiffs intend to supplement their submission to me and provide her declaration and damages request as soon as they are able to.  At this time, I recommend that the Court issue an order concerning Iran's liability for the July 20, 2004 attack, and once Plaintiffs are able to submit Sarah's declaration and damages request to me, I can provide the Court with a supplemental report and recommendation concerning her damages award.  Additionally, Sarah was originally named in the Complaint as Sarah Ernest due to an administrative error.  Her legal name is Sarah Marie Lambert, and Plaintiffs will be filing a motion to amend the case caption to reflect her legal name.

Vehicle ("HMMWV") when it was struck by an IED.  *Id.*  Cpl. Godwin died from injuries sustained in the IED blast.  *Id*. at 32.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely carried out this attack.  *Id*. at 32.  He bases his conclusion on JTJ's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, he explains that the attack occurred in Fallujah on July 20, 2004, shortly after the First Battle of Fallujah, when JTJ "established operational dominance in Fallujah."  *Id*. at 33.  Around the time of this attack, "Fallujah was central to JTJ's operations," and Zarqawi used the city as the group's "main operating base," which is further illustrated by the presence of key JTJ leaders operating in the city in and around June 2004.  *Id*.  In addition, JTJ continued to dominate Fallujah in the months following this attack.  For example, in August 2004, JTJ "demonstrated its dominance in the city" by attacking and taking over multiple Iraqi National Guard compounds. *Id*. at 34.  Dr. Gartenstein-Ross opines that "JTJ maintained operational dominance in Fallujah through November 2004," when the Coalition launched the Second Battle of Fallujah.  *Id*.  In the Bellwether Opinion, the Court also relied on Dr. Gartenstein-Ross's opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, the TTPs used to carry out this attack—an IED explosion—are another indicator that JTJ was responsible.  *Id*. at 34.  JTJ regularly used IEDs to attack U.S. forces during the First Battle of Fallujah and through the summer and fall of 2004.  *Id*.  According to a U.S. Marine Corps report, by October 2004, intelligence had identified more than 300 well-constructed defensive positions interlaced with IEDs in Fallujah, which Dr. Gartenstein-Ross concludes were likely orchestrated by JTJ.  *Id*.

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack.  *See* Attribution Report at 35-36 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012).  The IRGC-QF helped Zarqawi establish his presence in Iraq and continued to support JTJ beyond 2003, including by funneling weapons to JTJ strongholds in Fallujah and throughout Al Anbar Province in 2004.  *Id.* at 29.  *See also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three in or around Fallujah from 2005 to 2007); *see also Roth*, 651 F. Supp. 3d at 91 (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii.  *Damages*

#### a.  **Nancy Kathleen ("Kathy") Godwin** – *Mother of Cpl. Todd Godwin*



---

[7] Unless otherwise specified, Plaintiffs are biologically related to the Attack Victim.

████████████████████████████████████████████████████████

██

      ███████████████████████████████████████████  ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  ████████████████████████████

████████████████████████████████████

      █████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████     she requests, and I recommend, that the Court approve for her an

upward departure of 25 percent to $6.25 million in solatium damages. *See Baker v. Socialist*

*People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (awarding a 25 percent

upward departure to Katherine Doris because "she had to be hospitalized for asthma and shock

shortly after [her loved one's] death, and has battled depression ever since"); *id.* at 68, 83

(awarding a 25 percent upward departure for a brother who was so affected by his grief that he

became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse);

*Est. of Brown v Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43-44 (awarding a 20 percent upward

departure to LaJuana Smith because she "suffered a 'nervous breakdown' following Anthony's

death for which she sought medical treatment and was prescribed medication for approximately one year").

      **b. William Goode Godwin** – *Father of Cpl. Todd Godwin*

████████████████████████████████████████████████████████████

████████████████████████████

  ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ he requests, and I recommend, that the Court approve for

him an upward departure of 25 percent to $6.25 million in solatium damages. *See Thuneibat v.*

*Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25

percent upward departure after her personality changed following her son's death, turning from a

"lively socialite to a recluse," she became depressed to the point of requiring medication, and she

developed conditions including diabetes as a result of becoming less active; ██████████████████████

████████████████████; *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure

for a brother who was so affected by his grief that he became socially reclusive, found it difficult

to pursue a career, and engaged in substance abuse).

        **c.  Anna Elizabeth Godwin** – *Sister of Cpl. Todd Godwin*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████   █   ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

          █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Anna requests an upward

departure of 40 percent to $3.5 million in solatium damages. *See Wultz*, 864 F. Supp. 2d at 40-41

(awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD,

persistent grief, and depression, and because the attack caused her grades in school to suffer as a

result of her having "zero motivation"); *Higgins*, 2000 WL 33674311, at *4, 9 (awarding daughter

$12 million who changed her college plans after her father's kidnapping, subsequently performed

poorly in her academics, and eventually withdrew from school altogether); *Bernhardt*, 2023 WL

2598677, at *16 (awarding Santina Cartisser a 25 percent upward departure because of the

"breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth

of emotional pain she experienced from her brother's loss), *compare with* █████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████; *Cabrera I*, 2022 WL 2817730, at

*49, 50 (awarding a 20 percent upward departure to R.C. because he "suffered 'extreme depression

and repeated suicidal ideation,' and whose ability to live a normal childhood and pursue a

traditional education was especially disrupted by the emotional harms of his father's death.");

*Cabrera II*, 2023 WL 3496303, at *10 (awarding a 20 percent upward departure to J.H. because

he suffered depression, experienced suicidal ideations, had to live away from his parents during

formative years, and suffered heightened effects due to his father's injuries).

      **d.  Aaron William Godwin** – *Brother of Cpl. Todd Godwin*

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████ █

███ █████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███ ██ ████████████████████████████████████████████

█████████████████████████████ ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████  ██  █████████████████████

███████████████████████████████████████████████████████████

████████████████████

Aaron requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

### 3.    August 19, 2004 IED Attack that Killed U.S. Marine Corps Reserve Corporal Brad McCormick

On August 19, 2004, Cpl. McCormick was serving with 3rd Battalion, 24th Regiment, 1st Marine Division, near Fallujah, Al Anbar Province.  Attribution Report at 37.  Cpl. McCormick was conducting operations in the vicinity of Fallujah when his unit was struck by an IED.  *Id.*  Cpl. McCormick died from injuries sustained from the blast, and six other servicemembers were wounded in the attack.  *Id.*

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely committed this attack.  *Id.* at 37.  He bases his conclusion on JTJ's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, he explains that this attack occurred on August 19, 2004, between the First and Second Battles of Fallujah, when JTJ "established dominance over the other insurgent groups that were active in Fallujah."  *Id.* at 38-39.  As Dr. Gartenstein-Ross explains, "By August 2004, JTJ had established sufficient dominance in Fallujah that they were able to seize the 505th and 506th Iraqi National Guard compounds without a fight."  *Id.* at 39.  Furthermore, Dr. Gartenstein-Ross notes that Fallujah "was central to JTJ's operations around the time of this attack," a fact that is evidenced by the presence of JTJ leaders operating in the city in and around August 2004.  *Id.*  According to a U.S. intelligence briefing, JTJ continued to use Fallujah as their "main operating base" until late 2004, when the

Coalition launched the Second Battle of Fallujah. *Id.* at 39-40. In the Bellwether Opinion, the Court also relied on Dr. Gartenstein-Ross's opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, another indicator that JTJ was responsible for the attack is the TTPs used to carry it out—an IED explosion. *Id.* at 40. According to Dr. Gartenstein-Ross, the "JTJ-dominated insurgency emplaced IEDs around Fallujah as part of rings of defense to defend the city from coalition attack." *Id.* JTJ specifically placed IEDs in strategic locations to target Coalition forces. *Id.* In addition, Dr. Gartenstein-Ross opines that JTJ used Fallujah as a base for producing and deploying IEDs and had amassed weapons caches, including IEDs and VBIEDs, during its period of dominance in between the First and Second Battles of Fallujah. *Id.*

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 40-42 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012). The IRGC-QF helped Zarqawi establish his presence in Iraq and continued to support JTJ beyond 2003, including by funneling weapons to JTJ strongholds in Fallujah and throughout Al Anbar Province in 2004. *Id.* at 29. *See also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three attacks in or around Fallujah from 2005 to 2007); *see also Roth*, 651 F. Supp. 3d at 91 (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks, and that the consequences of its support were reasonably foreseeable).

   *ii.*  **Damages**

     **a. Rhonda Gail McCormick** – *Mother of Cpl. Brad McCormick*

███████████████████████████████████████████████

███████████████████████████████████████████████

████████   ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

Rhonda requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

       **b.  Larry Keith McCormick** – *Father of Cpl. Brad McCormick*

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

Larry requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

        **c.  Blake Wayne McCormick –** *Brother of Cpl. Brad McCormick*



Blake requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

    **4.**    **<u>February 27, 2005 IED Attack that Killed U.S. Army Second Lieutenant Richard Brian Gienau</u>**

On February 27, 2005, 2LT Gienau was serving with A Company, 224th Engineer Battalion in the south side of the Fallujah District, Al Anbar Province.  Attribution Report at 43.  2LT Gienau was riding in an up-armored HMMWV traveling in a convoy when an IED detonated on his vehicle.  *Id.*  2LT Gienau was killed in the blast, and four other servicemembers were wounded.  *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, likely committed this attack.  *Id*. at 43.  He bases his conclusion on AQI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, this attack occurred on February 27, 2005, along Alternative Supply Route ("ASR") Boston in the district of Fallujah.  *Id*. According to Dr. Gartenstein-Ross, ASR Boston was a known attack location for insurgents based in Fallujah, who at the time were dominated by AQI.  *Id*. at 44.  A narrative of Fallujah published by the U.S. Marine Corps notes that during the Second Battle of Fallujah, which concluded shortly before this attack, insurgents attacked convoys on ASR Boston.  *Id*. at 44.  And following the Second Battle of Fallujah, "AQI remained the dominant threat in the area," particularly along the surrounding routes, as "many AQI fighters fled the city to its outskirts."  *Id*. at 44-45.  Furthermore, reports from March 2005—shortly after this attack—noted that "AQI showed signs that they were continuing to gain strength in the Fallujah area."  *Id*. at 45.  In addition, as the Court has acknowledged, the Zarqawi organization, operating during this time as AQI, was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007."  Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, 2LT Gienau was killed in an IED attack, which is another indicator that AQI was responsible.  *Id*. at 46.  Dr. Gartenstein-Ross opines that "AQI frequently carried out IED attacks in the Fallujah area," and relies on several reports from U.S. military officials discussing AQI's extensive placement of IEDs around Fallujah in October 2004 and the discovery of IED caches and manufacturing facilities in December 2004.  *Id*.  Furthermore, Dr. Gartenstein-Ross considers that the nearby town of Julaybah was a "known hotspot for IED attacks carried out by AQI."  *Id*. Quoting Dr. Gartenstein-Ross's previous expert report, in its Bellwether Opinion the Court pointed

