IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT MARTINO, *et al*.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>                    Defendant. | Case No. 1:21-cv-01808-RDM |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING
LIABILITY AND DAMAGES FOR TRANCHE 1 WESTERN ANBAR
NON-BELLWETHER PLAINTIFFS**

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................1

II.    Evidentiary Standards ........................................................................................2

III.    Legal Framework ...............................................................................................4

    A.    Personal Jurisdiction ...............................................................................4

    B.    Subject Matter Jurisdiction .....................................................................4

        1.    Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks. ........................................................................5

        2.    Plaintiffs Bring Claims for Personal Injury or Death. .................6

        3.    The Attacks Constitute Acts of Extrajudicial Killing. .................7

        4.    The Zarqawi Organization and/or Ansar al-Sunna Committed Each Attack. ............................................................................10

        5.    Iran Provided Material Support for the Zarqawi Organization and AAS's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries. ....................................15

    C.    Federal Cause of Action .........................................................................17

    D.    Damages .................................................................................................19

        1.    Solatium Damages ......................................................................19

        2.    Prejudgment Interest ...................................................................25

        3.    Post-Judgment Interest ................................................................26

IV.    Analysis of Each Attack and Damages Warranted for Each Plaintiff .............27

    A.    IED Attacks ............................................................................................27

        1.    August 13, 2004 IED Attack that Killed U.S. Marine Corps Lance Corporal Kane Michael Funke ..........................................27

        2.    June 9, 2005 IED Attack that Killed U.S. Marine Corps Reserve Corporal Brad Squires ...................................................30

        3.    July 14, 2005 IED Attack that Killed U.S. Marine Corps Corporal Christopher Winchester and U.S. Army National Guard Staff Sergeant Tricia Jameson ...........................................34

        4.    August 3, 2005 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Aaron Reed ...........................................41

        5.    October 3, 2005 IED Attack that Killed U.S. Army Sergeant Bryan Large ...............................................................................47

        6.    October 6, 2005 IED Attack that Killed U.S. Marine Corps Lance Corporal Daniel McVicker ................................................50

        7.    September 16, 2006 IED Attack that Killed U.S. Navy Petty Officer Second Class David Sean Roddy ....................................59

i

8.      November 2, 2006 IED Attack that Killed U.S. Marine Corps Lance
        Corporal Luke Holler........................................................................62

9.      November 22, 2006 IED Attack that Killed U.S. Marine Corps Private
        Heath Warner...................................................................................65

10.     November 28, 2006 IED Attack that Killed U.S. Army Specialist Jon-Erik
        Loney ..............................................................................................72

B.   Complex Attack ............................................................................................77

11.     January 26, 2005 Complex Attack that Killed U.S. Marine Corps Sergeant
        Jesse Strong and Lance Corporal Karl Linn ...............................................77

C.   Suicide Attacks ............................................................................................83

12.     October 15, 2004 SVBIED Attack that Killed U.S. Army Corporal
        Jonathan Santos..............................................................................83

13.     April 11, 2006 Suicide IED Attack that Killed U.S. Army Sergeant
        Kenneth Hess ...................................................................................89

D.   Indirect Fire Attack ......................................................................................93

14.     December 18, 2006 Indirect Fire Attack that Killed U.S. Marine Corps
        Captain Kevin Kryst ..........................................................................93

V.   Conclusion ........................................................................................................96

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page(s)**

*Baker v. Socialist People's Libyan Arab Jamahirya,*
    775 F. Supp. 2d 48 (D.D.C. 2011) ....................................................................................41, 76

*Barry v. Islamic Republic of Iran,*
    437 F. Supp. 3d 15 (D.D.C. 2020) ................................................................................................18

*Belkin v. Islamic Republic of Iran,*
    845 F. Supp. 2d 204 (D.D.C. 2012) ..............................................................................................20

*Ben-Rafael v. Islamic Republic of Iran,*
    540 F. Supp. 2d 39 (D.D.C. 2008) ..........................................................................................23, 24

*Bernhardt v. Islamic Republic of Iran,*
    No. 18-CV-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) ............................ *passim*

*Blank v. Islamic Republic of Iran,*
    No. 19-CV-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) ...................................20

*Bova v. Islamic Republic of Iran,*
    No. 15-CV-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020) ...................................21

*Braun v. Islamic Republic of Iran,*
    228 F. Supp. 3d 64 (D.D.C. 2017) ..............................................................................................3

*Brown v. Islamic Republic of Iran,*
    687 F. Supp. 3d 21 (D.D.C. 2023) ......................................................................................79, 85

*Bundy v. Jackson,*
    641 F. 2d 934 (D.C. Cir. 1981) ..................................................................................................3

*Cabrera v. Islamic Republic of Iran,*
    No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022).........................................8, 24

*Cabrera v. Islamic Republic of Iran,*
    No. CV 18-2065 (JDB), 2023 WL 3496303 (D.D.C. May 16, 2023) ...................................17

*Clymer v. Webster,*
    596 A.2d 905 (Vt. 1991) ............................................................................................................18

*Dammarell v. Islamic Republic of Iran,*
    404 F. Supp. 2d 261 (D.D.C. 2005) ..........................................................................................18

*Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs.*
*Jungsong-Dong,*
414 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................................18

*Driscoll v. Islamic Republic of Iran,*
2023 WL 4892710 (D.D.C. June 27, 2023), *report and recommendation*
*adopted sub nom.*, 2023 WL 5932974 ...........................................................................36

*Espitia v. Islamic Republic of Iran,*
No. 1:21-cv-123, 2022 WL 2168355 (S.D. Tex. June 16, 2022).................................31, 36

*Est. of Brown v. Islamic Republic of Iran,*
872 F. Supp. 2d 37 (D.D.C. 2012) .........................................................................22, 37, 74

*Est. of Fishbeck v. Islamic Republic of Iran,*
No. 18-CV-2248 (CRC), 2023 WL 7448770 (D.D.C. Aug. 18, 2023)............................51, 61

*Est. of Fouty v. Syrian Arab Republic,*
No. 18-cv-385, 2024 WL 3443591 (D.D.C. July 17, 2024) .............................................18, 25

*Est. of Fouty v. Syrian Arab Republic,*
No. CV 18-385 (RBW), 2024 WL 4006166 (D.D.C. Aug. 30, 2024)......................................22

*Est. of Heiser v. Islamic Republic of Iran,*
466 F. Supp. 2d 229 (D.D.C. 2006) .................................................................... *passim*

*Est. of Heiser v. Islamic Republic of Iran,*
659 F. Supp. 2d 20 (D.D.C. 2009) ...................................................................................19, 20

*Est. of Johnson v. Islamic Republic of Iran,*
No. 23-CV-1689, 2024 WL 3225954 (D.D.C. Jun. 28, 2024)...............................................24

*Ewan v. Islamic Republic of Iran,*
466 F. Supp. 3d 236 (D.D.C. June 10, 2020)....................................................................19, 26

*Fissler*, *v. Islamic Republic of Iran,*
No. CV 18-3122 (CKK), 2022 WL 4464873 (D.D.C. Sept. 26, 2022) ...................................61

*Flanagan v. Islamic Republic of Iran,*
190 F. Supp. 3d 138 (D.D.C. 2016) .......................................................................................3

*Flanagan v. Islamic Republic of Iran,*
87 F. Supp. 3d 93 (D.D.C. 2015)......................................................................................20, 86

*Foley v. Syrian Arab Republic,*
281 F. Supp. 3d 153, 155-57 (D.D.C. 2017).........................................................................91

*Force v. Islamic Republic of Iran*,
    464 F. Supp. 3d 323 (D.D.C. 2020) ............................................................................8

*Force v. Islamic Republic of Iran*,
    617 F. Supp. 3d 20 (D.D.C. 2022) ......................................................................21, 25

*Fritz v. Islamic Republic of Iran*,
    324 F. Supp. 3d 54 (D.D.C. 2018) ................................................................. *passim*

*Gration v. Islamic Republic of Iran*,
    No. 21-CV-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) ...................19, 20, 26

*Hammons v. Islamic Republic of Iran*,
    No. 19-2518, 2023 WL 5933340 (D.D.C. 2023) ...........................................................3, 4

*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014) ............................................................................3

*Jakubowicz v. Islamic Republic of Iran*,
    No. 18-1450 (RDM), 2023 WL 6907852 (D.D.C. Sept. 1, 2023) ...................................24, 25

*Johnson v. Islamic Republic of Iran*,
    No. 23-CV-1689, 2024 W.L. 32259346 (D.D.C. Jun. 28, 2024) .........................................24

*Karcher v. Islamic Republic of Iran*,
    No. 16-CV-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023)....................................24

*Kilburn v. Islamic Republic of Iran*,
    699 F. Supp. 2d 136 (D.D.C. 2010) ........................................................................17

*Lee v. Islamic Republic of Iran*,
    No. 19-CV-0083 (APM) (D.D.C. Apr. 11, 2023) ...........................................................23

*Mark v. Islamic Republic of Iran*,
    626 F. Supp. 3d 16 (D.D.C. 2022) .....................................................................18, 24

*Mohammadi v. Islamic Republic of Iran*,
    782 F.3d 9 (D.C. Cir. 2015) ..............................................................................5

*Moradi v. Islamic Republic of Iran*,
    77 F. Supp. 3d 57 (D.D.C. 2015) .........................................................................19

*Neiberger v. Islamic Republic of Iran*,
    No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239 (D.D.C. Sept. 8, 2022) .............8, 10, 19, 33

*Oveissi v. Islamic Republic of Iran*,
    768 F. Supp. 2d 16 (D.D.C. 2011) ................................................................. *passim*

*Owens v. Republic of Sudan,*
    71 F. Supp. 3d 252 (D.D.C. 2014) ......................................................................21

*Owens v. Republic of Sudan,*
    174 F. Supp. 3d 241 (D.D.C. 2016) .....................................................................8

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017) .......................................................................2, 12

*Reed v. Islamic Republic of Iran,*
    845 F. Supp. 2d 204 (D.D.C. 2012) ...............................................................20, 25

*Roth v. Islamic Republic of Iran,*
    651 F. Supp. 3d 65 (D.D.C. 2023) .....................................................................28

*Roth v. Islamic Republic of Iran,*
    78 F. Supp. 3d 349 (D.D.C. 2015) ....................................................................19

*Salazar v. Islamic Republic of Iran,*
    370 F. Supp. 2d 105 (D.D.C. 2005) ...................................................................25

*Salzman v. Islamic Republic of Iran,*
No. 17-2475 (RDM), 2019 WL 4673761 (D.D.C. Sep. 25 2019) ...........................6, 16

*Schwartz v. Islamic Republic of Iran,*
    No. CV 18-1349 (RDM), 2020 WL 7042842 (D.D.C. Nov. 30, 2020)....................8

*Taitt v. Islamic Republic of Iran,*
    No. 20-CV-1557 (RC), 2023 WL 2536518 (D.D.C. Mar. 16, 2023) ....................20

*Taylor v. Islamic Republic of Iran,*
    811 F. Supp. 2d 1 (D.D.C. 2011) ......................................................................18

*Thuneibat v. Syrian Arab Republic,*
    167 F. Supp. 3d 22 (D.D.C. 2016) ............................................................ *passim*

*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 ................................................................................. *passim*

*W.A. v. Islamic Republic of Iran,*
    427 F. Supp. 3d 117 (D.D.C. 2019) ..................................................................18

*Worley v. Islamic Republic of Iran,*
    75 F. Supp. 3d 311 (D.D.C. 2014) ....................................................................18

*Wultz v. Islamic Republic of Iran,*
    864 F. Supp. 2d 24 (D.D.C. 2012) ................................................22, 71, 74, 82

**Statutes**

28 U.S.C. § 1604 ....................................................................................................4

28 U.S.C. § 1605A(a) .........................................................................................2, 17

28 U.S.C. § 1605A(a)(1) ......................................................................................6, 7

28 U.S.C. § 1605A(a)(2)(A)(ii) .............................................................................5, 17

28 U.S.C. § 1605A(c) ...........................................................................................17

28 U.S.C. § 1605A(a)(2)(A)(iii) ..................................................................................7

28 U.S.C. § 1608(a) ...................................................................................................2

28 U.S.C. § 1608(a)(4) ..............................................................................................4

28 U.S.C. § 1961(a) .................................................................................................26

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ..............................1, 2, 18, 20

Immigration and Nationality Act section 101(a)(22) (INA)....................................5

TVPA, Pub. L. No. 102-56 §3, 106 Stat. 73 (1991) ................................................7

Vt. Stat. Ann. Tit. 14, § 1452 (2024) .....................................................................18

**Other Authorities**

Expert Witness Report on Tranche 1 ......................................................................10

Pursuant to the Court's Order appointing me as Special Master and adopting an Administrative Plan, Dkt. [1] 64 ("Admin. Plan"), I respectfully submit this Report and Recommendations Regarding Liability and Damages for the Tranche 1 Non-Bellwether Plaintiffs Assigned to me as Special Master.

## I.    INTRODUCTION

Plaintiffs are family members of American servicemembers or civilians who were killed or injured in terrorist attacks in Iraq between 2003 and 2017. Plaintiffs brought suit against the Islamic Republic of Iran in 2021 under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

On November 30, 2023, Plaintiffs filed a motion for default judgment presenting evidence as to 25 bellwether attacks and 45 bellwether plaintiffs. *See* Dkt. Nos. 38, 39, 40, 41. On September 30, 2024, the Court issued a Memorandum Opinion and Order granting Plaintiffs' motion as to Iran's liability for all 25 bellwether attacks. Dkt. 55 ("Bellwether Liability Opinion" or "Bellwether Liability Op."). In the Bellwether Liability Opinion, the Court also resolved personal jurisdiction and several requirements for subject matter jurisdiction for all plaintiffs in this case. The Court referred damages for the bellwether plaintiffs to me as Special Master. I issued a report and recommendations on October 30, 2024. *See* Dkt. 65, 66. On February 25, 2025, the Court issued a memorandum opinion and order adopting my recommendations as to the bellwether plaintiffs in full (the "Bellwether Damages Opinion" or "Bellwether Damages Op."). Dkt. 71.[2] The Court previously appointed additional Special Masters to consider all issues related

---

[1] Unless otherwise stated, citations to "Dkt." refer to the Court's docket in *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808-RDM (D.D.C.).

