IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT MARTINO, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>  Defendant. | Case No. 1:21-cv-01808-RDM |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING LIABILITY AND DAMAGES FOR TRANCHE 1 EASTERN ANBAR NON-BELLWETHER PLAINTIFFS**

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................. 1

II.   Evidentiary Standards.................................................................................. 2

III.  Legal Framework .......................................................................................... 4

    A.    Personal Jurisdiction .......................................................................... 4

    B.    Subject Matter Jurisdiction................................................................. 4

        1.    Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks. ........................................................................... 6

        2.    Plaintiffs Bring Claims for Personal Injury or Death. ............................ 6

        3.    The Attacks Constitute Acts of Extrajudicial Killing.............................. 7

        4.    The Zarqawi Organization and/or Ansar al-Sunna Committed Each Attack. ........................................................................................ 10

        5.    Iran Provided Material Support for the Zarqawi Organization and AAS's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries.................................................................... 15

    C.    Federal Cause of Action..................................................................... 17

    D.    Damages............................................................................................. 19

        1.    Solatium Damages................................................................... 19

        2.    Prejudgment Interest............................................................... 26

        3.    Post-Judgment Interest............................................................ 27

IV.   Analysis of Each Attack and Damages Warranted for Each Plaintiff ........... 28

    A.    Suicide Attacks.................................................................................. 28

        1.    December 11, 2003 SVBIED Attack that Killed U.S. Army Specialist Marshall Edgerton .......................................................... 28

        2.    November 15, 2005 SVBIED Attack that Killed U.S. Marine Corps Lance Corporal Nickolas Schiavoni.......................................... 37

    B.    Complex Attacks ................................................................................ 43

        3.    September 12, 2004 Complex Attack that Killed U.S. Marine Corps Private First Class Jason Poindexter ....................................... 43

        4.    February 16, 2005 Complex Attack that Killed U.S. Army Staff Sergeant Jason Hendrix................................................................ 52

        3.    December 1, 2006 Complex Attack that Killed U.S. Army Staff Sergeant Robert Love.................................................................. 58

    C.    IED Attacks........................................................................................ 62

        6.    May 13, 2004 IED Attack that Killed U.S. Marine Corps Private First Class Brandon Sturdy ........................................................... 63

i

7.    September 17, 2004 IED Attack that Killed U.S. Marine Corps Corporal Christopher Ebert..................................................................................... 67

8.    October 6, 2004 IED Attack that Killed U.S. Army National Guard Sergeant Jessica Cawvey.................................................................... 74

9.    March 4, 2005 IED Attack that Killed U.S. Army Corporal Stephen McGowan................................................................................................ 81

10.   April 4, 2005 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Jerimiah Kinchen.................................................................. 84

11.   May 10, 2005 IED Attack that Killed U.S. Army Staff Sergeant Samuel Castle.................................................................................................. 91

12.   October 10, 2005 IED Attack that Killed U.S. Army Sergeant Leon Montiel Johnson ........................................................................................ 93

13.   October 15, 2005 IED Attack that Killed U.S. Army Specialist Richard Hardy................................................................................................... 100

14.   March 7, 2006 IED Attack that Killed U.S. Marine Corps Gunnery Sergeant Justin Martone......................................................................... 102

15.   June 17, 2006 IED Attack that Killed U.S. Marine Corps Corporal Jonathan Benson.................................................................................. 106

16.   August 22, 2006 IED Attack that Killed U.S. Navy Chief Petty Officer Paul Darga..................................................................................... 112

17.   October 9, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Jon Bowman ........................................................................ 115

18.   October 21, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Nathan Elrod.................................................................... 120

19.   December 11, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Clinton Miller.................................................................... 122

20.   January 30, 2007 IED Attack that Killed U.S. Army Corporal Stephen Shannon................................................................................... 126

21.   April 14, 2008 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Dean Opicka ........................................................................ 130

22.   November 14, 2008 IED Attack that Killed U.S. Marine Corps Corporal Aaron Allen................................................................................... 133

D.    Indirect Fire Attacks............................................................................ 135

23.   May 2, 2004 Indirect Fire Attack that Killed U.S. Navy Petty Officer Second Class Robert Jenkins............................................................ 135

24.   September 15, 2005 Indirect Fire Attack that Killed U.S. Marine Corps Lance Corporal Shane Swanberg....................................................... 139

25.   October 27, 2005 Indirect Fire Attack that Killed U.S. Marine Corps Lance Corporal Robert Eckfield...................................................... 142

ii

    E.      Anti-Aircraft Attacks ................................................................................. 147

          26.    November 2, 2005 Anti-Aircraft Attack that Killed U.S. Marine Corps Major Michael Martino......................................................................... 147

          27.    February 7, 2007 Anti-Aircraft Attack that Killed U.S. Marine Corps Sergeant Travis Pfister, Sergeant James Tijerina, and Corporal Thomas Saba................................................................................................... 152

    F.      Attacks in Fallujah and Western Al Anbar Province...................................... 163

          28.    October 3, 2005 IED Attack that Killed U.S. Army Sergeant Bryan Large in Western Al Anbar......................................................................... 163

          29.    December 1, 2005 IED Attack that Killed U.S. Marine Corps Corporal Anthony McElveen and Lance Corporal John Holmason in Fallujah.... 166

V.      Economic Damages Request....................................................................... 168

VI.    Conclusion.............................................................................................. 170

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Baker v. Socialist People's Libyan Arab Jamahiriya,*
   775 F. Supp. 2d 48 (D.D.C. 2011)................................................................................ 49

*Barry v. Islamic Republic of Iran,*
   437 F. Supp. 3d 15 (D.D.C. 2020)................................................................................ 19

*Belkin v. Islamic Republic of Iran,*
   667 F. Supp. 2d 8 (D.D.C. 2009))................................................................................ 20

*Ben-Rafael v. Islamic Republic of Iran,*
   540 F. Supp. 2d 39 (D.D.C. 2008)...........................................................................23, 24

*Ben-Yishai v. Syrian Arab Republic,*
   642 F. Supp. 3d 110 (D.D.C. 2022) ............................................................................ 33

*Bernhardt v. Islamic Republic of Iran,*
   No. 18-CV-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023)...........................*passim*

*Blank v. Islamic Republic of Iran,*
   No. 19-CV-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021)................................ 20

*Bova v. Islamic Republic of Iran,*
   No. 15-CV-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020)................................ 22

*Braun v. Islamic Republic of Iran,*
   228 F. Supp. 3d 64 (D.D.C. 2017))............................................................................... 3

*Brown v. Islamic Republic of Iran,*
   687 F. Supp. 3d 21 (D.D.C. 2023).................................................................31, 39, 45, 46

*Bundy v. Jackson,*
   641 F.2d 934 (D.C. Cir. 1981)...................................................................................... 3

*Cabrera v. Islamic Republic of Iran,*
   No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022)..............................8, 21, 25

*Cabrera v. Islamic Republic of Iran,*
   No. CV 18-2065 (JDB), 2023 WL 3496303 (D.D.C. May 16, 2023)...........................18, 35

*Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs.*
   *Jungsong-Dong,*
   414 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................ 18

*Est. of Brown v. Islamic Republic of Iran,*
   872 F. Supp. 2d 37 (D.D.C. 2012)............................................................................... 23

*Est. of Fouty v. Syrian Arab Republic*,
743 F. Supp. 3d 118 (D.D.C. 2024) ................................................................... 18

*Est. of Fouty v. Syrian Arab Republic*,
No. 18-CV-385 (RBW), 2024 WL 3443591 (D.D.C. July 17, 2024) ................................. 25

*Est. of Fouty v. Syrian Arab Republic*,
No. CV 18-385 (RBW), 2024 WL 4006166 (D.D.C. Aug. 30, 2024) .................22, 166, 169

*Est. of Heiser v. Islamic Republic of Iran*,
466 F. Supp. 2d 229 (D.D.C. 2006) .....................................................................*passim*

*Est. of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) ..................................................................... 19

*Est. of Johnson v. Islamic Republic of Iran*,
No. 23-CV-1689, 2024 WL 3225954 (D.D.C. Jun. 28, 2024) ............................................ 24

*Est. of Steinberg v. Islamic Republic of Iran*,
No. 17-CV-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019) .............................. 170

*Ewan v. Islamic Republic of Iran*,
466 F. Supp. 3d 236 (D.D.C. 2020) .............................................................20, 26

*Flanagan v. Islamic Republic of Iran*,
190 F. Supp. 3d 138 (D.D.C. 2016) ................................................................. 3

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015) .....................................................................*passim*

*Foley v. Syrian Arab Republic*,
No. 1:11-cv-00699 (D.D.C. Oct. 6, 2017), *report and recommendation*
*adopted*, 281 F. Supp. 3d 153, 155-57 (D.D.C. 2017) ...................................................33, 160

*Force v. Islamic Republic of Iran*,
464 F. Supp. 3d 323 (D.D.C. 2020) ................................................................. 8

*Force v. Islamic Republic of Iran*,
617 F. Supp. 3d 20 (D.D.C. 2022) ...................................................................21, 26, 168

*Fritz v. Islamic Republic of Iran*,
324 F. Supp. 3d 54 (D.D.C. 2018) .....................................................................*passim*

*Fritz v. Islamic Republic of Iran*,
No. 15-CV-456 (RDM), 2018 WL 5046229 (D.D.C. Aug. 13, 2018) .........................25, 169

*Gration v. Islamic Republic of Iran*,
No. 21-CV-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) ....................19, 20, 27

*Hammons v. Islamic Republic of Iran*,
  No. 19-2518, 2023 WL 5933340 (D.D.C. 2023)................................................................. 3

*Han Kim v. Democratic People's Republic of Korea*,
  774 F.3d 1044 (D.C. Cir. 2014)........................................................................................2, 3

*Jakubowicz v. Islamic Republic of Iran*,
  No. 18-1450 (RDM), 2023 WL 6907852, *report and recommendation adopted
  in part and modified in part*, No. 18-1450 (RDM), 2024 WL 1826610 (D.D.C.
  Apr. 25, 2024) ..................................................................................................................... 25

*Karcher v. Islamic Republic of Iran*,
  No. 16-CV-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023)................................. 25

*Kilburn v. Islamic Republic of Iran*,
  699 F. Supp. 2d 136 (D.D.C. 2010) ................................................................................. 17

*Lee v. Islamic Republic of Iran*,
  2023 WL 8651039 (D.D.C. Dec. 7, 2023)......................................................................... 165

*Lelchook v. Syrian Arab Republic*,
  No. 16-1550, 2019 WL 4673849 (D.D.C. Sept. 25, 2019) ................................................ 170

*Mark v. Islamic Republic of Iran*,
  626 F. Supp. 3d 16 (D.D.C. 2022)................................................................................18, 24

*Mohammadi v. Islamic Republic of Iran*,
  782 F.3d 9 (D.C. Cir. 2015)................................................................................................ 6

*Moradi v. Islamic Republic of Iran*,
  77 F. Supp. 3d 57 (D.D.C. 2015).................................................................................19, 168

*Mwila v. Islamic Republic of Iran*,
  33 F. Supp. 3d 36 (D.D.C. 2014)...................................................................................... 162

*Neiberger v. Islamic Republic of Iran*,
  No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239 (D.D.C. Sept. 8, 2022)
  ............................................................................................................................8, 10, 19, 169

*Oveissi v. Islamic Republic of Iran*,
  768 F. Supp. 2d 16 (D.D.C. 2011)...............................................................................*passim*

*Owens v. Rep. of Sudan*,
  864 F.3d 751 (D.C. Cir. 2017), *rev'd on other grounds*, 590 U.S. 418 (2020)..............2, 3, 12

*Owens v. Republic of Sudan*,
  71 F. Supp. 3d 252 (D.D.C. 2014)................................................................................... 21

*Peterson v. Islamic Republic of Iran*,
515 F. Supp. 2d 25 (D.D.C. 2007) ................................................................... 25

*Reed v. Islamic Republic of Iran*,
845 F. Supp. 2d 204 (D.D.C. 2012) ...............................................................21, 26

*Roth v. Islamic Republic of Iran*,
651 F. Supp. 3d 65 (D.D.C. 2023) .................................................... 60, 64, 69, 76

*Roth v. Islamic Republic of Iran*,
78 F. Supp. 3d 349 (D.D.C. 2015) .................................................................19, 170

*Salazar v. Islamic Republic of Iran*,
370 F. Supp. 2d 105 (D.D.C. 2005) ................................................................. 25

*Salzman v. Islamic Republic of Iran*,
No. 17-2475 (RDM), 2019 WL 4673761 (D.D.C. Sept. 25, 2019 ........................ 7

*Schwartz v. Islamic Republic of Iran*,
No. CV 18-1349 (RDM), 2020 WL 7042842 (D.D.C. Nov. 30, 2020) ................. 9

*Selig v. Islamic Republic of Iran*,
No. 1:19-cv-02889-TNM, 2021 WL 5446870 (D.D.C. Nov. 22, 2021) .............. 98

*Selig v. Islamic Republic of Iran*,
No. 1:19-cv-02889-TNM, 573 F. Supp. 3d 40 (D.D.C. 2021) ........................... 35

*Sheikh v. Republic of Sudan*,
485 F. Supp. 3d 255 (D.D.C. 2020) ................................................................ 170

*Swinney v. Islamic Republic of Iran*,
No. 20-cv-2316 (ACR), 2025 WL 1547694 (D.D.C. May 30, 2025) ................36, 97, 99

*Taitt v. Islamic Republic of Iran*,
No. 20-CV-1557 (RC), 2023 WL 2536518 (D.D.C. Mar. 16, 2023) ................... 20

*Thuneibat v. Syrian Arab Republic*,
167 F. Supp. 3d 22 (D.D.C. 2016) ............................................................*passim*

*Valore v. Islamic Republic of Iran*,
700 F. Supp. 2d 52 ....................................................................................*passim*

*W.A. v. Islamic Republic of Iran*,
427 F. Supp. 3d 117 (D.D.C. 2019) ................................................................. 18

*W.A. v. Islamic Republic of Iran*,
No. 18-cv-1883, 2020 WL 7869218 (D.D.C. Mar. 23, 2020) ..................... 74, 109, 111, 160

vii

*Wultz v. Islamic Republic of Iran*,
  864 F. Supp. 2d 24 (D.D.C. 2012).................................................................*passim*

**Statutes**

8 U.S.C. § 1101(a)(22)............................................................................................ 6

18 U.S.C. § 2339A(b)(1))...................................................................................... 15

28 U.S.C. § 1605 .................................................................................................... 5

28 U.S.C. § 1605A(a)....................................................................................2, 5, 17

28 U.S.C. § 1605A(a)(1).....................................................................................6, 7

28 U.S.C. § 1605A(a)(2)(A)(ii)......................................................................5, 6, 18

28 U.S.C. § 1605A(c)............................................................................................ 17

28 U.S.C. § 1608(a)................................................................................................. 2

28 U.S.C. § 1608(a)(4)............................................................................................ 4

28 U.S.C. § 1961(a)............................................................................................... 27

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A .....................................*passim*

TVPA Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. §
  1350 note).......................................................................................................... 7

Pursuant to the Court's Order appointing me as Special Master and adopting an Administrative Plan, Dkt. [1] 64 ("Admin. Plan"), I respectfully submit this Report and Recommendations ("R & R") regarding Liability and Damages for the Non-Bellwether Plaintiffs Assigned to me.

## I.    INTRODUCTION

Plaintiffs are family members of American servicemembers or civilians who were killed or injured in terrorist attacks in Iraq between 2003 and 2017.  Plaintiffs brought suit against the Islamic Republic of Iran in 2021 under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

On November 30, 2023, Plaintiffs filed a motion for default judgment presenting evidence as to 25 bellwether attacks and 45 bellwether plaintiffs.  *See* Dkt. Nos. 38, 39, 40, 41.  On September 30, 2024, the Court issued a Memorandum Opinion and Order granting Plaintiffs' motion as to Iran's liability for all 25 bellwether attacks.  Dkt. 55 ("Bellwether Liability Opinion" or "Bellwether Liability Op.").  In the Bellwether Liability Opinion, the Court also resolved personal jurisdiction and several requirements for subject matter jurisdiction for all plaintiffs in this case.  The Court referred damages for the bellwether plaintiffs to me, and I issued an R & R.  *See* Dkt. 65, 66.  On February 25, 2025, the Court issued a Memorandum Opinion and Order adopting my recommendations as to the bellwether plaintiffs in full (the "Bellwether Damages Opinion" or "Bellwether Damages Op.").  Dkt. 71.[2]  The Court previously appointed additional Special Masters to consider all issues related to each of the remaining non-bellwether Plaintiffs'

---

[1] Unless otherwise stated, citations to "Dkt." refer to the Court's docket in *Martino, et al. v. Islamic Republic of Iran*, No. 1:21-cv-01808-RDM (D.D.C.).

[2] My report and recommendations and the Court's Bellwether Damages Opinion were filed under seal.  Plaintiffs' counsel have provided me with copies of these filings.

entitlement to relief and to make recommendations regarding the liability and damages claims of these Plaintiffs. *See* Admin. Plan at 2–5.

I have reviewed Plaintiffs' submission and accompanying exhibits and find that they establish liability against Iran for its material support of 27 non-bellwether attacks (the "Attacks") that occurred in the Eastern region of Al Anbar Province in Iraq, and are sufficient to establish damages for 61 Plaintiffs ("Plaintiffs") associated with the Attacks. I have also reviewed Plaintiffs' damage requests for two additional plaintiffs injured by two attacks that arose previously in this action and for which the Court found Iran liable. Each Plaintiff is a family member of one of the direct victims killed in the Attacks (the "Attack Victims").

## II.    EVIDENTIARY STANDARDS

Plaintiffs' claims arising from the Attacks are part of a default judgment case under the terrorism exception to the FSIA, 28 U.S.C. § 1605A. To obtain a default judgment against Iran, Plaintiffs must "(1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens II*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal law by offering evidence 'satisfactory to the court,' *id.* §§ 1605A(c), 1608(e)." Bellwether Liability Op. at 5. "In a case like this one, which alleges that a foreign state materially supported acts of terrorism, the district court must determine 'how much and what kinds of evidence the plaintiff must provide.'" *Id.* at 4 (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)). "But the Court must do so in light of Congress's purpose in enacting § 1605(A)—that is, to compensate the victims of terrorism so as to punish foreign states who have committed or sponsored such acts and to deter them from doing so in the future—and the difficulty in obtaining

2

firsthand evidence and eyewitness testimony from an absent and likely hostile sovereign." *Id.* at 4–5 (cleaned up).

Thus, in the Bellwether Liability Opinion, the Court applied the Federal Rules of Evidence, but "has done so on the understanding, first that it has 'the authority—indeed the obligation—to adjust evidentiary requirements to differing situations,'" Bellwether Liability Op. at 6–7 (cleaned up) (citing *Han Kim*, 774 F.3d at 1048) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, "second, that the Court need not 'step into the shoes of the defaulting party and pursue every possible evidentiary challenge.'" *Id.* at 7 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens II*")). "Expert testimony, moreover, is not only entirely proper, but often sufficient, . . . and even indispensable in 'terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Id.* (quoting *Owens II*, 864 F.3d at 787–88). As a result, courts have recognized that in the FSIA context, experts may rely on hearsay evidence in formulating their admissible expert opinions. *See Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016); *Hammons v. Islamic Republic of Iran*, No. 19-2518, 2023 WL 5933340, at *14 (D.D.C. 2023). For these reasons, "[i]n lieu of holding an evidentiary hearing," in its Bellwether Liability Opinion the Court relied solely on "Plaintiffs' declarations, exhibits, and the expert reports and declarations submitted," which are sufficient to support entry of a default judgment in a FSIA case. Bellwether Liability Op. at 7; *see also Han Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on

3

uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment).

The Court has already found that Plaintiffs' two expert witnesses, Dr. Daveed Gartenstein-Ross and Michael Pregent, are highly qualified to testify as experts on attack attribution and Iranian support for terrorists operating in Iraq, including the terrorists who committed the Attacks during the relevant time period. Bellwether Liability Op. at 5–6.

## III.    LEGAL FRAMEWORK

In order to prevail on their claims, Plaintiffs must establish personal jurisdiction, subject matter jurisdiction, a federal cause of action, and damages. In the following section, I discuss the applicable legal standards governing the elements of their liability and damages claims, the relevant findings and conclusions the Court has already made in the Bellwether Liability Opinion, and how Plaintiffs' evidence generally meets each element. In Section IV, I discuss the evidence establishing Iran's liability for each of the 27 Eastern Anbar Attacks at issue here, as well as each corresponding Plaintiff's entitlement to damages under the FSIA's legal framework. I also discuss the entitlement to damages for two Plaintiffs with Attacks occurring in Fallujah and Western Anbar, for whom liability has previously been established by this Court.

### A.    Personal Jurisdiction

The Court has already held that it has personal jurisdiction over Iran because Plaintiffs served Iran under 28 U.S.C. § 1608(a)(4). *See* Bellwether Liability Op. at 101. Thus, I need not provide a recommendation as to this issue.

### B.    Subject Matter Jurisdiction

4

Although foreign states are generally "immune from" jurisdiction, the FSIA provides for certain exceptions in Sections 1605 to 1607. 28 U.S.C. § 1604. The terrorism exception waives sovereign immunity for foreign states in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

Bellwether Liability Op. at 89 (quoting 28 U.S.C. § 1605A(a)(1)). The exception, moreover, applies only to suits in which two additional requirements are met. "First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred." *Id.* at 89–90 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)). "Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred . . . and at the time the lawsuit was filed[.]"[3] *Id.* at 90 (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)).

In the Bellwether Liability Opinion, the Court resolved two of these requirements. First, it held that "Plaintiffs expressly seek only monetary relief, prejudgment interest, costs and expenses, and attorneys' fees." Bellwether Liability Op. at 90 (citing Dkt. 15 at 306). Second, it held that "Iran was designated as a state sponsor of terrorism in 1984 . . . and remain so designated to this day." *Id.* (citations omitted).

---

[3] "Section 1605A(a)(2) also requires that the foreign state have received 'a reasonable opportunity to arbitrate the claim,' but only if the act of terrorism 'occurred in the foreign state against which the claim has been brought.'" Bellwether Liability Op. at 90 n.31 (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii)). As the Court has held, "[t]hat requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran." *Id.*

Plaintiffs here satisfy each of the remaining elements.

### 1. Plaintiffs and/or the Attack Victims Were U.S. Nationals at the Time of the Attacks.

The FSIA's terrorism exception requires that the claimant or the victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii). "The terrorism exception assigns the term 'national of the United States' the 'meaning given that term in section 101(a)(22) of the Immigration and Nationality Act' (INA)." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 8 U.S.C. § 1101(a)(22); 28 U.S.C. § 1605A(h)(5)). "The referenced provision of the INA, in turn, generally describes 'national of the United States' to mean either a 'citizen of the United States' or a 'person who, though not a citizen of the United States, owes permanent allegiance to the United States.'" *Id.* (quoting 8 U.S.C. § 1101(a)(22)).

Each Attack Victim was serving as a member of the U.S. armed forces or as a U.S. government contractor at the time of the Attack in which he or she was killed, which is sufficient to meet this element. Furthermore, Plaintiffs were U.S. citizens at the time of the Attacks in which their loved ones were killed, as evidenced by their submission of declaration testimony and birth certificates, passports, and/or certificates of naturalization. *See* Ex. 2, Tranche 1 Eastern Anbar Plaintiffs Table (listing each Plaintiff and his or her respective exhibits containing proof of citizenship). Each Plaintiff therefore meets this requirement.