out that "IED attacks were a known AQI tactic in Fallujah in 2005." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area at the time could have carried out this attack. Although there were other insurgent groups with "some level of presence in the district, AQI had the strongest recorded presence in the area" and "is the only group with a recoded presence in the part of the district where this attack occurred." *Id*. at 46-47.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 47-49 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012). *See also Driscoll v. Islamic Republic of Iran*, No. 20-cv-622, 2023 WL 4892710, at *7 (D.D.C. June 27, 2023), *report and recommendation adopted sub nom*. 2023 WL 5932974 (D.D.C. July 13, 2023) (finding IED detonated by al-Qaeda or an al-Qaeda affiliate to be traceable to Iran or its proxies in part because the weapon was powerful enough to penetrate an up-armored vehicle); *see also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three attacks in or around Fallujah from 2005 to 2007).

> ## ii.    *Damages*
>
> ### a.  **Debbee Way** – *Mother of 2LT Richard Brian ("Brian") Gienau*

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████  ████████████████

██████████████████████████████████████████████

████

██████████████████████████████████████████

████████████████████████████████████████ she requests, and I recommend, that

the Court award an upward departure of 25 percent to $6.25 million in solatium damages.  *See*

*Bernhardt*, 2023 WL 2598677, at \*16 (awarding Janet Paresi a 25 percent upward departure

because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary

Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and

now suffers from PTSD"); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family

members experienced "a general feeling of permanent loss or change caused by the decedent's

absence" or received "medical treatment for depression and related affective disorders").  Further,

████████████████████████████████████████████████

████████  Due to the loss of this uniquely close relationship, Debbee makes a case for upward

departure similar to plaintiffs in *Flanagan* and *Bernhardt*.  *See Flanagan v. Islamic Republic of*

39

*Iran*, 87 F. Supp. 3d 93, 115, 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Bernhardt*, 2023 WL 2598677, at *16 (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep them together'" and the depth of emotional pain she experienced from her brother's loss).

       **b. Richard Louis Gienau** *– Father of 2LT Richard Brian ("Brian") Gienau*

████████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Richard

requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages. *See Oveissi I*, 768 F. Supp. 2d at 26–27 (explaining that upward departures may be awarded based on "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship"); *Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "'drawn out and incredibly difficult' grieving process"); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *see also Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders").

5.    **August 22, 2005 IED Attack that Killed U.S. Marine Corps Private First Class Ramon Romero**

On August 22, 2005, PFC Romero was serving with Weapons Company, 2nd Battalion, 7th Marines, 1st Marine Division in Fallujah, Al Anbar Province.  Attribution Report at 50.  PFC

Romero was conducting a mounted security patrol near the intersection of ASR Boston and ASR Iron when an IED was detonated against his unit. *Id*. PFC Romero was killed in the blast, and four other servicemembers were wounded. *Id*.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, likely committed this attack. *Id*. at 50. He bases his conclusion on AQI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack. *First*, the attack occurred in August 2005 in the Fallujah area, where AQI had reestablished a strong operational presence after the conclusion of the Second Battle of Fallujah. *Id*. at 51. By August 2005, AQI had established a new training camp just 30 kilometers south of Fallujah and created alliances with and paid other insurgent groups to attack U.S. forces. *Id*. at 52. Zarqawi also reintroduced AQI cells into the city and designated the surrounding towns as safe havens for the group to launch attacks on Fallujah. *Id*. Four months before the attack, AQI had established a planning and recruiting center at Fallujah's historic Furqan Mosque. *Id*. AQI maintained a significant presence in the area throughout the summer of 2005, when this attack took place, and continued to conduct attacks on Coalition forces around Fallujah well after that. *Id*. at 52-53. The Court previously attributed a bellwether IED attack that occurred only one day before this attack, also near Fallujah, to AQI. Bellwether Op. at 25-27. In making that attribution, the Court relied on consistent opinions from Dr. Gartenstein-Ross that "AQI was the dominant militant group in the Fallujah region in Al Anbar Province from 2004 to 2007" and that Fallujah was a recognized "AQI stronghold" in 2004. *Id*. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, PFC Romero was killed in an IED attack, which is another indicator that AQI was responsible. *Id*. at 53. Dr. Gartenstein-Ross opines that AQI had widely adopted the use of IEDs to kill and injure Coalition forces in Al Anbar Province. *Id*. at 53; *see also* Bellwether at 26 ("IED

attacks were a known AQI tactic in Fallujah in 2005."). In August 2005, Coalition forces specifically targeted AQI insurgents who had set up a base to manufacture IEDs in Al Anbar. *Id*. Abu Mahmud, a senior member of AQI in Al Anbar who was killed in a precision airstrike in October 2005, oversaw a significant portion of the foreign fighter assaults on Iraqi security and Coalition forces, including "most" IED attacks. *Id*. at 53-54. AQI's use of IEDs also continued well past the attack that killed PFC Romero. *Id*. at 54.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack. Although there were other insurgent groups with "some level of presence in the district, AQI had the strongest recorded presence in the area." *Id*. at 54. Furthermore, Dr. Gartenstein-Ross notes that the other insurgent groups that were present "were primarily involved in criminal activity as opposed to fighting the Coalition, making it unlikely that they were responsible for this attack." *Id*. Based on these factors, it is likely that the Zarqawi organization, operating as AQI, perpetrated the attack that killed PFC Romero.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 55-57. This is in line with the Court's previous finding that Iran materially supported the bellwether IED attack that was carried out the day before this attack, also near Fallujah. Bellwether Op. at 26, 95-98.

        *ii.*    ***Damages***

        **a. Maria Odilia Romero** – *Mother of PFC Ramon Romero*

██████████████████████████████████     ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████ she requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages. *See Thuneibat*, 167 F. Supp. 3d at 53 (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed other conditions including diabetes as a result of her reclusiveness); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she developed severe anxiety and depression, and even contemplated taking her own life following her father's death"); *id.* (awarding a 25 percent upward departure to Alexandra VandenBroek because she "continue[s] to suffer immensely" after her stepfather's death and "left

her job for months after his death"); *Flanagan*, 87 F. Supp. 3d at 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression).

**b. Juan Diego Romero** – *Father of PFC Ramon Romero*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

                    ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ he requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages. *See Thuneibat*, 167 F. Supp. 3d at 45 (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed other conditions including diabetes as a result of her reclusiveness); *Baker*, 775 F. Supp. 2d at 83 (awarding a 25 percent upward departure to Katherine Doris because "she had to be hospitalized for asthma and shock shortly after [her loved one's] death, and has battled depression ever since"); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or

change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders").

###### c. **Yajaira Romero** – *Sister of PFC Ramon Romero*



Yajaira requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in

solatium damages. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience bullying at school, developed severe anxiety and depression, and even contemplated taking her own life following her father's death"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep them together'" and the depth of emotional pain she experienced from her brother's loss); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303, at *10 (D.D.C. May 16, 2023) (awarding a 20 percent upward departure to K.H. and J.H. because they "suffered extreme depression and repeated suicidal ideation, and [their] ability to live a normal childhood and pursue a traditional education was especially disrupted by the emotional harms of [their] father's death.") (cleaned up); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain").

### d. Bernardo Romero – *Brother of PFC Ramon Romero*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████

████████████████████████████████████ Bernardo requests, and I recommend, that

the Court award an upward departure of 25 percent from the baseline award for surviving siblings

of attack victims to $3.125 million in solatium damages.  *See Bernhardt*, 2023 WL 2598677, at

*16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience

bullying at school, developed severe anxiety and depression, and even contemplated taking her

own life following her father's death"); *id.* (awarding Mary Heather Wise a 25 percent upward

departure because she "suffered from adrenal exhaustion and now suffers from PTSD");

*Thuneibat*, 167 F. Supp. 3d at 45 (awarding Samira Khorma a 25 percent upward departure after

her personality changed following her son's death, turning from a "lively socialite to a recluse,"

she became depressed to the point of requiring medication, and she developed conditions including

diabetes as a result of becoming less active); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda

Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and

depression, and because the attack caused her grades in school to suffer as a result of her having

"zero motivation").