[2] My report and recommendations and the Court's Bellwether Damages Opinion were filed under seal. Plaintiffs' counsel have indicated that they will provide me with copies of the sealed opinion.

to each of the remaining non-bellwether Plaintiffs' entitlement to relief and to make recommendations regarding the liability and damages claims of these Plaintiffs. *See* Admin. Plan at 2-5.

Plaintiffs now have sought to establish liability against Iran for its material support of 14 non-bellwether attacks (the "Attacks") that occurred in Western Al Anbar Province in Iraq, and to establish damages for 36 Plaintiffs ("Plaintiffs") associated with the Attacks. Each Plaintiff is a family member of one of the 16 direct victims killed in the Attacks (the "Attack Victims"). Plaintiffs provided me with proposed findings of fact and conclusions of law and supporting exhibits.

## II.    EVIDENTIARY STANDARDS

Plaintiffs' claims arising from the Attacks are part of a default judgment case under the terrorism exception to the FSIA, 28 U.S.C. § 1605A. To obtain a default judgment against Iran, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens v. Republic of Sudan*, 864 F.3d 751, 784 (D.C. Cir. 2017) ("*Owens II*"); (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal or state law by offering evidence "satisfactory to the court," *id*. §§ 1605A(c), 1608(e). Bellwether Liability Op. at 5. "In a case like this one, which alleges that a foreign state materially supported acts of terrorism, the district court must determine 'how much and what kinds of evidence the plaintiff must provide.'" *Id*. at 4 (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)). "But the Court must do so in light of Congress's purpose in enacting § 1605(A)—that is, to compensate the victims of terrorism so as to punish foreign states who have committed or sponsored such acts and to deter them from

2

doing so in the future—and the difficulty in obtaining firsthand evidence and eyewitness testimony from an absent and likely hostile sovereign." *Id*. at 4-5 (cleaned up).

Thus, in the Bellwether Liability Opinion, the Court applied the Federal Rules of Evidence, but "has done so on the understanding, first that it has 'the authority—indeed the obligation—to adjust evidentiary requirements to differing situations,'" Bellwether Liability Op. at 6-7 (cleaned up) (citing *Kim*, 774 F.3d at 1048) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, "second, that the Court need not 'step into the shoes of the defaulting party and pursue every possible evidentiary challenge.'" *id*. (quoting *Owens II*, 864 F.3d at 785). "Expert testimony, moreover, is not only entirely proper, but often sufficient, . . . and even indispensable in 'terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" Bellwether Liability Op. at 7 (quoting *Owens II*, 864 F.3d at 785-88). As a result, courts have recognized that in the FSIA context, experts may rely on hearsay evidence in formulating their admissible expert opinions. *See Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016); *Hammons v. Islamic Republic of Iran*, No. 19-2518, 2023 WL 5933340, at *14 (D.D.C. 2023). For these reasons, "[i]n lieu of holding an evidentiary hearing," in its Bellwether Liability Opinion the Court relied solely on "Plaintiffs' declarations, exhibits, and the expert reports and declarations submitted," which are sufficient to support entry of a default judgment in a FSIA case. Bellwether Liability Op. at 7; *see also Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment).

The Court has already found that Plaintiffs' two expert witnesses, Dr. Daveed Gartenstein-Ross and Michael Pregent, are highly qualified to testify as experts on attack attribution and Iranian support for terrorists operating in Iraq, including the terrorists who committed the Attacks during the relevant time period. *Id.* at 5-6.

## III.    LEGAL FRAMEWORK

In order to prevail on their claims, Plaintiffs must establish personal jurisdiction, subject matter jurisdiction, a federal cause of action, and damages. In the following section, I discuss the applicable legal standards governing the elements of Plaintiffs' liability and damages claims, the relevant findings and conclusions the Court has already made in the Bellwether Liability Opinion, and how Plaintiffs' evidence generally meets each element. In Section IV, I discuss the evidence establishing Iran's liability for each of the 14 Attacks at issue here, as well as each corresponding Plaintiff's entitlement to damages under the FSIA's legal framework.

### A.    Personal Jurisdiction

The Court has already held that it has personal jurisdiction over Iran because Plaintiffs served Iran under 28 U.S.C. § 1608(a)(4). *See* Bellwether Liability Op. at 101. Thus, I need not provide a recommendation as to this issue.

### B.    Subject Matter Jurisdiction

Although foreign states are generally "immune from" jurisdiction, the FSIA provides for certain exceptions in Sections 1605 to 1607. 28 U.S.C. § 1604. The terrorism exception waives sovereign immunity for foreign states in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency.

Bellwether Liability Op. at 89 (quoting 28 U.S.C. § 1605A(a)(1)). The exception, moreover, applies only to suits in which two additional requirements are met. "First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred." *Id.* at 89-90 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)). "Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred . . . and at the time the lawsuit was filed[.]"[3] *Id.* at 90 (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)).

In the Bellwether Liability Opinion, the Court resolved two of these requirements. First, it held that "Plaintiffs expressly seek only monetary relief, prejudgment interest, costs and expenses, and attorneys' fees." Bellwether Liability Op. at 90 (citing Dkt. 15 at 306). Second, it held that "Iran was designated as a state sponsor of terrorism in 1984 . . . and remains so designated to this day." *Id.* (citations omitted).

Plaintiffs here satisfy each of the remaining elements.

### 1.    Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks.

The FSIA's terrorism exception requires that the claimant or the victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii). "The terrorism exception assigns the term 'national of the United States' the 'meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (INA).'" *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 8 U.S.C. § 1101(a)(22); 28 U.S.C. § 1605A(h)(5)). "The

---

[3] "Section 1605A(a)(2) also requires that the foreign state have received 'a reasonable opportunity to arbitrate the claim,' but only if the act of terrorism 'occurred in the foreign state against which the claim has been brought.'" Bellwether Liability Op. at 90 (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii)). As the Court has held, "[t]hat requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran." *Id.* at 90 n.31.

referenced provision of the INA, in turn, generally describes 'national of the United States' to mean either a 'citizen of the United States' or a 'person who, though not a citizen of the United States, owes permanent allegiance to the United States.'" *Id*. (quoting 8 U.S.C. § 1101(a)(22)).

Each Attack Victim was serving as a member of the U.S. armed forces or as a U.S. government contractor at the time of the Attack in which he or she was killed, which is sufficient to meet this element. Furthermore, the majority of Plaintiffs were U.S. citizens at the time of the Attacks in which their loved ones were killed, as evidenced by their submission of declaration testimony and birth certificates, passports, and/or certificates of naturalization. *See* Ex. 2, Tranche 1 Western Anbar Plaintiffs Table (listing each Plaintiff and his or her respective exhibits containing proof of citizenship). Each Plaintiff therefore meets this requirement.

### 2.    Plaintiffs Bring Claims for Personal Injury or Death.

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts. 28 U.S.C. § 1605A(a)(1). Here, Plaintiffs are seeking to recover damages resulting from the extrajudicial killing of their family members. Plaintiffs satisfy the personal injury requirement of § 1605A(a)(1) "because the statute is understood to encompass claims by family members for the distress caused by a relative's injuries or death, also known as solatium actions." Bellwether Liability Op. at 91 (citing 28 U.S.C. § 1605A(c) and *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019)). "Family members seeking solatium damages are entitled to recover based on a theory that parallels a common law claim for intentional infliction of emotional distress, and they are therefore considered to be bringing claims for 'personal injury.'" *Id*. at 91-92 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54-55 (D.D.C. 2012)).

### 3.    The Attacks Constitute Acts of Extrajudicial Killing.

The terrorism exception also requires that Plaintiffs' personal injuries or deaths must have been "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act[.]" 28 U.S.C. § 1605A(a)(1). Plaintiffs' evidence shows that each of the Attacks constituted an extrajudicial killing.

"The FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA") to define 'extrajudicial killing.'" Bellwether Liability Op. at 92 (citing 28 U.S.C. § 1605A(h)(7)). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantee which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350 note). "As the D.C. Circuit has explained, this definition 'contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.'" Bellwether Liability Op. at 92 (quoting *Owens II*, 864 F.3d at 770).

First, Plaintiffs' evidence, discussed in more detail *infra* at § IV, shows that each of the Attacks indisputably involved a "killing." Indeed, each Plaintiff is a family member of an Attack Victim who was killed in one of the Attacks. *See generally* Bellwether Liability Op. at 92-93 (holding that 24 of the 25 bellwether attacks "indisputably constitute[d] extrajudicial killings," and one attack, in which a bellwether plaintiff was injured but another servicemember was killed, also constituted an extrajudicial killing).

Second, Plaintiffs' evidence shows that each of these killings was "deliberated." *See* § IV. "A 'deliberated' killing is 'simply one undertaken with careful consideration, not on a sudden

impulse.'"  Bellwether Liability Op. at 93 (citing *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016)).  Evidence of an attack's sophistication and planning—such as intelligence gathering, selection of the attack site in advance, the purchase or obtainment of weapons for use in the attack, and/or operational training to commit the attack—demonstrates deliberation.  *See* Bellwether Liability Op. at 93-95; *see also Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 364 (D.D.C. 2020) ("*Force I*") (finding an attack was deliberated because it was "meticulously planned," "demonstrate[d] characteristics of organized [terrorist] attacks," and showed signs of "careful intelligence and logistic preparations . . . made prior to the attack"); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239, at *3-4 (D.D.C. Sept. 8, 2022) ("*Neiberger I*") (explaining that an [improvised explosive device ("IED")] attack carried out by an Iranian-backed terror organization was a "prototypical deliberated, extrajudicial killing"); *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *38 (D.D.C. July 19, 2022) (explaining that even if Iranian-backed terrorists "may not have known in advance that [they] would have the opportunity to conduct a particular attack," these attacks were nevertheless "deliberated" because the terrorists "planned [their] tactics in advance should the opportunity to kill Americans arise"); *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349 (RDM), 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020) ("*Schwartz I*") (finding "ample evidence that the attacks in question were planned" from an expert declaration).

In the Bellwether Liability Opinion, the Court found there was "ample evidence" that the 25 bellwether attacks—including IED attacks, complex attacks, suicide bombings, small arms fire attacks, and artillery attacks—were all deliberated.  Bellwether Liability Op. at 93-95.  In reaching this conclusion, the Court considered factors such as IED attacks employing explosives that were buried beneath the ground, installed in advance, or detonated via command wire; complex attacks

involving ambushes of Coalition forces at critical points in their missions; suicide bombings requiring preparation for "martyrdom"; small arms fire attacks requiring planning and familiarity with the terrain; and artillery attacks requiring familiarity with the location and occupation of the target military bases. *See id*. "All five types of attacks, moreover, require obtaining and using specific types of weapons, such as IEDs, which often require prior training." *Id*. at 95.

As set forth *infra* in Section IV(A)-(D), each of the 14 Attacks was deliberated. Ten of the 14 Attacks involved the use of IEDs, which the Court, consistent with voluminous FSIA precedent, found by their nature involve deliberation. Bellwether Liability Op. at 94; *see also, e.g.*, *infra* Attacks #2, #3, and #7 (employing IEDs against troops responding to initial IED attacks); Attack #5 (employing an IED featuring a combination of 155-millimeter artillery shells and an anti-tank mine); and Attack #6 (employing pressure-plate activated IED containing multiple 155-millimeter rounds buried under the road and camouflaged). One of the Attacks was a complex attack in which over 100 terrorists ambushed Coalition forces using rocket-propelled grenades ("RPGs"), daisy-chain IEDs, and small arms fire from approximately 30 different positions. *See infra* Attack #11. The Court has found that similar complex attacks "required prior planning and knowledge of [the] mission conducted by the Coalition forces" and were thus deliberated. Bellwether Liability Op. at 94. Two of the Attacks involved suicide bombings, which require "prior planning, and in addition a preparation for 'martyrdom.'" Bellwether Liability Op. at 94; *infra* Attacks #12 and #13. Lastly, one of the Attacks involved the use of indirect fire via three separate rockets fired on a U.S. military base, which requires terrorist groups "to be familiar with the location and occupation of their target U.S. military bases." Bellwether Liability Op. at 94-95; *infra* Attack #14.

Plaintiffs' attack attribution expert Dr. Gartenstein-Ross also concludes that the Zarqawi organization and/or Ansar al-Islam/Ansar al-Sunna "planned" each Attack and discusses the

planning and capabilities required to carry out each specific type of attack in detail in his Expert Witness Report on Tranche 1 Western Anbar Attack Attributions ("Attribution Report").  *See* Attribution Report at 5, 17-19.

Finally, there is no evidence that any of the Attacks were authorized by a prior judgment affording judicial guarantees of due process or that they were lawfully carried out under the authority of a foreign nation.  *See* Bellwether Liability Op. at 95.  To the contrary, Plaintiffs demonstrate that each Attack was perpetrated by the Zarqawi organization and/or Ansar al-Islam/Ansar al-Sunna—foreign terrorist groups—which is sufficient to show that it was not authorized by a previous judgment from a regularly constituted court.  *See Neiberger*, 2022 WL 17370239, at *3.  Thus, each of the Attacks constitutes an "extrajudicial killing," just as the 25 bellwether attacks were "extrajudicial killings."  *See* Bellwether Liability Op. at 95.

### 4. The Zarqawi Organization and/or Ansar al-Sunna Committed Each Attack.

Plaintiffs' evidence demonstrates that the Zarqawi organization[4] and/or Ansar al-Sunna

---

[4] The Zarqawi organization is a Sunni terrorist organization that has undergone several name changes since its emergence in the early 1990s and its operation in Iraq since 2002.  It has been known by the following names: Bayat al-Imam (c. 1993-1999), Jund al-Sham (c. 1999-2004), Jamaat al-Tawhid wal-Jihad ("JTJ") (2004), Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or "AQI") (2004-2006), Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura Council or "MSC") (2006), Islamic State of Iraq ("ISI") (2006-2013), Islamic State of Iraq and al-Sham ("ISIS") (2013-2014), and the Islamic State (2014-present).  *See* Bellwether Liability Op. at 11 n.3; Attribution Report at 63; *see also generally* Dr. Daveed Gartenstein-Ross, Expert Report & Declaration on Sunni Militant Organizations (Nov. 29, 2023), Dkt. 41-2 ("Sunni Militant Groups Report"); Michael Pregent, Expert Report (Nov. 20, 2024), Dkt. 41-4.  Because of the "continuity and overlap" between these separately named entities, the Court has held that the "Zarqawi organization" is an appropriate nomenclature to define the "single, continuously operating organization" with "consistent leadership by Abu Musab al-Zarqawi and his followers." Bellwether Liability Op. at 11; *id*. at 11 n.3.  For ease of reference, Plaintiffs refer to these entities as the Zarqawi organization throughout this memorandum, except in their descriptions of the Attacks and attributions, where Plaintiffs, like the Court, adopt Dr. Gartenstein-Ross's practice of providing the more specific name of the Zarqawi organization aegis under which each Attack was perpetrated.  *See, e.g.*, Bellwether Liability Op. at 26 n.6.