### 2. Plaintiffs Bring Claims for Personal Injury or Death.

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts. 28 U.S.C. § 1605A(a)(1). Here, Plaintiffs are seeking to recover damages resulting from the extrajudicial killing of their family members. Plaintiffs satisfy the personal

injury requirement of § 1605A(a)(1) "because the statute is understood to encompass claims by family members for the distress caused by a relative's injuries or death, also known as solatium actions." Bellwether Liability Op. at 91 (citing 28 U.S.C. § 1605A(c) and *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019)). "Family members seeking solatium damages are entitled to recover based on a theory that parallels a common law claim for intentional infliction of emotional distress, and they are therefore considered to be bringing claims for 'personal injury.'" *Id.* at 91–92 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012)).

### 3.      The Attacks Constitute Acts of Extrajudicial Killing.

The terrorism exception also requires that Plaintiffs' personal injuries or deaths must have been "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act[.]" 28 U.S.C. § 1605A(a)(1). Plaintiffs' evidence shows that each of the Attacks constituted an extrajudicial killing.

"The FSIA looks to the Torture Victim Protection Act of 1991 ('TVPA') to define 'extrajudicial killing.'" Bellwether Liability Op. at 92 (citing 28 U.S.C. § 1605A(h)(7)). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350 note). "As the D.C. Circuit has explained, this definition 'contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.'" Bellwether Liability Op. at 92 (quoting *Owens II*, 864 F.3d at 770).

7

First, Plaintiffs' evidence, discussed in more detail *infra* at § IV, shows that each of the Attacks indisputably involved a "killing." Indeed, each Plaintiff is a family member of an Attack Victim who was killed in one of the Attacks. *See generally* Bellwether Liability Op. at 92–93 (holding that 24 of the 25 bellwether attacks "indisputably constitute[d] extrajudicial killings," and one attack, in which a bellwether plaintiff was injured but another servicemember was killed, also constituted an extrajudicial killing).

Second, Plaintiffs' evidence shows that each of these killings was "deliberated." *See* § IV. "A 'deliberated' killing is 'simply one undertaken with careful consideration, not on a sudden impulse.'" Bellwether Liability Op. at 93 (quoting *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016)). Evidence of an attack's sophistication and planning—such as intelligence gathering, selection of the attack site in advance, the purchase or obtainment of weapons for use in the attack, and/or operational training to commit the attack—demonstrates deliberation. *See* Bellwether Liability Op. at 93–95; *see also Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 364 (D.D.C. 2020) ("*Force I*") (finding an attack was deliberated because it was "meticulously planned," "demonstrate[d] characteristics of organized [terrorist] attacks," and showed signs of "careful intelligence and logistic preparations . . . made prior to the attack"); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193-EGS-ZMF, 2022 WL 17370239, at *3–4 (D.D.C. Sept. 8, 2022) (explaining that an improvised explosive device ("IED") attack carried out by an Iranian-backed terror organization was a "prototypical deliberated, extrajudicial killing"); *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *38 (D.D.C. July 19, 2022) (explaining that even if Iranian-backed terrorists "may not have known in advance that [they] would have the opportunity to conduct a particular attack," these attacks were nevertheless "deliberated" because the terrorists "planned [their] tactics in advance should the opportunity to

8

kill Americans arise"); *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349 (RDM), 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020) ("*Schwartz I*") (finding "ample evidence that the attacks in question were planned" from an expert declaration).

In the Bellwether Liability Opinion, the Court found there was "ample evidence" that the 25 bellwether attacks—including IED attacks, complex attacks, suicide bombings, small arms fire attacks, and artillery attacks—were all deliberated. Bellwether Liability Op. at 93–95. In reaching this conclusion, the Court considered factors such as IED attacks employing explosives that were buried beneath the ground, installed in advance, or detonated via command wire; complex attacks involving ambushes of Coalition forces at critical points in their missions; suicide bombings requiring preparation for "martyrdom"; small arms fire attacks requiring planning and familiarity with the terrain; and artillery attacks requiring familiarity with the location and occupation of the target military bases. *See id.* "All five types of attacks, moreover, require obtaining and using specific types of weapons, such as IEDs, which often require prior training." *Id.* at 95.

As set forth *infra* in Section IV(A)-(E), each of the 27 Attacks was deliberated. Seventeen of the Attacks involved the use of IEDs, which the Court, consistent with voluminous FSIA precedent, found by their nature require deliberation. Bellwether Liability Op. at 94. Three of the Attacks were complex ambushes in which terrorists employed IEDs and small arms fire to target Coalition convoys. The Court has likewise found that similar complex attacks "required prior planning and knowledge of [the] mission conducted by the Coalition forces" and were thus deliberated. *Id.* Two of the Attacks involved suicide bombings, which require "prior planning, and in addition a preparation for 'martyrdom.'" *Id.* Three of the Attacks involved the use of indirect fire (i.e., mortars, rockets, or artillery), which requires terrorist groups "to be familiar with the location and occupation of their target U.S. military bases." *Id.* at 94–95. Lastly, in two of the

Attacks, terrorists shot down U.S. military helicopters using small arms fire, rockets, and man-portable air defense systems ("MANPADs"). Such attacks "not only require[] prior planning but also for the group 'to be familiar with the terrain . . . and to know that these locations would be an ideal place to carry out such an attack.'" *Id.* at 94 (quoting D. Gartenstein-Ross expert report).

Plaintiffs' attack attribution expert Dr. Gartenstein-Ross also concludes that the Zarqawi organization and/or Ansar al-Islam/Ansar al-Sunna "planned" each Attack and discusses the planning and capabilities required to carry out each specific type of attack in detail in his Expert Witness Report on Tranche 1 Eastern Anbar Attack Attributions ("Attribution Report"). *See* Attribution Report at 4–5, 18–20.

Finally, there is no evidence that any of the Attacks were authorized by a prior judgment affording judicial guarantees of due process or that they were lawfully carried out under the authority of a foreign nation. *See* Bellwether Liability Op. at 95. To the contrary, Plaintiffs demonstrate that each Attack was perpetrated by the Zarqawi organization and/or Ansar al-Islam/Ansar al-Sunna—foreign terrorist groups—which is sufficient to show that it was not authorized by a previous judgment from a regularly constituted court. *See Neiberger*, 2022 WL 17370239, at \*3. Thus, each of the Attacks constitutes an "extrajudicial killing," just as the 25 bellwether attacks were "extrajudicial killings." *See* Bellwether Liability Op. at 95.

### 4. The Zarqawi Organization and/or Ansar al-Sunna Committed Each Attack.

Plaintiffs' evidence demonstrates that the Zarqawi organization[4] and/or Ansar al-Sunna

---

[4] The Zarqawi organization is a Sunni terrorist organization that has undergone several name changes since its emergence in the early 1990s and its operation in Iraq since 2002. It has been known by the following names: Bayat al-Imam (c. 1993-1999), Jund al-Sham (c. 1999-2004), Jamaat al-Tawhid wal-Jihad ("JTJ") (2004), Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or "AQI") (2004-2006), Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura

("AAS") [5] committed each of the Attacks. To assess responsibility for the Attacks, Dr. Gartenstein-Ross considered the following factors: (1) the geography and time period of the attack; (2) the tactics, techniques, and procedures ("TTPs") employed in the attack; (3) when relevant, U.S. Government reporting or analysis on the attack; and (4) when relevant, analysis of any claims of responsibility for the attack by terrorist groups. Attribution Report at 16–18. In addition, Dr. Gartenstein-Ross considered the likelihood that *any* terrorist group present in a given region could have been responsible for certain attacks and, where other groups besides the Zarqawi organization and AAS were present, he rules them out and explains why, in his expert opinion, it is more likely than not that the Zarqawi organization and/or AAS was responsible. *See id.* at 20–21.

---

Council or "MSC") (2006), Islamic State of Iraq ("ISI") (2006-2013), Islamic State of Iraq and al-Sham ("ISIS") (2013-2014), and the Islamic State (2014-present). *See* Bellwether Liability Op. at 11 n.3; Attribution Report at 27; *see also generally* Dr. Daveed Gartenstein-Ross, Expert Report & Declaration on Sunni Militant Organizations (Nov. 29, 2023), Dkt. 41-2 ("Sunni Militant Groups Report"); Michael Pregent, Expert Report (Nov. 20, 2024), Dkt. 41-4. Because of the "continuity and overlap" between these separately named entities, the Court has held that the "Zarqawi organization" is an appropriate nomenclature to define the "single, continuously operating organization" with "consistent leadership by Abu Musab al-Zarqawi and his followers." Bellwether Liability Op. at 11; *id.* at 11 n.3. For ease of reference, I refer to these entities as the Zarqawi organization throughout this R & R, except in descriptions of the Attacks and attributions, where Plaintiffs, like the Court, have adoped Dr. Gartenstein-Ross's practice of providing the more specific name of the Zarqawi organization aegis under which each Attack was perpetrated. *See, e.g.*, Bellwether Liability Op. at 26 n.6.

[5] Like the Zarqawi organization, AAS is a Sunni terrorist organization that operated in Iraq during the relevant time period. Originally established under the name Jund al-Islam in 2001, the group later adopted the name Ansar al-Islam ("AAI"), and changed its name to AAS on September 20, 2003. *See* Attribution Report at 51; Sunni Groups Report at 63–75; Bellwether Liability Op. at 11. Because the Attacks in this submission that Dr. Gartenstein-Ross attributes to AAS occurred after September 2003, Plaintiffs use the moniker "AAS" to describe the group. However, the Court previously used the overall title "AAI" to refer to both Ansar al-Islam and Ansar al-Sunna because AAS ultimately grew out of AAI. Bellwether Liability Op. at 11. Thus, the Court's findings in the Bellwether Liability Opinion concerning Iran's provision of material support to AAI apply equally to AAS-perpetrated attacks. *See, e.g.*, Bellwether Liability Op. at 65 (attributing attack to "AAI operating as 'AAS'").

11

Just as with the 25 bellwether attacks, Dr. Gartenstein-Ross concludes that the terrorist groups at issue, here the Zarqawi organization and AAS, either "likely" or "very likely" carried out the attack. *See id.* at 17–18 (explaining attribution probabilities).[6] In assessing the 25 bellwether attacks, the Court determined that either finding was sufficient to attribute the attacks to the identified terrorist group. Bellwether Liability Op. at 20–21. Upon a review of the evidence, the Court "agree[d] that, in some cases, there is overwhelming evidence that a particular group was responsible for a particular attack, while in other cases, the facts are murkier." *Id.* at 20. "Ultimately, however, the Court must simply decide whether Plaintiffs have proffered sufficient evidence to permit the Court to find by a preponderance of the evidence that the attack can be attributed either to the Zarqawi organization or AAI[/AAS]." *Id.* "In making that assessment, moreover, the Court must be mindful of the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign,' *Owens v. Rep. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds*, 590 U.S. 418 (2020), and from dangerous terrorist organizations, which often operate in secrecy and in hostile regions." *Id.* at 20–21.

---

[6] "One example of the kind of evidence that would support an attribution with a confidence level of *likely* is if the attack occurred within a group's geographic area of operations dominance, was executed with TTPs generally associated with the group, and aligns with the group's motivations (e.g., the target of attack matched the kind of targets that the group typically selected)." Attribution Report at 17-18. Dr. Gartenstein-Ross may determine that a specific terrorist group is *very likely* responsible for an attack "when the aforementioned factors exist alongside indicators of responsibility that make it appear that, rather than merely meeting a *preponderance of evidence* threshold, the group's responsibility can be determined with a probability that would satisfy an evidentiary threshold like *clear and convincing*." *Id.* at 18. As the Court explained, "That distinction makes sense, because terrorist organizations sometimes claim responsibility for their attacks, and sometimes they do not, because at times a single terrorist organization is the predominant group operating in a particular area, and at other times, multiple groups operate in the same area, and because these groups, at times, employ unique or specialized tactics, and at other times, they do not." Bellwether Liability Op. at 20.

Several of the Attacks occurred during a time when the Zarqawi organization and AAS closely cooperated with each other. *See* Attribution Report at Attack Nos. 4, 9, 11, 16. According to an authoritative U.S. Central Command report about the insurgency in Al Anbar Province, by April 2005, "AQI and Ansar al-Sunna showed a level of cooperation not seen elsewhere in Iraq . . . Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of fighters and contributed to the other's ability to mass." *Id.* By 2006, it was well-known that the Zarqawi organization and AAS were "interconnected," "related," and "affiliated." *Id.* For example, in the city of Hit, the two groups formalized their cooperation in a 2005 agreement that included AAS seeking the Zarqawi organization's approval for attacks it planned to carry out. *Id.* at 143. As the Court recognized in its Bellwether Liability Opinion, the Zarqawi organization "cooperated closely" with AAS in Ramadi in Al Anbar province "on leadership, finances, and operations." Bellwether Liability Op. at 82 (quoting Gartenstein-Ross expert report). Because both the Zarqawi organization and AAS received material support from Iran, questions about which of the two groups was more likely to have carried out a given attack are immaterial to Dr. Gartenstein-Ross's assessment that Iran's provision of material support to the groups contributed substantially to the attack's commission. Attribution Report at 52, 90, 107, 142. Thus, Dr. Gartenstein-Ross "evaluate[s] the probability that *either* group committed the attack rather than measuring the likelihood of [the Zarqawi organization's] or AAS's responsibility against one another." *Id.* In the Bellwether Liability Opinion, the Court also found that one attack was jointly attributable to the Zarqawi organization and AAS in light of their "history of cooperation," "working relationship," and "coordinat[ion] of actions for years." *See* Bellwether Liability Op. at 61–64.

13

As set forth *infra* at Section IV, Dr. Gartenstein-Ross—based on his expertise and assessment of supporting documentary evidence, including reports from the U.S. government and military—concludes it is more likely than not that the Zarqawi organization is responsible for 23 of the Attacks, and that the Zarqawi organization or AAS, or elements of both operating in coordination with one another, are responsible for four of the Attacks. This is consistent with the Court's previous findings that the Zarqawi organization committed 20 of the 25 bellwether attacks, that AAS committed four of the bellwether attacks, and that the Zarqawi organization and AAS jointly committed one bellwether attack. Bellwether Liability Op. at 10.

The Zarqawi organization was founded by the notorious terrorist Abu Musab al-Zarqawi, who prior to leading the group in Iraq had trained with al-Qaeda and run an al-Qaeda-funded terrorist camp in Afghanistan. Sunni Militant Groups Report, Dkt. 41-4, at 13–14. Once in Iraq, Zarqawi established his organization as a ruthlessly effective militant group, which he publicly aligned with al-Qaeda in 2004. *Id*. The Zarqawi organization was deemed to be the "primary terrorist threat to the Coalition" in Iraq in February 2004, and it "executed deadly attacks, established campaigns of violence, and held area of operations dominance in critical locations throughout the Iraq war, with one of its peaks occurring between 2004 and 2008." *Id*. One of those critical locations was eastern Al Anbar province, which was a "well-known ISI sanctuary" that was "central to the group's operations in the Fallujah area." Bellwether Liability Op. at 31 (quoting Gartenstein-Ross expert report).

AAS emerged from a conglomeration of Kurdish Sunni extremist groups in Iraq in late 2001, with Osama bin Laden and al Qaeda's blessing, funding, and training. *See* Sunni Militant Groups Report at 64–66. By 2002, AAS was harboring dozens of foreign jihadists who had traveled from Afghanistan to Iraq, including Abu Musab al-Zarqawi and his followers. *Id*. at 65.

14

In March 2003, Coalition forces launched Operation Viking Hammer against AAS's enclave in Iraq, which resulted in the death, capture, or flight of hundreds of AAS members. *Id.* at 67. Despite these losses, AAS survived and returned to Iraq, largely as a result of support it received from the Islamic Revolutionary Guard Corps ("IRGC"). *Id.* at 68.

### 5. Iran Provided Material Support for the Zarqawi Organization and AAS's Acts of Extrajudicial Killing, and Such Support Proximately Caused Plaintiffs' Injuries.

"The FSIA's terrorism exception applies when a plaintiff seeks money damages for 'personal injury or death that was caused by . . . the provision of material support or resources for' an 'act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking,' so long as that support was provided by 'an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'" Bellwether Liability Op. at 95 (citing 28 U.S.C. § 1605A(a)(1)). "Plaintiffs need not show that Iran 'specifically knew of or intended its support to cause' the particular attacks in question . . . or even that Iran's material support was a 'but for' cause of their injuries." *Id.* at 96–97 (internal citations omitted). Instead, the FSIA requires only a showing of proximate cause, which requires (1) that Iran's actions be a "substantial factor" in the sequence of events that led to Plaintiffs' injuries, and (2) that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's actions. *Id.* at 97 (citing *Owens II*, 864 F.3d at 794).

The Court has already found that Iran provided substantial financial support and operational capacity to the Zarqawi organization and AAI/AAS operating within Iraq during the same general time period. The Court concluded "that Iran provided both the Zarqawi organization and AAI 'material support' in the form of, 'currency,' 'training,' 'operational assistance,' and 'weapons,' among other things, within the meaning [of] the FSIA." *Id.* at 96 (citing 28 U.S.C. §

15

1605A(h)(3); 18 U.S.C. § 2339A(b)(1)).  The Court further found, consistent with Dr. Gartenstein-Ross's opinions here, that Iran materially supported attacks carried out by the Zarqawi organization and/or AAS in Al Anbar Province during the same general time period as the Attacks. Bellwether Liability Op. at 97 ("Iran's financial and military aid to the two groups was essential to each group's operating capacity and [], without Iran's backing, both groups would be substantially weakened.").

As to the foreseeability that such support would cause Plaintiffs' injuries, the Court previously found that "Iran's goal was to provide lethal aid to all groups fighting the United States," and "[t]hus, Iran not only supported these groups, but also actively encouraged them to carry out attacks in Iraq as part of its broader geopolitical strategy and provided both groups with the funding, weapons, and know-how to do so effectively." *Id.* at 97–98 (internal quotations and citations omitted).  The Court therefore concluded that "[t]he death and injury to servicemembers and contractors, and the suffering of their families was, by any measure, foreseeable." *Id.* at 98 (citing *Owens II*, 864 F.3d at 797–98; *Salzman*, 2019 WL 4673761, at \*14).  To the present day, Iran remains "the world's number one state sponsor of terror." President Donald Trump, Remarks concerning U.S. Airstrikes on Iran (June 21, 2025), https://apnews.com/article/trump-iran-speech-transcript-text-ff4b286992309ec1337e04260247bb1e.

In addition to the Court's prior findings as to Iranian support for Zarqawi organization and AAS attacks in Al Anbar Province and elsewhere in Iraq, I am able to rely on Dr. Gartenstein-Ross's determinations, consistent with the available evidence, that each of the 27 Attacks was materially supported by Iran.  *See infra* § IV; *see also* Attribution Report at 6, 26–35, 35–41, 42–50, 50–59, 59–67, 67–73, 73–80, 81–88, 88–98, 98–105, 105–112, 113–119, 119–125, 125–133, 133–141, 141–149, 149–156, 156–162, 163–169, 169–175, 175–181, 181–188, 188–193, 193–

16

199, 199–205, 205–211, 211–219, 219–221. As Dr. Gartenstein-Ross explains in his Attribution Report, as well as in his background report on Sunni Militant Groups, prior to and during the time period when the Attacks occurred, Iran and its Islamic Revolutionary Guard Corps Quds Force ("IRGC-QF") provided Zarqawi organization and AAS elements throughout Al Anbar Province with weapons, including IEDs, machine guns, sniper rifles, RPGs, mortars, rockets, and explosives—the same types of weapons the Zarqawi organization and AAS used to perpetrate the Attacks at issue here—in addition to financing, safe haven, travel facilitation, and training. *See id.* Because this support was crucial to the Zarqawi organization and AAS's ability to function and carry out attacks against U.S. servicemembers, Dr. Gartenstein-Ross concludes that Iran's material support "had a reasonable connection to" and "substantially contributed to" each Attack. *See id.*

C.      **Federal Cause of Action**

Plaintiffs bring claims solely under the private right of action in 28 U.S.C. § 1605A(c). The elements for establishing Iran's liability under this federal cause of action are "essentially the same" as the elements necessary to establish the FSIA's waiver of sovereign immunity discussed above. *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment,' or 'the legal representative of' any such person." Bellwether Liability Op. at 98–99 (quoting 28 U.S.C. § 1605A(c)). However, unlike the FSIA's requirements for subject matter jurisdiction, the private right of action does not necessitate that the claimant fall into one of the covered categories *at the time* the terrorist attack occurred. *Compare* 28 U.S.C.

17

§ 1605A(a)(2)(A)(ii) (granting jurisdiction over claims based on the status of "the claimant or the victim . . . at the time the [terrorist] act . . . occurred"), *with* § 1605A(c) (granting private right of action to "a national of the United States" or "a member of the armed forces" without temporal limits). *See also Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303, at *6 (D.D.C. May 16, 2023) ("*Cabrera II*"). Each Plaintiff is a U.S. national and thus meets this requirement. *See* Ex. 2, Tranche 1 Eastern Anbar Plaintiffs Table (listing exhibits including each Plaintiff's declaration and identity documents).

As to one Plaintiff, Barbara Saba, who passed away after the filing of this case, her estate has standing to sue under the FSIA for the extrajudicial killing of her son, U.S. Marine Corps Corporal Thomas Saba. *See* Dkt. 75, Suggestion of Death as to Nathan Strong; Dkt. 76, Plaintiffs' Motion to Substitute Party; March 17, 2025 Min. Order (granting motion to substitute the Estate of Barbara Saba as a plaintiff); Ex. 200 (documentation for the Estate of Barbara Saba). "The estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) (*"W.A. I"*) (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78–79 (D.D.C. 2017)). Courts in this District—including this Court in the present matter—thus recognize claims by the legal representative of an estate under 28 U.S.C. § 1605A. *See* Dkt. 92 at 7 (order granting judgment and damages to the Estate of Sherry Kay Rockholt). *See also, e.g.*, *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019); *Est. of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 156 (D.D.C. 2024); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 33 n.3 (D.D.C. 2022). Thus, "'any claim for personal injury, which includes IIED, can be maintained by the personal representative of the claimant once the claimant dies,' so long as the personal injury did not cause

18

the claimant's death." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020) (quoting *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 285–86 (D.D.C. 2005)).

### D.  Damages

#### 1.  Solatium Damages

To recover damages against Iran, Plaintiffs "must prove that the consequences of the [Defendant's] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 349, 402 (D.D.C. 2015) ("*Roth I*")). Courts may rely on written declarations from family member claimants describing the attack's effect on him or her. *See* Bellwether Damages Op. at 2 ("[T]he Special Master relied on sworn declarations, medical records, birth certificates, passports and an expert report."); *see also Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72–73 (D.D.C. 2015) (relying on wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband).

Courts in this jurisdiction consistently apply the general principles of tort law to FSIA actions. *See Roth I*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) ("*Oveissi II*")) (stating that courts "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (acknowledging that the court must proceed in the same manner as prior courts and look "to sources such as state decisional law, legal treatises, or the Restatements"); *Neiberger*, 2022 WL 17370239, at *11.