      **6.**      <u>**December 1, 2005 IED Attack that Killed U.S. Marine Corps Corporal**</u>
<u>**Anthony McElveen and Lance Corporal John Holmason**</u>

On December 1, 2005, Cpl. McElveen and LCpl. Holmason were serving with F Company, 2d Battalion, 7th Marines, 1st Marine Division in Fallujah, Al Anbar Province.  Attribution Report at 57.  They were both at a flour factory used by Coalition forces as a "makeshift patrol base" near Fallujah when they were killed in an IED attack, along with eight other servicemembers.  *Id*. at 57-58.  Analysis of the IED indicated that it was constructed of a hidden pressure plate initiation device and four artillery shells buried in two separate locations.  *Id*. at 58.  According to a Marine on the Explosive Ordnance Disposal ("EOD") team, the IED's pressure plate was the size of a "thumbnail," and the "miniature size of that triggering device was evidence of the growing sophistication among the insurgents."  *Id*. at 58.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, likely committed this attack.  *Id*. at 58.  He bases his conclusion on AQI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, the attack occurred in the Fallujah area, where AQI had reestablished a strong operational presence by late 2005.  *Id*. at 59.  Surrounding towns—such as Al-Karmah and Amariyah—served as safe havens for the group to launch attacks on Fallujah.  *Id*.  By the time of the December 1, 2005 attack that killed Cpl. McElveen and LCpl. Holmason, AQI's successful return to Fallujah was common knowledge.  *Id*. at 60.  This attack also occurred during a period when AQI was looking to disrupt Coalition forces and the Iraqi government in advance of upcoming Iraqi parliamentary elections on December 15, 2005.  *Id*.  In its attribution of a bellwether IED attack that occurred in August 2005 to AQI, the Court also relied on Dr. Gartenstein-Ross's assessment that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, Cpl. McElveen and LCpl. Holmason were killed in an IED attack, which is another indicator that AQI was responsible. *Id*. at 60. By November 2005, AQI had already established capability to construct "sophisticated" IEDs like the one used in this attack. *Id*. In addition, AQI had the training necessary to carry out the attack: by January 2006, the AQI associate group Swords of Truth operated in Fallujah and conducted trainings in IED deployment. *Id*. Abu Mahmud, a senior AQI member in Al Anbar who was killed in a precision airstrike in October of 2005, also oversaw a significant portion of the foreign fighter assaults on Iraqi security and Coalition forces, including "most" IED attacks. *Id*. at 61. In the Bellwether Opinion, the Court also relied on Dr. Gartenstein-Ross's opinion that "IED attacks were a known AQI tactic in Fallujah in 2005." Bellwether Op. at 26 (quoting Dr. Gartenstein-Ross expert report).

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack. Although the Islamic Army of Iraq ("IAI") claimed responsibility for a December 1, 2005 IED attack in Fallujah, the U.S. military confirmed that this was not the same attack that killed Cpl. McElveen and LCpl. Holmason. *Id*. at 61. In addition, other insurgent groups in Fallujah mainly focused on criminal activity rather than fighting. *Id*. at 61-62.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 62-64 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012). *See also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three attacks in or around Fallujah from 2005 to 2007); *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-CV-2248 (CRC), 2023 WL 7448770, at *8-10 (D.D.C. Aug. 18,

2023) (attributing pressure-plate IED attacks to Iran, in part because the "sophistication of the IEDs indicated a highly trained and highly resourced group was responsible.") (cleaned up).

> ### ii. ***Damages for* Thomas Benjamin McElveen** – *Father of Cpl. Anthony McElveen*



Thomas requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

> **7.  September 4, 2006 IED Attack that Killed U.S. Navy Reserve Petty Officer Second Class Christopher Walsh**

On September 4, 2006, PO2 Walsh was attached to U.S. Marine Corps Weapons Company, 1st Marines, 25th Marine Regiment (W/1/25) in Fallujah, Al Anbar Province. Attribution Report at 65. W/1/25 was conducting a mounted patrol in southern Fallujah when it was struck by an IED. *Id*. PO2 Walsh died from injuries sustained in the blast, and two other servicemembers were killed and one was injured. *Id*. An EOD unit assessed that the IED was command detonated via

copper wire running to a residence approximately 200 meters to the West. *Id*. The unit captured two possible triggermen from the residence following the attack. *Id*.

## i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as MSC, very likely committed this attack. *Id*. at 65. He bases his conclusion on MSC's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.

*First*, on August 3, 2006, MSC vowed to retake the city of Fallujah and declared that it had united local armed factions to fight the U.S., and by fall, it had "re-established its operational dominance in Fallujah." *Id*. at 66. From September through November, MSC led a successful and organized murder and intimidation campaign, which resulted in the assassination of a number of city council members, Iraqi police, and other prominent figures in Fallujah that opposed the group. *Id*. at 67. MSC remained active in Fallujah into 2007, after the attack on PO2 Walsh. *Id*. Fallujah remained one of the last strongholds of MSC, and Coalition forces were unable to "pacify" the city until late 2007. *Id*. Citing an expert report from Dr. Gartenstein-Ross, the Court acknowledged in its Bellwether Opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26.

*Second*, PO2 Walsh was killed in an IED attack, which is another indicator that MSC was responsible. *Id*. at 67. At the time of the attack, MSC used IEDs throughout Al Anbar Province. Abu Abdullah, the emir (regional leader) of MSC between western Baghdad and Fallujah, was known to carry out IED attacks within his area of control between late 2005 and September 2006. *Id*. at 67-68. Abu Abdullah was "a close associate of Zarqawi" and "was known as an expert bomb and improvised explosive device maker," who paid fighters to conduct IED attacks in Fallujah. *Id*. at 68.

Finally, Iran's material support to MSC substantially contributed to MSC's commission of this attack. *See* Attribution Report at 69-70; *see also* Bellwether Op. at 26, 95-98 (finding a 2005 IED attack near Fallujah was carried out by the Zarqawi Organization and materially supported by Iran); *Fissler v. Islamic Republic of Iran*, No. CV 18-3122 (CKK), 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022) (finding Iran responsible for a command-wire-detonated IED attack, in part based on the "substantial technical expertise" required to arm and trigger the explosives).

### ii. *Damages*

#### a. **Maureen Walsh** – *Mother of PO2 Christopher Walsh*

████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████ █████████████
███████████████████████████████████████████████
█████████████████████████████████████ █ ███████
███████████████████████████████████████████ █
███████████████████████████████████████████████



she requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages. *See Est. of Brown*, 872 F. Supp. 2d at 43 (awarding a 20 percent upward departure to LaJuana Smith because she "suffered a 'nervous breakdown' following Anthony's death for which she sought medical treatment and was prescribed medication for approximately one year"), *compare* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Alexandra VandenBroek and Terry Paresi because she "continue[s] to suffer immensely" from the death of her stepfather and "left her job for months after his death[,]" and he was "wrecked" after his father's death and "takes medication for anxiety"); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder).

**b. Patrick Thomas Walsh** – *Brother of PO2 Christopher Walsh*

████████████████████████████████████████████

████████████████████ █ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ ██████ ████████████████████████████████

████████████████████████████ ██████████ ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

Patrick requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

      **c.** **Joseph Michael Walsh** – *Brother of PO2 Christopher Walsh*

████████████████████████████████████

████████████████████ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████  ████████  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

Joseph requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

       **d.  Meghan Cathleen Turner** – *Sister of PO2 Christopher Walsh*

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████  ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████  ██████  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

Meghan requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

       **e.  Erin Marie Watson** – *Sister of PO2 Christopher Walsh*

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ she

requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125

million in solatium damages. *See Baker*, 775 F. Supp. 2d at 68, 84 (awarding a 25 percent upward

departure for a brother who was so affected by his grief that he became socially reclusive, found

it difficult to pursue a career, and engaged in substance abuse); *Bernhardt*, 2023 WL 2598677, at

*16 (awarding a 25 percent upward departure to Alexandra VandenBroek and Terry Paresi because

she "continue[s] to suffer immensely" from the death of her stepfather and "left her job for months

after his death[,]" and he was "wrecked" after his father's death and "now takes medication for

anxiety."); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer

because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to

dull her emotional pain.").

### 8.    November 5, 2006 IED Attack that Killed U.S. Marine Corps Corporal Jose Galvan

On November 5, 2006, Cpl. Galvan was serving with C Company, 1st CEB, 1st Marine

Division in Fallujah, Al Anbar Province. Attribution Report at 71. On the day of the attack, Cpl.

Galvan was conducting a dismounted sweep patrol for IEDs when he was struck by an IED. *Id*.

Cpl. Galvan died from injuries sustained in the blast. *Id*.

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely committed this attack. *Id*. at 71. He bases his conclusion on ISI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack. *First*, ISI dominated Al Anbar Province in 2006 and increased their presence in Fallujah, which had served as the center of the group's power throughout most of 2004. *Id*. at 72-73. On August 3, 2006, ISI posted proclamations across mosques and schools in Fallujah, vowing to "retake" the city. *Id*. at 73. ISI's resurgence in Fallujah during the summer of 2006 was also facilitated by continuing sectarian violence and deteriorating security in other parts of Iraq. *Id*. at 73. By the fall of 2006, ISI had re-established its dominance in Fallujah. *Id*. From September through November, ISI led a successful and organized murder and intimidation campaign, which assassinated a number of city council members, Iraqi police, and other prominent figures in Fallujah that opposed the group. *Id*. ISI remained active in Fallujah into 2007, after the attack on Cpl. Galvan. *Id*. at 74. Indeed, the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26.

*Second*, Cpl. Galvan was killed in an IED attack, which is another indicator that ISI was responsible. *Id*. at 74. At the time of the attack, ISI employed IEDs against Coalition forces throughout Al Anbar Province. By mid-2006, ISI's use of IEDs in Ramadi had become so common that typical ISI fighters carried a wide range of IEDs that were regularly used in attacks. *Id*. IEDs were a common TTP in Fallujah, where ISI "maintained a network of IEDs" in late 2006. *Id*. at 75; *see also* Bellwether Op. at 31-32 (attributing a February 8, 2007 IED attack to ISI and noting that ISI IED attacks in Al-Karmah, a city near Fallujah, had risen dramatically). Abu Abdullah, the regional leader of ISI between western Baghdad and Fallujah, was known to carry out IED attacks within his area of control between late 2005 and September 2006. *Id.* at 74. He was also

"a close associate of Zarqawi" and "was known as an expert bomb and improvised explosive device maker," who paid people to conduct IED attacks in Fallujah.  *Id.*

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack.  *See* Attribution Report at 75-77 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012).  For example, in December 2006, two IRGC-QF operatives were arrested with "weapons lists, documents pertaining to shipments of weapons into Iraq . . . among other sensitive intelligence information," and the information gleaned from these terrorists shows how Iran was working with the Zarqawi organization in Iraq.  *Id.* at 76.  *See also* Bellwether Op. at 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including three attacks in or around Fallujah from 2005 to 2007); *see also Roth*, 651 F. Supp. 3d at 91 (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks, and that the consequences of its support were reasonably foreseeable).