("AAS")[5] committed each of the Attacks.  To assess responsibility for the Attacks, Dr. Gartenstein-Ross considered the following factors: (1) the geography and time period of the attack; (2) the tactics, techniques, and procedures ("TTPs") employed in the attack; (3) when relevant, U.S. Government reporting or analysis on the attack; and (4) when relevant, analysis of any claims of responsibility for the attack by terrorist groups.  Attribution Report at 15-17.  In addition, Dr. Gartenstein-Ross considered the likelihood that *any* terrorist group present in a given region could have been responsible for certain attacks and, where other groups besides the Zarqawi organization and AAS were present, he rules them out and explains why, in his expert opinion, it is more likely than not that the Zarqawi organization and/or AAS was responsible.  *See id*. at 19-20.

Just as with the 25 bellwether attacks, Dr. Gartenstein-Ross concludes that the terrorist groups at issue, here the Zarqawi organization and AAS, either "likely" or "very likely" carried out the attack.  *See id*. at 17 (explaining attribution probabilities).[6]  In assessing the 25 bellwether

---

[5] Like the Zarqawi organization, AAS is a Sunni terrorist organization that operated in Iraq during the relevant time period.  Originally established under the name Jund al-Islam in 2001, the group later adopted the name Ansar al-Islam ("AAI"), and changed its name to AAS on September 20, 2003.  *See* Attribution Report at 32; Sunni Groups Report at 63-75; Bellwether Liability Op. at 11. Because the Attacks in this submission that Dr. Gartenstein-Ross attributes to AAS occurred after September 2003, Plaintiffs use the moniker "AAS" to describe the group.  However, the Court previously used the overall title "AAI" to refer to both Ansar al-Islam and Ansar al-Sunna because AAS ultimately grew out of AAI.  Bellwether Liability Op. at 11.  Thus, the Court's findings in the Bellwether Liability Opinion concerning Iran's provision of material support to AAI apply equally to AAS-perpetrated attacks.  *See, e.g*., Bellwether Liability Op. at 65 (attributing attack to "AAI operating as 'AAS'").

[6] "One example of the kind of evidence that would support an attribution with a confidence level of *likely* is if the attack occurred within a group's geographic area of operations dominance, was executed with TTPs generally associated with the group, and aligns with the group's motivations (e.g., the target of attack matched the kind of targets that the group typically selected)."  Attribution Report at 17.  Dr. Gartenstein-Ross may determine that a specific terrorist group is *very likely* responsible for an attack "when the aforementioned factors exist alongside indicators of responsibility that make it appear that, rather than merely meeting a *preponderance of evidence* threshold, the group's responsibility can be determined with a probability that would satisfy an evidentiary threshold like *clear and convincing*."  *Id*.  As the Court explained, "That distinction makes sense, because terrorist organizations sometimes claim responsibility for their attacks, and

attacks, the Court determined that either finding was sufficient to attribute the attacks to the identified terrorist group. Bellwether Liability Op. at 20-21. Upon a review of the evidence, the Court "agree[d] that, in some cases, there is overwhelming evidence that a particular group was responsible for a particular attack, while in other cases, the facts are murkier." *Id*. "Ultimately, however, the Court must simply decide whether Plaintiffs have proffered sufficient evidence to permit the Court to find by a preponderance of the evidence that the attack can be attributed either to the Zarqawi organization or AAI[/AAS]." *Id*. "In making that assessment, moreover, the Court must be mindful of the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign,' *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds*, 590 U.S. 418 (2020), and from dangerous terrorist organizations, which often operate in secrecy in hostile regions." *Id*. at 20-21.

Several of the Attacks occurred during a time when the Zarqawi organization and AAS closely cooperated with each other. *See* Attribution Report at 5, 20-24, 32, 45-46, 51, 63, 70, 76-77, 84. According to an authoritative U.S. Central Command report about the insurgency in Al Anbar Province, by April 2005, "in western Anbar, AQI and Ansar al-Sunna showed a level of cooperation not seen elsewhere in Iraq extending down to street level joint operations. . . . Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of fighters and contributed to the other's ability to mass." *Id*. By 2006, it was well-known that the Zarqawi organization and AAS were "interconnected," "related," and "affiliated." *Id*. For example, in the western Al Anbar city of Hit, the "two groups came to a

---

sometimes they do not, because at times a single terrorist organization is the predominant group operating in a particular area, and at other times, multiple groups operate in the same area, and because these groups, at times, employ unique or specialized tactics, and at other times, they do not." Bellwether Liability Op. at 20.

formal agreement that included AAS seeking the Zarqawi organization's approval for any attack it planned to carry out in the city." *Id.* at 23. Because both the Zarqawi organization and AAS received material support from Iran, questions about which of the two groups was more likely to have carried out a given attack are immaterial to Dr. Gartenstein-Ross's assessment that Iran's provision of material support to the groups contributed substantially to the attack's commission. *Id.* at 20-24, 32, 45-46, 51, 63, 70, 76-77, 84. Thus, Dr. Gartenstein-Ross "evaluate[s] the probability that *either* group committed the attack rather than measuring the likelihood of [the Zarqawi organization's] or AAS's responsibility against one another." *Id.* In the Bellwether Liability Opinion, the Court also found that one attack was jointly attributable to the Zarqawi organization and AAS in light of their "history of cooperation," "working relationship," and "coordinat[ion] of actions for years." *See* Bellwether Liability Op. at 61-64.

As set forth *infra* at § IV, Dr. Gartenstein-Ross—based on his expertise and assessment of supporting documentary evidence, including reports from the U.S. government and military—concludes it is more likely than not that the Zarqawi organization is responsible for seven of the Attacks, and that the Zarqawi organization or AAS, or elements of both operating in coordination with one another, are responsible for seven of the Attacks. *See also* Attribution Report at 4-5, 25-117.

The Zarqawi organization was founded by the notorious terrorist Abu Musab al-Zarqawi, who prior to leading the group in Iraq had trained with al-Qaeda and run an al-Qaeda-funded terrorist camp in Afghanistan. Sunni Militant Groups Report, Dkt. 41-4, at 13-14. Once in Iraq, Zarqawi established his organization as a ruthlessly effective militant group, which he publicly aligned with al-Qaeda in 2004. *Id.* The Zarqawi organization was deemed to be the "primary terrorist threat to the Coalition" in Iraq in February 2004, and it "executed deadly attacks,

13

established campaigns of violence, and held area of operations dominance in critical locations throughout the Iraq war, with one of its peaks occurring between 2004 and 2008." *Id.* One of those critical locations was Western Al Anbar Province, which the Court previously acknowledged was a "strategic location" that contained numerous towns that could be used as "point[s] of entry for fighters and supplies entering Iraq from neighboring Syria." Bellwether Liability Op. at 28-29 (citing Gartenstein-Ross expert report).

AAS emerged from a conglomeration of Kurdish Sunni extremist groups in Iraq in late 2001, with Osama bin Laden and al-Qaeda's blessing, funding, and training. *See* Sunni Militant Groups Report at 64-66. By 2002, AAS was harboring dozens of foreign jihadists who had traveled from Afghanistan to Iraq, including Abu Musab al-Zarqawi and his followers. *Id.* at 65. In March 2003, Coalition forces launched Operation Viking Hammer against AAS's enclave in Iraq, which resulted in the death, capture, or flight of hundreds of AAS members. *Id.* at 67. Despite these losses, AAS survived and returned to Iraq, largely as a result of support it received from the IRGC. *Id.* at 68.

As Dr. Gartenstein-Ross explains, both the Zarqawi organization and AAS established a dominant presence in the major cities of Western Al Anbar Province—Hit, Haditha, and Al Qaim—by the end of the Second Battle of Fallujah in 2004, and strengthened their position over 2005 and 2006. In the Haditha Triad, which encompasses the cities of Haditha, Haqlaniyah, and Barwana, "the Zarqawi organization and AAS became so dominant in 2006 that the Haditha city government 'almost completely dissolved' as a result of the groups' activities in the city." Attribution Report at 22 (quoting CENTCOM's *Study of the Insurgency in Anbar Province, Iraq*). Dr. Gartenstein-Ross also notes that these Sunni militant groups "had a high level of cooperation in western Al Anbar in particular," and that their dominance in the Hit-Haditha corridor "was

accomplished in part due to the increased cooperation and alliance between AAS and the Zarqawi organization." *Id*. at 22-23.

      **5.**    **Iran Provided Material Support for the Zarqawi Organization and AAS's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries.**

      "The FSIA's terrorism exception applies when a plaintiff seeks money damages for 'personal injury or death that was caused by . . . the provision of material support or resources for' an 'act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking,' so long as that support was provided by 'an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'" Bellwether Liability Op. at 95 (citing 28 U.S.C. § 1605A(a)(1)). "Plaintiffs need not show that Iran 'specifically knew of or intended its support to cause' the particular attacks in question . . . or even that Iran's material support was a 'but for' cause of their injuries." *Id*. at 96-97 (internal citations omitted). Instead, the FSIA requires only a showing of proximate cause, which requires (1) that Iran's actions be a "substantial factor" in the sequence of events that led to Plaintiffs' injuries, and (2) that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's actions. *Id*. at 97 (citing *Owens II*, 864 F.3d at 794).

      The Court has already found that Iran provided substantial financial support and operational capacity to the Zarqawi organization and AAI/AAS operating within Iraq during the same general time period. The Court concluded "that Iran provided both the Zarqawi organization and AAI 'material support' in the form of, 'currency,' 'training,' 'operational assistance,' and 'weapons,' among other things, within the meaning of the FSIA." *Id*. at 96 (citing 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1)). The Court further found, consistent with Dr. Gartenstein-Ross's opinions here, that Iran materially supported attacks carried out by the Zarqawi organization and/or AAS in Al Anbar Province during the same general time period as the Attacks.

Bellwether Liability Op. at 97 ("Iran's financial and military aid to the two groups was essential to each group's operating capacity and [], without Iran's backing, both groups would be substantially weakened.").

As to the foreseeability that such support would cause Plaintiffs' injuries, the Court previously found that "Iran's goal was to provide lethal aid to all groups fighting the United States," and "[t]hus, Iran not only supported these groups, but also actively encouraged them to carry out attacks in Iraq as part of its broader geopolitical strategy and provided both groups with the funding, weapons, and know-how to do so effectively." *Id*. at 97-98 (internal quotations and citations omitted). The Court therefore concluded that "[t]he death and injury to servicemembers and contractors, and the suffering of their families was, by any measure, foreseeable." *Id*. at 98 (citing *Owens II*, 864 F.3d at 797-98; *Salzman*, 2019 WL 4673761, at *14).

In addition to the Court's prior findings as to Iranian support for Zarqawi organization and AAS attacks in Al Anbar Province and elsewhere in Iraq, it is reasonable for me to rely on Dr. Gartenstein-Ross's determinations, consistent with the available evidence, that each of the 14 Attacks was materially supported by Iran. *See infra* § IV; *see also* Attribution Report at 5, 28-30, 35-37, 42-43, 47-49, 54-55, 59-61, 66-68, 73-75, 80-82, 87-89, 94-95, 101-03, 107-09, 114-15. As Dr. Gartenstein-Ross explains in his Attribution Report, as well as in his background report on Sunni Militant Groups, prior to and during the time period when the Attacks occurred, Iran and its Islamic Revolutionary Guard Corps Quds Force ("IRGC-QF") provided Zarqawi organization and AAS elements throughout Al Anbar Province with weapons, including IEDs, machine guns, sniper rifles, RPGs, mortars, rockets, and explosives—the same types of weapons the Zarqawi organization and AAS used to perpetrate the Attacks at issue here—in addition to financing, safe haven, travel facilitation, and training. *See id*. Because this support was crucial to the Zarqawi

16

organization and AAS's ability to function and carry out attacks against U.S. servicemembers, Dr. Gartenstein-Ross concludes that Iran's material support "had a reasonable connection to" and "substantially contributed to" each Attack. *See id*.

### C. Federal Cause of Action

Plaintiffs bring claims solely under the private right of action in 28 U.S.C. § 1605A(c). The elements for establishing Iran's liability under this federal cause of action are "essentially the same" as the elements necessary to establish the FSIA's waiver of sovereign immunity discussed above. *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment,' or 'the legal representative of' any such person." Bellwether Liability Op. at 98-99 (quoting 28 U.S.C. § 1605A(c)). However, unlike the FSIA's requirements for subject matter jurisdiction, the private right of action does not necessitate that the claimant fall into one of the covered categories *at the time* the terrorist attack occurred. *Compare* 28 U.S.C. § 1605A(a)(2)(A)(ii) (granting jurisdiction over claims based on the status of "the claimant or the victim . . . at the time the [terrorist] act . . . occurred"), *with* § 1605A(c) (granting private right of action to "a national of the United States" or "a member of the armed forces" without temporal limits). *See also Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303, at *6 (D.D.C. May 16, 2023) ("*Cabrera II*"). Each Plaintiff is a U.S. national and thus meets this requirement. *See* Ex. 2, Tranche 1 Western Anbar Plaintiffs Table (listing exhibits including each Plaintiff's declaration and identity documents).