19

Under these general principles, a state sponsor of terrorism that provided material resources and support to a terrorist organization for an attack that caused an extrajudicial killing is responsible for intentional infliction of emotional distress ("IIED"), the resulting pain and suffering, and solatium of immediate family members. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020) (finding that survivors of terrorism were entitled to damages for IIED "[b]ecause acts of terrorism [were] 'by their definition' extreme and outrageous conduct"); *Heiser II*, 659 F. Supp. 2d at 27 ("Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes [the IIED] test easily."); *Gration*, 2023 WL 5221955, at *26; *Blank v. Islamic Republic of Iran*, No. 19-CV-3645 (BAH), 2021 WL 3021450, at *9 (D.D.C. July 17, 2021).  Courts in this jurisdiction regularly hold that family members need not be present at the terrorist attack to recover under a theory of IIED.  *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010) (a person "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Heiser II*, 659 F. Supp. 2d at 27 (explaining "that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families" who need not meet the presence requirement to recover for IIED); *Taitt v. Islamic Republic of Iran*, No. 20-CV-1557 (RC), 2023 WL 2536518, at *8 (D.D.C. Mar. 16, 2023) (citing *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) ("In terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived.")).  "An award of solatium damages is intended to compensate for the 'the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent.'"  Bellwether Damages Op. at 6 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).

In assessing damages awards, courts generally look to prior awards for comparable injury, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (noting that courts take pains to ensure that individuals with similar injuries receive similar awards), and typically follow the *Heiser* or *Peterson II* frameworks for solatium damages, which establish baseline awards to "help ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022) ("*Force II*") (citing *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018)). For family members of deceased victims, these frameworks "'provide a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings.'" Bellwether Damages Op. at 6–7 (quoting *Cabrera*, 2022 WL 2817730, at *47); *see also Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*"); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014).

"These amounts, however, are merely guideposts, and courts should deviate depending on the circumstances." Bellwether Damages Op. at 7 (citing *Fraenkel*, 892 F.3d at 361–62). In particular, a court may consider "evidence establishing an especially close relationship between the [claimant] and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 29-30 (D.D.C. 2011) ("*Oveissi I*") (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by [the] decedent's absence" or received

21

"medical treatment for depression and related affective disorders") (cleaned up).    Upward enhancements can range from approximately 20 to 100 percent of the baseline award depending on the plaintiff's circumstances.    *See, e.g.*, *Bova v. Islamic Republic of Iran*, No. 15-CV-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding plaintiff a 20 percent upward departure after she suffered a "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-CV-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding a 25 percent enhancement to family members for their severe mental distress from the victim's sudden death); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40–41 (D.D.C. 2012) (awarding Amanda Wultz a 40 percent upward departure because she suffers from PTSD, persistent grief, and depression, and because the attack caused her grades in school to suffer as a result of her having "zero motivation"); *Oveissi I*, 768 F. Supp. 2d at 29–30 (awarding a 50 percent enhancement due to plaintiff's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Est. of Fouty v. Syrian Arab Republic*, No. CV 18-385 (RBW), 2024 WL 4006166, at *24 (D.D.C. Aug. 30, 2024) (awarding 100 percent upward departures to two siblings because they had especially close relationships with the victim, they were "intimately aware of the inhumane manner in which their servicemen brothers were murdered," and they were "forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member" who was taken hostage).

In the Bellwether Damages Opinion, the Court adopted my recommendations in full, granting upward departures for 19 out of 45 bellwether plaintiffs, ranging from 25 to 100 percent. *See generally* Dkt. 66, Bellwether Damages Op.; Special Master R. & R., *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Oct. 29, 2024), *report and recommendation adopted*,

22

Dkt. 71, No. 1:21-cv-01808 (D.D.C. Feb. 25, 2025).  For the Additional Bellwether and Fallujah plaintiffs, the Court adopted 90 of the special masters' recommendations for damages awards and modified 12 damages recommendations, awarding upward departures ranging from 25 to 50 percent.  *See generally* Dkt. 74, Special Master R. & R., *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Feb. 25, 2025), *report and recommendation adopted in part and modified in part*, Dkt. 91, No. 1:21-cv-01808 (D.D.C. May 7, 2025); Dkt. 80, Special Master R. & R., *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Mar. 14, 2025), *report and recommendation adopted in part and modified in part*, Dkt. 91, No. 1:21-cv-01808 (D.D.C. May 7, 2025).

The solatium baselines may also be subject to downward variances, as warranted by individual circumstances.  *See, e.g.*, *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact with her victim son for the 16 years preceding his death).  For children who were under the age of three at the time of their parent's death, "decisions in this district have differed with respect to the appropriate award," Dkt. 91 at 8 (citation omitted), and "[s]ome courts have applied a downward variance in these circumstances."  *Id.*  (citing *Cabrera II*, 2023 WL 3496303, at *11).  Although this Court has applied downward variances for certain young children in this action, *see id.*  (awarding $3 million to three children who were three years old or two years old when their parents were killed), it has also concluded "that a baseline award may be appropriate where there is evidence that the child has suffered severely from the loss of their parent, despite not knowing or remembering them."  *Id.*  (citing Bellwether Damages Op. at 8); *see also* Dkt. 91 at 11 (awarding $5 million baseline damages to plaintiff Conner Walker, who was five months old at the time of the attack that killed his father); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57–58 (D.D.C. 2008)

23

(awarding $5 million in solatium damages to each child of a slain father, who were three years old and nine months old at the time of his murder); Special Master's Report and Recommendations, *Stearns v. Islamic Republic of Iran*, No. 17-CV-131 (RCL) (D.D.C. May 01, 2024), ECF No. 114 at 24–27, *report and recommendation adopted*, Order and Judgment, *id.* at ECF No. 108 (D.D.C. Apr. 30, 2024) (awarding plaintiff J.H., who was five weeks old at the time of her father's death, $5 million in solatium damages); Special Master's Report and Recommendations, *Lee v. Islamic Republic of Iran*, No. 19-CV-0083 (APM), (D.D.C. Apr. 11, 2022), ECF No. 59, *report and recommendation adopted*, Order and Judgment, *id.* at ECF 84 (D.D.C. June 29, 2023) (awarding plaintiff J.T., who was five weeks old at the time of his father's death, $5 million in solatium damages).

With respect to estates, this Court, like the vast majority of courts in this District, has awarded estate plaintiffs the same solatium damages as someone still alive in like circumstances. Dkt. 92 at 7 (awarding the Estate of Sherry Kay Rockholt an upward departure to $6.25 million in solatium damages); *see also, e.g.*, *Ben-Rafael*, 540 F. Supp. 2d at 59 (awarding a baseline of $5 million in solatium damages to the estate of the victim's mother); *Mark*, 626 F. Supp. at, 40 (awarding a baseline solatium damages to the estate of Shlomi Mark, who passed away three years after the attack that killed his family members); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-CV-1689, 2024 WL 3225954, at *16 (D.D.C. Jun. 28, 2024) (awarding a baseline of $2.5 million in solatium damages to the estates of the mother and father of a wounded servicemember, who lived for 25 and four years, respectively, after the date of the attack).

24

Plaintiffs here are all either immediate family members or functionally equivalent[7] to immediate family members of a servicemember who was killed in an Attack. They are thus entitled to recover solatium damages. *See, e.g.*, *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families," immediate family members are entitled to solatium awards); *Est. of Fouty v. Syrian Arab Republic*, No. 18-CV-385 (RBW), 2024 WL 3443591, at *25-26 (D.D.C. July 17, 2024) (citing, *inter alia*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) and *Fritz v. Islamic Republic of Iran*, No. 15-CV-456 (RDM), 2018

---

[7] The class of plaintiffs that can recover solatium damages also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related to the victim. *Cabrera*, 2022 WL 2817730, at *42 (internal quotations omitted). To establish that a plaintiff is the functional equivalent of an immediate family member, they must show that they were "treated like" an attack victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("*Fritz II*") *Fritz II*, 324 F. Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Valore*, 700 F. Supp. 2d at 79–80 (concluding that the adoptive or non-adoptive stepfather satisfied the immediate-family requirement because the victim treated him as the natural father, and the half-brother or step-brother also satisfied the immediate family requirement because the victim treated him as a full-blood sibling); *Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2023 WL 6907852, at *7 (D.D.C. Sept. 1, 2023), *adopted and modified*, 2024 WL 1826610, at *1 (D.D.C. Apr. 25, 2024) ("*Jakubowicz II*") (finding a grandfather as a functional equivalent of a parent because he "served as a father figure") (modified on other grounds); *Karcher v. Islamic Republic of Iran*, No. 16-CV-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) ("*Karcher III*") (determining that a stepparent was a functional equivalent of a family member—even though the stepchild victim also had a relationship with his biological parent—because the stepparent "supplemented" the parental role as evidenced by "the nature of the relationship" with "many weekends, school breaks, summer vacations" spent together). The same framework of solatium damages baselines and adjustments applies to functionally equivalent claimants as to immediate family claimants. *See generally* Special Master R. & R. at *6–7, *Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2023 WL 6907852, *report and recommendation adopted in part and modified in part*, No. 18-1450 (RDM), 2024 WL 1826610 (D.D.C. Apr. 25, 2024) (modified on other grounds).

25

WL 5046229, at *20 (D.D.C. Aug. 13, 2018) (stating that the strict meaning of immediate family "include[s] . . . immediate family members of half blood")); *Fritz II*, 324 F. Supp. at 63.

I circulated a Draft version of this R & R to Plaintiffs several days prior to the Court's October 14, 2025 Memorandum Opinion. Plaintiffs' counsel and I independently reviewed the damages recommendations I had made in the Draft in light of that Opinion and exchanged emails discussing the recommended awards for particular Plaintiffs. I reviewed the recommended awards, as well as Plaintiffs' analysis, with special emphasis on assuring that upward departure recommendations were based on severe pain, grief or suffering that a Plaintiff suffered as a result of the death of the family member giving rise to solatium damages. I also sought to assure that recommended awards were consistent with previous awards approved by the Court.

### 2. Prejudgment Interest

Plaintiffs who were "delayed in recovering compensation for their injuries" may seek prejudgment interest on their compensatory damages. *Reed*, 845 F. Supp. 2d at 214–15. Courts in this jurisdiction award prejudgment interest on the plaintiffs' "past economic loss and their non-economic pain and suffering and solatium damages." *Force II*, 617 F. Supp. 3d at 42 (cleaned up).

The most appropriate measure of prejudgment interest is the average annual prime rate from the date of the attack to the judgment's date, which is the method the Court adopted in the Bellwether Damages Opinion. *See* Bellwether Damages Op. at 11–12; *Force II*, 617 F. Supp. 3d at 42 (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 45–51 (D.C. Cir. 1996)). The court in *Ewan* provided an example:

> To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1983 (10.79%); discounted that interest by the percentage of the year left from April 18, 1983, to December 31, 1983 (70.4%); and then added that amount to $1.00—yielding $1.07596. Then, the Court took that amount and multiplied it by the prime rate in 1984 (12.04%) and added that amount to $1.07596, yielding $1.205506. The

26

> Court continued this iterative process through June 10, 2020, resulting in a total multiplier of 10.62015. *See Opati*, 60 F. Supp. 3d at 83 n.10. For 2020, the Court estimated the rate to be 4.05167%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (44.2623%).

*Ewan*, 466 F. Supp. 3d at 250 n.3.

In line with the Court's award of prejudgment interest in the Bellwether Damages Opinion, Plaintiffs seek, and I recommend, an award of prejudgment interest here. Applying the methodology detailed in *Ewan*, the table in Appendix A details the resulting prejudgment interest figures to account for the time that passed since the Attacks until the estimated judgment date of January 31, 2026.

### 3.    Post-Judgment Interest

Post-judgment interest is interest on any money judgment in a civil case issued by a district court, including against a foreign sovereign over whom the court has jurisdiction. *Gration*, 2023 WL 5221955, at *37 (citing 28 U.S.C. § 1961(a)). Courts in this jurisdiction award post-judgment interest at the statutory rate because the application of section 1961(a) is mandatory, not discretionary. *See* Bellwether Damages Op. at 12 n.1 (citing *Gration*, 2023 WL 5221955, at *37) (collecting cases). The statute provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The Court awarded post-judgment interest at the statutory rate on Plaintiffs' money judgment in the Bellwether Damages Opinion, and Plaintiffs thus request, and I again recommend, that the Court grant post-judgment interest from the date of the favorable judgment to the date of the judgment's payment. *See* Bellwether Damages Op. at 12 n.1.

27

## IV.   ANALYSIS OF EACH ATTACK AND DAMAGES WARRANTED FOR EACH PLAINTIFF

This R & R concerns 61 Plaintiffs who were injured in 27 Attacks in the Eastern Al Anbar region of Iraq from 2003 to 2008 and two Plaintiffs who were injured in attacks in the Fallujah and Western Al Anbar regions of Iraq in 2005.  The 27 Eastern Anbar Attacks fall into five categories: suicide attacks, complex attacks, IED attacks, indirect fire attacks, and anti-aircraft attacks.  Dr. Gartenstein-Ross concludes that every Attack was either likely or very likely carried out by the Zarqawi organization, AAS, or elements of the two groups working together.  The Attacks, along with the damages recommended for each Plaintiff injured by the Attacks, are detailed below.  Findings of Iran's liability have already been made concerning the two attacks in Fallujah and Western Al Anbar, and appropriate citations are included below.

### A.   Suicide Attacks

Suicide bombings involve terrorists' purposeful commitment of suicide by command-detonating explosives while they are near their target, generally by employing a vest or vehicle laden with the explosives.  *See* Attribution Report at 18–19.  Suicide bombings may involve either IEDs or military-grade explosives.  *Id.*  According to Dr. Gartenstein-Ross, "suicide bombings typically require a significant amount of planning and support, including vetting and training the suicide bomber and scouting the attack location or route."  *Id.*  And as the Court previously held, suicide bombings "involve[] prior planning, and in addition a preparation for 'martyrdom.'" Bellwether Liability Op. at 94 (quoting D. Gartenstein-Ross expert report).

### 1.   December 11, 2003 SVBIED Attack that Killed U.S. Army Specialist Marshall Edgerton

On December 11, 2003, U.S. Army SPC Marshall Edgerton was serving with Company A, 82nd Signal Battalion, 82nd Airborne Division at Camp Blue Diamond near Ramadi, Al Anbar

Province. Attribution Report at 26. SPC Edgerton was assisting in boarding and escorting an Iraqi civilian delivery truck which had already been cleared by installation security onto Combat Outpost Champion Main. *Id*. SPC Edgerton began shouting after reportedly noticing something suspicious about the vehicle, possibly to warn others, when the occupants of the delivery truck detonated four 100-pound artillery rounds concealed in the truck's gas tank in a suicide vehicle-borne improvised explosive device ("SVBIED") attack. *Id*. at 26–27. SPC Edgerton was killed instantly, and 14 others were wounded. *Id*. at 27.

#### i.        *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) likely committed this SVBIED attack. *Id*. He bases this conclusion on JTJ's area of operations dominance at the time of the attack, the TTPs employed to carry out the attack, media reporting on the U.S. Government's assessment that the Zarqawi organization was involved, and ruling out other possible threat actors. *Id*. *First*, at the time of the attack, JTJ maintained an operational presence in Ramadi. *Id*. at 28. For instance, in August 2003, Coalition forces captured a JTJ affiliate in Ramadi, and in February 2004, Coalition forces detained multiple JTJ operatives, including at least one senior leader, while raiding a Ramadi safehouse. *Id*. Additionally, a 2007 United States Central Command ("CENTCOM") report on Al Anbar's operational environment noted that in 2004, JTJ regularly met with the Ramadi Shura Council ("RSC"), an informal coordinating body for insurgents based in and around Ramadi, illustrating JTJ's interest in the city and importance as an insurgent group. *Id*. Thus, based on JTJ's presence in the area at this time, it is likely that they committed this attack.

*Second*, the TTPs used to carry out the SVBIED attack indicate that JTJ was the most likely culprit because of the operational knowledge required, the use of suicide bombers, and the size of

29

the weapon. *Id.* at 29. The team operating the SVBIED demonstrated a significant understanding of Camp Blue Diamond's force protection protocols—they likely knew Camp Blue Diamond lacked the capacity to x-ray or inspect closed containers, and so they concealed the explosives in the truck's gas tank. *Id.* The attackers remained calm for over four hours awaiting inspection and were familiar enough with the security procedures to admit that they were not on the approved delivery list but named a unit that was purportedly the intended recipient, which was sufficient to allow the truck onto Camp Blue Diamond. *Id.* at 29. The drivers also seemed comfortable navigating the base and disguised their payload to appear similar to other deliveries. *Id.* These details are, according to Dr. Gartenstein-Ross, "significant indicators" that the group responsible had a very strong operational presence nearby to facilitate the collection and synthesis of such intelligence. *Id.* at 30. The use of a large SVBIED is likewise considered a "JTJ signature" for targeting Coalition forces. *Id.* Additionally, the use of suicide bombers was, according to a 2007 CENTCOM profile on JTJ, an integral tactic in JTJ's strategy, because of JTJ's "obsession with martyrdom." *Id.* A report by the Australian Government noted that Zarqawi, from 2002 to 2005 commonly carried out suicide attacking using SVBIEDs. *Id.* According to U.S. intelligence officials at the time, JTJ was responsible for five high-profile suicide, VBIED, and SVBIED attacks that occurred in Iraq in 2003. *Id.* at 30-31. As such, the SVBIED attack on December 11, 2003 at Camp Blue Diamond was typical of the tactics, techniques, and procedures commonly used by JTJ during this time, indicating the group's responsibility.

*Third*, as reported by media sources, U.S. intelligence officials attributed this attack as one of many in 2003 to JTJ. *Id.* at 31–32. NBC News in 2003 reported that U.S. intelligence officials "believe that Ayman al-Zarqawi [leader of JTJ], a Jordanian militant with links to Osama bin Laden's al-Qaida network, has orchestrated the vast majority of terror attacks against U.S.

forces…" and listed a number of attacks attributed to JTJ, including a December 10, 2003 attack in which a U.S. soldier died and 14 others were wounded when three suicide bombers attacked the headquarters of the 82nd Airborne Division west of Baghdad in the city of Ramadi. *Id.* Dr. Gartenstein-Ross notes that there is only one record of an attack on the 82nd Airborne at this time, and because all of the other details align, it is likely that the NBC article is referring to the December 11, 2003 attack which killed SPC Edgerton, and the date discrepancy is due to time zones or a misstatement by NBC. *Id.*

*Fourth*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out the attack. Although AAS and former regime elements ("FREs") were active in Ramadi during this time, AAS only rarely carried out SVBIED attacks, and did so typically in northern Iraq, not Ramadi. *Id.* at 32. Regardless, because Iran also provided material support to AAS, the possibility that AAS may have been involved does not alter the likelihood that Iran's support substantially contributed to the attack. *Id*.

*Finally*, Iran's material support to JTJ substantially contributed to the commission of the attack. *See id.* at 33–35 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq). *See also id.* at 32–33 n.115 (noting that this Court has held Iran's provision of material support and resources to JTJ was sufficient to hold Iran liable for attacks carried out by JTJ (collecting cases)). The Court previously held that Iran materially supported a Zarqawi organization-perpetrated SVBIED attack that occurred in December 2005, *see* Bellwether Liability Op. at 71–73, as well as a Zarqawi organization-perpetrated suicide attack in October 2004, *id.* at 66–68. *See also Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 41–42 (D.D.C. 2023) (holding Iran liable for sophisticated SVBIED attacks).

### ii.    *Damages*

31

### a. Amy Edgerton-McDonald – Spouse of SPC Marshall Edgerton

33

Amy

requests, and I recommend, that the Court award her $10 million in solatium damages.

34

**b. Alyssa Edgerton – Daughter of SPC Marshall Edgerton**

35

Alyssa requests, and I recommend, that the Court award her an upward departure of 25 percent to $6.25 million in solatium damages.

36

c.  **Marshall Hunter Edgerton – Son of SPC Marshall Edgerton**



Marshall requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 2.   November 15, 2005 SVBIED Attack that Killed U.S. Marine Corps Lance Corporal Nickolas Schiavoni

On November 15, 2005, LCpl Nickolas Schiavoni was serving with G Company, 2nd Battalion, 2nd Marines, Regimental Combat Team 8, 2nd Marine Division in Al-Karmah, Al Anbar Province. Attribution Report at 35. LCpl Schiavoni was driving a High Mobility Multi-Purpose Wheeled Vehicle ("HMMWV") as part of a mounted patrol approximately one mile north of Al-Karmah near alternate supply route ("ASR") Chicago. *Id*. As the convoy neared an intersection between ASR Chicago and a canal road, a white sedan traveling north along ASR Chicago performed a U-turn, stopped in the intersection, let a single military-aged male out, then turned onto the road the convoy was traveling on. *Id.* The Marines in the lead vehicle attempted to flag the white sedan down as it approached the convoy, but when the sedan was approximately ten meters from the convoy, it exploded. *Id.* at 36. The explosion killed LCpl Schiavoni, who

died of severe blast and shrapnel injuries across his body, and wounded three additional servicemembers. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely committed this SVBIED attack. *Id.* at 36. He bases this conclusion on AQI's area of operations dominance at the time of the attack, the TTPs employed in the attack, and ruling out other possible insurgent groups. *Id. First*, AQI was present in Al-Karmah before, during, and after this attack. *Id.* at 37. In 2005, AQI fighters who had previously fled the area were pushed back into eastern Al Anbar by Coalition forces and local Anbari communities, resulting in AQI concentrating their presence in Al-Karmah and other areas surrounding Fallujah. *Id.* An Institute for Defense Analyses described AQI's activity between 2005 and 2007 as a maintained a "strong and persistent presence in Al Karmah" from which they staged attacks on Fallujah. *Id.* Additionally, in 2005 local insurgent leaders and Fallujah-based AQI cells began loosely uniting under Sheikh Abd al-Munam Shakir Hamdan Faith al-Kubaisi of the Furqan Mosque, who sought to restore Sheikh Abdullah Janabi—who in 2004 swore allegiance to Zarqawi, and by extension, AQI—to power in Fallujah. *Id.* at 37–38. A 2007 CENTCOM report noted that local fighters who had sworn allegiance to Janabi were thus necessarily AQI affiliates. *Id.* at 38.

*Second*, the TTPs indicate that AQI was the most likely culprit because this attack involved the use of an SVBIED. *Id.* AQI employed suicide attacks as a primary tactic from the very beginning of the war in Iraq and was responsible for the majority of the SVBIED attacks. *Id.* A 2007 CENTCOM report revealed how highly prioritized VBIEDs were to AQI: in 2005, a recovered expenditure record indicated that a captured AQI cell allocated more funds to "vehicle maintenance"—a euphemism for modifying cars into VBIEDs—than even to weaponry. *Id.*

38

SVBIED attacks were a key component of AQI's strategy to retake Fallujah in 2005, and AQI's presence and activities in Fallujah were strongly connected to its operations in nearby Al-Karmah. *Id.* For the aforementioned reasons, AQI had the necessary networks and TTPs to carry out the SVBIED attack on November 15, 2005. *Id.* at 39.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out the attack. *Id.* Although Jaysh Mohammed and the Green Battalion were also present near Al-Karmah in November 2005, these groups were "primarily interested in criminal activity at the time and therefore not as interested in conducting attacks on Coalition forces." *Id.* AAS was also an active insurgent group in late 2005 in the region, but according to a 2007 CENTCOM report, AAS and AQI were aligned along a territorial region which likely included Al-Karmah. *Id.* Thus, Dr. Gartenstein-Ross concludes that it is likely that AQI carried out the November 15, 2005 attack that killed LCpl Schiavoni. *Id.* Furthermore, given that Iran also provided material support to AAS, the group's possible involvement does not undermine Dr. Gartenstein-Ross' conclusion that Iran was responsible. *Id.*

*Finally*, Iran's material support to AQI substantially contributed to the commission of the attack. *See id.* at 39–41 (citing U.S. government reporting substantiating Iran's support for the AQI organization in Iraq). *See also id.* at 39 n.159 (noting that this Court has held Iran's provision of material support and resources to AQI was sufficient to hold Iran liable for attacks carried out by AQI (collecting cases)). The Court previously held that Iran materially supported a Zarqawi organization-perpetrated SVBIED attack that occurred in December, 2005, *see* Bellwether Liability Op. at 71–73, as well as a Zarqawi organization-perpetrated suicide attack in October 2004, *id.* at 66–68. *See also Brown*, 687 F. Supp. 3d at 41–42 (holding Iran liable for sophisticated SVBIED attacks).