        **ii.**        ***Damages for* Jesus "Jesse" Vega** – *Stepfather of Cpl. Jose Galvan*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

Jesse requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

**9.      January 20, 2007 IED Attack that Killed U.S. Army Specialist Jeffrey Bisson**

On January 20, 2007, SPC Bisson was serving with 3rd Battalion, 509th Infantry (Airborne), 4th Brigade Combat Team, 25th Infantry Division near Fallujah, Al Anbar Province. Attribution Report at 78. SPC Bisson's unit was in a four-vehicle convoy traveling on Route Bills, northeast of Camp Fallujah, to link up with another element for a cordon and search mission, when they were hit by an IED buried in the road. *Id*. SPC Bisson died immediately from the blast, and the IED killed three other servicemembers and wounded one. *Id*. An investigation of the attack

determined that the IED consisted of one 130-155 millimeter round that was detonated with a command wire running 2,500 meters from the site.  *Id*.

###                      i.        *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely committed this attack.  *Id*. at 78.  He bases his conclusion on ISI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, this attack took place east of Fallujah and south of Al-Karmah.  *Id*. at 79.  ISI was the dominant insurgent group in Al Anbar Province at the time of the attack, including in both Fallujah and Al-Karmah.  *Id*.  In December 2006, Coalition forces targeted ISI fighters and killed a regional leader who had directed insurgent attacks in Fallujah.  *Id*. at 81.  ISI-led attacks in Fallujah persisted into early 2007.  *Id*.  ISI was also active in Al-Karmah, an area that was essential to the group's operations in Fallujah.  *Id*.  In early 2007, ISI's presence in Al-Karmah grew so extensive that the group infiltrated the local government structure.  *Id*. at 82.  ISI's dominance in Fallujah and Al-Karmah continued well after the January 20, 2007 attack that killed SPC Bisson.  *Id*. at 81-82.

*Second*, SPC Bisson was killed in a buried, command wire-detonated IED attack, which is another indicator that ISI was responsible.  *Id*. at 82.  It is well-documented that in 2006 ISI fighters in the province were typically armed with "a wide range of IEDs that were regularly used in stand-off attacks, ambushes, and as a cover for retreats."  *Id*.  According to Dr. Gartenstein-Ross, ISI's use of IEDs in Al Anbar continued in 2007, when the group maintained "training camps" to instruct its members on IED construction and use.  *Id*. at 82-83.  Beyond basic IED training, the January 2007 capture of an ISI IED cell leader by Coalition forces demonstrated that ISI also maintained specialized IED cells in Al Anbar Province at the time of the attack.  *Id*. at 83.  ISI was also known to use command wire-detonated and buried IEDs, as evidenced by the ISI weapons caches captured

by Coalition forces in June 2007 south of Baghdad, which contained IED command wires and materials similar to those used in the IED that killed SPC Bisson.  *Id.*

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack.  *See* Attribution Report at 83-85.  Notably, the Court previously found Iran liable for two IED attacks perpetrated by ISI near Al-Karmah less than one month after this attack, in February 2007.  Bellwether Op. at 30-34.  In attributing those bellwether attacks to ISI and Iran, the Court noted ISI's significant presence in Fallujah and the "multitude of IED attacks conducted by [] ISI in the Al-Karmah area."  *Id.* at 34.  Other courts in this District have likewise found that Iran materially supported attacks in which sophisticated IEDs were detonated by command wire.  *See, e.g.*, *Fissler*, 2022 WL 4464873, at *2.

       ***ii.***        ***Damages***

            **a.  Andrew Kyle Bisson** *– Son of SPC Jeffrey Bisson*

██████████████████████████████████████████████████████

████████████████████████████████████████

Andrew requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

**b.  Lauralee Ann Bisson** – *Mother of SPC Jeffrey Bisson*

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████    ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████

█████████████████████████████    ████    █████████████

████  ███  ███  ██  ██  ████  ███  █████  ████  ██  ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████  █████  ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████

        ████████████████████

██████████████████████████████

████████████ she requests, and I recommend, that the Court award an upward departure of 40 percent to $7 million in solatium damages.  *See Oveissi I*, 768 F. Supp. 2d at 26-27, 29-30 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma as a consequence of his loved one's sudden and unexpected death that upended his life, including depression, anger, and alcoholism); *Neiberger*, 2022 WL 17370239, at *15 (same) (quoting *Oveissi I*, 768 F. Supp. 2d at 26-27); *Baker*, 775 F. Supp. 2d at 83 (awarding a 25 percent upward departure to Katherine Doris because she "had to be hospitalized for asthma and shock shortly after [her loved one's] death, and has battled depression ever since"), *compare* ███████████

██████████████████████████████

████████████████████ ; *Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure as a result of her "enduring a drawn out and incredibly difficult grieving process"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed other conditions including diabetes as a result of her reclusiveness).

###### c.   **Richard Joseph Bisson** – *Father of SPC Jeffrey Bisson*

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████    ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

Richard requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

###### d.   **Christopher Bisson** – *Brother of SPC Jeffrey Bisson*

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



Christopher requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 10. February 19, 2007 IED Attack that Killed U.S. Marine Corps Private First Class Brett Witteveen

On February 19, 2007, PFC Witteveen was serving with A Company, 1st Battalion, 24th Marine Regiment, 4th Marine Division in Fallujah, Al Anbar Province.  Attribution Report at 86. PFC Witteveen was conducting a dismounted patrol in Fallujah when his patrol was struck by an IED, and he died of injuries sustained in the blast. *Id.*

#### i.  *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, likely committed this attack.  *Id.* at 86.  He bases his conclusion on ISI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack.  *First*, ISI maintained a strong operational presence in Fallujah at the time of this attack and conducted several attacks, including assassinations and bombings, in February and March 2007.  *Id.* at 87.  Iraqi forces, supported by Coalition partners, focused on combating ISI's presence in Fallujah in early 2007.  *Id.*

*Second*, PFC Witteveen was killed in an IED attack, which is another indicator that ISI was responsible. *Id*. at 88. In 2006 and 2007, ISI regularly used IEDs throughout Al Anbar Province, including in Fallujah. *Id*. ISI also maintained basic IED training for general members and specialized IED cells in Al Anbar Province around the time of this attack. *Id*.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack. *Id*. at 88. Although another Sunni insurgent group, Ansar al-Sunna ("AAS") (also referred to as Ansar al-Islam or AAI), was also present in Al Anbar Province during this time, Dr. Gartenstein-Ross opines that ISI cooperated closely with AAS on leadership, finances, and operations. *Id*. Furthermore, he notes that Iran also provided support to AAS. *Id*.; *see also* Bellwether Op. at 95-96 (holding that Iran provided material support to AAS/AAI). Any possible involvement of AAS in the attack would thus not undermine Dr. Gartenstein-Ross's conclusions concerning ISI's responsibility and Iran's material support for the attack that killed PFC Witteveen. Attribution Report at 88.

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See id*. at 88-90. The Court previously attributed two February 2007 IED attacks in Al-Karmah—a city neighboring Fallujah—to ISI, and found that Iran materially supported those bellwether attacks. Bellwether Op. at 30-34, 95-98. In particular, the Court found that ISI perpetrated a February 8, 2007 IED attack, in part based on ISI's claim of responsibility for a helicopter shootdown one day prior, and a February 11, 2007 IED attack. *Id*. at 30-34. In attributing those attacks, the Court relied on Dr. Gartenstein-Ross's opinions that "ISI was present in Fallujah" during this time and "was regularly using IEDs" in the area. *Id*.

### ii.    *Damages*

#### a.  **Richard Allen Witteveen** – *Father of Cpl. Brett Witteveen*

he requests, and I recommend, that the

Court award an upward departure of 25 percent to $6.25 million in solatium damages. *See Baker*, 775 F. Supp. 2d at 83 (awarding a 25 percent upward departure to Katherine Doris because "she had to be hospitalized for asthma and shock shortly after [her loved one's] death, and has battled depression ever since"); *id.* at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder).

      **b. Trent William Witteveen** – *Half-Brother of Cpl. Brett Witteveen*

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

Trent requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

> **c. Heather Marie Kaufman** – *Half-Sister of Cpl. Brett Witteveen*

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

████████████████████████████  ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████  █

██  ████████████████████████████  ████  ████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

        ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ Heather requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. *See Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Bernhardt*, 2023 WL 2598677, at *16 (awarding Dana Bernhardt a 25 percent upward departure because she "suffered from severe mental distress because of her husband's death and was later exposed to graphic depictions of the attack"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse).