17

As to one Plaintiff, Nathan Strong, who passed away after the filing of this case, his estate has standing to sue under the FSIA for the extrajudicial killing of his son, U.S. Marine Corps Reserve Sergeant Jesse Strong. *See* Dkt. 75, Suggestion of Death as to Nathan Strong; Dkt. 76, Plaintiffs' Motion to Substitute Party; March 17, 2025 Min. Order (granting motion to substitute the estate of Nathan Strong as a plaintiff); Ex. 100 (documentation for the Estate of Nathan Strong). "The estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) (*"W.A. I"*) (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78-79 (D.D.C. 2017)). Courts in this District thus recognize claims by the legal representative of an estate under 28 U.S.C. § 1605A. *See, e.g.*, *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019); *Est. of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 156-57 (D.D.C. July 17, 2024); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 33 n.3 (D.D.C. 2022).[7] Thus, "'any claim for personal injury, which includes IIED, can be maintained by the personal representative of the claimant once the claimant dies,' so long as the personal injury did not cause the claimant's death." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020) (quoting *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 285-86 (D.D.C. 2005)).

---

[7] *Compare with Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (holding that the standing of estates for § 1605A(c)(4) claims is instead a matter of state law); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12-13 (D.D.C. 2011) (same). The personal representative for the estate of Nathan Strong also has standing under Vermont law. *See* Vt. Stat. Ann. Tit. 14, § 1452 (2024) ("In an action for the recovery of damages for a bodily hurt or injury, occasioned to the plaintiff by the act or default of the defendant or defendants, if either party dies during the pendency of the action, the action shall survive and may be prosecuted to final judgment by or against the executors or administrators of the deceased party."); *Clymer v. Webster*, 596 A.2d 905, 910 n.4 (Vt. 1991).

D.    **Damages**

1.    **Solatium Damages**

To recover damages against Iran, Plaintiffs "must prove that the consequences of the [Defendant's] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 349, 402 (D.D.C. 2015) ("*Roth I*")). Courts may rely on written declarations from family member claimants describing the attack's effect on him or her. *See* Bellwether Damages Op. at 2 ("[T]he Special Master relied on sworn declarations, medical records, birth certificates, passports, and an expert report."); *see also Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (relying on wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband).

Courts in this jurisdiction consistently apply the general principles of tort law to FSIA actions. *See Roth I*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) ("*Oveissi II*")) (stating that courts "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (acknowledging that the court must proceed in the same manner as prior courts and look "to sources such as state decisional law, legal treatises, or the Restatements"); *Neiberger*, 2022 WL 17370239, at *11.

Under these general principles, a state sponsor of terrorism that provided material resources and support to a terrorist organization for an attack that caused an extrajudicial killing is responsible for intentional infliction of emotional distress ("IIED"), the resulting pain and suffering, and solatium of immediate family members. *See Ewan v. Islamic Republic of Iran*, 466

F. Supp. 3d 236, 245 (D.D.C. June 10, 2020) (finding that survivors of terrorism were entitled to damages for IIED "[b]ecause acts of terrorism [were] 'by their definition' extreme and outrageous conduct"); *Heiser II*, 659 F. Supp. 2d at 27 ("Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes [the IIED] test easily."); *Gration*, 2023 WL 5221955, at *26; *Blank v. Islamic Republic of Iran*, No. 19-CV-3645 (BAH), 2021 WL 3021450, at *9 (D.D.C. July 17, 2021). Courts in this jurisdiction regularly hold that family members need not be present at the terrorist attack to recover under a theory of IIED. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010) (a person "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Heiser II*, 659 F. Supp. 2d at 27 (explaining "that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families" who need not meet the presence requirement to recover for IIED; *Taitt v. Islamic Republic of Iran*, No. 20-CV-1557 (RC), 2023 WL 2536518, at *8 (D.D.C. Mar. 16, 2023) (citing *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) ("In terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived.")). "An award of solatium damages is intended to compensate for the 'mental anguish, bereavement and grief of those with a personal relationship to a decedent as the result of the decedent's death, as well as the harm caused by the loss of the decedent.'" Bellwether Damages Op. at 6 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).

In assessing damages awards, courts generally look to prior awards for comparable injury, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (noting that courts take pains to ensure that individuals with similar injuries receive similar awards), and typically follow the *Heiser* or *Peterson II* frameworks for solatium damages, which establish baseline awards to

"help ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022) ("*Force II*") (citing *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018)). For family members of deceased victims, these frameworks "'provide a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings.'" Bellwether Damages Op. at 6-7 (quoting *Cabrera*, 2022 WL 2817730, at *47); see also *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*"); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) ("*Owens II*").

"These amounts, however, are merely guideposts, and courts should deviate depending on the circumstances." Bellwether Damages Op. at 7 (citing *Fraenkel*, 892 F.3d at 361-62). In particular, a court may consider "evidence establishing an especially close relationship between the [claimant] and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*") (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders") (cleaned up). Upward enhancements can range from approximately 20 to 100 percent of the baseline award depending on the plaintiff's circumstances. *See, e.g.*, *Bova v. Islamic Republic of Iran*, No. 15-CV-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding plaintiff a 20 percent upward

departure after she suffered a "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-CV-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding a 25 percent enhancement to family members for their severe mental distress from the victim's sudden death); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding a 50 percent enhancement due to plaintiff's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Est. of Fouty v. Syrian Arab Republic*, No. CV 18-385 (RBW), 2024 WL 4006166, at *24 (D.D.C. Aug. 30, 2024) (awarding 100 percent upward departures to two siblings because they had especially close relationships with the victim, they were "intimately aware of the inhumane manner in which their servicemen brothers were murdered," and they were "forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member" who was taken hostage).

In the Bellwether Damages Opinion, the Court adopted the Special Master's recommendations and granted upward departures for 19 out of 45 bellwether plaintiffs, ranging from 25 to 100 percent. *See generally* Bellwether Damages Op.; Special Master R. & R., *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Oct. 29, 2024), *report and recommendation adopted*, No. 1:21-cv-01808 (D.D.C. Feb. 25, 2025).

The solatium baselines may also be subject to downward variances, as warranted by individual circumstances. *See, e.g.*, *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact with her victim son for

the 16 years preceding his death).  For children who were under the age of three at the time of their

parent's death, "decisions in this district have differed with respect to the appropriate award," Dkt.

91 at 8 (citation omitted), and "[s]ome courts have applied a downward variance in these

circumstances."  *Id.*  (citing *Cabrera II*, 2023 WL 3496303, at *11).  Although this Court has

applied downward variances for certain young children in this action, *see id.* (awarding $3 million

to three children who were three years old or two years old when their parents were killed), it has

also concluded "that a baseline award may be appropriate where there is evidence that the child

has suffered severely from the loss of their parent, despite not knowing or remembering them."

*Id.* (citing Bellwether Damages Op. at 8) ("In light of th[e] evidence regarding the effect that [the

minor plaintiff's] father's death has had on her, the Court concludes that a baseline award of $5

million is warranted.").  *See also* Dkt. 91 at 11 (awarding $5 million baseline damages to plaintiff

Conner Walker, who was five months old at the time of the attack that killed his father).  *See also,*

*e.g.*, *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57-58 (D.D.C. 2008) (awarding

$5 million in solatium damages to each child of a slain father, who were three years old and nine

months old at the time of his murder); Special Master's Report and Recommendations, *Stearns v.*

*Islamic Republic of Iran*, No. 17-CV-131 (RCL) (D.D.C. May 01, 2024), ECF No. 114 at 24-27,

*report and recommendation adopted*, Order and Judgment, *id.* at ECF 108 (D.D.C. Apr. 30, 2024)

(awarding plaintiff J.H., who was five weeks old at the time of her father's death, $5 million in

solatium damages); Special Master's Report and Recommendations, *Lee v. Islamic Republic of*

*Iran*, No. 19-CV-0083 (APM), (D.D.C. Apr. 11, 2022), ECF No. 59, *report and recommendation*

*adopted*, Order and Judgment, *id.* at ECF 84 (D.D.C. June 29, 2023) (awarding plaintiff J.T., who

was five weeks old at the time of his father's death, $5 million in solatium damages).

With respect to estates, this Court, like the vast majority of courts in this District, has awarded estate plaintiffs the same solatium damages as someone still alive in like circumstances. Dkt. 92 at 7 (awarding Estate of Sherry Kay Rockholt upward departure to $6.25 million in solatium damages); *see also, e.g.*, *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) (awarding a baseline of $5 million in solatium damages to the estate of the victim's mother); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 40 (D.D.C. 2022) (awarding a baseline solatium damages to the estate of Shlomi Mark, who passed away three years after the attack that killed his family members); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-CV-1689, 2024 WL 3225954, at *16 (D.D.C. Jun. 28, 2024) (awarding a baseline of $2.5 million in solatium damages to the estates of the mother and father of a wounded servicemember, who lived for 25 and four years, respectively, after the date of the attack).

Plaintiffs are all either immediate family members or functionally equivalent[8] to immediate family members of a servicemember who was killed in an Attack. They are thus entitled to recover

---

[8] The class of plaintiffs that can recover solatium damages also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022) ("*Cabrera I*") (internal quotations omitted). To establish that a plaintiff is the functional equivalent of an immediate family member, they must show that they were "treated like" an attack victim's spouse, child, parent, or sibling. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Valore*, 700 F. Supp. 2d at 79-80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him as the natural father, and the halfbrother or stepbrother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling); *Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2023 WL 6907852, at *7 (D.D.C. Sept. 1, 2023) ("*Jakubowicz II*") (finding a grandfather as a functional equivalent of a parent because he "served as a father figure"); *Karcher v. Islamic Republic of Iran*, No. 16-CV-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) ("*Karcher III*") (determining that a stepparent was a functional equivalent of a family member—even though the stepchild victim also had a relationship with his biological parent—because the stepparent

solatium damages.  *See, e.g.*, *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families," immediate family members are entitled to solatium awards); *Est. of Fouty v. Syrian Arab Republic*, No. 18-CV-385 (RBW), 2024 WL 3443591, at *25-26 (D.D.C. July 17, 2024) (citing, *inter alia*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) and *Fritz v. Islamic Republic of Iran*, No. 15-CV-456 (RDM), 2018 WL 5046229, at *20 (D.D.C. Aug. 13, 2018) (stating that the strict meaning of immediate family "include[s] . . . immediate family members of half blood")); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("*Fritz II*").

## 2.    Prejudgment Interest

Plaintiffs who were "delayed in recovering compensation for their injuries" may seek prejudgment interest on their compensatory damages.  *Reed*, 845 F. Supp. 2d at 214-15.  Courts in this jurisdiction award prejudgment interest on the plaintiffs' "past economic loss and their non-economic pain and suffering and solatium damages."  *Force II*, 617 F. Supp. 3d at 42 (cleaned up).

The most appropriate measure of prejudgment interest is the average annual prime rate from the date of the attack to the judgment's date, which is the method the Court adopted in the Bellwether Damages Opinion.  *See* Bellwether Damages Op. at 11-12; *Force II*, 617 F. Supp. 3d at 42 (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450-51 (D.C. Cir. 1996)).  The court in *Ewan* provided an example:

> To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1983 (10.79%); discounted that interest by the percentage of the year left from April 18, 1983, to December 31, 1983 (70.4%); and then added that amount to $1.00— yielding $1.07596.  Then, the Court took that amount and multiplied it by the prime

---

"supplemented" the parental role as evidenced by "the nature of the relationship" with "many weekends, school breaks, summer vacations" spent together).  The same framework of solatium damages baselines and adjustments applies to functionally equivalent claimants as to immediate family claimants.  *See generally Jakubowicz II*, 2023 WL 6907852, at *6-7.

> rate in 1984 (12.04%) and added that amount to $1.07596, yielding $1.205506. The Court continued this iterative process through June 10, 2020, resulting in a total multiplier of 10.62015. *See Opati*, 60 F. Supp. 3d at 83 n.10. For 2020, the Court estimated the rate to be 4.05167%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (44.2623%).

*Ewan*, 466 F. Supp. 3d at 250 n.3.

In line with the Court's award of prejudgment interest in the Bellwether Damages Opinion, Plaintiffs seek, and I recommend, an award of prejudgment interest here. Applying the methodology detailed in *Ewan*, the table in Appendix A details the resulting prejudgment interest figures to account for the time that passed since the Attacks until the estimated judgment date of June 31, 2025.

### 3.    Post-Judgment Interest

Post-judgment interest is interest on any money judgment in a civil case issued by a district court, including against a foreign sovereign over whom the court has jurisdiction. *Gration*, 2023 WL 5221955, at *37 (citing 28 U.S.C. § 1961(a)). Courts in this jurisdiction award post-judgment interest at the statutory rate because the application of section 1961(a) is mandatory, not discretionary. *See* Bellwether Damages Op. at 12 n.1 (citing *Gration v. Islamic Republic of Ian*, 2023 WL 5221955, at *37 (D.D.C. Aug. 15, 2023)) (collecting cases). The statute provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a). The Court awarded post-judgment interest at the statutory rate on Plaintiffs' money judgment in the Bellwether Damages Opinion, and Plaintiffs have requested, and I recommend, that the Court grant post-judgment interest from the date of the favorable judgment to the date of the judgment's payment. *See* Bellwether Damages Op. at 12 n.1.

IV.    **ANALYSIS OF EACH ATTACK AND DAMAGES WARRANTED FOR EACH PLAINTIFF**

This Section concerns 36 Plaintiffs who were injured in 14 attacks in the Western Al Anbar region of Iraq from 2004 to 2006.  The 14 Attacks fall into four categories: IED attacks, complex attacks, suicide attacks, and indirect fire attacks.  Dr. Gartenstein-Ross concludes that every Attack was either likely or very likely carried out by the Zarqawi organization, AAS, or elements of the two groups working together.  The Attacks, along with the damages warranted for each Plaintiff injured by the Attacks, are detailed below.

A.    **IED Attacks**

1.    **August 13, 2004 IED Attack that Killed U.S. Marine Corps Lance Corporal Kane Michael Funke**

On August 13, 2004, LCpl. Funke was serving with E Company, 2nd Battalion, 7th Marines, Regimental Combat Team 7, 1st Marine Division near Hit, Al Anbar Province. Attribution Report at 25.  LCpl. Funke and his unit were returning from a mounted counter-indirect fire ambush patrol in an armored vehicle.  *Id*.  His unit was traveling on alternative service route ("ASR") Bronze when they were struck by an IED.  As a result of the attack, the armored vehicle was destroyed, four servicemembers were injured, and LCpl. Funke was killed.  *Id*.