### *ii.* *Damages*

**a. Stephany Kern – Mother of LCpl Nickolas Schiavoni**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ she requests, and I recommend, that the Court award her

an upward departure of 25 percent to $6.25 million in solatium damages. ███████████████

████████████████████████████████████████████████

**b.  David Schiavoni – Father of LCpl Nickolas Schiavoni**

42

he requests, and I recommend, that the Court award him a 25 percent upward departure to $6.25 million in solatium damages.



### B.    Complex Attacks

Complex attacks involve the use of multiple types of weapons in the same attack and may be previously coordinated engagements by multiple terrorists or their opportunistic employment of multiple weapon types.  Attribution Report at 19.  Some complex attacks begin with an "event-based trigger," such as an initial IED detonation, which is then followed by follow-on small arms fire; others involve the use of multiple weapons from the outset, such as a convoy ambush.  *Id.* Complex attacks require access to multiple types of weapons, training on how to employ them, familiarity with the local terrain, and coordinated planning and communications.  *Id.*  According to Dr. Gartenstein-Ross, "Iran is known to have provided certain Iraq-based militant groups with specific training in coordinated attacks."  *Id.*

### 3.   September 12, 2004 Complex Attack that Killed U.S. Marine Corps Private First Class Jason Poindexter

On September 12, 2004, PFC Jason Poindexter was serving with Company E, 2nd Battalion, 5th Marine Regiment, 1st Marine Division, I Marine Expeditionary Force in Ramadi, Al Anbar Province.  *Id.* at 42.  At approximately 1115 local time, PFC Poindexter's unit was struck

43

by a VBIED near the veterans' affairs building on main supply route ("MSR") Michigan in Ramadi. *Id.* The VBIED attack was followed up with an ambush and firefight, where Echo Company was able to eventually fight off and kill six insurgents. *Id.* PFC Poindexter died from injuries sustained in the initial VBIED explosion, and three other servicemembers were wounded in the attack. *Id.*

### i.      *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) likely committed this complex attack involving a VBIED and ambush based on the area of operations dominance, the TTPs used in the attack, and ruling out other possible insurgent groups. *Id.* at 43. *First,* at the time of the attack, JTJ possessed a strong operational presence in Ramadi. *Id.* A 2007 CENTCOM report on Al Anbar's operational environment noted that in 2004, JTJ regularly met with the Ramadi Shura Counsel ("RSC"), an informal coordinating body for insurgents based in and around Ramadi, illustrating JTJ's interest in the city and importance as an insurgency group. *Id.* at 43–44. These insurgent groups wielded enough power that in July 2004, they were able to kidnap three of Anbar's then-governor's sons and force him to resign as governor and film himself "repenting" for having collaborated with the Coalition. *Id.* at 44–45. Additionally, in February 2004, Coalition forces raided a JTJ safehouse and detained multiple JTJ operatives including one of Zarqawi's lieutenants who was suspected of masterminding a string of recent deadly attacks in Iraq. *Id.* at 44. JTJ furthermore claimed responsibility for similar attacks in the fall of 2004, including two SVBIED attacks on October 30 and November 7, 2004 in Ramadi. *Id.* at 45. Thus, based on the JTJ's presence in the area at this time, it is likely that they committed this attack.

*Second*, the TTPs used to carry out the complex attack indicates AQI was the most likely culprit because it involved (1) a suicide bomber, (2) the employment of a car bomb, and (3) the

generation of large-scale casualties. *Id.* In the timeframe and location of this attack, JTJ was known to commonly use SVBIEDs, as noted in a 2005 Australian Government report and a 2005 U.S. Department of State profile, which attributed numerous VBIED attacks that occurred in 2004 to JTJ. *Id.* at 46. A 2007 CENTCOM report explained how suicide tactics were seen by JTJ/AQI's leadership as a "show of strength" designed to demonstrate the insurgent's willingness to sacrifice themselves for their beliefs, bolstering credibility among their followers. *Id.* at 45. On January 15, 2005, Coalition forces captured a JTJ bombmaker who admitted to his involvement in at least 32 car bombings and building "75% of all car bombs [VBIEDs] used in Iraq since OIF [Operation Iraqi Freedom]." *Id.* at 46–47. Furthermore, this court has previously held that VBIEDs were "a signature AQI attack method." *See Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 41–42 (D.D.C. July 27, 2023). Dr. Gartenstein-Ross notes that the complexity of an attack which includes an hours-long firefight suggests a strong understanding of the operational environment and logistical support necessary, increasing the likelihood JTJ was ultimately responsible. Attribution Report at 47.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out the attack. *Id.* Although AAS, RSC, and FREs were active in Ramadi during this time, AAS only rarely carried out SVBIED attacks, and did so exclusively in northern Iraq, not Ramadi. *Id.* at 47–48. Regardless, because Iran has also provided material support to AAS, the possibility that AAS may have been involved does not alter the likelihood that Iran's support substantially contributed to the attack. *Id.* at 48. RSC served primarily as an informal governing body which consolidated resources and coordinated attacks, but likely did not carry out the attacks. *Id.* FREs were occasionally known to be involved in SVBIED attacks, but the presence of the RSC suggests some level of coordination, support, and guidance was being

45

distributed among the various militia groups, and the likelihood that such a complex attack was executed without JTJ involvement is low. *Id.* Thus, Dr. Gartenstein-Ross concludes that it is likely that JTJ carried out the September 12, 2004 complex attack which killed PFC Poindexter. *Id*.

*Finally*, Iran's material support to JTJ substantially contributed to the commission of the attack. *See id.* at 48–50 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq). *See also id.* at 48 n.216 (noting that this Court has held Iran's provision of material support and resources to JTJ was sufficient to hold Iran liable for attacks carried out by JTJ (collecting cases)). The Court has found that similar complex attacks "required prior planning and knowledge of [the] mission conducted by the Coalition forces" and when such attacks include suicide bombings, require "prior planning, and in addition a preparation for 'martyrdom,'" all hallmarks of the Zarqawi organization. Bellwether Liability Op. at 94. The Court previously held that Iran materially supported a similar Zarqawi organization-perpetrated complex attack that occurred in April 2004, *id.* at 52–54, and a similar Zarqawi organization-perpetrated SVBIED attack that occurred in December 2005, *id.* at 71–73. *See also Brown*, 687 F. Supp. 3d at 41–42 (holding Iran liable for sophisticated SVBIED attacks).

### ii. *Damages*

#### a. Sharon Stevens – Mother of PFC Jason Poindexter

Sharon remembers her son Jason as an "outgoing, happy, and smiling" child. Ex. 99, Declaration of Sharon Stevens ¶ 2.

After Jason was killed by a car bomb in Iraq only a few days after arriving, Sharon was "numb" and "could not function." *Id.* ¶¶ 6, 8. Sharon "thought about taking [her] own life," though she never acted on it because she had to raise her other sons. *Id.* ¶ 9. Jason's death also affected

46

Sharon's physical health. *Id.* ¶¶ 9–11. As a result of the stress caused by her loss, she "began experiencing severe headaches . . . and was prescribed blood pressure medication to treat them, which [she] still take[s]." *Id.* ¶ 9. In April of 2005, she received hate mail that referenced Jason. *Id.* ¶ 10. That same day, she experienced a transient ischemic attack from the stress and developed Bell's Palsy, which continues to affect her speech. *Id.* She also experienced insomnia in the months after Jason's death, which impacted her ability to work. *Id.* ¶ 11. In addition to increasing her own use of alcohol—which she has since quit—Sharon saw her other sons, Travis and Robert, develop severe alcoholism in the aftermath of Jason's death. *Id.* ¶¶ 11, 12. She is constantly worried about her sons "possibly committing suicide" due to their ongoing grief over the loss of Jason. *Id.* ¶ 12. The resulting emotional stress from witnessing her sons' substance abuse and struggles with mental health "has contributed to [her] own physical illnesses." *Id.*

Due to Sharon's experiences with suicidal ideation and insomnia affecting her ability to work immediately after her son's death, increased alcohol use, the stress-related transient ischemic attack and Bell's Palsy—which continues to impact her speech today—that she developed as a result of receiving hate mail about Jason, and the emotional impact of her other sons' depression and substance abuse disorders, she requests, and I recommend, that the Court award her an upward departure of 25 percent to $6.25 million in solatium damages.

47



*Flanagan*, 87 F.Supp.3d at 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder).

**b. Samuel Poindexter – Father of PFC Jason Poindexter**

Samuel requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

**c. Robert Poindexter – Brother of PFC Jason Poindexter**

████████████████████████████

██████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

██████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████ Robert requests, and I recommend, that the Court award him a 25 percent upward departure to $3.125 million in solatium damages. ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

49

50

**d.  Travis Westbrook – Brother of PFC Jason Poindexter**

51

████████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ Travis requests, and I recommend,

that the Court award him an upward departure of 50 percent to $3.75 million in solatium damages.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████



### 4. February 16, 2005 Complex Attack that Killed U.S. Army Staff Sergeant Jason Hendrix

On February 16, 2005, SSG Jason Hendrix was serving in 1st Battalion, 9th Infantry Regiment, 2nd Infantry Division in Ramadi, Al Anbar Province. Attribution Report at 51. While SSG Hendrix was moving through Ramadi along Route Nova, his unit was attacked with two IEDs, wounding SSG Hendrix. *Id.* His patrol stopped and began to establish security around the site when a third IED detonated, wounding another servicemember in SSG Hendrix's unit. *Id.* at 48–49. Soon after the third IED detonated, ten to twelve insurgents attacked SSG Hendrix's patrol with small arms fire. *Id.* at 49. SSG Hendrix's unit was able to withdraw and evacuate SSG Hendrix by air to Camp Taqaddum, but SSG Hendrix succumbed to his injuries later that evening. *Id.*

#### i. *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS likely committed this complex attack,[8] based on the area of operations dominance at the time

---

[8] Dr. Gartenstein-Ross notes that this attack occurred during a time when AQI and AAS closely cooperated with each other. *Id.* at 51. A 2005 CENTCOM report described AQI and AAS as "show[ing] a level of cooperation not seen elsewhere in Iraq. . . Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of

of the attack, the TTPs used in the attack, and ruling out other possible insurgent groups. *Id*. *First,* at the time of the attack, both AQI and AAS possessed a strong operational presence in Ramadi. *Id*. at 52. For instance, a 2013 U.S. Army War College report described AQI's May 2005 kidnapping of the new Anbar governor in Ramadi—a few weeks later, the new governor would be found dead—and AQI's aggressive targeting of sheikhs who appeared willing to challenge AQI's "strong influence" in Ramadi. *Id*. at 54. AAS maintained a strong influence in Ramadi during this time as well, claiming responsibility for attacks such as the kidnappings and executions of contractors in May and June near Ramadi. *Id*. at 54–55. According to a 2007 CENTCOM report, in 2005 the insurgent leadership was "divided between the Ramadi Shura Council, AQI, and the Ansar al-Sunna" and by October 2005, AAS and AQI "had the same goal" as "co-belligerents." *Id*. AAS and AQI insurgents "rapidly shifted back and forth between" the two organizations, and in 2005 both organizations ultimately answered to Abu Salam. *Id*.

*Second*, the TTPs used to carry out the complex attack indicates that AQI and/or AAS were the most likely culprit because it involved the use of multiple IEDs and small arms fire. *Id*. at 55. IEDs were commonly used by both AQI and AAS during this time period. *Id*. By 2005, Coalition forces had discovered multiple AQI IED factories throughout Al Anbar Province, and often found senior AQI leaders at suspected IED production sites. *Id*. Coalition raids in Ramadi found multiple AQI weapons caches, including caches of artillery and mortar rounds, RPGs, high explosives, small arms weapons and ammunition, and bomb-making equipment. *Id*. AQI was even known to provide cash incentives to its fighters for successful IED attacks, with additional bonuses for

---

fighters and contributed to the other's ability to mass." *Id*. Because both AQI and AAS received material support from Iran, Dr. Gartenstein-Ross concludes that determining the group which was more likely to have carried out the attack vis-à-vis the other is immaterial. *Id*. at 52.

destroying a HMMWV. *Id.* AAS similarly employed small arms fire and IED attacks during this time, as evidenced by AAS recruiting videos demonstrating and claiming responsibility for various rocket attacks and roadside bombings during this period. *Id.* at 56. Because both AQI and AAS were "highly capable" fighting forces known to carry out complex attacks, the similar TTPs used in this attack indicate one or both organizations were responsible. *Id.*

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in the area could have carried out the attack. *Id.* at 57. The RSC was present in Ramadi in February of 2005, but in some instances was executing attacks on AQI's behalf for the aforementioned cash incentives. *Id.* Thus, RSC's possible involvement in an attack does not necessarily rule out AQI's responsibility. *Id.* Although Jaysh Mohammed and the Green Battalion were also present near Ramadi in February of 2005, these groups were "primarily involved in criminal activity and political endeavors, not targeting coalition forces." *Id.* Thus, Dr. Gartenstein-Ross concludes that it is likely that AAS and/or AQI carried out the February 16, 2005 complex attack which killed SSG Hendrix. *Id.*

*Finally*, Iran's material support for AQI and AAS substantially contributed to the commission of the attack. *See id.* at 57–59 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq). *See also id.* at 58 n.273 (noting that this Court has held Iran's provision of material support and resources to AQI was sufficient to hold Iran liable for attacks carried out by AQI (collecting cases)). The Court previously held that Iran materially supported two similar Zarqawi organization-perpetrated complex attacks that occurred in April 2004, Bellwether Liability Op. at 52–57, and held that the Zarqawi organization and AAS jointly carried out a complex attack in January 2008, *id.* at 61–64.

### ii. *Damages*

55

### a. Renee Amick – Mother of SSG Jason Hendrix

56

███████████████████████████████████████ Renee requests, and I recommend, that the Court

award her an upward departure of 25 percent to $6.25 million in solatium damages. ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

**b.  Daniel Amick – Stepfather of SSG Jason Hendrix**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

56

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Daniel's declaration establishes his father-son relationship with Jason. ████████████

███████████████████████████████████████████████████

██ He is thus entitled to solatium damages under the functional equivalency standards. *See Valore*, 700 F. Supp. 2d at 79–80 (D.D.C. 2010) (finding a non-adoptive stepfather entitled to damages where the stepfather considered the victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *Fritz II*, 324 F. Supp. 3d at 62–63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("[T]he interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship.").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Daniel requests, and I recommend, that the Court award him an upward departure of 25 percent to $6.25 million in solatium damages.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

57



### 5. December 1, 2006 Complex Attack that Killed U.S. Army Staff Sergeant Robert Love

On December 1, 2006, SSG Robert Love was serving with C Company, 16th Engineering Battalion, 1st Battalion, 9th Infantry, 1st Brigade, 1st Armored Division in Ramadi, Al Anbar Province. Attribution Report at 60. SSG Love and his unit were conducting a mounted combat patrol when an IED detonated against SSG Love's vehicle. *Id.* The unit was further attacked by small arms fire in the wake of the explosion. *Id.* As a result of the IED explosion, SSG Love was killed and two other servicemembers were injured. *Id.* Post-attack analysis by Explosive Ordnance Disposal ("EOD") determined that the IED was a "command detonated surface laid (speed bump) IED" that contained 20 to 25 pounds of explosive material. *Id.* EOD traced the IED command wire to a nearby building where three insurgents were detained by Coalition forces. *Id.* Further, EOD found "the bottom of a 30" X 42" speed bump IED" nearby and noted that "the IED was in line with an alleyway, providing a possible aiming point for the triggerman." *Id.*

#### i. Attack Attribution to the Zarqawi Organization

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this complex attack. *Id.* He bases his conclusion on ISI's area of operations dominance

at the time of the attack and the TTPs utilized to carry out the attack. *Id. First*, according to Dr. Gartenstein-Ross, ISI "had become *the dominant* insurgent group in the province" by early May of 2006 despite large-scale efforts by Coalition forces to clear Al Anbar in 2004 and 2005. *Id.* at 61. ISI's maintenance of "havens and clandestine networks" enabled it to conduct an underground insurgency and become "the most influential insurgent group during the period of this attack." *Id.* at 62. Dr. Gartenstein-Ross further describes the dominance ISI held over Ramadi through February 2007, which was after the attack that killed SSG Love. *Id.* ISI controlled checkpoints throughout Ramadi districts, each manned by twenty heavily-armed fighters who helped "to sustain a vicious murder and intimidation campaign." *Id.* Further events demonstrated "ISI's strong presence in Ramadi," including a U.S.-led raid in Ramadi which killed one ISI leader and captured seven others on October 21, 2006, a vehicle-borne IED filled with chlorine used by ISI to attack an Iraqi police station in Ramadi on October 21, 2006, another attack on an Iraqi police station in Ramadi by ISI on December 5, 2006, and a January 23, 2007 Coalition forces-led capture of six ISI members involved in IED attacks in the town neighboring Ramadi. *Id.* Dr. Gartenstein-Ross concludes that ISI was "the most influential insurgent group during the period of this attack" in Ramadi. *Id.*

*Second*, SSG Love was killed in a complex attack utilizing an IED and small arms fire, which was another indicator that ISI was responsible. *Id.* at 63. Dr. Gartenstein-Ross notes that the ISI "frequently used IEDs and small arms fire to attack Coalition forces," demonstrated by weapons uncovered during Coalition operations. *Id.* A U.S. Marine Corps report codified the results of one such operation in November 2005 that uncovered "several weapons caches containing IEDs and small arms in the same raids that captured ISI member Imah Salih al-Fahdawi." *Id.* Further, ISI had access to the resources necessary to perpetrate these attacks, and

59

captured documents showed the advanced training that ISI members in the province received on "IED construction and employment." *Id.* at 64. U.S. Army officers described ISI's presence in the region as "almost complete freedom of movement throughout the city" of Ramadi. *Id.* This free reign "allowed ISI to strategically emplace numerous IEDs" throughout Ramadi. *Id.* Based on the foregoing, Dr. Gartenstein-Ross concludes that it is very likely ISI perpetrated the December 1, 2006 attack in Ramadi which killed SSG Love.

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See id.* at 65–67 (citing U.S. government reporting which substantiated Iran's support for the Zarqawi organization in Iraq from 2003 to 2007); *see also* Bellwether Liability Op. at 22–24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91–92 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED and small arms attacks and that the consequences of its support were reasonably foreseeable).

### ii.    *Damages*

#### a.    **Robert Lee Love Sr. – Father of SSG Robert Love**



60

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████ his Power of Attorney requests, and I

recommend, that the Court award an upward departure of 25 percent to $6.25 million. ████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████



### b.  Evelyn Love Ford – Half-Sister of SSG Robert Love

Evelyn requests, and I recommend, that the Court award her the baseline amount of $2.5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

### C.  <u>IED Attacks</u>

Improvised explosive devices ("IED") are "typically composed of homemade explosives or repurposes military grade explosives (such as mortar shells) contained within a purpose-built or repurposed container (such as oxygen tanks)."  Attribution Report at 18.  They may be command-

detonated by remote triggers or detonated by a victim or vehicle through the use of pressure plates.

*Id.*   As Dr. Gartenstein-Ross explains, the "successful use of IEDs require expertise in bomb design" as well as training and presence to emplace the IED on roads, walls, vehicles or structures. *Id.*

### 6.    May 13, 2004 IED Attack that Killed U.S. Marine Corps Private First Class Brandon Sturdy

On May 13, 2004, PFC Brandon Sturdy was a machine gunner serving with the 2nd Battalion, 1st Marine Regiment, 1st Marine Division, I Marine Expeditionary Force in Saqlawiyah, Al Anbar Province, which was "a town on the outskirts of Fallujah."  Attribution Report at 67. PFC Sturdy was the gunner in a High Mobility Multi-purpose Wheeled Vehicle ("HMMWV") in a three-vehicle convoy tasked with driving through Saqlawiyah to transport a battalion commander for a meeting with the mayor of the town. *Id.*  En route to their destination, PFC Sturdy's unit was attacked by an IED which detonated on the convoy. *Id.* at 67–68.  The blast was "extremely powerful" and "totally destroyed the vehicle despite its armor plating, ruptured the eardrums of nearly every occupant, wounded 7 and instantly killed [PFC Sturdy]." *Id.* at 68.  PFC Sturdy's casualty report confirms that he was killed by shrapnel wounds sustained in the blast. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) very likely committed this IED attack. *Id.*  He bases his conclusion on JTJ's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id. First*, JTJ's role in the First Battle of Fallujah, which began in the spring of 2004, "facilitated its rise to prominence within the Iraqi Insurgency." *Id.* at 69.  As a result of the battle, "JTJ subsumed other insurgent groups and began to emerge as a unifying entity within the broader insurgency throughout Al Anbar Province." *Id.*  Emboldened by its "perceived success in Fallujah," JTJ "escalated attacks

in the city" and "began to use the city as a base of operations for attacks." *Id.* In addition to its absorption of other groups, JTJ utilized an umbrella organization, Fallujah Mujahideen Shura, to strengthen insurgency group coordination and bolster its practical power in Fallujah. *Id.* at 70. Dr. Gartenstein-Ross also notes that "JTJ maintained operational dominance in Fallujah through November 2004," which was several months after the attack. *Id.*

*Second*, PFC Sturdy was killed in an IED attack, which is another indicator that JTJ was responsible. *Id.* Dr. Gartenstein-Ross opines, based on a CENTCOM report on the First Battle of Fallujah, that many IED attacks "were perpetrated by JTJ or affiliated groups." *Id.* at 71. Further, according to a U.S. Marine Corps report on Fallujah, by October 2004 intelligence had identified more than "300 well-constructed defensive positions . . . interlaced with IEDs . . . and even daisy-chained IEDs along the city streets." *Id.* Dr. Gartenstein-Ross concludes that these defensive positions and IEDs were orchestrated by JTJ given their "operational dominance in Fallujah in October 2004." *Id.* Dr. Gartenstein-Ross further opines that "the large number of IED caches and manufacturing facilities . . . identified in Fallujah" further demonstrated "JTJ's ability to execute IED attacks." *Id.* Based on these factors, it is very likely that the JTJ carried out the May 13, 2004 IED attack in Saqlawiyah that killed PFC Sturdy.

*Finally*, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 71–73 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2012); *see also* Bellwether Liability Op. at 22–24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii.    Damages

#### a. Robert Louis Rivera II – Stepbrother of PFC Brandon Sturdy

Robert and his brother Brandon were "extremely close" growing up. Ex. 115, Declaration of Robert Louis Rivera II ¶ 2. They were only six months apart in age, lived together from 1996 through 2004, shared a friend group, and engaged in similar hobbies. *Id.* Brandon's mother legally adopted Robert and "Brandon and [Robert] were brothers even if not by blood." *Id.* Both brothers decided to join the Marine Corps around the same time and their "service became another commonality that brought [them] even closer." *Id.* ¶ 4.