    11.    **April 14, 2007 IED Attack that Killed U.S. Army Sergeant Brandon Wallace**

        In the early morning of April 14, 2007, SGT Brandon Wallace was serving with the 1451st Transportation Company, 11th Transportation Battalion, 1st Brigade Combat Team, 34th Infantry Division in Fallujah, Al Anbar Province. Attribution Report at 91. According to the U.S. Army

Regulation 15-6 investigation report, SGT Wallace's unit was on a mission escorting a supply convoy, and SGT Wallace was a scout truck gunner in the convoy's lead armored HMMWV. *Id*. at 91 (citing Ex. 35). The convoy approached a separate U.S. military unit that was stopped in the road for repairs and slowed down to bypass the vehicle. *Id*. As the convoy was passing, soldiers observed three white flares erupting 100-300 meters to the west off the road. *Id*. at 92. Immediately following the third flare, SGT Wallace's HMMWV was struck by an IED and thrown "about 60 meters from the blast hole." *Id*. SGT Wallace's vehicle was engulfed in flames, causing the ammunition in the vehicle to detonate and preventing fellow servicemembers from approaching the vehicle to render aid. *Id*. Post-blast analysis found that the IED was made from "one improvised container (speed bump) with an additional thirty pounds of high explosive buried beneath the improvised container" and was activated when SGT Wallace's vehicle drove over it. *Id*. SGT Wallace and one other servicemember were killed in the attack, and two others were wounded. *Id*.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely committed this attack. *Id*. at 92. He bases his conclusion on ISI's area of operations dominance at the time of the attack, and the TTPs used to carry out the attack. *Id*. *First*, ISI maintained a strong operational presence in Fallujah at the time of this attack and conducted several attacks, including assassinations and bombings, in February and March 2007. *Id*. at 94. Iraqi forces, supported by Coalition partners, were focused on combating ISI's presence in Fallujah in early 2007. *Id*. at 93. According to Dr. Gartenstein-Ross, ISI maintained its operational presence in Fallujah and its outskirts through much of 2007. *Id*. at 94. Furthermore, the Court previously noted that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in

Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, SGT Wallace was killed by a speed-bump IED, which is another indicator that ISI was responsible. Attribution Report at 94. IEDs were a common TTP associated with ISI in Al Anbar Province at the time of this attack. *Id*. Speed-bump IEDs, a rudimentary form of roadside IEDs, were particularly effective because they could be easily disguised when deployed. *Id*. ISI also maintained basic IED training for general members and specialized IED cells in Al Anbar Province around the time of this attack. *Id*. at 95. A June 2007 U.S. Army report assessed that ISI continued to maintain "networks" of IEDs well past the attack that killed SGT Wallace. *Id*. Per Dr. Gartenstein-Ross, "These networks are evidenced in part by the capture of an ISI weapons cache, located just south of Baghdad, that included IED materials similar to those used in the attack on SGT Wallace." *Id*.

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See* Attribution Report at 95-97 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012). *See also* Bellwether Op. at 30-34, 95-98 (finding that Iran materially supported bellwether attacks carried out by the Zarqawi organization, including two ISI IED attacks near Fallujah in early 2007); *Roth*, 651 F. Supp. 3d at 91 (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii.  *Damages*

#### a. **Robin Wallace** – *Mother of SGT Brandon Wallace*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

      ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  █  ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  █

██████████████████████████████████████

      ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

she requests, and I recommend, that the Court grant an upward departure of 40 percent to $7 million in solatium damages.  *See Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure in part because she suffers from PTSD, persistent grief, and depression); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to a plaintiff who suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered), *compare* ████████████████████████████████████████████; *Neiberger*, 2022 WL

17370239, at *16 (awarding an upward departure of 25 percent to a mother who attempted suicide in the aftermath of her son's killing, which led to a 10-day hospitalization, PTSD, and severe depression diagnoses); *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 132-33 (D.D.C. 2022) (awarding a 25 percent upward departure to Jacob Ben-Yishai, brother of an attack victim, because he has suffered from PTSD requiring hospitalization and has attempted suicide).

**b.  Rickey Wallace** – *Father of SGT Brandon Wallace*

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

Rickey requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c.  **Sarah Wallace** – *Sister of SGT Brandon Wallace*

███████████████████████, she requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. *See Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *Bova*, 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding Janet Childress a 20 percent upward departure due to her "precipitous emotional decline due to the death of her son. . . . Following notification that her son perished in the bombing, Ms. Childress turned to alcohol, attempted suicide, required hospitalization to alleviate her deteriorating mental condition, and engaged in a series of abusive and threatening relationships"); *Thuneibat*, 167 F. Supp. 3d at 45 (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse).

**d.  Rachel Dawn Tucker** – *Sister of SGT Brandon Wallace*

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

   ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

   ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Rachel requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Alexandra VandenBroek because she "continue[s] to suffer immensely" from the death of her stepfather, "left her job for months after his death[,] and encountered repeated media depictions and news stories relating to the attack"); *Est. of Brown*, 872 F. Supp. 2d at 43 (awarding a 20 percent upward departure to LaJuana Smith because she "suffered a 'nervous breakdown' following Anthony's death for which she sought medical treatment and was prescribed medication for approximately one year"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive and found it difficult to pursue a career).

B.      **Complex Attack**

Complex attacks involve the use of multiple types of weapons in the same attack and may be previously coordinated engagements by multiple terrorists or their opportunistic employment of multiple weapon types. Attribution Report at 17. Some complex attacks begin with an "event-based trigger," such as an initial IED detonation, which is then followed by follow-on small arms fire; others involve the use of multiple weapons from the outset, such as a convoy ambush. *Id*. Complex attacks require access to multiple types of weapons, training on how to employ them, familiarity with the local terrain, and coordinated planning and communications. *Id*. at 17-18. According to Dr. Gartenstein-Ross, "Iran is known to have provided certain Iraq-based militant groups with specific training in coordinated attacks." *Id*. at 18.

12.     **June 23, 2005 Complex Attack that Killed U.S. Marine Corps Corporal Ramona Valdez**

On June 23, 2005, Cpl. Valdez was serving with Headquarters Battalion, 8th Marines, 8th Regimental Combat Team, 2nd Marine Division in Fallujah, Al Anbar Province. Attribution Report at 98. Cpl. Valdez was traveling along Main Supply Route Michigan as part of a logistics convoy transporting supplies to Fallujah when a suicide vehicle-borne improvised explosive device ("SVBIED") detonated in their vicinity. *Id*. Immediately following the explosion, the convoy received small arms fire. *Id*. Two other units that arrived to locate and neutralize the attackers also received small arms fire. *Id*. Cpl. Valdez died as a result of blast and thermal injuries from the SVBIED detonation that initiated the attack. *Id*. The attack killed five other servicemembers and wounded an additional thirteen. *Id*.

*i.      Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as AQI, very likely committed this attack. *Id*. at 98. He bases his conclusion on AQI's area of operations

dominance at the time of the attack, the TTPs used to carry out the attack, and AQI's claim of responsibility for the attack.  *First*, at the time of the attack, AQI had reestablished a strong operational presence in the Fallujah area.  *Id*. at 99.  For example, prior to April 2005, AQI established a new training camp just 30 kilometers south of Fallujah, which was used to train the AQI fighters who attacked the U.S. military's Abu Ghraib Prison on April 2, 2005.  *Id*. at 99-100. Zarqawi also reintroduced AQI cells into Fallujah for the group to launch attacks, and AQI established a planning and recruiting center at Fallujah's historic Furqan Mosque.  *Id*. at 100. AQI's presence in the Fallujah area persisted into the summer of 2005 and, according to a CENTCOM report, by mid-July AQI and their affiliates "dominated the insurgency" in Fallujah. *Id*.  Consistent with this assessment, the Court noted in its Bellwether Opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007."  Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, Cpl. Valdez was killed in a complex attack consisting of an SVBIED—which courts have found to be a signature AQI attack method—and small arms fire.  *Id*. at 101 (citing *Brown v. Islamic Republic of Iran*, No. 1:21-CV-1308 (TNM), 2023 WL 4824740, at **4, 10 (D.D.C. July 27, 2023)).  AQI employed suicide attacks as a primary tactic in its insurgency from the beginning of the war in Iraq and is known to have carried out SVBIED attacks in Fallujah in 2005.  *Id*. at 101-102; *see also* Bellwether Op. at 71-73 (finding that AQI perpetrated a December 9, 2005 SVBIED attack).  In particular, Abu Mahmud, a senior member of AQI in Al Anbar Province, oversaw a significant portion of the foreign fighter assaults on Iraqi security and Coalition forces, including "most" SVBIED attacks.  *Id*. at 101.  This attack also took place during a period when the number of suicide attacks committed by AQI was increasing.  *Id*.  Furthermore, the Court previously pointed to Dr. Gartenstein-Ross's opinion that the Zarqawi organization

"regularly conducted similarly complex ambushes against Coalition Forces" in making attributions of complex bellwether attacks.  Bellwether Op. at 53-54; *see also id*. at 51-64.

*Third*, AQI claimed responsibility for the attack.  Attribution Report at 102.  Media reports from NBC and the *Chicago Tribune* both referenced AQI's claim that "it carried out the ambush" on June 25, 2005.  *Id*.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack.  *See* Attribution Report at 102-104.  Indeed, the Court previously held that Iran materially supported a December 2005 SVBIED attack, in addition to multiple complex attacks perpetrated by the Zarqawi organization.  *See* Bellwether Op. at 71-73, 51-64, 95-98.  *See also Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 40-41 (D.D.C. 2023) (finding that Iran provided material support to the Zarqawi organization's complex attacks and VBIED attacks, which require advanced training, and that "Iran's training camps instructed on the tactics necessary to successfully inflict casualties in a coordinated way.").