*i.    Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) very likely carried out this attack.  *Id*.  He bases his conclusion on JTJ's area of operations dominance at the time of the attack and the TTPs used to carry out the attack.  *Id*.  *First*, JTJ became an increasingly prominent insurgent actor across Al Anbar Province in the spring of 2004, following the First Battle of Fallujah.  *Id*. at 27.  As a result of the battle, JTJ established new alliances with various insurgent groups and became a major player in the insurgency by the summer of 2004.  *Id*. According to Dr. Gartenstein-Ross, "[a]s JTJ became increasingly prominent in Al Anbar and

Fallujah in particular, Hit became an important city for the group." *Id*. "Hit was a key stop on JTJ's critical pipeline" for foreign fighters, money, and other resources that stretched from the Iraq-Syria border in western Al Anbar to JTJ's Fallujah stronghold. *Id*. Dr. Gartenstein-Ross concludes that "JTJ thus had significant interest—and resultingly, significant presence—in Hit and the routes connecting it to their operations in Fallujah." *Id*.

*Second*, LCpl. Funke was killed in an IED attack, which is another indicator that JTJ was responsible. *Id*. Dr. Gartenstein-Ross opines that IEDs were a common TTP associated with JTJ, demonstrated by the large number of IED attacks during the Second Battle of Fallujah, which began shortly after this attack, in November 2004. *Id*. According to a U.S. Marine Corps report, by October 2004 intelligence had identified more than 300 well-constructed defensive positions interlaced with IEDs in Fallujah, which Dr. Gartenstein-Ross concludes were likely orchestrated by JTJ. *Id*. at 28. Based on these factors, it is very likely that the Zarqawi organization, as JTJ, carried out the August 13, 2004 IED attack in Hit that killed LCpl. Funke.

Finally, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 28-30 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2013); *see also* Bellwether Liability Op. at 22-24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii.    *Damages*

#### a.   **Dale Johnston** – Stepfather of LCpl. Kane Funke

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

Dale's declaration establishes his father-son relationship with Kane. ███████████

███████████████████████████████████████████

██████████████████████████ He therefore qualifies for solatium damages under

the functional equivalency standards.  *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52,

79-80 (D.D.C. 2010) (finding a non-adoptive stepfather entitled to damages where the stepfather

considered the victim to be his son and vice versa, and where the victim and stepfather acted as a

natural family); *Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother

based on evidence that the relationships were the functional equivalent of a parent); *see

also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such

a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages as the functional equivalent of a parent of an attack victim.

### 2.    June 9, 2005 IED Attack that Killed U.S. Marine Corps Reserve Corporal Brad Squires

On June 9, 2005, Cpl. Squires was serving with Weapons Company, 3rd Battalion, 25th Marine Regiment, 4th Marine Division between the towns of Haditha and Haqlaniyah in Al Anbar Province. *See* Attribution Report at 31. On the day of the attack, an M1A1 Abrams tank on Route Grizzlies was attacked and destroyed. *Id.* Later that same day, Cpl. Squires was traveling in a High Mobility Multi-Wheeled Vehicle ("HMMWV") tasked with retrieving mine-sweeping gear from an affiliated unit nearby to support tank recovery operations. *Id.* En route back to the tank site, and less than one mile away from their destination, Cpl. Squires's unit was attacked by an IED. *Id.* Cpl. Squires and three other servicemembers were immediately killed in the attack, and one other Marine later died from his wounds. Following the attacks, Weapons Company detained four military-aged males and confiscated 200 pounds of gunpowder, artillery fuses, and electronic triggering devices. *Id.*

#### i.    *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS very likely committed this IED attack. *Id.* He bases his conclusion on AQI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id. First*, this attack occurred during a time when AQI and AAS both had a strong operational presence in the Haditha Triad—an area including the cities of Haditha, Haqlaniyah, and Barwana. *Id.* at 33. In April 2005, AQI targeted Haditha as a part of the "Zarqawi Blitz," a wave of AQI attacks that occurred across Iraq following AQI's April 2, 2005 attack on the Abu Ghraib prison. *Id.* According to Dr. Gartenstein-Ross, the presence of AQI and AAS in the Haditha Triad

continued as 2005 progressed, as exemplified by a May 2005 Coalition operation against the groups in Haditha. *Id*. at 34. In August 2005, Coalition forces conducted Operation Quick Strike to target AQI and AAS fighters in the Haditha Triad. *Id*. AQI and AAS continued their operations in Haditha months after this attack. *Id*. Furthermore, this attack occurred during a time when AQI and AAS closely cooperated with each other and were "interconnected" or "affiliated." *Id*. at 32.

*Second*, Cpl. Squires was killed in an IED attack, which is another indicator that AQI and/or AAS was responsible. *Id*. at 35. Dr. Gartenstein-Ross opines that at the time of the attack, IEDs were a common TTP associated with both AQI and AAS in the Haditha Triad. *Id*. In October 2005, a U.S. Marine Corps press release detailed the capture of an AQI IED cache in Haqlaniyah, noting that "the cache consisted of bomb-making materials, numerous weapons and ammunition, and several computer discs with Arabic writing." *Id*. Moreover, AAS released a credible claim of responsibility for an August 2005 IED ambush on a Marine convoy near Haditha, not long after the attack that killed Cpl. Squires. *Id*. Based on these factors, it is very likely that the Zarqawi organization, as AQI, and/or AAS carried out the attack that killed Cpl. Squires.

Finally, Iran's material support to AQI and AAS substantially contributed to AQI and/or AAS's commission of this attack. *See* Attribution Report at 35-37 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 22-24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *id*. at 19-22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS); *Espitia v. Islamic Republic of Iran*, No. 1:21-cv-123, 2022 WL 2168355, at *5 (S.D. Tex. June 16, 2022) (finding that Iran materially supported a Zarqawi organization attack, explaining that "[t]he use of multiple IEDs and [explosively formed

penetrators] in a series of attacks . . . renders almost a certainty that Iran supplied at least some of these weapons.").

        *ii.*     ***Damages***

              **a.**  **Bruce Duane Squires** – Father of Cpl. Brad Squires



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

        ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████ Plaintiffs request, and I recommend, that the Court award an upward departure of 50

percent to $7.5 million in solatium damages. ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

    **3.**    **July 14, 2005 IED Attack that Killed U.S. Marine Corps Corporal Christopher Winchester and U.S. Army National Guard Staff Sergeant Tricia Jameson**

On July 14, 2005, Cpl. Winchester was serving with K Company, 3rd Battalion, 10th Marines, 2nd Marine Division in Trebil, Al Rutba district, Al Anbar Province. Attribution Report at 38. SSG Jameson was serving with the 313th Medical Company in the same area. *Id.* Cpl. Winchester's unit was conducting an IED sweep northeast of Trebil as part of its role at the port of entry between Iraq and Jordan, when the unit was attacked with an IED. *Id.* Cpl. Winchester died from injuries caused by the IED blast. SSG Jameson, who was in a nearby Medical Company, responded to the explosion. *Id.* While traveling to the site of the attack, SSG Jameson's M997 armored ambulance was attacked with an IED. *Id.* SSG Jameson was killed instantly by the explosion. *Id.*

        *i.*    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely committed this IED attack. *Id.* He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id.* *First*, this attack occurred on the Jordanian border in Trebil, Al Anbar Province. *Id.* Dr. Gartenstein-Ross assesses that the IEDs that killed Cpl. Winchester and SSG Jameson were likely part of an AQI strategy to target Jordan and Jordan-Iraq trade by attacking critical points such as the border station, Coalition activity in Jordan, and the major roadways along the Jordan-Iraq border. *Id.* For example, on December 3, 2004, an AQI fighter attempted to detonate a vehicle-borne improvised explosive

device ("VBIED") at the Al-Karmah border station. *Id*. at 39. According to Dr. Gartenstein-Ross, AQI's goal of bringing the fight to Jordan by disrupting the movement of goods, individuals, and Coalition forces within and between Jordan and Iraq existed since at least 2004. *Id*. After the attack that killed Cpl. Winchester and SSG Jameson, AQI continued its activity around Trebil. *Id*. at 40.

*Second*, Cpl. Winchester and SSG Jameson were killed in a multiple-IED attack, which is another indicator that AQI was responsible. Dr. Gartenstein-Ross states, "Given that it takes more time to emplace multiple IEDs, the perpetrator of this attack would need to possess relative freedom of mobility in Trebil." *Id*. at 41. AQI was the most prominent and capable group in this area, and thus the emplacement of multiple IEDs further increases the probability that it was responsible for this attack. *Id*. At the time of the attack, AQI was making frequent use of IEDs. *Id*. This is best documented in Al Anbar Province, where Coalition forces throughout 2005 discovered multiple IED factories. *Id*. In November 2005, Coalition forces captured large AQI caches of IEDs and IED materials in the provincial capital of Ramadi. *Id*.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack, including former regime elements ("FREs") or AAS. FRE groups in western Al Anbar mainly focused on criminal activity rather than fighting the Coalition. *Id*. Only AQI had both the intent and the ability to attack Coalition movements along the Iraq-Jordan border and to strike into Jordan, and only AQI had a history of launching attacks in this remote border area. *Id*. Based on these factors, it is likely that the Zarqawi organization, as AQI, carried out the attack that killed Cpl. Winchester and SSG Jameson.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 42-43 (citing U.S. government reporting substantiating Iran's

support for the Zarqawi organization in Iraq from 2003 to 2013); *see also* Bellwether Liability Op. at 22-24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Espitia* , 2022 WL 2168355, at *5  (finding that Iran materially supported a Zarqawi organization attack, explaining that "the use of multiple IEDs and [explosively formed penetrators] in a series of attacks . . . render almost a certainty that Iran supplied at least some of these weapons."); *Driscoll v. Islamic Republic of Iran*, 2023 WL 4892710, at *7 (D.D.C. June 27, 2023), *report and recommendation adopted sub nom*., 2023 WL 5932974 (finding IED detonated by al-Qaeda or an al-Qaeda affiliate to be traceable to Iran or its proxies in part because the weapon penetrated an armored vehicle).

> ## ii.    *Damages*
>
> ### a.  **Gail Marie Williams** – Mother of Cpl. Christopher Winchester

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ Plaintiffs

request, and I recommend, that the Court award Gail an upward departure of 25 percent to $6.25

million in solatium damages. ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

**b. Allison Gail Murphy** – Sister of Cpl. Christopher Winchester

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ Plaintiffs request,
and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in
solatium damages. ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

**c.  Patricia Ann Jameson** – Mother of SSG Tricia Jameson

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ █ █████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

        **d.  Robert M. Jameson** – Brother of SSG Tricia Jameson

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ █

████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    Plaintiffs request, and I recommend, that the Court award an

40

upward departure of 25 percent to $3.125 million in solatium damages. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

      **4.**    <u>**August 3, 2005 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Aaron Reed**</u>

On August 3, 2005, LCpl. Reed was serving with L Company, 3rd Battalion, 25th Marine Regiment, 4th Marine Division (3/25) in Barwana, Al Anbar Province.  Attribution Report at 44.  On the day of the attack, LCpl. Reed's unit was conducting a cordon and search operation on Route Phoenix, east of Barwana, as part of Operation Quick Strike.  LCpl. Reed was a passenger in an amphibious assault vehicle when it was struck by an IED that destroyed the vehicle.  *Id*.  The IED

blast killed LCpl. Reed, 13 other Coalition servicemembers, and one civilian translator, and it wounded an additional servicemember. *Id*. at 45.

### i. *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS very likely committed the IED attack that killed LCpl. Reed. *Id*. He bases his conclusion on AQI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*. *First*, at the time of the attack, AQI and AAS maintained a strong operational presence in Haqlaniyah, Haditha, and Barwana. *Id*. at 46. For instance, the U.S. Marine Corps' August 3, 2005 Enemy Situation and Assessment specifically notes that AQI and AAS "had a strong operational presence" in this area. *Id*. According to the assessment report, Haqlaniyah was "a prime collection point for AQIZ [Zarqawi's al-Qaeda in Iraq] and Ansar al Sunnah insurgent cells," and Barwana was a "safe haven/C2 [command post] node for Ansar al Sunnah." *Id*. Furthermore, this attack occurred during a time when AQI and AAS closely cooperated with each other and were "interconnected" or "affiliated." *Id*. at 45.

*Second*, LCpl. Reed was killed in an IED attack, a TTP that also indicates AQI and/or AAS's responsibility. *Id*. at 47. Dr. Gartenstein-Ross opines that at the time of the attack, IEDs were a common TTP associated with both AQI and AAS. *Id*. at 47. The Coalition's Operation Quick Strike targeted AQI and AAS near Haditha, which they were able to use "as a base to manufacture IEDs and VBIEDs." *Id*. In October 2005, a U.S. Marine Corps press release detailed the capture of an AQI IED cache in Haqlaniyah, noting that "the cache consisted of bomb-making materials, numerous weapons and ammunition, and several computer discs with Arabic writing." *Id*. Moreover, AAS released a credible claim of responsibility for an August 2005 IED ambush

on a Marine convoy near Haditha.  *Id*.  Based on these factors, it is very likely that the Zarqawi

organization, as AQI, and/or AAS carried out the attack that killed LCpl. Reed.

Finally, Iran's material support to AQI and AAS substantially contributed to AQI and/or

AAS's commission of this attack.  *See* Attribution Report at 47-49 (citing U.S. government

reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also*

Bellwether Liability Op. at 22-24 (finding that Iran materially supported April 2005 IED attack

perpetrated by the Zarqawi organization); *id*. at 19-22 (finding that Iran materially supported April

2004 IED attack perpetrated by AAS).

> ### ii.  *Damages*
>
> #### a.  **Sara Lynn Duvall** – Mother of LCpl. Aaron Reed

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

**b. Larry L. Duvall** – Stepfather of LCpl. Aaron Reed



Larry's declaration establishes his father-son relationship with Aaron.