When Robert learned of Brandon's death, he felt survivor's guilt. He felt that as "Brandon's older brother, [he] was supposed to be the one in front." *Id.* ¶ 8. Robert questioned steps he could have taken to prevent Brandon from dying, and he regretted even "mentioning the military and suggesting it for [them]." *Id.* Robert repeatedly experienced suicidal ideations during the years after Brandon's death. *Id.* ¶ 10. Robert did not seek medical treatment after his brother's death because he "believed that any formal documentation of negative psychological status would jeopardize security clearance and eligibility as a commissioned officer." *Id.* ¶ 9. However, he has no doubt that Brandon's loss caused him to suffer anxiety and depression. *Id.* ¶ 11. Brandon's death also resulted in a change in Robert's personality; he has developed "avoidant personality traits in both [his] personal and professional relationships, which persist today. Brandon's loss dissuades [him] from connecting with people." *Id.*

Robert's declaration establishes that he is the functional equivalent of Brandon's biological brother. Robert and Brandon shared a close sibling relationship, they lived together from 1996 through 2004, and Brandon's mother legally adopted Robert as her son. *Id.* ¶¶ 2, 4–5. Robert is thus entitled to solatium damages under the functional equivalency standards. *See Fritz II*, 324 F.

Supp. 3d at 63 (noting that stepsiblings recover as immediate family members when they were "treated like" a brother or sister); *Valore*, 700 F.Supp.2d at 79–80 (awarding solatium damages to plaintiffs who, to extent considered stepfather or stepbrother, respectively considered and treated victim as own son or brother and were functional equivalents of a father and brother).

Because Brandon's death caused Robert to suffer from suicidal ideations, anxiety, and depression, survivor's guilt, and resulted in a change in his personality and disconnect from others, Robert requests, and I recommend, an upward departure of 25 percent to $3.125 million in solatium damages.[9] ██████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████ *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45 (D.D.C. 2016) (awarding

---

[9] This is a closer case than some in my opinion given the fact that Robert is still in the Marines, which suggests that unlike some other family members I have considered, he has been able to continue his career. On balance, I believe he is entitled to an upward departure given the fact that his ability to be a Marine leader has been impaired by Brandon's death ("…caused me to develop avoidant personality traits in both my personal and professional relationships, which persist today.") Robert Louis Rivera II Declaration ¶ 11.

Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

**7.    September 17, 2004 IED Attack that Killed U.S. Marine Corps Corporal Christopher Ebert**

On September 17, 2004, Cpl Christopher Ebert was serving with F Company, 2nd Battalion, 1st Marine Regiment, 1st Marine Division in Habbaniyah, Al Anbar Province. Attribution Report at 73. Cpl Ebert was on patrol near the Lake Thar Thar Canal when his patrol was attacked with an IED. *Id.* at 74. Cpl Ebert died from "traumatic injuries" sustained in the attack. *Id.* Additionally, two other Marines were wounded and an interpreter was killed in the blast. *Id.* Later, a second IED detonated against the unit responding to the attack which killed Cpl Ebert, wounding another servicemember. *Id.*

***i.    Attack Attribution to the Zarqawi Organization***

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) likely committed this IED attack. *Id.* He bases his conclusion on JTJ's area of operations dominance at the time of the attack, the TTPs used to carry out the attack, and ruling out other insurgent groups as the perpetrator. *Id.* *First*, JTJ "was the dominant insurgent force in Fallujah and in the cities between Fallujah and Ramadi, including Habbaniyah," during the time of the attack. *Id.* at 75. In the time period leading up to the attack, JTJ was part of a group of insurgents that "controlled Fallujah under the banner of the [FMS]," a group that was "dominated" by JTJ. *Id.* at 75–76. JTJ's "operational dominance" in Fallujah was maintained through November 2004 and it had a "strong operational presence" in Ramadi when the attack occurred. *Id.* at 76. Further, a U.S. Marine Corps publication confirmed that JTJ had significant control of the "Fallujah-Ramadi corridor" through at least March 2005. *Id.* at 77. Dr. Gartenstein-Ross concludes that JTJ had a significant

operational presence along the routes and towns between Ramadi and Fallujah—including Habbaniyah, where Cpl Ebert was killed. *Id.*

*Second*, Cpl Ebert was killed in an IED attack, which is another indicator that JTJ was responsible. *Id.* Dr. Gartenstein-Ross opines that IEDs were a common TTP associated with JTJ, demonstrated by the profusion of IEDs placed by JTJ during the Second Battle of Fallujah, which began shortly after this attack in November 2004. *Id.* JTJ's ability to perpetrate IED attacks was further demonstrated in December 2004 when a Joint Chiefs of Staff Brigadier General noted "the large number of IED caches and manufacturing facilities that had been identified in Fallujah which . . . was dominated by JTJ." *Id.* at 77–78. A CENTCOM report on Al Anbar insurgency confirmed that JTJ continued to utilize IEDs to attack Coalition forces in the province into 2006, well after the attack. *Id.* at 78.

*Third*, Dr. Gartenstein-Ross rules out other insurgent groups that could have perpetrated the attack, instead opining that JTJ is ultimately the organization likely responsible. *Id.* Despite the proliferation of other insurgent groups in the province, a U.S. Marine Corps book identifies that JTJ was the "dominant actor in Iraq," particularly in Fallujah in 2004. *Id.* Further, prominent insurgent and terrorist leaders in Fallujah "had established allegiance with JTJ by the summer of 2004." *Id.* Dr. Gartenstein-Ross reiterates that JTJ's dominance and significant presence in Fallujah and Ramadi, respectively, "very likely enabled the group to maintain a strong operational presence along the routes and territories connecting the two cities" which included "Habbaniyah's position along this route." *Id.* He concludes that these factors made it likely that the JTJ, and not another insurgent group, perpetrated the September 17, 2004 attack that killed Cpl Ebert.

*Finally*, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 78–80 (citing U.S. government reporting substantiating Iran's

support for the Zarqawi organization in Iraq from 2003 to 2012); *see also* Bellwether Liability Op. at 22–24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii. Damages

#### a. Gail Ebert – Father of Cpl Christopher Ebert

███████████████████████████████████████████████████

████████████████████████████████████ Gail requests, and I recommend,

that the Court award him an upward departure of 25 percent to $6.25 million in solatium damages.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

### b. Roger Kaid – Brother of Cpl Christopher Ebert

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ he requests, and I recommend, that the Court award him an upward departure of 25 percent to $3.125 million in solatium damages.  ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

71

72

c.  **Brian Ebert – Brother of Cpl Christopher Ebert**

73

██████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██  Brian requests, and I recommend, that the Court award him an upward departure of 50 percent

to $3.75 million in solatium damages.  ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

### 8.   October 6, 2004 IED Attack that Killed U.S. Army National Guard Sergeant Jessica Cawvey

On October 6, 2004, SGT Jessica Cawvey was serving in the 1544th Transportation Company, 13th Corps Support Command (COSCOM) in Fallujah, Al Anbar Province. Attribution Report at 81. SGT Cawvey was acting as the tactical command in a five-ton cargo truck in a convoy en route from Baghdad International Airport to Al Taqaddum Airbase in Habbaniyah, Al Anbar Province. *Id.* Her convoy was on Main Supply Route (MSR) Tampa when they were attacked by an IED. *Id.* SGT Cawvey sustained head wounds in the blast and was later pronounced dead at Camp Fallujah. *Id.*

#### i.   *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) likely perpetrated this IED attack. *Id.* He bases his conclusion on JTJ's area of operations dominance at the time of the attack, the TTPs used to carry out the attack, and ruling out other insurgent groups

as the perpetrator. *Id*. *First,* JTJ "had established a strong operational presence at key urban centers along MSR Tampa" at the time of the attack. *Id*. at 82. More specifically, JTJ "maintained robust operational capabilities" spanning the entirety of SGT Cawvey's intended convoy route where the attack likely occurred. *Id*. at 82–83. A Marine Corps publication noted that, in the summer of 2004, JTJ conducted significant terrorist operations in Baghdad. *Id*. at 83. In addition to JTJ's "notable presence in Baghdad throughout 2004," JTJ also maintained an "operational presence" west of the city, which was demonstrated by a series of attacks in September through November 2004. *Id*. at 83–84. JTJ similarly "cemented operational dominance" in Fallujah throughout the time period leading up to the attack through November 2004, demonstrated by the fact that "much of the practical power in the city" rested with JTJ and the presence of JTJ leaders operating in and around the city. *Id*. at 84. JTJ also maintained a "strong presence" in Ramadi, which was one of the key urban centers located along MSR Tampa, shown by "claims of responsibilities for attacks in the city not long after this attack" that killed SGT Cawvey. *Id*. at 85.

*Second*, SGT Cawvey was killed in an IED attack, which is another indicator that JTJ was responsible. *Id*. Dr. Gartenstein-Ross opines that IEDs were a common JTJ method of attack along MSR Tampa and other well-trafficked routes. *Id*. According to a U.S. Marine Corps report, by October of 2004 intelligence had identified more than 300 well-constructed defensive positions interlaced with IEDs and daisy-chained IEDs along the streets of Fallujah. *Id*. Dr. Gartenstein-Ross, based on JTJ's operational dominance in Fallujah by October 2004, concludes that the placement of these IEDs was likely orchestrated by JTJ. *Id*.

*Third*, Dr. Gartenstein-Ross rules out other insurgent groups, instead opining that JTJ is most likely the organization responsible for the attack. *Id*. at 86. Despite the proliferation of other

75

insurgent groups in the province, a U.S. Marine Corps book identifies that JTJ was the "primary threat to Coalition forces in Iraq by mid-2004." *Id.* Further, predominant insurgent and terrorist leaders in Fallujah "had established allegiance with JTJ by the summer of 2004." *Id.* He concludes that these factors made it likely that JTJ, and not another insurgent group, perpetrated this attack.

*Finally*, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See* Attribution Report at 86–88 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq from 2003 to 2011); *see also* Bellwether Liability Op. at 22–24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (finding that Iran's support was a substantial factor in Zarqawi organization IED attacks and that the consequences of its support were reasonably foreseeable).

### ii.    *Damages*

#### a.  Sandra Cawvey – Mother of SGT Jessica Cawvey

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████ she requests, and I

recommend, that the Court award her an upward departure of 25 percent to $6.25 million in

solatium damages. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

b.  **Kevin Cawvey Sr. – Father of SGT Jessica Cawvey**

████████████████████████████████████████

███████████████████████████████████████████████████

77



██████████████████████ he requests, and I recommend, that the Court award him an upward departure of 25 percent to $6.25 million in solatium damages. ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

###### c.  Kevin Cawvey Jr. – Brother of SGT Jessica Cawvey

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ Kevin requests, and I recommend, that the Court award him an upward departure of 25 percent to $3.125 million in solatium damages. ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

d.  **Joshua Cawvey – Brother of SGT Jessica Cawvey**



Joshua requests, and I recommend, that the Court award him the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

9.    **March 4, 2005 IED Attack that Killed U.S. Army Corporal Stephen McGowan**

On March 4, 2005, CPL Stephen McGowan was serving with the 1st Battalion, 9th Infantry Division in Ramadi, Al Anbar Province. Attribution Report at 89. CPL McGowan was riding in a HMMWV in the Al Tammin neighborhood of Ramadi when his unit was struck by an IED. *Id.* After the IED explosion, three members of anti-Iraqi forces ("AIF") were captured while fleeing the area. *Id.* CPL McGowan, along with three other Coalition soldiers, were killed in the attack. *Id.* The IED explosion resulted in two blast holes which were two feet apart and measured two-and-a-half to three feet in depth, and three to four feet in diameter. *Id.* An unconfirmed EOD

report estimated that the IED consisted of three 155 millimeter rounds in the first hole and three 122 millimeter rounds in the second hole. *Id.*

### i.      *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS likely committed this IED attack. *Id.* He bases his conclusion on AQI and AAS's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id. First*, both AQI and AAS "maintained a strong operational presence in Ramadi in early 2005." *Id.* at 91. Ramadi was an "AQI stronghold" throughout early 2005 and AAS "also maintained a strong operational presence in Ramadi." *Id.* at 91–92. The groups also demonstrated a "level of cooperation" in 2005 and "retained operational presence in Ramadi long after" a notorious May 2005 attack on the Anbar government. *Id.* at 93. A CENTCOM report confirmed that, by October 2005, AQI and AAS shared the same goal, which was to control the upper Euphrates river region to use it as a base for additional attacks east towards Ramadi. *Id.* at 94.

*Second*, CPL McGowan was killed in an IED attack, which is another indicator that AQI and/or AAS was responsible. *Id.* at 94. A CENTCOM report on the Al Anbar insurgency states that by August 2005, both AQI and AAS fighters were utilizing Haditha, which was north of Ramadi, as a base to manufacture IEDs for use in cities all along the Euphrates River. *Id.* Further exemplifying the AAS's frequent use of IEDs were the videos of attacks using these weapons, which were circulated by the group for years, including in 2004. *Id.* at 94–95. Some of the footage demonstrates "the routine use of IEDs by AAS" in areas such as the Sunni Triangle, which includes Ramadi. *Id.* at 95. AQI similarly produced IEDs to target Coalition forces, and AQI caches of the types of weapons used in this attack were discovered in Ramadi during the same year this attack occurred. *Id.* Further, a CENTCOM report notes that AQI's use of IEDs to attack Coalition forces

in Al Anbar continued during 2006, after this attack occurred. *Id.* Based on these factors, it is likely that AQI and/or AAS carried out the March 4, 2005 attack that killed CPL McGowan.

*Third*, Dr. Gartenstein-Ross rules out other insurgent groups, instead opining that AQI and/or AAS is ultimately the organization likely responsible for the attack. *Id.* at 96. Despite the presence of another insurgent group, the Ramadi Shura Council, there is evidence that AQI "directly paid the Ramadi Shura Council to execute attacks on its behalf," thereby not ruling out AQI culpability. *Id.* Dr. Gartenstein-Ross notes that other prominent insurgent groups in Al Anbar during 2005, Jaysh Mohammed and the Green Battalion, had conflicting objectives with AQI, which made any hypothetical cooperation in the attack unlikely. *Id.* Dr. Gartenstein-Ross concludes that "both AQI and AAS had the strongest recorded presence in the specific area where and when this attack occurred," thus making it likely that AQI and/or AAS perpetrated the attack that killed CPL McGowan.

*Finally*, Iran's material support to AQI and AAS substantially contributed to AQI and/or AAS's commission of this attack. *See id.* at 96–98 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and AAS in Iraq); *see also* Bellwether Liability Op. at 22–24 (finding that Iran materially supported April 2005 IED attack perpetrated by the Zarqawi organization); *id.* at 19–22 (finding that Iran materially supported April 2004 IED attack perpetrated by AAS).

### ii.  Damages

#### a.  Bobbie Ann McGowan – Mother of CPL Stephen McGowan

83

[REDACTED]

Bobbie requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 10.    April 4, 2005 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Jerimiah Kinchen

On April 4, 2005, LCpl Jerimiah Kinchen was attached to Echo Company, 3d Recon Battalion, 2d Marine Division in Al Anbar Province. Attribution Report at 99. LCpl Kinchen was conducting a reconnaissance patrol supporting a counter-IED mission in a Humvee when his vehicle was struck by an IED. *Id.* LCpl Kinchen died from injuries sustained in the blast, and five other servicemembers were wounded in the attack. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

84

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely carried out this attack. *Id.* He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id.* *First*, this attack took place approximately 12 miles southeast of Camp Taqaddum in Al Anbar Province, which is situated south of Fallujah and northwest of Amariyah, and at the time of the attack, AQI had reestablished a strong operational presence in the Fallujah area. *Id.* at 100. AQI also established a new training camp in the spring of 2005 in the al-Biar village south of Amariyah—a town located near the site of the attack. *Id.* According to Dr. Gartenstein-Ross, following AQI's attack on Abu Ghraib Prison two days before this attack, AQI launched a new campaign of attacks known as the "Zarqawi Blitz" to "prove to Anbaris that the insurgency was still alive and well despite Coalition operations." *Id.* at 100–101. In April 2005, "AQI leader al-Zarqawi created alliances with and paid other insurgent groups in the Fallujah area to conduct attacks in the city." *Id.* at 101.

*Second*, the IED attack that killed LCpl Kinchen aligns with AQI's operational strategy and capabilities during the Zarqawi Blitz, as the group typically employed IEDs against Coalition forces during this period to minimize death or injury to Sunni civilians. *Id.* at 102. The attack that killed LCpl Kinchen occurred on a stretch of road where the impact on Sunni civilians could be minimized. *Id.* According to a CENTCOM report, "a large number of IED caches and manufacturing facilities had been identified in Fallujah," and Dr. Gartenstein-Ross discusses how "Coalition forces continued to capture AQI-affiliated IED makers who allegedly were behind a variety of attacks across Iraq." *Id.*

*Finally*, Iran's material support to AQI had a reasonable connection to the AQI attack that killed LCpl Kinchen. *Id.* at 103–105 (citing 2006 U.S. Department of the Treasury reporting that Iran provided the Zarqawi organization with both money and weapons and facilitating the

movement of its fighters across the Middle East); *see also* Bellwether Liability Op. at 25–27 (finding that Iran materially supported an August 2005 IED attack perpetrated by the Zarqawi organization near Fallujah in Al Anbar Province).

      *ii.*      ***Damages***

          **a.**  **Jeanie Kinchen – Mother of LCpl Jerimiah Kinchen**

87

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████ she requests, and I recommend, that the Court award her an upward departure of 25 percent to $6.25 million in solatium damages. ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

88

**b. James Charles Kinchen Jr. – Father of LCpl Jerimiah Kinchen**

89

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████████ he

requests, and I recommend, that the Court award him an upward departure of 25 percent to $6.25

million in solatium damages. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

    **c.   Amie Meredith – Sister of LCpl Jerimiah Kinchen**

she requests, and I recommend, that the Court award her an upward departure of 25 percent to

$3.125 million in solatium damages.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

### 11.    May 10, 2005 IED Attack that Killed U.S. Army Staff Sergeant Samuel Castle

On May 10, 2005, SSG Samuel Castle was serving with 327th Signal battalion, 35th Signal Brigade in Al Anbar Province. Attribution Report at 105. SSG Castle was traveling in a convoy approximately 20 miles west of Ramadi on a Main Supply Route ("MSR") Bronze, when his convoy was struck by an IED. *Id.* Two servicemembers were wounded in the attack and SSG Castle succumbed to injuries from blunt force trauma. *Id.* at 106.

### i.    *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) and/or AAS likely committed this IED attack. *Id.* He bases his conclusion on AQI and AAS's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id.* *First,* this attack occurred during a time when AQI and AAS closely cooperated with each other. *Id.* at

106.  By 2006, "U.S. and foreign government reports, as well as news media, characterized AAS and AQI as 'interconnected,' 'related,' and 'affiliated.'" *Id.*   According to a CENTCOM report on the insurgency in the Al Anbar Province, "at the time of the attack, both AQI and AAS maintained a strong operational presence in Ramadi." *Id.* at 108.  A report on Ramadi by the U.S. Army War College in 2005 discussed how AQI attacks and intimidation continued to undermine coalition efforts to stabilize the city. *Id.*   According to a declassified CENTCOM Threat Assessment from July, 2005, "AQI maintained a significant presence in Ramadi and the surrounding area, including the location of the attack." *Id.*

*Second*, SSG Castle was killed by an IED, which is another indicator that AQI and/or AAS are responsible for the attack. *Id.* at 109.  According to Dr. Gartenstein-Ross, "at the time of the attack, IEDs were a common TTP associated with AQI and AAS." *Id.*  This conclusion is further supported by raids in Ramadi in November 2005 during which "Coalition forces ... captured AQI leaders and weapons caches containing IEDs and IED materials." *Id.*  Dr. Gartenstein-Ross also notes that AQI provided bonus payments ranging from $190 to $7,000 to insurgents who carried out IED attacks or destroyed Coalition vehicles. *Id.* at 109–10.

*Finally*, Iran's material support to AQI and AAS had a reasonable connection to this attack. *Id.* at 110-112 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 25–27 (finding that Iran materially supported August 2005 IED attack perpetrated by the Zarqawi organization near Fallujah in Al Anbar Province).

      **ii.**    ***Damages***

      **a.  Jimmie Tyrone Castle – Father of SSG Samuel Castle**

92



Jimmie requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 12.    October 10, 2005 IED Attack that Killed U.S. Army Sergeant Leon Montiel Johnson

On October 10, 2005, SGT Leon Johnson was serving with B Company, 1st Battalion, 30th Infantry Regiment, 3rd Brigade, 3rd Infantry Division in Ramadi, Al Anbar Province. Attribution Report at 113. SGT Johnson was a part of a vehicle convoy transporting detainees in central Ramadi when an IED struck one of the vehicles in the convoy, wounding one servicemember. *Id.*

93

While responding to the scene, SGT Johnson's armored vehicle was struck by a second IED, resulting in incapacitating brain injuries to SGT Johnson. *Id*. SGT Johnson was trapped within the vehicle and shortly thereafter succumbed to injuries caused by the IED explosion and fire. *Id.* Following the blast that killed SGT Johnson, other members of his unit "observed a MAM [military aged male] with a camera recording the attack." *Id*.

### i.      *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely committed this IED attack. *Id*. at 114. He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id*. *First*, AQI's operational presence in the Al Anbar Province increased through 2005 and the group was "operationally dominant" in the region by 2006. *Id*. at 115. The capture of an AQI leader operating in the Ramadi area in November 2005 further demonstrates their operational presence in the region. *Id*. "By the end of 2005, eyewitness and news reports also indicate that AQI maintained operational dominance in streets of the city center, where the attack on SGT Johnson took place." *Id*.

*Second*, the perpetrators of this attack used IEDs, which is another indicator that AQI was responsible. *Id*. According to Dr. Gartenstein-Ross, "at the time of the attack, AQI frequently used IEDs to attack Coalition forces." *Id*. at 115. During a military operation in Ramadi in November of 2005, the U.S. military located AQI caches that included "numerous artillery and mortar rounds, rocket propelled grenades, high explosives, small arms weapons, small arms ammunition, bulletproof vests and bomb-making equipment." *Id*.

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups present in Ramadi may have been responsible for the attack. *Id*. at 116. Dr. Gartenstein-Ross opines that

94

AQI was the dominant insurgent group in Ramadi and maintained close relationships with other groups, including coordination with AAS and payments to RSC. *Id.* Although AAS had a notable presence in the area, Dr. Gartenstein-Ross notes that its possible involvement in the attack would not undermine Iran's ultimate responsibility, as Iran also provided support to AAS. *Id.* at 117.

*Finally*, Iran's material support to AQI had a reasonable connection to the attack that killed SGT Johnson. *See id.* at 117–119 (citing U.S. government report linking IED construction facilitator with both Iran and AQI); *see also* Bellwether Liability Op. at 25–27 (finding that Iran materially supported August 2005 IED attack perpetrated by the Zarqawi organization in Al Anbar Province).

### ii.  Damages

#### a.  Shalonda Johnson – Spouse of SGT Leon Montiel Johnson

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

      ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████ she

requests, and I recommend, that the Court award her an upward departure to $9 million in solatium

damages. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

      **b.  Leon Johnson Jr. – Son of SGT Leon Montiel Johnson**

████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

Leon requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

98

c. **Deionne Johnson – Daughter of SGT Leon Montiel Johnson**

Deionne requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages.

99

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

### 13.    October 15, 2005 IED Attack that Killed U.S. Army Specialist Richard Hardy

On October 15, 2005, SPC Richard Hardy was serving in Ramadi, Al Anbar Province. Attribution Report at 119.  SPC Hardy was conducting joint security operations with the Iraqi Army approximately five miles east of Ramadi when an IED detonated on the roadway.  *Id*.  SPC Hardy died from injuries sustained in the blast.  *Id*.  The blast also killed four other Coalition and two Iraqi servicemembers.  *Id*. at 120.