       *ii.*       ***Damages for* Estefani Valdez** *– Sister of Cpl. Ramona Valdez*

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ █ ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ ████ ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

Estefani requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

C.    **Suicide Attacks**

Suicide bombings involve terrorists' purposeful commitment of suicide by command-detonating explosives while they are near their target, generally by employing a vest or vehicle laden with the explosives. *See* Attribution Report at 17. Suicide bombings may involve either IEDs or military-grade explosives. *Id.* According to Dr. Gartenstein-Ross, "suicide bombings typically require a significant amount of planning and support, including vetting and training the suicide bomber and scouting the attack location or route." *Id.*

13.    **September 6, 2004 SVBIED Attack that Killed U.S. Marine Corps Corporal Mick Bekowsky, Lance Corporal Michael Allred, Lance Corporal Derek Gardner, and Lance Corporal Christopher McCarthy**

On September 6, 2004, Cpl. Bekowsky, LCpl. Allred, LCpl. Gardner, and LCpl. McCarthy were serving with F Company, 2nd Battalion, 1st Marine Regiment, 1st Marine Division in Al Anbar Province. Attribution Report at 105. On the day of the attack, they were part of a convoy driving along a highway north of Fallujah, when the driver of a vehicle laden with explosives crossed the median, hit their vehicle, and triggered explosives. *Id.* at 105-106. Cpl. Bekowsky, LCpl. Allred, LCpl. Gardner, and LCpl. McCarthy were killed in the SVBIED blast. *Id.* at 106. Three other servicemembers were killed and six were wounded. *Id.*

*i.    **Attack Attribution to the Zarqawi Organization***

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely committed this attack. *Id*. at 106. He bases his conclusion on JTJ's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *First*, JTJ established dominance over other insurgent groups that were active in Fallujah after the First Battle of Fallujah that concluded on May 1, 2004. *Id*. at 107. By August 2004, JTJ had established sufficient dominance in the Fallujah area that they were able to seize multiple Iraqi National Guard compounds without a fight. *Id*. Furthermore, Dr. Gartenstein-Ross opines that Fallujah was central to JTJ's operations around the time of this attack, which is evidenced by the presence of JTJ leaders in the city in and around August 2004. *Id*. at 108. JTJ also maintained operational dominance in Fallujah through November 2004. *Id*. In its Bellwether Opinion, the Court also credited Dr. Gartenstein-Ross's opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, Cpl. Bekowsky, LCpl. Allred, LCpl. Gardner, and LCpl. McCarthy were killed in an SVBIED attack, which courts have previously found to be a signature JTJ attack method. Attribution Report at 108 (citing *Brown*, 2023 WL 4824740, at **4, 10); Bellwether Op. at 73 (noting that the use of VBIEDs is a "signature attack method" of the Zarqawi organization); *see also* Bellwether Op. at 66-68 (attributing an October 2004 suicide bombing to JTJ and discussing JTJ's "use of suicide bombings as a TTP" in numerous attacks). Dr. Gartenstein-Ross notes that from June to November 2004, JTJ carried out a number of notorious VBIED attacks against U.S. and Iraqi forces. *Id*. at 109. The regular use of VBIEDs by insurgents was so prolific that by December 2004, Coalition forces had banned civilian vehicles in Fallujah to limit insurgents in the city from conducting VBIED attacks. *Id*. At least one of JTJ's Fallujah caches uncovered by

Coalition forces in November 2004 contained evidence that JTJ was exporting materials for VBIEDs to the rest of Iraq from Fallujah. *Id.*

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 110-111. The Court previously held that Iran materially supported a JTJ-perpetrated suicide attack that occurred one month after this attack, Bellwether Op. at 66-68, in addition to an SVBIED attack in December 2005, *id.* at 71-73. *See also Brown*, 687 F. Supp. at 41-42 (holding Iran liable for SVBIED attacks, which are "sophisticated attacks requiring expertise that only comes from advanced training.").

        *ii.*       ***Damages***

        **a. Joan Marie Bekowsky** – *Mother of Cpl. Mick Bekowsky*

██████ ██  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

        ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ she requests, and I recommend, that the Court

award an upward departure of 25 percent to $6.25 million in solatium damages. *See Thuneibat*,

167 F. Supp. 3d at 45 (awarding Samira Khorma a 25 percent upward departure after her

personality changed following her son's death, turning from a "lively socialite to a recluse" and

she became depressed to the point of requiring medication); *Est. of Brown*, 872 F. Supp. 2d at 43

(awarding a 20 percent upward departure to LaJuana Smith because she "suffered a 'nervous

breakdown' following Anthony's death for which she sought medical treatment and was

prescribed medication for approximately one year"); *Valore*, 700 F. Supp. 2d at 86 (granting

upward departures when family members experienced "a general feeling of permanent loss or

change caused by the decedent's absence" or received "medical treatment for depression and

related affective disorders") (cleaned up); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25

percent upward departure to Elizabeth Paresi because "she began to experience bullying at school,

developed severe anxiety and depression, and even contemplated taking her own life following her father's death").

       **b. Brian Glen Bekowsky** – *Stepfather of Cpl. Mick Bekowsky*



He is thus entitled to solatium damages under the functional equivalency standards. *See Valore*, 700 F. Supp. 2d at 79-80 (finding non-adoptive stepfather entitled to damages where the stepfather considered victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

he requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages. *Thuneibat*, 167 F. Supp. 3d at 45 (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a

"lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed other conditions including diabetes); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience bullying at school, developed severe anxiety and depression, and even contemplated taking her own life following her father's death"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse).

      **c. Haley Shane White** – *Half-Sister of Cpl. Mick Bekowsky*

Haley seeks, and I recommend, that the court award the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### d.  **Zellene Allred** – *Mother of LCpl. Michael Allred*



Zellene requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### e.  **Brett Allred** – *Father of LCpl. Michael Allred*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██  █████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Brett requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

      **f.   Adam Raleigh Allred** – *Brother of LCpl. Michael Allred*

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] he requests, and I recommend, that the Court award an upward departure of 40 percent to $3.5 million in solatium damages. *See Valore*, 700 F. Supp. 2d at 86 (D.D.C. 2010) (awarding a 25 percent upward departure to Luisa Alvarado because she "suffered several nervous breakdowns, at least one of which required hospitalization, from which she . . . never fully recovered"), *compare* [REDACTED]

███████████████████████████████████████████████; *Neiberger*, 2022 WL

17370239, at *16 (awarding an upward departure of 25 percent to a mother who attempted suicide

in the aftermath of her son's killing, which led to a 10-day hospitalization and PTSD and severe

depression diagnoses), *compare* ████████████████████████████; *Ben-Yishai*, 642

F. Supp. 3d at 132-33 (awarding a 25 percent upward departure to Jacob Ben-Yishai, brother of an

attack victim, because he has suffered from PTSD requiring hospitalization and has attempted

suicide).

> **g. Vickey McCleary Chalumeau** – *Mother of LCpl. Derek Gardner*

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ ██ █████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Vickey requests, and I recommend, that the Court award the baseline award of $5 million

in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

> **h. Erik John Gardner** – *Brother of LCpl. Derek Gardner*

███████████████████████████████████████

█████████████  ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

██████████████████████████████████

███████ Erik requests, and I recommend, that the Court award an upward departure of 25 percent from the baseline award for surviving siblings of attack victims to $3.125 million in solatium damages. *See Lelchook v. Syrian Arab Republic*, No. 16-1550 (RC), 2019 WL 4673849, at *6 (D.D.C. Sept. 25, 2019) (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world" and whose trajectory and outlook on life changed due to the death of her loved one); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the

center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up); *see also Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38-39 (Sept. 8, 2022) (awarding a 25 percent upward adjustment to the daughter of a victim, who "lost an irreplaceable provider, guide, and nurturer at a critical point in her young life," reacted to her father's death "in a self-destructive way" and once attempted suicide, and who continues to suffer from "distress, anxiety, and depression").

## 14. September 13, 2004 SVBIED Attack that Killed U.S. Marine Corps Corporal Adrian Soltau

On September 13, 2004, Cpl. Adrian Soltau was serving with A Company, 3rd Assault Amphibian Battalion, 1st Regimental Combat Team, 1st Marines near Fallujah in Al Anbar Province.  Attribution Report at 112. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  *Id.* (quoting Ex. 133, Decl. of Andrew Soltau).  The bomber crashed into the Humvee, and the explosion instantly killed Cpl. Soltau.  *Id.*  The explosion also killed and injured numerous additional servicemembers.  *Id.*

### i. Attack Attribution to the Zarqawi Organization

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as JTJ, very likely committed this attack.  *Id.* at 112.  He bases his conclusion on JTJ's area of operations dominance at the time of the attack and the TTPs used to carry out the attack.  *First*, Dr. Gartenstein-Ross opines that Fallujah was central to JTJ's operations around the time of this attack, and JTJ continued to use Fallujah as their "main operating base" until late 2004.  *Id.* at 114.  Indeed, by

August 2004, JTJ had established sufficient dominance in the Fallujah area that they were able to seize multiple Iraqi National Guard Compounds without a fight. *Id.* JTJ continued to dominate Fallujah through November 2004. *Id.* at 114-115. In the Court's Bellwether Opinion, it also relied on Dr. Gartenstein-Ross's assessment that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007." Bellwether Op. at 26 (citing Dr. Gartenstein-Ross expert report).

*Second*, Cpl. Soltau was killed in an SVBIED attack, which courts have previously found to be a signature JTJ attack method. *Id.* at 115 (citing *Brown*, 2023 WL 4824740, at **4, 10); Bellwether Op. at 73 (noting that the use of VBIEDs is a "signature attack method" of the Zarqawi organization); *see also* Bellwether Op. at 66-68 (attributing an October 2004 suicide bombing to JTJ and discussing JTJ's "use of suicide bombings as a TTP" in numerous attacks). Suicide bombings were a key JTJ tactic, evidenced by Zarqawi's claim that he had orchestrated 25 suicide attacks in 2003 alone. *Id.* Dr. Gartenstein-Ross also notes that near the location of the September 13 attack that killed Cpl. Soltau, the JTJ-led insurgency in Fallujah operated sites for preparing VBIEDs, until they were uncovered after the Second Battle of Fallujah. *Id.* At least one of the Fallujah-based caches uncovered by Coalition forces in November 2004 contained evidence that JTJ was exporting materials for VBIEDs from Fallujah to other locations in Iraq. *Id.*

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 116-117. The Court previously held that Iran materially supported a JTJ-perpetrated suicide attack that occurred one month after this attack, Bellwether Op. at 66-68, in addition to an SVBIED attack in December 2005, *id.* at 71-73. *See also Brown*, 687 F. Supp. at 41-42 (holding Iran liable for SVBIED attacks, which are "sophisticated attacks requiring expertise that only comes from advanced training.").

ii.    *Damages*

a.    **Marjorie Paul** – *Mother of Cpl. Adrian Soltau*

Marjorie requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### b. Andrew Soltau – *Father of Cpl. Adrian Soltau*

Andrew requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c. Desiree Soltau – *Stepmother of Cpl. Adrian Soltau*

███████████████████████████████████  █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

        ███████████████████████████████████████████

█████████████████████████████████████ She

is, therefore, eligible for solatium damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

    Desiree requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

        **d. James Perry III** – *Stepbrother of Cpl. Adrian Soltau*

        ███████████████████████████████████████████

████████████████  ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

   ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

James's declaration establishes that he is the functional equivalent of Adrian's biological brother. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"). ████████████████████████████

████████████████████████████████████████████████████

████████████████████████ he requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. *See Valore*, 700 F.

Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse).

### e.  **Scott Perry** – *Stepbrother Cpl. Adrian Soltau*



███████████████████████████████████████████████████████

█████████████████████████████  ████████  ████████████████████████

████████████████████████████████████████████

Scott's declaration establishes that he is the functional equivalent of Adrian's biological brother. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"). ████████████████████████████

████████████████████████████████████████████████████

████████ he requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. *See Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse).

**f.  Lakiesha Perry-Smith** – *Stepsister of Cpl. Adrian Soltau*

██████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████  ███  ██████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████  ██  ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

Lakiesha's declaration establishes that she is the functional equivalent of Adrian's biological stepsister. *Id.* ¶ 2. She is, therefore, eligible for solatium damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Lakiesha requests, and I recommend, that the Court award the baseline award of $2.5 million in solatium damages as the functional equivalent of a sibling of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

### D.    Sniper Attacks

Small arms and sniper attacks generally involve an attacker firing at a target with line-of-sight visibility. Attribution Report at 18. The U.S. Treasury Department has identified training that the IRGC-QF provided to Iraq-based militants in light arms and marksmanship. *Id.* And as the Court previously held, small arms fire attacks require "the group to be familiar with the terrain and to know that these locations would be an ideal place to carry out such an attack." Bellwether Op. at 82 (citing Dr. Gartenstein-Ross expert report) (cleaned up).

### 15.    December 16, 2006 Sniper Attack that Killed U.S. Marine Corps Lance Corporal Nicklas Palmer

On December 16, 2006, LCpl. Palmer was serving as a combat engineer in C Company, 1st Combat Engineer Battalion, 1st Marine Division, in Fallujah, Al Anbar Province.  Attribution Report at 118.  LCpl. Palmer was positioned as the gunner on a HMMWV while his unit conducted a cordon of a suspected IED.  *Id*.  While the vehicle was stopped, a sniper shot LCpl. Palmer in the face from an unknown distance and direction, killing him on site.  *Id*. at 118-19.  The bullet entered LCpl. Palmer's face, exited from the back of his neck, and caused extensive damage to his spinal cord.  *Id*. at 119.

### i.     *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, very likely committed this attack.  *Id*. at 119.  He bases his conclusion on ISI's area of operations dominance at the time of the attack and the TTPs used to carry out the attack.  *First*, in 2006, ISI was the dominant insurgent group in Al Anbar Province.  *Id*. at 120; *see also* Bellwether Op. at 26 (noting Dr. Gartenstein-Ross's opinion that the Zarqawi organization was the "dominant insurgent group in the Fallujah region in Al Anbar Province from 2004 to 2007.").  On August 3, 2006, ISI vowed to retake the city of Fallujah to fight U.S. and Iraqi troops.  Attribution Report at 120-21.  According to Dr. Gartenstein-Ross, ISI's resurgence in Fallujah during the summer of 2006 was facilitated by continuing sectarian violence and deteriorating security in other parts of Iraq, which assured funding and support.  *Id*. at 121.  The significant cooptation of diverse groups showed that, despite operating under different names, most insurgents in the region ultimately fell under the broader ISI umbrella.  *Id*.  By the fall of 2006, ISI had reestablished its operational dominance in Fallujah, and from September through November 2006, ISI led a successful and organized murder and intimidation campaign, which assassinated a number of city council members, Iraqi police, and other prominent figures in Fallujah that opposed the group.  *Id*.  ISI also remained active in Fallujah into 2007, after the attack that killed LCpl. Palmer.  *Id*.

*Second*, LCpl. Palmer was killed by a sniper attack, which was a common TTP used by ISI throughout Al Anbar Province in 2006. As of November 2006, ISI had developed a uniform standard for training recruits to carry out sniper attacks. *Id*. at 122. In nearby Ramadi, Iraqi security forces were regularly fired upon by ISI fighters equipped with pistols, assault rifles, and sniper rifles. *Id*. Additionally, the owner of the Ramadi Transport Company, who also was an ISI member, engaged in sniper attacks while facilitating the smuggling of weapons from Baghdad to Ramadi. *Id*. Therefore, according to Dr. Gartenstein-Ross, "sniper attacks were a known ISI tactic in Fallujah and the surrounding areas, further indicating ISI's likely responsibility for the attack that killed LCpl. Palmer." *Id*.

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See* Attribution Report at 122-23 (detailing Iranian support to the Zarqawi organization, including through the provision of machine guns, military equipment, and ammunition). The Court previously attributed a February 2007 sniper attack in Al Anbar Province to ISI and found that Iran materially supported that attack. Bellwether Op. at 80-82, 95-98. In that very similar bellwether attack, snipers shot a servicemember as he was exiting a vehicle, and the Court relied on Dr. Gartenstein-Ross's assessment that ISI "had the weapons and training necessary to carry out this attack." *Id*. at 80-82.

### ii.   *Damages*

#### a.  **Rachele Ann Palmer** – *Mother of LCpl. Nicklas Palmer*

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

Rachele requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

**b.  Brad Palmer** – *Father of LCpl. Nicklas Palmer*

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ ████ ████████

██████████████████████████████████████████████████

████████ ██████ ██████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Brad requests, and I recommend, that the Court award the baseline award of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c. **Dustin Palmer** – *Brother of LCpl. Nicklas Palmer*

████████████████████████████████████████████    ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████    he requests, and I

recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages.  *See Oveissi I*, 768 F. Supp. 2d at 27-28 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression and anger following the victim's death); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience bullying at school, developed severe anxiety and depression, and even contemplated taking her own life following her father's death").

### 16.    May 14, 2007 Sniper Attack that Killed U.S. Marine Corps Lance Corporal Jeffrey Walker

On May 14, 2007, LCpl. Jeffrey Walker was serving with Combat Logistics Battalion 6, Combat Logistics Regiment 2, 2nd Marine Logistics Group in Fallujah, Al Anbar Province. Attribution Report at 124.  On the day of the attack, LCpl. Walker was conducting a water resupply mission at the Fallujah Development Center, located three kilometers northwest of Fallujah.  *Id*. LCpl. Walker was starting the water pump when he was shot by sniper fire from unknown distance to the northwest.  *Id*.  He died of a gunshot wound to the head.  *Id*.

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization, operating as ISI, likely committed this attack.  *Id*. at 124.  He bases his conclusion on ISI's area of operations dominance at the time of the attack and the TTPs used to carry out the attack.

*First*, at the time of the attack, ISI had been the dominant group in Fallujah since 2006.  On August 3, 2006, ISI vowed to retake the city of Fallujah to fight the U.S. and Iraqi troops.  *Id*. at 126.  ISI's resurgence in Fallujah during the summer of 2006 was facilitated by continuing sectarian violence and deteriorating security in other parts of Iraq, which assured funding and

support.  *Id*.  The significant cooptation of diverse groups showed that, despite operating under different names, most insurgents in the region ultimately fell under the broader ISI umbrella.  *Id*. By the fall of 2006, ISI had re-established its operational dominance in Fallujah.  *Id*.  From September through November 2006, ISI led a successful and organized murder and intimidation campaign, which assassinated a number of city council members, Iraqi police, and other prominent figures in Fallujah that opposed the group.  *Id*. at 126-27. ISI-led attacks also persisted into early 2007 prior to the attack that killed LCpl. Walker.  *Id*.

*Second*, LCpl. Walker was killed by a sniper attack, which was a common TTP used by ISI throughout Anbar Province in 2006.  By March 2007, ISI had set up specialized training camps in Al Anbar Province that trained insurgents to carry out sniper attacks like the one that killed LCpl. Walker.  *Id*. at 127.  Within Al Anbar Province, ISI demonstrated the ability to carry out sniper attacks against Coalition forces in Fallujah.  *Id*.  For example, in June 2007, just one month after this attack, Coalition forces arrested an ISI sniper cell member suspected of attacks against Coalition forces in Fallujah.  *Id*. at 128.  Furthermore, in September 2007, Coalition forces detained 13 individuals near Fallujah who were suspected of being involved in an ISI sniper cell that had carried out multiple attacks against Coalition force.  *Id*.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack.  *Id*. at 128.  Although another Sunni insurgent group, AAS, was also present in Al Anbar Province during this time, ISI cooperated closely with AAS on leadership, finances, and operations, and Dr. Gartenstein-Ross concludes that Iran also supported AAS.  *Id*.; *see also* Bellwether Op. at 95-96.  Thus, AAS's possible involvement in the attack would not undermine Dr. Gartenstein-Ross's conclusions concerning ISI's responsibility and Iran's material support for the attack that killed LCpl. Walker.  *Id*.

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See* Attribution Report at 128-129 (detailing Iranian support to the Zarqawi organization, including through the provision of machine guns, military equipment, and ammunition). The Court previously attributed a February 2007 sniper attack in Al Anbar Province to ISI and found that Iran materially supported that attack. Bellwether Op. at 80-82, 95-98. In that bellwether attack, snipers shot a servicemember as he was exiting a vehicle, and the Court relied on Dr. Gartenstein-Ross's assessment that ISI "had the weapons and training necessary to carry out this attack." *Id.* at 80-82.