He qualifies for solatium damages under the functional equivalency standards. *See Valore*, 700 F. Supp. 2d at 79-80 (finding a non-adoptive stepfather entitled to damages where the stepfather considered the victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

      **c.  Matthew Stephen Reed** – Brother of LCpl. Aaron Reed

████████████████████████ Plaintiffs request, and I recommend, that the Court award an upward

departure of 25 percent to $3.125 million in solatium damages. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████      ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

### d.  **Jill Leigh Parmeter** – Stepsister of LCpl. Aaron Reed

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  ████████  ████████████

████████████████████████████████████████████  ████  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

Jill's declaration establishes that she is the functional equivalent of Aaron's biological sister. ████████████████████████████████████████████████████ ████████████████████████████████████████████ She therefore qualifies for solatium damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Plaintiffs request, and I recommend, that the Court award the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

## 5. October 3, 2005 IED Attack that Killed U.S. Army Sergeant Bryan Large

On October 3, 2005, SGT Large was serving with 3rd Battalion, 504th Parachute Infantry Regiment, 82nd Airborne Division in Haqlaniyah, Al Anbar Province. Attribution Report at 50. On the day of the attack, SGT Large's unit was acting in support of Operation River Gate, and was tasked with establishing blocking positions around the city of Haqlaniyah. *Id*. SGT Large was sitting in the rear left seat of a HMMWV when an IED composed of 155-millimeter artillery shells

47

and an anti-tank mine detonated under the rear left wheel of the vehicle. *Id*. The vehicle caught fire, and munitions inside the vehicle began igniting in secondary explosions, preventing aid from being rendered to the servicemembers inside. *Id*. SGT Large died in the blast, along with two other servicemembers. *Id*.

### i. *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS very likely committed this IED attack. *Id*. He bases his conclusion on AQI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*. *First*, at the time of the attack, AQI and AAS both had a strong operational presence in Haditha. *Id*. at 52. In August 2005, Coalition forces conducted Operation Quick Strike to target AQI and AAS fighters in and around Haditha, but the groups remained prominent in the area. *Id*. A report from U.S. Central Command assessed that by 2005, AQI had become so prominent that the group established a "state within a state" in Haditha, Haqlaniyah, and Barwana. *Id*. at 53. According to Dr. Gartenstein-Ross, the period of the attack that killed SGT Large coincided with the lunar month of Ramadan, when "AQI telegraphed an intensified pace of attacks." *Id*. Furthermore, this attack occurred during a time when AQI and AAS closely cooperated with each other and were "interconnected" or "affiliated." *Id*. at 51.

*Second*, SGT Large was killed in an attack employing an IED that consisted of 155-millimeter artillery shells and an anti-tank mine, which is another indicator that AQI and/or AAS was responsible. Dr. Gartenstein-Ross opines that at the time of the attack, IEDs were a TTP commonly employed by AQI and AAS in the Haqlaniyah area. *Id*. at 53. Indeed, around the time of Operation Quick Strike, AQI and AAS were using Haditha "as a base to manufacture IEDs and VBIEDs." *Id*. One week after this attack, a U.S. Marine Corps press release reported on an AQI

IED cache captured during Operation River Gate.  *Id*.  Based on these factors, it is very likely that the Zarqawi organization, as AQI, and/or AAS carried out the attack that killed SGT Large.

Finally, Iran's material support to AQI and AAS substantially contributed to AQI and/or AAS's commission of this attack.  *See* Attribution Report at 54-55 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 22-24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *id*. at 19-22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS).

> ### *ii.*    ***Damages***
>
> #### a.  **Larry Large** – Father of SGT Bryan Large

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████    ████████████████████████████

███████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

> **b. Devan Eutin[9]** – Stepdaughter of SGT Bryan Large

### 6.    October 6, 2005 IED Attack that Killed U.S. Marine Corps Lance Corporal Daniel McVicker

On October 6, 2005, LCpl. McVicker was serving as a bulk fuel specialist in Combat Logistics Battalion 2, 2nd Marine Expeditionary Force near the city of Al Qaim, Al Anbar Province. Attribution Report at 56. On the day of the attack, LCpl. McVicker and his unit were conducting a Combat Logistics Patrol on Alternate Supply Route ("ASR") Tin, approximately 18 kilometers east of Al Qaim, when his patrol was struck by an IED. *Id.* The IED was pressure-plate activated and contained "multiple 155mm rounds," and was buried in the road, covered in a "tar like substance that blended into the ASR." *Id.* The resulting blast crater was six feet wide, four feet long, and two feet deep. *Id.* The IED blast killed LCpl. McVicker and one other servicemember and wounded two others. *Id.*

> #### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) very likely committed this IED attack. *Id.* at 57. He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id. First*, Dr. Gartenstein-Ross observes that "AQI began to establish a presence in Al Qaim toward the end of 2004 and its footprint in the city reached a peak in 2005." *Id.* Over this time period, Al Qaim was

---

[9] Plaintiffs' counsel was unable to obtain Devan's signed declaration as of the time of their submission to me. Plaintiffs will supplement this submission and provide her declaration and damages request as soon as they are able to.

strategically important to the group because of its location on the Syrian border, which made it a vital entry point for foreign fighters and a logistics hub for AQI equipment and material moving further into Iraq. *Id*. By September 2005, AQI announced it had taken control of Al Qaim and posted "signs throughout the district proclaim[ing] the region the 'Islamic Kingdom of Qaim.'" *Id*. at 58. AQI remained dominant in Al Qaim and its surrounding areas well past the October 6, 2005 attack that killed LCpl. McVicker. *Id*. In the Bellwether Liability Opinion, the Court attributed a June 2006 IED attack in Al Qaim to the Zarqawi organization, relying on Dr. Gartenstein-Ross's opinion that in 2006 the Zarqawi organization "was the major armed force in Al Qaim." Bellwether Liability Op. at 28-30 (citing Gartenstein-Ross expert report).

*Second*, LCpl. McVicker was killed in an IED attack, which is another indicator that AQI was responsible. Dr. Gartenstein-Ross opines that at the time of the attack, AQI frequently used IEDs to attack U.S. and Coalition forces throughout Al Anbar Province, particularly in areas under AQI control. *Id*. at 59. For example, during Operation Steel Curtain in Al Qaim, approximately one month after the attack that killed LCpl. McVicker, U.S. Marines encountered numerous IEDs as they cleared Al Qaim. *Id*. According to Dr. Gartenstein-Ross, Al Anbar Province also housed numerous AQI IED factories. *Id*. Based on these factors, it is very likely that the Zarqawi organization, as AQI, carried out the attack that killed LCpl. McVicker.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 59-61 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2013); *see also* Bellwether Liability Op. at 28-30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization in Al Qaim); *id*. at 22-24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Est. of Fishbeck v. Islamic Republic of Iran*, No.

18-CV-2248 (CRC), 2023 WL 7448770, at *9 (D.D.C. Aug. 18, 2023) (relying on expert testimony to attribute IED attack to AQI and Iran because the IED was "ideally located and buried to create the most maximum effect," which "demonstrate[d] training" and "demonstrate[d] understanding of tactics and understanding of U.S. operations").

**ii.**     *Damages*

      **a.**   **Carey J. Meissner** – Mother of LCpl. Daniel McVicker



    Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

b.  **Mark A. McVicker** – Father of LCpl. Daniel McVicker

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Plaintiffs request, and

I recommend, that the Court award an upward departure of 25 percent to $6.25 million in solatium

damages. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

**c.   Irma J. McVicker** – Stepmother of LCpl. Daniel McVicker

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ █ ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ █ ████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

Irma's declaration establishes her mother-son relationship with Daniel. ██████████████

██████████████████████████████████████████

████████████████████████████████ She therefore qualifies for solatium

damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 62-63

(awarding solatium damages to a stepmother based on evidence that the relationships were the

functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . .

were sufficiently frequent and of such a nature as to render them equivalent to those interactions

typical of a parent-child relationship").

████████████████████████████████████████

█████████████████████████████ Plaintiffs request, and I recommend, that

the Court award an upward departure of 25 percent to $6.25 million in solatium damages. ██

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**d. Mollie R. Handy** – Sister of LCpl. Daniel McVicker

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████    █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Plaintiffs

request, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

**e.  Edward R. Ricci** – Stepbrother of LCpl. Daniel McVicker

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

Edward's declaration shows that he was the functional equivalent of Daniel's biological brother. ████████████████████████████████████████████████

███████████████████████████████ He therefore qualifies for solatium damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

███████████████████████████████████████████████████

████████████████████████████████████████████ Plaintiffs request, and I recommend, that the Court award an upward departure of 25 percent to $3.125 million in solatium damages. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

**7.      September 16, 2006 IED Attack that Killed U.S. Navy Petty Officer Second Class David Sean Roddy**

On September 16, 2006, PO2 Roddy was serving with Explosive Ordinance Disposal (EOD) Company, 1st Marine Logistics Group, 1st Marine Expeditionary Force Forward in Haditha, Al Anbar Province.  Attribution Report at 62.  PO2 Roddy's unit traveled to the site of an IED blast in South Dam Village to conduct a post-blast analysis.  *Id*.  While conducting a cordon search at the scene for secondary IEDs, the unit identified an unexploded IED near the Euphrates River, which they determined did not pose a threat.  *Id*.  When PO2 Roddy was preparing to mount a mine-resistant ambush-protected infantry mobility vehicle, a third IED detonated and killed him.  *Id*.  At the time of the IED explosion, another unit observed two suspected anti-Iraqi forces on a rooftop directly to the West of the IED site, whom they believed to be "observers" of the attack and subsequently detained for questioning.  *Id*.  A post-blast analysis determined that the IED that

killed PO2 Roddy consisted of two propane tanks emplaced under the road with a 200-meter command wire running west down a hill out of view of the patrol.  *Id.*

### i.        *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) and/or AAS very likely committed this IED attack.  *Id.*   He bases his conclusion on MSC and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack.  *Id.* at 63.  *First*, by the time of the attack, "MSC and AAS had established a strong cooperative relationship within the Hit-Haditha corridor."  *Id.* at 64.  In Hit specifically, MSC and AAS formalized their coordination in December 2005, when the two groups came to an agreement that included AAS seeking MSC's approval for any attack it planned to carry out in the area.  *Id.* According to Dr. Gartenstein-Ross, throughout 2006, MSC and AAS maintained dominance in Hit.  During the summer months, AAS led a murder and intimidation campaign focused on further strengthening its influence in the city, which extended through the fall.  *Id.* at 65.

*Second*, PO2 Roddy was killed in a command-wire detonated IED, which is another indicator that MSC and/or AAS was responsible.  Dr. Gartenstein-Ross opines that MSC and AAS frequently carried out IED attacks within the Hit-Haditha corridor during the time frame in which the attack that killed PO2 Roddy occurred.  *Id.* at 66.  MSC and AAS were "especially active in launching IED attacks near Hit during the last few months of 2006."  *Id.*  In September 2006, MSC leadership from Haditha, Hit, and Anah held a meeting to discuss strategies to drive Coalition forces from Haditha, including by emplacing an increased number of IEDs along roads to Haditha, a similar tactic used in the attack that killed PO2 Roddy.  *Id.*  Based on these factors, it is very likely that the Zarqawi organization, as MSC, and/or AAS carried out the attack that killed PO2 Roddy.

Finally, Iran's material support to MSC and/or AAS substantially contributed to MSC and/or AAS's commission of this attack. *See* Attribution Report at 66-68 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 28-30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization in western Al Anbar Province); *Est. of Fishbeck*, 2023 WL 7448770, at *9 (relying on expert testimony to attribute IED attack to AQI and Iran because the IED was "ideally located and buried to create the most maximum effect," which "demonstrate[d] training" and "demonstrate[d] understanding of tactics and understanding of U.S. operations"). Other courts in this District have likewise found that Iran materially supported attacks in which sophisticated IEDs were detonated by command wire. *See, e.g.*, *Fissler*, *v. Islamic Republic of Iran*, No. CV 18-3122 (CKK), 2022 WL 4464873, at *2.

### ii. *Damages*

#### a. **Robert Roddy, Jr.** – Father of PO2 David Sean Roddy

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

8.    **November 2, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Luke Holler**

On November 2, 2006, LCpl. Holler was serving with C Company, 4th Reconnaissance Battalion, 4th Marine Division in Hit, Al Anbar Province.  Attribution Report at 69.  LCpl. Holler was on dismounted patrol when he was called to investigate a situation and it turned into a gunfight. *Id*.  An IED was set off remotely, which sent shrapnel into his head and cut his legs severely at his thigh.  *Id*.  LCpl. Holler died from the injuries he sustained in the blast.  *Id*.

*i.    Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) and/or AAS very likely committed this IED attack.  *Id*.  He bases his conclusion on ISI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*.  *First*, this attack occurred during a time when ISI and AAS "had established a strong cooperative relationship in Hit."  *Id*. at 71.  According to Dr. Gartenstein-Ross, in Hit specifically, ISI formalized its cooperation with AAS in December of 2005, when the two groups came to an agreement that included AAS seeking ISI's approval for any attack it planned to carry out in the area.  *Id*.  As 2006 progressed, ISI and AAS maintained their operational dominance in Hit.  *Id*. at 72.  In the summer months, AAS led a murder and intimidation campaign to control the city.  *Id*. ISI and AAS's control of the area continued through the fall, and ISI was not driven from the city until February 2007.  *Id*.

*Second*, LCpl. Holler was killed in an IED attack, which is another indicator that ISI and/or AAS was responsible.  According to Dr. Gartenstein-Ross, ISI and AAS frequently carried out IED attacks in and near Hit during the timeframe of this attack.  *Id*.  Following the merging of ISI and AAS in nearby Haditha, Dr. Gartenstein-Ross notes that fighters from both organizations formed a subgroup called the Black Banners, consisting of financiers and IED facilitators who

62

coordinated attacks against Coalition forces and paid people $200 for emplacing IEDs. *Id*. Dr. Gartenstein-Ross also notes that ISI and AAS were especially active in launching IED attacks near Hit in the late months of 2006. *Id*. In the final two months of 2006, ISI occupied a facility just south of the Hit gas station that it used as an IED factory. *Id*. at 73. Based on these factors, it is very likely that the Zarqawi organization, as ISI, and/or AAS carried out the attack that killed LCpl. Holler.

Finally, Iran's material support to ISI and/or AAS substantially contributed to ISI and/or AAS's commission of this attack. *See* Attribution Report at 73-75 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 28-30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization in western Al Anbar Province); *id*. at 19-22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS).