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) likely committed this IED attack.  *Id*.  He bases his conclusion on AQI's area of operations dominance

100

at the time of the attack and the TTPs used to carry out the attack. *Id. First*, AQI's operational presence in the province increased through 2005 and became the dominant insurgent group by 2006. *Id.* at 121. According to Dr. Gartenstein-Ross, "the capture of AQI leaders operating in the Ramadi area further demonstrates AQI's presence in the provincial capital." *Id.*

*Second*, the perpetrators conducted an IED attack which is another indicator that AQI was responsible for the attack. *Id.* At the time of the attack, AQI frequently used IEDs to attack Coalition forces. *Id.* at 121–22. During a military operation in Ramadi in November of 2005, caches were located with "numerous artillery and mortar rounds, rocket propelled grenades, high explosives, small arms weapons, small arms ammunition, bulletproof vests and bomb-making equipment." *Id.*

*Third*, Dr. Gartenstein-Ross rules out other insurgent groups present in the area that could have carried out the attack. *Id.* at 122. During this time, AQI maintained close relationships with a number of "AQI-affiliated groups," including AAS. *Id.* And as of July 2005, both the AQI and AAS contingents in Ramadi reported to the same Zarqawi-tied individual. *Id.* Thus, AAS's possible involvement in the attack would not undermine an attribution to AQI, and, furthermore, because Iran also provided material support to AAS, it would not undermine Dr. Gartenstein's conclusion that Iran was responsible. *Id.* at 123.

*Finally*, Iran's material support to AQI had a reasonable connection to the attack that killed SPC Hardy. *Id.* at 123–25 (citing U.S. government report discussing Iran's funds and weapons contributions to AQI); *see also* Bellwether Liability Op. at 25–27 (finding that Iran materially supported an August 2005 IED attack perpetrated by the Zarqawi organization in Al Anbar Province).

**ii.    *Damages***

101

### a. Doris Hardy – Mother of SPC Richard Hardy

Doris requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 14. March 7, 2006 IED Attack that Killed U.S. Marine Corps Gunnery Sergeant Justin Martone

On March 7, 2006, GySgt Justin Martone was serving wit 9th Engineer Support Battalion, 3rd Marine Logistics Group, III Marine Expeditionary Force at Camp Taqaddum in Habbaniyah, Al Anbar Province. Attribution Report at 125. GySgt Martone was riding as a passenger in a Humvee when it was struck by an IED. *Id.* at 125–26. GySgt Martone died from "multiple ballistic projectile and blunt force injuries" sustained in the explosion. *Id.* at 126.

### i. Attack Attribution to the Zarqawi Organization

102

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) very likely committed this IED attack. *Id.* He bases his conclusion on MSC's area of operations dominance at the time of the attack and the TTPs used to carry out the attack. *Id. First*, "Within Al Anbar, MSC had an area of operations dominance in the provincial capital of Ramadi and the surrounding towns, including Habbaniyah, where this attack occurred." *Id.* at 127. By the end of 2005, MSC had exerted control of the streets of the city center and their foothold "continued to grow through early 2006." *Id.* "While Coalition forces attempted to root out the MSC in the city, Coalition efforts saw little success due to the group's deep entrenchment in Ramadi." *Id.* at 128. By May 2006, MSC had declared Ramadi as the capital of its "new Islamic caliphate," and was "systematically attacking the city's infrastructure to exert control over the population." *Id.*

*Second*, at the time of the attack, MSC frequently used IEDs to attack Coalition forces. *Id.* at 130. A 2005 military raid "unearthed several weapons caches containing IED materials in Eastern Ramadi in the same raids that captured MSC member Imad Salih al-Fahdawi." *Id.* In early 2006, MSC acquired a top IED expert who defected from the 1920 revolutionary brigade and brought along other skilled IED experts. *Id.* at 131. By the summer of 2006, MSC enjoyed "almost complete freedom of movement" in the city of Ramadi. *Id.*

*Third*, Dr. Gartenstein-Ross rules out the possibility that other insurgent groups in and around Habbaniyah were responsible for this attack. *Id.* at 129. He notes that several other insurgent groups were active in Ramadi, including the 1920 Revolution Brigade, AAS, the Islamic Army of Iraq, and Jaysh al-Fatahin. However, in the months leading up to this attack, MSC had effectively defeated 1920 Revolution Brigade and, as a result, many of its members defected to MSC. *Id.* Likewise, AAS, the Islamic Army of Iraq, and smaller tribal and insurgent groups had been coopted by MSC. *Id.* at 130. Thus, it is likely that MSC was responsible for this attack.

103

*Finally*, Dr. Gartenstein-Ross concludes that Iran's material support to MSC had a reasonable connection to this attack. *Id.* at 131–33 (citing U.S. government report discussing Iran's funds and weapons contributions to MSC); *see also* Bellwether Liability Op. at 28–30 (finding that Iran materially supported June 2006 IED attack perpetrated by the MSC in the Al Anbar Province).

### ii. Damages

#### a. Paulette Martone – Mother of GySgt Justin Martone

105

██████████████████████████████████████████████████████

████████████████████████████████████████████████

     ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ she requests, and I recommend, that the Court award her an upward departure of 25 percent

to $6.25 in solatium damages.    ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

**b.   Agostine Martone Jr. – Father of GySgt Justin Martone**



Agostine requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 15.    June 17, 2006 IED Attack that Killed U.S. Marine Corps Corporal Jonathan Benson

On June 17, 2006, Cpl Jonathan Benson was serving with K Company, 3rd Battalion, 5th Marines, Regimental Combat Team 5, I Marine Expeditionary Force in Al Anbar Province. Attribution Report at 134. Cpl Benson and his unit were conducting combat operations in a Humvee in Habbaniyah when they were struck by an IED. *Id.* As a result of the attack, Cpl Benson suffered severe injuries and survived for three months in the hospital before he died of his wounds on September 9, 2006. *Id.*

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) very likely carried out this attack. *Id.* He bases his conclusion on MSC's area of operations dominance

106

at the time of the attack and the TTPs used to carry out the attack. *Id*. at 134–35. *First*, MSC had become the dominant terrorist group in Al Anbar Province by early May 2006. *Id*. at 136. MSC's operations in Habbaniyah were closely linked to its operations in Ramadi due to Habbaniyah's "strategic location along communications routes" frequently transited by MSC members "between Fallujah and Ramadi." *Id*. MSC was not only responsible for "more than a third of the attacks" along this corridor by mid-2006, according to a CENTCOM report, but "MSC was dominant enough in Habbaniyah that it was able to outcompete and then absorb rival insurgent groups." *Id.* at 137. This leads Dr. Gartenstein-Ross to conclude that it is likely that attacks carried out by various subordinate affiliate groups, including Swords of Truth, Death Company, and the Ghazwan Group, were perpetrated at MSC's direction, demonstrating the group's dominance in the region. *Id*. at 137–38. The Court previously concluded that MSC was responsible for a similar IED attack in Al Anbar Province that killed LCpl Brent Zoucha on June 9, 2006. Bellwether Liability Op. at 28–30.

*Second*, the fact that an IED was used to kill Cpl Benson is another indicator that MSC was responsible for the attack. Attribution Report at 138. "MSC was known to carry out IED attacks in Habbaniyah during the period when this attack occurred," and one month before this attack, Coalition forces uncovered a weapons cache containing ready-made and IED-building materials in an MSC IED factory. *Id.* Dr. Gartenstein-Ross explains that "MSC was also known to leverage its associate groups for executing attacks in and around Habbaniyah," many of which used IEDs.

*Finally*, Iran's material support to MSC substantially contributed to MSC's commission of this attack. *See id*. at 138–41 (citing U.S. government reporting substantiating Iran's support for MSC); *see also* Bellwether Liability Op. at 28–30 (finding that Iran materially supported June 2006 IED attack perpetrated by MSC).

### ii.    *Damages*

#### a.  Marjorie Benson – Mother of Cpl Johnathan Benson

She requests, and I recommend, that the Court award her an upward departure of 40 percent to $7 million in solatium damages.

**b.  Steven Benson – Father of Cpl Johnathan Benson**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ He requests, and I

recommend, that the Court award an upward departure of 40 percent to $7 million in solatium

damages. ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

111

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

### 16.  August 22, 2006 IED Attack that Killed U.S. Navy Chief Petty Officer Paul Darga

On August 22, 2006, U.S. Navy CPO Paul Darga was serving with Explosive Ordnance Disposal ("EOD") Mobile Unit 2 near Hit, Al Anbar Province. Attribution Report at 141. CPO Darga's EOD Team was responding to an IED blast on a tractor carrying a jet fuel tanker that was reported by Task Force 1-36 southwest of Ramadi, Al Anbar Province. *Id*. Upon arriving at the scene and beginning to investigate, a well-concealed IED detonated. *Id*. CPO Darga died from blast injuries sustained in the attack. *Id*.

#### i.  *Attack Attribution to the Zarqawi Organization and/or AAS*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) and/or AAS very likely committed this IED attack. *Id*. This conclusion is based on MSC and AAS's area of operations dominance at the time of the attack and the TTPs employed to perpetrate the attack. *Id*. at 141-142. *First*, the location and period of this attack indicate responsibility either by MSC or AAS, or both. *Id*. at 142. When and where the attack occurred between Hit and Ramadi in Al Anbar Province, "MSC and AAS closely cooperated with each other," with a "level of cooperation not seen elsewhere in Iraq extending down to street level joint operations in the Hit-Haditha corridor." *Id*. MSC and AAS's cooperation "was formalized in December 2005 when the two groups came to an agreement that included AAS seeking MSC's approval for any attack it planned" in the area. *Id*. at 143. MSC intensified its Hit-area operations to "reestablish its

networks" in response to counter-operations in Al Qaim. *Id.* at 144. Starting in the summer of 2006, both MSC and AAS held "intensified influence" over Hit, according to a CENTCOM report, and "the city had become more dangerous than it was during previous tours." *Id.* The Court previously concluded that MSC was responsible for an IED attack in Al Anbar Province on June 9, 2006. Bellwether Liability Op. at 28–30.

*Second*, CPO Darga was killed in an attack involving the deployment and detonation of multiple IEDs, which is another indicator that MSC and/or AAS was responsible. Attribution Report at 145. During the time period of the attack, "MSC and AAS frequently carried out IED attacks in and near Hit." *Id.* Fighters from both MSC and AAS formed a subgroup called the Black Banners, who financed IED attacks and paid terrorists to perpetrate them. *Id.* In August 2006, the same month as this attack, soldiers in Hit recalled "an increased number of IED attacks compared to their previous tours in the city," which Dr. Gartenstein-Ross believes were very likely carried out by MSC and AAS due to their dominance in the city. *Id.* at 145–46. MSC's use of IEDs was strategically planned to drive out Coalition forces and disrupt supply lines, which would have included placing IEDs near Hit. *Id.* at 146.

*Finally*, Iran's material support to MSC and AAS substantially contributed to MSC and/or AAS's commission of the attack. *See* Attribution Report at 146–49 (citing U.S. government reporting substantiating Iran's support for the MSC and AAS in Iraq); *see also* Bellwether Liability Op. at 28–30 (finding that Iran materially supported June 2006 IED attack perpetrated by the Zarqawi organization, operating as MSC).

### ii. Damages

#### a. John "Jack" Darga – Father of CPO Paul Darga

113

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████

██████████████████████████████████████████████████

███████████████████████████████████████ Jack requests, and I

recommend, that the Court award him an upward departure of 25 percent to $6.25 million in

solatium damages. ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

114

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████

### 17.    October 9, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Jon Bowman

On October 9, 2006, LCpl Jon Bowman was serving with C Company, 1st Battalion, 6th Marines, 2nd Marine Division in Ramadi, Al Anbar Province. Attribution Report at 149. LCpl Bowman's unit was conducting a casualty evacuation during combat operations. *Id*. While LCpl Bowman was serving as the gunner of a Humvee, his vehicle was struck by an IED. *Id*. LCpl Bowman and two other servicemembers were killed in the blast. *Id*. One other victim was recovered approximately 150 meters east of the blast site. *Id*. Soon after the explosion, witnesses observed secondary explosions, which limited rescue and recovery efforts. *Id*.

#### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as MSC) very likely committed the IED attack that killed LCpl Bowman. *Id*. at 150. He bases this conclusion on MSC's area of operations dominance at the time of the attack as well as the TTPs employed to carry out the attack. *Id*.

*First*, "MSC had become the dominant insurgent group" in Al Anbar province by early 2006. *Id*. at 151. Specifically, by employing "murder and intimidation tactics," MSC became the dominant insurgent force in Ramadi, leading to daily battles between Coalition forces and MSC fighters, according to a CENTCOM report. *Id*. According to Dr. Gartenstein-Ross, "MSC sustained its operations in Ramadi through October 2006," and MSC remained the central threat to Coalition forces in the area for several more months. *Id*. at 152. In fact, "just nine days after

115

the attack that killed LCpl Bowman, MSC hosted a parade in Ramadi" to celebrate Zarqawi's declaration of Ramadi as its Islamic capital. *Id.* at 153. The Court previously concluded that the Zarqawi organization was responsible for a small arms attack in Ramadi approximately four months following this attack. Bellwether Liability Op. at 81–82.

*Second*, LCpl Bowman was killed in an IED attack, which is a TTP that also indicates MSC responsibility. Attribution Report at 153. Dr. Gartenstein-Ross explains that a top IED expert created an MSC-associated group in Ramadi in early 2006, and "[h]is defection spurred other RB IED experts to break with [Saddam Hussein] and join MSC." *Id.* By May 2006, MSC regularly conducted IED attacks against Coalition forces in Ramadi, and MSC fighters were paid a "$500-$700 bonus for destroying a [Humvee], such as the one that LCpl Bowman was riding in when he was attacked." *Id.* at 154.

*Finally*, Iran's material support to MSC substantially contributed to MSC's commission of this attack. *See* Attribution Report at 154–56 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and MSC); *see also* Bellwether Liability Op. at 81–82 (finding that Iran materially supported February 2007 small arms attack in Ramadi perpetrated by the Zarqawi organization).

### ii.    *Damages*

#### a.    Jill Puckett – Mother of LCpl Jon Bowman

116

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██

Jill requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

### b.  Ashley Bowman Bellot – Sister of LCpl Jon Bowman

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████ ██ █████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ ██ █████████████████████████

██████████████████████████████████████████████████

117

Ashley requests,

118

and I recommend, that the Court award her an upward departure of 50 percent to $3.75 million in solatium damages.

**18.    October 21, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Nathan Elrod**

On October 21, 2006, LCpl Nathan Elrod was serving with Weapons Company, 1st Battalion, 6th Marine Regiment, 2nd Marine Division in Ramadi, Al Anbar Province. Attribution Report at 156. While conducting combat operations in a Humvee in the "heart of Ramadi," an IED detonated on his vehicle. *Id.* at 156–57. LCpl Elrod died of his wounds from the attack, including blast and thermal injuries. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this IED attack. *Id.* at 157. He bases his conclusion on ISI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id.*

*First*, the location in Ramadi and timing of the attack in October 2006, indicate ISI's responsibility. *Id.* at 158. By early May 2006, "Ramadi serv[ed] as an important operational node" in Al Anbar Province, and ISI was the dominant insurgent group in the region. *Id.* According to Dr. Gartenstein-Ross, "ISI sustained its operations in Ramadi through October 2006 and it preoccupied Coalition force commanders more than any other group." *Id.* Dr. Gartenstein-Ross cites to four additional clashes involving ISI in the region between October 2006 and January 2007. *Id.* at 159. He also relies on an authoritative CENTCOM report that describes ISI's immense influence in Ramadi in the fall of 2006. *Id.* The Court previously concluded that ISI was responsible for a small arms attack in Ramadi approximately four months following this attack. Bellwether Liability Op. at 81–82.

*Second*, LCpl Elrod was killed in an IED attack, which is another indicator that ISI was responsible. Attribution Report at 160. Dr. Gartenstein-Ross opines that around the time of the attack, "ISI frequently used IEDs to attack Coalition forces." *Id.* This was the case in part because

120

a top IED expert in Ramadi, who had defected from Saddam Hussein's regime, created as associate group for ISI in the city. *Id.* Additional defectors with IED skills "followed suit, contributing significantly to ISI's IED portfolio in the months leading up to this attack." *Id.* The Chief of Staff of the Army's Operation Iraqi Freedom Study also notes that "ISI habitually coordinated IED attacks in Ramadi" and funded bonuses of up to $700 for destroying a Humvee, such as the vehicle in which LCpl Elrod was killed. *Id.*

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See* Attribution Report at 160–62 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization and ISI); *see also* Bellwether Liability Op. at 81–82 (finding that Iran materially supported February 2007 small arms attack in Ramadi perpetrated by ISI).

### ii. Damages

#### a. Teresa Elrod – Mother of LCpl Nathan Elrod



Teresa requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### b.  *Timothy Elrod*: *Father of LCpl Nathan Ross Elrod*



Timothy requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### 19.    December 11, 2006 IED Attack that Killed U.S. Marine Corps Lance Corporal Clinton Miller

On December 11, 2006, LCpl Clinton Miller was serving with Marine Wing Support Squadron 373, Marine Wing Support Group 37, 3d Marine Aircraft Wing, 1st Marine Expeditionary Force in Al-Khalidiya, Al Anbar Province. Attribution Report at 163. On the day of the attack, LCpl Miller was traveling with his unit in a Humvee on a mounted patrol in search of a possible IED located in Al-Khalidiya. *Id*. During the patrol, LCpl Miller's vehicle was struck by an IED, wounding two servicemembers and killing three, including LCpl Miller. *Id*.

122

### i. *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed the IED attack that killed LCpl Miller. *Id.* He bases his conclusion on ISI's area of dominance at the time of the attack and the TTPs employed in carrying out the attack. *Id.* at 163–64.

*First*, the location of the attack in Al-Khalidiya, between Fallujah and Ramadi in Al Anbar Province, indicates ISI's responsibility. *Id.* at 164. As of 2006, ISI "was the dominant insurgent group in Al Anbar Province." *Id.* According to a CENTCOM report, the Ramadi-Fallujah corridor "served as a center for AQI arms caches." *Id.* at 165. By August 2006, an ISI leader who ran insurgent cells in Al-Khalidiya also served in the Iraqi defense ministry and fed ISI national intelligence. *Id.* Dr. Gartenstein-Ross explains that "ISI continued to maintain a presence in Al-Khalidiya until late 2007." *Id.* at 166. The Court previously concluded that ISI was responsible for a small arms attack in Ramadi that killed PFC Youngblood approximately two months following this attack. Bellwether Liability Op. at 81–82.

*Second*, LCpl Miller was killed by an IED, which is another indicator of ISI's responsibility. Attribution Report at 166. Around the time period of the attack, "IEDs were a common TTP associated with ISI," and by late 2006, ISI trained all incoming members in IED attacks. *Id.* ISI's use of IEDs was particularly common in Al-Khalidiya, with "ISI leaders . . . manufacturing IEDs in the city" and economically-incentivized teams of operatives planting them. *Id.* The Court previously concluded that ISI was responsible for an IED attack in Al Anbar Province that killed SGT Clevenger approximately two months after this attack. Bellwether Liability Op. at 30–32.

123

124

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See* Attribution Report at 167–69 (citing U.S. government reporting substantiating Iran's support for ISI and the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 81–82 (finding that Iran materially supported February 2007 small arms attack in Ramadi perpetrated by ISI).

### ii. Damages

#### a. Kerby Jon Miller – Father of LCpl Clinton Miller



he requests, and I recommend, that the Court award him an upward departure of 25 percent to $6.25 million in solatium damages.

125

**b. Kim Miller – Stepmother of LCpl Clinton Miller**



Kim's declaration establishes his mother-son relationship with C.J.

She therefore is eligible for solatium damages under the functional equivalency standards. *See Fritz II*, 324 F. Supp. 3d at 62–63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *Valore*, 700 F. Supp. 2d at 79–80 (finding a non-adoptive stepfather entitled to damages where the stepfather considered the victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Kim requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

### 20.    January 30, 2007 IED Attack that Killed U.S. Army Corporal Stephen Shannon

On January 30, 2007, CPL Stephen Shannon was serving with the First Platoon of Company C, 397th Engineer Battalion in Ramadi, Al Anbar Province. Attribution Report at 169.

CPL Shannon's battalion was traveling in a convoy, conducting a "routine clearance" mission in support of 1st Battalion, 6th Marines in Northern Ramadi when the "lead RG-31 [mine-resistant ambush protected vehicle] was attacked with what was originally thought to be an Improvised Rocket Launcher (IRL) but later turned out to be an IED." *Id.* CPL Shannon was struck by shrapnel, and after receiving medical assistance, died on January 31, 2007, of blast injuries sustained in the attack. *Id.* at 169–70. A post-blast analysis of the IED demonstrated that it was "composed of 10-15 pounds of explosives with a command wire and pressure switch," and that the IED's case was enhanced with metal to "increase its fragmentation" and it was "concealed behind a serpentine barrier." *Id.* at 170.

### *i.*  *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this IED attack. *Id.* He bases his conclusion on the geographic location and time period of the attack and the TTPs used in the attack. *Id. First*, this attack occurred when "ISI had a strong operational presence in Al Anbar Province," specifically in Ramadi. *Id.* at 171. Between late October 2006 and late February 2007, "ISI retained an ability to conduct attacks against Coalition forces in the city and use resources in Ramadi to support operations in the surrounding area" despite efforts to expel the group from the area. *Id.* at 172. ISI attacked Iraqi police stations in two separate attacks on October 21, 2006, and December 5, 2006. *Id.* ISI also committed two VBIED attacks in late February. *Id.* According to Dr. Gartenstein-Ross, ISI maintained its influence in Ramadi "through February 2007, after the attack that killed CPL Shannon." *Id.* at 172.

*Second*, CPL Shannon was killed in an IED attack, which is another indicator that ISI was responsible. *Id.* CPL Shannon was killed by a "speed bump type" IED, which is a "rudimentary

127

form of roadside IED." *Id.* at 172–73. ISI commonly used speed bump IEDs because of the "simplicity of producing, emplacing, and operating" the IEDs, and "typical AQI fighters active in Ramadi" used a "wide range of IEDs." *Id.* at 173. ISI continued to use IEDs in 2007 and maintained "specialized IED cells," suggesting "widespread use of IEDs by ISI at the time of the attack on CPL Shannon." *Id.* ISI maintained networks of IEDs into June 2007, several months after the attack that killed CPL Shannon. *Id.* at 173. Based on these factors, it is very likely that the Zarqawi organization (as ISI) carried out the attack that killed CPL Shannon.

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See id.* at 173–75 (citing U.S. government and United Nations reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 8–10, 32 (finding that Iran materially supported February 2007 IED attack perpetrated by ISI); *id.* at 8–10, 34 (finding that Iran materially supported another February 2007 IED attack perpetrated by ISI); *id.* at 8–10, 58–60 (noting that Iran materially supported ISI, which between 2006 and May 2007, perpetrated complex attacks in Ramadi that combined "IEDs, RPGs, and smalls arms fire").

### ii.  Damages

#### a.  Joan Shannon – Mother of CPL Stephen Shannon



Joan requests, and I recommend, that the Court award her an upward departure of 25 percent to $6.25 million in solatium damages.