### ii.    *Damages*

#### a.    **Conner Walker**[8] – *Son of LCpl. Jeffrey Walker*



---

[8] Conner Walker was originally named in the Complaint as "C.Y., a minor" and later substituted on the docket as "Conner Young." *See* Dkt. 70, Pls. Mot. to Amend Caption and Substitute Plaintiffs; *see also* Dec. 30, 2024 Min. Order (amending caption and substituting Conner Young as real party in interest). However, Conner's legal last name is Walker, and Plaintiffs will be filing a motion to amend the case caption to reflect his legal name.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  ██  █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

            ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ he requests, and I recommend, that the Court

award an upward departure of 25 percent to $6.25 million in solatium damages. *See Selig v.
Islamic Republic of Iran*, No. 1:19-cv-02889-TNM, 2021 WL 5446870, at *71-75 (D.D.C. Nov.
22, 2021) (awarding: (1) 25 percent upward adjustment to minor child J.S. who lost father at
"young age" and "lost an irreplaceable provider, guide, and nurturer at a critical point in his young
life"; and (2) 25 percent upward departure for Meelod Waheed who was a minor at the time of his
father's killing "because courts have recognized the particularly devastating effect that the loss of
a parent can have on minors") (citing *Oveissi*, 768 F. Supp. 2d at 29); *Jakubowicz v. Islamic
Republic of Iran*, No. CV 18-1450 (RDM), 2023 WL 6907852, at *7 (D.D.C. Sept. 1, 2023)

(awarding D.A.B. a 25 percent enhancement because he "was still very young when [his father figure] was killed – and as a result lost the benefit of the victim's parental guidance during his formative years."); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain").

### b.  James David Walker – *Father of LCpl. Jeffrey Walker*

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ he

requests, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium damages.  *See Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure to a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi in part because she "developed severe anxiety and depression, and even contemplated taking her own life following her father's death"); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression).

      **c.  Kasey Nicole Walker** *– Sister of LCpl. Jeffrey Walker*



████████████████████████████████████████████  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

      █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ she requests, and I recommend, that

the Court award an upward departure of 40 percent to \$3.5 million in solatium damages.  *See*

*Oveissi I*, 768 F. Supp. 2d at 27-28 (awarding a 50 percent enhancement due to the family

member's lifelong emotional trauma including depression, anger, and alcoholism following the

victim's death); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward

departure because she suffers from PTSD, persistent grief, and depression, and because the attack

caused her grades in school to suffer as a result of her having "zero motivation"); *Higgins v. Islamic*

*Republic of Iran*, No. 99-CV-377 (JCKK), 2000 WL 33674311, at *4, 9 (D.D.C. Sept. 21, 2000)

(awarding \$12 million to a daughter who changed her college plans after her father's kidnapping,

subsequently performed poorly in her academics, and eventually withdrew from school altogether); *Valore*, 700 F. Supp. 2d at 86 (awarding a 25 percent upward departure to Lynn Spencer because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain"); *Baker*, 775 F. Supp. 2d at 68, 83 (awarding a 25 percent upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience bullying at school, developed severe anxiety and depression, and even contemplated taking her own life following her father's death").

### d. Kelly Walker Murray – *Sister of LCpl. Jeffrey Walker*

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

██████████████████████████████████████████

███████████████████████████████████████████████

████████    Kelly requests, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages.  *See Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent upward departure to Elizabeth Paresi because "she began to experience bullying at school, developed severe anxiety and depression, and even contemplated taking her own life following her father's death."); *Flanagan*, 87 F. Supp. 3d at 118 (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); *Wultz*, 864 F. Supp. 2d at 40-41 (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up).

## V.    CONCLUSION

For the reasons stated above and the analysis set forth, I urge the Court to award the amounts for each of the Plaintiffs that I respectfully recommend and enter final judgments and

117

damages awards against the Islamic Republic of Iran for each of the Plaintiffs, who have presented evidence of their eligibility and damages in the amounts requested above and reflected in the following table.

### Tranche 1 Fallujah Plaintiffs Damages Table

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|
| Sarah Marie Lambert | Sister | 05/25/2004 | [pending supplemental submission] | 2.6479 | |
| Nancy Kathleen Godwin*[9] | Mother | 07/20/2004 | $6,250,000 | 2.6307 | $16,441,875 |
| William Goode Godwin* | Father | 07/20/2004 | $6,250,000 | 2.6307 | $16,441,875 |
| Anna Godwin* | Sister | 07/20/2004 | $3,500,000 | 2.6307 | $9,207,450 |
| Aaron William Godwin | Brother | 07/20/2004 | $2,500,000 | 2.6307 | $6,576,750 |
| Rhonda Gail McCormick | Mother | 08/19/2004 | $5,000,000 | 2.6215 | $13,107,500 |
| Larry McCormick | Father | 08/19/2004 | $5,000,000 | 2.6215 | $13,107,500 |
| Blake McCormick | Brother | 08/19/2004 | $2,500,000 | 2.6215 | $6,553,750 |
| Debbee Way* | Mother | 02/27/2005 | $6,250,000 | 2.5569 | $15,980,625 |
| Richard Louis Gienau* | Father | 02/27/2005 | $6,250,000 | 2.5569 | $15,980,625 |
| Maria Odilia Romero* | Mother | 08/22/2005 | $6,250,000 | 2.4844 | $15,527,500 |
| Juan Diego Romero* | Father | 08/22/2005 | $6,250,000 | 2.4844 | $15,527,500 |
| Yajaira Romero* | Sister | 08/22/2005 | $3,125,000 | 2.4844 | $7,763,750 |
| Bernardo Romero* | Brother | 08/22/2005 | $3,125,000 | 2.4844 | $7,763,750 |
| Thomas Benjamin McElveen | Father | 12/1/2005 | $5,000,000 | 2.4427 | $12,213,500 |

---

[9] I identify with an asterisk Plaintiffs for whom I have recommended an upward departure in their solatium damages award.

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|
| Maureen Walsh* | Mother | 09/04/2006 | $6,250,000 | 2.3092 | $14,432,500 |
| Patrick Thomas Walsh | Brother | 09/04/2006 | $2,500,000 | 2.3092 | $5,773,000 |
| Joseph Michael Walsh | Brother | 09/04/2006 | $2,500,000 | 2.3092 | $5,773,000 |
| Meghan Cathleen Turner | Sister | 09/04/2006 | $2,500,000 | 2.3092 | $5,773,000 |
| Erin Marie Watson* | Sister | 09/04/2006 | $3,125,000 | 2.3092 | $7,216,250 |
| Jesse Vega | Stepfather | 11/05/2006 | $5,000,000 | 2.2788 | $11,394,000 |
| Andrew Bisson | Son | 01/20/2007 | $5,000,000 | 2.2421 | $11,210,500 |
| Lauralee Bisson* | Mother | 01/20/2007 | $7,000,000 | 2.2421 | $15,694,700 |
| Richard Bisson | Father | 01/20/2007 | $5,000,000 | 2.2421 | $11,210,500 |
| Christopher Bisson | Brother | 01/20/2007 | $2,500,000 | 2.2421 | $5,605,250 |
| Richard Witteveen* | Father | 02/19/2007 | $6,250,000 | 2.2283 | $13,926,875 |
| Trent William Witteveen | Half-Brother | 02/19/2007 | $2,500,000 | 2.2283 | $5,570,750 |
| Heather Kaufman* | Half-Sister | 02/19/2007 | $3,125,000 | 2.2283 | $6,963,438 |
| Robin Wallace* | Mother | 04/14/2007 | $7,000,000 | 2.2035 | $15,424,500 |
| Rickey Wallace | Father | 04/14/2007 | $5,000,000 | 2.2035 | $11,017,500 |
| Sarah Wallace* | Sister | 04/14/2007 | $3,125,000 | 2.2035 | $6,885,938 |
| Rachel Dawn Tucker* | Sister | 04/14/2007 | $3,125,000 | 2.2035 | $6,885,938 |
| Estefani Valdez | Sister | 06/23/2005 | $2,500,000 | 2.5091 | $6,272,750 |
| Joan Marie Bekowsky* | Mother | 09/06/2004 | $6,250,000 | 2.6160 | $16,350,000 |
| Brian Glen Bekowsky* | Stepfather | 09/06/2004 | $6,250,000 | 2.6160 | $16,350,000 |
| Haley Shane White | Half-Sister | 09/06/2004 | $2,500,000 | 2.6160 | $6,540,000 |
| Zellene Allred | Mother | 09/06/2004 | $5,000,000 | 2.6160 | $13,080,000 |
| Brett Allred | Father | 09/06/2004 | $5,000,000 | 2.6160 | $13,080,000 |
| Adam Raleigh Allred* | Brother | 09/06/2004 | $3,500,000 | 2.6160 | $9,156,000 |

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|
| Vickey McCleary Chalumeau | Mother | 09/06/2004 | $5,000,000 | 2.6160 | $13,080,000 |
| Erik John Gardner* | Brother | 09/06/2004 | $3,125,000 | 2.6160 | $8,175,000 |
| Marjorie Paul | Mother | 09/13/2004 | $5,000,000 | 2.3048 | $11,524,000 |
| Andrew Soltau | Father | 09/13/2004 | $5,000,000 | 2.3048 | $11,524,000 |
| Desiree Soltau | Stepmother | 09/13/2004 | $5,000,000 | 2.3048 | $11,524,000 |
| James Perry III* | Stepbrother | 09/13/2004 | $3,125,000 | 2.3048 | $7,202,500 |
| Scott Perry* | Stepbrother | 09/13/2004 | $3,125,000 | 2.3048 | $7,202,500 |
| Lakiesha Perry-Smith | Stepsister | 09/13/2004 | $2,500,000 | 2.3048 | $5,762,000 |
| Rachele Palmer | Mother | 12/16/2006 | $5,000,000 | 2.2587 | $11,293,500 |
| Brad Palmer | Father | 12/16/2006 | $5,000,000 | 2.2587 | $11,293,500 |
| Dustin Palmer* | Brother | 12/16/2006 | $3,125,000 | 2.2587 | $7,058,438 |
| Conner Walker* | Son | 05/14/2007 | $6,250,000 | 2.1897 | $13,685,625 |
| James Walker* | Father | 05/14/2007 | $6,250,000 | 2.1897 | $13,685,625 |
| Kasey Walker* | Sister | 05/14/2007 | $3,500,000 | 2.1897 | $7,663,950 |
| Kelly Walker Murray* | Sister | 05/14/2007 | $3,125,000 | 2.1897 | $6,842,813 |
| **Total Compensatory Damages Awards:** | | | **$233,875,000** | | **$561,297,790** |

Date: February 25, 2025

/s/ Stephen A. Saltzburg
Special Master