         ***ii.***        ***Damages***

         **a.**  **Ruth Anne Holler** – Mother of LCpl. Luke Holler



████████████████████████████████████████████████

██████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

    **b.   John L. Holler** – Father of LCpl. Luke Holler

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

    **c.   Joseph Aaron Holler** – Brother of LCpl. Luke Holler

████████████████████████████████████████████████

████████████████████████████████████████████████



Plaintiffs request, and I recommend, that the Court award the baseline amount of $2.5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

        **9.**      **November 22, 2006 IED Attack that Killed U.S. Marine Corps Private Heath Warner**

On November 22, 2006, Pvt. Warner was serving with G Company, 2nd Battalion, 3rd Marine Division approximately eight miles south of Haqlaniyah, Al Anbar Province.  Attribution Report at 76.  Pvt. Warner was serving as the gunner of a HMMWV when it was struck by an IED.  Pvt. Warner died from blast injuries received in the IED explosion.  *Id.*

        ***i.***      ***Attack Attribution to the Zarqawi Organization and/or AAS***

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) and/or AAS very likely committed this IED attack.  *Id.* at 76.  He bases his conclusion on ISI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack.  *Id.*  *First*, this attack occurred in Haqlaniyah, which formed part of an important area known as the Haditha Triad.  *Id.* at 78.  According to Dr. Gartenstein-Ross, during this time period in the Haditha Triad, an especially high level of cooperation existed between ISI and AAS.  ISI and AAS continued to hold control of the area through their infiltration of the government

structures of all three cities of the Haditha Triad in 2006. *Id*. As 2006 progressed, the presence of ISI and AAS leaders in the Haditha Triad increased. *Id*. at 79. In November 2006, when this attack occurred, ISI and AAS continued to assert strong authority in the Haditha Triad. *Id*.

*Second*, Pvt. Warner was killed in an IED attack, which is another indicator that ISI and/or AAS was responsible. According to Dr. Gartenstein-Ross, ISI and AAS were known for carrying out IED attacks during this period. *Id*. at 79-80. For example, in 2006, ISI paid militants between $500 and $700 for destroying a HMWVV, such as the one Pvt. Warner was traveling in. *Id*. at 79. Dr. Gartenstein-Ross also notes that ISI and AAS held numerous weapons caches in the area and had established networks for transporting supplies in and out of the Haditha Triad. *Id*. at 80. In Haditha and throughout Al Anbar Province, ISI and AAS commonly "shared resources such as weapons caches and VBIED factories" during the time period of this attack. *Id*. Based on these factors, it is very likely that the Zarqawi organization, as ISI, and/or AAS carried out the attack that killed Pvt. Warner.

Finally, Iran's material support to ISI and/or AAS substantially contributed to ISI and/or AAS's commission of this attack. *See* Attribution Report at 80-82 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 28-30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization in western Al Anbar Province); *id*. at 19-22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS).

### ii.    *Damages*

### a.  **Melissa J. Warner** – Mother of PVT Heath Warner

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ Plaintiffs request, and I recommend, that the Court award

an upward departure of 100 percent to $10 million in solatium damages. ███████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████

**b. Scott Nicholas Warner** – Father of PVT Heath Warner

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████  ██  ██████████

██████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ Plaintiffs request, and I recommend that

the Court award an upward departure of 100 percent to \$10 million in solatium damages. ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

   **c.  Ashton Warner** – Brother of PVT Heath Warner

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████    █████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████   █████   ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ Accordingly,

Plaintiffs request, and I recommend, that the Court award an upward departure of 100 percent to

$5 million in solatium damages. ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

**10.    November 28, 2006 IED Attack that Killed U.S. Army Specialist Jon-Erik Loney**

On November 28, 2006, SPC Loney was serving with 1st Battalion, 36th Infantry Regiment in Hit, Al Anbar Province.  Attribution Report at 83.  SPC Loney was riding in a Bradley vehicle when his unit noticed two men running away from a car shop in the middle of an open field.  *Id*. They began to search for IEDs, but found no indications until SPC Loney's Bradley drove over an IED containing 500 pounds of explosives, "blowing a hole the size of a couch cushion where he was sitting."  *Id*.  SPC Loney died from injuries sustained in the explosion.  *Id*.

*i.    Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) and/or AAS very likely committed this IED attack.  *Id*.  He bases his conclusion on ISI and AAS's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*.  *First*, this attack occurred during a time when ISI and AAS closely cooperated with each other.  In Hit, ISI's cooperation with AAS was formalized in December of 2005, when the two groups came to an agreement that included AAS seeking ISI's approval for any attack it planned to carry out in Hit.  *Id*. at 85.  Throughout 2006, ISI and AAS maintained their operational dominance in Hit.  *Id*. at 86.  According to Dr. Gartenstein-Ross, part of ISI's strategy to strengthen its influence in the western Euphrates River Valley was to attract more media attention to Hit by launching more attacks in the city.  *Id*.  ISI was not driven from the city until February 2007, months after this attack.  *Id*.

*Second*, SPC Loney was killed in a high-powered IED explosion, which is another indicator that ISI and/or AAS was responsible.  According to Dr. Gartenstein-Ross, ISI and AAS frequently

carried out IED attacks in and near Hit during the timeframe of this attack. *Id.* Following the merging of ISI and AAS in nearby Haditha, fighters from both organizations formed a subgroup called the Black Banners, consisting of financiers and IED facilitators who coordinated attacks against Coalition forces and paid people $200 for emplacing IEDs. *Id.* Dr. Gartenstein-Ross opines that ISI and AAS were especially active in launching IED attacks near Hit in the late months of 2006. *Id.* at 87. For example, in the final two months of 2006, ISI occupied a facility just south of a Hit gas station that it used as an IED factory. *Id.* Based on these factors, it is very likely that the Zarqawi organization, as ISI, and/or AAS carried out the attack that killed SPC Loney.

Finally, Iran's material support to ISI and/or AAS substantially contributed to ISI and/or AAS's commission of this attack. *See* Attribution Report at 87-89 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 28-30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization in western Al Anbar Province); *id.* at 19-22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS).

        **ii.**    ***Damages***

          **a. Violet Sue Kaylor** – Mother of SPC Jon-Erik Loney

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

        █████████████████████████████████

████████████████████████████████████████

████████████████████████ Plaintiffs request, and I recommend, that the

Court award an upward departure of 25 percent to $6.25 million in solatium damages. ██████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

        **b.  Jim Anthony Kaylor** – Stepfather of SPC Jon-Erik Loney

        ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ ██ ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

      ███████████████████████████████████  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

      Jim's declaration establishes his father-son relationship with Jon-Erik.  ██████████████

███████████████████████████████████████████████████████████ He

therefore qualifies for solatium damages under the functional equivalency standards.  *See Valore*,

700 F. Supp. 2d at 79-80  (finding a non-adoptive stepfather entitled to damages where the

stepfather considered the victim to be his son and vice versa, and where the victim and stepfather

acted as a natural family); *Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a

stepmother based on evidence that the relationships were the functional equivalent of a parent);
*see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of
such a nature as to render them equivalent to those interactions typical of a parent-child
relationship"). ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Plaintiffs request, and I recommend, that the Court award an upward departure of 25
percent to $6.25 million in solatium damages. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

### B.        Complex Attack

Complex attacks involve the use of multiple types of weapons in the same attack and may be previously coordinated engagements by multiple terrorists or their opportunistic employment of multiple weapon types.  Attribution Report at 18.  Some complex attacks begin with an "event-based trigger," such as an initial IED detonation, which is then followed by follow-on small arms fire; others involve the use of multiple weapons from the outset, such as a convoy ambush.  *Id*. Complex attacks require access to multiple types of weapons, training on how to employ them, familiarity with the local terrain, and coordinated planning and communications.  *Id*.  According to Dr. Gartenstein-Ross, "Iran is known to have provided certain Iraq-based militant groups with specific training in coordinated attacks."  *Id*.

### 11.        January 26, 2005 Complex Attack that Killed U.S. Marine Corps Sergeant Jesse Strong and Lance Corporal Karl Linn

On January 26, 2005, Sgt. Strong and LCpl. Linn were serving with Charlie Company, 4th Combat Engineer Battalion, 4th Marine Division, attached to 1st Battalion, 23rd Marines, 31st Marine Expeditionary Unit, 1st Marine Division in Haditha, Al Anbar Province.  Attribution Report at 90.  Sgt. Strong and LCpl. Linn were conducting cordon and knock operations intended to capture targeted individuals and disrupt insurgent activities in Haditha and the neighboring town of Haqlaniyah.  *Id*.  After conducting these operations, their unit was traveling in a convoy when insurgents launched an ambush.  According to the Marine Expeditionary Force's Situation Report, "the attack was initiated with RPGs and followed by daisy-chain IEDs and small arms fire," which reportedly came from a mosque, a bridge, a house, a ridge, and multiple alleyways on either side of the road.  *Id*.  According to one servicemember in the unit, "the enemy had 30 different positions" with "about 150 people or so."  *Id*.  Sgt. Strong and LCpl. Linn died from blast injuries

sustained from the IEDs used in this attack.  *Id.* at 91.  The attack also killed two other servicemembers and wounded seven others.  *Id.*

### i.        *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) very likely committed this complex attack that killed Sgt. Strong and LCpl. Linn.  *Id.*  He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack.  *Id.*  *First*, AQI had a strong operational presence in Haditha that persisted before, during, and after this attack.  Haditha served as a major cross-border hub and transit center where a high number of AQI fighters were present.  *Id.* at 92.  After the Second Battle of Fallujah ended in December 2004, a number of AQI fighters fled to the Hit-Haditha Corridor.  *Id.*  Haditha and the nearby Euphrates River also served as important supply lines for AQI.  *Id.* at 93.  Shortly following this ambush, Coalition forces launched two operations in February and March 2005 in response to AQI's growing presence in Anbar Province, and discovered and captured several AQI leaders in Haditha.  *Id.* According to Dr. Gartenstein-Ross, the focus of Coalition forces on the city and region, in conjunction with the history of AQI in Haditha, demonstrates AQI's dominance in the Hit-Haditha corridor at the time of the attack on Sgt. Strong and LCpl. Linn.  *Id.*

*Second*, Sgt. Strong and LCpl. Linn were killed in a complex attack that involved the use of small arms fire, RPGs, and IEDs, and these TTPs are another indicator that AQI was responsible. According to Dr. Gartenstein-Ross, IEDs were a common TTP associated with AQI.  *Id.* Furthermore, information collected by Coalition forces during Operation Al Fajr indicates that AQI had access to RPGs and small arms like those used in this attack.  *Id.*  Dr. Gartenstein-Ross also assesses that the "insurgents who carried out this ambush displayed a level of sophistication consistent with that of an experienced and well-resourced group, as AQI was in the Haditha area in early 2005."  *Id.* at 94.  Furthermore, AQI claimed responsibility for attacks around this area

and time period involving similar TTPs in February and April 2005. *Id.* Based on these factors, it is very likely that the Zarqawi organization, as AQI, carried out the attack that killed Sgt. Strong and LCpl. Linn.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 94-95 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 51-64 (finding that Iran materially supported multiple complex attacks perpetrated by the Zarqawi organization that employed RPGs, small arms fire, and IEDs); *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 40-41 (D.D.C. 2023) (finding that Iran provided material support to Zarqawi organization complex attacks, which require advanced training, and that "Iran's training camps instructed on the tactics necessary to successfully inflict casualties in a coordinated way.").

        *ii.*     ***Damages***

              **a. Victoria Murano Strong** – Mother of Sgt. Jesse Strong

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

**b. Estate of Nathan Strong** – Father of Sgt. Jesse Strong

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████    ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

Fr the estate of Nathan Strong, Plaintiffs request, and I recommend, that the Court award the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c. **Malisa Linn** – Mother of LCpl. Karl Linn

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

    ██████████████████████████████████████████████████

███████████████████████████████████████  Plaintiffs request, and I
recommend, that the Court award an upward departure of 25 percent to $6.25 in solatium damages.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

**d.  Richard Jeffrey Linn** – Father of LCpl. Karl Linn

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ ██ ████████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

 Therefore, I therefore recommend that the Court award the baseline amount of $5 million.

### C.    Suicide Attacks

Suicide bombings involve terrorists' purposeful commitment of suicide by command-detonating explosives while they are near their target, generally by employing a vest or vehicle laden with explosives. *See* Attribution Report at 18. According to Dr. Gartenstein-Ross, "suicide bombings typically require a significant amount of planning and support, including vetting and training the suicide bomber and scouting the attack location or route." *Id*.

### 12.    October 15, 2004 SVBIED Attack that Killed U.S. Army Corporal Jonathan Santos

On October 15, 2004, CPL Santos was serving as a linguist in the 9th Psychological Operations Battalion, 4th Psychological Operations Group. Attribution Report at 96. His unit was stationed near the town of Karabilah in Al Qaim district, Al Anbar Province. *Id*. CPL Santos and

83

his unit were returning to their base from a mission near the Syrian border. CPL Santos was traveling in an armored HMMWV that was the last vehicle in a three-vehicle convoy. *Id*. While they traveled, a car parked near the side of the road suddenly accelerated, rammed into Cpl. Santos's HMMWV, and detonated a SVBIED. *Id*. at 96-97. CPL Santos died from the blast. *Id*. at 97.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely committed the SVBIED attack that killed CPL Santos. *Id*. He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*. *First*, AQI had a well-known presence in Al Qaim District during this period. *Id*. at 98. AQI approached tribal leaders in Al Qaim in 2004 and offered resources in exchange for partnership against Coalition forces. *Id*. According to Dr. Gartenstein-Ross, AQI utilized Al Qaim as a point of entry for fighters and supplies entering Iraq from neighboring Syria. *Id*. at 99. "AQI's presence in Al Qaim was extensive, and the group imposed brutal conditions on the Iraqi residents." *Id*. In attributing a June 2006 bellwether attack to the Zarqawi organization, the Court relied on Dr. Gartenstein-Ross's consistent testimony that the Zarqawi organization was "the major armed force in Al Qaim" in 2006, after its "presence in the region 'began in 2004 and reached a peak in 2005.'" Bellwether Liability Op. at 28 (quoting Gartenstein-Ross expert report).