129

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

### 21.  April 14, 2008 IED Attack that Killed U.S. Marine Corps Reserve Lance Corporal Dean Opicka

On April 14, 2008, LCpl Dean Opicka was serving with the U.S. Marine Corps Reserve's F Company, 2nd Battalion, 24th Marine Regiment, 4th Marine Division in Al Anbar Province. Attribution Report at 176. LCpl Opicka was riding in a M114 HMMVW as part of a logistics convoy "traveling south on Route New Castle" when the vehicle was struck by an IED blast. *Id.* LCpl Opicka died from his injuries obtained from the attack. One other servicemember was killed in the attack, and one other was wounded. *Id*. An analysis of the blast demonstrated that the "IED consisted of 40 [illegible] of explosives, contained in an improvised metal container, with a pressure plate initiator." *Id.*

#### i.  *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this IED attack. *Id.* He bases his conclusion on the geographic location and time period of the attack and the TTPs used in the attack. *Id. First*, this attack occurred in 2008 when ISI was a "prominent insurgent actor in the Fallujah-Ramadi corridor." *Id.* at 177. ISI maintained "an operational presence" in the corridor through 2008. *Id.* at 178. Coalition forces and Iraqi officials conducted missions to capture ISI leaders in cities surrounding Al-Khalidiya between February and August 2008. *Id*. Additionally, ISI claimed responsibility for a suicide bomb in the region in June 2008. *Id*.

130

*Second*, LCpl Opicka was killed in an IED attack, another indicator that ISI was responsible. *Id.* IEDs were a common technique that ISI used in the Al Anbar Province, and a particular street in Al Khalidiya in 2007 was considered "one of the most heavily IED'd 200 meter stretches in Iraq." *Id.* Additionally, ISI's IED use in the Fallujah-Ramadi corridor is "well documented by news media." *Id.* News outlets reported four stories regarding IED attacks and IED cell leader detentions in Ramadi between March 25, 2008 and April 9, 2008. *Id.* at 178–79. Based on these factors, it is very likely that the Zarqawi organization (as ISI) carried out the attack that killed LCpl Opicka.

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See id.* at 179–81 (citing U.S. government and media reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. 8–10, 31–32 (finding that Iran provided material support to ISI for a February 2007 IED attack and noting that the "Al Anbar Province generally [was a] 'key ISI area[] of operation'"); *id.* at 33–34 (finding Iran provided material support to the Zarqawi organization and ISI for another February 2007 IED attack).

### ii. *Damages*

#### a. Donna Opicka – Mother of LCpl Dean Opicka



Donna requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 259.

### b. Daniel Opicka – Brother of LCpl Dean Opicka

Daniel requests, and I recommend, that the Court award him the baseline amount of $2.5 million in solatium damages. *Heiser*, 466 F. Supp. 2d at 269.

132

### 22. November 14, 2008 IED Attack that Killed U.S. Marine Corps Corporal Aaron Allen

On November 14, 2008, Cpl Aaron Allen was serving with 1st Battalion, 4th Marines, (Regimental Combat Team-1, I Marine Expeditionary Force Forward), 1st Marine Division in Ferris, Al Anbar Province. Attribution Report at 181. Cpl Allen was "conducting combat operations as part of a dismounted patrol to investigate a possible" IED approximately one mile north of Ferris. *Id.* Cpl Allen was struck by an IED while establishing a cordon and later died from his injuries sustained in the attack. *Id.* One other servicemember was injured in the attack. *Id.*

#### i. *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) likely committed this IED attack. *Id.* He bases his conclusion on the geographic location and time period of the attack, the TTPs used in the attack, and by ruling out other insurgent groups. *Id.* at 181–82. *First*, the attack occurred in Ferris, Al Anbar Province in November 2008, which is just southwest of Zaidon, a city in which ISI conducted a "terror campaign . . . in late 2006." *Id.* at 182–84. "ISI's presence in Zaidon continued into 2007," and that influence "extended to Ferris." *Id.* at 184. Although information is scarce regarding ISI's presence in Zaidon in 2008, one report noted that "ISI was still active there several months before the attack that killed Cpl Allen." *Id.*

*Second*, Cpl Allen was killed in an IED attack, which is another indicator that ISI was responsible. *Id.* At the time of the attack, ISI had "well established IED networks in the area." *Id.* An "expert IED designer" and "key ISI facilitator" that supported IED attacks in Zaidon and Abu Ghraib was killed one year before the attack that killed Cpl Allen. *Id.* at 184–85. That leader "was the tactical commander behind the ISI attack on Abu Ghraib prison in April of 2005"— according to Dr. Gartenstein-Ross, "such a large-scale attack" demonstrates ISI's capacity to carry

133

out IED attacks in and around Ferris. *Id.* IED networks in Iraq continued into 2008, as evidenced by the capture of several ISI leaders in the region. *Id.* at 185.

*Third*, Dr. Gartenstein-Ross also considered and ruled out other "insurgent groups [that] were also active in the Zaidon area." *Id.* at 185. At the time of the attack that killed Cpl Allen, the 1920 Revolution Brigades was also operating in Zaidon; however, that group "turned on ISI when ISI members targeted its leaders in 2007." *Id.* at 186. In 2007 (prior to the attack that killed Cpl Allen), the "remaining 1920 Revolution Brigades leaders subsequently reached out to Coalition forces for assistance in fighting ISI." *Id.* Considering "the 1920 Revolution Brigade concerned itself with fighting ISI alongside Coalition forces, it is unlikely that the group perpetrated this attack." *Id.* Accordingly, based on these factors, it is likely that ISI carried out the attack that killed Cpl Allen.

*Finally*, Iran's material support to ISI substantially contributed to ISI's commission of this attack. *See id.* at 186–88 (citing U.S. government, United Nations, and media reporting substantiating Iran's support for the Zarqawi organization and ISI in Iraq); *see also* Bellwether Liability Op. 8–10, 31–32 (finding that Iran provided material support to the Zarqawi organization and ISI for a February 2007 IED attack and noting that the "Al Anbar Province generally [was a] 'key ISI area[] of operation'"); *id.* at 33–34 (finding Iran provided material support to the Zarqawi organization and ISI for another February 2007 IED attack in the Al Anbar Province).

### ii.    *Damages*

#### a.   **Mary Allen – Mother of Cpl Aaron Allen**

134



Cathy requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### D.    Indirect Fire Attacks

Indirect fire attacks "involve weapons that do not require line-of-sight to targets, including rockets and artillery or mortar fire." Attribution Report at 19.  Given the complexity involved, indirect fire attacks "require a known target location and weapons training to be accurate." *Id.* The U.S. military and another court in this District have discussed Iran's provision of training and weapons to militant groups in Iraq to conduct indirect fire attacks against Coalition forces. *Id.* at 19–20 (citing briefing with U.S. commander of Multi-National Force–Iraq and *Roth*, 2023 WL 196577 at *4).

### 23.    May 2, 2004 Indirect Fire Attack that Killed U.S. Navy Petty Officer Second Class Robert Jenkins

On May 2, 2004, PO2 Robert Jenkins was serving with Naval Mobile Construction Battalion 14 at Junction City, a U.S. military outpost near Ramadi, Al Anbar Province.  Attribution Report at 189.  On the day of the attack, PO2 Jenkins was at the Junction City Seabees motor pool, where servicemembers were gathering for a debriefing, when four rounds of 120-millimeter

mortars struck the camp in four locations: "the motor pool, dining facility, billeting, and an unspecified road." *Id.* There were 34 casualties as a result of the attack, and a government report noted that "the high number of resultant casualties stemmed from the density of servicemembers at the point of impact." *Id.* Twenty-eight of the 34 casualties were wounded, and six were killed. *Id.* PO2 Jenkins died of "multiple ballistic injuries" sustained in the attack, including serious wounds to his abdomen and lower legs. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as JTJ) very likely committed this indirect fire attack. *Id.* He bases his conclusion on the geographic location and time period of the attack, the TTPs used in the attack, and, JTJ's claim of responsibility for the attack. *Id.* *First*, the attack occurred near Ramadi, Al Anbar Province in May 2004, a time when JTJ "was the most prominent insurgent actor in the city." *Id.* at 190. JTJ regularly met with the Ramadi Shura Council, a body known for coordinating "insurgents based in and around Ramadi and throughout Al Anbar." *Id.* Additionally, in 2004, Coalition forces discovered a JTJ safehouse in Ramadi and captured an insurgent "suspected of masterminding a string of deadly attacks in Iraq." *Id.* at 190–91. Dr. Gartenstein-Ross notes that in April 2004, U.S. commanders who described Ramadi as "one of the cities with 'a dangerous brew of al-Qaeda inspired foreign fighters,'" were likely referring to JTJ. *Id.* at 191. Also in April 2004, the Chairman of the Joint Chiefs of Staff "reported that the opposition in Ramadi was split between former regime elements and JTJ fighters." *Id.* JTJ maintained a strong presence even after May 2004 when PO2 Jenkins was killed, and in October 2004 JTJ "formally pledg[ed]" allegiance to al-Qaeda and became al-Qaeda in Iraq. *Id.*

*Second*, PO2 Jenkins was killed in an indirect fire attack using four rounds of 120mm mortars, which is another indicator that JTJ was responsible. *Id.* During the time frame in which PO2 Jenkins was killed, JTJ "frequently carried out mortar attacks." *Id.* The Iraqi Governing Council "blamed JTJ for a complex attack in Karbala that involved . . . mortars . . . and resulted in hundreds of casualties" in March 2004. *Id.* Later that year in July, JTJ "claimed responsibility for an attack on [the] Iraqi National Guard center in Samarra, in which the group used 38 mortars to destroy the building." *Id.* According to Dr. Gartenstein-Ross, those two attacks demonstrate "JTJ's access to these weapons and ability to employ them effectively in its attacks." *Id.* Further, a January 2005 Central Intelligence Agency report demonstrated "JTJ's proficiency with mortar attacks" and noted that "Zarqawi intend[ed] to frighten" Iraqi voters around the time of an election period using "bombings, mortars, rockets, and harassment." *Id.* That report also "acknowledges JTJ's ability to conduct mortar attacks." *Id.*

*Third*, on May 6, 2004, JTJ reportedly claimed responsibility for a mortar attack around Ramadi that killed six Marines. *Id.* at 192. Dr. Gartenstein-Ross and other experts often rely on similar claims from the Zarqawi organization as evidence of the group's responsibility for specific attacks. *Id.*

*Finally*, Iran's material support to JTJ substantially contributed to JTJ's commission of this attack. *See id.* at 192–93 (citing U.S. government and news outlet reporting substantiating Iran's support for the Zarqawi organization and JTJ in Iraq); *see also* Bellwether Liability Op. at 8–10, 85–87 (finding Iran provided material support to JTJ for a May 2004 indirect fire attack and noting that "JTJ has a history of targeting Coalition military bases").

### ii.    *Damages*

#### a.  Elizabeth Jenkins – Spouse of PO2 Robert Jenkins

137

138

Elizabeth requests, and I recommend, that the Court award her an upward departure of $9.5 million in solatium damages.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

### 24.    September 15, 2005 Indirect Fire Attack that Killed U.S. Marine Corps Lance Corporal Shane Swanberg

On September 15, 2005, LCpl Shane Swanberg was serving with Weapons Company, 3rd Battalion, 7th Marine Regiment, 1st Marine Division (at the time, attached to an element of the 2nd Marine Division) at Camp Ramadi in Ramadi, Al Anbar Province. Attribution Report at 194. LCpl Swanberg was at Forward Operating Base ("FOB") Camp Ramadi when the camp came under indirect fire and was attacked by "three 122-millimeter rockets that resulted in three impacts on the base." *Id.* at 189–90. According to a crater analysis, the rockets possibly came from "approximately 8 miles east of the base," and 34 men were detained as a result of the attack. *Id.* at 190. LCpl Swanberg died from the injuries he sustained in the attack, and seven others were wounded. *Id.*

#### i.    Attack Attribution to the Zarqawi Organization

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) very likely committed this indirect fire attack. *Id.* He bases his conclusion on the geographic location and time period of the attack, the TTPs used in the attack, and U.S. government reports suggesting AQI's responsibility. *Id. First*, AQI had a "strong operational presence in Ramadi" at the time of the attack. *Id.* at 195. An AQI leader known as Abu Khattab returned to Ramadi in August 2005 and organized insurgent groups "who all operated in 'at least a tacit alliance with AQI' in a campaign to 'turn Ramadi into another Fallujah [a former AQI stronghold].'" *Id.* To accomplish this campaign, AQI attempted to assassinate the Al Anbar Province governor, which resulted in

139

the deaths of several local sheikhs. *Id.* at 195–96. AQI continued to target the Coalition and government figures and buildings, and was responsible for actual and attempted assassinations of government leaders. *Id.* at 196. AQI also "effectively controlled the activities of seemingly separate insurgent groups in Ramadi at the time of the attack that killed LCpl Swanberg" by directly paying the insurgents to execute attacks. *Id.* By 2006, AQI established "operational dominance in Ramadi" and had "eliminated much of the competing insurgent resistance groups in the Ramadi area." *Id.* This "operational dominance" continued long after the September 2005 attack that killed LCpl Swanberg. *Id.*

*Second*, LCpl Swanberg was killed in an indirect fire attack using 122mm rockets, which is another indicator that AQI was responsible. *Id.* at 197. AQI "regularly used indirect fire to target Coalition bases," and in April 2005, AQI claimed to have perpetrated an attack using "rocket-propelled grenades, small-arms, and mortar fire." *Id.* The group also likely committed a "small arms and rocket fire" attack on a camp in Husaybah. *Id.* Dr. Gartenstein-Ross also notes that the TTPs deployed in the attack that killed LCpl Swanberg were commonly associated with AQI attacks in Ramadi. *Id.* A CENTCOM report noted that in the first half of 2006, AQI and its allies regularly conducted attacks on Coalition and Iraqi forces using IEDs, small arms fire, and indirect fire. *Id.* CENTCOM also noted that AQI fighters in Ramadi during the period of the attack that killed LCpl Swanberg "were armed with . . . 57-122mm rockets." *Id.*

*Third*, Dr. Gartenstein-Ross relies on a U.S. government document published in response to this attack that "specifically identified AQI as the group responsible for the attacks incurred at that time." *Id.* The report further noted that on the day of the attack that killed LCpl Swanberg, the "level of coordination and timing would suggest a high level of capability and planning usually associated with [AQI]." *Id.*

140

*Finally*, Iran's material support to AQI had a reasonable connection to AQI's commission of this attack. *See* Attribution Report at 198–99 (citing U.S. government and media reporting substantiating Iran's support for the Zarqawi organization in Iraq); *see also* Bellwether Liability Op. at 8–10, 85–87 (finding Iran provided material support to the Zarqawi organization for a May 2004 indirect fire attack and noting that the Zarqawi organization "has a history of targeting Coalition military bases").

       ***ii.***     ***Damages***

        **a.  Linda Clanin-Swanberg – Mother of LCpl Shane Swanberg**

141

Linda requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

**25.    October 27, 2005 Indirect Fire Attack that Killed U.S. Marine Corps Lance Corporal Robert Eckfield**

On October 27, 2005, LCpl Robert Eckfield was serving with the 2nd Battalion, 6th Marine Regiment, 2nd Marine Division, II Marine Expeditionary Force in Saqlawiyah, Al Anbar Province. Attribution Report at 199. On the day of the attack, LCpl Eckfield was at a military outpost in Saqlawiyah. *Id*. At approximately 1231 local time, the base was attacked by four 98-millimeter mortar rounds. *Id*. at 199–200. The autopsy report indicates that LCpl Eckfield died of "a penetrating shrapnel wound of the head" from indirect fire, which resulted in a "rapid fatality." *Id*. at 200. One other servicemember was also killed in the attack. *Id*.

Military documents concerning the attack show Coalition forces detained three military-aged males at a U.S.-operated entry control point approximately nine miles southeast of the point of impact. *Id*. A subsequent search of their vehicle revealed logbooks with grids, a 1:100,000 map of Fallujah, a GPS with saved quadrants, and a compass. *Id*.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) very likely committed this indirect fire attack. *Id*. He bases his conclusion on AQI's area of operations dominance at the time of the attack and the TTPs employed to carry out the attack. *Id*. *First*, according to Dr. Gartenstein-Ross, at the time of the attack AQI had a strong operational presence in Fallujah and its outskirts, including Saqlawiyah. *Id*. at 201. Following the Second Battle of Fallujah, many AQI fighters were forced to flee to cities like Saqlawiyah, which became important staging grounds for AQI to launch attacks, kidnappings, and smuggling operations. *Id*. AQI also established a new training camp in the al-Biar village south of Amariyah, a town just 26 miles

south of Saqlawiyah. *Id.* at 202. This camp was used to train the AQI fighters who attacked the U.S. military's Abu Ghraib Prison on April 2, 2005. *Id.* According to Dr. Gartenstein-Ross, AQI maintained a significant presence in Fallujah and the surrounding area as 2005 progressed. *Id.*

*Second*, LCpl Eckfield was killed in an indirect fire attack involving mortars, which is another indicator that AQI was responsible. *Id.* at 203. According to Dr. Gartenstein-Ross, AQI regularly used mortars to target Coalition forces. *Id.* A report from U.S. Central Command stated that proper mortar technique was a doctrinal component of AQI training, and that AQI's regular use of mortar fire in Al Anbar continued throughout 2006, during which time they maintained specialized mortar teams. *Id.* at 204. Based on these factors, it is very likely that the Zarqawi organization, as AQI, carried out the attack that killed LCpl Eckfield.

*Finally*, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 204–205 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); Bellwether Liability Op. at 83–86 (finding Iran liable for Zarqawi organization indirect fire attack on U.S. military base using mortars).

### ii.    *Damages*

#### a.   Virginia Ballestero – Mother of LCpl Robert Eckfield



████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

Virginia requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### b.  Nathan Eckfield – Brother of LCpl Robert Eckfield

████████████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

Nathan seeks, and I recommend, that the Court award him the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c.  Rachel Taylor – Half-Sister of LCpl Robert Eckfield

████████████████████████████████████████████████████████████████

██████████████████████████████████████

144

145

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Rachel requests, and I recommend, that the Court award her an upward departure of 25 percent to $3.125 million in solatium damages. ██████████████

████████████████████████████████████████

145

**d.   Norman Taylor – Half-Brother of LCpl Robert Eckfield**

████████████████████████████████████████████████

███████████████████████████████

Norman requests, and I recommend, that the Court award him the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### E.   Anti-Aircraft Attacks

Anti-aircraft attacks involve the engagement of aircraft, primarily Coalition helicopters, with weapons such as small arms, rocket-propelled grenades ("RPGs"), ant-aircraft guns or artillery, and surface-to-air missiles. Attribution Report at 19. In sanctions designations targeting individuals responsible for fueling the Iraqi insurgency, the U.S. Treasury Department has identified training that the IRGC-Quds Force provided to Iraq-based militants in "firing anti-aircraft missiles." *Id*.

### 26.   November 2, 2005 Anti-Aircraft Attack that Killed U.S. Marine Corps Major Michael Martino

On November 2, 2005, Maj. Michael Martino was the co-pilot of an AH-1W Super Cobra attack helicopter. Attribution Report at 205. He was serving in Marine Light Attack Helicopter Squadron 369 (HMLA-369), Marine Aircraft Group 26, 2d Marine Aircraft Wing, II Marine Expeditionary Force stationed in the vicinity of Ramadi, Al Anbar Province. *Id*. at 205–206. Maj. Martino and his co-pilot were supporting operations by 3rd Battalion, 6th Marine Regiment near the town of Sadah, approximately four miles northeast of Ramadi. *Id*. at 206. While Maj. Martino was "conducting Hellfire missile engagements on enemy positions," enemy forces began engaging his aircraft with small arms fire and rockets. *Id*. A shoulder-fired rocket struck Maj. Martino's Super Cobra helicopter and caused it to crash, killing both Maj. Martino and his co-pilot. *Id*.

In the aftermath of the shootdown, a transport helicopter inserted a team of five Marines as a quick reaction force to secure the crash site while a ground recovery team that had also been sent

147

was intercepted by an IED that detonated and killed the unit's platoon commander. *Id*. Additional reinforcements arrived and engaged with insurgents in the area for several hours while the bodies of Maj. Martino and his co-pilot were extracted. *Id*. Throughout the engagement, an aerial reaction force received small arms fire from multiple directions. *Id*. They were able to positively identify and return fire on several insurgents that had engaged them with an RPK light machine gun and AK-47s. *Id*. In the midst of the fight, another helicopter was fired upon with a rocket of "unconfirmed type," but the rocket missed and the shooter was not positively identified. *Id*. At 1120 local time, as the aerial reaction force continued to receive small arms fire, they detected an insurgent observing their position with binoculars from a building. *Id*. They responded by launching a Hellfire precision guided missile at the building, at which point enemy fire ceased. *Id*.

Intelligence reports later indicated that the attack that downed Maj. Martino's helicopter was coordinated from a house located 300 meters away from the crash site, and that the insurgents in the house were coordinating additional surface-to-air attacks when the house was struck. *Id*. at 207.

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as AQI) very likely committed this anti-aircraft attack. *Id*. He bases his conclusion on AQI's area of operations dominance at the time of the attack, the TTPs employed to carry out the attack, and AQI's claim of responsibility of the attack. *Id*. *First*, following the end of the Second Battle of Fallujah in December 2004, AQI moved their bases of operation to various locations in Al Anbar, including Ramadi. *Id*. at 208. According to Dr. Gartenstein-Ross, by the time this attack occurred, AQI was the dominant insurgent group in Ramadi and its motives aligned with the attack on Maj. Martino's

aircraft. *Id*. AQI remained the dominant insurgent group in Ramadi long after this attack that killed Maj. Martino. *Id*. at 209.

*Second*, Maj. Martino was killed in an anti-aircraft attack involving small arms and surface-to-air missiles, which is another indicator that AQI was responsible. *Id*. According to Dr. Gartenstein-Ross, AQI possessed the materials and training to carry out this type of complex anti-aircraft attack in locations scattered across Iraq. *Id*. According to a report from U.S. Central Command, AQI-associated groups based in Diyala Province received RPG training with AQI members in Al Anbar Province in 2006. *Id*.

*Third*, several news outlets, including *Reuters* and *Agence France-Press*, reported that AQI issued a claim of responsibility for the attack on Maj. Martino's Super Cobra in Ramadi the following day. *Id*. at 209–10. The claim, posted to an Islamist website, reportedly stated that "your brothers in the military wing of the Al-Qaeda Organisation in the Land of the Two Rivers brought down a Super Cobra helicopter in the city of Ramadi with a Strella rocket." *Id*. Based on the foregoing factors, it is very likely that AQI carried out the attack that killed Maj. Martino.

*Finally*, Iran's material support to AQI substantially contributed to AQI's commission of this attack. *See* Attribution Report at 210–11 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); Bellwether Liability Op. at 77–80 (finding Iran liable for Zarqawi organization anti-aircraft attacks on U.S. helicopters using surface-to-air missiles).

### ii.    *Damages*

#### a.  Sybil Martino – Mother of Maj. Michael Martino

██████████████████████████████████████████████

███████████████████████████

149

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██

Sybil requests, and I recommend, that the Court award her the baseline amount of $5 million in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269.