*Second*, CPL Santos was killed in an SVBIED attack, which courts have previously found to be a signature AQI attack method. *Id*. at 100 (citing *Brown v. Islamic Republic of Iran*, No. 1:21-CV-1308 (TNM), 2023 WL 4824740, at **4, 10 (D.D.C. July 27, 2023)); Bellwether Liability Op. at 73 (noting that the use of VBIEDs is a "signature attack method" of the Zarqawi organization). According to Dr. Gartenstein-Ross, AQI also conducted a sophisticated SVBIED attack in Al Qaim a short time after this attack took place. Attribution Report at 100. The AQI

leader Abu Musab al-Zarqawi claimed in a letter he sent to al-Qaeda's leadership that he had orchestrated 25 suicide attacks in 2003 alone.  *Id.*

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out this attack.  Other insurgent groups in Al Qaim in 2004 were "primarily concerned with criminal activity and would have been unlikely to carry out an SVBIED attack." *Id.* at 101.  Based on these factors, it is likely that the Zarqawi organization, as AQI, carried out the attack that killed CPL Santos.

Finally, Iran's material support to AQI substantially contributed to AQI's commission of this attack.  *See* Attribution Report at 101-103 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq).  The Court previously held that Iran materially supported a Zarqawi organization-perpetrated suicide attack that occurred one day before this attack, Bellwether Liability Op. at 66-68, in addition to an SVBIED attack in December 2005, *id.* at 71-73.  *See also Brown*, 687 F. Supp. 3d at 41-42 (holding Iran liable for SVBIED attacks, which are "sophisticated attacks requiring expertise that only comes from advanced training.").

        *ii.*     **Damages**

           **a.**  **Doris Pangelinan Kent** – Mother of CPL Jonathan Santos

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████ Plaintiffs

request, and I recommend, that the Court award an upward departure of 25 percent to $6.25 million

in solatium damages.  ████████████████████  ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

**b.  Christopher Kent** – Stepfather of CPL Jonathan Santos

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

Christopher's declaration establishes his father-son relationship with Jonathan. █████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ He therefore qualifies for solatium damages under

the functional equivalency standards.  *See Fritz II*, 324 F. Supp. 3d at 62-63  (awarding solatium

damages to a stepmother based on evidence that the relationships were the functional equivalent

of those of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("[T]he interactions . . . were

sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship.").

Plaintiffs request, and I recommend, that the Court award a baseline amount of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

      **c.** **Jared John Santos** – Brother of CPL Jonathan Santos

███████████████████████████████████████

███████████████████████████████████████

███ Plaintiffs request, and I recommend, that the Court award an upward departure of 25 percent

to $3.125 million in solatium damages. ██████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

13.    **April 11, 2006 Suicide IED Attack that Killed U.S. Army Sergeant Kenneth Hess**

On April 11, 2006, SGT Hess was serving with 4th Squadron, 14th Cavalry Regiment, 172nd Stryker Brigade Combat Team, 101st Airborne Division in Rawa, Al Anbar Province. Attribution Report at 103. That afternoon, SGT Hess was on a dismounted combat patrol with his unit in the New Rawa Market when a suicide bomber attacked them. *Id*. at 104. The attacker detonated his suicide vest near SGT Hess, fatally wounding SGT Hess with shrapnel to the head, and wounding two other members of the patrol. *Id*. SGT Hess died from the attack. *Id*.

*i.    Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) very likely committed this suicide IED attack.  *Id*.  He bases his conclusion on MSC's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack.  *Id*.  *First*, at the time of the attack, MSC possessed area of operations dominance in Al Anbar and was the dominant terrorist group in Rawa.  *Id*. at 105.  According to Dr. Gartenstein-Ross, MSC began increasing presence in Rawa in February 2006, as other militant groups in the Hit-Haditha corridor—which includes Rawa—merged or cooperated with MSC.  *Id*. at 106.  MSC purposefully expanded their influence in Rawa in early spring 2006, according to an intercepted letter from MSC leaders, and succeeded in establishing dominance in Rawa by April 2006.  *Id*.

*Second*, SGT Hess was killed in a suicide IED attack, which is another strong indicator that MSC was responsible.  *Id*. at 107.  According to Dr. Gartenstein-Ross, suicide IEDs were a common TTP associated with MSC.  *Id*.  A report from U.S. Central Command stated that by May 2006, MSC had a number of suicide bombers intended for use outside Ramadi that were kept in the areas surrounding Ramadi, and an MSC leader claimed in May 2006 that the group had been using independent suicide bombers to attack Coalition forces in Al Anbar Province.  *Id*.  Based on these factors, it is likely that the Zarqawi organization, as MSC, carried out the attack that killed SGT Hess.

Finally, Iran's material support to MSC substantially contributed to MSC's commission of this attack.  *See* Attribution Report at 107-109 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 66-68 (finding that Iran materially supported October 2004 suicide-vest IED attack perpetrated by the Zarqawi organization); *id*. at 71-73 (finding that Iran materially supported December 2005 SVBIED attack perpetrated by the Zarqawi organization).

ii.    *Damages*

a.    **April M. Hess** – Spouse of SGT Kenneth Hess

████████████████████████████████████████████████████  ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ Plaintiffs request, and I recommend, that the Court award an upward departure

to $10 million in solatium damages within the *Peterson II* framework. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

**b. Katherine Meeks** – Mother of SGT Kenneth Hess

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ Plaintiffs request, and I recommend, that the

Court award an upward departure of 25 percent to $6.25 million in solatium damages. ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████

**D.** **Indirect Fire Attack**

Indirect fire attacks "involve weapons that do not require line-of-sight to targets, including rockets and artillery or mortar fire." Attribution Report at 19. Given the complexity involved, indirect fire attacks "require a known target location and weapons training to be accurate." *Id*. The U.S. military and another court in this District have discussed Iran's provision of training and weapons to militant groups in Iraq to conduct indirect fire attacks against Coalition forces. *Id*. (citing briefing with U.S. commander of Multi-National Force–Iraq and *Roth v. Islamic Republic of Iran*, No. 1:19-cv-02179, 2023 WL 196577 at *4 (D.D.C., Jan. 17, 2023)).

**14.** **December 18, 2006 Indirect Fire Attack that Killed U.S. Marine Corps Captain Kevin Kryst**

On December 18, 2006, Capt. Kryst was serving as a Cobra helicopter pilot in Marine Light Helicopter Attack Squadron 267. Attribution Report at 110. His squadron was based in Camp Korean Village near the city of Rutbah, Al Anbar Province. *Id*. On the day of the attack, insurgents launched three 107-millimeter rockets into Camp Korean Village from the southwest. *Id*. Two of the rockets exploded in midair above the base, and one landed and then exploded inside the base. Fragmentation from the rockets caused extensive damage to Capt. Kryst's abdomen and lower body. He was medically evacuated to the base's aid station, where he died from his wounds. *Id*. One other servicemember on the base was severely wounded in the attack. *Id*.

*i.* *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this indirect fire attack. *Id*. He bases his conclusion on ISI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*. at 110-111.

93

*First*, according to Dr. Gartenstein-Ross, at the time of this attack, ISI had a strong operational presence in Rutbah.  *Id*. at 112.  Despite Coalition efforts to drive ISI out of western Anbar in 2005, Rutbah continued to serve as a key ISI support node.  *Id*.  ISI's prominence in Rutbah continued throughout 2006, leading to an increased number of IED attacks in the city.  *Id*.  Dr. Gartenstein-Ross notes that by October 2006, ISI had grown so confident in Rutbah that the group held rallies in the city's streets to celebrate its announcement of an Islamic State in Iraq.  *Id*.  ISI continued to operate in Rutbah in December 2006, the month of the attack that killed Capt. Kryst.  *Id*. at 113.

*Second*, Capt. Kryst was killed in an indirect fire attack involving 107-millimeter rockets, which is another indicator that ISI was responsible.  *Id*.  According to Dr. Gartenstein-Ross, ISI conducted numerous indirect fire attacks throughout Al Anbar during the Iraq War.  *Id*.  In the provincial capital of Ramadi in 2006, ISI fighters conducted complex attacks against Coalition bases that involved the use of indirect fire.  *Id*.  In addition to Ramadi, there are also numerous reports of ISI utilizing rocket attacks specifically to target Coalition bases across Al Anbar Province in late 2006.  *Id*. at 114.  In its Bellwether Liability Opinion, the Court also attributed a bellwether attack on a U.S. military base using 107-millimeter rockets to the Zarqawi organization, noting that the Zarqawi organization had "access to a range of artillery weapons" and a "history of targeting Coalition military bases."  Bellwether Liability Op. at 85-87 (citing Gartenstein-Ross expert report).  Based on these factors, it is very likely that the Zarqawi organization, as ISI, carried out the attack that killed Capt. Kryst.

Finally, Iran's material support to ISI substantially contributed to ISI's commission of this attack.  *See* Attribution Report at 114-115 (citing U.S. government reporting substantiating Iran's

support for the Zarqawi organization in Iraq); Bellwether Liability Op. at 85-87 (finding Iran liable

for Zarqawi organization indirect fire attack on U.S. military base using 107-millimeter rockets).

#### ii.    *Damages*

##### a.  **Bradley Kryst** – Brother of Capt. Kevin Kryst



Plaintiffs request, and I recommend, that the Court award the baseline amount of $2.5

million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

**V.      CONCLUSION**

For the reasons stated above, I make the recommendations reflected in Appendix A, below, regarding awards for the Plaintiffs covered by this R&R and urge that the Court enter, final judgments and damages awards against the Islamic Republic of Iran for each of the Plaintiffs who have presented evidence of their eligibility and damages in the recommended amounts.


Date:  June 26, 2025                                    Respectfully Submitted,

                                                        /s/ Stephen A. Saltzburg
                                                        Special Master

## Appendix A – Tranche 1 Western Anbar Plaintiffs Damages Table

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|
| Dale Johnston | Stepfather | 8/13/2004 | $5,000,000 | 2.6588 | $13,294,000 |
| Bruce Duane Squires | Father | 6/9/2005 | $7,500,000 | 2.5488 | $19,116,000 |
| Gail Marie Williams | Mother | 7/14/2005 | $6,250,000 | 2.5342 | $15,838,750 |
| Allison Gail Murphy | Sister | 7/14/2005 | $3,125,000 | 2.5342 | $7,919,375 |
| Patricia Ann Jameson | Mother | 7/14/2005 | $5,000,000 | 2.5342 | $12,671,000 |
| Robert Jameson | Brother | 7/14/2005 | $3,125,000 | 2.5342 | $7,919,375 |
| Sara Lynn Duvall | Mother | 8/3/2005 | $5,000,000 | 2.5259 | $12,629,500 |
| Larry Duvall | Stepfather | 8/3/2005 | $5,000,000 | 2.5259 | $12,629,500 |
| Matthew Stephen Reed | Brother | 8/3/2005 | $3,125,000 | 2.5259 | $7,893,438 |
| Jill Leigh Parmeter | Stepsister | 8/3/2005 | $2,500,000 | 2.5259 | $6,314,750 |
| Larry Large | Father | 10/3/2005 | $5,000,000 | 2.5004 | $12,502,000 |
| Devan Eutin | Stepdaughter | 10/3/2005 | Intentionally left blank | 2.5004 | Intentionally left blank |
| Carey Meissner | Mother | 10/6/2005 | $5,000,000 | 2.4991 | $12,495,500 |
| Mark McVicker | Father | 10/6/2005 | $6,250,000 | 2.4991 | $15,619,375 |
| Irma McVicker | Stepmother | 10/6/2005 | $6,250,000 | 2.4991 | $15,619,375 |
| Mollie Handy | Sister | 10/6/2005 | $3,125,000 | 2.4991 | $7,809,688 |
| Edward Ricci | Stepbrother | 10/6/2005 | $3,125,000 | 2.4991 | $7,809,688 |
| Robert Roddy Jr. | Father | 9/16/2006 | $5,000,000 | 2.3345 | $11,672,500 |
| Ruth Anne Holler | Mother | 11/2/2006 | $5,000,000 | 2.3111 | $11,555,500 |
| John Holler | Father | 11/2/2006 | $5,000,000 | 2.3111 | $11,555,500 |
| Joseph Aaron Holler | Brother | 11/2/2006 | $2,500,000 | 2.3111 | $5,777,750 |
| Melissa Warner | Mother | 11/22/2006 | $10,000,000 | 2.3011 | $23,011,000 |

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|
| Scott Nicholas Warner | Father | 11/22/2006 | $10,000,000 | 2.3011 | $23,011,000 |
| Ashton Warner | Brother | 11/22/2006 | $5,000,000 | 2.3011 | $11,505,500 |
| Violet Sue Kaylor | Mother | 11/28/2006 | $6,250,000 | 2.2981 | $14,363,125 |
| Jim Anthony Kaylor | Stepfather | 11/28/2006 | $6,250,000 | 2.2981 | $14,363,125 |
| Victoria Murano Strong | Mother | 1/26/2005 | $5,000,000 | 2.6048 | $13,024,000 |
| Estate of Nathan Strong | Father | 1/26/2005 | $5,000,000 | 2.6048 | $13,024,000 |
| Malisa Linn | Mother | 1/26/2005 | $6,250,000 | 2.6048 | $16,280,000 |
| Richard Jeffrey Linn | Father | 1/26/2005 | $5,000,000 | 2.6048 | $13,024,000 |
| Doris Pangelinan Kent | Mother | 10/15/2004 | $6,250,000 | 2.6392 | $16,495,000 |
| Christopher Kent | Stepfather | 10/15/2004 | $5,000,000 | 2.6392 | $13,196,000 |
| Jared John Santos | Brother | 10/15/2004 | $3,125,000 | 2.6392 | $8,247,500 |
| April Hess | Spouse | 4/11/2006 | $10,000,000 | 2.4131 | $24,131,000 |
| Katherine Meeks | Mother | 4/11/2006 | $6,250,000 | 2.4131 | $15,081,875 |
| Bradley Kryst | Brother | 12/18/2006 | $2,500,000 | 2.2882 | $5,720,500 |
| **Total Compensatory Damages Awards:** | | | $183,750,000 | | $453,120,189 |