**b.  Robert A. Martino – Father of Maj. Michael Martino**

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

150

███████████████████████████████████████████████

████████████████

Robert requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### c.  Robert M. Martino – Brother of Maj. Michael Martino

███████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

Robert requests, and I recommend, that the Court award him the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

### d.  Lauri Martino Nelson – Sister of Maj. Michael Martino

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

Lauri requests, and I recommend, that the Court award her the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

27.     **February 7, 2007 Anti-Aircraft Attack that Killed U.S. Marine Corps Sergeant Travis Pfister, Sergeant James Tijerina, and Corporal Thomas Saba**

On February 7, 2007, Sgt Travis Pfister, Sgt James Tijerina, and Cpl Thomas Saba were serving in Marine Medium Helicopter Squadron 364 (HMM-364), 3rd Marine Air Wing (3rd MAW). Attribution Report at 212. At 1111 local time on the day of the attack, all three Marines were onboard a CH-46E Sea Knight twin-rotor helicopter flying over the town of Al-Karmah, near the city of Fallujah. *Id.* The helicopter crew was conducting a casualty evacuation mission (CASEVAC) when it was "shot down by hostile fire." Sgt Pfister, Sgt Tijerina, and Cpl Saba—as well as the four other servicemembers in the helicopter—died in the crash. *Id.* Their bodies were later recovered and transported to Camp Fallujah. *Id.*

According to the Operations (Ops) Report, the CH-46E was accompanied by another helicopter from 2nd Marine Aircraft Wing (Forward), whose occupants assisted in the determination that the crash was "the result of anti-aircraft munitions." *Id.* According to a report from U.S. Central Command on the conflict in Anbar province, the CH-46 was likely shot down using a Man-Portable Air-Defense System (MANPAD). *Id.* According to Dr. Gartenstein-Ross, contemporaneous press articles show this crash took place during a significant uptick in effective

152

ground-fire attacks against U.S. helicopters, a phenomenon which was occurring simultaneously across several Iraqi provinces between late January and early February 2007. *Id.*

### i.    *Attack Attribution to the Zarqawi Organization*

Dr. Gartenstein-Ross concludes that the Zarqawi organization (operating as ISI) very likely committed this anti-aircraft attack. *Id.* He bases his conclusion on ISI's area of operations dominance at the time of the attack, the TTPs employed to carry out the attack, and ISI's claim of responsibility of the attack. *Id.* *First*, at the time of the attack, ISI maintained a significant presence in the Al-Karmah area, including Fallujah, which is approximately 17 miles southwest of Al-Karmah. *Id.* at 213. By early 2007, ISI had established operational dominance in Al-Karmah and placed a security emir in Al-Karmah to implement Sharia law in the town. *Id.* at 215. ISI's dominance in Fallujah and Al-Karmah continued until well after this attack. *Id.*

*Second*, Sgt Pfister, Sgt Tijerina, and Cpl Saba were killed in a helicopter shoot down attack involving a MANPAD system, which is another indicator that ISI was responsible. *Id.* According to Dr. Gartenstein-Ross, ISI had access to the training and materials required to conduct attacks with anti-aircraft weapons—specifically SA-7 MANPAD missiles. *Id.* Between October 2006 and November 2008, U.S. and Iraqi forces found at least 35 SA-7 missiles and 83 surface-to-air missiles, along with evidence of ISI forces' training in their use in various places throughout Iraq. *Id.* Beyond MANPADs, ISI also maintained access to RPGs, surface-to-air missiles, 50-caliber machine guns, and other anti-aircraft guns. *Id.* According to a report from U.S. Central Command, ISI-associated groups based in Diyala Province received RPG training with ISI members in Al Anbar Province in 2006, and ISI members brandished RPGs, Soviet surface-to-air missile system rockets, and Dimitrov anti-aircraft guns in October 2006. *Id.* at 215–16.

153

*Third*, U.S. government reporting supports that ISI committed this attack. *Id.* at 217. In a CENTCOM report on the insurgency in Al Anbar, a "reputable source citing credible intelligence" attributes responsibility for the shootdown of a CH-46 helicopter with a MANPAD on February 7 directly to AQI. *Id.*

*Fourth*, ISI issued a claim of responsibility online immediately after the attack and released a video of the helicopter crashing, which was reported by *The New York Times* and the *Guardian.* *Id.* Based on these factors, it is very likely that ISI carried out the attack that killed Sgt Pfister, Sgt Tijerina, and Cpl Saba.

*Finally*, Iran's material support to ISI had a reasonable connection to ISI's commission of this attack. *See* Attribution Report at 218–19 (citing U.S. government reporting substantiating Iran's support for the Zarqawi organization in Iraq); Bellwether Liability Op. at 85–87 (finding Iran liable for Zarqawi organization anti-aircraft attacks on U.S. military base using RPGs, surface-to-air missiles, and anti-aircraft guns).

### ii. Damages

#### a. Anthony Saba Sr. – Father of Cpl Thomas Saba



155

██████████████████████████████████████████████████████

██████████████████████████████████████████

Anthony requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

**b.  Estate of Barbara Saba – Mother of Cpl Thomas Saba**

████████████████████████████████████████████

███████████████████████████     ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  the Estate

of Barbara Saba requests, and I recommend, that the Court award the Estate an upward departure

of 25 percent to $6.25 million in solatium damages.

### c.  Anthony Saba Jr. – Brother of Cpl Thomas Saba

156

Anthony requests, and I recommend, that the Court award him an upward departure of 25 percent to $3.125 million in solatium damages.

158

**d. Mary Ellen Saba – Sister of Cpl Thomas Saba**

Mary requests, and I recommend, that the Court award her an upward departure of 50 percent to $3.75 million in solatium damages.

**e.   Joshua Pfister – Brother of Sgt Travis Pfister**

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████

    ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ Joshua requests, and I recommend, that the Court award him an upward departure of 25 percent to $3.125 million in solatium damages. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

**f.    Lynn Shaw – Sister of Sgt James Tijerina**



Lynn requests, and I recommend, that the Court award her the baseline amount of $2.5 million in solatium damages. *Heiser I*, 466 F. Supp. 2d at 269.

## F.    Attacks in Fallujah and Western Al Anbar Province

### 28.    October 3, 2005 IED Attack that Killed U.S. Army Sergeant Bryan Large in Western Al Anbar

#### i.    *Attack Attribution to the Zarqawi Organization*

I previously recommended that the Court find Iran liable for the October 3, 2005 IED Attack that Killed U.S. Army Sergeant Bryan Large. *See* Dkt. 99, Special Master R. & R. at 47–49, *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. June 26, 2025) (attributing this attack to the Zarqawi Organization (operating as AQI) and finding that "Iran's material support to AQI substantially contributed to AQI's commission of this attack"). On October 14, 2025, the Court issued a memorandum opinion and order finding Iran liable for the attack. Dkt. 104, Sealed Memo. Op. at 6–7 and 8–9 n.3. Plaintiffs now submit a request for Plaintiff Devan Eutin's damages arising from this attack.

#### ii.    *Damages*

163

### a. Devan Eutin – Stepdaughter of Bryan Large

Bryan Large stepped in to raise Devan after her biological father killed himself, raising Devan as his own daughter from the time she was two years old until the day he died 12 years later. *See* Ex. 210, Declaration of Devan Eutin ¶ 2. Bryan was Devan's "hero" because he acted as her father and "treated [Devan] like his own." *Id.* Devan and her dad lived together in the same house until Devan was around ten years old, when her parents separated. *Id.* After her parents separated, Devan and Bryan remained close, and she "still saw [her] dad on weekends and visited him at Fort Bragg during holidays." *Id.*

Bryan had a closed casket funeral after an IED resulted in his body "[coming] home in pieces…severely burnt." *Id.* ¶ 5. Devan was devastated by her father's loss, recalling it as "the worst thing that had ever happened to [her]." *Id.* ¶ 6. Devan's "family was fractured by [her] dad's death" and she started moving around frequently with her mom and sister. *Id.* ¶ 6. Devan felt "adrift, like [she] had no purpose in life." *Id.* ¶ 9. Knowing that the military had given her father the stability he needed to become a better person, Devan followed in Bryan's footsteps and enlisted in the Army at 18 as a medic. *Id.* ¶ 9. Like her father, Devan also deployed to Iraq, and was one of the last of the U.S. forces to leave when the U.S. withdrew. *Id.*

Due to the trauma of her father's death and the stress of her deployment, Devan began drinking. *Id.* She was eventually discharged from the Army due to her alcohol abuse via a general discharge under honorable circumstances. *Id.* She has since been diagnosed with PTSD, depression, and anxiety, resulting in a Veterans Affairs disability rating of 100 percent. *Id.* After her separation from the Army, Devan's drinking problem became worse, and she resorted to "anything to dull the pain." *Id.* ¶ 10. She began abusing drugs and eventually became homeless. *Id.* She was forced to live in a tent under a Los Angeles overpass. *Id.* Around this time, Devan

began using heroin intravenously. *Id.* To fuel her habits and improve her living conditions, Devan became an erotic dancer. *Id.* After more than three years of this, she attempted suicide because she "was so ashamed imagining what [her dad] would think of [her]." *Id.* "In the end, it was [her dad's] memory that brought [Devan] back from the brink of despair," and she has been sober for six years. *Id.* ¶ 11.

Devan's declaration establishes that she is the functional equivalent of Bryan's biological daughter. They shared a close father-daughter relationship from the time she was two until the day he died. *Id.* ¶ 2. She therefore qualifies for solatium damages under the functional equivalency standards. *See Lee v. Islamic Republic of Iran*, 2023 WL 8651039, at *3, *5 (D.D.C. Dec. 7, 2023) (awarding solatium damages to a stepdaughter based on evidence that the relationships were the functional equivalent of a parent and child); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Because the trauma from Bryan's death caused Devan to attempt suicide, suffer from depression, anxiety, and PTSD, abuse alcohol and heroin, resulted in the end of her career in the Army, and contributed to her homelessness, she requests, and I recommend, that the Court award her an upward departure of 50 percent to $7.5 million in solatium damages. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*Est. of Fouty*, 2024 WL 4006166, at *22 (awarding 80 percent upward departure Hilary North because her loved one's killing caused her to develop schizoaffective disorder, become homeless, and "shattered [her] emotionally and psychologically"); *Oveissi I*, 768 F. Supp. 2d at 29–30 (awarding a 50 percent enhancement to the functional equivalent of a son due to his lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); █

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

### 29.   December 1, 2005 IED Attack that Killed U.S. Marine Corps Corporal Anthony McElveen and Lance Corporal John Holmason in Fallujah

#### i.   *Attack Attribution to the Zarqawi Organization*

This Court previously found Iran liable for the December 1, 2005 IED attack that killed U.S. Marine Corps Corporal Anthony McElveen and Lance Corporal John Holmason. Dkt. 74, Special Master R. & R. at 49–52, *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Feb. 25, 2025), *report and recommendation adopted in part and modified in part*, Dkt. 91, No. 1:21-cv-01808 (D.D.C. May 7, 2025) (attributing this attack to the Zarqawi Organization,

operating as AQI, and finding that "Iran's material support to AQI substantially contributed to AQI's commission of this attack") (modified on other grounds).   Plaintiffs now submit Plaintiff Mark Comfort's request for damages arising from this attack.

### ii.    *Damages*

#### a.   **Mark Comfort – Stepfather of John Holmason**

Mark's declaration establishes his father-son relationship with John.  ████████████ ████████████████████████████████████████████████ ████████████████████   He therefore qualifies for solatium damages under the functional equivalency standards.  *See Valore*, 700 F. Supp. 2d at 79–80 (finding a non-adoptive stepfather

entitled to damages where the stepfather considered the victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *Fritz II*, 324 F. Supp. 3d at 62-63 (awarding solatium damages to a stepmother based on evidence that the relationships were the functional equivalent of a parent); *see also Oveissi I*, 768 F. Supp. 2d at 27 ("the interactions . . . were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship").

Mark requests, and I recommend, that the Court award him the baseline amount of $5 million in solatium damages as the functional equivalent of a parent of an attack victim. *Heiser I*, 466 F. Supp. 2d at 269.

## V.    ECONOMIC DAMAGES REQUEST

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat*, 167 F. Supp. 3d at 48 (citing 28 U.S.C. § 1605A(c)). "As a general rule, lost earnings—past and future—are compensable economic damages." *Moradi*, 77 F. Supp. 3d at 71. Economic damages are typically "not hard to quantify," but must be proven with "competent evidence." *Force II*, 617 F. Supp. 3d at 30 (quoting *Moradi*, 77 F. Supp. 3d at 71).

Because her brother's death had a direct impact on her earnings and benefits, Mary Saba seeks economic damages of $2,952,188. Using reasonable assumptions and reliable calculations—based on economic models and government data—experts at the Center for Forensic Economic Studies ("CFES") estimate Mary's lost earnings and benefits, subtracting out taxes and personal maintenances, ranges from $2,496,496 to $2,952,188, differing based on how the Court wishes to calculate expected weekly hours of household services lost. Ex. 209, Expert Damages Report of Chad L. Staller and Stephen M. Dripps for Mary Saba ("Staller Damages Report") at 7.

168

The lower figure presents solely a starting point for further calculation. It is a base value representing one weekly hour of household services lost, which the Court may then multiply by its factual determination of how many hours per week Mary actually lost due to her brother's death. *See id.* at 5. In contrast, the higher value ($2,952,188) requires no further fact-finding by the Court, and instead relies on standardized estimates from the Bureau of Labor Statistics' American Time Use Survey based on Mary's Healthy Life Expectancy, age 75.5. *See id.* at 4–5. If the Court selects this estimate, no additional calculation or individualized determinations are necessary.

Courts have routinely concluded that the estimates used by CFES, including estimates related to lost household services based on American Time Use Survey data, are reasonable, and as a result, Plaintiffs seek the higher end of the range. *See Fritz v. Islamic Republic of Iran,* No. CV 15-456 (RDM), 2018 WL 5046229, at *17 (D.D.C. Aug. 13, 2018), *report and recommendation adopted as modified,* 324 F. Supp. 3d 54 (D.D.C. 2018) (accepting the economic damages report proposed by CFES as "reasonable, consistent with generally accepted practices, and…based on reasonable and well-documented sources" and finding CFES "applied reasonable and generally accepted data on household services."); *Est. of Fouty*, 2024 WL 4006166, at *18 (accepting a CFES household services calculation prepared by Mr. Staller and Mr. Dripps based on the Department of Labor's American Time Use Survey); *Neiberger*, 2022 WL 17370239, at *14 (accepting a CFES economic damages model, deeming such conclusions "reasonable, consistent with generally accepted practices, and calculated using appropriate assumptions based on reasonable and well-documented sources") (quotation marks omitted); *see* Dkt. 66, *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808 (D.D.C. Oct. 29, 2024), at 14–15, *report and recommendation adopted*, Dkt. 71, No. 1:21-cv-01808 (D.D.C. Feb. 25, 2025) (accepting the economic damages model proposed by Mr. Staller and Mr. Dripps, recognizing that "decisions in

this district have regularly approved similar reports from the Center for Forensic Economic Studies" and "once again" qualifying Mr. Staller and Mr. Dripps as experts); *Roth I*, 78 F. Supp. 3d at 405 (same); *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 268 (D.D.C. 2020) (same); *Fritz II*, 324 F. Supp. 3d at 59–60 (same); *Lelchook v. Syrian Arab Republic*, No. 16-1550, 2019 WL 4673849, at *3 (D.D.C. Sept. 25, 2019) (same); *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *8 (D.D.C. Nov. 18, 2019) (same). Plaintiffs, however, do not seek to apply prejudgment interest to these economic damages because the CFES report already includes estimates on present value. Staller Damages Report at 5.

## VI.    CONCLUSION

In accordance with the explanations set forth above, I respectfully recommend that the Court approve the awards set forth in Appendix A against the Islamic Republic of Iran for each of the Plaintiffs addressed in this R & R for a total of $812,049,365 in compensatory damages. Moreover, pursuant to the Court's previous final orders, I also recommend that the Court award punitive damages awards for all Plaintiffs equal to the total compensatory damages awarded, resulting in total damages that are twice the compensatory award. Dkt. 71 at 10; Dkt. 91 at 12.

Date:  October 16, 2025

/s/ Stephen A. Saltzburg
Stephen A. Saltzburg
Special Master

170

### Appendix A – Tranche 1 Eastern Anbar Plaintiff Damages Table

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Proposed Economic Damages | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|---|
| Amy Edgerton-McDonald | Spouse | 12/11/2003 | $10,000,000 | 2.8218 | | $28,218,000 |
| Alyssa Edgerton | Daughter | 12/11/2003 | $6,250,000 | 2.8218 | | $17,636,250 |
| Marshall Hunter Edgerton | Son | 12/11/2003 | $5,000,000 | 2.8218 | | $14,109,000 |
| Stephany Kern | Mother | 11/15/2005 | $6,250,000 | 2.5611 | | $16,006,875 |
| David Schiavoni | Father | 11/15/2005 | $6,250,000 | 2.5611 | | $16,006,875 |
| Sharon Stevens | Mother | 9/12/2004 | $6,250,000 | 2.7334 | | $17,083,750 |
| Samuel Poindexter | Father | 9/12/2004 | $5,000,000 | 2.7334 | | $13,667,000 |
| Robert Poindexter | Brother | 9/12/2004 | $3,125,000 | 2.7334 | | $8,541,875 |
| Travis Westbrook | Brother | 9/12/2004 | $3,750,000 | 2.7334 | | $10,250,250 |
| Renee Amick | Mother | 2/16/2005 | $6,250,000 | 2.6783 | | $16,739,375 |
| Daniel Amick | Stepfather | 2/16/2005 | $6,250,000 | 2.6783 | | $16,739,375 |
| Robert Lee Love Sr. | Sister | 12/1/2006 | $6,250,000 | 2.3694 | | $14,808,750 |
| Evelyn Love Ford | Father | 12/1/2006 | $2,500,000 | 2.3694 | | $5,923,500 |
| Robert Louis Rivera III | Stepbrother | 5/13/2004 | $3,125,000 | 2.7725 | | $8,664,063 |
| Gail Ebert | Father | 9/17/2004 | $6,250,000 | 2.7318 | | $17,073,750 |
| Robert Kaid | Brother | 9/17/2004 | $3,125,000 | 2.7318 | | $8,536,875 |
| Brian Ebert | Brother | 9/17/2004 | $3,750,000 | 2.7318 | | $10,244,250 |
| Sandra Cawvey | Mother | 10/6/2004 | $6,250,000 | 2.7257 | | $17,035,625 |
| Kevin Cawvey Sr. | Father | 10/6/2004 | $6,250,000 | 2.7257 | | $17,035,625 |
| Kevin Cawvey Jr. | Brother | 10/6/2004 | $3,125,000 | 2.7257 | | $8,517,813 |
| Joshua Cawvey | Brother | 10/6/2004 | $2,500,000 | 2.7257 | | $6,814,250 |

171

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Proposed Economic Damages | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|---|
| Bobbie Ann McGowan | Mother | 3/4/2005 | $5,000,000 | 2.6714 | | $13,357,000 |
| Jeanie Kinchen | Mother | 4/4/2005 | $6,250,000 | 2.6580 | | $16,612,500 |
| James Charles Kinchen Jr. | Father | 4/4/2005 | $6,250,000 | 2.6580 | | $16,612,500 |
| Amie Meredith | Sister | 4/4/2005 | $3,125,000 | 2.6580 | | $8,306,250 |
| Jimmie Tyrone Castle | Father | 5/10/2005 | $5,000,000 | 2.6425 | | $13,212,500 |
| Shalonda Johnson | Spouse | 10/10/2005 | $9,000,000 | 2.5766 | | $23,189,400 |
| Leon Johnson Jr. | Son | 10/10/2005 | $5,000,000 | 2.5766 | | $12,883,000 |
| Deionne Johnson | Daughter | 10/10/2005 | $5,000,000 | 2.5766 | | $12,883,000 |
| Doris Hardy | Mother | 10/15/2005 | $5,000,000 | 2.5840 | | $12,920,000 |
| Paulette Martone | Mother | 3/7/2006 | $6,250,000 | 2.5074 | | $15,671,250 |
| Agostine Martone Jr. | Father | 3/7/2006 | $5,000,000 | 2.5074 | | $12,537,000 |
| Marjorie Benson | Mother | 6/17/2006 | $7,000,000 | 2.4551 | | $17,185,700 |
| Steven Benson | Father | 6/17/2006 | $7,000,000 | 2.4551 | | $17,185,700 |
| John Darga | Father | 8/22/2006 | $6,250,000 | 2.4212 | | $15,132,500 |
| Jill Puckett | Mother | 10/9/2006 | $5,000,000 | 2.3966 | | $11,983,000 |
| Ashley Bowman Bellot | Sister | 10/9/2006 | $3,750,000 | 2.3966 | | $8,987,250 |
| Teresa Elrod | Mother | 10/21/2006 | $5,000,000 | 2.3904 | | $11,952,000 |
| Timothy Elrod | Father | 10/21/2006 | $5,000,000 | 2.3904 | | $11,952,000 |
| Kerby Jon Miller | Father | 12/11/2006 | $6,250,000 | 2.3642 | | $14,776,250 |
| Kim Miller | Stepmother | 12/11/2006 | $5,000,000 | 2.3642 | | $11,821,000 |
| Joan Shannon | Mother | 1/30/2007 | $6,250,000 | 2.3395 | | $14,621,875 |
| Donna Opicka | Mother | 4/14/2008 | $5,000,000 | 2.1481 | | $10,740,500 |

172

| Plaintiff | Relation to Victim | Date of Attack | Proposed Solatium Damages | Prejudgment Interest Multiplier | Proposed Economic Damages | Total Compensatory Damages Including Prejudgment Interest |
|---|---|---|---|---|---|---|
| Daniel Opicka | Brother | 4/14/2008 | $2,500,000 | 2.1481 | | $5,370,250 |
| Mary Allen | Mother | 11/14/2008 | $5,000,000 | 2.0862 | | $10,431,000 |
| Elizabeth Jenkins | Spouse | 5/2/2004 | $9,500,000 | 2.7760 | | $26,372,000 |
| Linda Clanin-Swanberg | Mother | 9/15/2005 | $5,000,000 | 2.5873 | | $12,936,500 |
| Virginia Ballestero | Mother | 10/27/2005 | $5,000,000 | 2.5692 | | $12,846,000 |
| Nathan Eckfield | Brother | 10/27/2005 | $2,500,000 | 2.5692 | | $6,423,000 |
| Rachel Taylor | Half-sister | 10/27/2005 | $3,125,000 | 2.5692 | | $8,028,750 |
| Norman Taylor | Half-brother | 10/27/2005 | $2,500,000 | 2.5692 | | $6,423,000 |
| Sybil Martino | Mother | 11/2/2005 | $5,000,000 | 2.5667 | | $12,833,500 |
| Robert A. Martino | Father | 11/2/2005 | $5,000,000 | 2.5667 | | $12,833,500 |
| Robert M. Martino | Brother | 11/2/2005 | $2,500,000 | 2.5667 | | $6,416,750 |
| Lauri Martino Nelson | Sister | 11/2/2005 | $2,500,000 | 2.5667 | | $6,416,750 |
| Anthony Saba Sr. | Father | 2/7/2007 | $5,000,000 | 2.3357 | | $11,678,500 |
| Estate of Barbara Saba | Mother | 2/7/2007 | $6,250,000 | 2.3357 | | $14,598,125 |
| Anthony Saba Jr. | Brother | 2/7/2007 | $3,125,000 | 2.3357 | | $7,299,063 |
| Mary Ellen Saba | Sister | 2/7/2007 | $3,750,000 | 2.3357 | $2,952,188 | $11,711,063 |
| Joshua Pfister | Brother | 2/7/2007 | $3,125,000 | 2.3357 | | $7,299,063 |
| Lynn Shaw | Sister | 2/7/2007 | $2,500,000 | 2.3357 | | $5,839,250 |
| Devan Eutin | Stepdaughter | 10/3/2005 | $7,500,000 | 2.5796 | | $19,347,000 |
| Mark Comfort | Stepfather | 12/1/2005 | $5,000,000 | 2.5542 | | $12,771,000 |
| **Total Compensatory Damages Awards:** | | | $316,250,000 | | | $812,049,365 |

173